# BURSOR & FISHER
### P.A.

**888 SEVENTH AVENUE**
**NEW YORK, NY 10019**
**www.bursor.com**

**YITZCHAK KOPEL**
Tel: **646.837.7127**
Fax: **212.989.9163**
ykopel@bursor.com

January 30, 2018

*Via ECF and U.S. Mail*

The Honorable William H. Pauley III
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *Hart, et al. v. BHH, LLC d/b/a Bell + Howell*, *et al.*, Case No. 15-cv-04804

Dear Judge Pauley:

      I represent Plaintiffs and the certified classes in the above action. I write pursuant to Rule III(A)(ii) of Your Honor's Individual Practices to request a pre-motion conference on Plaintiffs' anticipated Motions to Exclude the Testimony of Defendants' Proffered Experts Philip Whitford and Paul Borth and Rebuttal Expert Stefan Boedeker.

## The Testimony of Dr. Whitford and Dr. Borth Should Be Excluded

      Defendants have designated Dr. Whitford as a rodent expert witness and Dr. Borth as an entomology expert witness to testify regarding the efficacy of the Bell + Howell Ultrasonic Pest Repellers in this case. Whitford and Borth base their opinions that the Pest Repellers work on a series of seven tests performed on the Bell + Howell repellers in China. Borth relies on five of the studies and Whitford relies on the other two. Each of the seven Chinese studies used a similar design in which pests were able to choose between two areas – one with an operational repeller and the other without. Two of the seven studies were conducted in empty Chinese dorm rooms and the remaining five were conducted using a pair of plexiglass cubes (Chamber A with the pest repeller and Chamber B without) connected by a narrow tunnel.

      The myriad of problems with the tests were best noted by Dr. Borth himself, who has years of experience in evaluating the efficacy of insecticides for the Dow Chemical Company:

> Q:    … In the course of your work at Dow, would you have relied on the five Chinese studies that we just discussed in making a determination that the product would be effective inside people's residences?
>
> A:    I would not have relied on those studies solely to fulfill my obligation to Dow.
>
> Q:    Why not?

> A: Because they are – well for the reasons we pointed out. They weren't – they could have been done better. They could have been – or else you have to have other tests that are done, replicated, there's a control, the species [is specified]. I mean for Dow's purposes, this – I would not use these data to make a commercialization decision on ….

Borth Dep. at 179:17-180:13.  This moment of candor describes just some of the fatal flaws present in all of the Chinese tests Defendants' experts are relying on.  The studies did not use proper controls.  *See Steigerwald v. BHH, LLC*, 2016 WL 6962593, at *7 (N.D. Ohio Nov. 29, 2016) (granting motion to exclude testimony of expert witness in Bell + Howell Ultrasonic Repeller case where expert "failed to use a 'control' to determine the ability of the devices to repel ants").  Nor were any of the experiments ever replicated.  *See* Whitford Dep. at 168:1-3 (in order to have an "adequate basis to make [a] claim" experiments need to be "repeated again and again.").  In fact, as Borth testified, the tests could not even be replicated now due to their failure to specify which species of pests (or even the model of repellers) which were tested.  *See* Borth Dep. at 126:2-13 ("Q:  Given that you don't know the species of the pests used, would you be able to replicate this test if you wanted to?  A:  It would be ... coincidence I guess.  … I can certainly tests roaches, I can test ants, and I can test spiders.  Whether they're exactly the same species, we don't know since they – since they didn't say."); *see also Lava Trading, Inc. v. Hardford Fire Ins. Co.*, 2005 U.S. Dist. LEXIS 4566, at *50 (S.D.N.Y. Feb. 14, 2005) ("An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and that estimate must be testable. Someone else using the same data and methods must be able to replicate the result.").

