UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOANNE HART and SANDRA BUENO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>BHH, LLC d/b/a Bell + Howell and VAN HAUSER LLC<br><br>Defendants. | Civ. No. 1:15-CV-04804-WHP |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO PRECLUDE THE REBUTTAL EXPERT
<u>TESTIMONY OF STEFAN BOEDEKER</u>**

Dated: March 9, 2018

**BURSOR & FISHER, P.A.**

Scott A. Bursor
Joshua D. Arisohn
Yitzchak Kopel
888 Seventh Avenue
New York, NY 10019
Telephone: (212) 989-9113
Facsimile: (212) 989-9163
Email: scott@bursor.com
          jarisohn@bursor.com
          ykopel@bursor.com

*Class Counsel*

## TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ........................................................................................................................ 1

LEGAL STANDARD .................................................................................................................. 1

I.     BOEDEKER'S REBUTTAL REPORT INCLUDES NON-REBUTTAL OPINIONS .................................................................................................................... 2

II.    BOEDEKER'S OPINIONS ARE UNRELIABLE ............................................................ 7

      A.     Boedeker's Regression Analysis Is Fundamentally Flawed .................................. 7

      B.     Boedeker's Testimony About Weir's Average Price Calculation Is Fundamentally Flawed ........................................................................................ 11

CONCLUSION ........................................................................................................................... 13

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ................................................................................................ 2

*Astra Aktiebolag v. Andrax Pharms., Inc.*,
  222 F. Sup. 2d 423 (S.D.N.Y. 2002) ................................................................................ 2, 6

*Bourjaily v. United States*,
  483 U.S. 171 (1988) ............................................................................................................ 2

*Campbell v. Metro. Prop. & Cas. Ins. Co.*,
  239 F.3d 179 (2d Cir.2001) ................................................................................................ 2

*Cospelich v. Hurst Boiler & Welding Co., Inc.*,
  2009 WL 8599064 (S.D. Miss. July 7, 2009) ..................................................................... 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ............................................................................................................ 2

*Ebbert v. Nassau Co.*,
  2008 WL 4443238 (E.D.N.Y. Sept. 26, 2008) .................................................................... 2

*Hans v. Tharaldson*,
  2011 WL 6937598 (D.N.D. Dec. 23, 2011) ........................................................................ 2

*In re Digital Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ........................................................................................... 9

*Jorgenson Forge Corp. v. Consarc Corp.*,
  2002 WL 34363668 (W.D. Wash. Jan. 9, 2002) ................................................................. 3

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................................ 2

*Ritch v. AM Gen.'l Corp.*,
  1997 WL 834214 (D.N.H. Nov.17, 1997) .......................................................................... 3

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ....................................................................................... 2, 9

**RULES**

Fed. R. Civ. P. 26(a)(2)(D)(ii) ................................................................................................... 2

Fed. R. Evid. 702 ................................................................................................................. 1, 2

**OTHER AUTHORITIES**

*Reference Guide on Estimation of Economic Damages*,
  2011 WL 7724259 ............................................................................................................. 6, 9

## INTRODUCTION

Defendants BHH, LLC d/b/a Bell + Howell and Van Hauser LLC proffer Stefan Boedeker as an expert witness to rebut the testimony of Plaintiff's damages expert, Colin B. Weir. The Court should strike Mr. Boedeker's proposed testimony on several grounds. First, despite being presented solely as a rebuttal witness, Mr. Boedeker intends to testify on the effectiveness of the Products—something that Mr. Weir does not provide any opinions on at all—and thus goes well beyond the scope of permissible rebuttal testimony. Second, Mr. Boedeker's proposed testimony on the market value of the ancillary features of the Products is inherently unreliable. Despite the fact that retail sales data was available for the Products, Mr. Boedeker conducted a hedonic regression analysis using only wholesale data and thus did not consider what real-world consumers were actually willing to pay for the products. In addition, Mr. Boedeker ignored that, according to his own regression analysis, the ancillary features have no statistically significant impact on the price of the Products, or even a negative impact. Finally, Mr. Boedeker's criticism of Mr. Weir's average price calculations is fundamentally flawed because he does not know how Mr. Weir carried out his calculations and his own calculations are based on insufficient data. For all of these reasons, Mr. Boedeker's proposed testimony should be stricken in full, or at least in part.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert and other scientific or technical expert testimony, and states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

1

>principles and methods, and (3) the witness has applied the
>principles and methods reliably to the facts of the case.

