**EXHIBIT 1**

Page 1

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4    JOANNE HART and SANDRA          )

5    BUENO, on behalf of             )

6    themselves and all others       )

7    similarly situated,             )

8                    Plaintiffs,     )

9             vs.                    ) No.1:15-CV-04804-WHP

10   BHH, LLC d/b/a BELL +           )

11   HOWELL and VAN HAUSER, LLC,     )

12                   Defendants.     )

13

14

15            Videotaped Deposition of DR. PAUL W.

16   BORTH, called for examination, taken pursuant

17   to the Rules of the United States District Courts,

18   pertaining to the taking of depositions, taken before

19   Lynn A. McCauley, CSR No. 84-003268, RPR, a Certified

20   Shorthand Reporter of the State of Illinois, at

21   33 West Monroe Street, Suite 1100, Chicago, Illinois,

22   on January 16, 2018, at 9:44 a.m.

23

24

25   Pages 1- 313

Page 14

1    and roaches please?                                    09:49
2          A.   That's common -- common nomenclature.      09:49
3               If it requires -- if the answer --         09:49
4    my answer requires that I separate roaches and ants   09:49
5    from spiders, I'll say so.                             09:49
6          Q.   Okay.  Thank you.                           09:49
7               Are you providing any opinion as to         09:49
8    the efficacy of Bell + Howell ultrasonic pest          09:49
9    repellers in repelling and driving out rodents?        09:50
10         A.   No.                                          09:50
11         Q.   Are you an expert on rodents?               09:50
12         A.   No.                                          09:50
13         Q.   Are you an expert on consumer preference?   09:50
14         MR. OSTOJIC:  Object to form, foundation.        09:50
15              But go ahead.                                09:50
16   BY THE WITNESS:                                         09:50
17         A.   No.                                          09:50
18   BY MR. KOPEL:                                           09:50
19         Q.   Are you an expert on marketing?             09:50
20         A.   I've not been employed as a marketer.       09:50
21         Q.   So are you delivering any expert opinions   09:50
22   pertaining to the fields of consumer preference or     09:50
23   marketing in this case?                                09:50
24         A.   Yes, I am, and that goes to my previous     09:50
25   employment under -- or with Dow AgroSciences, the      09:50

Page 15

1    various roles that I held.                          09:50

2         Q.   Okay.  Can you please explain what        09:50

3    opinions you're expressing regarding consumer       09:50

4    preference and marketing?                           09:50

5         A.   They are contained in the report in       09:50

6    various different ways.                              09:50

7              The one that jumps out at me as most      09:51

8    obvious is my opinion on Joanne Hart and Sandra     09:51

9    Bueno's deposition and their use of the devices that 09:51

10   are in question.                                    09:51

11             And then the other piece in the           09:51

12   report that probably goes to your question is the   09:51

13   section on -- that I pulled from Amazon reviews.    09:51

14        Q.   So I know I asked you this before, but I  09:51

15   wasn't entirely clear on the answer.                09:51

16             Are you an expert in marketing?           09:51

17        A.   I have had many jobs within Dow           09:51

18   AgroSciences that -- that required that I interact  09:51

19   with marketers and marketing and the development of 09:51

20   pesticides.                                         09:52

21             Was I ever hired as a marketer,           09:52

22   which you could say would be the -- in the realm of 09:52

23   an expert, I was never hired as an expert in        09:52

24   marketing.                                          09:52

25        Q.   Do --                                     09:52

Page 16

```
 1          A.   I supplemented their work as a technical    09:52
 2    person.                                                09:52
 3          Q.   Do you hold any degrees or certification    09:52
 4    in marketing?                                          09:52
 5          A.   I'm sorry.  I couldn't hear you.            09:52
 6          Q.   Do you hold any degrees or certifications   09:52
 7    in marketing?                                          09:52
 8          A.   No, I do not.                               09:52
 9          Q.   Have you ever taught any courses in         09:52
10    marketing?                                             09:52
11          A.   No, I have not.                             09:52
12          Q.   Have you ever written any publications      09:52
13    concerning marketing?                                  09:52
14          A.   I have written technical -- technical       09:52
15    pieces that were contained in trade magazines, which   09:52
16    could be considered marketing materials for pest --    09:52
17    certain pesticides.                                    09:52
18          Q.   Can you please explain what you mean by     09:52
19    that?                                                  09:52
20          A.   Yeah.                                       09:52
21          Q.   Are you referring to product instructions   09:52
22    or specifications?                                     09:52
23          A.   I am.                                        09:52
24               Both product -- the -- the roles           09:52
25    that I had in Dow AgroSciences required me over the    09:53
```

Page 43

```
 1    two consumers in reaching your conclusions?          10:29
 2         MR. OSTOJIC:  Object.  Form, foundation, and    10:29
 3    mischaracterizes his testimony.                      10:29
 4              Go ahead.                                   10:29
 5    BY THE WITNESS:                                       10:29
 6         A.   Anecdotal evidence is not something I      10:29
 7    would rely on 100 percent.  In the -- but I would    10:29
 8    consider it as the part of the whole -- the whole    10:30
 9    data package, if you will, the whole total data      10:30
10    package.                                              10:30
11    BY MR. KOPEL:                                         10:30
12         Q.   Have you seen reliable evidence that the   10:30
13    Bell + Howell ultrasonic pest repellers are capable  10:30
14    of pest control in a residential environment?        10:30
15         MR. OSTOJIC:  Object.  Asked and answered.      10:30
16              But go ahead.                               10:30
17    BY THE WITNESS:                                       10:30
18         A.   That's a long -- that's a long question.   10:30
19    Can you say it again?                                 10:30
20         MR. KOPEL:  Can you please repeat the           10:30
21    question?                                             10:30
22                        (WHEREUPON, the record was       10:30
23                         read by the reporter.)           10:30
24         MR. OSTOJIC:  Same objections.  Asked and       10:30
25    answered.                                             10:30
```

```
                                                         Page 44

  1                    Go ahead.                          10:30

  2     BY THE WITNESS:                                   10:30

  3          A.   I guess I cannot ask you questions,     10:30

  4     but --                                            10:30

  5          MR. KOPEL:  You can ask for a clarification. 10:30

  6     BY THE WITNESS:                                   10:31

  7          A.   Clarify reliable for me.                10:31

  8     BY MR. KOPEL:                                     10:31

  9          Q.   Well, you just said that -- you -- I    10:31

 10     believe what you just said -- I was using the word 10:31

 11     reliable based on what you said, and -- what I    10:31

 12     believe you said was that anecdotal evidence may be 10:31

 13     considered as part of a whole package, but by itself 10:31

 14     it's not really reliable, so I was using reliable in 10:31

 15     the same context as you.                          10:31

 16          A.   Okay.  So the question again was, as I  10:31

 17     remember it.  Have I seen reliable evidence in a  10:31

 18     consumer --                                       10:31

 19          MR. KOPEL:  Do you want to read back.        10:31

 20          THE WITNESS:  Yeah.  Sorry.                  10:31

 21          MR. KOPEL:  I'll just ask the court reporter 10:31

 22     to please read the question one more time.        10:31

 23          THE WITNESS:  Now that I understand reliable. 10:31

 24          MR. KOPEL:  That's fine.                     10:31

 25
```

