EXHIBIT B

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3

4    JOANNE HART and SANDRA          )

5    BUENO, on behalf of             )

6    themselves and all others       )

7    similarly situated,             )

8                   Plaintiffs,      )

9              vs.                   ) No.1:15-CV-04804-WHP

10   BHH, LLC d/b/a BELL +           )

11   HOWELL and VAN HAUSER, LLC,     )

12                   Defendants.     )

13

14

15           Videotaped Deposition of DR. PAUL W.

16   BORTH, called for examination, taken pursuant

17   to the Rules of the United States District Courts,

18   pertaining to the taking of depositions, taken before

19   Lynn A. McCauley, CSR No. 84-003268, RPR, a Certified

20   Shorthand Reporter of the State of Illinois, at

21   33 West Monroe Street, Suite 1100, Chicago, Illinois,

22   on January 16, 2018, at 9:44 a.m.

23

24

25   Pages 1- 313

                                         Page 1

<div style="columns:2">

1 PRESENT:
2     BURSOR & FISHER, P.A., by
      MR. YITZCHAK KOPEL AND
3     MR. ALEC LESLIE
      888 Seventh Avenue
4  New York, New York 10019
      646-837-7127
5     ykopel@bursor.com
      aleslie@bursor.com
6         Appeared on behalf of Plaintiffs;
7
          and
8
9     LEAHY, EISENBERG & FRAENKEL, LTD., by
      MR. ROBERT OSTOJIC AND
10    MR. ADAM H. MC CABE
      33 West Monroe Street, Suite 1100
11 Chicago, Illinois 60603
      312-368-4554
12    ro@lefltd.com
      ahm@lefltd.com
13        Appeared on behalf of Defendants.
14
15 ALSO PRESENT:
16    MR. SCOT ZIARKO, Videographer.
17
18
19
20
21
22
23
24
25

Page 2

</div>

1           I N D E X
2 WITNESS:
   DR. PAUL W. BORTH
3
   EXAMINATION BY:              PG   LN
4  MR. KOPEL            6   7
   MR. OSTOJIC        290   3
5  MR. KOPEL          304   6
6
   EXHIBITS:      DESCRIPTION     PG   LN
7  Exhibit 1   Defendants' Expert   11   6
               Disclosure
8  Exhibit 2   Defendants' Expert   11   23
               Witness Rebuttal to
9              Plaintiffs' Expert
               Report
10 Exhibit 3   Feuerstein 74      49   13
               through 85
11 Exhibit 4   BHH, LLC 1810      49   21
               through 1815
12 Exhibit 5   BHH, LLC 712 through  50   3
   717
13 Exhibit 6   Deposition         52   5
               Transcript of Debbie
14             Feuerstein
   Exhibit 7   Expert Disclosure in  184   10
15             the case of Deborah
               Galoski, Plaintiff,
16             versus Stanley
               Black & Decker,
17             Inc., et al.,
               Defendants
18 Exhibit 8   Efficacy of        186   24
               Ultrasound for
19             German Cockroach and
               Oriental Ant Flea
20 Exhibit 9   Deposition         212   19
               Transcript of Paul
21             W. Borth in Golaski
               v. Applica Consumer
22             Products
   Exhibit 10  Laboratory and Field  229   20
23             Trials with
               Commercial
24             Ultrasonic Devices
               Against Three Ant
25             Species

Page 3

1 Exhibit 11  Lack of Repellency   243   10
               of Three Commercial
2              Ultrasonic Devices
               to the German
3              Cockroach
   Exhibit 12  Responses of        251   18
4              Mosquitoes and
               German Cockroaches
5              to Ultrasound
               Emitted from a
6              Random Ultrasonic
               Generating Device
7 Exhibit 13  Defendants'         289   25
               Disclosure of
8              Retained Experts
   Exhibit 14  Copy of             293   10
9              Bell + Howell
               Packaging and
10             Owner's Manual
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1         THE VIDEOGRAPHER:  Good morning.  We are now    09:33
2 on the record.                        09:41
3         My name is Scot Ziarko.  I'm the    09:41
4 videographer representing Veritext Legal Solutions.    09:41
5         Today's date is January 16, 2018.    09:41
6 The time is now approximately 9:44 a.m.    09:41
7 This deposition is being held at    09:41
8 33 West Monroe Street, Chicago, Illinois.    09:41
9         The caption of this case is Joanne    09:41
10 Hart versus BHH, LLC.    09:41
11        The name of the witness today is    09:41
12 Dr. Paul Borth.    09:41
13        Our court reporter is Lynn McCauley    09:41
14 also with Veritext Legal Solutions.    09:42
15        Will counsel please identify    09:42
16 yourselves for the record, and will the court    09:42
17 reporter please swear in the witness.    09:42
18    MR. KOPEL:  Yitzchak Kopel, Bursor & Fisher,    09:42
19 representing plaintiffs in the certified classes.    09:42
20        With me here today is my colleague,    09:42
21 Alec Leslie.    09:42
22    MR. OSTOJIC:  Robert Ostojic, O-s-t-o-j-i-c,    09:42
23 on behalf of the defendant, BHH, LLC, doing business    09:42
24 as Bell + Howell; and with me is Adam McCabe.    09:42
25        (WHEREUPON, the witness was

Page 5

2 (Pages 2 - 5)

**Page 6**

```
 1              duly sworn.)              09:42
 2      THE VIDEOGRAPHER:  You may begin.      09:42
 3      DR. PAUL W. BORTH
 4  called as a witness herein, having been first duly
 5  sworn, was examined and testified as follows:
 6              EXAMINATION
 7  BY MR. KOPEL:
 8      Q.  Good Morning, Dr. Borth.        09:42
 9      A.  Good morning.              09:42
10      Q.  Can you please state your name and     09:42
11  address for the record.              09:42
12      A.  Dr. Paul W. Borth.  Address, 10255 Fox   09:42
13  Trace, Zionsville, Indiana 46077.        09:42
14      Q.  And that's your residential address;   09:42
15  correct?                        09:42
16      A.  Yes.                  09:42
17      Q.  Can you please state your business   09:42
18  address?                        09:42
19      A.  Business address is the same, 10255 Fox   09:42
20  Trace, Zionsville, Indiana 46077.        09:43
21      Q.  Okay.  So you have an office inside your   09:43
22  home?                        09:43
23      A.  Yes.                  09:43
24      Q.  I know we had met off the record, but let   09:43
25  me please formally introduce myself.      09:43
```

**Page 7**

```
 1          My name is Yitzchak Kopel.  I'm a   09:43
 2  lawyer.  I represent the plaintiffs in the certified   09:43
 3  classes in a class action lawsuit against BHH, LLC   09:43
 4  and Van Hauser, LLC.              09:43
 5          I'll be asking you some questions   09:43
 6  today in connection with that lawsuit.      09:43
 7          Do you understand that?      09:43
 8      A.  I do.                  09:43
 9      Q.  And you understand that you're not being   09:43
10  sued; right?                    09:43
11      A.  Yes.                  09:43
12      Q.  Okay.  Have you ever sat for a deposition   09:43
13  before?                        09:43
14      A.  Yes.                  09:43
15      Q.  How many times?              09:43
16      A.  One.                  09:43
17      Q.  And was that in connection with the   09:43
18  Black & Decker lawsuit?              09:43
19      A.  Yes.                  09:43
20      Q.  Other than that, have you ever sat for a   09:43
21  deposition?                    09:43
22      A.  No.                  09:43
23      Q.  Have you ever testified at trial?      09:43
24      A.  No.                  09:43
25      Q.  Have you ever been a party to a lawsuit?   09:43
```

**Page 8**

```
 1      A.  Many years ago I was involved in a car   09:43
 2  accident that I was the driver, and somebody sued me   09:43
 3  for hitting them in the back rear end.      09:44
 4      Q.  Okay.  And there was -- your deposition   09:44
 5  was not taken in that case?            09:44
 6      A.  No.  It was settled by the insurance   09:44
 7  company.                        09:44
 8      Q.  Any other lawsuits to which you were a   09:44
 9  party?                        09:44
10      A.  No.                  09:44
11      Q.  Have you ever been convicted of a crime?   09:44
12      A.  No.                  09:44
13      Q.  Before we continue, I'd like to please   09:44
14  discuss some ground rules for today.      09:44
15          You understand that you're      09:44
16  testifying under oath today?            09:44
17      A.  Yes.                  09:44
18      Q.  You understand that you have the same   09:44
19  obligation to tell the truth here today as you would   09:44
20  if you were testifying in a courtroom before a judge   09:44
21  and a jury?                    09:44
22      A.  Yes.                  09:44
23      Q.  It's important that we communicate   09:44
24  clearly today.  I'm going to ask you several   09:44
25  questions in connection with this case.      09:44
```

**Page 9**

```
 1          If you don't understand a question,   09:44
 2  please let me know, and I will try to clarify it for   09:44
 3  you.  Okay?                    09:44
 4      A.  Yes.                  09:44
 5      Q.  You understand you're being represented   09:44
 6  here today by counsel who's sitting right next to   09:44
 7  you?                        09:44
 8      A.  Yes.                  09:44
 9      Q.  Today's deposition is being videotaped.   09:44
10          Do you understand that?      09:44
11      A.  Yes.                  09:44
12      Q.  Do you understand that there is a court   09:44
13  reporter here today.  The court reporter is      09:44
14  transcribing everything we say for the record?   09:44
15      A.  Yes.                  09:44
16      Q.  So let's please try to speak at a   09:44
17  reasonable pace to help the court reporter take down   09:45
18  our words.                    09:45
19          Will you help me with that?      09:45
20      A.  I will try.                  09:45
21      Q.  It's difficult for the court reporter if   09:45
22  we talk over each other, so I'm going to try my very   09:45
23  best to not interrupt you while you're answering my   09:45
24  questions, and I'm going to ask that you please try   09:45
25  to let me finish my questions before you begin your   09:45
```

1  answers.  Okay?                              09:45
2     A.  Yes.                                  09:45
3     Q.  Also, for the benefit of the court        09:45
4  reporter, please try to answer all of my questions    09:45
5  verbally, which means you cannot nod your head or say  09:45
6  things like uh-huh because those are impossible for    09:45
7  the court reporter to transcribe.              09:45
8            (WHEREUPON, there was a
9            brief interruption.)
10  BY MR. KOPEL:
11    Q.  Did you get that question?              09:45
12    A.  I understand the basis of it.  Yes, I       09:45
13  understand.                                09:45
14    Q.  Okay.  Is there any reason that you        09:45
15  cannot testify truthfully and accurately today?     09:45
16    A.  No.                                  09:45
17    Q.  Are you taking any prescription          09:45
18  medications or other drugs that may affect your      09:45
19  ability to think or remember or testify truthfully    09:46
20  today?                                     09:46
21    A.  No.                                  09:46
22    MR. KOPEL:  I will ask the court reporter to    09:46
23  please mark as Exhibits Borth 1 and 2 two documents.  09:46
24        The first one is titled,              09:46
25  "Defendants' Expert Disclosures."              09:46
                                          Page 10

1        The second one is titled,              09:46
2  "Defendants' Expert Witness Rebuttal to Plaintiffs'    09:46
3  Expert Report."                             09:46
4            (Whereupon, a certain            09:46
5            document was marked Borth
6            Exhibit 1 for
7            identification.)                  09:46
8     MR. KOPEL:  Can you please hand those to the    09:46
9  witness.                                   09:46
10  BY MR. KOPEL:                               09:46
11    Q.  Dr. Borth, do you have Exhibit 1?         09:46
12    A.  I do.                                09:46
13    Q.  Have you seen it before?               09:46
14    A.  I have.                              09:47
15    Q.  What is it?                           09:47
16    A.  Defendants' Expert Disclosure prepared by   09:47
17  Mr. Paul W. Borth, BCE.                       09:47
18    Q.  So this is your expert report in this      09:47
19  case?                                      09:47
20    A.  Yes, it is.                           09:47
21            (Whereupon, a certain
22            document was marked Borth
23            Exhibit 2 for
24            identification.)
25  BY MR. KOPEL:                               09:47
                                          Page 11

1     Q.  Do you have Exhibit 2?                  09:47
2     A.  I do.                                09:47
3     Q.  Have you seen it before?               09:47
4     A.  I have.                              09:47
5     Q.  What is it?                           09:47
6     A.  Defendants' Expert Witness Rebuttal to     09:47
7  Plaintiffs' Expert Report.                      09:47
8     Q.  Okay.  And this is your rebuttal expert    09:47
9  report in this case?                          09:47
10    A.  It is.                               09:47
11    Q.  Have you submitted any other expert        09:47
12  testimony in this case so far?                 09:47
13    A.  No.                                  09:47
14    Q.  Do these reports contain a complete        09:47
15  statement of all opinions you will express and the    09:47
16  basis and reasons for them?                    09:47
17    A.  They include what I had at the time that   09:47
18  the report was written.  Subject to that, I       09:47
19  understand some of the things have been supplied that  09:47
20  were not available when these were written.       09:47
21    Q.  Okay.  And you've reviewed additional      09:48
22  materials since they were written?             09:48
23    A.  Yes.                                 09:48
24    Q.  Have the additional materials that you've   09:48
25  reviewed changed anything -- changed your opinions on  09:48
                                          Page 12

1  any matters contained within those reports?         09:48
2     A.  No, they serve to reinforce it.          09:48
3     Q.  What was your assignment in this case?      09:48
4     A.  It would be best if I could read the       09:48
5  purpose --                                 09:48
6     Q.  Go ahead.                            09:48
7     A.  -- of the reason I was retained.          09:48
8        So this is included in my               09:48
9  Defendants' Expert Disclosure.                 09:48
10       "This document was prepared to           09:48
11  evaluate the research reports that BHH, LLC and     09:48
12  Van Hauser, LLC used to support the entomological    09:48
13  claims made on and in the packaging and owner's     09:48
14  manual of various of its ultrasonic pest repeller    09:48
15  products."                                 09:49
16       That's the basis, the primary           09:49
17  purpose.                                   09:49
18    Q.  Okay.  Are you providing an opinion as to   09:49
19  the efficacy of the Bell + Howell ultrasonic pest    09:49
20  repellers in driving out and repelling insects?     09:49
21    A.  Yes.                                 09:49
22    Q.  Are -- and can we agree for today -- I      09:49
23  understand that this isn't completely scientifically   09:49
24  accurate -- but can we agree for today that if I say   09:49
25  the word insects, I am referring to ants, spiders,    09:49
                                          Page 13

4 (Pages 10 - 13)

**Page 14**

1  and roaches please?                                09:49
2      A.  That's common -- common nomenclature.   09:49
3          If it requires -- if the answer --      09:49
4  my answer requires that I separate roaches and ants   09:49
5  from spiders, I'll say so.                        09:49
6      Q.  Okay.  Thank you.                         09:49
7          Are you providing any opinion as to       09:49
8  the efficacy of Bell + Howell ultrasonic pest     09:49
9  repellers in repelling and driving out rodents?    09:50
10     A.  No.                                       09:50
11     Q.  Are you an expert on rodents?            09:50
12     A.  No.                                       09:50
13     Q.  Are you an expert on consumer preference?   09:50
14     MR. OSTOJIC:  Object to form, foundation.     09:50
15         But go ahead.                            09:50
16  BY THE WITNESS:                                  09:50
17     A.  No.                                       09:50
18  BY MR. KOPEL:                                     09:50
19     Q.  Are you an expert on marketing?           09:50
20     A.  I've not been employed as a marketer.    09:50
21     Q.  So are you delivering any expert opinions   09:50
22  pertaining to the fields of consumer preference or   09:50
23  marketing in this case?                          09:50
24     A.  Yes, I am, and that goes to my previous   09:50
25  employment under -- or with Dow AgroSciences, the   09:50

**Page 15**

1  various roles that I held.                        09:50
2      Q.  Okay.  Can you please explain what        09:50
3  opinions you're expressing regarding consumer      09:50
4  preference and marketing?                         09:50
5      A.  They are contained in the report in       09:50
6  various different ways.                           09:50
7          The one that jumps out at me as most      09:51
8  obvious is my opinion on Joanne Hart and Sandra    09:51
9  Bueno's deposition and their use of the devices that   09:51
10  are in question.                                 09:51
11         And then the other piece in the          09:51
12  report that probably goes to your question is the   09:51
13  section on -- that I pulled from Amazon reviews.   09:51
14     Q.  So I know I asked you this before, but I   09:51
15  wasn't entirely clear on the answer.              09:51
16         Are you an expert in marketing?           09:51
17     A.  I have had many jobs within Dow           09:51
18  AgroSciences that -- that required that I interact   09:51
19  with marketers and marketing and the development of   09:51
20  pesticides.                                       09:52
21         Was I ever hired as a marketer,           09:52
22  which you could say would be the -- in the realm of   09:52
23  an expert, I was never hired as an expert in      09:52
24  marketing.                                        09:52
25     Q.  Do --                                     09:52

**Page 16**

1      A.  I supplemented their work as a technical   09:52
2  person.                                            09:52
3      Q.  Do you hold any degrees or certification   09:52
4  in marketing?                                      09:52
5      A.  I'm sorry.  I couldn't hear you.          09:52
6      Q.  Do you hold any degrees or certifications   09:52
7  in marketing?                                      09:52
8      A.  No, I do not.                             09:52
9      Q.  Have you ever taught any courses in       09:52
10  marketing?                                        09:52
11     A.  No, I have not.                           09:52
12     Q.  Have you ever written any publications    09:52
13  concerning marketing?                             09:52
14     A.  I have written technical -- technical     09:52
15  pieces that were contained in trade magazines, which   09:52
16  could be considered marketing materials for pest --   09:52
17  certain pesticides.                               09:52
18     Q.  Can you please explain what you mean by   09:52
19  that?                                             09:52
20     A.  Yeah.                                      09:52
21     Q.  Are you referring to product instructions   09:52
22  or specifications?                                09:52
23     A.  I am.                                      09:52
24         Both product -- the -- the roles          09:52
25  that I had in Dow AgroSciences required me over the   09:53

**Page 17**

1  course of several years to write product labels, to   09:53
2  review product labels, and to approve product labels.   09:53
3          Sometimes the essence of those were       09:53
4  written up in trade magazine articles and then     09:53
5  published in a trade magazine, which would -- the   09:53
6  circulation of that trade magazine would be going to   09:53
7  the customers of Dow AgroSciences, so I would      09:53
8  consider that marketing.                          09:53
9      Q.  Who were the customers you're referring   09:53
10  to?                                               09:53
11     A.  Professionals generally,                  09:53
12  agriculturalists, urban pest management          09:53
13  professionals, owners of distributorships.        09:53
14     Q.  Okay.  Did -- does Dow distribute         09:53
15  products directly to nonprofessional consumers?   09:53
16     MR. OSTOJIC:  Object to form.                 09:54
17         But go ahead.                             09:54
18  BY THE WITNESS:                                   09:54
19     A.  I cannot recall any that they did during   09:54
20  my employment.                                    09:54
21  BY MR. KOPEL:                                     09:54
22     Q.  Have you ever worked on any matter        09:54
23  pertaining to the marketing of a product that was   09:54
24  distributed directly to nonprofessional consumers?   09:54
25     A.  I have to -- I have to clarify your --    09:54

5 (Pages 14 - 17)

**Page 18**

```
 1   the one word in your question was distributed or    09:54
 2   distributor.                                        09:54
 3          In the chain of command -- not chain    09:54
 4   of command -- in the -- what's that word -- the     09:54
 5   selling chain, Dow AgroSciences was the basic       09:54
 6   manufacturer of pesticides products. For the most   09:54
 7   part in my employment, I can't remember anything    09:54
 8   otherwise, we would sell -- the company would sell  09:54
 9   those products to a distributor. Those distributors 09:54
10   would then sell to either another layer in the chain 09:54
11   or the enduser, whoever that might be.          09:55
12          I cannot -- maybe I'm not             09:55
13   remembering your question, but I cannot remember a  09:55
14   time when Dow AgroSciences sold directly to the     09:55
15   enduser.                                    09:55
16       Q.  Were -- were these products that you    09:55
17   worked on during your course at Dow, were they     09:55
18   intended for -- solely for professionals, or did they 09:55
19   also include products that were intended to be used  09:55
20   by nonprofessionals?                         09:55
21       A.  I have to -- again, I have to clarify.   09:55
22          There are -- there are examples          09:55
23   where Dow would sell the active ingredient to a     09:55
24   distributor or formulator who would then formulate it 09:55
25   for use by a consumer.                        09:56
```

**Page 19**

```
 1          So, again, there's a layer in        09:56
 2   between Dow and the enduser.                  09:56
 3       Q.  So did -- did Dow have any role in     09:56
 4   creating the packaging or labeling of a product that 09:56
 5   was ultimately viewed by a nonprofessional consumer? 09:56
 6       MR. OSTOJIC:  Object to form.            09:56
 7   BY THE WITNESS:                            09:56
 8       A.  Yes.                              09:56
 9   BY MR. KOPEL:                             09:56
10       Q.  And were you involved in that?         09:56
11       A.  Yes.                              09:56
12       Q.  Can you give me an example?          09:56
13       A.  An example would be chlorpyrifos is the  09:56
14   active ingredient, c-h-l-o-r-p-y-r-i-f-o-s, that's    09:56
15   the active ingredient sold under the trade name at   09:56
16   one time of Dursban, D-u-r-s-b-a-n. Dursban was sold 09:56
17   in big box stores like Lowe's Home and Garden, many, 09:56
18   many other places.                          09:57
19          Now, Dow would have provided the      09:57
20   basic product information on the label and any claims 09:57
21   that were made on the product.                09:57
22          Whether the distributor or that next   09:57
23   layer added things was beyond the scope of Dow.     09:57
24       Q.  Okay.  So do you know for certain whether 09:57
25   or not any claims that appeared on a packaging      09:57
```

**Page 20**

```
 1   marketed to nonprofessionals were ever written or   09:57
 2   reviewed by you personally?                   09:57
 3       A.  I could not give you an example.       09:57
 4       Q.  So when it comes to claims written on the 09:57
 5   labeling of Bell + Howell ultrasonic pest repellers,  09:57
 6   would you consider yourself an expert in          09:57
 7   interpretation of those claims?                09:58
 8       A.  I would.                          09:58
 9       Q.  What's your basis for --             09:58
10       A.  The basis -- sorry.                  09:58
11       Q.  What's your basis for that?           09:58
12       A.  The basis is that I spent many years    09:58
13   writing, reviewing, approving pesticide labels to the  09:58
14   consumer -- or the customer of Dow AgroSciences.    09:58
15          I am very well aware of the          09:58
16   technical language that appears on labels. I've      09:58
17   written it, I've reviewed it, I've approved them, and  09:58
18   since the information on a product label is -- in my   09:58
19   opinion -- a binding document so to speak, it tells   09:58
20   the enduser how to use the product.            09:58
21          How I wrote those labels for Dow      09:58
22   products would also apply for products that were    09:58
23   distributed or sold by Bell + Howell or Van Hauser.  09:58
24       Q.  Okay.  And you hold that opinion even   09:59
25   though you've -- you can't give me a single example  09:59
```

**Page 21**

```
 1   of any time you've ever written, reviewed, or       09:59
 2   collaborated on a claim that appeared on a product   09:59
 3   that was directly purchased by nonprofessional      09:59
 4   consumers; correct?                         09:59
 5       A.  I cannot give you a specific example, but 09:59
 6   I am very confident in my years with Dow that I did  09:59
 7   so.                                      09:59
 8       Q.  Okay.  Is -- is there any -- do you think 09:59
 9   it's possible that there might be a difference in how  09:59
10   an end consumer might understand something versus how 09:59
11   a scientist or a professional might understand it?    09:59
12       A.  Yes.                              09:59
13       MR. OSTOJIC:  Object to form, foundation.   09:59
14   BY THE WITNESS:                            09:59
15       A.  Yes.                              09:59
16   BY MR. KOPEL:                             09:59
17       Q.  So when you were writing and reviewing   09:59
18   claims, were you were primarily concerned with how   09:59
19   professionals or scientists would perceive those     09:59
20   claims; correct?                          09:59
21       A.  If the customer was a professional, then, 10:00
22   yes.                                     10:00
23       Q.  And you can't give me a single example in 10:00
24   which the customer was not an example; right?       10:00
25       MR. OSTOJIC:  Object --                 10:00
```

6 (Pages 18 - 21)

**Page 22**

1  BY MR. KOPEL:                          10:00
2      Q.  Was not a professional; correct?      10:00
3      MR. OSTOJIC:  Objection.  Asked and answered.   10:00
4      But go ahead.              10:00
5  BY THE WITNESS:                     10:00
6      A.  I cannot with my recollection today give   10:00
7  you a specific example.  I could not point to a      10:00
8  product that -- that would appear on a shelf in a big  10:00
9  box store that had my words on it.          10:00
10     It's very likely that I would have      10:00
11 reviewed and approved such language, but writing it,   10:00
12 different story.                   10:00
13 BY MR. KOPEL:                      10:00
14     Q.  I think earlier you -- you said that you   10:00
15 thought claims made on the packaging of a product     10:00
16 were binding statements; is that correct?      10:00
17     A.  I did.                 10:00
18     MR. OSTOJIC:  Object.  Mischaracterizes --   10:00
19 BY MR. KOPEL:                      10:00
20     Q.  Okay.  So --            10:00
21     MR. OSTOJIC:  -- his testimony.       10:00
22     But go ahead.              10:00
23 BY THE WITNESS:                     10:00
24     A.  I remember saying that, yes, in so many   10:00
25 words.                        10:00

**Page 23**

1  BY MR. KOPEL:                          10:00
2      Q.  Okay.  What did you mean by that?       10:00
3      A.  I mean that it's my opinion that when a   10:00
4  customer buys a product that it is beholden upon them  10:01
5  to read the product instructions, use the product as  10:01
6  it's intended to be used so that the desired effects   10:01
7  are achieved.                     10:01
8  BY MR. KOPEL:                      10:01
9      Q.  Do you know whether the law requires them  10:01
10 to do so?                       10:01
11     MR. OSTOJIC:  Object to form, foundation,   10:01
12 also may call for a legal opinion.         10:01
13     But go ahead.              10:01
14 BY THE WITNESS:                     10:01
15     A.  I do not know, but it's common sense in   10:01
16 my opinion that a -- someone who buys a product would  10:01
17 use and want to before using read the instructions on  10:01
18 how the manufacturer says it should be used.       10:01
19 BY MR. KOPEL:                      10:01
20     Q.  Are you giving opinions on legal matters   10:01
21 in this case?                     10:01
22     A.  I do not know.             10:01
23     Q.  What do you mean by that?         10:01
24     A.  I'm not a lawyer, so I'm not -- I don't   10:01
25 think I'm qualified to know whether I'm -- whether an  10:02

**Page 24**

1, opinion is legal or not.                  10:02
2      Q.  Okay.                  10:02
3      A.  You'd have to educate me.          10:02
4      Q.  Sure.                  10:02
5      And we just discussed an example.      10:02
6  Whether or not a consumer is required to read      10:02
7  instructions and use a product as directed.       10:02
8      Would you agree that that's      10:02
9  something that would be at least potentially governed  10:02
10 by the applicable law?                 10:02
11     MR. OSTOJIC:  Object to form, foundation.   10:02
12 BY THE WITNESS:                     10:02
13     A.  I think -- yes, I would think so.      10:02
14 BY MR. KOPEL:                      10:02
15     Q.  And you're not -- you're not qualified to  10:02
16 render an opinion on that; correct?        10:02
17     A.  I cannot point to a legal statute that   10:02
18 would say so.  It makes common sense to me but...     10:02
19     Q.  Do these reports, Exhibits 1 and 2 in    10:02
20 front of you, do they list all facts or data that you  10:02
21 considered in forming your opinions?       10:03
22     A.  At the time that I wrote them, yes.     10:03
23     Q.  Now, I -- I think that your report      10:03
24 referenced six tests that were conducted on the      10:03
25 Bell + Howell ultrasonic pest repeller; correct?     10:03

**Page 25**

1      A.  Correct.                10:03
2      Q.  Okay.  Were you -- did you view or      10:03
3  consider any other reports conducted on Bell + Howell  10:03
4  ultrasonic pest repeller besides for those six?      10:03
5      A.  Yes, I was privy to the reports that were  10:03
6  appended to Dr. Potter's reports.         10:03
7      Q.  Okay.  And besides for what was -- strike  10:03
8  that.                         10:03
9      Were you privy to those before you       10:03
10 wrote your initial report in this case?      10:03
11     MR. OSTOJIC:  Exhibit 1?           10:03
12     MR. KOPEL:  Yes.             10:03
13     MR. OSTOJIC:  Do you understand the question?  10:03
14     THE WITNESS:  I do.            10:04
15 BY THE WITNESS:                     10:04
16     A.  And I was not.             10:04
17 BY MR. KOPEL:                      10:04
18     Q.  Okay.  Have you spoken with       10:04
19 Ms. Feuerstein at all?                 10:04
20     A.  No.                   10:04
21     Q.  Have you spoken with Mr. Mishan?       10:04
22     A.  Yes.                  10:04
23     Q.  When did you speak with Mr. Mishan?     10:04
24     A.  I can't recall the exact date.        10:04
25     Q.  How many times did you speak with him?   10:04

7 (Pages 22 - 25)

**Page 26**

1   A.  Twice.                               10:04
2   Q.  How long ago was it?                 10:04
3   A.  The last was probably -- approximately  10:04
4  I'd say two weeks, two to three weeks ago; and the  10:04
5  time before that might have been six weeks ago.  10:04
6   Q.  What did you discuss?                 10:04
7   A.  The first conversation was about the  10:04
8  agreement, my retention agreement, and some  10:04
9  particulars with that, and the second was more or  10:05
10  less a review of the rebuttal report that I had  10:05
11  submitted.                                10:05
12   Q.  Did Mr. Mishan make any comments on your  10:05
13  rebuttal report?                          10:05
14   A.  Verbally, yes.                       10:05
15   Q.  What did he say?                     10:05
16   A.  I can't recall exact.                10:05
17   Q.  Did you ultimately make changes as a  10:05
18  result of his comments?                   10:05
19   A.  My opinions did not change.  Some of the  10:05
20  text did.                                 10:05
21   Q.  Who else did you speak to in connection  10:05
22  with this case?                           10:05
23   A.  Well, the attorneys that are --      10:05
24  Mr. Ostojic who is represented here, and then his  10:05
25  team of -- of attorneys.                  10:05

**Page 27**

1   Q.  Have you spoken with Dr. Whitford?   10:05
2   A.  Not -- I have, yeah.                  10:06
3   Q.  When was that?                       10:06
4   A.  I believe it was right after his     10:06
5  deposition, and that would be the only time.  10:06
6   Q.  Have you e-mailed with him?          10:06
7   A.  Just recently, yes.                   10:06
8   Q.  How long was your conversation after his  10:06
9  deposition?                               10:06
10   A.  I'm guessing 10 or 15 minutes.       10:06
11   Q.  What did you guys discuss?           10:06
12   A.  We -- primarily we discussed his research  10:06
13  with the transonic unit.                  10:06
14   Q.  What did he say about -- oh, I'm sorry.  10:06
15  Go ahead.                                 10:06
16   A.  And -- and his deposition.           10:06
17   Q.  What did he say about it?            10:06
18   A.  It was just points here and there.  I  10:06
19  mean nothing really -- there wasn't any action taken  10:07
20  because it was just back and forth comments.  10:07
21   Q.  Did you -- you were present by telephone  10:07
22  for Dr. Whitford's deposition; correct?   10:07
23   A.  Yes, I was.                          10:07
24   Q.  Did you take notes while you listened to  10:07
25  it?                                       10:07

**Page 28**

1   A.  I did.                               10:07
2   Q.  Do you have those notes here today?  10:07
3   A.  They are not here.                    10:07
4   Q.  Did you speak with anyone else in     10:07
5  connection with your work on this case?   10:07
6   A.  No.                                   10:07
7   Q.  Does either -- have you provided a    10:07
8  statement of compensation in either of your expert  10:07
9  reports in this case?                     10:07
10   A.  I have not.                          10:07
11   Q.  In the course of your work in Dow, I know  10:07
12  that you -- you did some work evaluating insecticides  10:08
13  or pest -- is there -- pesticides?        10:08
14   A.  That's a broader term because in typical  10:08
15  parlance that would mean insecticides, herbicides,  10:08
16  fungicides.                               10:08
17   Q.  Okay.  And I assume you did work on   10:08
18  herbicides an fungicides?                 10:08
19   A.  I did.                               10:08
20   Q.  Okay.  I'm -- going forward can we agree  10:08
21  I'm not -- I'm not interested in that work.  I'm --  10:08
22  not that I'm not interested, but for purposes of that  10:08
23  case, I'm not looking for responses in connection  10:08
24  with that work unless I specify otherwise, please.  10:08
25   A.  I -- I can agree with that as long as  10:08

**Page 29**

1  you -- us long as you understand that when I talk  10:09
2  about writing labels, reviewing labels, and approving  10:09
3  labels, that could include -- that does include --  10:09
4  it's pesticides, which could include all three of  10:09
5  those subcategories that you mentioned.   10:09
6   Q.  Okay.  Have you ever worked in evaluating  10:09
7  a nonlethal pest repellent during the -- during your  10:09
8  time at Dow?                              10:09
9   A.  I would say yes.                      10:09
10   Q.  Can -- sure.                         10:09
11       Can you elaborate?                   10:10
12   A.  Elaborate, yes.                      10:10
13       There was at least one instance     10:10
14  where Dow AgroSciences was working on a repeller --  10:10
15  repellent material for bedbugs.  It never made it to  10:10
16  commercialization.  It was not decided by the  10:10
17  business team that there was -- we didn't have the  10:10
18  right infrastructure to sell that so.     10:10
19   Q.  Thanks for that response.            10:10
20       Now, as it pertains to spiders,      10:10
21  ants, and roaches, have you ever worked on evaluating  10:10
22  the efficacy of repellent for those insects outside  10:10
23  of your expert testimony in this case and in the  10:10
24  Black & Decker case?                      10:10
25       MR. OSTOJIC:  Object to form.        10:10