It gets worse.  Both Whitford and Borth agreed that the design and protocol of the tests indicated that they were written by inexperienced people.  *See* Borth Dep. at 99:2-6 ("Q:  Okay, does that make you question the competence of the people running this report …?  A:  It tells me that they were inexperienced in protocol design."); Whitford Dep. at 242:22-23 ("I would say [the design] shows a lack of knowledge about the behavior of animals").  This was evident from several fatal mistakes made in the tests which completely invalidated their results.  First, five of the seven Chinese tests tested multiple critters at the same time.  Two tested mice, spiders, and roaches together.  Another two tested spiders, roaches, and ants together.  And one tested roaches and ants together.  But mice eat spiders and roaches.  And spiders eat roaches and ants.  And Dr. Borth acknowledged that ants and roaches can affect each other's movements.  *See* Borth Dep. at 111:25-112:2 ("Q:  Now, do you agree that ants and roaches can affect each other's movements?  A:  They might.").  Dr. Whitford stated that "the mixing of" animals "is a catastrophic mistake in design" which can render test results "unreliable."  Whitford Dep. 188:5-189:18; *see also* Borth Dep. at 103:17-104:3 ("Q:  Would you agree that it's a confounding variable to place insects together in a chamber where one insect preys upon the other insect?  A:  I would not advise that.  Q:  Would you agree that it's a confounding variable?  A:  It could be ….").  Second, in at least three of the seven tests, the people conducting the test replaced dead critters with new live ones in the middle of the test, and did not bother to record or explain whether the new live ones were placed in the repeller or non-repeller areas of the tests.  *See id.* at 139:22-23 ("Q:  Which chamber were they put it?  A:  It's not readily apparent.").  This was highly improper and made the data from the tests impossible to interpret.  *See* Whitford Dep. 235:23-241:8 (testifying that replacing dead critters with live ones mid-experiment "would not be proper" and that "[a] scrupulous scientist would not" do that); Borth Dep. at ("I would not have done that."). Third, as

to the five Chinese tests utilizing plexiglass tubes connected by a tunnel, the people conducting the tests either explicitly counted pests in the tunnel as being "repelled" or did not specify whether they were doing so. This was also improper. *See* Whitford Dep. at 234:1-9 (pests found in "the tunnel itself should be considered the tunnel" and "should not be considered Chamber B"); Borth Dep. at 254:9-19 ("Q: Having reviewed these publications, would you agree that it's generally accepted in the field as an acceptable practice to not label insects found in the conduit as repelled? A: In these publications that we reviewed today, it appears that way."). It is little wonder that Borth testified these tests could never survive the scrutiny of peer review. *See id.* at 309:19-310:4 ("Q: Do you believe that if submitted for publication in a peer-reviewed journal, the Chinese studies conducted on the Bell + Howell repellers would be potentially selected for publication? A: No. …").

Additional deficiencies beyond the seven Chinese studies are also apparent in their testimony. For example, Dr. Whitford relies on his own testing of another product, the Bird-X Transonic Pro, as basis for his opinion that the Bell + Howell Repellers are efficacious. But that is improper because his report on the Transonic Pro explicitly indicates that the unit was put on a setting which emitted sonic (as well as ultrasonic sound waves), even though the Bell + Howell repellers only emit ultrasonic waves.

Borth and Whitford's expert reports also express numerous inappropriate opinions for which they have neither any qualifications nor basis. This includes opinions regarding the trustworthiness of the testimony of the named Plaintiffs and numerous opinions expressing legal conclusions. *See, e.g.* 10/31/17 Borth Report at 5 ("[i]f a customer does not follow the use instructions … then the customer has defaulted on his/her obligation to use the product in good faith … and therefore must take full responsibility …."). More egregious, Borth purports to provide opinions on how consumers interpret claims on the retail packaging of the Pest Repellers even though he has no educational background in marketing, never held a marketing job, and never even "ask[ed] a single consumer how they understood these claims." *See* Borth Dep. at 307:16-18. These opinions are also improper under the *Daubert* standard.

**Stefan Boedeker's Testimony Should Be Excluded**

Mr. Boedeker's testimony should be stricken because it goes well beyond the scope of proper rebuttal testimony. While Mr. Boedeker is being presented solely to rebut the testimony of Plaintiffs' damages expert, Colin B. Weir, Mr. Boedeker's opinions go well beyond Mr. Weir's damages analysis. In fact, Mr. Boedeker dedicates an entire section of his rebuttal report to "Experimental Testing Supporting Product Effectiveness," something that Mr. Weir does not address at all. At the very least, this section of Mr. Boedeker's report should be stricken.

The rest of Mr. Boedeker's proposed testimony should be excluded as well because it is not sufficiently reliable or relevant to pass muster under FRE 702 and *Daubert*. First, while Mr. Boedeker conducted a regression analysis to quantify the value to consumers of the ancillary features of the Products, his analysis used wholesale rather than retail sales figures and thus does not reflect consumer preferences at all. Moreover, the results his analysis prove rather than rebut Mr. Weir's analysis because they demonstrate that the ancillary features of the Products have no value to consumers or even negative value. Second, Mr. Boedeker's criticism of Mr. Weir's average price calculations is so fundamentally flawed, and based on insufficient data, that it could not possibly be helpful the jury.

BURSOR&FISHER
P.A.

PAGE 4

                                      Very truly yours,

                                      Yitzchak Kopel

CC:    All counsel of record (via ECF)