In determining whether expert testimony is admissible under Rules 702 and 403, and the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 (1993) and its progeny, the Court must assume a gatekeeper function to determine whether "the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *accord Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir.2001). Although the Daubert analysis was initially developed to examine scientific testimony, *Daubert* applies with equal force to other types of expert testimony including that of economists. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The proponent of the testimony must establish admissibility by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1988); *Astra Aktiebolag v. Andrax Pharms., Inc.*, 222 F. Sup. 2d 423, 487 (S.D.N.Y. 2002). The Court has broad discretion in determining whether to admit expert testimony. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).

## ARGUMENT

### I. BOEDEKER'S REBUTTAL REPORT INCLUDES NON-REBUTTAL OPINIONS

Federal Rule of Civil Procedure 26(a)(2)(D)(ii) allows for rebuttal evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party. . . ." Accordingly, "a rebuttal report should not extend beyond the scope of the other party's expert reports." *Hans v. Tharaldson*, 2011 WL 6937598, at *10 (D.N.D. Dec. 23, 2011); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) ("A rebuttal expert report is not the proper place for presenting new arguments. . . ."); *Ebbert v. Nassau Co.*, 2008 WL 4443238 at *13-*14 (E.D.N.Y. Sept. 26, 2008) (striking rebuttal expert report containing material that

should have been in initial report); *Jorgenson Forge Corp. v. Consarc Corp.*, 2002 WL 34363668, at *1 (W.D. Wash. Jan. 9, 2002) (excluding rebuttal opinions that went "well beyond the scope of the Plaintiff's expert reports and introduce[d] new opinions"); *Ritch v. AM Gen.'l Corp.*, 1997 WL 834214, at *1 (D.N.H. Nov.17, 1997) ("an expert's rebuttal testimony may not go too far beyond the scope of the report submitted with the original disclosure.").

Here, Defendants present Mr. Boedeker solely to rebut the testimony of Plaintiffs' damages expert, Colin B. Weir:

> Q. Mr. Boedeker, is your understanding that you're serving as a rebuttal witness in this case?
>
> A. That is my understanding, yes.
>
> Q. And you are rebutting the testimony of Mr. Colin Weir; is that right?
>
> A. That is correct.

Kopel Decl. Ex. 21, Boedeker Dep. 21:7-12. Mr. Weir's report is limited to the issue of damages:

> I have been asked by Counsel for Plaintiffs to determine whether it is possible to determine damages in this case on a classwide basis using common evidence and, if so, to provide a framework for and an initial assessment of damages and harm suffered by the Class resulting from the Claim made by Defendants.

Kopel Decl. Ex. 24, Oct. 31, 2017 Weir Rpt. ¶ 4. Nowhere in Mr. Weir's report does he opine on the effectiveness of the Products. In fact, he expressly, and repeatedly, disclaimed providing any opinion on the effectiveness of the Products in this case:

> Q. Did you review any scientific studies with respect to ultrasound pest repellant?
>
> A. By that do you mean their effectiveness?
>
> Q. Yes.