Page 45

```
 1                            (WHEREUPON, the record was    10:31
 2                            read by the reporter.)        10:31
 3            MR. OSTOJIC:  Same objections.                10:31
 4    BY THE WITNESS:                                       10:32
 5            A.   No.                                       10:32
 6    BY MR. KOPEL:                                          10:32
 7            Q.   Let's talk about driving pests out of the 10:32
 8    home or out of the building.                           10:32
 9                   Now, when -- in the context of the      10:32
10    Bell + Howell devices, we've got the claim:  Drive     10:32
11    pests out; correct?                                    10:32
12            A.   Yes.                                       10:32
13            Q.   Okay.  What do you interpret that to       10:32
14    mean?                                                   10:32
15            A.   I interpret that to mean that the device   10:32
16    will drive pests out of the range of their hearing or  10:32
17    being exposed to the device.                            10:32
18            Q.   So if pests are inside of -- or            10:32
19    underneath a floor, for instance, or in a crack in a   10:32
20    floor, would that be included?                          10:32
21            MR. OSTOJIC:  Object to form.                   10:32
22    BY THE WITNESS:                                         10:32
23            A.   Included in what?                          10:32
24            MR. OSTOJIC:  What?                             10:32
25            MR. KOPEL:  Sure.  Let me take a step back.     10:32
```

Page 46

```
 1    BY MR. KOPEL:                                       10:33

 2         Q.    If pests in a crack in a floor or       10:33

 3    underneath a floor, then the ultrasonic sound waves 10:33

 4    would not be able to reach them; correct?           10:33

 5         A.    More than likely.                        10:33

 6         Q.    Okay.  So is -- so is that area included 10:33

 7    under your definition of drives pests out?          10:33

 8         MR. OSTOJIC:  Object to form.                  10:33

 9              But go ahead.                             10:33

10    BY THE WITNESS:                                     10:33

11         A.    If it was to drive -- if the ultrasonic  10:33

12    repeller drove pests out of a room, let's say, to   10:33

13    some area where they could not hear or be exposed to 10:33

14    the ultrasonic sound, then the answer is yes; and if 10:33

15    that's behind walls, yes; if that's in cracks, yes;  10:33

16    if it's -- if they can't -- if they're not exposed to 10:33

17    the sound, they can't be repelled.                  10:33

18    BY MR. KOPEL:                                       10:34

19         Q.    Do you think it was -- it is unreasonable 10:34

20    for a consumer to understand drives pests out to mean 10:34

21    drives pests out of the house?                      10:34

22         A.    I do not.                                10:34

23         Q.    You think that is a reasonable            10:34

24    interpretation?                                      10:34

25         A.    I sure do.                                10:34
```

Page 47

| | | |
|---|---|---|
| 1 | MR. OSTOJIC:  Object to form, foundation. | 10:34 |
| 2 | Go ahead. | 10:34 |
| 3 | BY MR. KOPEL: | 10:34 |
| 4 | Q.   Now, have you seen evidence that the | 10:34 |
| 5 | Bell + Howell ultrasonic pest repellers are capable | 10:34 |
| 6 | of driving pest out of a house? | 10:34 |
| 7 | MR. OSTOJIC:  Object to form, foundation. | 10:34 |
| 8 | BY THE WITNESS: | 10:34 |
| 9 | A.   No. | 10:34 |
| 10 | BY MR. KOPEL: | 10:34 |
| 11 | Q.   Same question for a living space. | 10:34 |
| 12 | Have you seen evidence that the | 10:34 |
| 13 | Bell + Howell ultrasonic pest repellers are capable | 10:34 |
| 14 | of driving pests out of a living space? | 10:34 |
| 15 | A.   It would be anecdotal evidence, but I go | 10:35 |
| 16 | back to the Hart and Bueno depositions and assert | 10:35 |
| 17 | that they -- the use of repeller could have been | 10:35 |
| 18 | responsible for what they experienced, what they saw, | 10:35 |
| 19 | the results. | 10:35 |
| 20 | Q.   Have you seen reliable scientific | 10:35 |
| 21 | evidence that the Bell + Howell ultrasonic pest | 10:35 |
| 22 | repellers are capable of driving pests out of a | 10:35 |
| 23 | living space? | 10:35 |
| 24 | A.   No. | 10:35 |
| 25 | Q.   Have you seen evidence that the | 10:35 |

Page 48

1    ultrasonic pest repellers, the Bell + Howell        10:35
2    ultrasonic pest repellers are capable of being       10:35
3    effective beyond a period of nine days?              10:36
4           MR. OSTOJIC:  Object to form.                 10:36
5                    Go ahead.                            10:36
6    BY THE WITNESS:                                      10:36
7           A.   I'm trying to remember the length of time  10:36
8    that the six tests that you referenced were          10:36
9    conducted.                                           10:36
10   BY MR. KOPEL:                                        10:36
11          Q.   Now, this isn't -- it's not a memory     10:36
12   test, so if it helps you answer the question, I'm    10:36
13   happy to mark those as exhibits.                     10:36
14          A.   It would help.                           10:36
15          Q.   Okay.                                    10:36
16          A.   Because I don't know if they were longer  10:36
17   than nine days or not.                               10:36
18          Q.   Perfectly understandable, so let's,      10:36
19   please -- the first thing I'm going to hand you is a  10:36
20   document that was previously marked as Exhibit 13.   10:36
21          MR. OSTOJIC:  Is this 13 on --                10:37
22          MR. KOPEL:  Yes, this was marked as -- I      10:37
23   believe at Mr. Mishan's deposition.                  10:37
24          THE WITNESS:  Okay.  So just to be clear, I'm  10:37
25   only looking at the inspect reports.                 10:37

Page 49

```
 1          MR. KOPEL:  Sure.  And I'm going to hand you      10:37
 2     three -- we're going to mark three additional          10:37
 3     exhibits.                                               10:37
 4               While you're looking that over, I'll          10:37
 5     ask the court reporter to mark three documents.         10:38
 6               The first one is Bates No.                     10:38
 7     Feuerstein 74 through 85.                               10:38
 8               I'll ask the court reporter to                10:38
 9     please mark this as Exhibits Borth -- we're up to 3;   10:38
10     right?  3.                                              10:38
11                         (Whereupon, a certain               10:38
12                          document was marked Borth
13                          Exhibit 3 for
14                          identification.)                   10:38
15          MR. KOPEL:  The second document is Bates Nos.      10:38
16     BHH LLC 1810 through 1815.                              10:38
17               I'll ask the court reporter to mark          10:38
18     that down at Borth Exhibit 4.                           10:38
19                         (Whereupon, a certain
20                          document was marked Borth
21                          Exhibit 4 for
22                          identification.)                   10:38
23          MR. KOPEL:  The third document bears Bates         10:38
24     Nos. BHH LLC 712 through 717, and I'll ask the court   10:38
25     reporter to please mark that as Borth Exhibit 5.       10:38
```