8 (Pages 26 - 29)

| | Page 30 |
|---|---|
| 1 | Go ahead.   10:10 |
| 2 | BY THE WITNESS:   10:10 |
| 3 | A. No.   10:10 |
| 4 | BY MR. KOPEL:   10:11 |
| 5 | Q. Are you aware of whether or not Dow   10:11 |
| 6 | during your time there ever considered manufacturing   10:11 |
| 7 | any sort of repellent for ants, spiders, and roaches?   10:11 |
| 8 | A. I'm not aware of such.   10:11 |
| 9 | Q. Have -- now, when you were evaluating   10:11 |
| 10 | insecticides at Dow, was Dow conducting its own tests   10:11 |
| 11 | on the insecticides in-house?   10:11 |
| 12 | A. They were, in combination with other   10:11 |
| 13 | entities globally.   10:11 |
| 14 | Q. So you -- was your job to review data   10:11 |
| 15 | from tests conducted by Dow in addition to data from   10:12 |
| 16 | tests conducted by other laboratories?   10:12 |
| 17 | A. In certain of those roles that are in the   10:12 |
| 18 | CV, yes.   10:12 |
| 19 | Q. Are you familiar with i2L?   10:12 |
| 20 | A. I am -- well, I was aware of the company   10:12 |
| 21 | they evolved from, and I -- they're in Baltimore,   10:12 |
| 22 | Maryland, and I visited their labs for actually   10:12 |
| 23 | purposes of Dow contracting them to do some bedbug   10:12 |
| 24 | work and maybe other things, so -- but I cannot   10:12 |
| 25 | remember what the name of the company was before they   10:12 |

| | Page 31 |
|---|---|
| 1 | became i2L.   10:12 |
| 2 | Q. I think it might have been ICR.   10:12 |
| 3 | Does that ring a bell?   10:12 |
| 4 | A. Yeah, that sounds correct, yes.   10:12 |
| 5 | Q. But it was the same staff; correct?   10:12 |
| 6 | A. Well, Rob and Todd, the director, moved   10:12 |
| 7 | on to something else. I don't know whether the   10:12 |
| 8 | technicians are the same or not.   10:12 |
| 9 | Q. Okay. Do you know Timothy Ford?   10:13 |
| 10 | A. That's interesting -- I -- I think I   10:13 |
| 11 | might have met him. The name is familiar. I can't   10:13 |
| 12 | be certain.   10:13 |
| 13 | Q. How about Christine Stier?   10:13 |
| 14 | A. I do not recall that name.   10:13 |
| 15 | Q. Jennifer Hostetler?   10:13 |
| 16 | A. I do not recall that name.   10:13 |
| 17 | Q. And in the course of your work at Dow,   10:13 |
| 18 | did you rely on test results from -- that were   10:13 |
| 19 | produced by i2L or its predecessor?   10:13 |
| 20 | A. Yes.   10:13 |
| 21 | Q. Do you know them to be competent   10:13 |
| 22 | scientists?   10:13 |
| 23 | MR. OSTOJIC: Object to form and foundation.   10:13 |
| 24 | BY THE WITNESS:   10:13 |
| 25 | A. In the area of bedbugs, we had no reason   10:13 |

| | Page 32 |
|---|---|
| 1 | to believe they were not. That area of research was   10:13 |
| 2 | just really starting to take off, and methods,   10:14 |
| 3 | protocols were just being established, so now some 20   10:14 |
| 4 | years later, whatever protocols they used for bedbugs   10:14 |
| 5 | are probably improved, perfected, but we had no   10:14 |
| 6 | reason not to believe they were competent in bedbug   10:14 |
| 7 | research.   10:14 |
| 8 | BY MR. KOPEL:   10:14 |
| 9 | Q. Do you know Bill Donahue?   10:14 |
| 10 | A. No.   10:14 |
| 11 | Q. Have -- have you ever had occasion to   10:14 |
| 12 | discuss ultrasonic technology with any of your   10:14 |
| 13 | colleagues at Dow?   10:14 |
| 14 | A. Not in a professional setting.   10:14 |
| 15 | Q. Okay. And who did you speak to about it   10:14 |
| 16 | outside of the professional setting?   10:14 |
| 17 | A. Yeah, I've been an entomologist in the   10:14 |
| 18 | profession for over 30 years, and during the course   10:15 |
| 19 | of those years when ultrasound repellers were first   10:15 |
| 20 | coming on the market, I'm sure that I had discussions   10:15 |
| 21 | with people, not in Dow, because -- well, not in Dow,   10:15 |
| 22 | but I cannot remember who those people were.   10:15 |
| 23 | Q. Okay. Can you please describe the   10:15 |
| 24 | contents of your discussions?   10:15 |
| 25 | MR. OSTOJIC: Object to form, foundation.   10:15 |

| | Page 33 |
|---|---|
| 1 | BY THE WITNESS:   10:15 |
| 2 | A. Well, it would primarily be the interest   10:15 |
| 3 | in the research, in all the researchers that were   10:15 |
| 4 | publishing data on ultrasonic repellers.   10:15 |
| 5 | BY MR. KOPEL:   10:15 |
| 6 | Q. Which researchers are you referring to?   10:15 |
| 7 | A. More than -- well, the ones that -- at   10:15 |
| 8 | least the ones that were cited in Dr. Potter's   10:16 |
| 9 | reports. Not all of them. I don't know all of those   10:16 |
| 10 | people.   10:16 |
| 11 | But Ballard and Gold were the ones   10:16 |
| 12 | that come to mind.   10:16 |
| 13 | Q. Dr. Subramanyam?   10:16 |
| 14 | A. Oh, Subramanyam.   10:16 |
| 15 | Actually, I didn't know until I read   10:16 |
| 16 | this that he was involved in ultrasonic repellers. I   10:16 |
| 17 | hadn't seen any of his research. He's an in -- I   10:16 |
| 18 | know him. He's primarily -- he -- his primary   10:16 |
| 19 | expertise or where he -- where he has spent most of   10:16 |
| 20 | his research with Dow has been in area of fumigation.   10:16 |
| 21 | Q. And you -- you've relied on his research   10:16 |
| 22 | in the course of your work at Dow?   10:16 |
| 23 | A. Fumigation work, yes.   10:16 |
| 24 | Q. How about -- the names I think you   10:16 |
| 25 | mentioned so far were Ballard, Gold?   10:16 |

9 (Pages 30 - 33)

| | Page 34 | | Page 36 |
|---|---|---|---|

1    A.  Yes.                          10:16
2    Q.  How about them?  Have you relied on their  10:16
3 work?                              10:17
4    MR. OSTOJIC:  Object to form.        10:17
5 BY MR. KOPEL:
6    Q.  In the course of your -- in the course  10:17
7 of --
8    A.  Within Dow?                   10:17
9    Q.  Yes.                         10:17
10    A.  Not personally, but they have a long  10:17
11 history, and it's likely that prior to my taking the  10:17
12 role -- a role they would have been -- done some  10:17
13 independent research and probably for termites  10:17
14 because that was Dow AgroSciences' emphasis.    10:17
15 BY MR. KOPEL:                      10:17
16    Q.  Do you know each of these individuals to  10:17
17 be competent entomologists?           10:17
18    MR. OSTOJIC:  Object to form, foundation.  10:17
19 BY THE WITNESS:                   10:17
20    A.  I do not know Jim Ballard.  I know the  10:17
21 name.  I've never met him.            10:17
22    Dr. Roger Gold, I have met.  He's      10:17
23 got a distinguished title, has a distinguished chair  10:17
24 at Texas A&M I believe in urban pest management.  10:17
25    Just like I indicated for the       10:17

**Page 34**

1 of your work at Dow?                  10:19
2    A.  I've had no reason to because there was  10:19
3 no rodent projects going on.            10:19
4    Q.  Do you know him to be a competent and  10:19
5 qualified rodentologist?              10:19
6    A.  Only by reputation.            10:19
7    Q.  Now, given that you were aware of -- let  10:19
8 me take a step back.                 10:19
9    You mentioned that during your time  10:19
10 at Dow you likely had discussions with -- with people  10:19
11 about ultrasonic technology in a nonprofessional  10:19
12 setting; correct?                   10:19
13    A.  Yes.                        10:19
14    Q.  Okay.  Did you consider looking into the  10:19
15 manufacture of devices using this technology in the  10:19
16 course of your work at Dow?           10:20
17    A.  No.                         10:20
18    MR. OSTOJIC:  Object to form.        10:20
19 BY MR. KOPEL:                     10:20
20    Q.  Why not?                    10:20
21    A.  It wasn't the core competency of Dow  10:20
22 AgroSciences to test non-pesticidal products such as  10:20
23 ultrasonics at -- at that time.          10:20
24    Q.  Okay.  And so at a later date you did  10:20
25 come to test a device regarding bedbugs; right?  10:20

**Page 36**

1 Beijing University professor, you would expect that  10:17
2 somebody rising to that level in the university  10:17
3 system would be -- whatever you said -- competent  10:18
4 or -- I can't remember the last part of your  10:18
5 question.                          10:18
6 BY MR. KOPEL:                     10:18
7    Q.  How about Dr. Potter?  Had you heard of  10:18
8 Dr. Potter prior to this lawsuit?        10:18
9    A.  Yes, I have.                  10:18
10    Q.  And have you ever relied on his work in  10:18
11 the course of your work at Dow?         10:18
12    A.  Yes, because he was active in testing  10:18
13 urban pest management products, and my -- the people  10:18
14 that reported to me when I was director of some of  10:18
15 these groups would have gone to Dr. Potter as a  10:18
16 university -- unbiased university person and  10:18
17 placed -- asked to place some of our products in his  10:18
18 testing.                           10:18
19    Q.  Do you know Dr. Potter to be a competent  10:18
20 and qualified entomologist?            10:18
21    A.  Yes.                        10:18
22    Q.  What about Bobby Corrigan?  Have you  10:18
23 heard of him?                      10:19
24    A.  I have.                      10:19
25    Q.  Have you relied on his work in the course  10:19

**Page 35**

1    A.  Yes, sir.                     10:20
2    Q.  Okay.  And what was the distinction  10:20
3 between ultrasonic technology and that technology in  10:20
4 terms of whether or not it was suitable to look into  10:20
5 for production by Dow?               10:20
6    A.  Well, those decisions -- it was never my  10:20
7 sole decision to do so or not.  It was always a team  10:20
8 setting, and in those initial discussions one of the  10:20
9 first things that was in the stepwise process in  10:20
10 Dow's product development was to engage the business  10:21
11 leaders to decide whether there was suitable market  10:21
12 size or not to go into those -- to even spend money  10:21
13 on the first -- the first set of researches.  10:21
14    So the difference being -- again,  10:21
15 ultrasonics was in an era that I was not involved in  10:21
16 this same kind of decisionmaking.        10:21
17    But bedbugs, we perceived it to be a  10:21
18 huge opportunity, a huge market; and somebody, first  10:21
19 one in, usually makes the most money.     10:21
20    Q.  You are not an expert in the physics of  10:21
21 ultrasonic technology; correct?         10:21
22    A.  Correct.                     10:22
23    Q.  And you have no formal training in the  10:22
24 physics of ultrasonic technology; correct?  10:22
25    A.  Correct.                     10:22

**Page 37**

10 (Pages 34 - 37)

1   Q.  Can you -- can you please take a look at   10:22
2 Pages 18 and 19 of Exhibit 2, and let me know when   10:22
3 you're there.   10:22
4   A.  This would be of my rebuttal report;   10:23
5 right?   10:23
6   Q.  Correct.   10:23
7   A.  Yes, I'm there.   10:23
8   Q.  Okay.  Do you see there's a section   10:23
9 titled, "Inherent Bias Throughout the Potter Report"?   10:23
10   A.  I do.   10:23
11   Q.  Okay.  Now, here -- it -- it looks like   10:23
12 you take issue with two -- with two things Dr. Potter   10:23
13 did, which was use of the words/phrase control and   10:23
14 out of buildings; correct?   10:23
15   A.  Yes.   10:23
16   Q.  Okay.  So let's -- I was hoping you can   10:23
17 explain these to me one at a time.   10:23
18       What -- what does the word control   10:23
19 mean, and why is it inappropriate in this context?   10:23
20   MR. OSTOJIC:  Object to form, foundation.   10:23
21       Why don't you read that section and   10:23
22 then go ahead and...   10:23
23   THE WITNESS:  Yeah.   10:24
24   MR. KOPEL:  Just let me know whenever you're   10:24
25 ready.   10:24

Page 38

1   THE WITNESS:  All right.  I'm ready.   10:25
2   MR. KOPEL:  Okay.  Do you remember the   10:25
3 question I asked?   10:25
4   THE WITNESS:  No, I would like to have it   10:25
5 repeated.   10:25
6 BY MR. KOPEL:   10:25
7   Q.  Sure.   10:25
8       Can you please define what you were   10:25
9 referring to when you speak of pest control here and   10:25
10 explain why you think it is inappropriate in this   10:25
11 context?   10:25
12   A.  I'll start with the second part of your   10:25
13 question.  Why is it -- did you say appropriate or   10:25
14 inappropriate?   10:25
15   Q.  I think to set a foundation so we all   10:25
16 understand what we're talking about, let me break up   10:25
17 the question.   10:25
18   A.  Okay.   10:25
19   Q.  Can you please explain what you mean by   10:25
20 pest control in this context, what that means?   10:25
21   A.  Control to me means rid the pest of --   10:25
22 no, let me back up.   10:25
23       For the customer that's using it   10:25
24 control would mean that you have eliminated the   10:25
25 concern from the environment.   10:26

Page 39

1       So if I'm in an agricultural field   10:26
2 and I control aphids in a soybean field, I have   10:26
3 reduced the number of aphids in that soybean field   10:26
4 below a level which would cause the farmer harm,   10:26
5 monetary damage.  It's called economic threshold.   10:26
6       Similarly, if you're in an urban   10:26
7 environment --   10:26
8   Q.  What does that mean?  Like inside of a   10:26
9 residence?   10:26
10   A.  Yes.   10:26
11   Q.  Okay.  Thanks.   10:26
12   A.  If a pesticide reduces the number of   10:26
13 cockroaches, let's say, below a level that is   10:26
14 concerning to the customer, then there -- is there by   10:26
15 control.  That's what I mean by control.   10:26
16   Q.  Can you please explain why you thought it   10:27
17 was inappropriate for Dr. Potter to use that term in   10:27
18 this context?   10:27
19   A.  Yes, I sure can.   10:27
20   Q.  Go ahead.   10:27
21   A.  The word control is not used in any of   10:27
22 the product literature that Bell + Howell produced.   10:27
23   Q.  Have you seen evidence that the   10:27
24 Bell + Howell ultrasonic pest repellers are capable   10:27
25 of reaching the level of pest control in an urban   10:27

Page 40

1 environment?   10:27
2   MR. OSTOJIC:  Object to form, foundation.   10:27
3       Go ahead.   10:27
4 BY THE WITNESS:   10:27
5   A.  I'm sorry.  I'm thinking through all   10:27
6 the --   10:27
7   MR. KOPEL:  Do you need me to rephrase the   10:27
8 question?   10:27
9   THE WITNESS:  Well, either to repeat or   10:27
10 rephrase, yeah.   10:28
11   MR. KOPEL:  Yeah, no problem.  No problem.   10:28
12 BY MR. KOPEL:   10:28
13   Q.  So -- let me try to take a step back.   10:28
14       You've now defined what pest -- what   10:28
15 you believe pest control means in the context of a   10:28
16 residence; correct?   10:28
17   A.  Yes.   10:28
18   Q.  Have you seen evidence that the   10:28
19 Bell + Howell ultrasonic pest repellers are capable   10:28
20 of pest control inside of a residence?   10:28
21   A.  I've seen evidence of control in the   10:28
22 laboratory setting that -- in these six, five-five   10:28
23 studies that were mentioned earlier.   10:28
24       I would add that in -- from the   10:28
25 depositions of Joanne Hart and Sandra Bueno that   10:28

Page 41

11 (Pages 38 - 41)

1 there was a level of control exhibited there in those  10:28
2 residences.                                    10:28
3      Q.  Okay.  And -- and as a matter of science,  10:28
4 do you think it's appropriate to rely on the       10:29
5 experience of two individuals to reach a scientific  10:29
6 conclusion?                                   10:29
7      MR. OSTOJIC:  Object to form, foundation.      10:29
8 BY MR. KOPEL:                               10:29
9      Q.  Maybe I need to -- maybe I need to       10:29
10 rephrase the question.                         10:29
11         Do you believe it's appropriate to      10:29
12 rely on anecdotal accounts of two consumers of making  10:29
13 a determination if something is effective?         10:29
14      A.  Isn't the basis of this lawsuit, those    10:29
15 two consumers?                               10:29
16      Q.  I -- and I appreciate that you're not an  10:29
17 attorney, so you probably don't know this, but it's   10:29
18 not really appropriate for you to ask me questions.   10:29
19 I'm going to ask the questions.                  10:29
20         Can you please answer my question?      10:29
21      A.  I'll try.                            10:29
22      Q.  Go ahead.  Do you remember the question?  10:29
23      A.  No.                                10:29
24      Q.  Do you believe as a matter of science    10:29
25 it's appropriate to rely on the anecdotal accounts of  10:29

Page 42

1 two consumers in reaching your conclusions?        10:29
2      MR. OSTOJIC:  Object.  Form, foundation, and  10:29
3 mischaracterizes his testimony.                  10:29
4      Go ahead.                              10:29
5 BY THE WITNESS:                            10:29
6      A.  Anecdotal evidence is not something I    10:29
7 would rely on 100 percent.  In the -- but I would    10:30
8 consider it as the part of the whole -- the whole    10:30
9 data package, if you will, the whole total data      10:30
10 package.                                   10:30
11 BY MR. KOPEL:                             10:30
12      Q.  Have you seen reliable evidence that the  10:30
13 Bell + Howell ultrasonic pest repellers are capable  10:30
14 of pest control in a residential environment?       10:30
15      MR. OSTOJIC:  Object.  Asked and answered.   10:30
16      But go ahead.                          10:30
17 BY THE WITNESS:                            10:30
18      A.  That's a long -- that's a long question.  10:30
19 Can you say it again?                         10:30
20      MR. KOPEL:  Can you please repeat the        10:30
21 question?                                  10:30
22         (WHEREUPON, the record was    10:30
23         read by the reporter.)          10:30
24      MR. OSTOJIC:  Same objections.  Asked and   10:30
25 answered.                                 10:30

Page 43

1         Go ahead.                     10:30
2 BY THE WITNESS:                            10:30
3      A.  I guess I cannot ask you questions,      10:30
4 but --                                     10:30
5      MR. KOPEL:  You can ask for a clarification.   10:30
6 BY THE WITNESS:                            10:31
7      A.  Clarify reliable for me.              10:31
8 BY MR. KOPEL:                             10:31
9      Q.  Well, you just said that -- you -- I     10:31
10 believe what you just said -- I was using the word   10:31
11 reliable based on what you said, and -- what I      10:31
12 believe you said was that anecdotal evidence may be   10:31
13 considered as part of a whole package, but by itself  10:31
14 it's not really reliable, so I was using reliable in  10:31
15 the same context as you.                      10:31
16      A.  Okay.  So the question again was, as I   10:31
17 remember it.  Have I seen reliable evidence in a    10:31
18 consumer --                               10:31
19      MR. KOPEL:  Do you want to read back.       10:31
20      THE WITNESS:  Yeah.  Sorry.             10:31
21      MR. KOPEL:  I'll just ask the court reporter  10:31
22 to please read the question one more time.        10:31
23      THE WITNESS:  Now that I understand reliable.  10:31
24      MR. KOPEL:  That's fine.               10:31
25

Page 44

1         (WHEREUPON, the record was    10:31
2         read by the reporter.)          10:31
3      MR. OSTOJIC:  Same objections.          10:31
4 BY THE WITNESS:                            10:32
5      A.  No.                          10:32
6 BY MR. KOPEL:                             10:32
7      Q.  Let's talk about driving pests out of the  10:32
8 home or out of the building.                   10:32
9         Now, when -- in the context of the     10:32
10 Bell + Howell devices, we've got the claim:  Drive   10:32
11 pests out; correct?                         10:32
12      A.  Yes.                          10:32
13      Q.  Okay.  What do you interpret that to    10:32
14 mean?                                   10:32
15      A.  I interpret that to mean that the device  10:32
16 will drive pests out of the range of their hearing or  10:32
17 being exposed to the device.                   10:32
18      Q.  So if pests are inside of -- or        10:32
19 underneath a floor, for instance, or in a crack in a  10:32
20 floor, would that be included?                 10:32
21      MR. OSTOJIC:  Object to form.            10:32
22 BY THE WITNESS:                            10:32
23      A.  Included in what?                  10:32
24      MR. OSTOJIC:  What?                   10:32
25      MR. KOPEL:  Sure.  Let me take a step back.   10:32

Page 45

12 (Pages 42 - 45)

1 BY MR. KOPEL:                          10:33
2     Q.  If pests in a crack in a floor or     10:33
3 underneath a floor, then the ultrasonic sound waves   10:33
4 would not be able to reach them; correct?        10:33
5     A.  More than likely.              10:33
6     Q.  Okay.  So is -- so is that area included  10:33
7 under your definition of drives pests out?       10:33
8     MR. OSTOJIC:  Object to form.        10:33
9         But go ahead.                  10:33
10 BY THE WITNESS:                         10:33
11    A.  If it was to drive -- if the ultrasonic   10:33
12 repeller drove pests out of a room, let's say, to   10:33
13 some area where they could not hear or be exposed to  10:33
14 the ultrasonic sound, then the answer is yes; and if  10:33
15 that's behind walls, yes; if that's in cracks, yes;  10:33
16 if it's -- if they can't -- if they're not exposed to  10:33
17 the sound, they can't be repelled.              10:33
18 BY MR. KOPEL:                           10:34
19    Q.  Do you think it was -- it is unreasonable  10:34
20 for a consumer to understand drives pests to mean   10:34
21 drives pests out of the house?                  10:34
22    A.  I do not.                       10:34
23    Q.  You think that is a reasonable      10:34
24 interpretation?                         10:34
25    A.  I sure do.                     10:34

Page 46

1     MR. OSTOJIC:  Object to form, foundation.   10:34
2         Go ahead.                      10:34
3 BY MR. KOPEL:                           10:34
4     Q.  Now, have you seen evidence that the   10:34
5 Bell + Howell ultrasonic pest repellers are capable   10:34
6 of driving pest out of a house?                 10:34
7     MR. OSTOJIC:  Object to form, foundation.   10:34
8 BY THE WITNESS:                         10:34
9     A.  No.                          10:34
10 BY MR. KOPEL:                          10:34
11    Q.  Same question for a living space.     10:34
12        Have you seen evidence that the     10:34
13 Bell + Howell ultrasonic pest repellers are capable   10:34
14 of driving pests out of a living space?         10:34
15    A.  It would be anecdotal evidence, but I go  10:35
16 back to the Hart and Bueno depositions and assert   10:35
17 that they -- the use of repeller could have been   10:35
18 responsible for what they experienced, what they saw,  10:35
19 the results.                            10:35
20    Q.  Have you seen reliable scientific     10:35
21 evidence that the Bell + Howell ultrasonic pest    10:35
22 repellers are capable of driving pests out of a    10:35
23 living space?                           10:35
24    A.  No.                          10:35
25    Q.  Have you seen evidence that the      10:35

Page 47

1 ultrasonic pest repellers, the Bell + Howell    10:35
2 ultrasonic pest repellers are capable of being    10:35
3 effective beyond a period of nine days?         10:36
4     MR. OSTOJIC:  Object to form.        10:36
5         Go ahead.                      10:36
6 BY THE WITNESS:                         10:36
7     A.  I'm trying to remember the length of time  10:36
8 that the six tests that you referenced were     10:36
9 conducted.                              10:36
10 BY MR. KOPEL:                          10:36
11    Q.  Now, this isn't -- it's not a memory    10:36
12 test, so if it helps you answer the question, I'm   10:36
13 happy to mark those as exhibits.                10:36
14    A.  It would help.                  10:36
15    Q.  Okay.                         10:36
16    A.  Because I don't know if they were longer  10:36
17 than nine days or not.                      10:36
18    Q.  Perfectly understandable, so let's,   10:36
19 please -- the first thing I'm going to hand you is a  10:36
20 document that was previously marked as Exhibit 13.   10:36
21    MR. OSTOJIC:  Is this 13 on --         10:37
22    MR. KOPEL:  Yes, this was marked as -- I    10:37
23 believe at Mr. Mishan's deposition.             10:37
24    THE WITNESS:  Okay.  So just to be clear, I'm  10:37
25 only looking at the inspect reports.            10:37

Page 48

1     MR. KOPEL:  Sure.  And I'm going to hand you   10:37
2 three -- we're going to mark three additional     10:37
3 exhibits.                               10:37
4         While you're looking that over, I'll    10:37
5 ask the court reporter to mark three documents.    10:38
6 The first one is Bates No.                    10:38
7 Feuerstein 74 through 85.                   10:38
8         I'll ask the court reporter to       10:38
9 please mark this as Exhibits Borth -- we're up to 3;  10:38
10 right?  3.                             10:38
11        (Whereupon, a certain            10:38
12            document was marked Borth
13            Exhibit 3 for
14            identification.)             10:38
15    MR. KOPEL:  The second document is Bates Nos.  10:38
16 BHH LLC 1810 through 1815.                   10:38
17        I'll ask the court reporter to mark   10:38
18 that down at Borth Exhibit 4.                  10:38
19        (Whereupon, a certain            10:38
20            document was marked Borth
21            Exhibit 4 for
22            identification.)             10:38
23    MR. KOPEL:  The third document bears Bates   10:38
24 Nos. BHH LLC 712 through 717, and I'll ask the court  10:38
25 reporter to please mark that as Borth Exhibit 5.   10:38

Page 49

13 (Pages 46 - 49)

| | |
|---|---|
| 1        (Whereupon, a certain      10:38 | 1  please mark as Borth Exhibit 6 the Deposition      10:47 |
| 2            document was marked Borth | 2  Transcript of Debbie Feuerstein.      10:47 |
| 3            Exhibit 5 for | 3        (Whereupon, a certain      10:47 |
| 4            identification.)      10:39 | 4            document was marked Borth |
| 5        MR. OSTOJIC: Would you go over Exhibits 3,      10:39 | 5            Exhibit 6 for |
| 6  4, and 5, the Bates stamp again.      10:39 | 6            identification.)      10:47 |
| 7        MR. KOPEL: Well, I'll just give them to you      10:39 | 7  BY MR. KOPEL:      10:47 |
| 8  if that's okay. Or -- or -- do you have them, Rob?      10:39 | 8        Q.  Dr. Borth, do you have Exhibit 6?      10:47 |
| 9        MR. OSTOJIC: Yeah, I have them.      10:39 | 9        A.  I do.      10:48 |
| 10        MR. KOPEL: Yeah, no problem.      10:39 | 10        Q.  Have you seen it before?      10:48 |
| 11        So Feuerstein 74 through 85 is Borth      10:39 | 11        A.  I have, yeah.  I'm assuming that all the      10:48 |
| 12  3.      10:39 | 12  pages are here.      10:48 |
| 13        MR. OSTOJIC: Okay.      10:39 | 13        Q.  What is it?      10:48 |
| 14        MR. KOPEL: BHH LLC 1810 through 1815 is 4.      10:39 | 14        A.  What is it?  It's a videotape -- well,      10:48 |
| 15        MR. OSTOJIC: Uh-huh.      10:39 | 15  not videotape.      10:48 |
| 16        MR. KOPEL: And BHH LLC 712 through 717 is 5.      10:39 | 16        Joanne -- I'm just reading the title      10:48 |
| 17        MR. OSTOJIC: Got it.  Thank you.      10:39 | 17  page.  Joanne Hart and Amanda Park, on behalf of      10:48 |
| 18        MR. KOPEL: I'm going to ask the court      10:41 | 18  themselves and all other similarly situated,      10:48 |
| 19  reporter to please repeat the question and then we'll      10:41 | 19  plaintiffs, versus BHH and Van Hauser, defendants,      10:48 |
| 20  wait for her to catch up with us and you'll give your      10:41 | 20  videotaped deposition of Debbie Feuerstein, taken      10:48 |
| 21  answer, please.      10:41 | 21  at -- in New York.      10:48 |
| 22        THE WITNESS: Okay.      10:42 | 22        It's -- I guess that's good enough.      10:48 |
| 23        (WHEREUPON, the record was | 23        Q.  And you read this before you drafted your      10:48 |
| 24            read by the reporter.) | 24  expert reports in this case; correct?      10:48 |
| 25        THE WITNESS: Okay.  Could you repeat it one      10:45 | 25        A.  I did, yes.      10:48 |
| Page 50 | Page 52 |

| | |
|---|---|
| 1  more time, and then I've got an answer.      10:45 | 1        Q.  Okay.  Is -- now, the tests which were      10:48 |
| 2        (WHEREUPON, the record was      10:45 | 2  marked as Borth Exhibits 3, 4, 5, and the document      10:49 |
| 3            read by the reporter.)      10:45 | 3  which I handed to you, which was previously marked as      10:49 |
| 4        MR. OSTOJIC: Object to form.      10:45 | 4  Exhibit 13, was it your contention that these tests      10:49 |
| 5        Go ahead.      10:45 | 5  were supervised by a department head from the      10:49 |
| 6  BY THE WITNESS:      10:45 | 6  University of Beijing?      10:49 |
| 7        A.  I have not.      10:45 | 7        A.  Yes, that's what I understood from the      10:49 |
| 8  BY MR. KOPEL:      10:45 | 8  deposition transcripts.      10:49 |
| 9        Q.  Have you seen reliable evidence that the      10:45 | 9        Q.  Okay.  Can you please have a look at      10:49 |
| 10  Bell + Howell ultrasonic pest repellers are capable      10:45 | 10  Exhibit 6 on Page 31.  If you see there's four pages      10:49 |
| 11  of repelling pests in a carpeted room?      10:45 | 11  on each?      10:49 |
| 12        A.  No.      10:46 | 12        A.  Uh-huh.      10:49 |
| 13        Q.  Have you seen reliable evidence that the      10:46 | 13        Okay.      10:49 |
| 14  Bell + Howell ultrasonic pest repellers are capable      10:46 | 14        Q.  So you see here On Line 17 Ms. Feuerstein      10:49 |
| 15  of repelling pests in a room with furniture in it?      10:46 | 15  says, "The initial testing was conducted in China by      10:50 |
| 16        MR. OSTOJIC: Object to form.      10:46 | 16  Beijing University Agriculture Department"?      10:50 |
| 17        Go ahead.      10:46 | 17        Do you see that?      10:50 |
| 18  BY THE WITNESS:      10:46 | 18        A.  Yes.      10:50 |
| 19        A.  No.      10:46 | 19        Q.  Okay.  And -- okay.  Do you see on      10:50 |
| 20  BY MR. KOPEL:      10:46 | 20  Page 32, Line 18, question, "Do you still have a copy      10:50 |
| 21        Q.  Have you seen reliable evidence that the      10:46 | 21  of those tests results?  Answer, "No I don't have      10:50 |
| 22  Bell + Howell ultrasonic pest repellers are capable      10:46 | 22  those copy anymore"?      10:50 |
| 23  of repelling pests in a room with a bed in it?      10:46 | 23        A.  I see that.      10:50 |
| 24        A.  No.      10:46 | 24        Q.  Okay.  Do you understand, based on this,      10:50 |
| 25        MR. KOPEL: I'll ask the court reporter to      10:47 | 25  that this is the -- the department head in Beijing      10:50 |
| Page 51 | Page 53 |

14 (Pages 50 - 53)

1 University supervised another test which          10:50
2 Ms. Feuerstein did not have copies for?          10:51
3       MR. OSTOJIC: Object to form, foundation.    10:51
4 Incomplete.                                       10:51
5       THE WITNESS: Before answering that I'd like 10:51
6 to take time to kind of get the context.          10:51
7       MR. KOPEL: Well -- that's perfectly fine.   10:51
8 Go ahead.                                         10:51
9       THE WITNESS: Okay.                          10:53
10      MR. KOPEL: Do you remember the question?    10:53
11      THE WITNESS: No, I would like to have it    10:53
12 just repeated.                                    10:53
13      MR. KOPEL: Please repeat the question.      10:53
14           (WHEREUPON, the record was   10:53
15            read by the reporter.)      10:53
16      MR. KOPEL: I think I can probably rephrase  10:53
17 that.                                             10:53
18        Do you understand the question?           10:53
19 BY THE WITNESS:                                   10:53
20      A. As it relates to this Long Whale company 10:53
21 that she did -- she admits that she did not have  10:53
22 copies of it.                                     10:53
23 BY MR. KOPEL:                                     10:53
24      Q. Okay. Do you still contend that the      10:53
25 department head in Beijing University supervised  10:54
Page 54

1 those other tests?                                10:54
2      A. Which other tests?                        10:54
3      Q. The tests found -- marked as             10:54
4 Exhibit Borth 3, 4, 5, and the document previously 10:54
5 marked as Exhibit 13.                             10:54
6      A. Yes. Unless I'm understanding it wrong,   10:54
7 I read the chronology -- as I read the chronology  10:54
8 here, Ms. Feuerstein contracted tests before      10:54
9 commercialization that she does not have records for, 10:54
10 and then there was a second round of testing      10:54
11 supervised by the professor at Beijing University 10:54
12 that I understood to be the six reports that are  10:54
13 included in the report.                           10:54
14      Q. Can you please take a look at Page 36,   10:54
15 Line 19?                                          10:54
16      A. Yes.                                      10:54
17      Q. Question, "Had you ever run any tests at 10:54
18 Beijing University on the pest repellers since that 10:55
19 time?"                                            10:55
20        Answer, "I think we did once or           10:55
21 twice test with them through one or two years and 10:55
22 then -- then that's it. Yeah, yeah, I think       10:55
23 professor, I think left. I think he is no longer at 10:55
24 Beijing University, so we end up switch our testing 10:55
25 to professional laboratories."                    10:55
Page 55

1        Do you see that?                           10:55
2      A. I do.                                      10:55
3      Q. Okay. Does that change your response?     10:55
4      MR. OSTOJIC: Object to form, foundation.     10:55
5        But go ahead.                              10:55
6 BY THE WITNESS:                                   10:55
7      A. It does appear that the university        10:55
8 professor at Beijing -- with what I've read up to 10:55
9 this point, you know, there might be more later, but 10:55
10 up to Page 36 and 37, did not have supervisory    10:55
11 control, if you will, over the protocols and the  10:55
12 testing.                                          10:56
13 BY MR. KOPEL:                                     10:56
14      Q. Okay. Can you please turn to Page 56 of  10:56
15 the deposition transcript.                        10:56
16      A. Okay.                                     10:56
17      Q. I'm going to recite some lines here for  10:56
18 the record, but you are welcome to read as much as 10:57
19 you would like for context.                       10:57
20        Here on Page 56, starting with Line       10:57
21 22, question, "Below it says, 'Plug it in' -- and 10:57
22 there is an ellipsis -- 'drive pests out.' Do you 10:57
23 see that?"                                        10:57
24        Answer, "Yes."                            10:57
25        Question, "Who originally wrote           10:57
Page 56