3

> A. Since it's beyond the scope of my retention to evaluate the pest repeller's effectiveness, I did not look at any such studies.
>
> . . .
>
> Q. Did you do anything independently to research whether the devices were ineffective?
> A. That's beyond the scope of my assignment to make that determination, so I did not conduct any further independent research to make a determination as to whether liability should or should not be established in this case.
>
> Q. So, you are not offering an opinion as to whether the devices were, in fact, ineffective, correct?
>
> A. That is correct. I am not offering an opinion one way or the other as to whether the devices are ineffective. My opinions stem from an assumption that Plaintiffs are able to establish their theory of liability, which is the noted first step in a damages analysis. But, as to whether they are successful in that endeavor, I have not offered an opinion one way or the other.
>
> Q. So, you haven't reviewed any studies with respect to the effectiveness of ultrasonic pest repellers, correct?
>
> A. Again, because I'm not offering an opinion as to liability, to the best of my recollection I have not looked at studies as to the effectiveness of pest repellers.
>
> . . .
>
> Q. And you didn't do any other research with respect to the general effectiveness of the ultrasonic pest repellers?
>
> A. Again, because it's beyond the scope of my assignment to determine liability, I did not conduct any additional research to determine whether liability should or should not be established.

Kopel Decl. Ex. 25, Weir Dep. at 43:12-20; 78:2-79:4; 79:14-21.

Despite this, Mr. Boedeker dedicates an entire section of his rebuttal report to "Experimental Testing Supporting Product Effectiveness," something that Mr. Weir does not

4

address at all.  Kopel Decl. Ex. 26, Boedeker Rpt. ¶¶ 23-36.  Among other things, Mr. Boedeker provides the following opinions:

- "The Whitford Report illustrates that the Products do in fact work."  *Id.* ¶ 25.

- "Dr. Borth utilized a well-documented and well-established statistical methodology known as the Chi-Square Test of Independence"  *Id.* ¶ 28.

- "Based on . . . statistical test results, I agree with Dr. Borth's conclusion that 'Based upon the conditions in which the Pest Repellers were used in these five choice experiments and using the data reported in the associated research reports, the Pest Repellers can be classified as "efficacious" with a reasonable amount of certainty, given that efficacy is defined as the affectation of pest behavior such that there is a disproportionate number of pests found in an adjoining arena where there is no Pest Repeller.'"  *Id.* ¶ 34.

- "Further, applying the theory of statistical hypothesis testing to the results from five scientifically designed experiments yield strong statistical evidence to the contrary such that the hypothesis of the products' ineffectiveness must be rejected."  *Id.* ¶ 35.

Of course, none of this has anything to do with Mr. Weir's opinions on the proper measure of damages in this case.

In his rebuttal report, Mr. Boedeker attempts to justify opining on the effectiveness of the Products by stating that "[t]he Weir Report repeatedly asserts that the Product is ineffective and worthless."  *Id.* ¶ 23 (citing Weir Rpt. ¶¶ 3,8 and 11).  But Mr. Weir "asserts" no such thing.  He merely states that he has been "advised that Plaintiffs allege" that "the Products do not repel pests at all, and are ineffective and worthless."  Kopel Decl. Ex. 24, Oct. 31, 2017 Weir Rpt. ¶ 3; *id.* ¶ 8 ("I understand that Plaintiffs allege that the Products at issue in this case are worthless."); *id.* ¶ 11 ("I understand that Plaintiffs assert that the Products do not repel pests, and are thus ineffective and worthless.").  At his deposition, Mr. Weir explained that this is precisely the kind of assumption that a damages expert is required to make:

> Q.    So, in that case your testimony regarding full compensatory damages was based on the assumption that the products were, in fact, ineffective?

5

> A. I don't know if I would state it quite like that. What I would say is that plaintiffs alleged that the products were ineffective and valueless. And the first step in any damages calculation is to assume, depends on which way you want to phrase it, either that plaintiffs established their theory of liability or that defendants are held liable for the alleged behavior.
>
> Q. So, you based your analysis on the allegations in that matter?
>
> A. The reference manual on scientific evidence as it relates to the quantification of damages is crystal clear on that being the very first step that any damages quantifier should take in a contested proceeding such as this.