Page 50

```
 1                        (Whereupon, a certain       10:38
 2                        document was marked Borth
 3                        Exhibit 5 for
 4                        identification.)            10:39
 5        MR. OSTOJIC:  Would you go over Exhibits 3, 10:39
 6   4, and 5, the Bates stamp again.                 10:39
 7        MR. KOPEL:  Well, I'll just give them to you 10:39
 8   if that's okay.  Or -- or -- do you have them, Rob? 10:39
 9        MR. OSTOJIC:  Yeah, I have them.            10:39
10        MR. KOPEL:  Yeah, no problem.               10:39
11            So Feuerstein 74 through 85 is Borth    10:39
12   3.                                               10:39
13        MR. OSTOJIC:  Okay.                         10:39
14        MR. KOPEL:  BHH LLC 1810 through 1815 is 4. 10:39
15        MR. OSTOJIC:  Uh-huh.                       10:39
16        MR. KOPEL:  And BHH LLC 712 through 717 is 5. 10:39
17        MR. OSTOJIC:  Got it.  Thank you.           10:39
18        MR. KOPEL:  I'm going to ask the court      10:41
19   reporter to please repeat the question and then we'll 10:41
20   wait for her to catch up with us and you'll give your 10:41
21   answer, please.                                  10:41
22        THE WITNESS:  Okay.                         10:42
23                        (WHEREUPON, the record was
24                        read by the reporter.)
25        THE WITNESS:  Okay.  Could you repeat it one 10:45
```

Page 51

| | | |
|---|---|---|
| 1 | more time, and then I've got an answer. | 10:45 |
| 2 | (WHEREUPON, the record was | 10:45 |
| 3 | read by the reporter.) | 10:45 |
| 4 | MR. OSTOJIC:  Object to form. | 10:45 |
| 5 | Go ahead. | 10:45 |
| 6 | BY THE WITNESS: | 10:45 |
| 7 | A.   I have not. | 10:45 |
| 8 | BY MR. KOPEL: | 10:45 |
| 9 | Q.   Have you seen reliable evidence that the | 10:45 |
| 10 | Bell + Howell ultrasonic pest repellers are capable | 10:45 |
| 11 | of repelling pests in a carpeted room? | 10:45 |
| 12 | A.   No. | 10:46 |
| 13 | Q.   Have you seen reliable evidence that the | 10:46 |
| 14 | Bell + Howell ultrasonic pest repellers are capable | 10:46 |
| 15 | of repelling pests in a room with furniture in it? | 10:46 |
| 16 | MR. OSTOJIC:  Object to form. | 10:46 |
| 17 | Go ahead. | 10:46 |
| 18 | BY THE WITNESS: | 10:46 |
| 19 | A.   No. | 10:46 |
| 20 | BY MR. KOPEL: | 10:46 |
| 21 | Q.   Have you seen reliable evidence that the | 10:46 |
| 22 | Bell + Howell ultrasonic pest repellers are capable | 10:46 |
| 23 | of repelling pests in a room with a bed in it? | 10:46 |
| 24 | A.   No. | 10:46 |
| 25 | MR. KOPEL:  I'll ask the court reporter to | 10:47 |

Page 107

```
 1   BY THE WITNESS:                                    12:17
 2        A.   It could but not --                      12:17
 3   BY MR. KOPEL:                                      12:17
 4        Q.   That wouldn't concern you in the context 12:17
 5   of a test?                                         12:17
 6             MR. OSTOJIC:  Object to form, foundation. 12:17
 7                  But go ahead.                        12:17
 8   BY THE WITNESS:                                    12:17
 9        A.   As I said, I would not have designed an  12:17
10   experiment with -- and put spiders and roaches and 12:17
11   ants in the chamber or the testing arena at the same 12:17
12   time.                                              12:18
13   BY MR. KOPEL:                                      12:18
14        Q.   Okay.  Would you have put roaches and    12:18
15   ants in the same arena at the same time if you had 12:18
16   designed an experiment?                            12:18
17        A.   You know, let me -- let me qualify.      12:18
18             It really depends on the purpose of      12:18
19   the experiment.                                    12:18
20             You could set out a hypothesis where     12:18
21   the purpose of experiment being I want to find out 12:18
22   what happens when ants and roaches are put in the  12:18
23   chamber together.  You'd have to do it that way in 12:18
24   order to answer that question.                     12:18
25        Q.   Sure.                                    12:18
```

Page 111

```
 1    BY MR. KOPEL:                                          12:21
 2         Q.   So in this test they tested the roaches      12:21
 3    and ants in the same chamber at the same time;         12:21
 4    correct?                                               12:21
 5         A.   Well, it appears so, but let me read the     12:22
 6    protocol to make sure that I'm --                      12:22
 7         Q.   That's okay.  If it's helpful you can        12:22
 8    take a look at Page 3 --                               12:22
 9         A.   That would help.                             12:22
10         Q.   -- the second paragraph, the last            12:22
11    sentence of the second paragraph.                      12:22
12         A.   "In order to prevent spiders -- in order     12:22
13    to prevent spiders eat ants and roaches, the testing   12:22
14    will be conducted separately, spiders in one           12:22
15    testing" -- yes, you are right.                        12:22
16         Q.   Okay.  Do you feel comfortable using the     12:22
17    data from the roaches and the ants portion of this     12:22
18    study in rendering an opinion on a home which might    12:22
19    only have ants or only have roaches?                   12:22
20         A.   Yes, I do.                                   12:22
21         Q.   Why?                                         12:22
22         A.   Because -- because I'm presented with        12:22
23    data that show a difference in -- in results when the  12:22
24    repeller is on or off.                                 12:23
25         Q.   Now, do you agree that ants and roaches      12:23
```

Page 112

| | | |
|---|---|---|
| 1 | can affect each other's movements? | 12:23 |
| 2 |     A.   They might. | 12:23 |
| 3 |     Q.  So let's say the ultrasonic technology | 12:23 |
| 4 | was only effective as to roaches or ants, but -- so | 12:23 |
| 5 | under those circumstances wouldn't it be possible | 12:23 |
| 6 | that as a secondary result the one that it is not | 12:23 |
| 7 | effective for would also exhibit movement? | 12:23 |
| 8 |     MR. OSTOJIC:  Object.  Form, foundation, | 12:23 |
| 9 | incomplete hypothetical. | 12:23 |
| 10 |        Go ahead. | 12:23 |
| 11 | BY THE WITNESS: | 12:23 |
| 12 |     A.  Could you repeat that long question? | 12:23 |
| 13 |     MR. KOPEL:  Sure. | 12:23 |
| 14 | BY MR. KOPEL: | |
| 15 |     Q.  Let's say -- let's say that ultrasonic | 12:23 |
| 16 | technology were effective to affect the movement of | 12:24 |
| 17 | roaches and not ants, okay? | 12:24 |
| 18 |     A.  Okay.  Hypothetical. | 12:24 |
| 19 |     Q.  Hypothetical, right. | 12:24 |
| 20 |     Under those circumstances, if you | 12:24 |
| 21 | tested roaches and ants together in the same chamber, | 12:24 |
| 22 | even under this hypothetical where the technology is | 12:24 |
| 23 | not effective towards the ants, you still might see | 12:24 |
| 24 | some increased movement on the part of the ants due | 12:24 |
| 25 | to its effectiveness on the roaches; would that be | 12:24 |