1 that?"                                            10:57
2        Answer, "I think my designer took it       10:57
3 from the art work we have in the past."           10:57
4        I'm skipping over to Page 57, Line         10:57
5 14. Question, "What do you interpret this phrase to 10:57
6 mean?"                                            10:57
7        Answer, "Plug it in, drive pest out"       10:57
8 exclamation point -- question mark.                10:57
9        Question, "Correct?"                       10:57
10        Answer, "Yeah, this is the plug-in        10:57
11 unit, so you plug into a C outlet, meaning don't do 10:57
12 any work, and then ultrasonic work used to drive  10:57
13 pests out."                                       10:57
14        Question, "Drive pests out of a home      10:57
15 or office?"                                       10:57
16        Answer, "Of the area."                    10:57
17        Question, "Of the area?"                  10:58
18        Answer, "Out of the area of room          10:58
19 where pest repeller is."                          10:58
20        Question, "So this phrase was not         10:58
21 intended to mean that the repellers could drive pests 10:58
22 out of the home or office?"                       10:58
23        Answer, "It is the repeller drive         10:58
24 the pests out from the home."                     10:58
25        Question, "Oh, so it means it drives 10:58
Page 57

15 (Pages 54 - 57)

**Page 58**

```
1  pests out from the home?"                        10:58
2          Answer, "Right, right."                  10:58
3          And I'll just skip to Line 22. Then      10:58
4  this is a question.                              10:58
5          "The use of the multipack in that        10:58
6  statement is intended to mean that if a consumer uses  10:58
7  all the repellers in the pack, they'll be able to      10:58
8  drive pests out of their home; correct?"         10:58
9          Answer, "Yes."                           10:58
10         Do you see that?                          10:58
11   A.  I do.                                       10:58
12   Q.  Okay. Does this change your opinion on      10:58
13 what is meant when the product says, "Drive pests 10:58
14 out"?                                             10:58
15   A.  No.                                         10:58
16   Q.  Okay. And do you see here where             10:58
17 Ms. Feuerstein says, "The repeller drive pests out 10:58
18 from the home"?                                   10:58
19   A.  I do.                                       10:58
20   Q.  Okay. So -- and do you recognize her to    10:58
21 be the inventor of the product?                   10:58
22   A.  It's -- somewhere in this deposition she   10:59
23 claims to be, yes.                                10:59
24   Q.  Okay. And do you also recognize that she   10:59
25 had supervisory approval over the language used on 10:59
```

**Page 59**

```
1  the label?                                        10:59
2      MR. OSTOJIC: Object to form, foundation.      10:59
3  BY THE WITNESS:                                   10:59
4      A.  I don't know that I saw that anywhere in  10:59
5  there. Could you point me to it maybe?            10:59
6      MR. KOPEL: Sure.                              10:59
7  BY MR. KOPEL:                                     10:59
8      Q.  Please take a look at Page 53, Lines 6    10:59
9  through 8.                                        10:59
10         Question, "And you had a role in          10:59
11 approval each of these pieces of artwork?"        10:59
12         Answer, "Yes."                            10:59
13   A.  Then the answer is yes.                     10:59
14   Q.  Okay. And does this now change your         10:59
15 opinion on what is meant when the product says,   10:59
16 "drive pests out"?                                10:59
17   A.  It still does not.                          10:59
18   Q.  Why not?                                    10:59
19   A.  Because the words "out of the home" are     10:59
20 not written in the product literature anywhere.   11:00
21   Q.  Now, do you see here that the person        11:00
22 involved in making that statement interpreted them to 11:00
23 mean that it drives pests out from the home?      11:00
24     MR. OSTOJIC: Object to form, foundation.      11:00
25 Asked and answered. It's also argumentative.      11:00
```

**Page 60**

```
1          But go ahead and answer.                  11:00
2  BY THE WITNESS:                                   11:00
3      A.  I -- I see that that -- I see what you    11:00
4  read, that she had -- the question was: "And you had 11:00
5  a role in approval each of these pieces of artwork?" 11:00
6          And she answers, "Yes" -- "before it      11:00
7  hit the market, yes."                             11:00
8      Q.  Okay. And, I'm sorry, that wasn't         11:00
9  exactly my question.                              11:00
10     MR. KOPEL: Can you please repeat my           11:00
11 question?                                         11:00
12         (WHEREUPON, the record was                11:00
13         read by the reporter.)                    11:00
14     MR. OSTOJIC: Same objections. Form,           11:01
15 foundation. He's already asked and answered it, and 11:01
16 it's also an incomplete hypothetical I think.     11:01
17         But go ahead.                             11:01
18 BY THE WITNESS:                                   11:01
19     A.  Yes, I see that.                          11:01
20 BY MR. KOPEL:                                     11:01
21     Q.  Do you disagree with Ms. Feuerstein?      11:01
22     A.  I do.                                     11:01
23         My basis for that is that the words       11:01
24 in the product literature prevail.                11:01
25     Q.  Okay. But would you agree, based on this  11:01
```

**Page 61**

```
1  testimony, that that was the intention of the     11:01
2  statement: "Drives pests out"?                    11:01
3      MR. OSTOJIC: Object. Form, foundation.        11:01
4  Asked and answered. Also may cause for him to     11:02
5  speculate as to what Feuerstein's intent was or was 11:02
6  not.                                              11:02
7          To the extent you can answer the          11:02
8  question, go ahead.                               11:02
9      THE WITNESS: Repeat the question, please.     11:02
10         (WHEREUPON, the record was                11:02
11         read by the reporter.)                    11:02
12     MR. OSTOJIC: I'm sorry. Objection. I need     11:02
13 a clar -- are you talking about the intent of the 11:02
14 words or the intent of Ms. Feuerstein in that     11:02
15 question?                                         11:02
16     MR. KOPEL: I'm not sure there's a             11:02
17 distinction, but if there's a distinction, you can go 11:02
18 ahead and say so.                                 11:02
19 BY THE WITNESS:                                   11:02
20     A.  You can only -- I can only go by what's   11:02
21 written here. I -- I cannot get into             11:02
22 Ms. Feuerstein's mind to know whether she intended 11:03
23 one thing or another. I can only reread what she  11:03
24 says.                                             11:03
25                                                   11:03
```

16 (Pages 58 - 61)

1 BY MR. KOPEL:                              11:03
2     Q.  But this is how she interprets her own   11:03
3 statement; correct?                        11:03
4     MR. OSTOJIC:  Object.  Form, foundation.  May   11:03
5 call for speculation as to what the subjective mind   11:03
6 of Feuerstein is thinking.                 11:03
7         Frankly, her deposition is --     11:03
8     MR. KOPEL:  Counsel, please stop making   11:03
9 speaking objections.                       11:03
10    MR. OSTOJIC:  I'm not, but it's conflicting,   11:03
11 and we're going over the same subject.      11:03
12        Asked and answered.
13        To the extent you can answer the   11:03
14 question, you can go ahead and answer.      11:03
15 BY THE WITNESS:                            11:03
16    A.  I just repeat what I said.          11:03
17        I can only go by what's written     11:03
18 here.                                      11:03
19 BY MR. KOPEL:
20    Q.  And do you remember what my question was?  11:03
21    A.  I think your question -- you can tell me   11:03
22 if I'm wrong -- was did she intend -- was her   11:03
23 intention in those words that it would drive pests   11:03
24 out of a house.                            11:03
25    Q.  So it was -- that wasn't exactly my most   11:03

Page 62

1 recent question.                           11:03
2    A.  Okay.                               11:03
3    Q.  I -- and, counsel, I know, has a lot of   11:03
4 objections regarding my questions, so please try to   11:04
5 listen carefully to the question because sometimes it   11:04
6 can get confusing.  When counsel makes a lot of   11:04
7 objections, it's hard to remember exactly what the   11:04
8 question was.                              11:04
9        Based on this testimony would you     11:04
10 agree that the interpretation of the words drives   11:04
11 pests out -- okay.  Based on -- let me rephrase the   11:04
12 question.                                  11:04
13        Based on this testimony, would you   11:04
14 agree that the person who made the statement drives   11:04
15 pests out interprets that statement to mean drives   11:04
16 pests out from the home?                   11:04
17    MR. OSTOJIC:  Objection.  Ms. Feuerstein's   11:04
18 testimony stands on its own, it's a written document.  11:04
19 If you want, you can go through the entire deposition   11:04
20 testimony, but it's very inappropriate to ask a   11:04
21 witness to seek to try to determine the intent of   11:04
22 another person within their mind interpreting a   11:05
23 phrase.                                    11:05
24        Also it's been asked and answered;   11:05
25 but to the extent you understand the question, go   11:05

Page 63

1 ahead and answer.                          11:05
2    THE WITNESS:  I have lost the place -- what   11:05
3 page are we looking at, pages plural?        11:05
4    MR. KOPEL:  I am referring to Page 58.    11:05
5    THE WITNESS:  Oh, I'm off.  Okay.  Let me go   11:05
6 back to that.                              11:05
7    MR. KOPEL:  And perhaps it would be       11:05
8 helpful -- counsel has stated his objection, and I   11:05
9 know it's hard to remember the question after the   11:05
10 objections are made, so I would be happy to stipulate   11:05
11 that the objections counsel has made already will   11:05
12 apply and perhaps the court reporter can reread the   11:05
13 question and witness's answer.             11:05
14    THE WITNESS:  Yes, that would -- sorry --   11:05
15 that would be helpful.                     11:05
16        (WHEREUPON, the record was           11:05
17        read by the reporter.)               11:06
18    MR. OSTOJIC:  Same objections.          11:06
19 BY THE WITNESS:
20    A.  Her answer, Page 58, Line 7.  "It is the   11:06
21 repeller drive pests out from the home."     11:06
22        So -- question, "Oh, so it means it   11:06
23 drives pests out from the home?"            11:06
24        "Right, right" was the answer.        11:06
25

Page 64

1 BY MR. KOPEL:                              11:06
2    Q.  Is that a yes?                       11:06
3    MR. OSTOJIC:  Same objections.           11:06
4 BY THE WITNESS:                            11:06
5    A.  I can't get into Ms. Feuerstein's mind   11:06
6 and what she intended.  It's clearly written here,   11:06
7 Lines 7 and 8, the answer, "It is the repeller drive   11:06
8 the pests out from the home."              11:06
9 BY MR. KOPEL:                              11:07
10    Q.  Can you just turn back to Page 57     11:07
11 briefly, please.  I'm looking at Ms. Feuerstein's   11:07
12 testimony, Lines 19 through 21, "Meaning don't do any   11:07
13 work and then ultrasonic work used to drive pests   11:07
14 out."                                      11:07
15        Do you see that?                     11:07
16    A.  Yes.                                 11:07
17    Q.  Okay.  Would you agree that finding and   11:07
18 sealing up all entry points within your house that an   11:07
19 insect can get to would constitute doing work?   11:07
20    A.  Yes, which is consistent with the product   11:07
21 literature.                                11:08
22    Q.  Is work required in order to -- in order   11:08
23 for the pest repellers to be effective?     11:08
24    MR. OSTOJIC:  Object to form.            11:08
25

Page 65

17 (Pages 62 - 65)

1 BY THE WITNESS:                                11:08
2       A.  It's circumstantial.  I would guess in   11:08
3 some cases, yes; in some cases, no.             11:08
4             The product literature says the      11:08
5 repeller helps -- I should look at it to be sure I'm   11:08
6 quoting exactly, but the operative word is it helps   11:08
7 repel pests, and so other things may be necessary to   11:08
8 effect the -- get the effect you're -- the customer   11:08
9 desires.                                        11:08
10      Q.  And it also says, "plug it in, drive   11:08
11 pests out"; correct?                            11:08
12      A.  It does, yes.                          11:08
13      Q.  It doesn't say, "Plug it in and do a   11:08
14 bunch of work to drive pests out"; right?       11:08
15      A.  It does not.                           11:08
16      Q.  Are you familiar with the concept of   11:08
17 habituation?                                    11:09
18      A.  Yes.                                   11:09
19      Q.  What is it?                            11:09
20      A.  Habituation is a behavior -- as I would   11:09
21 describe it -- a behavioral response of an organism,   11:09
22 a response to some stimulus that it becomes accustom   11:09
23 to, and the -- the effect of that stimulus decreases   11:09
24 over time as a result of -- of it being in the   11:09
25 presence of the stimulus.                       11:09
                                              Page 66

1       MR. OSTOJIC:  Counsel, if we're on a place --   11:09
2 I know you went to habituation for the depo.  Can we   11:09
3 take just two minutes so I can make a quick call on   11:09
4 something else?                                 11:09
5       MR. KOPEL:  Yes.                          11:09
6       MR. OSTOJIC:  Okay.                       11:09
7       THE VIDEOGRAPHER:  The time is now 11:12 a.m.   11:09
8             This is the end of Media No. 1.     11:09
9             We're off the record.              11:10
10            (WHEREUPON, a recess was        11:10
11            had.)
12      THE VIDEOGRAPHER:  The time is now 11:29 a.m.   11:26
13            This is the beginning of Media 2.   11:26
14            We're back on the record.          11:26
15 BY MR. KOPEL:                                   11:26
16      Q.  Dr. Borth, what does habituation mean in   11:26
17 the context of ultrasonic pest repelling technology?   11:27
18      MR. OSTOJIC:  Object to form.             11:27
19 BY THE WITNESS:                                 11:27
20      A.  If the court reporter would reread the   11:27
21 answer to your last question, I would say that's what   11:27
22 it means in the context of ultrasonic pest repellers.   11:27
23      MR. KOPEL:  That's not necessary.         11:27
24 BY MR. KOPEL:                                   11:27
25      Q.  Do you believe that if -- if ants,    11:27
                                              Page 67

1 spiders, and roaches are exposed to ultrasonic sound   11:27
2 waves for extended periods of time, then they will   11:27
3 become habituated to the sound and no longer be   11:27
4 repelled?                                       11:27
5       MR. OSTOJIC:  Object form as to will.     11:27
6             But go ahead.                       11:27
7 BY THE WITNESS:                                 11:27
8       A.  I do not take that as blanket statement.   11:27
9             I'd have to see evidence of a       11:28
10 particular ant, particular spider, particular roach.   11:28
11 BY MR. KOPEL:                                   11:28
12      Q.  Do you have any opinion as to whether   11:28
13 habituation ever occurs with regards to exposure of   11:28
14 ultrasonic sound waves to ants, spiders, or roaches?   11:28
15      MR. OSTOJIC:  Object to form.             11:28
16 BY THE WITNESS:                                 11:28
17      A.  Yes.                                  11:28
18 BY MR. KOPEL:                                   11:28
19      Q.  What's your opinion?                  11:28
20      A.  The opinion is if these insects,      11:28
21 including spiders, are exposed continuously to the   11:28
22 same ultrasonic frequency decibel, everything exactly   11:28
23 the same, it's possible that they could habituate to   11:28
24 that particular sound -- well, to that particular --   11:28
25 well, sounds.                                   11:29
                                              Page 68

1       Q.  What's the basis for your opinion?    11:29
2       A.  Education, background in entomology, and   11:29
3 having classes, and reading texts about habituation.   11:29
4       Q.  Now, when I'm talking about specifically   11:29
5 habituation to ultrasonic technology, can you   11:29
6 identify any studies or a text or any other sources   11:29
7 on which you're basing your opinion?            11:29
8       A.  It's a general concept that is well borne   11:29
9 out, and I don't have any -- any references at my   11:29
10 disposal right now to show you.                 11:29
11      Q.  Have you seen any evidence to suggest   11:29
12 that habituation would not occur when using the   11:29
13 Bell + Howell ultrasonic pest repellers in a   11:29
14 residence?                                      11:29
15      MR. OSTOJIC:  Object to form.             11:29
16      THE WITNESS:  That's -- that's a long     11:30
17 question --                                     11:30
18      MR. KOPEL:  Okay.                         11:30
19      THE WITNESS:  -- could you repeat it or   11:30
20 rephrase.                                       11:30
21      MR. KOPEL:  Can please repeat the question?   11:30
22            (WHEREUPON, the record was      11:30
23            read by the reporter.)            11:30
24      MR. OSTOJIC:  Same objection.             11:30
25
                                              Page 69

18 (Pages 66 - 69)

1 BY THE WITNESS:                          11:30
2    A.  That goes to prove something that doesn't  11:30
3 exist, which -- you know, when you design an      11:30
4 experiment, it's very hard to design something that  11:30
5 would prove something doesn't exist.          11:30
6        You -- the opposite is what most      11:30
7 scientists would show, not what does not exist.   11:30
8 BY MR. KOPEL:                           11:30
9    Q.  Would you expect that habitation might   11:30
10 occur when using an ultrasonic pest repeller in a   11:30
11 residential environment?                  11:31
12   A.  Again, it depends on the specific -- the   11:31
13 specifics of the ultrasonic pest repeller, the    11:31
14 specifics -- the details of the residence or room,   11:31
15 whatever you said.                      11:31
16   Q.  Okay.  So would you expect that      11:31
17 habituation would occur when using Bell + Howell   11:31
18 ultrasonic pest repellers in a residential        11:31
19 environment?                          11:31
20   A.  No.                             11:31
21   Q.  Why not?                         11:31
22   A.  Because I have read that the frequency --  11:31
23 the electronics within the Bell + Howell ultrasonics  11:31
24 was variable, and it's swept through a range of    11:31
25 frequencies.  It's not -- and not continuous.     11:31

1    Q.  Have you seen literature showing that use  11:31
2 of sweeping frequencies prevents habituation from   11:31
3 occurring?                            11:31
4    A.  I have not; but, again, with what      11:31
5 habituation is based upon, if you remove the     11:31
6 stimulus, you change the stimulus, you do anything  11:32
7 differently, you're going to delay -- at least delay  11:32
8 and maybe eliminate the -- the phenomenon of     11:32
9 habituation.                          11:32
10   Q.  In absence of the sweeping frequencies,   11:32
11 would you expect habituation to occur with regards to  11:32
12 ants, spiders, and roaches in a residential      11:32
13 environment when using the Bell + Howell devices?   11:32
14   A.  I cannot -- I cannot say that, I wouldn't  11:32
15 say that, because I don't have the details behind to  11:32
16 answer that question confidently.            11:32
17   Q.  What additional details would you need?   11:32
18   A.  I would need to know the -- the physics   11:32
19 of -- even though I'm not a physics expert, I would  11:32
20 need to know whether the sound was continuous or not.  11:32
21 I would need to know the -- what do you call it --  11:33
22 the dimensions, how the room is set up, need to know  11:33
23 the insects that you're talking about, all the     11:33
24 details are necessary.                   11:33
25   Q.  Can you give me an example of when you   11:33

1 would expect habituation to occur when using a    11:33
2 ultrasonic pest repeller with regards to ants,    11:33
3 spiders, and roaches?                   11:33
4      MR. OSTOJIC:  Object to form.           11:33
5 BY THE WITNESS:                         11:33
6    A.  I can give you a -- a hypothetical      11:33
7 because I've not tested it.                11:33
8      MR. KOPEL:  Okay.  Great.              11:33
9 BY THE WITNESS:                         11:33
10   A.  But the hypothetical would be if you have  11:33
11 a container, a -- contained insects that cannot    11:33
12 escape and they are subjected to the same frequency  11:33
13 continuously, they may -- it's not definite, they may  11:34
14 develop habituation behavior over time.        11:34
15 BY MR. KOPEL:                          11:34
16   Q.  Can you please turn to Exhibit 1, that's  11:34
17 your initial expert report, Page 20.          11:34
18   A.  Okay.                          11:34
19   Q.  And I am referencing Opinion 14.       11:34
20       Do you see Opinion 14 on Page 20?       11:34
21   A.  Of my initial -- oh, I'm looking at the   11:34
22 wrong report.  Sorry.                   11:35
23       Okay.                         11:35
24   Q.  And Opinion 14 reads:  "Based upon      11:35
25 References 4 to 8, 10, 13, I reject the allegation   11:35

1 that these devices do not repel pests."        11:35
2       Do you see that?                   11:35
3    A.  Yes.                           11:35
4    Q.  Okay.  And 4 to 8 are Chinese testing of  11:35
5 the Bell + Howell ultrasonic devices; correct?    11:35
6      MR. OSTOJIC:  Object to form.           11:35
7 BY THE WITNESS:                         11:35
8    A.  Yes.                           11:35
9 BY MR. KOPEL:                          11:35
10   Q.  And those -- those tests are contained   11:35
11 within Exhibits Both 3, 4, 5, and the document which  11:36
12 I handed to you, which was previously marked as    11:36
13 Exhibit 13; correct?                    11:36
14   A.  Yes.                           11:36
15   Q.  Okay.  And Reference 13 is referring to a  11:36
16 1984 study performed by Ballard, Gold and T. Decker;  11:36
17 correct?                             11:36
18   A.  Correct.                        11:36
19   Q.  And these are -- and one last thing.     11:36
20 Reference 10 is a chi-square test analysis that you  11:36
21 performed on References 4 through 8; correct?     11:36
22   A.  Correct.                        11:36
23   Q.  And these -- these seven sources are what  11:36
24 you are basing your opinion on that these devices do  11:37
25 repel pests; correct?                   11:37

1  A.  In part, yes.                          11:37
2  Q.  What do you mean by in part?           11:37
3  A.  Well, I base my opinion on everything,  11:37
4  totality of everything I looked at, which would  11:37
5  include everything on this list.           11:37
6  Q.  Okay.  What else on this list supports  11:37
7  that finding?                              11:37
8  A.  Everything.  Referenced -- in total,   11:37
9  References 1 through 23.  Everything I read goes into  11:37
10  making an opinion.                         11:37
11  Q.  I understand, but, you know, taken by  11:37
12  itself, did you find evidence in the First Amended  11:37
13  Class Action Complaint that these devices are  11:37
14  effective to repel pests?                  11:37
15  A.  First Amended Class Action -- okay.  I  11:37
16  have to ask to get this repeated again.  Sorry.  11:37
17  Q.  Sure.                                  11:38
18       Taken by itself, did you find any     11:38
19  evidence within the First Amended Class Action  11:38
20  Complaint that the Bell + Howell devices are  11:38
21  effective to respell pests?                11:38
22  A.  I don't know -- I'm sorry.  But I don't  11:38
23  know how you connect the Complaint.  Maybe it's  11:38
24  semantics, but I'm not understanding.      11:38
25  Q.  Well, the only reason I'm bringing up the  11:38
                                              Page 74

1  Complaint is that it's No. 1 on your list of  11:38
2  references here.                           11:38
3  A.  Okay.  Sure.                           11:38
4  Q.  And you said that you relied on all of  11:38
5  these?                                     11:38
6  A.  Yes, yes.                              11:38
7  Q.  But I'm trying to make a determination of  11:38
8  how you could have gotten that from number --  11:38
9  Reference No. 1?                           11:38
10  A.  Oh, well, I'm -- what I meant by that is  11:38
11  that everything I read goes into my brain and is used  11:38
12  to draw -- to make an opinion.             11:38
13  Q.  Okay.  So are -- are you relying in your  11:38
14  opinion on any other -- on any other studies in  11:38
15  making -- in making your opinion that you reject the  11:38
16  allegation that these devices do not repel pests?  11:39
17  MR. OSTOJIC:  Object to form.             11:39
18  BY THE WITNESS:                            11:39
19  A.  I have experience in the Black & Decker  11:39
20  case which required me to read things that are not  11:39
21  included here.                             11:39
22  BY MR. KOPEL:                              11:39
23  Q.  Are you basing your opinions on those  11:39
24  documents?                                 11:39
25  A.  No.  But, as I said, everything I read --  11:39
                                              Page 75

1  it goes into your mind, and everything that you --  11:39
2  that you absorb goes into making opinions.  11:39
3  Q.  Did you consider those documents in  11:39
4  making your opinions in this case?          11:39
5  A.  No.  What I've listed here is certainly  11:39
6  sufficient to draw my opinions from.       11:39
7  Q.  Okay.  I'd like to actually talk with you  11:39
8  about these Chinese studies first, please; and the  11:40
9  first one I'd like to please discuss is dated  11:40
10  March 23, 2012, and I believe that should be  11:40
11  contained within the exhibit previously marked as 13.  11:40
12       And let me know if you're able to      11:40
13  locate that, please.                       11:40
14  A.  I have Exhibit 13, yeah.               11:40
15  Q.  And I'm looking -- I'm specifically     11:40
16  referencing an SGS test performed on ants, spiders,  11:40
17  and roaches dated March 23, 2012.          11:41
18       Please let me know if you can locate   11:41
19  that, and I'm happy to give you the report number if  11:41
20  that's helpful.                            11:41
21  A.  Well, in -- in this list of efficacy test  11:41
22  reports, which one is it?  The first one that has  11:41
23  insects from SGS?  What was --             11:41
24  Q.  It's a report number ending with the  11:41
25  numbers 3439.                             11:41
                                              Page 76

1  A.  Yes, okay.  I have that.               11:41
2  Q.  Okay.  Now, you've seen this before;   11:41
3  correct?                                   11:41
4  A.  Yes.                                   11:41
5  Q.  This is one of the seven references from  11:41
6  Opinion 14 in your initial report; correct?  11:41
7  A.  Yes.                                   11:41
8  Q.  Okay.  Now, this looks like it was      11:41
9  prepared by someone named Mei, M-e-i, last name L-v.  11:42
10       Do you see that?                       11:42
11  A.  I see that.                            11:42
12  Q.  Who is that?                           11:42
13  A.  I have no idea.                        11:42
14  Q.  Do you know what her qualifications are?  11:42
15  A.  I do not.                             11:42
16  Q.  Is that relevant?                      11:42
17  A.  It could be.                          11:42
18  Q.  Does it concern you that you're         11:42
19  reviewing -- you're relying on a test that was  11:42
20  performed by someone whose qualifications you're  11:42
21  unaware of?                                11:42
22  A.  Not really.                           11:42
23  Q.  Why not?                              11:42
24  A.  Because I have data here that -- based on  11:42
25  what's written with their protocols, their summary;  11:42
                                              Page 77

20 (Pages 74 - 77)

**Page 78**

1 and the counts that they made, to me, appear -- I      11:42
2 mean they were counts, they were raw observations.      11:43
3      Q.  Oh, go ahead.  I didn't mean to interrupt  11:43
4 you.                                11:43
5      A.  I would -- I mean it's an assumption, but  11:43
6 you would think that Mei Lv knows what a spider is an  11:43
7 can count them correctly; and ants and spiders -- I  11:43
8 mean roaches and ants the same -- the same.      11:43
9      Q.  Do you see on the first page here it      11:43
10 says, "Style No."  It says, "Nil"?      11:43
11      A.  Style number?                11:43
12           Yes, I see that.                11:43
13      Q.  Okay.  So do you know what model      11:43
14 Bell + Howell ultrasonic pest repellers were used in  11:43
15 this test?                          11:43
16      A.  Let me refer -- most of these details for  11:43
17 these are included in my Reference 10.      11:43
18           Can I look at that?  Because it      11:43
19 would --                          11:43
20      Q.  Sure.  Look at whatever you need.      11:43
21      A.  -- help me more quickly answer.      11:43
22      Q.  You have that; right?  You have      11:43
23 Reference 10 there?                    11:43
24      A.  I do, yes.                    11:44
25      Q.  Okay.  Great.                  11:44

**Page 79**

1      A.  So we're -- that would be No. 3.      11:44
2           Yes, my -- yes, it says, "Model      11:44
3 tested was not stated."  That's how I worded it.  11:44
4      Q.  Now, are you relying on this test in  11:44
5 rendering an opinion as to all models of the      11:44
6 Bell + Howell ultrasonic pest repellers?      11:44
7      A.  Yes.                        11:44
8      Q.  Did this model have sweeping frequencies,  11:44
9 or was it static?                      11:44
10      A.  I can make the assumptions from the      11:44
11 Debbie Feuerstein deposition that they -- they were  11:44
12 variable or sweeping.                  11:45
13      Q.  Is it -- is it your understanding that  11:45
14 all models of Bell + Howell ultrasonic pest repellers  11:45
15 are sweeping?                      11:45
16      A.  I believe from reading the deposition  11:45
17 that there was a point in time when Bell + Howell  11:45
18 improved -- I think she used the word improved their  11:45
19 design to move into sweeping frequencies.      11:45
20           The time, the date, I don't know      11:45
21 when that was.                      11:45
22      Q.  Do you know if that was before or after  11:45
23 March of 2012?                      11:45
24      A.  I cannot say with certainty.      11:45
25      Q.  Okay.  Is that inquiry relevant to your  11:45

**Page 80**

1 opinion that this test result is germane to all      11:45
2 models of Bell + Howell pest repellers?      11:45
3      A.  Are you leading -- I can't ask you a      11:45
4 question.                          11:45
5      Q.  Well, if you would like a clarification,  11:45
6 go ahead.                          11:45
7      A.  Yes, please, try to clarify.      11:45
8      Q.  Sure.                      11:45
9           My understanding, based on your      11:45
10 testimony, and you're free to correct me if I'm      11:46
11 wrong, is that you don't know whether this model      11:46
12 utilized static or sweeping frequencies; is that      11:46
13 correct?                          11:46
14      A.  That's correct.                11:46
15      Q.  Okay.  Is that -- is that relevant to      11:46
16 your determination of whether this data can be      11:46
17 extended to all models of the Bell + Howell pest      11:46
18 repellers?                          11:46
19      A.  Not really, no.                11:46
20      Q.  Why not?                    11:46
21      A.  Because the -- under the conditions they  11:46
22 tested we have the results, and so the -- the      11:46
23 repeller that they tested gave us the results they  11:46
24 gave us.                          11:46
25      Q.  Now, let's say hypothetically that they  11:46

**Page 81**

1 used a sweeping frequency model in this test.      11:46
2      A.  Uh-huh.                      11:46
3      Q.  Would you be comfortable extending the  11:46
4 data from this test to models that do not have      11:46
5 sweeping frequencies?                  11:46
6      A.  I believe that the basics of ultrasonic  11:47
7 technology are going to give you the results that you  11:47
8 have in this -- under these conditions whether it is  11:47
9 sweeping frequency or not.                11:47
10      Q.  Do you remember testifying earlier that  11:47
11 you thought sweeping frequencies might help prevent  11:47
12 habituation?                        11:47
13      A.  I do.                      11:47
14      Q.  Okay.  So can you conceive of situations  11:47
15 where sweeping frequencies might be more effective  11:47
16 than static frequencies?                11:47
17           MR. OSTOJIC:  Object to form.      11:47
18 BY THE WITNESS:                      11:47
19      A.  Well, the reason I believe that sweeping  11:47
20 frequencies were developed was to increase the      11:47
21 efficacy of the unit.                  11:47
22 BY MR. KOPEL:                        11:48
23      Q.  What -- what -- what information do you  11:48
24 need to know in order to make a determination as to  11:48
25 whether or not this data can be used to make an      11:48

21 (Pages 78 - 81)

**Page 82**

1  opinion on other models of Bell + Howell repellers?   11:48
2      MR. OSTOJIC:  Wait.  I'm sorry.  Can you   11:48
3  repeat that question?   11:48
4      MR. KOPEL:  Absolutely.   11:48
5      MR. OSTOJIC:  Well --   11:48
6      MR. KOPEL:  Sure.  I'll repeat it.  No   11:48
7  problem.   11:48
8  BY MR. KOPEL:   11:48
9      Q.  Do you think that any tests ascertaining   11:48
10  the efficacy of ultrasound technology in general can   11:48
11  be used as evidence of the efficacy of any ultrasound   11:48
12  device?   11:48
13      MR. OSTOJIC:  Object to form, foundation.   11:48
14      But go ahead.   11:49
15  BY THE WITNESS:   11:49
16      A.  Yes.   11:49
17  BY MR. KOPEL:   11:49
18      Q.  So as long as it's ultrasound, than it   11:49
19  is -- it is relevant to making a determination as to   11:49
20  whether Bell + Howell devices are effective?   11:49
21      MR. OSTOJIC:  Object to form, foundation.   11:49
22      But go ahead.   11:49
23  BY THE WITNESS:   11:49
24      A.  There are details underlying   11:49
25  ultrasound -- ultrasonic technology that that would   11:49

**Page 83**

1  be necessary to know before I could make a   11:49
2  generalization, and I generally don't make   11:49
3  generalizations.   11:49
4  BY MR. KOPEL:   11:49
5      Q.  Okay.  So what are those details?   11:49
6      A.  The kilohertz, the decibels, number of   11:49
7  speakers in the unit, the directional attitude of   11:49
8  those speakers, the case itself, everything about it,   11:49
9  everything about the unit.   11:49
10      Q.  Okay.  What was the frequency of the   11:49
11  devices tested here?   11:49
12      A.  I would have to really look at a lot of   11:49
13  documents, and the documentation may not be there.   11:50
14      Q.  Other than this test right here, what   11:50
15  else would -- do you think would give you that   11:50
16  information?   11:50
17      MR. OSTOJIC:  Object to form.   11:50
18  BY MR. KOPEL:   11:50
19      Q.  Other than this test labeled as Report   11:50
20  No. SZXWT00603439, what other document do you think   11:50
21  might give you that information?   11:50
22      A.  In my experience a document that is   11:50
23  commonly referred to as a product specification sheet   11:50
24  would include that information.   11:50
25      Q.  Did you review the product specification   11:50

**Page 84**

1  sheet for these devices?   11:50
2      A.  I did for one of them that was provided   11:50
3  by -- by plaintiff -- or defendants.  Sorry.   11:50
4      Q.  Okay.  Was that the same model device as   11:50
5  pictured here?   11:50
6      A.  I'd have to look.  I can check it out if   11:51
7  you want me to take the time.   11:51
8      Q.  Well, let's take a step back.   11:51
9          You don't know what model device was   11:51
10  use here; right?   11:51
11      A.  No.   11:51
12      Q.  Okay.  So is there any way to determine   11:51
13  whether it was the same model or not?   11:51
14      A.  No.  Unless -- no.   11:51
15      Q.  Okay.  Do you know if this model of   11:51
16  Bell + Howell ultrasonic pest repeller was ever even   11:51
17  sold to the general public?   11:51
18      A.  I would assume so or they wouldn't be   11:51
19  testing it.   11:51
20      Q.  You don't think companies can test things   11:51
21  that have not been released to the general public?   11:51
22      A.  They can, and I have experience with   11:51
23  those.   11:51
24      Q.  Okay.  And so let's go back to my   11:51
25  original question.   11:51

**Page 85**

1          Do you know whether this model of   11:51
2  Bell + Howell ultrasonic pest repeller that's being   11:51
3  tested in Report No. SZXWT00603439 was ever sold to   11:51
4  the general public?   11:51
5      A.  Without the model number, I cannot be   11:51
6  sure.   11:51
7      Q.  So you don't know what the frequency of   11:51
8  this device was; correct?   11:51
9      A.  I would have to rely on Debbie   11:51
10  Feuerstein's deposition and the product spec sheet   11:52
11  that I inspected, because she said that all the   11:52
12  models were similar.   11:52
13          I'm paraphrasing what she said,   11:52
14  but -- and so the one product spec sheet that I   11:52
15  looked at I can reference, and then I can also bring   11:52
16  up for the first time Dr. Mankin's work and --   11:52
17      Q.  Okay.  Do you know if Dr. Mankin tested   11:52
18  this model?   11:52
19      A.  I do not know that.   11:52
20      Q.  Does that concern you?   11:52
21      A.  Well, not actually, no.   11:52
22      Q.  Why not?   11:52
23      A.  Because these are ultrasonic repellers   11:52
24  and they're sold as such and I have faith I guess you   11:52
25  could say that it's producing ultrasonic sound or you   11:52