Kopel Decl. Ex. 25, Weir Dep. at 24:13-25:8. In other words, Mr. Weir is not providing an opinion on the effectiveness of the Products, but rather assuming for purposes of his damages analysis, as he must, that Plaintiffs will be able to prove their case. *See, e.g.*, Reference Manual on Scientific Evidence (3d ed.), Reference Guide on Estimation of Economic Damages, 2011 WL 7724259, at 429 ("Damages quantification operates on the premise that the defendant is liable for damages from the defendant's harmful act."); *id.* at 432 ("The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event."); *id.* ("In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful. Accordingly, throughout this discussion, we assume that the plaintiff is entitled to compensation for losses sustained from a harmful act of the defendant.").

At his deposition, Mr. Boedeker himself acknowledged that Mr. Weir does not provide an opinion on effectiveness, but instead properly assumes that the Products are ineffective as a starting point for his analysis:

> Q. Did Mr. Weir provide any opinions on [the effectiveness of

6

| | | |
|---|---|---|
| | | the Products]? |
| | A. | Mr. Weir -- I wouldn't call it opinion because that was his starting assumption, right.  His starting assumption, he wrote that in his report, but also testified at his deposition that he -- his entire work is based on the assumption of a total worthlessness of the product.  I wouldn't call it an opinion, but I think that's his starting assumption to do his calculations. |
| | Q. | So you take issue with Mr. Weir's starting assumption about the effectiveness of the products? |
| | A. | I mean, I'm not taking issue with him making a starting assumption.  Experts are quite frequently asked to calculate certain scenarios under certain assumptions. |

Kopel Decl. Ex. 21, Boedeker Dep. at 26:2-18.  Accordingly, Mr. Boedeker's opinions regarding the effectiveness of the Products go far beyond the scope of the Weir report and paragraphs 23-36 of his report should be stricken in full.[1]

## II.   BOEDEKER'S OPINIONS ARE UNRELIABLE

### A.   Boedeker's Regression Analysis Is Fundamentally Flawed

Mr. Boedeker argues that a full refund measure of damages is inappropriate in this case because, based on the hedonic regression[2] analysis that he performed, "extra features like safety

---

[1] In any event, Mr. Boedeker is not even qualified to opine on the effectiveness of the Products:

| | | |
|---|---|---|
| | Q. | Are you rebutting any testimony by experts about the effectiveness of the products at issue? |
| | A. | That would be outside my expertise.  I'm not a biologist or a pest control expert, so -- or a technical expert about the product itself, so I would not be testifying about that. |

Kopel Decl. Ex. 21, Boedeker Dep. at 25:5-11.

[2] "Hedonic regression is an econometric model commonly used by economists to quantify the relationship between the price of a product and its attributes, and the technique has a long history in use for determining damages in class action litigation."  Kopel Decl. Ex. 24, Oct. 31, 2017 Weir Rpt. ¶ 20.

7

covers, night lights, and photo cells significantly changed the product prices." Kopel Decl. Ex. 26, Boedeker Rpt. at 22. But two fundamental flaws in Mr. Boedeker's hedonic regression analysis render it an unreliable basis for his opinions.

First, while Plaintiffs contend that a full refund is appropriate because a reasonable consumer would attach no value to a repeller that does not repel—regardless of any additional features—Mr. Boedeker's hedonic regression analysis is based on *wholesale* rather than retail sales figures, and thus does not reflect the preferences of a single real-world consumer.

At his deposition, Mr. Boedeker acknowledged that he used only wholesale data for his regression analysis:

> Q. And so in this SKU tab with the input for your regression analysis, what retail sales data did you include?
>
> . . .
>
> A. This was actually a file that I received from counsel. . . .
>
> Q. Is there any retail pricing data in that SKU tab that we're looking at?
>
> A. This particular tab has wholesale prices in it.
>
> Q. Okay. So the further regression analysis used wholesale prices?
>
> A. Yeah . . . I took the prices here, the wholesale prices that were in the data set.

Kopel Decl. Ex. 21, Boedeker Dep. 116:23-118:4. Mr. Boedeker also acknowledged the inherent irrelevance of wholesale data in determining market pricing for various features:

> Q. Most consumers, they don't pay the wholesale price, they pay a retail price, which is different, right?
>
> A. The retail price, overall, would be different.
>
> . . .