Page 113

| | | |
|---|---|---|
| 1 | correct? | 12:24 |
| 2 | A.   You might. | 12:24 |
| 3 | MR. OSTOJIC:  Object to form, foundation. | 12:24 |
| 4 | Incomplete hypothetical. | 12:24 |
| 5 | But go ahead. | 12:24 |
| 6 | BY THE WITNESS: | 12:24 |
| 7 | A.   You might. | 12:24 |
| 8 | BY MR. KOPEL: | 12:24 |
| 9 | Q.   Okay.  So does that concern you in terms | 12:24 |
| 10 | of extending the data from this test to a situation | 12:24 |
| 11 | where only roaches were present or only ants were | 12:24 |
| 12 | present? | 12:24 |
| 13 | A.   Again, I say not really. | 12:24 |
| 14 | BY MR. KOPEL: | 12:24 |
| 15 | Q.   What species were used in this test? | 12:24 |
| 16 | A.   They do not say. | 12:24 |
| 17 | Q.   Is it important to know what species | 12:25 |
| 18 | there are -- they use? | 12:25 |
| 19 | A.   It would be helpful. | 12:25 |
| 20 | Q.   Is it important? | 12:25 |
| 21 | MR. OSTOJIC:  Object to asked and answered. | 12:25 |
| 22 | But go ahead. | 12:25 |
| 23 | BY THE WITNESS: | 12:25 |
| 24 | A.   Not necessary in my opinion. | 12:25 |
| 25 | | |

Page 126

```
 1    people talk about replications.                       12:40
 2         Q.   Given that you don't know the species of    12:40
 3    tests used, would you be able to replicate this test  12:40
 4    if you wanted to?                                      12:41
 5         MR. OSTOJIC:  Object to form, foundation.         12:41
 6              But go ahead.                                12:41
 7    BY THE WITNESS:                                        12:41
 8         A.   It would be -- it would be coincidence I     12:41
 9    guess.  It would be -- I certainly can test roaches,   12:41
10    I can test ants, and I can test spiders.               12:41
11              Whether they're exactly the same             12:41
12    species, we don't know since they -- since they        12:41
13    didn't say.                                            12:41
14    BY MR. KOPEL:                                          12:41
15         Q.   Well, in common practice and when we talk    12:41
16    about the scientific concept of replication, would be  12:41
17    to use the same species; correct?                      12:41
18         A.   You would want to have anything              12:41
19    identical, yes, replicates should be identical.        12:41
20         Q.   Given that we don't know the model of        12:41
21    pest repeller used here, would that also prevent you   12:41
22    from replicating this test if you wanted to do so?     12:41
23         A.   It depended on what level.                   12:41
24              If you -- if you wanted to test a            12:41
25    Bell + Howell ultrasonic repeller, and your question   12:41
```

Page 138

```
 1        A.   Yes.                                      01:49
 2        Q.   Would it have been improper if they       01:49
 3   hadn't done that?                                   01:49
 4        MR. OSTOJIC:   Object to form.                 01:49
 5   BY THE WITNESS:                                     01:49
 6        A.   Yeah, the word improper, it -- if they   01:49
 7   set a rule in the beginning that says where they're 01:49
 8   going to count something in a -- that's in a tunnel, 01:49
 9   then you abide by the rule.                         01:49
10   BY MR. KOPEL:                                       01:49
11        Q.   Well, do you see the next sentence says,  01:49
12   "Add a new spider, ants, and roaches according to the 01:49
13   quantity of loss the next day."                     01:49
14             Do you see that?                          01:49
15        A.   Yes.                                      01:49
16        Q.   Was that a proper thing for them to do?   01:49
17        A.   I would not have done that.               01:49
18        Q.   Does that call the data that came from    01:49
19   the study into question?                            01:49
20        MR. OSTOJIC:   Object to form, but go ahead.   01:49
21   BY THE WITNESS:                                     01:49
22        A.   I don't think seriously.                  01:49
23   BY MR. KOPEL:                                       01:49
24        Q.   Well, let's take a step back.             01:49
25             When they replaced them, which           01:49
```

Page 139

```
 1    chamber did they put them in?                        01:49
 2         A.   I'd have to assume they put them in the    01:50
 3    one where they were originally released, where they I 01:50
 4    think originally released they said they split them  01:50
 5    50/50, so more than likely they put them back in the 01:50
 6    same way that they introduced the original           01:50
 7    population.                                           01:50
 8         Q.   I -- I don't understand.                   01:50
 9              So, in other words, if you look at         01:50
10    Day 3, right, so it looks like they added three      01:50
11    roaches.  Which chamber were the three roaches added 01:50
12    to?                                                   01:50
13         A.   Wait a minute.  Okay.  Day 3 under         01:50
14    testing, the third --                                01:50
15         Q.   Test Result Day 3, there's a -- at the     01:50
16    bottom of the chart it says, "Quantity of loss."     01:50
17              Do you see that?                           01:50
18         A.   Yes.                                       01:50
19         Q.   So it looks like they put in 3 new         01:50
20    roaches on Day 3; right?                             01:50
21         A.   That's what it looks like, yes.            01:50
22         Q.   Okay.  Which chamber were they put in?     01:50
23         A.   It's not readily apparent.                 01:50
24         Q.   Okay.  Does it matter which chamber they   01:51
25    put them in?                                          01:51
```

Page 146

```
 1   BY THE WITNESS:                                      01:58
 2        A.   They may if they went to university and    01:58
 3   had statistic class.                                 01:58
 4   BY MR. KOPEL:                                        01:58
 5        Q.   Given that there were uncertainties of     01:58
 6   large numbers of new pests added in the middle of the 01:58
 7   test and you don't know what chamber they're added   01:58
 8   to, are you really comfortable relying on this test? 01:58
 9        A.   Yes.                                       01:58
10        MR. OSTOJIC:  Asked and answered.               01:58
11             But go ahead.                              01:58
12   BY THE WITNESS:                                      01:58
13        A.   Yes again.                                 01:58
14   BY MR. KOPEL:                                        01:58
15        Q.   Do you think that this would pass muster   01:58
16   in peer review?                                      01:58
17        MR. OSTOJIC:  Object to form.                   01:58
18             But go ahead.                              01:58
19   BY THE WITNESS:                                      01:58
20        A.   It depends on the peers, it depends on     01:58
21   the publication.                                     01:58
22   BY MR. KOPEL:                                        01:58
23        Q.   Would you have relied on a test like this  01:58
24   in the course of your work at Dow?                   01:58
25        A.   No.                                        01:58
```