22 (Pages 82 - 85)

1 wouldn't see the results that you do.          11:52
2    Q.   And as long as it's ultrasonic sound,     11:52
3 it's all the same?                   11:53
4    MR. OSTOJIC: Object to form, foundation.      11:53
5 BY THE WITNESS:                    11:53
6    A.   Of course not.          11:53
7 BY MR. KOPEL:                     11:53
8    Q.   Okay.   So let's go back to my question    11:53
9 before.                       11:53
10      Does it concern you that you didn't     11:53
11 know the frequency or amplitude of these device --   11:53
12 this device?                    11:53
13    A.   It would be supplemental information.   It  11:53
14 doesn't concern me in making my opinion.         11:53
15    Q.   Why not?               11:53
16    A.   Because, again, I'm assuming that it's   11:53
17 ultrasound.  The results bear out that there was an   11:53
18 effect of the repeller, and so it doesn't concern me.  11:53
19    Q.   How many speakers does this device       11:53
20 contain?                      11:53
21    A.   I do not know.           11:53
22    Q.   Does that concern you?        11:53
23    A.   Well, not insofar as the counts that    11:53
24 they -- that they made, no -- well, I don't      11:53
25 understand why it would.              11:53
                                   Page 86

1    Q.   Does it matter how many speakers a device  11:53
2 has in terms --                  11:53
3    A.   It can.                11:53
4    Q.   Let me just finish my question.  Sorry.    11:53
5    A.   Sorry.                 11:53
6    Q.   Does it matter how many speakers a device  11:53
7 has in terms of ascertaining its efficacy?       11:53
8    A.   It could.               11:54
9    Q.   Okay.   And let's say this device had two   11:54
10 speakers, would you feel comfortable saying devices   11:54
11 with one speaker are effective based on the data    11:54
12 produced in this test?              11:54
13    A.   I would say that the head count or the   11:54
14 specimen count that they made is what I'm relying --  11:54
15 is what I'm basing my opinion on.            11:54
16    MR. KOPEL: Can you repeat my question,       11:54
17 please?                       11:54
18          (WHEREUPON, the record was     11:54
19          read by the reporter.)      11:54
20    MR. OSTOJIC: Object to form.          11:54
21      Go ahead.                11:54
22 BY THE WITNESS:                    11:54
23    A.   If the experiment bears out, yes, I would  11:54
24 be comfortable.                  11:54
25                                Page 87

1 BY MR. KOPEL:                     11:54
2    Q.   Even though those devices have fewer     11:54
3 speakers than the device here?           11:54
4    A.   If it works, it works.         11:54
5    MR. OSTOJIC: Object to form.         11:54
6 BY MR. KOPEL:                     11:54
7    Q.   So is it relevant how many speakers a    11:54
8 device has?                     11:54
9    A.   I think it is.            11:54
10    Q.   Okay.   If it's relevant, then how are you  11:54
11 comfortable, nonetheless, extending these results    11:54
12 with other devices which may potentially have a     11:55
13 different amount of speakers?            11:55
14    MR. OSTOJIC: Object to form, foundation.      11:55
15 Argumentative.                   11:55
16      But go ahead.              11:55
17 BY THE WITNESS:                    11:55
18    A.   Because I am looking at the raw data that  11:55
19 were produced in an experiment testing the repellency  11:55
20 of an ultrasonic device, and whether those data or   11:55
21 whether the device has two speakers or one speaker,   11:55
22 it -- it -- I don't need to know that to interpret    11:55
23 and to analyze the data that came out -- the specimen  11:55
24 count.                       11:55
25                                Page 88

1 BY MR. KOPEL:                     11:55
2    Q.   And I understand that you can interpret    11:55
3 and analyze the data that came out, but my question   11:55
4 is something different than that.           11:55
5       My question is:  Are you comfortable     11:55
6 extending this data to models that have a different   11:55
7 number of speakers than this model?          11:56
8    MR. OSTOJIC: Object to form, foundation.      11:56
9 Asked and answered.                11:56
10      Go ahead.                11:56
11 BY THE WITNESS:                    11:56
12    A.   Yes.                  11:56
13 BY MR. KOPEL:                     11:56
14    Q.   How about speaker size?  What was the     11:56
15 size of these speakers?              11:56
16    A.   I do not know.            11:56
17    Q.   Okay.   Have you compared the size of     11:56
18 these speakers to other Bell + Howell models?       11:56
19    A.   No.                   11:56
20    Q.   Why not?               11:56
21    A.   My purpose for this -- for this role did   11:56
22 not include experimentation with different devices.   11:56
23    Q.   Now, let's say Bell + Howell          11:56
24 devices had different size speakers than these, would  11:56
25 you still be comfortable using these -- the data     11:56
                                   Page 89

23 (Pages 86 - 89)

Page 90

```
 1  produced from this test in rendering an opinion on    11:56
 2  those other models?                                   11:56
 3     A.  Yes.                                           11:56
 4     Q.  How about speaker direction?  Do you have      11:56
 5  any data on that for this model?                      11:56
 6     A.  No.                                            11:56
 7     Q.  Okay.  Is that relevant?                       11:57
 8     A.  I would think so.                              11:57
 9     Q.  Okay.                                          11:57
10     A.  And I've said that in the report.              11:57
11     Q.  Okay.  So if it's relevant, why didn't         11:57
12  you make an effort to determine what the speaker      11:57
13  direction was?                                        11:57
14     A.  Because, again, I -- my job was to look        11:57
15  at the data that were produced and determine if it    11:57
16  supported the claims made on the product literature.  11:57
17     Q.  Even -- even if the product literature is      11:57
18  on a device that has a speaker with a different       11:57
19  direction or a different size?                        11:57
20     MR. OSTOJIC:  Objection.  Misstates the            11:57
21  evidence, but go ahead and answer.                    11:57
22  BY THE WITNESS:                                       11:57
23     A.  I think you gave me a -- you said even         11:57
24  if, and I need to -- you need to rephrase.            11:57
25     MR. KOPEL:  Sure.  Yeah, yeah.                     11:57
```

Page 91

```
 1  BY MR. KOPEL:                                         11:57
 2     Q.  Does that hold true even if the product        11:57
 3  literature you're referring to is -- is -- contains a 11:57
 4  product that has a different size speaker, different  11:58
 5  number of speakers, different speaker direction?      11:58
 6     MR. OSTOJIC:  Object to form, foundation,          11:58
 7  also may misstate the evidence.                       11:58
 8     But go ahead.                                      11:58
 9  BY THE WITNESS:                                       11:58
10     A.  Yeah, I -- when you say product               11:58
11  literature, I need to know are you talking back to    11:58
12  the published tests, the research that we --           11:58
13  BY MR. KOPEL:                                         11:58
14     Q.  I just used the words product literature      11:58
15  because you did.                                      11:58
16     A.  Okay.                                          11:58
17     Q.  So if you want me to take a step back,        11:58
18  I'm happy to.                                         11:58
19     A.  Yeah, that might help, because I'm            11:58
20  confused.                                             11:58
21     Q.  Okay.  So -- and I'll take a step back,       11:58
22  and I'm sorry, because I'm going to ask you some      11:58
23  questions that you've already answered, but I think   11:58
24  it would be helpful just to establish the foundation  11:58
25  again.                                                11:58
```

Page 92

```
 1     You don't know what the speaker size              11:58
 2  of this model was; correct?                           11:58
 3     A.  That's correct.                                11:58
 4     Q.  But you're still using this data to            11:58
 5  render an opinion on other models that may or may not 11:58
 6  have different speaker sizes?                          11:58
 7     MR. OSTOJIC:  Object.  Asked and answered,         11:58
 8  but go ahead.                                         11:58
 9  BY THE WITNESS:                                       11:58
10     A.  I am.                                          11:58
11  BY MR. KOPEL:                                         11:58
12     Q.  And you don't know how many speakers this     11:58
13  device has; correct?                                  11:58
14     A.  I do not.                                      11:59
15     Q.  But you're still using the data from this     11:59
16  test to render an opinion on models which may or may  11:59
17  not have different amounts of speakers?               11:59
18     MR. OSTOJIC:  Same objections.                     11:59
19  BY MR. KOPEL:                                         11:59
20     Q.  -- correct?                                    11:59
21     A.  My opinions are -- are on Bell + Howell       11:59
22  repellers, so, yes, I mean that -- that's the extent  11:59
23  of the opinion.                                       11:59
24     Q.  Okay.  Now, I think in your criticism of      11:59
25  Dr. Potter's work, you said that studies from         11:59
```

Page 93

```
 1  peer-reviewed literature were not extendable to the   11:59
 2  Bell + Howell devices because they weren't --          11:59
 3  potentially had different speaker sizes.              11:59
 4     Do you recall saying that?                        11:59
 5     A.  That was one of the examples, yeah.           11:59
 6     Q.  Okay.  How is this different, what you're     11:59
 7  doing here from what you're criticizing Dr. Potter    11:59
 8  from doing?                                           11:59
 9     A.  Because I am looking at the data that was     11:59
10  supplied to me, and I analyzed it, I rendered an      11:59
11  opinion based on these data.                          11:59
12     Q.  And how is it different from what            12:00
13  Dr. Potter did?                                       12:00
14     A.  Well, Dr. Potter's experiments --            12:00
15     Q.  I'm sorry to interrupt you.  You might       12:00
16  have misunderstood the question.                      12:00
17     I'm talking about Dr. Potter's use             12:00
18  of published studies regarding non Bell + Howell      12:00
19  repellers, all right, and I believe you criticized   12:00
20  him for using that data to render an opinion on the   12:00
21  efficacy of Bell + Howell repellers; is that correct? 12:00
22     A.  That is correct.                              12:00
23     Q.  Okay.                                         12:00
24     A.  Yes.                                          12:00
25     Q.  And one reason you identified is that --     12:00
```

24 (Pages 90 - 93)

1  is that the -- the repellers might contain different   12:00
2  numbers of speakers.                      12:00
3        Do you remember saying that?        12:00
4     A.  Yes.                                12:00
5     Q.  Okay.  How is that -- how is that   12:00
6  different than what you did here?          12:00
7     A.  Because these are Bell + Howell -- these   12:00
8  were Bell + Howell devices that I'm analyzing.   12:00
9     Q.  Do some Bell + Howell --           12:00
10    A.  He --                              12:00
11    Q.  I'm sorry.  No, I didn't mean to   12:00
12 interrupt you.  Go ahead.                  12:01
13    A.  The published literature back from the   12:01
14 '80s and '90s did not include Bell + Howell devices.   12:01
15    Q.  So is the relevant analysis whether or   12:01
16 not it has the same name on the device; is that the   12:01
17 relevant analysis?                         12:01
18    A.  Well the relevance of the name is that   12:01
19 it -- the manufacturer manufacturers a device to   12:01
20 their specifications.                      12:01
21       We don't know whether the devices   12:01
22 that were tested in the '80s and '90s have the same   12:01
23 specifications as Bell + Howell.           12:01
24       And when I say specifications, I   12:01
25 don't just mean just frequencies and decibels.  I
                                        Page 94

1  mean, you know, the whole package.        12:01
2     Q.  Do all Bell + Howell devices contain the   12:01
3  same number of speakers?                   12:01
4     A.  At this time I don't know.  I mean in   12:01
5  this -- Ms. Feuerstein said in her deposition that   12:01
6  the devices evolved over -- improved over time.  That   12:02
7  was her -- her terminology.                12:02
8        So when you say do all of them have,   12:02
9  I don't know -- I suspect it might be different   12:02
10 because they've been selling them for X number of   12:02
11 years.                                     12:02
12    Q.  Okay.  So if -- if one model has two   12:02
13 speakers and one model has one, are those the same   12:02
14 specifications?                            12:02
15    A.  No.                                12:02
16    Q.  Okay.  But, nonetheless, you've extended   12:02
17 the test results from this model onto all -- all   12:02
18 models of Bell + Howell pest repellers; correct?   12:02
19    A.  Well --                            12:02
20    MR. OSTOJIC:  Object.  Asked and answered   12:02
21 like four or five times.                   12:02
22       But go ahead.                       12:02
23 BY THE WITNESS:                            12:02
24    A.  This model and the next model you're   12:02
25 going to bring up and the model after that and the   12:02
                                        Page 95

1  model after that, so it wasn't just this model.   12:02
2  BY MR. KOPEL:                             12:02
3     Q.  Yeah, but you've done anything to confirm   12:02
4  that these models have the same specifications as the   12:02
5  other Bell + Howell pest repellers; correct?   12:02
6     MR. OSTOJIC:  Same objection.          12:02
7  BY THE WITNESS:                           12:02
8     A.  I -- I did.  I looked at the product spec   12:02
9  sheet for a model, I looked at Mankin's results, and   12:02
10 I concluded that they produced ultrasonic sound.   12:03
11 BY MR. KOPEL:                             12:03
12    Q.  Can you explain why you criticize   12:03
13 Dr. Potter for using test results of models that   12:03
14 potentially have two different numbers of speakers   12:03
15 whereas you did the same thing?            12:03
16    MR. OSTOJIC:  Object.  Argumentative.  Also   12:03
17 asked and answered.  And to the form of the question.   12:03
18       If you want you can refresh your   12:03
19 recollection by looking at your report where you make   12:03
20 that criticism.                            12:03
21    THE WITNESS:  Can you point me to where that   12:03
22 criticism is?                             12:03
23 BY MR. KOPEL:                             12:05
24    Q.  I'm looking at Page 18 of your rebuttal   12:05
25 report.                                   12:05
                                        Page 96

1     A.  Okay.  I'm there.                  12:05
2     Q.  Okay.  I'm looking at the second   12:05
3  paragraph.  You said here, "Since ultrasound is   12:05
4  unidirectional, the directional position of the   12:06
5  speakers within the case is vitally important to the   12:06
6  effectiveness of the device.  Speaker number, size   12:06
7  and direction, are examples of several independent   12:06
8  variables/components within all ultrasonic brands and   12:06
9  models that can vary and thus variably affect device   12:06
10 efficacy.  This goes to my opinionated position that   12:06
11 it's incumbent upon scientists to stay the   12:06
12 conservative course and not assume or make misleading   12:06
13 proclamations that an untested device would perform   12:06
14 as well or as poorly as tested devices under the same   12:06
15 experimental conditions even if certain other   12:06
16 variables, components, and functionalities are   12:06
17 similar."                                 12:06
18       Do you see that?                    12:06
19    A.  Yes.                              12:06
20    Q.  Okay.  Are you doing the same thing   12:06
21 you're criticizing in -- in using this report to   12:06
22 render an opinion that all Bell + Howell models are   12:06
23 effective?                                12:06
24    A.  I do not believe so because they're   12:06
25 manufactured by Bell + Howell.            12:06
                                        Page 97

25 (Pages 94 - 97)

**Page 98**

```
 1     Q.  Okay.  And -- I'm sorry to interrupt.   12:06
 2     A.  And Ms. Feuerstein testified that there's  12:06
 3  a -- there's a lineage of devices improved over time,  12:07
 4  and the same technology is in each of them.    12:07
 5     Q.  But speaker number, size, and direction,  12:07
 6  these are all variables that you did not compare  12:07
 7  these devices to the other models on; correct?   12:07
 8     A.  Correct.                    12:07
 9     MR. OSTOJIC:  Object.  Asked and answered.  12:07
10     MR. KOPEL:  Let's move on.        12:07
11  BY MR. KOPEL:                     12:07
12     Q.  Please turn back to the study we were  12:07
13  discussing, the one ending in 3439.  I'm still on the  12:07
14  first page.                      12:07
15     A.  3439.  First page.           12:07
16        Okay.                      12:07
17     Q.  See Comments, Remark section?   12:07
18     A.  Yes.                       12:07
19     Q.  It says, "Canceled bread and white   12:07
20  granulated sugar as food for spiders on 12 -- March  12:07
21  2012, the spiders were not eating and drinking."  12:07
22        Do you see that?             12:08
23     A.  Yes.                       12:08
24     Q.  Okay.  Do you spiders eat bread and white  12:08
25  granulated sugar?                  12:08
```

**Page 99**

```
 1     A.  Not in my experience.         12:08
 2     Q.  Okay.  Does that make you question the  12:08
 3  competence of the people running this report -- this  12:08
 4  testing?                        12:08
 5     A.  It tells me that they were inexperienced  12:08
 6  in protocol design.                12:08
 7     Q.  Is it important for someone to have   12:08
 8  experience in protocol design when running tests like  12:08
 9  this?                          12:08
10     A.  It's certainly helpful.         12:08
11     Q.  Is it important?             12:08
12     MR. OSTOJIC:  Object.  Asked and answered.  12:08
13     But go ahead.                  12:08
14  BY THE WITNESS:                   12:08
15     A.  It's a subjective word.        12:08
16  BY MR. KOPEL:                     12:08
17     Q.  Well, you're rendering opinions in this  12:08
18  case; right?                     12:08
19        Is it your opinion that it's      12:08
20  important?                       12:08
21     A.  All right.  Please read the question  12:08
22  again.  Sorry.                    12:08
23     MR. KOPEL:  Do you know what question the  12:09
24  witness is referring to?             12:09
25        Sorry.                     12:09
```

**Page 100**

```
 1        (WHEREUPON, the record was
 2        read by the reporter.)        12:09
 3  BY THE WITNESS:                   12:09
 4     A.  That depends on the laboratory let's say,  12:09
 5  their laboratory.                 12:09
 6        You could have a technician who is  12:09
 7  just following orders; and if the protocol was  12:09
 8  established by someone who was experienced and the  12:09
 9  technician's job was to count the insects, then it  12:09
10  does -- in my opinion it does not -- it is not  12:10
11  important for that technician to be an expert in  12:10
12  protocol design.                  12:10
13  BY MR. KOPEL:                     12:10
14     Q.  Would the food that you're feeding the  12:10
15  insects be part of a protocol?        12:10
16     MR. OSTOJIC:  Object to form, foundation.  12:10
17  BY THE WITNESS:                   12:10
18     A.  If food was being used, yes.    12:10
19  BY MR. KOPEL:                     12:10
20     Q.  Okay.  So it appears that whoever made  12:10
21  this protocol was inexperienced; correct?  12:10
22     A.  It does.  Whoever -- yes -- well, let  12:10
23  me -- whoever designed the protocol and put it to  12:10
24  words that -- that bread and white granulated sugar  12:10
25  should be included in the spider testing.  12:10
```

**Page 101**

```
 1  BY MR. KOPEL:                     12:10
 2     Q.  Does that give you any concern as to the  12:10
 3  reliability of what was done in this study?  12:10
 4     A.  No.                       12:10
 5     Q.  Please turn to the next page.    12:10
 6        Under the -- the Object         12:10
 7  heading, the last line says, "Both frequency and  12:10
 8  sound pressure (DB) are important parameters."  12:10
 9        Do you see that?             12:11
10     A.  I do.                     12:11
11     Q.  Do they -- do they say that speaker size  12:11
12  is an important parameter?            12:11
13     A.  It does not state that.        12:11
14     Q.  Do they say that speaker -- the number of  12:11
15  speakers is an important parameter?   12:11
16     A.  It does not say that.          12:11
17     Q.  Does it say that speaker direction is an  12:11
18  important parameter?                12:11
19     A.  It does not say that.          12:11
20     Q.  Please look at the next page.  There's a  12:11
21  heading title, "Preparation and Handling of  12:11
22  Ants/Spiders/Roaches."              12:11
23        Do you see that?             12:11
24     A.  Yes.                       12:11
25     Q.  Now, here it says that "As spiders are  12:11
```

26 (Pages 98 - 101)

1 larger and far more aggressive than ants and roaches,  12:11
2 they can, and often do, kill smaller pests like ants  12:11
3 and roaches. Therefore, the testing of spiders and  12:11
4 ants/roaches must be conducted separately in  12:11
5 different times."  12:11
6      Do you see that?  12:11
7    A.  Yes.  12:11
8    Q.  Do you agree with that statement?  12:11
9    A.  Not 100 percent.  12:11
10   Q.  Okay. Why not?  12:12
11   A.  Because ants can be very aggressive.  12:12
12   Q.  Okay. And when you say ants can be very  12:12
13 aggressive, do you mean that they can be aggressive  12:12
14 towards roaches?  12:12
15   A.  They could be.  12:12
16   Q.  Okay. Now, do you -- do you agree,  12:12
17 though, with the second sentence that we read?  12:12
18 "Therefore, the testing of spiders and ants/roaches  12:12
19 must be conducted separately in different times"?  12:12
20   A.  That would be ideal.  12:12
21   Q.  Do you agree with it?  12:12
22   A.  Well, it depends -- I do not agree whole  12:12
23 heart -- I mean in -- without reservation or without  12:12
24 qualification because when the word must be it,  12:12
25 depends on the purpose of the test.  12:12

Page 102

1    Q.  Well, okay. If -- do you agree that  12:12
2 spiders eat roaches?  12:13
3    A.  Yes.  12:13
4    Q.  Okay. Now, would you suppose that the  12:13
5 presence of a roach in a certain area might affect  12:13
6 the movement of the spider?  12:13
7    A.  If -- yes. However, let me elaborate.  12:13
8      What we're not talking about here is  12:13
9 the species of spider or the species of -- this is a  12:13
10 generalization, okay.  12:13
11     Spiders are predatory. They eat  12:13
12 other insects; and so if a roach happens upon their  12:13
13 nest -- or their web -- sorry -- they might eat it.  12:13
14   Q.  Okay. Now, let's talk about in the  12:13
15 context of testing, please.  12:13
16   A.  Yeah.  12:13
17   Q.  Okay. Would you agree that it's a  12:13
18 confounding variable to place insects together in a  12:13
19 chamber where one insect preys upon the other insect?  12:13
20     MR. OSTOJIC: Object to form.  12:14
21 BY THE WITNESS:  12:14
22   A.  I would not advise that.  12:14
23 BY MR. KOPEL:  12:14
24   Q.  Would you agree that it's a confounding  12:14
25 variable?  12:14

Page 103

1      MR. OSTOJIC: Object to form.  12:14
2 BY THE WITNESS:  12:14
3    A.  It could be. You have to look at the  12:14
4 data to find out if it was confounding or not.  12:14
5 BY MR. KOPEL:  12:14
6    Q.  Would you agree that that could  12:14
7 potentially render the data from that -- from that  12:14
8 test unreliable?  12:14
9    A.  No. I'd have to say that the data that  12:14
10 comes out of that is worth something because you want  12:14
11 to -- you want to gather all the data that you  12:14
12 possibly can.  12:14
13   Q.  Now, do you have experience in dealing  12:14
14 with pest infestations in private homes?  12:14
15   A.  Yes.  12:14
16   Q.  Is it common to see an infestation of  12:14
17 spiders and roaches at the same time in the same  12:14
18 home?  12:14
19   A.  I am not -- I cannot answer that. It  12:14
20 would be a -- there's no reason not to believe they  12:15
21 can.  12:15
22   Q.  Have you ever seen it?  12:15
23   A.  No.  12:15
24   Q.  Would you suppose -- I'm sorry. Were you  12:15
25 done with your answer?  12:15

Page 104

1    A.  Yeah, because even -- the word  12:15
2 infestation is subjective. I don't know what you  12:15
3 mean by infestation.  12:15
4      If you're meaning spiders appearing  12:15
5 everywhere, crawling over the table, crawling, you  12:15
6 know, that's one thing as opposed to there's one  12:15
7 spider web up in the corner of the room, and the same  12:15
8 thing goes for roaches.  12:15
9      It's a subjective -- infestation is  12:15
10 a subjective word, means different things to  12:15
11 different people. Different homeowners have more  12:15
12 tolerance that other homeowners.  12:15
13   Q.  Have you seen that people with cats eat  12:15
14 less likely to have rodent problems in their home?  12:15
15     MR. OSTOJIC: Object to form.  12:15
16 BY THE WITNESS:  12:15
17   A.  I have not because I don't own a cat.  12:15
18 BY MR. KOPEL:  12:16
19   Q.  Would you suppose that because cats eat  12:16
20 or harass rodents, people with cats are less likely  12:16
21 to have rodent problems in their homes?  12:16
22     MR. OSTOJIC: Object to form, but go ahead.  12:16
23 BY THE WITNESS:  12:16
24   A.  That seems like a logical extension to  12:16
25 me.  12:16

Page 105

27 (Pages 102 - 105)

BY MR. KOPEL:                                  12:16

2    Q.   Okay.  Can you please look at the page    12:16

3 with the Bates number -- oh, excuse me.  I think you    12:16

4 have different Bates numbers than I do.              12:16

5        I'm looking at this same test.             12:16

6 There's a chart for spiders.                       12:16

7        Do you see that?                            12:16

8    A.   I think we're on the same page, yeah.      12:16

9    Q.   Okay.  Great.                              12:17

10       Do you see here there's -- on the          12:17

11 bottom of the chart it says, "Note" and there's three    12:17

12 bullet points here?                                12:17

13   A.   Yes.                                       12:17

14   Q.   Okay.  The second one indicates that       12:17

15 these spiders were eating roaches; correct?        12:17

16   A.   "Each spider chamber was provided 10       12:17

17 recently dead roaches as food for spiders on a daily    12:17

18 basis."                                           12:17

19       I see that.                                 12:17

20   Q.   Would you suppose that if you had spiders    12:17

21 around -- in the same space as roaches, it would be    12:17

22 likely that the spiders would eat the roaches?      12:17

23       MR. OSTOJIC:  Object to form.  Incomplete    12:17

24 hypothetical.                                      12:17

25       But go ahead.                               12:17

Page 106

---

BY THE WITNESS:                                12:17

2    A.   It could but not --                        12:17

3 BY MR. KOPEL:                                      12:17

4    Q.   That wouldn't concern you in the context    12:17

5 of a test?                                         12:17

6        MR. OSTOJIC:  Object to form, foundation.    12:17

7        But go ahead.                               12:17

8 BY THE WITNESS:                                    12:17

9    A.   As I said, I would not have designed an    12:17

10 experiment with -- and put spiders and roaches and    12:17

11 ants in the chamber or the testing arena at the same    12:17

12 time.                                             12:18

13 BY MR. KOPEL:                                     12:18

14   Q.   Okay.  Would you have put roaches and      12:18

15 ants in the same arena at the same time if you had    12:18

16 designed an experiment?                           12:18

17   A.   You know, let me -- let me qualify.        12:18

18       It really depends on the purpose of        12:18

19 the experiment.                                   12:18

20       You could set out a hypothesis where       12:18

21 the purpose of experiment being I want to find out    12:18

22 what happens when ants and roaches are put in the    12:18

23 chamber together.  You'd have to do it that way in    12:18

24 order to answer that question.                     12:18

25   Q.   Sure.                                      12:18

Page 107

---

Do you think that that was the       12:18

2 purpose of this test?                              12:18

3    A.   I don't know actually.  I wasn't in the    12:18

4 room when they designed the experiment.            12:18

5    Q.   Okay.  Can you turn to -- back to the      12:18

6 second page where it says, "Object."              12:18

7        Okay.  Do you see the sentence where       12:18

8 it says, "This is to measure the efficacy of high-    12:18

9 frequency sound as a pest management tool"?         12:19

10   A.   Wait a minute.  I'm just now getting to    12:19

11 it.                                               12:19

12       MR. OSTOJIC:  What page is that?            12:19

13       MR. KOPEL:  Sure.  It's the second page of    12:19

14 this test.                                         12:19

15 BY THE WITNESS:                                    12:19

16   A.   Okay.  And where are you -- you're under    12:19

17 "Object."                                          12:19

18 BY MR. KOPEL:                                      12:19

19   Q.   Yep.  The third sentence.                  12:19

20   A.   "This is to measure the efficacy of high-    12:19

21 frequency sound as a pest management tool."         12:19

22       Yeah, I see that.                           12:19

23   Q.   Okay.  So we're pretty clear of what the    12:19

24 object of this test is?                            12:19

25   A.   That's what they state.                    12:19

Page 108

---

Q.   Okay.  If you were designing a test with    12:19

2 that object, would you put ants and roaches in the    12:19

3 same chamber?                                      12:19

4    A.   You know, now that I think about it, I    12:19

5 might, because in a pest -- in a house if there is a    12:19

6 infestation of all three of these things, a large    12:19

7 enough infestation to be concerned, you might want to    12:19

8 do that.                                           12:19

9        In my opinion it wouldn't be the           12:19

10 only thing I'd do, but that seems to be a valid     12:19

11 question since these pests do occur in the -- can    12:20

12 occur I should say -- in the same room at the same    12:20

13 time.                                             12:20

14 BY MR. KOPEL:                                     12:20

15   Q.   And if tests -- if tests are used that    12:20

16 use multiple pests in the same chamber at the same    12:20

17 time, can the data from those tests necessarily be    12:20

18 reliable to say what would have occurred had they not    12:20

19 done so?                                           12:20

20       MR. OSTOJIC:  Object to form, foundation.    12:20

21 BY THE WITNESS:                                    12:20

22   A.   Had they not done what?                    12:20

23 BY MR. KOPEL:                                      12:20

24   Q.   Put multiple pests in the same chambers    12:20

25 at the same time.                                 12:20

Page 109

---

28 (Pages 106 - 109)

1     MR. OSTOJIC:  Same objections.          12:20
2 BY THE WITNESS:                             12:20
3     A.  I've lost the first part of your    12:20
4 question.                                   12:20
5     MR. KOPEL:  Sure.                        12:20
6 BY MR. KOPEL:                                12:20
7     Q.  Let's say a home has an infestation of   12:20
8 ants, does not have an infestation of spiders or   12:20
9 roaches, okay?                               12:20
10    A.  Uh-huh.                              12:20
11    Q.  Let's say you take a test where ants and   12:20
12 roaches are tested in the same chamber at the same   12:20
13 time, would the data from that test necessarily   12:20
14 translate to the case of the home that only has an   12:21
15 ant infestation?                            12:21
16    MR. OSTOJIC:  Object to incomplete       12:21
17 hypothetical, form.                         12:21
18        But go ahead and answer.            12:21
19 BY THE WITNESS:                             12:21
20    A.  There are other factors involved.  It   12:21
21 would not be a direct one-to-one -- one-to-one test   12:21
22 versus what you're observing in the house.  12:21
23        If you got just ants in the house   12:21
24 and you've got data that's based on roaches and ants,   12:21
25 it's -- it's not a direct comparison, no.   12:21
Page 110

1 BY MR. KOPEL:                                12:21
2     Q.  So in this test they tested the roaches   12:21
3 and ants in the same chamber at the same time;   12:21
4 correct?
5     A.  Well, it appears so, but let me read the   12:22
6 protocol to make sure that I'm --           12:22
7     Q.  That's okay.  If it's helpful you can   12:22
8 take a look at Page 3 --                     12:22
9     A.  That would help.                     12:22
10    Q.  -- the second paragraph, the last    12:22
11 sentence of the second paragraph.           12:22
12    A.  "In order to prevent spiders -- in order   12:22
13 to prevent spiders eat ants and roaches, the testing   12:22
14 will be conducted separately, spiders in one   12:22
15 testing" -- yes, you are right.             12:22
16    Q.  Okay.  Do you feel comfortable using the   12:22
17 data from the roaches and the ants portion of this   12:22
18 study in rendering an opinion on a home which might   12:22
19 only have ants or only have roaches?        12:22
20    A.  Yes, I do.                           12:22
21    Q.  Why?                                 12:22
22    A.  Because -- because I'm presented with   12:22
23 data that show a difference in -- in results when the   12:22
24 repeller is on or off.                      12:23
25    Q.  Now, do you agree that ants and roaches   12:23
Page 111

1 can affect each other's movements?          12:23
2     A.  They might.                          12:23
3     Q.  So let's say the ultrasonic technology   12:23
4 was only effective as to roaches or ants, but -- so   12:23
5 under those circumstances wouldn't it be possible   12:23
6 that as a secondary result the one that it is not   12:23
7 effective for would also exhibit movement?   12:23
8     MR. OSTOJIC:  Object.  Form, foundation,   12:23
9 incomplete hypothetical.                     12:23
10        Go ahead.                            12:23
11 BY THE WITNESS:                             12:23
12    A.  Could you repeat that long question?  12:23
13    MR. KOPEL:  Sure.                        12:23
14 BY MR. KOPEL:                               12:23
15    Q.  Let's say -- let's say that ultrasonic   12:23
16 technology were effective to affect the movement of   12:24
17 roaches and not ants, okay?                 12:24
18    A.  Okay.  Hypothetical.                 12:24
19    Q.  Hypothetical, right.                 12:24
20        Under those circumstances, if you    12:24
21 tested roaches and ants together in the same chamber,   12:24
22 even under this hypothetical where the technology is   12:24
23 not effective towards the ants, you still might see   12:24
24 some increased movement on the part of the ants due   12:24
25 to its effectiveness on the roaches; would that be   12:24
Page 112

1 correct?                                     12:24
2     A.  You might.                           12:24
3     MR. OSTOJIC:  Object to form, foundation.   12:24
4 Incomplete hypothetical.                     12:24
5        But go ahead.                         12:24
6 BY THE WITNESS:                             12:24
7     A.  You might.                           12:24
8 BY MR. KOPEL:                               12:24
9     Q.  Okay.  So does that concern you in terms   12:24
10 of extending the data from this test to a situation   12:24
11 where only roaches were present or only ants were   12:24
12 present?                                     12:24
13    A.  Again, I say not really.             12:24
14 BY MR. KOPEL:                               12:24
15    Q.  What species were used in this test?   12:24
16    A.  They do not say.                     12:24
17    Q.  Is it important to know what species   12:25
18 there are -- they use?                      12:25
19    A.  It would be helpful.                 12:25
20    Q.  Is it important?                     12:25
21    MR. OSTOJIC:  Object to asked and answered.   12:25
22        But go ahead.                        12:25
23 BY THE WITNESS:                             12:25
24    A.  Not necessary in my opinion.         12:25
25
Page 113

29 (Pages 110 - 113)

1 BY MR. KOPEL:                              12:25
2     Q.  Okay.  Do you know if they used the      12:25
3 species of ants that are -- that are present in the   12:25
4 United States?                             12:25
5     A.  I do not.                          12:25
6     Q.  Do you know if they use a species of      12:25
7 roaches that are present in the United States?    12:25
8     A.  Based on the picture that is provided --   12:25
9 and this is the only evidence I have to go by,    12:25
10 okay -- that picture resembles cockroaches that are   12:25
11 present in the United States.                  12:25
12    Q.  Are you referring to the hand drawing?   12:25
13    A.  No, Page 3 of 19.  There's a --         12:25
14    Q.  Is that a real picture, or is that a     12:25
15 depiction?                                 12:26
16    A.  I -- I don't know, but if you -- you     12:26
17 know, I'm -- what was the original question?  Do I   12:26
18 know?                                    12:26
19    Q.  The question is:  Do you know whether   12:26
20 they use a species of spiders that are present in the   12:26
21 United States?                             12:26
22    A.  I do not.                          12:26
23    Q.  Do you know if they use a species of     12:26
24 roaches that are present in the United States?    12:26
25    A.  I do not.                          12:26