8

> Q.   Are you aware of any consumers paying the wholesale price for the products at issue in this case?
>
> A.   I think I testified earlier that I – I have not seen a single transaction data point.

*Id.* 118:5-24.  In addition, in this case there is such "a disconnect between retail and wholesale pricing" that "measurement of retail value from wholesale prices provides no reliable information about harm done to Class members by Defendants' misrepresentation of the Products."  3/9/18 Weir Decl. ¶ 7.  For instance, as Mr. Weir sets out in declaration, the average markup by Product varies widely in the case, and ranges from 74% to 200%.  *Id.* at ¶ 9, Fig. 1.  Because this "markup is inconsistent across Bell + Howell SKUs," there is little correspondence between the wholesale figures that Mr. Boedeker used in his analysis and actual market prices.  *Id.*  Accordingly, "Mr. Boedeker's hedonic regressions using wholesale prices cannot convey reliable information about the harm done to Class members," and his analysis on this point should be stricken.  *Id.* ¶ 12; *see also, e.g.*, *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 94 (S.D.N.Y. 2017) ("Because Professor Noll assumes despite contrary evidence that the retail price is a linear function of the wholesale price, i.e., that causation runs solely from wholesale prices to retail prices, his finding of a uniform 140% pass-through rate is unreliable."); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) ("At a minimum, however, rebuttal experts must meet Daubert's threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony."); *Cospelich v. Hurst Boiler & Welding Co., Inc.*, 2009 WL 8599064, at *2 (S.D. Miss. July 7, 2009) (excluding testimony where the rebuttal expert failed to employ a reliable methodology).

Second, rather than support his conclusion that the additional features of the repellers have some independent value, Mr. Boedeker's hedonic regression analysis actually confirms

9

Plaintiffs' contention that a full refund is appropriate. As Mr. Boedeker explained during his deposition, "the goal of [his] regression [analysis was] to see if different product features cause the price to change." Kopel Decl. Ex. 21, Boedeker Dep. 109:7-9. Mr. Boedeker's output, however, indicates that the additional features of the Products do not have any independent value. As Mr. Boedeker notes in his report, "P-values 10% or smaller indicate statistical significance." Kopel Decl. Ex. 26, Boedeker Rpt. at 23 n.18. Here, however, almost none of the additional features have a P-value greater than ten according to Mr. Boedeker's own analysis. Others actually have a *negative* impact on the price of the products at issue.

> Q. Here, the impact of the safety cover feature, well, it's negative, right?
>
> A. That's correct, yes.
>
> . . .
>
> Q. So under your log-linear analysis and your linear analysis, the magnetic feature has no statistically significant impact on the sales price of the product, right?
>
> A. Yeah, for the data that I had analyzed, that's correct.
>
> . . .
>
> Q. So under both the log-linear and the linear analysis that you did, the MicroSize feature has an impact that's not statistically significant from zero on the price of the product?
>
> A. That's correct.
>
> . . .
>
> Q. So under both your log-linear and your linear analysis, the outlet feature in the products has an impact on price that's not statistically different from zero; is that correct?
>
> A. That's correct, yeah. That's the correct -- yeah.

> Q. Now, in Table 2, the safety cover has a P value of 8.8 percent; is that correct?
>
> A. That's correct.
>
> Q. And that is statistically significant because it's less than 10 percent?
>
> A. That is correct.
>
> Q. But the impact here is in parentheses, and so it's negative?
>
> A. Yeah. . . .

Kopel Decl. Ex. 21, Boedeker Dep. 162:2-4; 165:4-9; 165:16-20; 165:24-66:13. On top of all of this, Mr. Boedeker conceded that consumers would have no interest in a nightlight attached to a non-functional repeller:

> Q. Based on your common sense, there are very, very few people who are going to go into a store and pay $20 for a repeller with a nightlight that they know won't repel simply because it has a nightlight, right?
>
> . . .
>
> A. Let's put it the other way, if I'm going out to buy a nightlight, I'm probably not going to buy a nightlight with a repeller attached to it. . . .