Page 147

| | | |
|---|---|---|
| 1 | Q.    Why not? | 01:58 |
| 2 | A.    Too many unanswered questions. | 01:58 |
| 3 | Q.    So why are you more comfortable in the | 01:58 |
| 4 | course of your work here relying on it? | 01:58 |
| 5 | A.    Because the -- I -- because I've worked | 01:59 |
| 6 | with Dow Chemical, I know the rigor with which they | 01:59 |
| 7 | require their data to be obtained and used and | 01:59 |
| 8 | analyzed. | 01:59 |
| 9 | I don't know the rigor from | 01:59 |
| 10 | Bell + Howell case -- or the Bell + Howell culture. | 01:59 |
| 11 | Q.    Was there a reason -- | 01:59 |
| 12 | A.    They're different companies. | 01:59 |
| 13 | Q.    Was there a reason that Dow Chemical had | 01:59 |
| 14 | a heightened -- a very rigorous standard? | 01:59 |
| 15 | MR. OSTOJIC:  Object to form. | 01:59 |
| 16 | Go ahead. | 01:59 |
| 17 | BY THE WITNESS: | 01:59 |
| 18 | A.    Well, I didn't set the standard.  I only | 01:59 |
| 19 | complied with it.  They wanted to reduce variability | 01:59 |
| 20 | and be able to write labels and literature that was | 01:59 |
| 21 | unquestionable. | 01:59 |
| 22 | BY MR. KOPEL: | 01:59 |
| 23 | Q.    Do you agree that had the -- these new | 01:59 |
| 24 | pests been added to Chamber B, that would skew the | 02:00 |
| 25 | test results? | 02:00 |

Page 148

```
 1          A.   Had they been -- yes, but the degree to      02:00
 2     which I don't know.                                    02:00
 3          Q.   Well --                                      02:00
 4          A.   Because the differences are highly           02:00
 5     significant for spiders and -- let's see -- ants       02:00
 6     under Point 1, Probably Point 1; for roaches, highly   02:00
 7     significant; and for the combination of all pests,     02:00
 8     highly significant differences in Chamber A and        02:00
 9     Chamber B.                                             02:00
10          Q.   But you haven't done the calculations to     02:00
11     figure that out; have you?                             02:00
12          A.   I said that what I did was take the          02:00
13     numbers as presented there.  I did not take into       02:00
14     account the quantity lost as they describe it.         02:00
15          Q.   Was that a mistake?                          02:01
16          A.   No.                                          02:01
17          Q.   Now, if you look at roaches, it looks        02:01
18     like they added 12 roaches over the course of the      02:01
19     test.                                                  02:01
20               Do you see that?                             02:01
21          A.   9 plus 3.  Yes.                              02:01
22          Q.   And then they had 16 at the end of the       02:01
23     test.                                                  02:01
24               Do you see that on Day 7?                    02:01
25          A.   Had 16 roaches in Chamber B, yes, I see      02:01
```

| | | |
|---|---|---|
| 1 | Do you see that? | 02:28 |
| 2 | A.   Yes. | 02:28 |
| 3 | Q.   Okay.  Did you do any research into the | 02:28 |
| 4 | speaker size of this model? | 02:28 |
| 5 | A.   Not speaker size, no. | 02:28 |
| 6 | Q.   Did you do any research into whether this | 02:28 |
| 7 | model produced static or frequency -- or variable | 02:28 |
| 8 | outputs? | 02:28 |
| 9 | A.   I read what Mankin said about it. | 02:28 |
| 10 | Q.   Was this the same one he tested? | 02:28 |
| 11 | A.   Yes. | 02:28 |
| 12 | Q.   Given that it has variable outputs, | 02:28 |
| 13 | you're still comfortable extend -- basing your | 02:29 |
| 14 | opinion that even Bell + Howell repellers with static | 02:29 |
| 15 | outputs are effective based on this test? | 02:29 |
| 16 | MR. OSTOJIC:  Object to form. | 02:29 |
| 17 | BY THE WITNESS: | 02:29 |
| 18 | A.   Yes. | 02:29 |
| 19 | BY MR. KOPEL: | 02:29 |
| 20 | Q.   Okay.  And this test was not replicated | 02:29 |
| 21 | to your knowledge; was it? | 02:29 |
| 22 | A.   Not in a true sense that's commonly used | 02:29 |
| 23 | in science, no. | 02:29 |
| 24 | Q.   And all the tests that we've reviewed so | 02:29 |
| 25 | far have not been replicated; correct? | 02:29 |

Page 172

```
 1          A.   Not in the true sense.                    02:29
 2          Q.   Would you have relied on any of these     02:29
 3     tests in the course of your work at Dow when        02:29
 4     evaluating a product?                               02:29
 5          A.   I would.                                  02:29
 6          MR. OSTOJIC:  Objection.  Asked and answered.  02:29
 7               But go ahead.                             02:30
 8     BY THE WITNESS:                                     02:30
 9          A.   I would consider them data.  I don't      02:30
10     throw out data.                                     02:30
11     BY MR. KOPEL:                                       02:30
12          Q.   Okay.  But -- but you never relied on --  02:30
13     take it back.                                       02:30
14               Okay.  Can you please turn to             02:30
15     Page 2?                                             02:30
16          A.   Yes.                                      02:30
17          Q.   Okay.                                     02:30
18          A.   It says here they used granulated sugar   02:30
19     as food.                                            02:30
20               Do you see that?                          02:30
21          MR. OSTOJIC:  Objection.  You looking at the   02:30
22     picture?                                            02:30
23          THE WITNESS:  Yeah, it --                      02:30
24          MR. KOPEL:  I'm sorry.  I meant Page 3.  That  02:30
25     was my mistake.                                     02:30
```

Page 176

1          Q.   And it's possible they're in the chamber        02:34

2    together at the same time that they were -- the --        02:34

3    the spiders, roaches, and ants were affecting each        02:34

4    other's movements within the chambers; correct?        02:34

5          MR. OSTOJIC:  Object to form, foundation.        02:34

6    BY THE WITNESS:        02:34

7          A.   It's possible, yes.  We have no way of        02:34

8    knowing.        02:34

9    BY MR. KOPEL:        02:34

10         Q.   Well, spiders eat roaches; right?        02:34

11         A.   Yes.        02:34

12         Q.   So wouldn't you say it's pretty likely in        02:34

13   that case that the spiders were affecting the        02:34

14   movement of the roaches?        02:34

15         A.   No, I didn't say that --        02:34

16         MR. OSTOJIC:  Objection to form and        02:34

17   foundation.        02:34

18   BY THE WITNESS:        02:34

19         A.   -- I said it's possible.        02:34

20                                                           

21   BY MR. KOPEL:        02:34

22         Q.   But you don't know one way or the other;        02:34

23   right?        02:34

24         A.   I can't prove it one way or the other.        02:34

25         Q.   Do you know one way or the other?        02:34

Page 179

```
 1    not clear.                                              02:52
 2                    Earlier we discussed, you know, that    02:52
 3    Dow had rigorous standards when evaluating efficacy     02:52
 4    of insecticides, that companies differ in terms of      02:52
 5    the standards required.                                 02:52
 6                    Do you recall that?                      02:53
 7         A.   Yes, words to that effect.  I don't know      02:53
 8    that I used the word standards, but, yes, I recall      02:53
 9    the conversation.                                       02:53
10         Q.   Okay.  In the course of your work at Dow,     02:53
11    would you have relied upon the five -- solely upon      02:53
12    the five studies we just examined, that is the five     02:53
13    Chinese studies of the Bell + Howell repellers in       02:53
14    determining that a product was effective?               02:53
15                    You know what.  Let me restate the      02:53
16    question, okay?                                         02:53
17                    In the course of your work at Dow,      02:53
18    would you have relied on the five Chinese studies       02:53
19    that we just discussed in making a determination that   02:53
20    the product would be effective inside people's          02:53
21    residences?                                             02:53
22         MR. OSTOJIC:  Object to form, foundation.          02:53
23                    To the extent you can answer, go        02:54
24    ahead.                                                  02:54
25
```