Page 114

1     Q.  Is it possible that a species of ants,    12:26
2 spiders, or roaches that live across the world might   12:26
3 react differently to stimuli than species that live   12:26
4 in the U.S.?                               12:26
5     MR. OSTOJIC:  Object to form.            12:26
6     Go ahead.                             12:26
7 BY THE WITNESS:                            12:26
8     A.  In my opinion that's a small           12:26
9 insignificant probability.                     12:26
10 BY MR. KOPEL:                             12:26
11    Q.  So it's possible, but you think it's      12:26
12 unlikely; is that a fair -- is that accurate?     12:26
13    MR. OSTOJIC:  Object to form.            12:26
14 BY THE WITNESS:                            12:26
15    A.  It's unlikely --                     12:26
16 BY MR. KOPEL:                             12:26
17    Q.  I'm sorry.  You just nodded your head,   12:26
18 and you can't -- was that a?                   12:26
19    A.  Well, I was waiting for you to finish.    12:26
20    Q.  Okay.  Go ahead.                     12:26
21    A.  Unlikely and insignificant.            12:26
22    Q.  Was this test replicated?              12:27
23    A.  I did not read that it was replicated,    12:27
24 no.                                      12:27
25    Q.  Was there a control used for this test?   12:27

Page 115

1     A.  The word control, again, can be defined   12:27
2 in different ways, and you could make the case here   12:27
3 that the control or the treatments between days, 24   12:27
4 hours, 48 hours, 72 hours, et cetera, those are --   12:27
5 you could make the case that those are independent   12:27
6 observations and, therefore, one controls for the   12:27
7 other.                                    12:28
8     Q.  Do you know what would have occurred had   12:28
9 they run this testing for seven days without the   12:28
10 repellers on?                              12:28
11    MR. OSTOJIC:  Object to form.            12:28
12 BY THE WITNESS:                            12:28
13    A.  Do I know what would happen if they --   12:28
14 I'm trying to restate it in my mind.            12:28
15 BY MR. KOPEL:                             12:28
16    Q.  Well, maybe I can -- maybe I can rephrase   12:28
17 the question.                              12:28
18    A.  Okay.                              12:28
19    Q.  Okay.  Let's talk about spiders.         12:28
20       What would the distribution of           12:28
21 spiders have been had they run this testing but   12:28
22 with no repeller present or turned on?           12:28
23    MR. OSTOJIC:  Object.  Form, foundation.     12:28
24 BY THE WITNESS:                            12:28
25    A.  Given the fact that these spiders were    12:28

Page 116

1 fed, it's likely that they would have stayed in the   12:28
2 same place that they were released.             12:28
3 BY MR. KOPEL:                             12:28
4     Q.  Do you know -- do you -- do you -- can    12:29
5 you tell me for a fact that the distribution would   12:29
6 have been any different had these repellers been not   12:29
7 present or not turned on?                      12:29
8     MR. OSTOJIC:  Wait.  Object to form,        12:29
9 foundation.                               12:29
10       Would you repeat that?                 12:29
11       (WHEREUPON, the record was             12:29
12       read by the reporter.)                 12:29
13    THE WITNESS:  I'm -- I'm still not quite     12:29
14 understanding it.  Maybe you can rephrase it.     12:29
15    MR. KOPEL:  Sure.                        12:29
16 BY MR. KOPEL:                             12:29
17    Q.  Now, in the course of your work at Dow,   12:29
18 when you were assessing studies, which were relevant   12:29
19 towards evaluating insecticide efficacy, was it     12:29
20 important for you to see data on controls used?   12:30
21    A.  Yes.                               12:30
22    Q.  Okay.  And under those circumstances did   12:30
23 you typically rely on pretesting data, or was the   12:30
24 control a whole separate treatment for the same   12:30
25 length of time without -- without the treatment   12:30

Page 117

30 (Pages 114 - 117)

Page 118:

1 applied?                                          12:30
2       MR. OSTOJIC: Object to form.          12:30
3       Go ahead.                              12:30
4 BY THE WITNESS:                              12:30
5       A. Typically the experiments that -- that we   12:30
6 use for insecticide testing involves an untreated    12:30
7 control for the same amount of time as you were      12:30
8 treating -- as the treatment was applied.            12:30
9       So everything is equal, identical,      12:30
10 except for the one variable you're trying to discern,   12:31
11 discriminate with, which would be the treatment.    12:31
12       Insecticide, yes; insecticide, no.    12:31
13       Q. And why was that the case? Why was that   12:31
14 important?                                    12:31
15       A. That was important because you wanted to   12:31
16 be able to statistically determine whether there was   12:31
17 a difference between the result in the control plot   12:31
18 which had no insecticide versus the treatment plot.   12:31
19       Q. And that was not done in this test;   12:31
20 correct?                                     12:31
21       MR. OSTOJIC: Object to form.          12:31
22 BY THE WITNESS:                             12:31
23       A. The experiments were different, but   12:31
24 they -- they had a -- a chamber which had -- did not   12:31
25 have a repeller, and so it was not done. I -- you   12:31
Page 118

Page 119:

1 have to -- in this type of experiment what's    12:32
2 important is that in -- is that all conditions are   12:32
3 equal, identical in both chambers, and the fact that   12:32
4 in pretesting you -- again, going back to the   12:32
5 statistics, you want to make sure that there's no   12:32
6 bias in those two chambers.                   12:32
7       And so you -- the purpose of the       12:32
8 pretest is to test -- to validate that the     12:32
9 distribution of spiders in this case would be equal   12:32
10 between the two chambers.                     12:32
11       So you're -- okay. I'll just stop     12:32
12 there because I think I'm off on a tangent.   12:32
13       Q. And you only have that data for 2 days,   12:32
14 you don't have it for 7 days; correct?       12:33
15       A. I do not.                          12:33
16       Q. And we don't know what the data would   12:33
17 have borne out had it been done for 7 days; correct?   12:33
18       A. I do not --                        12:33
19       MR. OSTOJIC: Object to form.          12:33
20 BY THE WITNESS:                             12:33
21       A. -- expect it would be any different.   12:33
22 BY MR. KOPEL:                               12:33
23       Q. Do you know?                       12:33
24       A. I do not expect it to be any different.   12:33
25
Page 119

Page 120:

1 BY MR. KOPEL:                               12:33
2       Q. And I understand what you expect, but do   12:33
3 you know is the question?                    12:33
4       MR. OSTOJIC: Object to form. Asked and   12:33
5 answered.                                    12:33
6       But go ahead.                         12:33
7 BY THE WITNESS:                             12:33
8       A. Preliminary testing was not done for 7   12:33
9 days, so I do not have data for 5 more days than   12:33
10 what's provided here.                        12:33
11 BY MR. KOPEL:                              12:33
12       Q. Have you ever relied -- in the course of   12:33
13 your time at Dow, have you ever relied on product   12:33
14 testing that used a pretest as a control where the   12:33
15 pretest was less than a third of the testing length?   12:33
16       A. That does not cause me concern. I can't   12:34
17 remember or cite a particular experiment we ran that   12:34
18 had less than the duration of the test itself, but   12:34
19 once the distribution, whether it's on Day 1, 2, 3,   12:34
20 4, 5, 6, 7, once the distribution of insects equals   12:34
21 out between the two chambers, then you've got what   12:34
22 you want, you're control is -- is working.    12:34
23       Q. Okay. And would you agree that it's --   12:34
24 the generally accepted principle in the scientific   12:34
25 world would be to run the control for the same amount   12:34
Page 120

Page 121:

1 of time as the treatment?                    12:34
2       MR. OSTOJIC: Object to form.          12:34
3 BY THE WITNESS:                             12:34
4       A. I would not agree it's generally     12:34
5 accepted. It would be great if you had the time and   12:35
6 the resources to do it. It would be nice.    12:35
7 BY MR. KOPEL:                              12:35
8       Q. Do you think that a study which used the   12:35
9 pretest period that was less than a third in the   12:35
10 length of the treatment period, do you think that   12:35
11 this could withstand peer review in a journal?   12:35
12       A. I do.                              12:35
13       Q. Have you ever seen that where a study was   12:35
14 published in a journal that used a much shorter   12:35
15 pretest as the control?                      12:35
16       A. Well, you've asked me my opinion. I said   12:35
17 I think it could be published.               12:35
18       Have I -- can I give you a reference   12:35
19 in a journal, volume, page numbers, no, I cannot do   12:35
20 that.                                        12:35
21       Q. Can you please turn to the chart for   12:35
22 roaches and ants.                            12:36
23       On Day 1, so this is --                12:36
24       MR. OSTOJIC: Hold on.                 12:36
25       MR. KOPEL: I'm sorry.                 12:36
Page 121

31 (Pages 118 - 121)

**Page 122**

1    MR. OSTOJIC: He's not there.          12:36
2    THE WITNESS: Like I said before, my -- I'm    12:36
3 anticipating you asking question that I could most    12:36
4 easily answer by looking at my -- the Reference 10    12:36
5 that I cited before, but if you don't want me to, I    12:36
6 won't.                                   12:36
7    MR. OSTOJIC: No, no, no.              12:36
8    MR. KOPEL: You can look at whatever you    12:36
9 want. That's fine.                       12:36
10    MR. OSTOJIC: I wanted you guys to be on the    12:36
11 same page because he asked you to go to the roaches    12:36
12 and ants.                                12:36
13    MR. KOPEL: That's -- I'm not giving you a    12:36
14 memory test right now. If it's helpful for you to    12:36
15 look at something else, you're welcome to do so.    12:36
16 Okay?                                    12:36
17    THE WITNESS: Well, I'll wait until you ask    12:36
18 the question.                            12:36
19    MR. KOPEL: Yeah, listen to the question.    12:36
20 BY MR. KOPEL:                             12:36
21    Q.  Okay. On Day Negative 2 in this test    12:36
22 there were 7 roaches in Chamber A and 13 roaches in    12:36
23 Chamber B.                               12:37
24       Do you see that?                    12:37
25    A.  Talking just roaches?               12:37

**Page 123**

1    Q.  Just roaches.                      12:37
2    A.  No, I see 7 and 13. Is that what you    12:37
3 said?                                    12:37
4    Q.  I believe so.                      12:37
5    A.  Yes, that's what I see.             12:37
6    Q.  That's 30 percent more roaches in    12:37
7 Chamber B on Day Negative 2 than there were on -- I'm    12:37
8 sorry.                                   12:37
9       That's 30 percent more roaches in    12:37
10 Chamber B than Chamber A on Day Negative 2; correct?    12:37
11    A.  If that's your arithmetic, but the    12:37
12 arithmetic -- that's why I was going to this -- this    12:37
13 document because the -- just citing those numbers and    12:37
14 30 percent, we don't know whether that's a    12:37
15 significant difference or not.            12:37
16       I ran the chi-square test to         12:37
17 determine whether that was equal -- whether those    12:37
18 numbers were statistically different or not.    12:37
19    Q.  Now, your chi-square test took both --    12:37
20 both days of pretesting into consideration; correct?    12:37
21    A.  It considered them independently, but --    12:37
22 not together.                            12:37
23    Q.  Okay. Was that a statistically       12:37
24 significant difference?                   12:38
25    A.  I'd have to look.                   12:38

**Page 124**

1       Okay. Let me just -- SGS 2012;        12:38
2 right, that's my No. 3?                   12:38
3       Okay. Roaches and ants. All right.    12:38
4 For -- I'm looking different. Something is wrong.    12:38
5 Oh, there's the 713.                     12:38
6       Okay. For roaches the chi-square      12:38
7 p-value was 0.1818, rounded up, and so they were    12:38
8 statistically the same in each -- in each chamber.    12:38
9    Q.  For Day Negative 2?                 12:38
10    A.  Well, yes, I called it Day 1 in my table;    12:38
11 but, yes, 7 and 13. The number 7 and 13 --    12:38
12    Q.  Yes.                             12:39
13    A.  -- are not different at the .18 level.    12:39
14    Q.  Given that the first day there was a 30    12:39
15 percent discrepancy, do you have any reason to    12:39
16 believe that on the third day there wouldn't have    12:39
17 been a 40 or 50 percent discrepancy?      12:39
18    MR. OSTOJIC: Object to form, foundation.    12:39
19 Mischaracterize the evidence, but go ahead.    12:39
20    THE WITNESS: Do I have any -- you got to    12:39
21 repeat it.                               12:39
22    MR. KOPEL: Sure.                      12:39
23 BY MR. KOPEL:                             12:39
24    Q.  Given that -- that the first day of    12:39
25 preliminary testing there was a 30 percent    12:39

**Page 125**

1 discrepancy, do you have any reason to believe that    12:39
2 on -- had the preliminary testing done on for a third    12:39
3 day, that there would not have been a 40 or 50    12:39
4 percent discrepancy?                      12:39
5    MR. OSTOJIC: Object to form, foundation, and    12:39
6 also misstates the evidence.             12:39
7       But go ahead.                       12:39
8 BY THE WITNESS:                           12:39
9    A.  Yeah, it's a hypothetical, and I don't --    12:39
10 I don't think it would be any different.    12:39
11    MR. OSTOJIC: Any different than what it was?    12:40
12 BY THE WITNESS:                           12:40
13    A.  Yes. Meaning that the chambers were --    12:40
14 were statistically the same.             12:40
15       If you carried pretesting after Day    12:40
16 3, I expect that they would be statistically the    12:40
17 same.                                    12:40
18 BY MR. KOPEL:                             12:40
19    Q.  Are the posttesting, the two days of    12:40
20 posttesting here, are they relevant?      12:40
21    A.  Certainly.                        12:40
22    Q.  Now, I know that -- I believe you    12:40
23 testified earlier that you did not believe that    12:40
24 this -- this test had been replicated; correct?    12:40
25    A.  Not -- yes, not in the common way that    12:40

32 (Pages 122 - 125)

1 people talk about replications. 12:40
2    Q. Given that you don't know the species of 12:40
3 tests used, would you be able to replicate this test 12:40
4 if you wanted to? 12:41
5    MR. OSTOJIC: Object to form, foundation. 12:41
6 But go ahead. 12:41
7 BY THE WITNESS: 12:41
8    A. It would be -- it would be coincidence I 12:41
9 guess. It would be -- I certainly can test roaches, 12:41
10 I can test ants, and I can test spiders. 12:41
11    Whether they're exactly the same 12:41
12 species, we don't know since they -- since they 12:41
13 didn't say. 12:41
14 BY MR. KOPEL: 12:41
15    Q. Well, in common practice and when we talk 12:41
16 about the scientific concept of replication, would be 12:41
17 to use the same species; correct? 12:41
18    A. You would want to have anything 12:41
19 identical, yes, replicates should be identical. 12:41
20    Q. Given that we don't know the model of 12:41
21 pest repeller used here, would that also prevent you 12:41
22 from replicating this test if you wanted to do so? 12:41
23    A. It depended on what level. 12:41
24    If you -- if you wanted to test a 12:41
25 Bell + Howell ultrasonic repeller, and your question 12:41
Page 126

1 was does Bell + Howell repellers repel roaches and 12:41
2 ants, not even asking the question about models, 12:41
3 you're not saying do they differ, you're just asking 12:42
4 does a Bell + Howell repeller repel roaches and ants, 12:42
5 so I could do that. 12:42
6    MR. KOPEL: All right. Can we take -- can we 12:42
7 take a five-minute break. 12:42
8    THE VIDEOGRAPHER: The time is 12:44. 12:42
9 We're off the record. 12:42
10    (WHEREUPON, a lunch recess
11 was had.) 01:35
12    THE VIDEOGRAPHER: The time is now 01:35
13 approximately 1:37 p.m. 01:35
14    This the beginning of Media 3. 01:35
15    We're back on the record. 01:35
16    MR. KOPEL: Good afternoon, Dr. Borth. 01:35
17    THE WITNESS: Hello. 01:35
18 BY MR. KOPEL: 01:35
19    Q. Okay. I'd like to run through the 01:35
20 remainder of these Chinese tests with you, please, so 01:35
21 let's please look at the exhibit marked as Borth 3. 01:35
22    Do you have Exhibit 3? 01:35
23    A. Yes, I do. 01:35
24    Q. Have you seen it before? 01:35
25    A. This is a -- I have to make sure. 01:35
Page 127

1    Q. Fine. The only question that's pending 01:36
2 is: Have you seen it before? 01:36
3    A. Well, I don't know because it's got a 01:36
4 different name than what I've got on my -- I've 01:36
5 got -- it has Intertek. 01:36
6    Okay. 2016. I've got -- let me 01:36
7 look at the numbers. GZU dash -- yes. 01:36
8    Q. Okay. What is this? 01:36
9    A. It's a test report. The applicant was 01:36
10 Intellitec International, product Bell + Howell 01:36
11 ultrasonic repeller. It was tested from April 7 to 01:36
12 April 18, 2016 on ants, spiders, and roaches in 01:36
13 Dongguan, China. 01:36
14    Q. Okay. And do you see here it's -- this 01:36
15 is signed by Leo Lin and Sam Lin? 01:37
16    A. Yes, I do. 01:37
17    Q. Do you know who they are? 01:37
18    A. No, I do not. 01:37
19    Q. Do you know if they're qualified to 01:37
20 conduct this test? 01:37
21    A. Do I know? The fact that their name is 01:37
22 on the report, leads me to believe they're qualified. 01:37
23    Q. So do you believe that any report where 01:37
24 someone's name is on it, that means they're 01:37
25 qualified? 01:37
Page 128

1    A. No. 01:37
2    Q. Okay. So do you know if Leo Lin and Sam 01:37
3 Lin are qualified? 01:37
4    A. Not specifically, no. 01:37
5    Q. Do you know which model the pest repeller 01:37
6 was used in this test? 01:37
7    A. Let's see if I wrote it -- there was one 01:37
8 that I was able to determine the model number from 01:38
9 the photograph. Let me see if that was this one. 01:38
10    No, model test -- it was not stated. 01:38
11 The picture is not clear enough without enhancement 01:38
12 to see what it was. 01:38
13    Q. Do you know what the size of the speaker 01:38
14 in this model tested was? 01:38
15    A. No. 01:38
16    Q. Do you know how many speakers it 01:38
17 contained? 01:38
18    A. No. 01:38
19    Q. Do you know anything about the direction 01:38
20 of the speaker? 01:38
21    A. Only an assumption that it had to be 01:38
22 coming out of that hole to sit in front of the unit. 01:38
23    Q. Do you know what the decibel level of the 01:38
24 output of the speaker was? 01:38
25    A. No, it's not stated. 01:38
Page 129

33 (Pages 126 - 129)

**Page 130**

1  Q. Do you know if the speaker was static or  01:38
2  used sweeping frequencies?  01:39
3  A. The testers did not state that.  01:39
4  Q. But despite not knowing all that  01:39
5  information, you're still comfortable extending the  01:39
6  data that you saw from this test to all models of the  01:39
7  Bell + Howell pest repellers; correct?  01:39
8  A. Yes.  01:39
9  Q. What species of ants were used in this  01:39
10  test?  01:39
11  A. It was not stated.  01:39
12  Q. What species of spiders were used in this  01:39
13  test?  01:39
14  A. Not stated.  01:39
15  Q. What species of roaches were used in this  01:39
16  test?  01:39
17  A. Not stated.  01:39
18  Q. What type of food did they provide to the  01:39
19  pests in this test?  01:39
20  A. I don't see that it's stated anywhere in  01:39
21  the -- in the test report.  01:40
22  Q. Do you think that a protocol should  01:40
23  typically state what kind of food was being used?  01:40
24  A. Yes.  01:40
25  Q. Due to the fact that you don't know what  01:40

**Page 131**

1  kind of food was used, is this test capable of  01:40
2  replication?  01:40
3  MR. OSTOJIC: Object to form.  01:40
4  BY THE WITNESS:  01:40
5  A. Well, I -- I don't -- I'm going to go  01:40
6  back, if I can, to the previous question.  01:40
7  There is no indication that food was  01:41
8  provided at all.  01:41
9  BY MR. KOPEL:  01:41
10  Q. Okay. Can you please turn to page, which  01:41
11  is Section 5, Daily Testing Record?  01:41
12  A. Okay. Section 5, Daily Testing Record.  01:41
13  Okay.  01:41
14  Q. Do you see here that it says, "Record the  01:41
15  consumption of food and water in each chamber"?  01:41
16  A. Yes, it does say that.  01:41
17  Q. Okay. And then two rows down it says,  01:41
18  "Record the weight of new food and water."  01:41
19  Do you see that?  01:41
20  A. It does say that.  01:41
21  Q. Do you understand, based on that, that  01:41
22  food was used in this test?  01:41
23  A. It appears that it was.  01:41
24  Q. But you don't know what kind of food it  01:41
25  was; right?  01:41

**Page 132**

1  A. No, and it was not delineated in the  01:41
2  table test results.  01:41
3  Q. Given that you don't know what kind of  01:41
4  food was used, is this test capable of replication?  01:41
5  A. For the purposes of the reason the test  01:41
6  was conducted, yes.  01:41
7  Q. Okay. Let's say they used food that was  01:42
8  not typically eaten by spiders, ants, and roaches,  01:42
9  would that make a difference if they had used food  01:42
10  that spiders, ants, and roaches don't use versus if  01:42
11  they use food that they do?  01:42
12  A. I don't think so because the key question  01:42
13  is: Does the repeller repel the insects?  01:42
14  It does not talk about -- I mean  01:42
15  that's the simple question -- that's the question to  01:42
16  be answered, the hypothesis.  01:42
17  Q. So it doesn't matter if the insects were  01:42
18  starving or not?  01:42
19  A. Oh, it does.  01:42
20  Q. Do you know if the insects were starving  01:42
21  or not here?  01:42
22  A. No, I do not.  01:42
23  Q. So does that give you concern given that  01:42
24  you contend that that's relevant?  01:42
25  A. It does not concern me with respect to  01:42

**Page 133**

1  the daily counts that they made.  01:42
2  Q. Is this test capable of replication if  01:42
3  you don't know what type of food was used?  01:42
4  A. You could replicate it at a high level.  01:42
5  You could not replicate it in  01:43
6  exact -- without knowing that -- in exactly the same  01:43
7  way.  01:43
8  Q. Typically in science when the term  01:43
9  replication is used with regard to studies, it's  01:43
10  meant that all the variables were kept the same;  01:43
11  correct?  01:43
12  A. That's correct.  01:43
13  Q. And then that --  01:43
14  A. Except --  01:43
15  Q. I'm sorry. Go ahead.  01:43
16  A. Except for -- no. In a replication  01:43
17  you're exactly right. I was thinking treatment  01:43
18  versus --  01:43
19  Q. So in that sense this test can't be  01:43
20  replicated; correct?  01:43
21  A. Well, it could if the same experimenters  01:43
22  did it exactly the same way. We just don't know what  01:43
23  they did.  01:43
24  Q. Right. So given that we don't know that,  01:43
25  could we replicate it?  01:43

34 (Pages 130 - 133)

1    A. Oh, you might roll the dice and hit it;    01:43
2 but, no. I mean you wouldn't be certain.    01:43
3    Q. Given that we don't know what species of    01:43
4 each pest were used, could we replicate this test?    01:43
5    A. Again, I go back to a previous question.    01:43
6 At the -- when you're talking about spiders, ants,    01:43
7 and roaches, the -- the specific -- the species, it    01:43
8 would be nice to have that information, but I don't    01:44
9 think it's necessary.    01:44
10    Q. Typically in -- when you've seen peer-    01:44
11 reviewed publications and they're doing replications    01:44
12 of studies done on insects, have you seen that    01:44
13 they're using the same species of insects in the    01:44
14 replications?    01:44
15    A. Yes.    01:44
16    Q. Have you seen any peer-reviewed --    01:44
17    A. This --    01:44
18    Q. I'm sorry. Go ahead.    01:44
19    A. But this was not intended to be published    01:44
20 in the peer-reviewed journal.    01:44
21    Q. Have you ever seen a study that was    01:44
22 published in a peer-reviewed journal where they used    01:44
23 different species of the insects for purposes of    01:44
24 replication?    01:44
25    A. I can imagine that it happened, very    01:44

Page 134

1 easily. In a case where I want to determine and --    01:44
2 the basis of the label language, whether a pesticide    01:44
3 kills aphids, I could have soybean aphid, I could    01:44
4 have cotton aphid, I could have green bug, they're    01:44
5 all aphids, so if you want to write product    01:45
6 literature that is understandable by your target    01:45
7 audience, you may not use the different species, you    01:45
8 use -- you test it on a variety of species and then    01:45
9 lump it under an umbrella call aphids in that    01:45
10 example.    01:45
11    Q. And that would not necessarily be a    01:45
12 replication, that would be a different kind of test    01:45
13 to make sure it works equally across different    01:45
14 species; correct?    01:45
15    A. Yeah, replication is a different concept    01:45
16 than what I just discussed.    01:45
17    Q. Okay. So you haven't seen a    01:45
18 peer-reviewed study where -- where what they did was    01:45
19 replicate a test using a different species; right?    01:45
20    A. No, in the true sense -- in the most --    01:45
21 yes, I'll stop there because -- now I got to keep    01:45
22 going.    01:45
23        Just because in the commonly way --    01:45
24 in the common way that scientists use the word    01:45
25 replication, it's exactly as you say, they should --    01:45

Page 135

1 all replicates should be identical.    01:46
2    Q. Was this -- have you seen that this test    01:46
3 was replicated?    01:46
4    A. No.    01:46
5    Q. In the course of your work at Dow, did    01:46
6 you require that tests -- that -- let me rephrase.    01:46
7        When you relied on data from testing    01:46
8 at Dow, did you ever rely on tests that were not    01:46
9 replicated?    01:46
10    A. Yes.    01:46
11    Q. Okay. Can you please turn to the page    01:46
12 with the chart titled, "Test Result"?    01:46
13    A. Okay.    01:46
14    Q. Okay. Were the spiders, ants, and    01:46
15 roaches all in the same chamber in this test?    01:46
16    A. I got to go back to the methods and make    01:46
17 sure.    01:47
18        Yes, they were. I've kind of forgot    01:47
19 the question. You asked whether --    01:47
20    Q. I just asked whether they were in the    01:47
21 same chamber?    01:47
22    A. Yes, they were.    01:47
23    Q. Now, on this page at the bottom it says,    01:47
24 "Remarked quantity of tunnel was counted as    01:48
25 Chamber B."    01:48

Page 136

1        Do you see that?    01:48
2    A. I do.    01:48
3    Q. We don't know how many -- what were    01:48
4 observed in the tunnel; right?    01:48
5    A. It doesn't call it out. I suspect you    01:48
6 could do some arithmetic to figure it out.    01:48
7    Q. How would you do that?    01:48
8    A. Well, you would look at the -- the number    01:48
9 of insects that were in the test and if they were not    01:48
10 accounted for in the counts.    01:48
11    Q. Yeah, but it says, "The quantity of    01:48
12 tunnel was counted as Chamber B."    01:48
13        Do you see that?    01:48
14    A. I do. Okay. So, yeah, let me -- let me    01:48
15 correct myself.    01:48
16        They apparently counted what was in    01:48
17 the tunnel, and they simply included it with Chamber    01:48
18 B, which was the -- the chamber without the pest    01:48
19 repeller.    01:48
20    Q. Is it your understanding that that was    01:48
21 done in all the Chinese tests?    01:48
22    A. I'd have to look at each one. I don't    01:49
23 know.    01:49
24    Q. Is it relevant whether or not they did    01:49
25 that in a given test?    01:49

Page 137

Veritext Legal Solutions
866 299-5127

1      A.  Yes.                          01:49
2      Q.  Would it have been improper if they      01:49
3  hadn't done that?                     01:49
4      MR. OSTOJIC:  Object to form.              01:49
5  BY THE WITNESS:                       01:49
6      A.  Yeah, the word improper, it -- if they      01:49
7  set a rule in the beginning that says where they're      01:49
8  going to count something in a -- that's in a tunnel,      01:49
9  then you abide by the rule.              01:49
10 BY MR. KOPEL:                         01:49
11     Q.  Well, do you see the next sentence says,      01:49
12 "Add a new spider, ants, and roaches according to the   01:49
13 quantity of loss the next day."          01:49
14         Do you see that?                01:49
15     A.  Yes.                          01:49
16     Q.  Was that a proper thing for them to do?      01:49
17     A.  I would not have done that.       01:49
18     Q.  Does that call the data that came from      01:49
19 the study into question?              01:49
20     MR. OSTOJIC:  Object to form, but go ahead.   01:49
21 BY THE WITNESS:                       01:49
22     A.  I don't think seriously.         01:49
23 BY MR. KOPEL:                         01:49
24     Q.  Well, let's take a step back.      01:49
25         When they replaced them, which       01:49

Page 138

1  chamber did they put them in?          01:49
2      A.  I'd have to assume they put them in the      01:50
3  one where they were originally released, where they   01:50
4  think originally released they said they split them   01:50
5  50/50, so more than likely they put them back in the   01:50
6  same way that they introduced the original     01:50
7  population.                          01:50
8      Q.  I -- I don't understand.         01:50
9         So, in other words, if you look at      01:50
10 Day 3, right, so it looks like they added three      01:50
11 roaches.  Which chamber were the three roaches added   01:50
12 to?                                  01:50
13     A.  Wait a minute.  Okay.  Day 3 under      01:50
14 testing, the third --                01:50
15     Q.  Test Result Day 3, there's a -- at the      01:50
16 bottom of the chart it says, "Quantity of loss."      01:50
17         Do you see that?                01:50
18     A.  Yes.                          01:50
19     Q.  So it looks like they put in 3 new      01:50
20 roaches on Day 3; right?              01:50
21     A.  That's what it looks like, yes.       01:50
22     Q.  Okay.  Which chamber were they put in?      01:50
23     A.  It's not readily apparent.         01:50
24     Q.  Okay.  Does it matter which chamber they   01:51
25 put them in?                          01:51

Page 139

1      A.  For that particular day, yes.       01:51
2      Q.  And for the next day as well?       01:51
3      A.  For the count -- well.            01:51
4      Q.  Does that -- does that concern you in      01:51
5  terms of your relying on this study?      01:51
6      A.  It's not the best procedure, but I didn't   01:51
7  rely just on this particular test to draw opinions.   01:51
8      Q.  Standing alone could you -- could you      01:51
9  deduce whether or not the repellers are effective      01:51
10 based on this test?                   01:51
11     A.  Well, for that, if you don't mind, I'll      01:51
12 go back to my report which gives me the statistics.   01:52
13     Q.  That's no problem, but while you're      01:52
14 reviewing the statistics, can you please take a look   01:52
15 as to whether you accounted for the quantity of lost   01:52
16 that were added and where you count -- which chamber   01:52
17 you counted them as being added to?       01:52
18     MR. OSTOJIC:  Object to form.              01:52
19 BY THE WITNESS:                       01:52
20     A.  I took the -- in my statistical analysis   01:53
21 I took the data, the counts that were provided per      01:53
22 day, each day for roaches -- well, for all of them.   01:53
23     Q.  Were the repellers effective at driving      01:53
24 out spiders, ants, or roaches for any day of the      01:53
25 study?                               01:53

Page 140

1      A.  Yes.                          01:53
2      Q.  Okay.  So on Day 1 had they driven out      01:53
3  all the spiders, ants, or roaches?       01:53
4      MR. OSTOJIC:  I'm sorry.  Can you repeat the   01:53
5  question?                            01:53
6      MR. KOPEL:  Sure.                    01:53
7  BY MR. KOPEL:                         01:53
8      Q.  On Day 1 had the repeller driven out all   01:53
9  the spiders, ants, and roaches?          01:53
10     MR. OSTOJIC:  All?                    01:53
11     MR. KOPEL:  That's what I said.           01:54
12 BY THE WITNESS:                       01:54
13     A.  Are you -- I need a clarification.       01:54
14         When you say, "spiders, ants, and      01:54
15 roaches," are you talking about the combined species,   01:54
16 or are you asking me for spiders alone, for ants      01:54
17 alone, for roaches alone?              01:54
18 BY MR. KOPEL:                         01:54
19     Q.  The latter.                     01:54
20     A.  Okay.  All right.  And then -- sorry.      01:54
21 Repeat the question again because I'm ready to       01:54
22 answer, but I need to know --          01:54
23     Q.  Sure.                          01:54
24         Would you agree that there is a      01:54
25 difference between a statistically significant effect   01:54

Page 141

36 (Pages 138 - 141)

1 and a biologically or commercially relevant effect?   01:54
2     MR. OSTOJIC: Object to form.        01:54
3        Go ahead.        01:54
4 BY THE WITNESS:        01:54
5     A. One usually follows the other, but not   01:54
6 necessarily do you need to have statistically   01:54
7 significant to commercialize something.   01:54
8 BY MR. KOPEL:        01:54
9     Q. Okay. And throughout the course of this   01:54
10 test there were always spiders in Chamber A; correct?   01:54
11     A. Yes.        01:55
12     Q. Throughout the course of this test there   01:55
13 were always ants in Chamber A; correct?   01:55
14     A. Correct.        01:55
15     Q. Throughout the course of this test there   01:55
16 were always roaches in Chamber A; correct?   01:55
17     A. Yes.        01:55
18     Q. Now, if these results were seen in a   01:55
19 residential home using a repeller, do you think a   01:55
20 consumer would be satisfied with the product?   01:55
21     A. Yeah, I --        01:55
22     MR. OSTOJIC: Object to form, foundation.   01:55
23 May call for speculation depending upon the consumer   01:55
24 but.        01:55
25
                                    Page 142

1 BY THE WITNESS:        01:55
2     A. And I would go back to the chi-square   01:55
3 test that I did, and even though you said that there   01:55
4 are those pests in every day, the difference between   01:55
5 the number Chamber A and those in Chamber B is   01:55
6 significantly different in most cases.   01:55
7 BY MR. KOPEL:
8     Q. Do you think that if you showed a   01:55
9 consumer a chi-square test to show a -- a   01:55
10 statistically significant difference, they would be   01:55
11 satisfied despite seeing the presence of each of   01:55
12 these pests on every day using a repeller?   01:56
13     A. Well --        01:56
14     MR. OSTOJIC: Wait, wait. Let me make an   01:56
15 objection here.        01:56
16        Object to form, foundation, and   01:56
17 irrelevant, inconsequential question, and also may   01:56
18 call for speculation as to any specific consumer.   01:56
19        But go ahead and answer.   01:56
20 BY THE WITNESS:        01:56
21     A. Well, that's kind of what I was going to   01:56
22 say. It depends when the consumer -- when you take   01:56
23 the population down from what it started at to a   01:56
24 lower number, which is in the chambers with the pest   01:56
25 repeller, the consumer may not see them.   01:56
                                    Page 143