Kopel Decl. Ex. 21, Boedeker Dep. 178:22-79:9. In other words, a non-functioning repeller has zero value to consumers, even if it has some ancillary feature like a nightlight attached.

Because Mr. Boedeker's opinion that a full refund is not the appropriate measure of damages is belied by his own analysis, his proposed testimony regarding the value of the ancillary features of the Products is unreliable and should be stricken.

### B. Boedeker's Testimony About Weir's Average Price Calculation Is Fundamentally Flawed

Mr. Boedeker's criticism of Mr. Weir's average price calculations is fundamentally flawed because he does not know how Mr. Weir carried out his calculations and his own

calculations are based on insufficient data.

Mr. Boedeker claims that Mr. Weir somehow relied upon an incorrect data set and thereby inflated his damages figures. Kopel Decl. Ex. 26, Boedeker Rpt. ¶¶ 21-22. But Mr. Boedeker never fully explains in his report what mistakes he believed Mr. Weir made. Indeed, at his deposition, Mr. Boedeker conceded that he did not even know what data Mr. Weir relied upon despite the fact that it had been disclosed by Plaintiffs:

> Q. So it's your understanding that the retail sales data that you've relied on in this tab is the only data that Mr. Weir relied on for calculating his averages?
>
> . . .
>
> A. I don't know what he used.
>
> . . .
>
> Q. So it's your understanding that he didn't rely on any other data in calculating his averages, right?
>
> [objection]
>
> A. I don't know. This is the data that I worked with, so I don't know what other data he worked with. . . .

Kopel Decl. Ex. 21, Boedeker Dep. 131:5-25. Mr. Boedeker should not be permitted to criticize Mr. Weir for the data that he used to calculate the average prices of some of the Products when Mr. Boedeker admits that he does not even know what data Mr. Weir actually relied on.

In any event, Mr. Weir relied upon all of the available retail sales data to calculate the average prices of the products. The retail sales data for the Products at issue in this case includes prices matched to specific SKUs and prices that are not be matched to specific SKUs. Accordingly, Mr. Weir calculated the average prices of the Products in the following manner: "For Repellers without SKU-specific information, I applied a state- or nation-wide average price

12

that is derived from **both** SKU-specific sales data, and the retail sales data that reflects sales of Bell + Howell Pest Repellers (but that cannot be tied to any specific SKU)." 3/9/18 Weir Decl. ¶ 20 (emphasis added). Mr. Boedeker, on the other hand, calculated the average prices using **only** the SKU-specific sales data, while omitting all of the unmatched sales data. *Id.* ¶¶ 20-30. The result of ignoring all of this relevant data is that Mr. Boedeker significantly undervalues the damages in this case:

> By omitting a whopping 44% ($1,558,728) of the retail sales data of Pest Repellers sold to California retail customers and 40% ($16,217,980) of the retail sales data of Pest Repellers sold to Nationwide retail customers from his analysis, Boedeker artificially deflates the average retail price of the Products. Boedeker's average prices are skewed downwards, because he ignores the retail sales data for Products that sell at retail prices that are, on average, greater than the prices of the Pest Repellers he included in his calculations.

*Id.* ¶ 21. Accordingly, it is Mr. Boedeker—not Mr. Weir—who seeks to provide the jury with unreliable damages testimony, and such testimony should be stricken in full.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their Motion To Preclude The Rebuttal Expert Testimony Of Stefan Boedeker and strike the testimony of Stefan Boedeker either in whole or in part.

Dated:  March 9, 2018                                Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:     */s/ Yitzchak Kopel*
            Yitzchak Kopel

Scott A. Bursor
Joshua D. Arisohn
Yitzchak Kopel
888 Seventh Avenue
New York, NY 10019
Telephone:  (212) 989-9113

13

Facsimile:  (212) 989-9163
Email:  scott@bursor.com
        jarisohn@bursor.com
        ykopel@bursor.com

*Class Counsel*