Page 180

```
 1    BY THE WITNESS:                                        02:54
 2         A.   I would not have relied on those studies     02:54
 3    solely to fulfill my obligation to Dow.                02:54
 4    BY MR. KOPEL:                                          02:54
 5         Q.   Why not?                                     02:54
 6         A.   Because they are -- well, for the reasons    02:54
 7    we pointed out.  They weren't -- they could have been  02:54
 8    done better.  They could have been -- or else you      02:54
 9    have to have other tests that are done, replicated,    02:54
10    there's a control, the species.                        02:54
11              I mean for Dow's purposes, this -- I         02:54
12    would not use these data to make a commercialization   02:54
13    decision on, but I wouldn't discount them either.      02:54
14              I've said that, and I want to make           02:55
15    sure you understand that.  I don't throw data out.     02:55
16              So sole -- the -- solely, no.  In            02:55
17    combination with other things, as many other things    02:55
18    that I can find, they're part of the package.          02:55
19         Q.   Would the totality of the data you've        02:55
20    seen on the effectiveness of the Bell + Howell         02:55
21    repellers, would the totality of that data have been   02:55
22    sufficient for you to commercialize this product for   02:55
23    use in residences with Dow?                            02:55
24         MR. OSTOJIC:  Object to form, foundation, and     02:55
25    irrelevant.                                            02:55
```

Page 181

| | | |
|---|---|---|
| 1 | But go ahead. | 02:55 |
| 2 | BY THE WITNESS: | 02:55 |
| 3 | A.  Well, it's difficult to say because | 02:55 |
| 4 | different -- as I said before, business people are | 02:55 |
| 5 | involved in the decisionmaking at Dow. | 02:55 |
| 6 | If the business leaders saw the data | 02:55 |
| 7 | and agreed that it was sufficient to back up the | 02:56 |
| 8 | claims on the labels, they might have. | 02:56 |
| 9 | Q.  Was it -- and, as I understood it, it was | 02:56 |
| 10 | your job to make -- to make these determinations; was | 02:56 |
| 11 | it not? | 02:56 |
| 12 | A.  That was one of many. | 02:56 |
| 13 | Q.  Okay. | 02:56 |
| 14 | A.  But my -- my opinion carried a lot of | 02:56 |
| 15 | weight. | 02:56 |
| 16 | Q.  Okay.  As to your own purposes, would you | 02:56 |
| 17 | have relied on the totality of the data you've seen | 02:56 |
| 18 | on Bell + Howell repellers to go forward with the | 02:56 |
| 19 | commercialization of the product at Dow? | 02:56 |
| 20 | MR. OSTOJIC:  Object.  Same objections as | 02:56 |
| 21 | before. | 02:56 |
| 22 | THE WITNESS:  As a Dow -- all right.  I have | 02:56 |
| 23 | to ask you to read it back because I think you said | 02:56 |
| 24 | at the end as a Dow employee, so that's -- | 02:56 |
| 25 | MR. KOPEL:  I believe that's what I -- | 02:56 |

Page 182

```
 1        THE WITNESS:  -- different.  Not a          02:56
 2   Bell + Howell employee, a Dow employee.          02:56
 3        MR. KOPEL:  I believe that's what I said, but  02:56
 4   let's --                                         02:56
 5        THE WITNESS:  Okay.                          02:56
 6        MR. KOPEL:  Let's let the court reporter read  02:56
 7   it back, please.                                 02:56
 8                    (WHEREUPON, the record was      02:57
 9                     read by the reporter.)          02:57
10        MR. OSTOJIC:  Same objections.              02:57
11   BY THE WITNESS:                                  02:57
12        A.   All right.  For my own purposes, what do  02:57
13   you mean by that?                                02:57
14   BY MR. KOPEL:                                    02:57
15        Q.   Sure.  I mean in the course of your    02:57
16   professional obligations at Dow.                 02:57
17        A.   Okay.                                  02:57
18             No.                                    02:57
19        Q.   Can you please turn to your initial    02:57
20   report at Page 8?                                02:57
21        A.   Okay.                                  02:57
22        Q.   I'm looking at Opinion 5 and the first  02:58
23   sentence.                                        02:58
24        A.   Oh, sorry.  I'm on the wrong one again.  02:58
25   I pulled the rebuttal.                           02:58
```

Page 200

```
 1    that.                                              03:35
 2                 Okay.  So do you see here in Table 4  03:35
 3    on Page 1029 that Dr. Koehler did not count the    03:35
 4    cockroaches found in the corridor as being in the  03:35
 5    untreated room, he counted them separately?        03:35
 6                 Do you see that?                       03:35
 7         A.   I do.                                     03:35
 8         Q.   Okay.  And -- and you were saying in your 03:35
 9    rebuttal report that it's more appropriate to count a 03:35
10    corridor as being repelled.                         03:35
11                 Do you remember that?                  03:35
12         A.   Well, if you're limiting your categories  03:35
13    to two, yes.  There's always the possibility to add a 03:35
14    third as Dr. Koehler did, corridor or tunnel or     03:35
15    connecting to, and that would have been even better 03:35
16    in my opinion had the researchers done that.        03:35
17         Q.   So what is it that you think they did     03:35
18    incorrectly?                                        03:36
19         A.   I didn't say incorrect.  I just said      03:36
20    would have been more informative --                 03:36
21         Q.   Oh, okay.                                 03:36
22         A.   -- if they had created a third category   03:36
23    called -- like Koehler did -- corridor or connecting 03:36
24    to, number found in connecting to.                  03:36
25         Q.   Okay.  And when you say the researchers,  03:36
```