1 BY MR. KOPEL:        01:56
2     Q. Why wouldn't a consumer see them?   01:56
3     A. I don't know that they would. I'm saying   01:56
4 they may not see them. You have fewer numbers to be   01:56
5 seen. They could be hiding.        01:56
6     Q. So when you say, "to drive out" do you   01:57
7 think that just means a statistically significant   01:57
8 effect?        01:57
9     A. That's a --        01:57
10     MR. OSTOJIC: Object to form.        01:57
11        But go ahead.        01:57
12 BY THE WITNESS:        01:57
13     A. That's an objective way to show a   01:57
14 difference.        01:57
15 BY MR. KOPEL:        01:57
16     Q. Okay. And do you agree that a consumer   01:57
17 might view the words differently than a scientist?   01:57
18 BY THE WITNESS:        01:57
19     A. I don't know.        01:57
20     MR. OSTOJIC: Same objections as before,   01:57
21 including speculation.        01:57
22        Go ahead.        01:57
23 BY THE WITNESS:        01:57
24     A. I have no way of knowing.        01:57
25
                                    Page 144

1 BY MR. KOPEL:        01:57
2     Q. I thought you were an expert on this   01:57
3 topic?        01:57
4     A. I am.        01:57
5     Q. You are?        01:57
6     A. What topic are you talking about?   01:57
7     Q. Well, don't -- didn't you say you were an   01:57
8 expert in terms of labeling claims?        01:57
9     A. Yes.        01:57
10     Q. Okay. So would a consumer review this   01:57
11 labeling claim in the same manner as a scientist?   01:57
12     MR. OSTOJIC: Would or should? I -- same   01:57
13 objections as before.        01:57
14 BY THE WITNESS:        01:57
15     A. I don't understand the relevancy. Maybe   01:57
16 ask it a different way.        01:57
17 BY MR. KOPEL:        01:57
18     Q. Would a consumer review the claim drives   01:58
19 pests out the same way as a scientist would review   01:58
20 that claim?        01:58
21     A. I don't know the scientist, I don't know   01:58
22 the consumer.        01:58
23     Q. Do you think a consumer has statistical   01:58
24 significance in mind when they read that claim?   01:58
25     MR. OSTOJIC: Same objections.   01:58
                                    Page 145

37 (Pages 142 - 145)

**Page 146**

1 BY THE WITNESS:                                01:58
2     A.  They may if they went to university and   01:58
3 had statistic class.                            01:58
4 BY MR. KOPEL:                                   01:58
5     Q.  Given that there were uncertainties of   01:58
6 large numbers of new pests added in the middle of the  01:58
7 test and you don't know what chamber they're added   01:58
8 to, are you really comfortable relying on this test?  01:58
9     A.  Yes.                                     01:58
10    MR. OSTOJIC:  Asked and answered.            01:58
11        But go ahead.                            01:58
12 BY THE WITNESS:                                 01:58
13    A.  Yes again.                               01:58
14 BY MR. KOPEL:                                   01:58
15    Q.  Do you think that this would pass muster  01:58
16 in peer review?                                 01:58
17    MR. OSTOJIC:  Object to form.                01:58
18        But go ahead.                            01:58
19 BY THE WITNESS:                                 01:58
20    A.  It depends on the peers, it depends on   01:58
21 the publication.                               01:58
22 BY MR. KOPEL:                                   01:58
23    Q.  Would you have relied on a test like this  01:58
24 in the course of your work at Dow?              01:58
25    A.  No.                                      01:58

**Page 147**

1     Q.  Why not?                                01:58
2     A.  Too many unanswered questions.          01:58
3     Q.  So why are you more comfortable in the   01:58
4 course of your work here relying on it?         01:58
5     A.  Because the -- I -- because I've worked  01:59
6 with Dow Chemical, I know the rigor with which they   01:59
7 require their data to be obtained and used and   01:59
8 analyzed.                                       01:59
9        I don't know the rigor from              01:59
10 Bell + Howell case -- or the Bell + Howell culture.  01:59
11    Q.  Was there a reason --                    01:59
12    A.  They're different companies.             01:59
13    Q.  Was there a reason that Dow Chemical had  01:59
14 a heightened -- a very rigorous standard?       01:59
15    MR. OSTOJIC:  Object to form.                01:59
16        Go ahead.                                01:59
17 BY THE WITNESS:                                 01:59
18    A.  Well, I didn't set the standard. I only  01:59
19 complied with it. They wanted to reduce variability  01:59
20 and be able to write labels and literature that was   01:59
21 unquestionable.                                01:59
22 BY MR. KOPEL:                                   01:59
23    Q.  Do you agree that had the -- these new   01:59
24 pests been added to Chamber B, that would skew the   02:00
25 test results?                                   02:00

**Page 148**

1     A.  Had they been -- yes, but the degree to   02:00
2 which I don't know.                             02:00
3     Q.  Well --                                  02:00
4     A.  Because the differences are highly       02:00
5 significant for spiders and -- let's see -- ants   02:00
6 under Point 1, Probably Point 1; for roaches, highly  02:00
7 significant; and for the combination of all pests,   02:00
8 highly significant differences in Chamber A and   02:00
9 Chamber B.                                      02:00
10    Q.  But you haven't done the calculations to  02:00
11 figure that out; have you?                      02:00
12    A.  I said that what I did was take the       02:00
13 numbers as presented there. I did not take into   02:00
14 account the quantity lost as they describe it.   02:00
15    Q.  Was that a mistake?                       02:01
16    A.  No.                                       02:01
17    Q.  Now, if you look at roaches, it looks     02:01
18 like they added 12 roaches over the course of the   02:01
19 test.                                           02:01
20        Do you see that?                         02:01
21    A.  9 plus 3. Yes.                           02:01
22    Q.  And then they had 16 at the end of the   02:01
23 test.                                           02:01
24        Do you see that on Day 7?                 02:01
25    A.  Had 16 roaches in Chamber B, yes, I see   02:01

**Page 149**

1 that.                                           02:01
2     Q.  Oh, excuse me. You're right.             02:01
3        Okay. So they had 20 roaches total   02:01
4 on Day 7; correct?                              02:01
5     A.  Yes.                                      02:01
6     Q.  Okay. So the majority of the roaches     02:01
7 were added during the course of that test; correct?  02:01
8     A.  Yes.                                      02:01
9     Q.  That doesn't concern you though; right?   02:01
10    MR. OSTOJIC:  Same objection. Also asked and   02:01
11 answered a couple times.                        02:01
12        But go ahead.                            02:01
13 BY THE WITNESS:                                 02:01
14    A.  No.                                       02:01
15 BY MR. KOPEL:                                   02:01
16    Q.  Okay. Can you please take a look at the   02:01
17 document marked as Exhibit 9.                   02:01
18    MR. OSTOJIC:  Did you say 9?                  02:02
19    THE WITNESS:  Yeah, I don't have a 9.         02:02
20    MR. KOPEL:  I misspoke. Thanks for your       02:02
21 correction. It was marked as Exhibit 4.         02:02
22 BY MR. KOPEL:                                   02:02
23    Q.  And this is a QMANN test?                 02:02
24    A.  Yes, it is.                               02:02
25    Q.  Okay. So you have the document which is   02:02

38 (Pages 146 - 149)

**Page 150**

1 marked as Exhibit 4?                    02:02
2    A.  Yes.                    02:02
3    Q.  Have you seen it before?                    02:02
4    A.  Yes.                    02:02
5    Q.  What is it?                    02:02
6    A.  A Test Report from QMANN Quality Service    02:02
7 Company.  Product Description, Bell + Howell        02:03
8 Ultrasonic Test Repeller.  Test Period, November 1    02:03
9 through November 19, 2010.  The purpose of test,        02:03
10 Model 50161 Pest Repeller Effective Coverage.        02:03
11    Q.  Now, I'm sorry.  I have to ask you some    02:03
12 of the same questions here as I've asked already, and    02:03
13 hopefully we can move through it quickly.        02:03
14        You don't know what species of mice,    02:03
15 spiders, and roaches were used in this test; correct?    02:03
16    A.  No.                    02:03
17    Q.  Did you know that Ms. Feuerstein        02:03
18 testified that it was -- there was no heat on during    02:03
19 the -- while this test was operational?        02:03
20    A.  I do not recall that.                    02:03
21    Q.  If -- if that were true, would that be a    02:03
22 problem?                    02:03
23        MR. OSTOJIC:  Object to form, foundation,        02:03
24 incomplete.                    02:03
25        But go ahead.                    02:03

**Page 151**

1 BY THE WITNESS:                    02:03
2    A.  Not in comparing, no, because the same --    02:03
3 if there wasn't any heat in what they're labeling        02:04
4 No. 7, there wasn't any heat in No. 8, so everything    02:04
5 is the same.                    02:04
6 BY MR. KOPEL:                    02:04
7    Q.  All right.  Would the -- would the -- the    02:04
8 data from this test necessarily be the same under        02:04
9 circumstances in a typical American residential home    02:04
10 which would have heat?                    02:04
11    A.  Could be.  I have no way of knowing.        02:04
12    Q.  So it would be speculative one way or the    02:04
13 other; correct?                    02:04
14        MR. OSTOJIC:  Object.  Form, foundation,        02:04
15 incomplete hypothetical.                    02:04
16        But go ahead.                    02:04
17 BY THE WITNESS:                    02:04
18    A.  Well, it's not speculative that the cold    02:04
19 was the same as you said.  You told me.  I didn't        02:04
20 recall that in 7 and 8.  That's not speculative.  It    02:04
21 was that way.                    02:04
22        And what you're -- you're        02:04
23 speculating whether they added heat to it.        02:04
24 BY MR. KOPEL:                    02:04
25    Q.  No, I'm sorry.  I think we're        02:04

**Page 152**

1 misunderstanding each other.                    02:04
2    A.  Okay.                    02:04
3    Q.  Let me please clarify.                    02:04
4        Typical American homes tend to have    02:04
5 heat during the wintertime; correct?                    02:04
6    A.  Yes, I'd agree.                    02:04
7    Q.  Okay.  Do you agree that the temperature    02:05
8 that the test was conducted might affect the movement    02:05
9 of the pest tested?                    02:05
10    A.  Yes.                    02:05
11    Q.  Okay.  So would you agree with me that it    02:05
12 would be hard to take the results of this test in        02:05
13 order to render an opinion about what the outcome        02:05
14 would have been under conditions in typical American    02:05
15 homes given that American homes would be a different    02:05
16 temperature than this test was done at?        02:05
17        MR. OSTOJIC:  Object.  Form.  Also, it    02:05
18 misstates the evidence as to the temperature because    02:05
19 the temperature is here on the report, and that it's    02:05
20 different than American homes.                    02:05
21 BY MR. KOPEL:                    02:05
22    Q.  Okay.  And here, too, mice, spiders, and    02:05
23 roaches were tested at the same time; correct?        02:05
24    A.  It seems like that's what they mean by    02:06
25 the footnote:  "Put mice, spiders, and roaches in    02:06

**Page 153**

1 rooms."                    02:06
2        It does not say one way or the other    02:06
3 whether they were together or different.        02:06
4    Q.  I think I can -- might be able to point    02:06
5 you to something that might refresh your recollection    02:06
6 on this.                    02:06
7        If you look on the first page,        02:06
8 Testing Procedures, No. 1A?                    02:06
9    A.  Yep.  There you go.  Exactly you're        02:06
10 right.                    02:06
11    Q.  So -- and just for purposes of the        02:06
12 record, I'm right that they were tested at the same    02:06
13 time; correct?                    02:06
14    A.  Correct.                    02:06
15    Q.  Okay.  Now, if you look at Testing        02:06
16 Condition, it says, "All gap and window door properly    02:06
17 sealed with wooden board and taped securely."        02:06
18        Do you see that?                    02:06
19    A.  "All gaps and window" -- yes.        02:06
20    Q.  Was that a problem in this protocol, or    02:06
21 was that a proper thing to do?                    02:06
22    A.  For the purposes of spiders and roaches,    02:06
23 I don't think that it matters.                    02:07
24    Q.  Well, is it a proper thing to do or was    02:07
25 it an improper thing to do?                    02:07

39 (Pages 150 - 153)

```
 1      MR. OSTOJIC:  Object.  Asked and answered.    02:07
 2      Go ahead.                        02:07
 3 BY THE WITNESS:                       02:07
 4      A.  For what they tried -- were trying for --  02:07
 5 for the purposes of this test, they -- what's the    02:07
 6 right word -- deduced -- they -- they set the        02:07
 7 protocol the way they did to achieve the purposes of  02:07
 8 the test.                            02:07
 9      So I have to say that they -- by        02:07
10 them properly sealing the doors and a wooden board,  02:07
11 taped, that -- that bullet point, I'd say, yeah, it  02:07
12 was proper under their conditions and for what they  02:07
13 wanted to do.                        02:07
14 BY MR. KOPEL:                         02:07
15      Q.  And -- and when you say what they wanted  02:07
16 to do, are you referring to testing the efficacy of  02:07
17 the Bell + Howell repellers against mice, spiders,   02:07
18 and roaches; correct?                 02:07
19      A.  I'm going back to the purpose of the test  02:07
20 to test pest repeller effective coverage.  That's   02:08
21 must be what they were trying to answer.        02:08
22      Q.  And effective coverage means the         02:08
23 repellency coverage; correct?            02:08
24      A.  Yes, I would assume so.           02:08
25      Q.  Okay.  Now, all the -- all the mice,    02:08
                                     Page 154
```

```
 1 spiders, and roaches were released into Room 7 at the  02:08
 2 same time.
 3      Do you see that?                 02:08
 4      A.  That's what it says, yes.         02:08
 5      Q.  Was that an improper thing to do in this  02:08
 6 protocol that they were put into Room 7 all at the   02:08
 7 same time?  In other words, rather than half of them  02:08
 8 in Room 7, half in Room 8?               02:08
 9      A.  It's not the only ones that did it that  02:08
10 way.  I think Dr. Potter did his that way too.      02:08
11      Q.  Was it improper for them to do this?    02:08
12      A.  It's just the -- it's their protocol.   02:08
13      Q.  Was that improper?  Yes or no?        02:08
14      A.  No, not improper to achieve their        02:08
15 purpose.                             02:08
16      Q.  Was it improper when Dr. Potter did it?  02:08
17      A.  I think I put that in my report.       02:09
18      Q.  Okay.  So when they did it, it was okay;  02:09
19 when Dr. Potter did it, it was a problem?         02:09
20      A.  Their -- it would have been better to --  02:09
21 well, let me look at their post, their pretest.      02:09
22      Because it all comes down to --          02:09
23 wherever they put them in the -- it really doesn't   02:09
24 matter, I think, in what chamber they put them as    02:09
25 long as in their pretest period these pests         02:09
                                     Page 155
```

```
 1 equilibrated and found their way to be equal between  02:09
 2 the two rooms.                       02:09
 3      So I go back to -- this is QMANN         02:09
 4 2 --                                02:09
 5      Q.  Okay.  So let's take a look.  On Pretest  02:09
 6 Day 1 were the mice equal in the two rooms?       02:09
 7      A.  All right.  I got -- well, I'm not      02:10
 8 testifying on mice.                   02:10
 9      Q.  Well, you can receive the numbers,      02:10
10 though; right?                       02:10
11      A.  I can see the numbers.            02:10
12      Q.  Okay.  Were they equal?           02:10
13      A.  They're -- 3, 3, and 15.  2 are equal, 1  02:10
14 is not.  Whether they're statistically significant --  02:10
15 oh, wait a minute.                   02:10
16      Q.  I think --                    02:10
17      A.  That's down the --               02:10
18      Q.  Yes.                         02:10
19      A.  Sorry.  3 and 12 -- 3 and -- no, they    02:10
20 were not equal.                     02:10
21      Q.  Do you have any understanding of what    02:10
22 might have caused these swings back and forth with a  02:10
23 disproportionate number of mice in Room 8 the first  02:10
24 few days, and then a disproportionate number of mice  02:10
25 in Room 7?                          02:10
                                     Page 156
```

```
 1      A.  No, I'm not testifying with mice.  I     02:10
 2 don't know.                         02:10
 3      Q.  Okay.  So on Pretest Day 1 for spiders,  02:10
 4 were they equal?                     02:10
 5      A.  6 and 0, 6 and 0.                02:10
 6      They were not statistically equal.        02:10
 7      Q.  And then, in fact, on Pretest Day 3 there  02:10
 8 was 10 spiders in Room 7 and 0 in Room 8; correct?   02:11
 9      A.  Yes.                         02:11
10      Q.  Okay.  So they were not equal there?    02:11
11      A.  They were not equal.             02:11
12      Q.  And -- and on Pretest Days 1 and 3, there  02:11
13 was 20 roaches in Room 7 with 0 in Room 8.        02:11
14      Do you see that?                 02:11
15      A.  Yes.                         02:11
16      Q.  All right.  They weren't equal; right?   02:11
17      A.  No.                          02:11
18      Q.  Okay.  Was it improper for them to       02:11
19 release all the pests in the room with the repeller  02:11
20 at the outset of the test?               02:11
21      A.  Again, improper -- the word improper is  02:11
22 subjective.  It depends on the purpose of the test.  02:11
23      I can imagine that a home situation       02:11
24 has a -- has different pests in it at the same time,  02:11
25 and perhaps they were going after -- trying to deduce  02:11
                                     Page 157
```

40 (Pages 154 - 157)

**Page 158**

1 something from that -- that possibility.          02:11
2     Q.  Is it possible that what they were          02:12
3 testing is the ability of the repeller to drive the   02:12
4 pests out --                                          02:12
5     A.  It's possible.                               02:12
6     Q.  -- of the room?                              02:12
7     A.  Is it possible that's what Dr. Potter was   02:12
8 testing.                                              02:12
9        MR. OSTOJIC:  Objection to form.  May call   02:12
10 for speculation as to possibilities, but go ahead.   02:12
11 BY THE WITNESS:                                      02:12
12     A.  Well, Dr. Potter went further, well        02:12
13 beyond what the label instructions say, and he --   02:12
14 he -- his test was designed to drive -- to determine 02:12
15 whether the pest repeller would drive pests out of a 02:12
16 building, and that's why he put those harborages in  02:12
17 there, and that goes well beyond what the claims are 02:12
18 on the -- in the product literature.                 02:12
19 BY MR. KOPEL:                                        02:12
20     Q.  Okay.  And I -- and I accept that you       02:12
21 have lots of criticisms of Dr. Potter, and I do plan 02:12
22 on getting to that, and I'll give you as much of an  02:12
23 opportunity as you'd like to talk about it, but I    02:12
24 just want to focus you in on the fact they were all  02:12
25 released into the room with the repeller.            02:12

**Page 159**

1        And I believe you just testified     02:13
2 that it's possible that what they were trying to test 02:13
3 in this QMANN report was whether or not the repeller 02:13
4 could drive them out of that room, and I asked if    02:13
5 that's possible that Dr. Potter was trying to do the 02:13
6 same thing, was trying to test the same thing?       02:13
7        MR. OSTOJIC:  Object to form.           02:13
8        Was there a question, or is that        02:13
9 just a narrative?                                     02:13
10        MR. KOPEL:  Yeah, the question -- I asked -- 02:13
11 I repeated what I asked.                              02:13
12 BY MR. KOPEL:                                         02:13
13     Q.  I asked if it's possible that Dr. Potter   02:13
14 was also testing whether or not the repeller would   02:13
15 drive them out of that room?                          02:13
16        MR. OSTOJIC:  Object.  I don't think it's an 02:13
17 understandable question, but -- may call for          02:13
18 speculation as to the form of the question as well,  02:13
19 but go ahead if you understand it.                    02:13
20 BY THE WITNESS:                                       02:13
21     A.  Well, but what you connected it to, that   02:13
22 question in the very beginning was:  Dr. Potter      02:13
23 trying -- in my words -- trying to test spiders plus 02:13
24 roaches, and he did --                                02:13
25

**Page 160**

1 BY MR. KOPEL:                                         02:14
2     Q.  Okay.  I get it.                             02:14
3     A.  He did not have spiders plus roaches.       02:14
4     Q.  So perhaps we're miscommunicating.          02:14
5        I'm talking about the release of the        02:14
6 pest into the room with the repeller.                 02:14
7     A.  Okay.  What's the question?                 02:14
8     Q.  In this test they released all the pests   02:14
9 into the room with the repeller rather than doing    02:14
10 50/50?                                                02:14
11     A.  That's what they said.                      02:14
12     Q.  Was that an appropriate way to test        02:14
13 whether it would drive the pests out of that room?   02:14
14     A.  It's not a un -- yes, because they had     02:14
15 pretests -- they had a pretest period which had      02:14
16 repeller not on, and that was to give the pests an   02:14
17 opportunity to move freely between the chambers.     02:14
18     Q.  And we just looked at the pretests, and   02:14
19 it looked like -- at least with regards to spiders   02:14
20 and roaches -- by the end of the pretest they were   02:14
21 all in Room 7; correct?                               02:14
22     A.  By the end of the pretest, which would be  02:15
23 Day 3, yes, they were all in Room 7.                  02:15
24     Q.  Okay.  So do you still contend that this   02:15
25 was proper, but the fact that Dr. Potter released    02:15

**Page 161**

1 them into the room with the repeller was improper?   02:15
2        MR. OSTOJIC:  Object.  Mischaracterizes his  02:15
3 testimony.  Asked and answered and form.              02:15
4        But I'd go ahead if you want to             02:15
5 clear it up for him.                                  02:15
6 BY THE WITNESS:                                       02:15
7     A.  I did not say -- and if I did, I have to   02:15
8 qualify -- Dr. Potter did not release them in the    02:15
9 same way that QMANN released them.  He released them 02:15
10 in a harborage, and that harborage affected the      02:15
11 distribution during the pretesting period for his    02:15
12 tests, i2LR test.                                     02:15
13 BY MR. KOPEL:                                         02:16
14     Q.  Okay.  So I -- just -- just to make sure   02:16
15 we understand each other, the focus of your criticism 02:16
16 of Dr. Potter was on the harborage rather than the   02:16
17 fact that they were released into the room with the  02:16
18 repeller; is that correct?                            02:16
19        MR. OSTOJIC:  Object to form as far as saying 02:16
20 it's the only criticism.                              02:16
21        But go ahead and answer.                    02:16
22 BY THE WITNESS:                                       02:16
23     A.  Yes, that's one of them.  That's a big     02:16
24 one.                                                  02:16
25

41 (Pages 158 - 161)

BY MR. KOPEL:                                      02:16

Q.   Yeah, and I'm just trying to understand     02:16
if part of your criticism, separate and apart from   02:16
the harborage, was that they were released into the   02:16
room with the repeller rather than being released   02:16
50/50?                                            02:16

A.   No.  Because he -- if he had a adequate     02:16
pretest, they would have distributed equally.    02:16

Q.   But they --                                  02:16

A.   Unfortunately they didn't have that.         02:16

Q.   They didn't distribute equally here;         02:16
correct?                                          02:16

A.   No, not in -- one day they did, one day     02:16
they didn't.                                      02:16

Q.   Two days they didn't; right?                 02:16

A.   Well, yes, if you want to count Pretest     02:16
Day 1, yes.                                       02:16

Q.   Do you see from the diagram here that the   02:16
exit area is significantly bigger than the treatment   02:17
area?                                             02:17

A.   I don't know if it's significantly           02:17
bigger.  It's bigger.                             02:17

Q.   Was that -- was that a proper comparison     02:17
given the disparate sizes of the rooms?           02:17

A.   I don't think that's important.              02:17

Page 162

---

Q.   So given the different sizes of the room,   02:17
would you still expect them to distribute in absence   02:17
of a repeller 50/50?                              02:17

MR. OSTOJIC:  Object to form.                     02:17

BY THE WITNESS:                                   02:17

A.   Yes, I would expect during the 3 days of    02:17
pretest that you would see a nonsignificant       02:17
difference in the distribution between 7 -- Room 7   02:17
and Room 8.                                       02:17

BY MR. KOPEL:                                      02:17

Q.   Now, given the different sizes of the       02:17
room, why wouldn't you expect more to be in Room 8   02:17
than Room 7?                                       02:17

A.   I -- I would not because they're taking     02:17
their measurements once daily, and, at least for   02:18
spiders, I don't believe they moved that fast.    02:18

Q.   So you think that there wasn't really       02:18
adequate time for the spiders to make their way into   02:18
Room 8?                                            02:18

A.   That could be a reason.                       02:18

Q.   Does that -- does that suggest that there   02:18
was a problem with the control here because they were   02:18
only given 3 days?                                02:18

A.   Well, there -- there's an issue.  There's   02:18
an issue because in this particular test the pretest   02:18

Page 163

---

period did not allow them to distribute equally, so   02:18
how do you correct for that?                      02:18

You either throw it out and start              02:18
over because something is causing them to stay where   02:18
they are, which is what Dr. Potter did; or another   02:18
possibility is you let the pretest run longer until   02:19
they do equilibrate.                              02:19

Q.   They didn't do that here; right?             02:19

A.   They did not.                                 02:19

Q.   Can you please look at the document         02:19
marked as Exhibit Borth 5.                        02:19

A.   Okay.  I have it.  What do you want me to   02:19
look at?                                          02:19

Q.   You know what.  I'm sorry.  I have one      02:19
more question about -- about that last document,   02:19
Exhibit 4, before we go on to 5.                  02:19

Can you see, based on this document,           02:19
that they were adding pests throughout the course of   02:19
the experiment?                                   02:19

A.   I see that they added -- it looks like     02:20
they added 5 spiders on Pretest Day 3 and 4; roaches   02:20
on Pretest Day 3.                                 02:20

Q.   Well, let's take a look at the roaches,     02:20
please; right.                                    02:20

So if you look at Test Day 2, we              02:20

Page 164

---

have a total of 17 roaches; correct?                      02:20

A.   Yes.                                         02:20

Q.   Okay.  And then Test Day 3 we have 19       02:20
roaches; correct?                                 02:20

A.   How many?                                    02:20

Q.   19.                                          02:20

A.   Pretest Day --                               02:20

Q.   Nope.  Test Day 2 to Test Day 3?            02:20

A.   Test Day 2 -- under roaches?                 02:20

Q.   Yes.  Test Day 2 they had 17, Test Day 3   02:20
they had 19.                                       02:20

MR. OSTOJIC:  Object to form, foundation.        02:20

BY MR. KOPEL:                                      02:20

Q.   Do you see that?                             02:20

A.   All right.  Let me -- I think I can look   02:20
at -- you're not talking pretest anymore.  You're   02:20
down in what's labeled Undergoing Test?           02:20

Q.   Yes, yes.                                    02:21

A.   Undergoing Tests 3 and 4 you said?           02:21

Q.   No, I'm looking at Days 2 and 3.            02:21

A.   2 and 3.  Okay.  Undergoing Test 2, 17     02:21
total between Rooms 7 and 8; and Test -- Day 3, 19   02:21
total between Room 7 and 8.                        02:21

Q.   It looks like they added; right?            02:21

MR. OSTOJIC:  Object to form, foundation.        02:21

Page 165

42 (Pages 162 - 165)

1 BY THE WITNESS:                                   02:21
2     A.   17 -- there was 17 one day.  There were   02:21
3 19 the next day.  It appears that they added.      02:21
4 BY MR. KOPEL:                                      02:21
5     Q.   If you look at Day 7, there is a total of 02:21
6 21 roaches.                                        02:21
7          Do you see that?                          02:21
8     A.   Yes, I do.                                02:21
9     Q.   And that's more than they even started    02:21
10 the experiment with; right?                       02:21
11    A.   Yes.                                       02:21
12    Q.   Okay.  Does any of this cause you any      02:21
13 concern in relying on this test?                   02:21
14    A.   It's hard -- it's difficult to make sense  02:21
15 out of -- out of what they replaced and what they 02:21
16 didn't replace.                                    02:21
17          Is it a concern to me?  Again, I --       02:21
18 I used the numbers as they presented -- as they were 02:22
19 presented in my analysis.                          02:22
20    Q.   Okay.  I only want to ask you a few        02:22
21 questions about Exhibit 5, please, because there's a 02:22
22 lot of overlap between these tests, and I'll try to 02:22
23 go pretty quickly.                                 02:22
24          You don't know what species of pests      02:22
25 were used in this experiment; right?               02:22

Page 166

1     A.   No.                                       02:22
2     Q.   You don't know what they were fed; do     02:22
3 you?                                               02:22
4     A.   No.                                       02:22
5     Q.   Now, for your statistical analysis did    02:22
6 you assume that -- did you assume that 50 percent of 02:22
7 the pests would remain in Room 3 and 50 would be   02:23
8 outside of Room 3?                                 02:23
9     A.   That was the high -- null hypothesis,     02:23
10 yes.                                               02:23
11    Q.   Why?                                       02:23
12    A.   Because they're either in the room where  02:23
13 the repeller is, or they're not in the room where  02:23
14 repeller is.                                       02:23
15    Q.   So despite the fact that there were 6      02:23
16 rooms, you think that in absence of the repeller   02:23
17 there might have otherwise been 50 percent in Room 3? 02:23
18    MR. OSTOJIC:  Object to form.                   02:23
19 BY THE WITNESS:                                    02:23
20    A.   In the absence -- I'm restating for       02:23
21 myself.                                            02:23
22 BY MR. KOPEL:                                      02:23
23    Q.   Sure.                                      02:23
24    A.   In the absence of a -- you got to reread  02:23
25 it.                                                02:23

Page 167

1     Q.   Well, we've got 6 rooms here; right?      02:23
2     A.   They're -- yes, 1 through 6.              02:23
3     Q.   In the absence of a repeller, would you   02:24
4 expect that there would be equal amounts in each    02:24
5 room?                                              02:24
6     A.   Given enough time -- you didn't tell me   02:24
7 where they were introduced, but if you can be more  02:24
8 specific --                                        02:24
9     Q.   Sure.                                     02:24
10    A.   -- I might be able to be more confident   02:24
11 in answering.                                      02:24
12    Q.   There were -- there were -- here they      02:24
13 were released into Room 3 at the same time; right?  02:24
14 It's under testing procedures 1A?                  02:24
15    A.   Yes, correct.                              02:24
16    Q.   So your null hypothesis is that 50         02:24
17 percent would stay in the Room 3, and the other 50 02:24
18 percent would distribute themselves among the other 5 02:24
19 rooms?                                             02:24
20    A.   That's the testing hypothesis for         02:24
21 chi-square, yes.                                   02:24
22    Q.   What's the basis for that?                 02:24
23    A.   That they're either in the room where the 02:24
24 repeller is, or they're not in the room where the  02:24
25 repeller is.                                       02:24

Page 168

1     Q.   Despite the fact that there are 5 times   02:24
2 as many rooms without repellers as the one with?    02:25
3     A.   Sure.                                     02:25
4     Q.   Don't you think it would have been more   02:25
5 proper to operate under the null hypothesis that they 02:25
6 would distribute themselves equally among the rooms? 02:25
7     A.   Would it be more proper?  No.  They're    02:25
8 either in the room with the repeller, or they're not 02:25
9 in the room with the repeller.  It's testing whether 02:25
10 the repeller repelled.                             02:25
11    Q.   Okay.  I want to talk to you, please,      02:26
12 about a -- a test that took place on July 7, 2014.  02:26
13 It's in the exhibit already marked as 13.          02:26
14          Are you having a hard time                02:26
15 finding --                                         02:26
16    A.   No.  Which one?                            02:26
17    Q.   July 7, 2014 --                            02:26
18    A.   Oh, I was --                               02:26
19    Q.   The report ends with GZU002 --             02:26
20    A.   I'm looking at the --                      02:26
21    Q.   It's an Intertek test.                     02:26
22    A.   That's -- that's important.  Okay.         02:26
23          July 7, 2014, Intertek.  Yes, I have      02:27
24 it.                                               02:27
25    Q.   Do you see it?                             02:27

Page 169

43 (Pages 166 - 169)

```
1     A.  Yes.                   02:27
2     Q.  Okay.  I'm sorry.  But I have to ask you  02:27
3  a couple of the same questions again.       02:27
4     A.  That's fine.            02:27
5     Q.  What species of ants, spiders, and   02:27
6  roaches were used in this test?          02:27
7     A.  The testers did not say.      02:27
8     Q.  Did you do any research to see -- now  02:27
9  that you had the style number, did you do any   02:27
10  research to see what the speaker size of the style  02:27
11  number was in this test?            02:27
12     A.  Wait a minute.  Excuse me.  We're on  02:27
13  July -- Intertek, July 7, 2014?          02:27
14     Q.  Correct.               02:27
15     A.  The one I'm looking at has mice and rats,  02:27
16  which I'm not providing testimony.      02:27
17     Q.  So there's another -- there's another one  02:27
18  on the same date in that same document.       02:27
19     A.  Okay.  There's the second one.  Okay.  So  02:28
20  the question was:  Do I know the species of ants,   02:28
21  spiders, and roaches?              02:28
22        Again, the testers did not provide   02:28
23  that information.                02:28
24     Q.  So here the style number tested on was  02:28
25  50167.                     02:28
                                Page 170
```

```
1        Do you see that?         02:28
2     A.  Yes.                   02:28
3     Q.  Okay.  Did you do any research into the   02:28
4  speaker size of this model?           02:28
5     A.  Not speaker size, no.      02:28
6     Q.  Did you do any research into whether this  02:28
7  model produced static or frequency -- or variable   02:28
8  outputs?                    02:28
9     A.  I read what Mankin said about it.      02:28
10     Q.  Was this the same one he tested?      02:28
11     A.  Yes.                 02:28
12     Q.  Given that it has variable outputs,      02:28
13  you're still comfortable extend -- basing your   02:29
14  opinion that even Bell + Howell repellers with static  02:29
15  outputs are effective based on this test?       02:29
16     MR. OSTOJIC:  Object to form.     02:29
17  BY THE WITNESS:                02:29
18     A.  Yes.                 02:29
19  BY MR. KOPEL:                  02:29
20     Q.  Okay.  And this test was not replicated   02:29
21  to your knowledge; was it?           02:29
22     A.  Not in a true sense that's commonly used  02:29
23  in science, no.                02:29
24     Q.  And all the tests that we've reviewed so  02:29
25  far have not been replicated; correct?       02:29
                                Page 171
```

```
1     A.  Not in the true sense.          02:29
2     Q.  Would you have relied on any of these     02:29
3  tests in the course of your work at Dow when     02:29
4  evaluating a product?               02:29
5     A.  I would.               02:29
6     MR. OSTOJIC:  Objection.  Asked and answered.  02:29
7        But go ahead.           02:30
8  BY THE WITNESS:                02:30
9     A.  I would consider them data.  I don't     02:30
10  throw out data.                02:30
11  BY MR. KOPEL:                  02:30
12     Q.  Okay.  But -- but you never relied on --  02:30
13  take it back.                  02:30
14        Okay.  Can you please turn to      02:30
15  Page 2?                    02:30
16     A.  Yes.                 02:30
17     Q.  Okay.                02:30
18     A.  It says here they used granulated sugar   02:30
19  as food.                    02:30
20        Do you see that?         02:30
21     MR. OSTOJIC:  Objection.  You looking at the   02:30
22  picture?                   02:30
23     THE WITNESS:  Yeah, it --        02:30
24     MR. KOPEL:  I'm sorry.  I meant Page 3.  That  02:30
25  was my mistake.                02:30
                                Page 172
```

```
1  BY THE WITNESS:                02:30
2     A.  Okay.  Under what -- point me to it.      02:30
3  BY MR. KOPEL:                  02:30
4     Q.  Sure.  It's a paragraph that starts with   02:30
5  the word "placed."                02:30
6     A.  "Placed an equal amount of food and      02:30
7  water.  Used granulated sugar as food."       02:30
8        Yes, I see that.         02:30
9     Q.  Okay.  Was it appropriate for them to use  02:30
10  granulated sugar as food for the spiders?       02:30
11     A.  No.                 02:30
12     Q.  Okay.  Does that give you concern about   02:30
13  Leo Lin and Sam Lin who performed this testing?      02:30
14     A.  No.                 02:31
15     Q.  As to their qualifications?       02:31
16     A.  No.  As I said before, the counts are     02:31
17  what is important in what I used to form my opinion.   02:31
18        You know, in the total of everything   02:31
19  else, the counts of spiders and roaches and ants on   02:31
20  the different days is what's important.       02:31
21     Q.  Okay.  Here, too, they added new spiders,  02:31
22  roaches, and ants throughout the experiment; correct?  02:31
23     MR. OSTOJIC:  Objection.  Misstates the      02:31
24  document.                   02:31
25        But go ahead.           02:31
                                Page 173
```