Page 201

1    are you referring to i2L?                            03:36

2          A.   Yes.                                      03:36

3          Q.   Okay.  Now, wouldn't it be very easy to   03:36

4    deduce how many were in the tube if you just took    03:36

5    them out that were in the treated portion and        03:36

6    untreated portion and then you saw how many were     03:36

7    missing?  Wouldn't you then be able to deduce how    03:36

8    many were in the connecting tube?                    03:36

9          A.   By arithmetic you should be able to do    03:36

10   that.                                                03:36

11         Q.   So you have that information regardless;   03:36

12   isn't that right?                                    03:36

13         A.   You could find -- you could develop that  03:36

14   information.                                         03:36

15         Q.   In any event, Dr. Koehler did not count   03:36

16   the corridor as being repelled; correct?            03:36

17         A.   He treated it as a third category,        03:36

18   just...                                              03:37

19         Q.   So that's a yes, he did not count it as   03:37

20   being repelled; correct?                             03:37

21         A.   He didn't say as such, no.                03:37

22         Q.   And this is a peer-reviewed article;      03:37

23   correct?                                             03:37

24         A.   Yes.                                      03:37

25         Q.   Okay.  So the scientists who reviewed     03:37

Page 247

```
 1    BY MR. KOPEL:                                          05:23

 2         Q.   This issue which you perceive as a          05:23

 3    deficiency survived scrutiny during the peer review   05:23

 4    process; correct?                                     05:23

 5         MR. OSTOJIC:  Same objection.                    05:23

 6    BY THE WITNESS:                                       05:24

 7         A.   Yes.                                         05:24

 8    BY MR. KOPEL:                                          05:24

 9         Q.   Can you please turn to Page 64?             05:24

10         A.   Okay.                                        05:24

11         Q.   Okay.  And I'm looking at the right-hand    05:24

12    column, and there's a sentence starting with the      05:24

13    words, "The remaining."                                05:24

14              Do you see that?                             05:24

15         A.   Yes.                                         05:24

16         Q.   It says, "The remaining cockroaches that    05:24

17    were unaccounted for (not visible) were in the         05:24

18    conduits connecting the enclosures."                   05:24

19              Do you see that?                             05:24

20         A.   I do.                                        05:24

21         Q.   Okay.  So do you understand, based on       05:24

22    this, that the insects found in the corridors were    05:24

23    not counted as repelled in this study?                05:24

24         A.   Based on that sentence, that's what I       05:24

25    would assume.  I -- I did not go through the -- all   05:24
```

Page 248

```
 1    the arithmetic to account for it, but that sentence     05:24
 2    leads me to believe that.                               05:24
 3         Q.   And that aspect of the protocol also was      05:24
 4    necessarily approved through the scrutiny of the peer   05:25
 5    review process; correct?                                05:25
 6         MR. OSTOJIC:  Same objections.                     05:25
 7    BY THE WITNESS:                                         05:25
 8         A.   Yes, I would have disapproved it, but I       05:25
 9    wasn't on the editorial board.                          05:25
10    BY MR. KOPEL:                                           05:25
11         Q.   So we've now seen two peer-reviewed           05:25
12    publications in which the connecting tube was not       05:25
13    counted as repelled; correct?                           05:25
14         A.   Yes.                                          05:25
15         Q.   Can you please take a look at Page 65?        05:25
16         A.   Okay.                                         05:26
17         Q.   And I'm looking at the discussion             05:26
18    portion, the last sentence where the authors conclude   05:26
19    that results from Ballard, et al. in 1984 indicate      05:26
20    that the device could not repel the German cockroach    05:26
21    as sufficiently as an effective best management tool.   05:26
22              Do you see that?                              05:26
23         A.   I see it.                                     05:26
24         Q.   Okay.  And that's the same conclusion         05:26
25    that Dr. Potter reached based on that study; correct?   05:26
```

Page 253

```
 1    chambers."                                          05:33
 2              Do you see that?                          05:33
 3        A.   "The unaccounted cockroaches were          05:33
 4    found" -- yes, I see that.                          05:33
 5        Q.   So do you understand, based on this, that  05:33
 6    in this test the cockroaches found in the conduits  05:33
 7    connecting the chambers were not counted as repelled? 05:33
 8        A.   That's what they said, yes.                05:33
 9        Q.   Okay.  And that point passed scrutiny of   05:33
10    peer review; right?                                 05:33
11        MR. OSTOJIC:  Object to form, foundation.       05:33
12    BY THE WITNESS:                                     05:33
13        A.   Because the peer review panel did not      05:33
14    include me.                                         05:33
15    BY MR. KOPEL:                                       05:33
16        Q.   Now, we've looked at several articles      05:33
17    where they counted the conduit.  They did not count 05:33
18    the con -- let me rephrase.                         05:33
19              We've now looked at several peer-         05:33
20    reviewed articles in which insects found in the     05:34
21    conduit were not labeled as repelled; correct?      05:34
22        A.   Yes.                                       05:34
23        Q.   Okay.  Sitting here today can you name a   05:34
24    single publication in which the insects found in the 05:34
25    conduit were counted as repelled?                   05:34
```

Page 254

```
 1          A.   Do you consider my report to be a         05:34

 2    publication?                                          05:34

 3          Q.   Other than your report, please.            05:34

 4          A.   I can't answer -- I can't ask you          05:34

 5    questions.  Sorry.                                    05:34

 6               I can't today, you know, without           05:34

 7    doing a full literature search, describe or enumerate 05:34

 8    any publication that counted.                         05:34

 9          Q.   Having reviewed these publications, would  05:34

10    you agree that it's generally accepted in the field   05:34

11    as an acceptable practice to not label insects found  05:34

12    in the conduit as repelled?                           05:35

13          MR. OSTOJIC:  Object to form, foundation as     05:35

14    to these publications, and also may call for          05:35

15    speculation.                                          05:35

16               But go ahead.                              05:35

17    BY THE WITNESS:                                        05:35

18          A.    In these publications that we reviewed    05:35

19    today, it appears that way.                           05:35

20    BY MR. KOPEL:                                          05:35

21          Q.   Would you say that based on reviewing      05:35

22    several peer-reviewed publications that did this      05:35

23    practice, that it is a generally acceptable practice  05:35

24    in the field to do it that way?                       05:35

25          A.   Well --                                    05:35
```

Page 267

```
 1                   It's not that it was an invalid        05:50
 2    test, it had the wrong objective as -- as it relates  05:50
 3    to this case in your opinion; correct?               05:51
 4         MR. OSTOJIC:  Same objection.                   05:51
 5                   But go ahead.                          05:51
 6    BY THE WITNESS:                                       05:51
 7         A.   In addition, the harborages protected the  05:51
 8    insects from the ultrasound.                          05:51
 9                   As soon as they stick their little     05:51
10    head outside of that harborage, it's likely that they 05:51
11    were going to be exposed to the ultrasonic.           05:51
12                   So you -- so the fact that the         05:51
13    insects did not move in Dr. Potter's test does not    05:51
14    surprise me, it's what I wrote in my report, because  05:51
15    they were protected.                                  05:51
16    BY MR. KOPEL:                                         05:51
17         Q.   Where do insects typically nest inside of  05:51
18    the house?                                            05:51
19         MR. OSTOJIC:  Object to form, foundation.        05:51
20    BY THE WITNESS:                                       05:51
21         A.   Any place that suits their requirements.   05:51
22    BY MR. KOPEL:                                         05:51
23         Q.   And what's that?                            05:51
24         A.   Usually -- I mean I -- I would -- I would   05:51
25    list -- put a list together.  It would be safety,     05:51
```