44 (Pages 170 - 173)

1  BY THE WITNESS:                          02:31
2      A.  Throughout I don't see, but I do see      02:31
3  added new spiders, roaches, and ants next day at the   02:31
4  bottom of Table -- the only table they provide --      02:31
5  Page 5 of 10.                            02:31
6  BY MR. KOPEL:                           02:31
7      Q.  Were the spiders, roaches, and ants      02:31
8  tested together in this experiment?           02:32
9      A.  I don't see that.  If you see it, please   02:32
10  point me to it.                          02:32
11     Q.  Sure.                            02:32
12          Well, if you look at the chart,        02:32
13  there is -- they report consumed food and consumed   02:32
14  water.                                 02:32
15          Do you see that?                   02:32
16     A.  Yes.                             02:32
17     Q.  And they report one number for spiders,   02:32
18  roaches, and ants.                       02:32
19          Do you see that?                   02:32
20     A.  Yes.                             02:32
21     Q.  Okay.  Does that seem to you likely then   02:32
22  that they -- that they were in the same chamber given   02:32
23  that they're reporting one number for all three of   02:32
24  them?                                 02:32
25     A.  It -- it could be.  It's reasonable to   02:32

                                        Page 174

1  assume that.                           02:33
2      Q.  Okay.  And you would not have -- you      02:33
3  would not have set up this protocol to test all three   02:33
4  of them in the same chamber at the same time;     02:33
5  correct?
6      A.  I would if the key question was:  What's   02:33
7  the effect of a repeller on all three pests at the   02:33
8  same time.                             02:33
9      Q.  Okay.  Can you go back to the second page   02:33
10  where it says, "Test Object."              02:33
11     A.  Yes.                             02:33
12     Q.  Okay.  Do you see here it says, "This is   02:33
13  to measure the efficacy of high frequency sound as a   02:33
14  pest management tool"?                    02:33
15     A.  Yes, I see that.                    02:33
16     Q.  Okay.  Do you understand that to be the   02:33
17  objective?                             02:33
18     A.  Yes.                             02:33
19     Q.  Okay.  Would you have conducted this --   02:33
20  if you had conducted the this experiment, would you   02:33
21  have put all three of them in the same chamber at the   02:33
22  same time?                             02:34
23     A.  What I would have done is done each one   02:34
24  individually and then put them all together in every   02:34
25  combination possible.                    02:34

                                        Page 175

1      Q.  And it's possible they're in the chamber   02:34
2  together at the same time that they were -- the --   02:34
3  the spiders, roaches, and ants were affecting each   02:34
4  other's movements within the chambers; correct?    02:34
5          MR. OSTOJIC:  Object to form, foundation.   02:34
6  BY THE WITNESS:                         02:34
7      A.  It's possible, yes.  We have no way of   02:34
8  knowing.                               02:34
9  BY MR. KOPEL:                           02:34
10     Q.  Well, spiders eat roaches; right?      02:34
11     A.  Yes.                             02:34
12     Q.  So wouldn't you say it's pretty likely in   02:34
13  that case that the spiders were affecting the      02:34
14  movement of the roaches?                  02:34
15     A.  No, I didn't say that --             02:34
16         MR. OSTOJIC:  Objection to form and      02:34
17  foundation.                            02:34
18  BY THE WITNESS:                         02:34
19     A.  -- I said it's possible.             02:34
20
21  BY MR. KOPEL:                           02:34
22     Q.  But you don't know one way or the other;   02:34
23  right?
24     A.  I can't prove it one way or the other.   02:34
25     Q.  Do you know one way or the other?       02:34

                                        Page 176

1          MR. OSTOJIC:  Object to form.          02:34
2  BY THE WITNESS:                         02:34
3      A.  It's possible.                     02:34
4  BY MR. KOPEL:                           02:34
5      Q.  And you would not have added new pests   02:34
6  during the course of the experiment; correct, if you   02:34
7  had written this protocol?                 02:35
8      A.  I would not have kept the -- kept the   02:35
9  experiment going.                        02:35
10  BY MR. KOPEL:                           02:35
11     Q.  In some instances throughout these tests   02:35
12  you -- we observed that even though there were no   02:35
13  pests in a chamber on a given day, there was still   02:35
14  consumption of food or water in that chamber on that   02:35
15  day.  Do you recall that?                 02:35
16         MR. OSTOJIC:  Object to form.          02:35
17  BY THE WITNESS:                         02:35
18     A.  I could see that in the table, at least   02:35
19  for -- well, what you don't know from what I can see   02:35
20  in the table is which -- no -- water -- yes,      02:36
21  there's -- okay.  Let's take an example.  I'm just --   02:36
22  you know, quickly found one.              02:36
23          Chamber A, consumed water Day 6.        02:36
24  1.6 milliliters and 0 pests counted in that chamber.   02:36
25          The question could be how could        02:36

                                        Page 177

45 (Pages 174 - 177)

**Page 178**

1 water be consumed if there's no pests in the chamber.  02:36
2     And that's a good question, which is  02:36
3 why I did not put weight on consumed food or consumed  02:36
4 water in any of these tests, because it's -- the  02:36
5 measurement of such is so variable.  02:36
6     There's so many variables that can  02:36
7 creep into the measurement of water.  Evaporation,  02:36
8 did they use sponges, did they pick up the sponge and  02:37
9 squeeze it a little more in one than the other.  02:37
10     There's just too many ways that you  02:37
11 can get bad data, so I did not use -- I did not use  02:37
12 the food and water.  I saw it, I considered it, and I  02:37
13 decided that it would be best just to rely on the  02:37
14 very easy count the insects.  02:37
15     MR. KOPEL:  Let's take a break.  02:37
16     THE VIDEOGRAPHER:  The time is now 2:39.  02:37
17     We're off the record.  02:37
18     (WHEREUPON, a recess was  02:52
19     had.)  02:52
20     THE VIDEOGRAPHER:  The time is now 2:54 p.m.  02:52
21     This is the beginning of Media 4.  02:52
22     We're back on the record.  02:52
23 BY MR. KOPEL:  02:52
24     Q.  Dr. Borth, earlier we -- and I apologize.  02:52
25 I've got a candy in my mouth, so let me know if I'm  02:52

**Page 179**

1 not clear.  02:52
2     Earlier we discussed, you know, that  02:52
3 Dow had rigorous standards when evaluating efficacy  02:52
4 of insecticides, that companies differ in terms of  02:52
5 the standards required.  02:52
6     Do you recall that?  02:53
7     A.  Yes, words to that effect.  I don't know  02:53
8 that I used the word standards, but, yes, I recall  02:53
9 the conversation.  02:53
10     Q.  Okay.  In the course of your work at Dow,  02:53
11 would you have relied upon the five -- solely upon  02:53
12 the five studies we just examined, that is the five  02:53
13 Chinese studies of the Bell + Howell repellers in  02:53
14 determining that a product was effective?  02:53
15     You know what.  Let me restate the  02:53
16 question, okay?  02:53
17     In the course of your work at Dow,  02:53
18 would you have relied on the five Chinese studies  02:53
19 that we just discussed in making a determination that  02:53
20 the product would be effective inside people's  02:53
21 residences?  02:53
22     MR. OSTOJIC:  Object to form, foundation.  02:53
23     To the extent you can answer, go  02:54
24 ahead.  02:54
25

**Page 180**

1 BY THE WITNESS:  02:54
2     A.  I would not have relied on those studies  02:54
3 solely to fulfill my obligation to Dow.  02:54
4 BY MR. KOPEL:  02:54
5     Q.  Why not?  02:54
6     A.  Because they are -- well, for the reasons  02:54
7 we pointed out.  They weren't -- they could have been  02:54
8 done better.  They could have been -- or else you  02:54
9 have to have other tests that are done, replicated,  02:54
10 there's a control, the species.  02:54
11     I mean for Dow's purposes, this -- I  02:54
12 would not use these data to make a commercialization  02:54
13 decision on, but I wouldn't discount them either.  02:54
14     I've said that, and I want to make  02:55
15 sure you understand that.  I don't throw data out.  02:55
16     So sole -- the -- solely, no.  In  02:55
17 combination with other things, as many other things  02:55
18 that I can find, they're part of the package.  02:55
19     Q.  Would the totality of the data you've  02:55
20 seen on the effectiveness of the Bell + Howell  02:55
21 repellers, would the totality of that data have been  02:55
22 sufficient for you to commercialize this product for  02:55
23 use in residences with Dow?  02:55
24     MR. OSTOJIC:  Object to form, foundation, and  02:55
25 irrelevant.  02:55

**Page 181**

1     But go ahead.  02:55
2 BY THE WITNESS:  02:55
3     A.  Well, it's difficult to say because  02:55
4 different -- as I said before, business people are  02:55
5 involved in the decisionmaking at Dow.  02:55
6     If the business leaders saw the data  02:55
7 and agreed that it was sufficient to back up the  02:56
8 claims on the labels, they might have.  02:56
9     Q.  Was it -- and, as I understood it, it was  02:56
10 your job to make -- to make these determinations; was  02:56
11 it not?  02:56
12     A.  That was one of many.  02:56
13     Q.  Okay.  02:56
14     A.  But my -- my opinion carried a lot of  02:56
15 weight.  02:56
16     Q.  Okay.  As to your own purposes, would you  02:56
17 have relied on the totality of the data you've seen  02:56
18 on Bell + Howell repellers to go forward with the  02:56
19 commercialization of the product at Dow?  02:56
20     MR. OSTOJIC:  Object.  Same objections as  02:56
21 before.  02:56
22     THE WITNESS:  As a Dow -- all right.  I have  02:56
23 to ask you to read it back because I think you said  02:56
24 at the end as a Dow employee, so that's --  02:56
25     MR. KOPEL:  I believe that's what I --  02:56

46 (Pages 178 - 181)

| | |
|---|---|
| 1 THE WITNESS: -- different. Not a 02:56 | 1 peer-reviewed journals that were not published under 02:59 |

Page 182 (left column):

1 THE WITNESS: -- different. Not a 02:56
2 Bell + Howell employee, a Dow employee. 02:56
3 MR. KOPEL: I believe that's what I said, but 02:56
4 let's -- 02:56
5 THE WITNESS: Okay.
6 MR. KOPEL: Let's let the court reporter read 02:56
7 it back, please. 02:56
8 (WHEREUPON, the record was 02:57
9 read by the reporter.) 02:57
10 MR. OSTOJIC: Same objections. 02:57
11 BY THE WITNESS: 02:57
12 A. All right. For my own purposes, what do 02:57
13 you mean by that? 02:57
14 BY MR. KOPEL: 02:57
15 Q. Sure. I mean in the course of your 02:57
16 professional obligations at Dow. 02:57
17 A. Okay. 02:57
18 No. 02:57
19 Q. Can you please turn to your initial 02:57
20 report at Page 8? 02:57
21 A. Okay. 02:57
22 Q. I'm looking at Opinion 5 and the first 02:58
23 sentence. 02:58
24 A. Oh, sorry. I'm on the wrong one again. 02:58
25 I pulled the rebuttal. 02:58
Page 182

Page 184 (right column):

1 peer-reviewed journals that were not published under 02:59
2 the auspices of ESA, the Entomological Society of 02:59
3 America. 02:59
4 MR. KOPEL: I'll ask the court reporter to 03:00
5 please mark as Exhibit 7 an Expert Disclosure in the 03:00
6 case of Deborah Galoski, Plaintiff, versus Stanley 03:00
7 Black & Decker, Inc., et al., Defendants. 03:00
8 (Whereupon, a certain
9 document was marked Borth
10 Exhibit 7 for
11 identification.) 03:00
12 BY MR. KOPEL: 03:00
13 Q. Dr. Borth, do you have Exhibit 7? 03:00
14 A. Yes. 03:00
15 Q. Have you seen it before? 03:00
16 A. Yes. 03:01
17 Q. What is it? 03:01
18 A. Defendant's Expert Disclosure Deborah 03:01
19 Galoski, Plaintiff, v. Stanley Black & Decker, Inc., 03:01
20 Defendants. It's -- it's authored by me, prepared by 03:01
21 Dr. Paul W. Borth Ento-Centric Consulting on 03:01
22 January 12, 2017. 03:01
23 Q. Is this -- this is your expert report in 03:01
24 the Black & Decker case? 03:01
25 A. Yes. 03:01
Page 184

Page 183 (left column):

1 Q. That's fine. Let me know when you're 02:58
2 ready. 02:58
3 A. Page 8. 02:58
4 Okay. Opinion 5. I see it. 02:58
5 Q. Here it says, "It is my opinion that if a 02:58
6 scientist wishes to publish research on entomological 02:58
7 topics, he/she would do so in the journals of the 02:58
8 most logical and preeminent scientific society where 02:58
9 entomological research is easily published and found, 02:58
10 those of the ESA." 02:58
11 A. Yes. 02:58
12 Q. "Under this opinion I conclude that there 02:58
13 is no more recent journal publication of the effects 02:58
14 of ultrasound on roaches, ants, spiders -- or spiders 02:58
15 than those cited and referenced in this disclosure." 02:59
16 Do you see that? 02:59
17 A. Yes. 02:59
18 Q. Is -- now that you've -- do you still 02:59
19 contend that this statement is accurate? 02:59
20 A. No. Parts of it. 02:59
21 Q. Okay. 02:59
22 A. After -- you know, this was written 02:59
23 before I saw Dr. Potter's report. 02:59
24 Having seen Dr. Potter's report, 02:59
25 there are additional studies that were published in 02:59
Page 183

Page 185 (right column):

1 Q. Okay. And I see here a numbered list of 03:01
2 references. 03:01
3 Do you see that? 03:01
4 A. Yes. 03:01
5 Q. Okay. And this -- these references 03:01
6 contain several peer-reviewed publications concerning 03:01
7 the effects of ultrasonic technology; correct? 03:02
8 A. Yes. 03:02
9 Q. And many of these references were not 03:02
10 cited in your expert reports in this case; correct? 03:02
11 A. In the Hart-Bueno case, correct. 03:02
12 Q. And, in fact, several of these studies 03:03
13 were published after the studies you cited in the 03:03
14 Hart-Bueno report; correct? 03:03
15 MR. OSTOJIC: Object to form. 03:03
16 BY THE WITNESS: 03:03
17 A. They could be. I'd have to look at 03:03
18 each -- look at the dates. 03:03
19 BY MR. KOPEL: 03:03
20 Q. Well, if we look at, for instance, No. 20 03:03
21 that was published in 2002; correct? 03:03
22 A. Yes. 03:03
23 Q. If we look at number -- 03:04
24 A. I think I'm wrong in answering that. 03:04
25 You said published in 2002? 03:04
Page 185

47 (Pages 182 - 185)

1 Q. Yes, that's what I said.    03:04
2 A. I do not think it was published in the    03:04
3 peer-reviewed literature or in a journal or any    03:04
4 publication available to the public.    03:04
5 I believe that that was part of the    03:04
6 confidential data that were sent to me by counsel for    03:04
7 the defendants in that case.    03:05
8 Q. Okay. All right. Have you -- are you    03:05
9 familiar with all the documents you've listed in this    03:05
10 table of references in your Black & Decker report?    03:05
11 A. To some level, yes.    03:05
12 Q. You've read them?    03:05
13 A. Yes. Because it says, "The following    03:05
14 reference materials were used in preparing this    03:05
15 report."    03:05
16 MR. KOPEL: Okay. You can put that -- that    03:05
17 report to the side for now, please.    03:05
18 I'll ask the court reporter to    03:05
19 please mark as Exhibit 8 a study titled, "Efficacy of    03:05
20 Ultrasound for German Cockroach and Oriental Rat    03:05
21 Flea."    03:06
22 (Whereupon, a certain    03:06
23 document was marked Borth    03:06
24 Exhibit 8 for    03:06
25 identification.)    03:06

Page 186

1 BY MR. KOPEL:    03:06
2 Q. Do you have Exhibit 8?    03:06
3 A. I do.    03:06
4 Q. Have you seen it before?    03:06
5 A. Yes, I have.    03:06
6 Q. What is it?    03:06
7 A. It's an article written by Philip    03:06
8 Koehler, Richard Patterson and J.C. Webb entitled,    03:06
9 "Efficacy of Ultrasound for German Cockroach and    03:06
10 Oriental Rat Flea Control," published in the    03:06
11 Entomological Society of America's Journal of    03:06
12 Economic Entomologic.    03:06
13 Q. And this is a peer-reviewed publication;    03:07
14 correct?    03:07
15 A. Correct.    03:07
16 Q. Can you please turn to the second page of    03:07
17 this study?    03:07
18 A. Page 1028.    03:07
19 Q. That's correct, yes.    03:07
20 Okay. So the setup in the study    03:07
21 used a corridor.    03:07
22 Do you see that?    03:07
23 A. Corridor between Room 1 and Room 2, yes.    03:07
24 Q. So there was one room with a repeller and    03:07
25 one room without a repeller and there was a corridor    03:07

Page 187

1 in between them. Is that right or am I confused?    03:07
2 A. And they had them in both -- it appears    03:07
3 with the squiggly lines there that ultrasonic    03:07
4 placement locators were in -- on a shelf in each --    03:07
5 in Room 1 and in Room 2 per Figure 1.    03:07
6 Q. Right.    03:08
7 Now, do you see Table 1 at the    03:08
8 bottom of this page?    03:08
9 A. Yes.    03:08
10 Q. Okay. And Table 1 reports frequency and    03:08
11 decibel levels of the devices tested; correct?    03:08
12 A. Yes.    03:08
13 Q. And several of these frequencies and    03:08
14 decibels are within the same range as those found in    03:08
15 the Bell + Howell devices; correct?    03:09
16 A. I'd have to look. They might be.    03:09
17 Q. And I'll represent to you that, according    03:09
18 to Dr. Mankin's findings, Bell + Howell was between    03:09
19 36 and 40 kilohertz and 88 and 99 decibels?    03:09
20 Do you remember the question?    03:11
21 A. No, I didn't know there was a question.    03:11
22 Q. Oh, well, that was a waste of a couple    03:11
23 minutes.    03:11
24 A. I'm sorry.    03:11
25 Q. Yes, my question is: If you're looking    03:11

Page 188

1 at Table 1, do you see that many of these devices use    03:11
2 the same frequency and decibel levels as the    03:11
3 Bell + Howell devices?    03:12
4 MR. OSTOJIC: Object to form and foundation.    03:12
5 BY THE WITNESS:    03:12
6 A. Then you went on to talk about Mankin,    03:12
7 and I thought that was the end of the conversation.    03:12
8 BY MR. KOPEL:    03:12
9 Q. Sure. Well, that's my question.    03:12
10 A. Which is what, again? Sorry.    03:12
11 Q. All right. Do you see, based on Table 1,    03:12
12 that many of the devices tested used comparable    03:12
13 frequency and decibel levels to the Bell + Howell    03:12
14 devices, which, according to Dr. Mankin's testing,    03:12
15 bear a frequency of 36 to 40 kilohertz and 88 to 99    03:12
16 decibels?    03:12
17 MR. OSTOJIC: Object to form.    03:12
18 Go ahead.    03:12
19 BY THE WITNESS:    03:12
20 A. I say yes to the decibels, not    03:12
21 remember -- recalling how far Mankin measured the    03:12
22 decibel level, but the numbers that you represent, 88    03:13
23 to 99, that's within the range of what Koehler    03:13
24 reports.    03:13
25 And as far as frequency, you're    03:13

Page 189

48 (Pages 186 - 189)

**Page 190**

1 representing 36 to 40 kilohertz I believe.        03:13
2        Under the high frequency one, I'd        03:13
3 say that's within the range generally; high frequency   03:13
4 two, with few exceptions is within the range; but low   03:13
5 frequency is -- is not in the range.        03:13
6    Q. Okay. And can you just take a quick        03:13
7 look, please, on Page 1029, the first paragraph on    03:13
8 the right side, last sentence.        03:13
9        It -- it mentions that devices added    03:13
10 a low-frequency sound to alert the owner that the    03:13
11 device was operational?        03:14
12        Do you see that?        03:14
13    A. Oh, up there, yes. Yes, yes I see it.    03:14
14    Q. Okay. So you understand, based on that,   03:14
15 the low-frequency sound was not really added for the   03:14
16 purpose of repellency --        03:14
17    A. Right.        03:14
18    Q. -- rather it was --        03:14
19    MR. OSTOJIC: Object to the form, foundation.   03:14
20 The document speaks for itself, and you're asking him   03:14
21 to read just the one sentence -- I guess interpret    03:14
22 just that singular sentence.        03:14
23 BY MR. KOPEL:        03:14
24    Q. Okay. Did you hear my question?        03:14
25    A. I did.        03:14

**Page 191**

1    Q. Okay. Is your understanding, based on  03:14
2 that sentence, that the low-frequency portion was    03:14
3 not -- was not there for repellency purposes, but    03:14
4 rather that people understood the devices were    03:14
5 working?        03:14
6    MR. OSTOJIC: Same objection.        03:14
7 BY THE WITNESS:        03:14
8    A. Yes.        03:14
9 BY MR. KOPEL:        03:14
10    Q. Okay. Now, Dr. Koehler used harborage in  03:14
11 this test; correct?        03:14
12    A. I saw that word. I have not read it with  03:14
13 enough -- I mean I cannot describe the harborage    03:15
14 without probably reading more but.        03:15
15    Q. Well, if you look at Page 1028, I'm    03:15
16 looking at the second paragraph here.        03:15
17    A. Okay. Under German Cockroach?        03:15
18    Q. Yep.        03:15
19    A. I'm not seeing the word harborage in    03:15
20 there, in that -- under German Cockroach in that    03:15
21 first column. I may be missing it.        03:15
22    Q. I'm sorry. What? What's that?        03:15
23    A. I'm not seeing the word harborage.    03:15
24    Q. Oh, sure. So there's a sentence that    03:15
25 starts with the word "Food (Purina Rodent Chow),    03:16

**Page 192**

1 water, and harborage (10 by 60 cm rolled cardboard)  03:16
2 were placed in the corners of each room."        03:16
3    A. Yes, you're right. You're right.        03:16
4    Q. Okay. And -- okay. If you look at the   03:16
5 right-hand column here, second paragraph, it        03:16
6 describes that the ultrasound device was first placed  03:16
7 in Room 1 and then in Room 2.        03:16
8        Do you see that?        03:16
9    A. Yes.        03:16
10    Q. Okay. So in terms of that diagram, do   03:16
11 you now understand that the placement of the repeller  03:16
12 was only in one room at a time?        03:16
13    A. It seems so from that. He doesn't say   03:16
14 how much time, you know, was -- was -- how much time  03:16
15 there was between the placement of the two, but it   03:16
16 appears that's to be -- yeah, to be true.        03:17
17    Q. Okay. So -- so this test was similar in  03:17
18 many ways to tests run -- the Chinese tests in    03:17
19 Bell + Howell repellers and run by i2L in that there  03:17
20 was a treatment area, an escape area, and a corridor  03:17
21 in between them; correct?        03:17
22    MR. OSTOJIC: Object to the form.        03:17
23        But go ahead.        03:17
24 BY THE WITNESS:        03:17
25    A. At a gross level, yes.        03:17

**Page 193**

1 BY MR. KOPEL:        03:17
2    Q. Okay. Was it -- was it improper for   03:17
3 Koehler to use harborage in this experiment?        03:17
4    A. I --        03:17
5    MR. OSTOJIC: I would ask that then you read   03:17
6 through the entire study or the document if you're    03:17
7 going to ask him specific questions on the testing    03:18
8 that was done allegedly in the document.        03:18
9    THE WITNESS: Which I'll take the time to do.  03:18
10 BY MR. KOPEL:        03:18
11    Q. You're welcome to. This -- this document  03:18
12 was cited in your rebuttal report; correct?        03:18
13    A. Yeah.        03:18
14    Q. Okay.        03:18
15    A. For a reason that was not your question,  03:18
16 but...        03:18
17        Okay. I have read through. So        03:26
18 question?        03:26
19    Q. Okay. Thank you.        03:26
20        Okay. So you see that -- it's    03:26
21 Dr. Koehler; right?        03:26
22    A. Yes.        03:26
23    Q. Okay. You see that Dr. Koehler used    03:26
24 harborage?        03:27
25    A. Yes.        03:27

49 (Pages 190 - 193)

1    Q.   Was that improper?                03:27
2    A.   Not in his mind.              03:27
3    Q.   Was it improper in your opinion?   03:27
4    MR. OSTOJIC:  Object to form, foundation.   03:27
5        Go ahead.                 03:27
6 BY THE WITNESS:                  03:27
7    A.   For his purposes I don't believe if was   03:27
8 improper for what he was trying to do.   03:27
9    Q.   And what's that?              03:27
10   A.   He was trying to determine whether the   03:27
11 repellers repelled cockroaches -- German cockroaches.   03:27
12   Q.   So for those purposes it was okay that he   03:27
13 placed harborages in the rooms?         03:27
14   A.   Well, for his study design, which was   03:27
15 this -- what's the area -- it's 6.7 meter by -- a   03:27
16 much larger scale rooms I guess you would call them   03:27
17 as -- for his purposes those harborages -- I mean for   03:27
18 his purpose in the larger rooms that -- different   03:28
19 than Potter's or Intellitec, the Chinese stuff.  I   03:28
20 don't see that it was improper.         03:28
21   Q.   Okay.  How were his purposes different   03:28
22 than Potter's purposes?              03:28
23   MR. OSTOJIC:  Object to form.         03:28
24 BY THE WITNESS:                  03:28
25   A.   For -- for insects Dr. Koehler was   03:28

Page 194

1 conducting this experiment in large rooms, in -- I   03:28
2 think he said somewhere in here that he tried to   03:28
3 approximate natural conditions or normal living space   03:28
4 or something to that effect.           03:28
5        Dr. Potter's insect tests were   03:28
6 conducted in a -- in a chamber cube basically, not   03:28
7 the size -- certainly not the size of a room.   03:28
8 BY MR. KOPEL:                    03:29
9    Q.   How was the size relevant to whether or   03:29
10 not use of harborage was appropriate?   03:29
11   A.   Well, in particular with -- in the   03:29
12 smaller space that Potter used, the harborage -- one   03:29
13 harborage versus I think Koehler used -- it sounded   03:29
14 like -- a number of them.             03:29
15       The one harborage was the only   03:29
16 place -- I mean they were kind of concentrated   03:29
17 because the -- the space was not as large as what   03:29
18 Koehler had.                    03:29
19       Koehler had large rooms and   03:29
20 harborages -- again, it sounds like -- again, I don't   03:29
21 see a diagram of where the harborages were placed,   03:29
22 but they were perhaps placed throughout the room, and   03:29
23 that's a different -- it's a different experimental   03:29
24 design than what Dr. Potter had.         03:29
25   Q.   You're identifying a lot of things, and I   03:29

Page 195

1 want to please take them one at a time.   03:29
2        First of all, do you see any   03:29
3 indication that there was more than one rolled to   03:29
4 cardboard piece in each room?           03:30
5    A.   I thought I read that, but maybe not.  I   03:30
6 know there was at least one.  You pointed that out to   03:30
7 me.  So let's -- let's stipulate that there was one.   03:30
8    Q.   Okay.  So the second you mention the size   03:30
9 of the room, and I'm still failing to understand.   03:30
10       How -- how does the size of the room   03:30
11 affect whether or not it's appropriate to use   03:30
12 harborage?                     03:30
13   A.   When you're trying to determine whether a   03:30
14 pest repeller repels insects, you don't need to have   03:30
15 harborages at all.                03:30
16       What I read in Koehler's experiment   03:30
17 is that he wanted to simulate or replicate, if you   03:30
18 will, the conditions in a, quote, normal size -- two   03:30
19 rooms.                       03:31
20       And because of the space available,   03:31
21 the pheromones that Dr. Potter says are in those   03:31
22 harborages, are going to be spread out through the   03:31
23 entire volume of the room as opposed to a small cube   03:31
24 like Dr. Potter had.               03:31
25   Q.   Have you done an analysis of the sample   03:31

Page 196

1 sizes used here versus the sample size used by   03:31
2 Dr. Potter?                     03:31
3    A.   No.                    03:31
4    Q.   So it's possible that they were just as   03:31
5 concentrated with pests; isn't that correct?   03:31
6    MR. OSTOJIC:  Object to form as far as   03:31
7 possibility.                    03:31
8        But go ahead.              03:31
9 BY THE WITNESS:                  03:31
10   A.   It's possible.              03:31
11 BY MR. KOPEL:                    03:31
12   Q.   Now, the fact that this is a   03:31
13 peer-reviewed article suggests that the other   03:31
14 scientists reviewing this had no problem with the   03:31
15 fact that Dr. Koehler used harborage in this   03:31
16 experiment; correct?               03:31
17   MR. OSTOJIC:  Object to form.  Calls for   03:31
18 speculation what other scientists may believe.   03:31
19   THE WITNESS:  Do you want to go on?   03:32
20 BY MR. KOPEL:                    03:32
21   Q.   I'm sorry.  What's the question?   03:32
22   A.   The question was for my attorney.   03:32
23   THE WITNESS:  Can I answer?          03:32
24   MR. OSTOJIC:  Oh, no, yeah, yeah, you can   03:32
25 answer.                       03:32

Page 197

50 (Pages 194 - 197)

1    THE WITNESS: Okay. Now I've lost it.    03:32
2    MR. KOPEL: Do you remember the question?    03:32
3    THE WITNESS: No, please repeat.    03:32
4  BY MR. KOPEL:    03:32
5    Q.  The fact that this was approved in a    03:32
6  peer-reviewed publication, suggests that the other    03:32
7  scientists who reviewed this before publication were    03:32
8  okay with the fact that Dr. Koehler used harborage in    03:32
9  this study; correct?    03:32
10    A.  Correct. Under these conditions.    03:32
11    Q.  Okay. And would you agree -- use of    03:32
12  harborage in such an experiment would more closely    03:32
13  approximate real-world conditions where people in    03:32
14  their homes do have spaces that can be used by    03:32
15  insects as harborage; correct?    03:32
16    MR. OSTOJIC: Object to form.    03:33
17    Go ahead.    03:33
18  BY THE WITNESS:    03:33
19    A.  If -- yes, if -- if that's the objective    03:33
20  of the experiment.    03:33
21  BY MR. KOPEL:    03:33
22    Q.  Did you see here that Dr. Koehler found    03:33
23  that the presence of an upholstered chair and sofa    03:33
24  and coffee table significantly attenuated the    03:33
25  strength of ultrasonic signals?    03:33

Page 198

1    I'm referencing Page 1028, column --    03:33
2  of the right-hand column, the second to the last    03:33
3  paragraph.    03:33
4    A.  Well, and I was looking at his data in    03:33
5  Table 3, which I'd have to cross-reference back to    03:33
6  what you said.    03:33
7    Q.  Sure.    03:33
8    A.  But the comparison he makes is ultrasound    03:33
9  between the furnished rooms and the unfurnished rooms    03:33
10  and corridor and non-ultrasound.    03:33
11    And as I look at those ranges    03:34
12  between furnished and unfurnished, they overlap --    03:34
13  actually, I thought they were standard errors, and    03:34
14  he's not reporting standard errors, he's just    03:34
15  reporting the range.    03:34
16    So 73 to 75 in the furnished, 78 to    03:34
17  81 in unfinished corridor, 71 to 74 unfurnished, 75    03:34
18  to 76.    03:34
19    So, yes, it does -- the sound -- as    03:34
20  he reports in Table 3, the average sound pressure    03:34
21  level does decrease from unfurnished to furnished.    03:34
22    Q.  And were -- did you hear when    03:34
23  Dr. Whitford was commenting that when it comes to    03:34
24  decibel levels -- I'm trying to remember how he said    03:34
25  this. I can't remember the words he used. Scratch    03:35

Page 199

1  that.    03:35
2    Okay. So do you see here in Table 4    03:35
3  on Page 1029 that Dr. Koehler did not count the    03:35
4  cockroaches found in the corridor as being in the    03:35
5  untreated room, he counted them separately?    03:35
6    Do you see that?    03:35
7    A.  I do.    03:35
8    Q.  Okay. And -- and you were saying in your    03:35
9  rebuttal report that it's more appropriate to count a    03:35
10  corridor as being repelled.    03:35
11    Do you remember that?    03:35
12    A.  Well, if you're limiting your categories    03:35
13  to two, yes. There's always the possibility to add a    03:35
14  third as Dr. Koehler did, corridor or tunnel or    03:35
15  connecting to, and that would have been even better    03:35
16  in my opinion had the researchers done that.    03:35
17    Q.  So what is it that you think they did    03:35
18  incorrectly?    03:36
19    A.  I didn't say incorrect. I just said    03:36
20  would have been more informative --    03:36
21    Q.  Oh, okay.    03:36
22    A.  -- if they had created a third category    03:36
23  called -- like Koehler did -- corridor or connecting    03:36
24  to, number found in connecting to.    03:36
25    Q.  Okay. And when you say the researchers,    03:36