Page 268

```
 1    they need food, they need water, and they are born to    05:51
 2    breed.                                                    05:51
 3           Q.    What do you mean by safety?                  05:51
 4           A.    Oh, they feel protected.                     05:52
 5           Q.    So they prefer -- they prefer to nest in     05:52
 6    a place with harborage; correct?                          05:52
 7           A.    Well, cockroaches and ants do, which are     05:52
 8    the case here.                                            05:52
 9           Q.    And those are areas where the -- the         05:52
10    Bell + Howell repellers cannot reach; correct?           05:52
11           A.    Ultrasound cannot reach them.  Clearly       05:52
12    stated on the product literature.                         05:52
13           Q.    Okay.  Let's talk about the pheromones,      05:52
14    please.                                                   05:52
15                 And I -- I suspect that the issue            05:52
16    here is similar to the last one.                          05:52
17                 Would you agree that in a -- in a            05:52
18    residence that has an insect infestation that the        05:52
19    insects would have left pheromones in that house?        05:52
20           MR. OSTOJIC:  Object to form, but go ahead.        05:52
21    BY THE WITNESS:                                           05:52
22           A.    Yes.                                         05:52
23    BY MR. KOPEL:                                             05:52
24           Q.    Okay.  So in that respect would you agree    05:52
25    that the i2L testing was emulative of real-world         05:52
```

Page 274

| | | |
|---|---|---|
| 1 | BY THE WITNESS: | 05:58 |
| 2 | A.   It's not -- I -- the answer -- the short | 05:58 |
| 3 | answer to your question is -- is yes. | 05:58 |
| 4 | But -- but, again, to go back to | 05:58 |
| 5 | the -- the claims on the label of this repeller don't | 05:58 |
| 6 | require that you have harborages or sofas or chairs | 05:59 |
| 7 | or walls. | 05:59 |
| 8 | BY MR. KOPEL: | 05:59 |
| 9 | Q.   So even if the repellers don't work in an | 05:59 |
| 10 | environment where you have all the furniture you just | 05:59 |
| 11 | mentioned, the claims would still be correct because | 05:59 |
| 12 | the packaging does not mention those items; is that | 05:59 |
| 13 | what you're saying? | 05:59 |
| 14 | A.   That's -- | 05:59 |
| 15 | MR. OSTOJIC:  Object to form, foundation, | 05:59 |
| 16 | incomplete hypothetical, misstates the evidence. | 05:59 |
| 17 | But go ahead. | 05:59 |
| 18 | BY THE WITNESS: | 05:59 |
| 19 | A.   That's what I'm saying. | 05:59 |
| 20 | BY MR. KOPEL: | 05:59 |
| 21 | Q.   Can we talk about the starvation concept | 05:59 |
| 22 | that you're talking about on Page 8 here. | 05:59 |
| 23 | Is it your contention that the | 05:59 |
| 24 | repellers would be less likely to have a repellent | 06:00 |
| 25 | effect if insects are satiated? | 06:00 |

Page 307

| | | |
|---|---|---|
| 1 | BY THE WITNESS: | 06:47 |
| 2 | A.   I -- I -- indirectly, yes. | 06:47 |
| 3 | Indirectly with the Amazon review | 06:47 |
| 4 | that I did before, that I talked about before. | 06:47 |
| 5 | BY MR. KOPEL: | 06:47 |
| 6 | Q.   Okay.  But did the Amazon reviews say | 06:47 |
| 7 | what the consumers thought the claims meant? | 06:47 |
| 8 | A.   No, they do not -- I don't know whether | 06:47 |
| 9 | they say it or not.  They're taking their whole | 06:47 |
| 10 | experience and lumping it into a one of five star | 06:47 |
| 11 | rating. | 06:47 |
| 12 | And their experiences have to | 06:47 |
| 13 | include that they got a package that had these kind | 06:47 |
| 14 | of words on it, and they got a user manual that said | 06:47 |
| 15 | this. | 06:47 |
| 16 | Q.   Did you ask -- ever ask a single consumer | 06:47 |
| 17 | how they understood these claims? | 06:47 |
| 18 | A.   No. | 06:47 |
| 19 | Q.   What if I told you that the Amazon rating | 06:47 |
| 20 | for this product is below average, would that change | 06:48 |
| 21 | your opinion? | 06:48 |
| 22 | A.   You already asked that question, and I | 06:48 |
| 23 | said I would -- I would certainly -- | 06:48 |
| 24 | Q.   I think I -- I think I -- you might have | 06:48 |
| 25 | misunderstood what I was saying.  I'm sorry to cut | 06:48 |

Page 309

```
 1   BY MR. KOPEL:                                        06:49
 2        Q.   Have you seen any evidence that the        06:49
 3   ultrasonic waves emitted by the Bell + Howell        06:49
 4   repellers are capable of reaching pest in a room that 06:49
 5   contains furniture?                                  06:49
 6        MR. OSTOJIC:  Objection.  Asked and answered    06:49
 7   and may call -- and foundation.                      06:49
 8              Also incomplete hypothetical to type      06:49
 9   of furniture, where it's located.                    06:49
10              Go ahead.                                 06:49
11        MR. KOPEL:  That's called witness coaching.     06:49
12   Please stop that.                                    06:50
13   BY THE WITNESS:                                      06:50
14        A.   I've not seen Bell + Howell --            06:50
15   Bell + Howell devices tested in rooms that have      06:50
16   furniture or carpeting.  Though it still doesn't     06:50
17   change my opinion.                                   06:50
18   BY MR. KOPEL:                                        06:50
19        Q.   Do you believe that if submitted for       06:50
20   publication in a peer-reviewed journal, the Chinese  06:50
21   studies conducted on the Bell + Howell repellers     06:50
22   would be potentially selected for publication?       06:50
23        MR. OSTOJIC:  Objection.  Asked and answered    06:50
24   like two to three hours ago.                         06:50
25              Common, we got to move on to other        06:50
```

Page 310

```
 1    things.  We're just repeating the same questions.      06:50
 2              But go ahead and answer it again.            06:50
 3    BY THE WITNESS:                                        06:50
 4         A.   No, that wasn't the purpose of their         06:50
 5    studies.  Feuerstein said that.  It did not want to    06:50
 6    publish.                                               06:50
 7         MR. KOPEL:  All right.  I have no further          06:50
 8    questions.                                             06:50
 9         MR. OSTOJIC:  We're going to reserve               06:50
10    signature.                                             06:50
11         THE VIDEOGRAPHER:  The time it now 6:53 p.m.       06:51
12    This is the end of Media No. 5.  This concludes this   06:51
13    deposition.                                            06:51
14              We're off the record.                        06:51
15         MS. REPORTER:  Are you ordering the                06:51
16    transcript at this time?                               06:51
17         MR. KOPEL:  Not at this time.                      06:51
18              Do you know pricing?  Can I look at           06:51
19    pricing?  I'm going to have my office contact          06:51
20    Veritext in regards to ordering.                       06:51
21         MS. REPORTER:  Would you like a copy if it's       06:51
22    ordered?                                               06:51
23         MR. OSTOJIC:  I will not need one now; but         06:51
24    obviously if the plaintiff orders one, please contact  06:51
      me, I will probably get a copy.                        06:51
25    (Whereupon, at 6:53 p.m. the deposition was concluded.)
```