Page 200

1  are you referring to i2L?    03:36
2    A.  Yes.    03:36
3    Q.  Okay. Now, wouldn't it be very easy to    03:36
4  deduce how many were in the tube if you just took    03:36
5  them out that were in the treated portion and    03:36
6  untreated portion and then you saw how many were    03:36
7  missing? Wouldn't you then be able to deduce how    03:36
8  many were in the connecting tube?    03:36
9    A.  By arithmetic you should be able to do    03:36
10  that.    03:36
11    Q.  So you have that information regardless;    03:36
12  isn't that right?    03:36
13    A.  You could find -- you could develop that    03:36
14  information.    03:36
15    Q.  In any event, Dr. Koehler did not count    03:36
16  the corridor as being repelled; correct?    03:36
17    A.  He treated it as a third category,    03:36
18  just...    03:37
19    Q.  So that's a yes, he did not count it as    03:37
20  being repelled; correct?    03:37
21    A.  He didn't say as such, no.    03:37
22    Q.  And this is a peer-reviewed article;    03:37
23  correct?    03:37
24    A.  Yes.    03:37
25    Q.  Okay. So the scientists who reviewed    03:37

Page 201

51 (Pages 198 - 201)

1 this article thought it was fine to not count them as   03:37
2 being -- to count them separate and not -- rather   03:37
3 than counting the corridor cockroaches as being   03:37
4 repelled; correct?   03:37
5     MR. OSTOJIC.  Object.  The document speaks   03:37
6 for itself, may call for speculation as to what the   03:37
7 authors thought, but go ahead.   03:37
8 BY THE WITNESS:   03:37
9     A.  For this study, those that reviewed it   03:37
10 must have agreed with it.   03:37
11         There were other studies where the   03:37
12 researchers -- and I would have to look for them if   03:37
13 you're going to ask me which ones, but I seem to   03:37
14 remember other studies that did not have the third   03:37
15 category called corridor, but included -- if they   03:37
16 were not in the -- if they were not in the repeller   03:37
17 chamber, then they were by definition not repelled.   03:37
18         So I think it depends on -- on the   03:38
19 person doing the research.   03:38
20         And in this case Koehler chose to do   03:38
21 it this way, and I -- given enough time, I could find   03:38
22 those documents -- those other researchers I'm   03:38
23 talking about which were peer-reviewed article, and   03:38
24 they didn't -- did not have the third category called   03:38
25 corridor.   03:38

Page 202

1 BY MR. KOPEL:   03:38
2     Q.  And do you know if they counted them as   03:38
3 being repelled, or that they discounted the corridor   03:38
4 all together?   03:38
5     A.  I can't recall.   03:38
6     Q.  So do you have a specific memory of any   03:38
7 peer-reviewed publication that ever counted the   03:38
8 corridor connecting tube as being repelled.   03:38
9     A.  I cannot recall without looking through   03:38
10 all the references that we've discussed today.   03:38
11     Q.  You haven't cited any in your report   03:38
12 though; right?   03:38
13     A.  No, I didn't go that far.   03:38
14     Q.  Given that this approach passed muster in   03:38
15 a peer-reviewed publication, would -- would you agree   03:39
16 that the methodology of not counting the pests in a   03:39
17 corridor as being repelled is a methodologically   03:39
18 acceptable approach as a matter of science?   03:39
19     MR. OSTOJIC.  Object to form and foundation.   03:39
20 BY THE WITNESS:   03:39
21     A.  It's one example.  It was accepted, yeah.   03:39
22 BY MR. KOPEL:   03:39
23     Q.  Now -- now, if you look at Page 1030,   03:39
24 please.  In the second paragraph Dr. Koehler says --   03:39
25 finds that "The cockroaches did not move   03:39

Page 203

1 predominantly to untreated rooms where the sound   03:39
2 intensity was significantly lower."   
3         Do you see that?  Sorry.  I'll say   
4 it again.   03:40
5     Dr. Koehler concludes that "The   03:40
6 cockroaches did not move predominantly to untreated   03:40
7 rooms where the sound intensity was significantly   03:40
8 lower."   03:40
9         Do you see that?   03:40
10     A.  I see that.  Not under conclusion, but   03:40
11 under results.   03:40
12     Q.  Do you think that it was unacceptable for   03:40
13 Dr. Potter to rely upon the study in concluding that   03:40
14 the Bell + Howell ultrasonic repellers would be   03:40
15 ineffective as to cockroaches?   03:40
16     A.  Yes.   03:40
17     Q.  Why?   03:40
18     A.  Because the Bell + Howell repellers were   03:40
19 not in this study.   03:40
20     Q.  Even though this study examined devices   03:40
21 with comparable frequencies?   03:40
22     A.  Comparable frequencies, comparable   03:40
23 decibels, but not the unit itself.   03:40
24     Q.  Now, when -- when you were evaluating   03:40
25 products in the course of your tenure at Dow, did you   03:40

Page 204

1 ever look at studies that were geared towards   03:41
2 comparable products or active ingredients in   03:41
3 products?   03:41
4     A.  I looked at everything I could, yes.   03:41
5     Q.  Was that inappropriate for you to do?   03:41
6     A.  No, it's part of the total package.   03:41
7     Q.  Okay.  So is it inappropriate for   03:41
8 Dr. Potter to consider this in this context?   03:41
9     MR. OSTOJIC.  Object.  Asked and answered.   03:41
10 Also form.   03:41
11 BY THE WITNESS:   03:41
12     A.  I don't know -- you know, I can't speak   03:41
13 for Dr. Potter, but as a -- as a scientist I think it   03:41
14 behooves you to look at everything you can, and this   03:41
15 is one piece of -- of data.  It's a data point.   03:41
16 BY MR. KOPEL:   03:41
17     Q.  So -- and Dr. Potter didn't rely on the   03:41
18 single study; right, he relied on several pieces of   03:41
19 data; correct?   03:41
20     A.  I don't know.   03:41
21     MR. OSTOJIC.  Objection.  Calls for   03:41
22 speculation.   03:41
23 BY MR. KOPEL:   03:41
24     Q.  Well, you read -- you read Dr. Potter's   03:41
25 report; right?   03:41

Page 205

52 (Pages 202 - 205)

1    A.   He cites other studies, yes.          03:41
2    Q.   And he also -- and he's also relying on   03:41
3  the i2L study and the CR Research studies; correct?   03:41
4        MR. OSTOJIC:   Same objection.          03:41
5  BY THE WITNESS:                                03:42
6    A.   Yeah, I -- I think the word rely may be a   03:42
7  legal term that's a little -- I mean what's the   03:42
8  weight of evidence you put on each one I don't know.   03:42
9        He didn't rely solely on any one.       03:42
10  He relied on -- in his -- in his own      03:42
11  studies, just like I am relying on the totality of   03:42
12  everything that I looked at.                   03:42
13  BY MR. KOPEL:                                  03:42
14    Q.   Okay.  So given that -- was it         03:42
15  inappropriate for Dr. Potter to rely in part on this   03:42
16  study in making his determination that his opinion is   03:42
17  that Bell + Howell ultrasonic pest repellers are   03:42
18  infective as to cockroaches?                  03:42
19        MR. OSTOJIC:   Objection.  Asked and answered.   03:42
20        But you can answer it again.            03:42
21  BY THE WITNESS:                               03:42
22    A.   It would be -- I forget the word you   03:42
23  used --                                       03:42
24        MR. OSTOJIC:   Inappropriate.           03:42
25

1  BY THE WITNESS:                               03:42
2    A.   -- inappropriate because the           03:42
3  Bell + Howell units were not in this list of nine.   03:42
4        It's additional data, and some of       03:42
5  the frequencies and the decibels overlap, so it's all   03:42
6  interesting, but -- but without testing the actual   03:42
7  device that is being claimed -- is at issue, it's   03:43
8  really stretching it.                         03:43
9  BY MR. KOPEL:                                 03:43
10    Q.   Now, you're not an expert on the physics   03:43
11  of ultrasonic sound; correct?                 03:43
12    A.   Correct.                               03:43
13        MR. OSTOJIC:   Objection.  Asked and answered.   03:43
14  BY MR. KOPEL:                                 03:43
15    Q.   Can you please explain to me how the   03:43
16  physical properties of the -- the multiple devices   03:43
17  used in -- let me rephrase the question.      03:43
18        Can you please explain to me how the   03:43
19  physical properties of the sound emitted by the   03:43
20  devices examined in this report differ from the   03:43
21  physical properties of the sound emitted from the   03:43
22  Bell + Howell ultrasonic pest repellers?       03:43
23        MR. OSTOJIC:   Object to form, foundation,   03:43
24  also facts not in evidence.  He has an article, not   03:43
25  the entirety of all the information he would need, to   03:43

1  make that assessment; but to the extent you can   03:43
2  answer, go ahead.                             03:43
3  BY THE WITNESS:                               03:43
4    A.   That's what I was going to say.        03:43
5        MR. KOPEL:   Yeah, I'm going to ask counsel to   03:43
6  please stop telling the witness what to say because   03:43
7  that's inappropriate.                         03:43
8  BY MR. KOPEL:                                 03:43
9    Q.   But -- so can you -- are you -- here's a   03:43
10  follow-up question.                          03:43
11        MR. OSTOJIC:   I'm not really.  Honestly, I'm   03:43
12  not trying to coach him.  I'm really making legal   03:44
13  objection.                                    03:44
14        MR. KOPEL:   That doesn't sound like a legal   03:44
15  objection to me.                             03:44
16        MR. OSTOJIC:   But if you're asking -- if   03:44
17  you're asking a witness to evaluate characteristics   03:44
18  but provide none of the characteristics, it calls for   03:44
19  speculation.  It's difficult.                03:44
20  BY MR. KOPEL:                                 03:44
21    Q.   Can you identify any differences between   03:44
22  the physical properties of the sound emitted from   03:44
23  these devices versus the physical properties of the   03:44
24  sound emitted from the Bell + Howell ultrasonic pest   03:44
25  repellers?                                    03:44

1        MR. OSTOJIC:   Same objections.         03:44
2  BY THE WITNESS:                               03:44
3    A.   I have to go to their -- their label for   03:44
4  the table.  Table 1, Characteristics of Commercial   03:44
5  Ultrasonic Units.                            03:44
6        They provide decibel, kilohertz, and   03:44
7  waveform and period information.  They do not talk   03:44
8  about the number of speakers.  They do not talk about   03:44
9  the size of the speakers, the attitude of the   03:44
10  speakers, the case design, how big the speaker   03:44
11  opening is.                                   03:44
12        All of those things -- simply the       03:44
13  manufacturer, the basic manufacturer is not   03:45
14  Bell + Howell.                               03:45
15        So it -- it's -- again, I forget --     03:45
16  I forget your question, but it -- I would not use   03:45
17  this data to extrapolate to Bell + Howell.  It's   03:45
18  additional data, certainly.                  03:45
19  BY MR. KOPEL:                                 03:45
20    Q.   Now, everything you just -- all those   03:45
21  factors you just identified are physical properties   03:45
22  of the device itself; correct?               03:45
23    A.   Physical, yeah, structural-type things.   03:45
24    Q.   What physical differences do those make   03:45
25  to the actually ultrasonic sound waves that are   03:45

53 (Pages 206 - 209)

Page 210

```
 1  emitted from the device?                03:45
 2      A.  Well, if you -- if you have a -- a   03:45
 3  speaker output hole that is one centimeter in   03:45
 4  diameter versus one that's three centimeters in   03:45
 5  diameter, it would seem logical to me that there   03:45
 6  would be less sound coming out of that smaller hole.   03:45
 7      Q.  Okay.  And -- let's finish up with this   03:45
 8  first.                                  03:46
 9          Now, just above that on Page 1030   03:46
10  Dr. Koehler says, "Since most inhabited areas of   03:46
11  buildings where household pests are prevalent, have   03:46
12  furniture, the attenuation of sound by placement of   03:46
13  furniture indicates that thorough treatment with high   03:46
14  SPL is most probably impossible with current   03:46
15  available technology."                  03:46
16          Do you see that?                03:46
17      A.  Well, you didn't -- when you started you   03:46
18  said just above that, but I had forgotten where we   03:46
19  were, so are you on the -- I do see a sentence   03:46
20  starting, "Since most inhabited areas."   03:47
21          Is that what you just read?  I   03:47
22  shouldn't ask you questions.            03:47
23      Q.  No, no, no.  That's totally fine.  You   03:47
24  know what.  I'm actually going to -- I'm going to   03:47
25  move on from that question.             03:47
```

Page 211

```
 1          Can you please look at the very end   03:47
 2  of this report here, the last sentence which reads:   03:47
 3  "Although manufacturers claim that ultrasound can   03:47
 4  penetrate voids to control pests, the presence of   03:47
 5  furniture in a room significantly decrease the   03:47
 6  intensity of ultrasound.  Therefore, the physics of   03:47
 7  ultrasound limits its potential efficacy in normal   03:47
 8  residences and commercial establishments."   03:48
 9          Do you see that?                03:48
10      A.  I see that.                    03:48
11      Q.  Okay.  Do you have any reason to disagree   03:48
12  with that?                              03:48
13          MR. OSTOJIC:  Object to form.   03:48
14  BY THE WITNESS:                         03:48
15      A.  Well, as it relates to this case, it's --   03:48
16  it's not relevant.                      03:48
17  BY MR. KOPEL:                           03:48
18      Q.  Why not?                       03:48
19      A.  Because Bell + Howell did not claim that   03:48
20  ultrasound can penetrate voids to control pests.   03:48
21      Q.  Okay.  How about the second part of that   03:48
22  sentence?                               03:48
23      A.  Again, I would like to review the label   03:48
24  to refresh my memory, but I'm pretty sure it says   03:48
25  don't put the repeller behind furniture or block   03:48
```

Page 212

```
 1  the -- you know, to block the sound.    03:48
 2      Q.  Okay.  Now I want to get back to the   03:48
 3  question I actually asked, which is:  Do you have a   03:49
 4  reason to dispute Dr. Koehler's conclusion here at   03:49
 5  the end of the study, that the physics of ultrasound   03:49
 6  limits its potential efficacy in normal residences   03:49
 7  and commercial establishments?          03:49
 8      A.  Under the conditions that he tested those   03:49
 9  nine units that is I think a valid conclusion from   03:49
10  his specific design and setup.          03:49
11      Q.  And -- and to be clear -- okay.  Thank   03:49
12  you.                                    03:49
13          MR. KOPEL:  Okay.  I'll ask the court   03:50
14  reporter to please mark as -- the deposition   03:50
15  transcript of Paul W. Borth in Golaski v. Applica   03:50
16  Consumer Products as Exhibit 9.         03:50
17          (Whereupon, a certain
18           document was marked Borth
19           Exhibit 9 for
20           identification.)            03:51
21  BY MR. KOPEL:                           03:51
22      Q.  Dr. Borth, do you have Exhibit 9?   03:51
23      A.  Yes.                           03:51
24      Q.  Have you seen it before?        03:51
25      A.  I have.                        03:51
```

Page 213

```
 1      Q.  What is it?                    03:51
 2      A.  It's a transcript of the deposition that   03:51
 3  I gave in connection with the Galoski versus Applica   03:51
 4  Consumer Products case.                 03:51
 5      Q.  Now, I know that you don't have time to   03:51
 6  read through this whole thing, but just -- as sitting   03:51
 7  here right now, without having to review this whole   03:51
 8  thing, is there anything that comes to mind that --   03:51
 9  that you said here that you recall to be incorrect or   03:51
10  that you would change your testimony on?   03:51
11          MR. OSTOJIC:  Object to form.   03:51
12  BY MR. KOPEL:                           03:51
13      Q.  With -- given the caveat that you have   03:51
14  not reviewed the whole thing right now?   03:51
15          MR. OSTOJIC:  Object to form, foundation.   03:51
16  BY THE WITNESS:                         03:52
17      A.  Well, I guess I have to ask a legal   03:52
18  question or opinion.                    03:52
19          The counsel that I -- I say reported   03:52
20  to or that I was working with on this case told me at   03:52
21  the end of the case that this case was to be kept   03:52
22  confidential, so I have refrained from saying   03:52
23  anything about this particular case under that   03:52
24  direction.                              03:52
25
```

54 (Pages 210 - 213)

Veritext Legal Solutions
866 299-5127

BY MR. KOPEL:                                        03:52

   Q.   Okay.  And I'm going to represent to you   03:52
that this deposition transcript is public record.  I   03:52
took this off of the court's docket, so this is not a   03:52
confidential document.                              03:52

   A.   Okay.  Can I ask my attorney?           03:52

   MR. KOPEL:  Go ahead.                         03:52

   MR. OSTOJIC:  I don't know anything about    03:52
that case.  It really would I guess depend upon how   03:52
the parties in that case resolved that case with      03:53
respect to the confidentiality and whether this       03:53
deposition would fall under that clause.              03:53

BY MR. KOPEL:                                        03:53

   Q.   Well, were you a party to any settlement   03:53
agreement in that case?                              03:53

   A.   No.                                      03:53

   MR. KOPEL:  I don't see how that could be    03:53
binding.                                             03:53

   MR. OSTOJIC:  I don't know.  You know         03:53
settlement agreements with confidentiality includes   03:53
not just parties but experts and everything, so I'm   03:53
not -- I was not involved, our firm was not involved   03:53
in this Black & Decker case.  I don't know of any     03:53
agreement of confidentiality, so I can't comment.     03:53

   MR. KOPEL:  I'd like to examine --           03:53

   MR. OSTOJIC:  I can tell you having other    03:53
cases with confidentiality agreements, it does go to   03:53
experts, agents, it goes to attorneys, law firms, as   03:53
well as the parties of the case.                      03:53

   MR. KOPEL:  I'd like to examine the witness   03:53
on this deposition transcript.                        03:53

   Is it your intention to instruct him         03:53
not to answer those questions?                        03:53

   MR. OSTOJIC:  It is not my intention.  It's   03:53
really I suppose up to him.                           03:53

   Although I would then -- I'm not              03:54
sure if the court reporter can mark for us from the   03:54
beginning of the questioning on this exhibit to the   03:54
end because it may need to be redacted or -- if the   03:54
people of the parties in that other case come in      03:54
later and find that it was part of the               03:54
confidentiality agreement.                           03:54

   MR. KOPEL:  Okay.  So at that point --       03:54

   MR. OSTOJIC:  I don't know though.  I mean   03:54
it --                                                03:54

   MR. KOPEL:  At that point I'll -- you know,   03:54
counsel can take a look, and if you make --           03:54

   MR. OSTOJIC:  You know let me make a          03:54
suggestion.  Let's break now for just a few minutes.  03:54

   Let me talk to you.  There's not a           03:54

question pending, but obviously...                    03:54

   MR. KOPEL:  Okay.  That's fine.              03:54

   THE VIDEOGRAPHER:  The time is 3:56.          03:54
   We're off the record.                        03:54

   (WHEREUPON, a recess was                      04:19
   had.)                                         04:22

   THE VIDEOGRAPHER:  The time is now 4:24.      04:22
   We're back on the record.                    04:22

BY MR. KOPEL:                                        04:22

   Q.   So, Dr. Borth, you've got Exhibit 9 in   04:22
front of you; correct?                               04:22

   A.   I do, yes.                               04:22

   Q.   Okay.  Can you -- can you please turn to   04:22
Page 142.                                            04:22

   A.   Okay.                                    04:22

   Q.   Okay.  And I'm -- I'm looking beginning   04:22
on Line 20 of Page 142.                              04:23

   A.   Uh-huh.  Go ahead.                        04:23

   Q.   The question reads:  "So it's your        04:23
opinion -- just so I am clear -- that once you test a   04:23
device that emits ultrasonic waves, if you have a     04:23
similar device that emits frequency peak kilohertz    04:23
with a similar voltage magnitude, you wouldn't        04:23
necessarily need to test that specific device, you    04:23
could imply the results from the test of the original   04:23

device."                                             04:23

   Answer, "You could infer that within         04:23
reason I'd say."                                      04:23

   Now, was this your testimony?                04:23

   A.   Yes.                                     04:23

   Q.   Okay.  And when -- and when we talk about   04:23
voltage magnitude, that's directly related to decibel   04:23
level; correct?                                      04:23

   A.   Yes.                                     04:23

   Q.   Okay.  Do you still believe this to be   04:23
true?                                                04:23

   MR. OSTOJIC:  Object to form, foundation.    04:23

BY THE WITNESS:                                      04:23

   A.   Are you asking if I would answer the same   04:23
way?                                                 04:24

BY MR. KOPEL:                                        04:24

   Q.   Yes.                                     04:24

   A.   I would elaborate; but, yes, the core of   04:24
the -- the core of the answer would be the same.     04:24

   Inferences are never as reliable I           04:24
guess you'd say as having correct data, but.         04:24

   Q.   Do you recall there was a correlation    04:24
report that you used in this case?  And when I say    04:24
"this case," I'm referring to Black & Decker?         04:24

   A.   I don't recall -- I don't recall         04:24

1 preparing one, there may have been one from -- that   04:24
2 was provided as exhibits or whatever they --   04:24
3 appendices or something.   04:24
4     Q.  Can you please take a look at Line 20 on   04:24
5 Page 143?   04:24
6     A.  143.   04:24
7         Okay.   04:25
8     Q.  Question, "So would you know whether the   04:25
9 shape of a speaker would affect the way in which   04:25
10 ultrasonic waves are emitted from that speaker?"   04:25
11         Answer, "I would not."   04:25
12         Question, "You wouldn't know, for   04:25
13 instance, if the speaker is shaped differently it   04:25
14 might create a larger area that's touched by   04:25
15 ultrasonic waves?"
16         Question [sic], "I would not know."   04:25
17         Question, "Or, consequently, a   04:25
18 smaller area that's actually affected by the   04:25
19 ultrasonic waves?"   04:25
20         Answer, "That would be pure   04:25
21 speculation."   04:25
22         And now I'm going to actually   04:25
23 skip -- you're welcome to read, but in terms of line   04:25
24 numeration, I'm going to skip to Line 14 here.   04:25
25         Question, "So you wouldn't know   04:25

Page 218

1 whether the shape of a given device or a difference   04:25
2 in the manufacturing process would affect the actual   04:25
3 efficacy of that device in repelling the pest as   04:25
4 represented to consumers"; would you?   04:25
5         And then there's some discussion by   04:25
6 the attorneys.   04:25
7         Answer, "I'm going to tell you --   04:25
8 I'll give you my answer; and if it doesn't meet your   04:25
9 needs, you've got to reask it. The variable that's   04:25
10 of important here is the frequency output or the   04:25
11 frequency peak. That is -- that is what has been   04:26
12 measured and correlated. And so long as an unknown   04:26
13 model would prove that the frequency peak is the same   04:26
14 as the reference, I would expect the results in a   04:26
15 biological test to be not significantly different."   04:26
16         Was that your testimony?   04:26
17     A.  Yes.   04:26
18     Q.  Do you still agree with that?   04:26
19     A.  I -- I would say the same thing.   04:26
20  Speculation.  I've never tested these things.  You   04:26
21 know I'm not an expert in physics, so I today would   04:26
22 say it's common sense -- or at least it could be --   04:26
23 it might be different.  You just don't know.   04:26
24         If you don't have the exact device,   04:26
25 that is at issue, then you're going back to   04:26

Page 219

1 inferences and correlations, and it's not as good as   04:26
2 having the actual device that's at issue.   04:26
3     Q.  Did you say that at your deposition in   04:27
4 the Black & Decker case?   04:27
5     A.  I don't know.   04:27
6     Q.  Does your testimony today seem consistent   04:27
7 to you with your testimony in the Black & Decker   04:27
8 case?   04:27
9     A.  I think I'm -- I'm -- I've got more data   04:27
10 than I did then, more time has passed; and, as I   04:27
11 said, the core of what I said then, I don't disagree   04:27
12 with. I could add to it. I would -- I did. I add   04:27
13 to it today.   04:27
14     Q.  But you didn't in that case; right?   04:27
15     MR. OSTOJIC:  Object to form, foundation.   04:27
16         I don't know if you can -- the   04:27
17 deposition speaks for itself.   04:27
18         But go ahead.   04:27
19 BY THE WITNESS:   04:27
20     A.  I only can read what you read, and I did   04:27
21 not add in -- you know, the speaker shape that they   04:27
22 were talking -- is being talked about here, I didn't   04:27
23 test that; but it makes sense to me that it might   04:27
24 affect, and that's why I used the word speculate.   04:27
25

Page 220

1 BY MR. KOPEL:   04:27
2     Q.  Okay. But you also said here that "As   04:27
3 long as an unknown model would prove that the   04:28
4 frequency peak is the same as the reference, I would   04:28
5 expect the results in a biological test to be not   04:28
6 significantly different."   04:28
7         Do you see that?   04:28
8     A.  I said that.   04:28
9     MR. OSTOJIC:  Objection. Asked and answered.   04:28
10 BY MR. KOPEL:   04:28
11     Q.  Okay. And do you agree with that still?   04:28
12     A.  I did say that.   04:28
13     Q.  Do you agree with that still?   04:28
14     MR. OSTOJIC:  Objection. Asked and answered.   04:28
15         But go ahead.   04:28
16 BY THE WITNESS:   04:28
17     A.  I could say that after a year or whatever   04:28
18 I'm smarter now than I was before, and while the   04:28
19 basis -- basics are the same, I think I would -- I   04:28
20 would have to qualify it today.   04:28
21 BY MR. KOPEL:   04:28
22     Q.  Can you please take a look at Page 148,   04:28
23 beginning on Line 7.   04:28
24         Please let me know when you have it.   04:28
25     A.  What page was it?   04:28

Page 221

56 (Pages 218 - 221)

1    Q.   Page 148 beginning on Line 7.          04:28
2    A.   Okay.  I have it.          04:28
3    Q.   Question, "So you don't know whether they  04:29
4  would actually be effective in repelling a given pest  04:29
5  or insect based on this change in shape or size;       04:29
6  isn't that true?"          04:29
7        Answer, "I did not do the testing;     04:29
8  but, again, I go back to the variable at interest.    04:29
9  Is the frequency peak matched to the working         04:29
10 frequency output.  So if those are similar, in my    04:29
11 opinion, the efficacy results would be the same."     04:29
12       Do you see that?          04:29
13   A.   I do.          04:29
14   Q.   Was that your testimony?          04:29
15   A.   Was it my testimony?          04:29
16       Yes.          04:29
17   Q.   Do you still agree with that?          04:29
18   A.   As it says in my report, the art -- the    04:29
19 variables of most interest, in my opinion, are the    04:29
20 frequency and the decibels.          04:29
21       There could be other things that     04:29
22 affect the efficacy of the product.          04:29
23   Q.   So --          04:29
24   A.   I don't think that those other things    04:29
25 supersede the importance of these two.          04:29

Page 222

1    Q.   And here when you were asked about    04:29
2  speaker shape and size, your answer is that as long   04:30
3  as the frequency peak matched to the working        04:30
4  frequency output, the results would be the same.     04:30
5        Do you see that?          04:30
6    A.   Yes.          04:30
7    Q.   Okay.  And, specifically, that, do you    04:30
8  still hold that opinion?          04:30
9    MR. OSTOJIC:  Objection.  Asked and answered.   04:30
10 Two times.          04:30
11 BY THE WITNESS:          04:30
12   A.   Yes.          04:30
13 BY MR. KOPEL:          04:30
14   Q.   So you believe that to be true regardless  04:30
15 of speaker, shape, and size?          04:30
16   MR. OSTOJIC:  Objection.  Asked and answered.   04:30
17 BY THE WITNESS:          04:30
18   A.   Go on.          04:30
19   MR. OSTOJIC:  Three times.          04:30
20       Go ahead.          04:30
21 BY THE WITNESS:          04:30
22   A.   If there's a -- okay.  The way I would    04:30
23 answer your question definitively is to do a multiple  04:30
24 regression test of all the variables.  Frequency,     04:30
25 decibels are probably the top two that would have the  04:30

Page 223

1  most impact on the results.          04:30
2        There could be a list of others that    04:31
3  affect it, maybe not any one significantly in and of   04:31
4  itself; but you put them all together, and they might  04:31
5  have -- they might make a difference.          04:31
6    Q.   Did you do that in the Black & Decker     04:31
7  case?          04:31
8    A.   No, I did not.          04:31
9    Q.   Why not?          04:31
10   A.   It wasn't part of the responsibility that  04:31
11 was given to me.          04:31
12   Q.   Do you think you should have?          04:31
13   A.   No, they -- I'm not a physics expert.  I   04:31
14 wouldn't know how to -- I wouldn't -- I don't have    04:31
15 the testing equipment.  I don't think they would want  04:31
16 me to.          04:31
17   Q.   Okay.  And in the Black & Decker case did  04:31
18 you make determinations on the efficacy of certain    04:31
19 devices based on testing performed on other devices?  04:31
20   A.   I may have.  You'd have to point me to it  04:31
21 or else I'll read the whole thing.          04:31
22   Q.   Well, please take a look at your expert    04:32
23 report in that case.          04:32
24   A.   In that case?          04:32
25   Q.   Sure.          04:32

Page 224

1    A.   What number?          04:32
2    Q.   You got it?          04:32
3    A.   No, I've got No. 2, Exhibit 2?  No.     04:32
4    Q.   It's Exhibit 7.          04:32
5    A.   I'm not seeing it.          04:32
6    Q.   The document starts with Exhibit 1.      04:32
7    A.   Oh.  Got it.  Got it.          04:32
8    Q.   Okay.  Please take a look at Page 9.     04:32
9  There's an Opinion section, and I'll direct you to    04:33
10 your Opinions 1 and 2, which also cross-reference    04:33
11 your Findings 4 and 7.          04:33
12   A.   Yes.  I mean I know there wasn't a      04:33
13 question, but I've read 1 and 2.          04:33
14   Q.   You've read them.  Okay.          04:33
15       So in that case you have based --     04:33
16 you based a finding of efficacy for an ultrasonic    04:33
17 pest repeller based on testing conducted on a       04:33
18 different ultrasonic pest repeller; correct?         04:33
19   MR. OSTOJIC:  Object to form, foundation.     04:33
20 The document speaks for itself.          04:33
21       But go ahead.          04:34
22 BY THE WITNESS:          04:34
23   A.   The answer is yes.          04:34
24 BY MR. KOPEL:          04:34
25   Q.   Do you think that your testimony in this  04:34

Page 225

57 (Pages 222 - 225)

**Page 226**

1 case is consistent with your testimony in that case   04:34
2 in that in this case you've criticized Dr. Potter for   04:34
3 doing exactly what you did in the Black & Decker   04:34
4 case?   04:34
5     MR. OSTOJIC: Objection. Mischaracterizes   04:34
6 his testimony, actions; as well as form, foundation.   04:34
7     But go ahead.   04:34
8 BY THE WITNESS:   04:34
9     A. Which is what?   04:34
10 BY MR. KOPEL:   04:34
11    Q. Which is rely on testing of other   04:34
12 ultrasonic devices in making a finding of --   04:34
13 regarding efficacy of another device.   04:34
14    MR. OSTOJIC: Same objections.   04:34
15 BY THE WITNESS:   04:34
16    A. As I recall, that case -- the devices   04:34
17 that were at issue were all manufactured by Applica   04:34
18 or Black & Decker, and --- and -- I don't know what   04:35
19 your question is.   04:35
20 BY MR. KOPEL:
21    Q. Sure. Well --   04:35
22    A. I may need it again.   04:35
23    Q. Okay. If you look at your Finding No. 4,   04:35
24 it appears that you've used a correlation report?   04:35
25    A. Yes, it wasn't -- it was not developed by   04:35

**Page 227**

1 me. I believe it was developed by -- I mean I was   04:35
2 handed -- it was part of the documentation that was   04:35
3 given to me.   04:35
4    Q. Okay. And you've used this correlation   04:35
5 report to determine that different models of   04:35
6 ultrasonic pest repellers have similar electrical   04:35
7 magnitude and frequency peak.   04:35
8    Do you see that?   04:35
9    MR. OSTOJIC: I'm sorry -- object.   04:35
10 BY THE WITNESS:   04:35
11    A. No.   04:35
12    MR. OSTOJIC: Where you looking at?   04:35
13    MR. KOPEL: Finding No. 4.   04:36
14    THE WITNESS: Can I ask for a page number?   04:36
15    MR. KOPEL: Page 6.   04:36
16    MR. OSTOJIC: Page 6.   04:36
17    MR. KOPEL: Yes.   04:36
18    MR. OSTOJIC: Not opinion --   04:36
19    MR. KOPEL: Yeah, sure. That's -- this --   04:36
20 this was cross-referenced in your Opinion 1.   04:36
21    THE WITNESS: I have 4.   04:36
22    Okay. I've read it. What --   04:36
23    MR. OSTOJIC: Let me see what page you're   04:36
24 looking on.   04:36
25    THE WITNESS: 6.   04:36

**Page 228**

1     MR. OSTOJIC: All right. No. 4.   04:36
2 BY MR. KOPEL:   04:36
3    Q. So it seems here that there was testing   04:36
4 done on a Weitech-branded device; correct?   04:36
5    A. It's been over a year, but that's what I   04:36
6 would -- yes.   04:36
7    Q. And you were rendering an opinion on an   04:36
8 Applica-branded device; correct?   04:37
9    A. I was rendering an opinion on   04:37
10 Black & Decker Applica, yes.   04:37
11    Q. Okay. So those -- those are different   04:37
12 devices; right?   04:37
13    A. I really can't recall from a year ago   04:37
14 what the details of this case were.   04:37
15    And I cannot recall the relationship   04:37
16 between Stanley Black & Decker and Applica, and I   04:37
17 don't --   04:37
18    Q. Well, you mean between Weitech and   04:37
19 Black & Decker?   04:37
20    A. Well, either one.   04:37
21    Q. How -- how is that -- how is the   04:37
22 relationship relevant?   04:37
23    A. Well, because the way you asked the   04:37
24 question.   04:37
25    Q. Well, what is the relevance of the   04:37

**Page 229**

1 relationship to one another? I mean did you examine   04:37
2 whether or not the devices had the same number of   04:37
3 speakers?   04:38
4    A. I looked at the product spec sheet as   04:38
5 this Finding No. 4 says, and I enumerated -- restated   04:38
6 what I saw in the product spec sheet and then   04:38
7 testified I guess you could say that there was a   04:38
8 correlation report that went along with it.   04:38
9    Whether it was Applica that produced   04:38
10 it or Black & Decker that produced it or Weitech, I   04:38
11 cannot remember.   04:38
12    MR. KOPEL: You can put that to the side,   04:38
13 please.   04:38
14    I'll ask the court reporter to   04:39
15 please mark as Exhibit 10 a document titled,   04:39
16 "Laboratory and Field Trials with Commercial   04:39
17 Ultrasonic Devices Against Three Ant Species."   04:39
18    (Whereupon, a certain   04:40
19    document was marked Borth   04:40
20    Exhibit 10 for   04:40
21    identification.)   04:40
22 BY MR. KOPEL:   04:40
23    Q. Dr. Borth, do you have Exhibit 10?   04:40
24    A. I do.   04:40
25    Q. Have you seen it before?   04:40

58 (Pages 226 - 229)