1    A.  If it's -- if it's listed in my         04:40
2 references, then I've seen it before.          04:40
3    Q.  What is it?                              04:40
4    A.  It's a -- apparently a research note     04:40
5 authored by Fangneng Huang.                     04:40
6    Q.  Okay.  I'll -- I'll --                   04:40
7    A.  Yeah, the author --                      04:40
8    Q.  -- represent -- I'm sorry.               04:40
9    A.  I was just going to say the authors are  04:41
10 Huang, Subramanyam, and Clark.                  04:41
11    Q.  I'll represent to you that this is in    04:41
12 your list of references for your rebuttal report in  04:41
13 this case.                                       04:41
14         Now, I wanted to ask you some          04:41
15 questions in connection with this study.        04:41
16         Have you read it?                       04:41
17    MR. OSTOJIC:  Objection to the form.        04:41
18         Go ahead.                               04:41
19 BY THE WITNESS:                                  04:41
20    A.  If it's in my -- in my references, I have  04:41
21 read it.                                         04:41
22 BY MR. KOPEL:                                    04:41
23    Q.  What is the Journal of Agricultural Urban  04:41
24 Entomology?                                      04:41
25    A.  I do not know who sponsors that or who  04:41
Page 230

1 the governing body, the editorial board, the    04:41
2 editorial policies, et cetera.  I'm not familiar with  04:41
3 it.                                              04:41
4    Q.  Do you know it to be a peer-reviewed     04:41
5 journal?                                         04:41
6    A.  Not for certain, no.                     04:41
7    Q.  Now, there's a footnote here that says,  04:41
8 "Accepted for publication" on a given date.     04:41
9    A.  Uh-huh.                                   04:41
10    Q.  Does that tell you anything in this      04:41
11 regard?                                          04:41
12    A.  With respect to being peer-reviewed, no.  04:41
13    Q.  Okay.                                     04:42
14    A.  It's -- typically when something is      04:42
15 labeled as a note, it's -- it's a note, it's not --  04:42
16 it's not considered to be -- it's a quick update on  04:42
17 something that somebody wants to get out there real  04:42
18 quickly, they're probably continuing the testing and  04:42
19 would produce a regular refereed journal article  04:42
20 later in time.                                   04:42
21    Q.  Okay.  But accepted for publication      04:42
22 implies that there was some degree of oversight by  04:42
23 the journal's editorial board before they've accepted  04:42
24 this public; correct?                            04:42
25    MR. OSTOJIC:  Object to form.               04:42
Page 231

1 BY MR. KOPEL:                                    04:42
2    Q.  This note for publication?               04:42
3    A.  If there was an editorial board, yes.    04:42
4    Q.  Now, I would like to ask you some        04:43
5 questions regarding this note.                   04:43
6         Do you want to have a quick look at     04:43
7 it first, or should I proceed with my questions?  04:43
8    A.  I would like to look at it.              04:43
9    Q.  Go ahead, and let me know when you're    04:43
10 ready, please.                                   04:43
11    A.  Okay.  I think I've -- I'm ready.        04:48
12    Q.  Okay.  Do you see that in the study that  04:48
13 was done here -- and I'm looking on Page 26 in the  04:48
14 second paragraph -- wood chips were placed in the  04:49
15 center region closure as a harborage?           04:49
16    A.  Yes, I saw that.                         04:49
17    Q.  Was that improper?                       04:49
18    A.  I don't know the purpose of their        04:49
19 experiment, so you have to -- you have to look at the  04:49
20 purpose and then make that decision.            04:49
21    Q.  Didn't you just read this study?         04:49
22    A.  I did.                                    04:49
23    Q.  And you still don't know what the purpose  04:49
24 was?                                             04:49
25    A.  Well, I can read.                        04:49
Page 232

1    Q.  Well, if you look at Page 1, the second  04:49
2 paragraph, it says, "We conducted laboratory and  04:49
3 field trials to determine the repelling abilities of  04:49
4 three commercial ultrasonic devices against three  04:49
5 common ant species."  And then it identifies them.  04:49
6         Do you see that?                         04:49
7    A.  Yes.                                      04:49
8    Q.  Okay.  Does that tell you what the        04:49
9 objective of this test was?                      04:49
10    A.  "Determine the repelling abilities of    04:49
11 three commercial ultrasonic units against three  04:49
12 common ant species."                             04:50
13    Q.  Was it improper that they used wood chips  04:50
14 as harborage?                                    04:50
15    A.  I'm sure they didn't think so.           04:50
16    Q.  And the editorial board of this journal,  04:50
17 or whoever approved this note, didn't think so either  04:50
18 probably?                                        04:50
19    MR. OSTOJIC:  Object.  Form, foundation.    04:50
20 States facts not in evidence.  May call for     04:50
21 speculation.                                     04:50
22         But go ahead.                           04:50
23 BY THE WITNESS:                                  04:50
24    A.  Yeah, if it's published, whoever was the  04:50
25 gatekeeper to the publishing must have allowed it or  04:50
Page 233

59 (Pages 230 - 233)

1 did allow it.                          04:50
2 BY MR. KOPEL:                          04:50
3     Q.  Now, do you see that here -- and I'm        04:50
4 looking at the third paragraph on Page 26 -- a whole    04:50
5 colony of ants was released into one of the        04:50
6 enclosures and allowed to acclimate there with the    04:50
7 gates closed, and that was the enclosure -- if you    04:50
8 read into the next paragraph -- that contained the    04:50
9 ultrasonic unit, which was then turned on        04:50
10 continuously for nine days.                04:50
11     Do you see that?                    04:51
12     A.  Yes.                        04:51
13     Q.  Okay.  And in the course of this trial    04:51
14 only two ants moved from the enclosure with the    04:51
15 ultrasound to the one without the ultrasound after    04:51
16 three days.                        04:51
17     Do you see that?                    04:51
18     A.  I remember reading that, yes.        04:51
19     Q.  And then -- and then in Trial 2 the ants    04:51
20 failed to move from the enclosure with the ultrasound    04:51
21 to the one without after continuous exposure for nine    04:51
22 days to ultrasound.                    04:51
23     Do you see that?                    04:51
24     A.  I remember reading it.  I'm not following    04:51
25 along with you, but, yes.                04:51
                                    Page 234

1     Q.  Okay.  So was it inappropriate for        04:51
2 Doctors Huang, Subramanyam, and Clark to release the    04:51
3 whole colony of ants into one of the enclosures and    04:51
4 allow them to acclimate there with the gates closed?    04:51
5     MR. OSTOJIC:  Object to form, foundation.    04:51
6 Also calls for a incomplete hypothetical.        04:51
7     To the extent you can comment        04:51
8 upon -- based on these facts to the study, go ahead.    04:52
9 BY THE WITNESS:                        04:52
10     A.  I -- I don't know in their mind        04:52
11 whether -- they must have thought it was appropriate,    04:52
12 or they wouldn't have done it.            04:52
13 BY MR. KOPEL:                        04:52
14     Q.  And do you know Dr. Huang?            04:52
15     A.  I know of him.  I don't know him.        04:52
16     Q.  Does he have a reputation as a capable    04:52
17 entomologist?                        04:52
18     A.  Well, he studied under Suby.  I suspect    04:52
19 he got his PhD.                        04:52
20     And Suby -- it's short for            04:52
21 Subramanyam -- is respected within the field.        04:52
22     So while I don't know Fangneng        04:52
23 Huang -- if he's -- if he's got a PhD underneath Suby,    04:52
24 I would say that he's credible.            04:52
25     Q.  And certainly whoever the gatekeeper was    04:52
                                    Page 235

1 for this journal thought that this was -- this was a    04:52
2 proper practice for purposes of the study; correct?    04:53
3     MR. OSTOJIC:  Object to form, foundation.        04:53
4 Speculative.                        04:53
5     Go ahead.                        04:53
6 BY THE WITNESS:                        04:53
7     A.  Yeah, and under the -- my other comment    04:53
8 that -- a research note, if in fact this is it, is --    04:53
9 it's usually not put through the peer review process    04:53
10 like a -- a journal.  They're more apt to be accepted    04:53
11 because they're like progress reports.        04:53
12 BY MR. KOPEL:                        04:53
13     Q.  And here the ants did not move from the    04:53
14 enclosure with ultrasound to the one without        04:53
15 ultrasound?  You saw that?                04:53
16     A.  A couple of them did; didn't they?        04:53
17     Q.  I believe there were two trials.  One of    04:53
18 them there was two ants and the other one was none.    04:53
19 I'm reading the fourth paragraph on Page 26.        04:53
20     A.  Yes.  Sorry.  Yeah, I read that, too.    04:53
21     Q.  Okay.  Did that indicate that there was    04:53
22 something wrong with the test?            04:53
23     MR. OSTOJIC:  Object to form, foundation.    04:54
24 Incomplete hypothetical.                04:54
25     But go ahead.                    04:54
                                    Page 236

1 BY THE WITNESS:                        04:54
2     A.  Well, I -- I don't remember -- if        04:54
3 something was wrong with the test, what I would have    04:54
4 looked at is that acclimation period; and if they did    04:54
5 not move equally in the pretest or the acclimation    04:54
6 period -- see, they didn't do that.  I think they had    04:54
7 the gates closed, so the design was different than    04:54
8 the design that we're talking about.        04:54
9     With the gates closed -- they        04:54
10 acclimated in one chamber just to get them used to    04:54
11 that chamber.  Then they opened up the -- the gates,    04:54
12 as I remember, and so they weren't given the        04:54
13 opportunity to go back and forth and spread        04:54
14 themselves out equally in this design.        04:55
15     Q.  Did they need that opportunity?        04:55
16     MR. OSTOJIC:  Object to form.            04:55
17 BY THE WITNESS:                        04:55
18     A.  Again, it goes back to what -- their own    04:55
19 protocol and what they were trying to do.        04:55
20 BY MR. KOPEL:                        04:55
21     Q.  Well, there's a lot of similarities        04:55
22 between this protocol and what i2L did; correct?        04:55
23     MR. OSTOJIC:  Object to form, foundation.    04:55
24 The documents speak for themselves.            04:55
25 BY THE WITNESS:                        04:55
                                    Page 237

60 (Pages 234 - 237)

1    A.   A lot of similarities.  A lot is a --    04:55
2  BY MR. KOPEL:                                04:55
3    Q.   Well, they both contain harborage; right?  04:55
4    A.   They both contain harborage.          04:55
5    Q.   Okay.                                 04:55
6    A.   Different -- well, hold on.           04:55
7         No.  The harborages were              04:55
8  tremendously different.  Wood chips in one, cardboard  04:55
9  tube in another.                             04:55
10        Am I right?                           04:55
11        i2LR had -- Potter put his            04:55
12 cockroaches in there within a cardboard -- some kind  04:55
13 of cardboard enclosed -- or roll.  I think they used  04:55
14 that terminology, cardboard roll.            04:56
15        That's a lot different than wood      04:56
16 chips, so that similarity -- you know, if you take it  04:56
17 up to the level were there harborages in each, yes.  04:56
18 The type of harborage, very different.       04:56
19   Q.   I think you might be referring to the  04:56
20 testing on cockroaches with the cardboard.   04:56
21   A.   Oh, you are right.  I -- I apologize.  04:56
22        Ants, they had a -- as I              04:56
23 understood -- a Petri dish painted India black on the  04:56
24 top.                                         04:56
25        So, again, my statement stands.  The  04:56

Page 238

1  harborage for the odorous house ants, very different  04:56
2  than the harborage for these Camponotus species.  04:56
3    Q.   But they both -- they both used      04:56
4  harborage; correct?                          04:56
5    A.   They did.                            04:56
6    Q.   And in both instances the entirety of the  04:56
7  colony was released on the side with the repeller;  04:56
8  correct?                                     04:56
9    A.   Yes.                                 04:56
10   Q.   And in both instances they were allowed  04:56
11 to acclimate solely on that side; correct?   04:56
12   A.   No.  i2LR didn't have any gates, as I  04:57
13 remember.  I may be wrong, and you can correct me.  04:57
14   Q.   Sure.                                04:57
15        Do you -- I guess I haven't given    04:57
16 you a copy of the report.                    04:57
17        MR. KOPEL:  We will hand to the witness a  04:57
18 document previously marked as Exhibit 1, the  04:57
19 deposition of Dr. Michael Potter.            04:57
20        MR. OSTOJIC:  Object.  Deposition?   04:57
21        MR. KOPEL:  It was marked as Exhibit 1 at the  04:57
22 deposition of Dr. Potter.                    04:57
23        MR. OSTOJIC:  I thought you meant it's his  04:57
24 Deposition 1.  Okay.                         04:57
25        MR. KOPEL:  Okay.                    04:57

Page 239

1  BY MR. KOPEL:                                04:57
2    Q.   And if you will please take a look at  04:57
3  Appendix 4.  That is the i2L testing.        04:57
4    A.   Okay.  I've turned to it.  Page 1 of 16  04:58
5  is the title page, and so it's what counsel is  04:58
6  referring to.                                04:58
7    Q.   Can you please take a look at Pages 8  04:58
8  going into 9.  Please read the last paragraph on 8  04:58
9  until the end of that paragraph on Page 9.   04:58
10        MR. OSTOJIC:  To himself?             04:58
11        MR. KOPEL:  To yourself.              04:58
12        THE WITNESS:  Oh, not out loud.       04:59
13        MR. KOPEL:  Nope.                     04:59
14        THE WITNESS:  Okay.                   04:59
15 BY THE WITNESS:
16   A.   Okay.  I've read it.                  05:00
17   Q.   Okay.  Does this -- so would you agree  05:00
18 that -- the i2L protocol was very similar to the  05:00
19 Huang and Subramanyam protocol in that the ants were  05:00
20 all released onto the enclosure on the side with the  05:00
21 repeller, and they acclimated solely on that side --  05:00
22   A.   Yes.                                 05:00
23   Q.   -- during the pretest?                05:00
24        And then in both tests the repeller  05:00
25 was turned on, and in both tests the ants remained on  05:00

Page 240

1  the side with the repeller; correct?        05:00
2        MR. OSTOJIC:  Object to form, foundation.  05:00
3  Misstates the evidence.                      05:00
4        But go ahead.                         05:00
5  BY THE WITNESS:                              05:00
6    A.   Yes.                                 05:00
7    Q.   Now, Doctors Huang, Subramanyam, and  05:00
8  Clark did not view the fact that the ants failed to  05:00
9  move at all as an indication that their study had  05:01
10 failed; did they?                            05:01
11        MR. OSTOJIC:  Object to form, foundation.  05:01
12 May call for speculation.                    05:01
13        But go ahead.                         05:01
14 BY THE WITNESS:                              05:01
15   A.   Of course not.  It's their study.  They  05:01
16 would not have tried to publish it if it failed.  05:01
17 BY MR. KOPEL:                                05:01
18   Q.   Do you know Dr. Jeffrey Clark?        05:01
19   A.   No.  I do know Suby.                  05:01
20   Q.   Okay.  So at least with regards to these  05:01
21 aspects of the protocols that are similar between  05:01
22 this note and the i2L report, there were several  05:01
23 respected scientists who viewed those aspects as  05:02
24 being acceptable; correct?                   05:02
25        MR. OSTOJIC:  Object to form, foundation.  05:02

Page 241

61 (Pages 238 - 241)

1        Go ahead.                      05:02
2 BY THE WITNESS:                       05:02
3    A.  Well, we -- we assume that the three   05:02
4 scientists who authored the paper approved it, and   05:02
5 then whoever was the gatekeeper for the research note   05:02
6 approved it.  I don't know how many there were or who   05:02
7 they are.                            05:02
8 BY MR. KOPEL:                         05:02
9    Q.  Okay.  Do you think that whoever the   05:02
10 gatekeeper for the Journal of Agricultural Urban   05:02
11 Entomology would be -- let me rephrase.   05:02
12        Do you think that whoever the   05:02
13 gatekeeper for the Journal of Agricultural Urban   05:02
14 Entomology is, that they would be a qualified   05:02
15 entomologist?                         05:02
16    MR. OSTOJIC:  Objection.  Calls for   05:02
17 speculation.                          05:02
18        But go ahead.                  05:02
19 BY THE WITNESS:                       05:02
20    A.  Yes.                          05:02
21 BY MR. KOPEL:                         05:02
22    Q.  And they clearly approved this study;   05:02
23 correct?                             05:02
24    MR. OSTOJIC:  Object to form, foundation.   05:02
25 Calls for speculation.                05:03
Page 242

1        But go ahead.                  05:03
2 BY THE WITNESS:                       05:03
3    A.  They approved it because it's published.   05:03
4    MR. KOPEL:  I'll ask the court reporter to   05:03
5 please mark as Exhibit 11 a study titled, "Lack of   05:03
6 Repellency of Three Commercial Ultrasonic Devices to   05:03
7 the German Cockroach."                05:03
8        (Whereupon, a certain           05:03
9           document was marked Borth
10           Exhibit 11 for
11           identification.)           05:04
12 BY MR. KOPEL:                         05:04
13    Q.  Dr. Borth, do you have Exhibit 11?   05:04
14    A.  I do.                         05:04
15    Q.  Have you seen it before?       05:04
16    A.  I'm quite certain that I have.   05:04
17    Q.  What is it?                    05:04
18    A.  It's a paper published in the -- in   05:04
19 Insect Science in 2006 by Huang and Subramanyam.   05:04
20    Q.  Okay.  And are you familiar with the   05:04
21 Journal of Insect Science?            05:04
22    A.  In a cursory fashion.          05:04
23    Q.  Is that a peer-reviewed journal?   05:04
24    A.  To my knowledge it is.         05:04
25    Q.  And we've discussed that you are familiar   05:04
Page 243

1 with the work of Huang and Subramanyam; correct?   05:04
2    MR. OSTOJIC:  Object to form.        05:05
3 BY THE WITNESS:                       05:05
4    A.  Well, I see the papers they've published,   05:05
5 so to that extent, yes.               05:05
6 BY MR. KOPEL:                         05:05
7    Q.  Okay.  I'm going to ask you some   05:05
8 questions in connection with this.  If you would like   05:05
9 to take a look before I ask the questions, you're   05:05
10 welcome to.  I know it's a little tedious, but you   05:05
11 did cite this in your report, so did Dr. Potter, and   05:05
12 I would like to ask you some questions about it.   05:05
13    A.  That's fine.                   05:05
14    Q.  And if it's helpful, I can ask the   05:05
15 questions first, and that might save time, but   05:05
16 whatever you prefer.                  05:05
17    A.  Well, maybe you ask the question; and if   05:05
18 I -- I reserve the right to go back and read it all.   05:05
19    Q.  That's fine with me.  Okay.      05:05
20        Okay.  Can you -- can you please   05:05
21 take a look at Page 63?               05:06
22    A.  Okay.                         05:06
23    Q.  And I'm referring to the first paragraph   05:06
24 here.  And it appears here that there was a 48-hour   05:06
25 acclimation period at the start of the test.   05:06
Page 244

1        Do you see that?               05:06
2    A.  Yes.                          05:06
3    Q.  Okay.  And -- but they -- separate and   05:06
4 apart from that they -- they did control tests.   05:06
5        Do you see that?  There's a -- the   05:06
6 next sentence says, "In the control tests"?   05:06
7    A.  I see that sentence, yes.        05:06
8    Q.  Okay.  So Huang and Subramanyam did not   05:06
9 choose to rely on the 48-hour pretest as a control;   05:06
10 correct?                             05:06
11    MR. OSTOJIC:  Object to form, foundation as   05:06
12 to what they thought without him reading the entire   05:06
13 article.                             05:07
14    THE WITNESS:  Yeah, I'm going to have to   05:07
15 read.                                05:07
16    MR. KOPEL:  Okay.  Go ahead.        05:07
17    THE WITNESS:  That's a question I can't   05:07
18 answer just by looking at the sentences.   05:07
19    THE VIDEOGRAPHER:  The time is 5:14.   05:12
20    This is the end of Media 4.         05:12
21    We're off the record.             05:12
22        (WHEREUPON, a recess was        05:12
23           had.)                      05:22
24    THE VIDEOGRAPHER:  The time is now 5:24 p.m.   05:22
25    This is the beginning of Media 5.   05:22
Page 245

62 (Pages 242 - 245)

1        We're back on the record.        05:22
2 BY MR. KOPEL:                           05:22
3        Q.  Dr. Borth, have you reviewed Exhibit 11?   05:22
4        A.  Yes.                         05:22
5        Q.  Okay.  Now, in -- in this study Huang,     05:22
6 Subramanyam used two cubes with a corridor in between   05:22
7 them; correct?                          05:23
8        A.  And Plexiglass.              05:23
9        Q.  Plexiglass cubes?            05:23
10       A.  Yes.                         05:23
11       Q.  And there was a 48-hour acclimation   05:23
12 period, but they did not use that pretest period as   05:23
13 their control; correct?                 05:23
14       A.  Correct.                     05:23
15       Q.  In fact, the control was a whole separate   05:23
16 test in which there were no ultrasonic units on   05:23
17 either enclosure; correct?              05:23
18       A.  Correct, which I find to be a deficiency,   05:23
19 but that's correct.                     05:23
20       Q.  Okay.  And this deficiency survived   05:23
21 scrutiny in the peer review process; correct?   05:23
22       MR. OSTOJIC:  Object to form, foundation.   05:23
23       MR. KOPEL:  I misstated.  I -- let me   05:23
24 rephrase that question.                 05:23
25
                                    Page 246

1 BY MR. KOPEL:                           05:23
2        Q.  This issue which you perceive as a   05:23
3 deficiency survived scrutiny during the peer review   05:23
4 process; correct?                       05:23
5        MR. OSTOJIC:  Same objection.     05:23
6 BY THE WITNESS:                         05:24
7        A.  Yes.                         05:24
8 BY MR. KOPEL:                           05:24
9        Q.  Can you please turn to Page 64?   05:24
10       A.  Okay.                        05:24
11       Q.  Okay.  And I'm looking at the right-hand   05:24
12 column, and there's a sentence starting with the   05:24
13 words, "The remaining."                 05:24
14          Do you see that?              05:24
15       A.  Yes.                         05:24
16       Q.  It says, "The remaining cockroaches that   05:24
17 were unaccounted for (not visible) were in the   05:24
18 conduits connecting the enclosures."    05:24
19          Do you see that?              05:24
20       A.  I do.                        05:24
21       Q.  Okay.  So do you understand, based on   05:24
22 this, that the insects found in the corridors were   05:24
23 not counted as repelled in this study?   05:24
24       A.  Based on that sentence, that's what I   05:24
25 would assume.  I -- I did not go through the -- all   05:24
                                    Page 247

1 the arithmetic to account for it, but that sentence   05:24
2 leads me to believe that.               05:24
3        Q.  And that aspect of the protocol also was   05:24
4 necessarily approved through the scrutiny of the peer   05:25
5 review process; correct?                05:25
6        MR. OSTOJIC:  Same objections.    05:25
7 BY THE WITNESS:                         05:25
8        A.  Yes, I would have disapproved it, but I   05:25
9 wasn't on the editorial board.          05:25
10 BY MR. KOPEL:                          05:25
11       Q.  So we've now seen two peer-reviewed   05:25
12 publications in which the connecting tube was not   05:25
13 counted as repelled; correct?           05:25
14       A.  Yes.                         05:25
15       Q.  Can you please take a look at Page 65?   05:25
16       A.  Okay.                        05:25
17       Q.  And I'm looking at the discussion   05:26
18 portion, the last sentence where the authors conclude   05:26
19 that results from Ballard, et al. in 1984 indicate   05:26
20 that the device could not repel the German cockroach   05:26
21 as sufficiently as an effective best management tool.   05:26
22          Do you see that?              05:26
23       A.  I see it.                    05:26
24       Q.  Okay.  And that's the same conclusion   05:26
25 that Dr. Potter reached based on that study; correct?   05:26
                                    Page 248

1        MR. OSTOJIC:  Object.  Form, foundation.   05:26
2 BY THE WITNESS:                         05:26
3        A.  I don't recall.              05:26
4 BY MR. KOPEL:                           05:26
5        Q.  Okay.  And the statement also went   05:26
6 through the peer review process; correct?   05:26
7        A.  Yes.                         05:26
8        Q.  Okay.  Do you disagree with it?   05:26
9        MR. OSTOJIC:  Object to form.     05:26
10 BY THE WITNESS:                        05:26
11       A.  Well, I'd have to refresh my memory by   05:26
12 looking at Ballard, et al. 1984.        05:26
13 BY MR. KOPEL:                          05:26
14       Q.  I'm going to show you --       05:27
15       A.  You -- excuse me.  But you referenced   05:28
16 Page 65, and only one sentence at the end.   05:28
17          Also on Page 65 is Table 1.  Can I   05:28
18 make a comment on that?                 05:28
19       Q.  Yeah, but please give me one second to --   05:28
20 okay.  Please go ahead.                 05:28
21       A.  You asked me several times as an employee   05:28
22 of Dow what would I do if I was presented with these   05:28
23 results.                                05:28
24          I look at these results and see that   05:28
25 numerically in most of the cases, most of the days,   05:28
                                    Page 249

63 (Pages 246 - 249)

**Page 250**

1 the daily number of insects in the enclosures were in   05:28
2 the inactive chamber or cube.   05:28
3     They were not significantly   05:28
4 different in every case, which the authors reported,   05:28
5 and so I believe that's where they draw their   05:28
6 conclusions that these were in effective because they   05:29
7 were not significantly different.   05:29
8     If I was in my old Dow role and saw   05:29
9 those -- that many numerical differences in favor of   05:29
10 the product, whether it was an insecticide or   05:29
11 whatever, I would want to explore more and find out   05:29
12 why.   05:29
13     They had four replications, which is   05:29
14 a good number of replications. If you can't get   05:29
15 significance with four replications, that means the   05:29
16 variability is really high.   05:29
17     And that leads me to question what   05:29
18 else is going on here.   05:29
19     And as a Dow employee I would have   05:29
20 conducted a follow-up test to do more to   05:29
21 understand -- try to understand what's going on.   05:29
22   Q.  Okay. Thanks.   05:29
23     So you do disagree with the author's   05:29
24 conclusion that the test did not provide evidence   05:29
25 that these devices can repel or eliminate the German   05:29

**Page 251**

1 cockroach as the manufacturers claim?   05:29
2   MR. OSTOJIC:  Object. Incomplete   05:30
3 hypothetical. Form.   05:30
4     But go ahead.   05:30
5 BY THE WITNESS:   05:30
6   A.  I cannot disagree with their conclusions.   05:30
7 I only added what I added because the tabular results   05:30
8 are way in favor numerically of -- it just draws   05:30
9 questions. It just means there's something else   05:30
10 going on that was not teased out.   05:30
11   MR. KOPEL:  I'll ask the court reporter to   05:31
12 please mark as Exhibit 12 a document titled,   05:31
13 "Responses of Mosquitoes and German Cockroaches to   05:31
14 Ultrasound Emitted from a Random Ultrasonic   05:31
15 Generating Device."   05:31
16     (Whereupon, a certain   05:31
17     document was marked Borth
18     Exhibit 12 for
19     identification.)   05:31
20 BY MR. KOPEL:   05:31
21   Q.  Dr. Borth, do you have Exhibit 12?   05:31
22   A.  I do.   05:31
23   Q.  Okay. What is it?   05:31
24   A.  It's an article by Ahmad, Subramanyam,   05:31
25 and Zurek.   05:32

**Page 252**

1   Q.  Do you know who Ahmad is?   05:32
2   A.  I do not.   05:32
3   Q.  Do you know who Zurek is?   05:32
4   A.  I do not.   05:32
5   Q.  But you know who Subramanyam is; right?   05:32
6   A.  I do.   05:32
7   Q.  Okay. And it looks like this was   05:32
8 published in the Netherlands Entomological Society.   05:32
9     Do you see that on the bottom of the   05:32
10 page?   05:32
11   A.  Yes.   05:32
12   Q.  Do you know if this would have been peer   05:32
13 reviewed?   05:32
14   A.  I believe it is. I -- I have seen   05:32
15 reference to that journal before. I've never   05:32
16 published in it. I don't know much about it, but I   05:32
17 suspect that it is peer reviewed.   05:32
18   Q.  Now, I -- I really just have one point I   05:32
19 wanted to ask you about here, and you can read as   05:32
20 much as you'd like, but I'm not sure that you'll find   05:32
21 it necessary to read the whole thing.   05:32
22     My question for you is located on   05:32
23 Page 31, and I am referencing the first full sentence   05:33
24 on Page 31, which reads: "The unaccounted   05:33
25 cockroaches were found in the conduits connecting the   05:33

**Page 253**

1 chambers."   05:33
2     Do you see that?   05:33
3   A.  "The unaccounted cockroaches were   05:33
4 found" -- yes, I see that.   05:33
5   Q.  So you do understand, based on this, that   05:33
6 in this test the cockroaches found in the conduits   05:33
7 connecting the chambers were not counted as repelled?   05:33
8   A.  That's what they said, yes.   05:33
9   Q.  Okay. And that point passed scrutiny of   05:33
10 peer review; right?   05:33
11   MR. OSTOJIC:  Object to form, foundation.   05:33
12 BY THE WITNESS:   05:33
13   A.  Because the peer review panel did not   05:33
14 include me.   05:33
15 BY MR. KOPEL:   05:33
16   Q.  Now, we've looked at several articles   05:33
17 where they counted the conduit. They did not count   05:33
18 the con -- let me rephrase.   05:33
19     We've now looked at several peer-   05:33
20 reviewed articles in which insects found in the   05:34
21 conduit were not labeled as repelled; correct?   05:34
22   A.  Yes.   05:34
23   Q.  Okay. Sitting here today can you name a   05:34
24 single publication in which the insects found in the   05:34
25 conduit were counted as repelled?   05:34

64 (Pages 250 - 253)

**Page 254**

```
 1      A.  Do you consider my report to be a      05:34
 2  publication?                                    05:34
 3      Q.  Other than your report, please.         05:34
 4      A.  I can't answer -- I can't ask you       05:34
 5  questions.  Sorry.                              05:34
 6          I can't today, you know, without        05:34
 7  doing a full literature search, describe or enumerate  05:34
 8  any publication that counted.                   05:34
 9      Q.  Having reviewed these publications, would  05:34
10  you agree that it's generally accepted in the field  05:34
11  as an acceptable practice to not label insects found  05:34
12  in the conduit as repelled?                     05:35
13      MR. OSTOJIC:  Object to form, foundation as  05:35
14  to these publications, and also may call for    05:35
15  speculation.                                    05:35
16          But go ahead.                           05:35
17  BY THE WITNESS:                                 05:35
18      A.  In these publications that we reviewed  05:35
19  today, it appears that way.                     05:35
20  BY MR. KOPEL:                                   05:35
21      Q.  Would you say that based on reviewing   05:35
22  several peer-reviewed publications that did this  05:35
23  practice, that it is a generally acceptable practice  05:35
24  in the field to do it that way?                 05:35
25      A.  Well --                                 05:35
```

**Page 255**

```
 1      MR. OSTOJIC:  Object to form.               05:35
 2          But go ahead.                           05:35
 3  BY THE WITNESS:                                 05:35
 4      A.  It's certainly something that you could  05:35
 5  emulate.  If you were designing your own protocol and  05:35
 6  you went to the literature and saw these three  05:35
 7  publications, it would seem reasonable to me that you  05:35
 8  could -- you could, you wouldn't have to, but you  05:35
 9  could design the types the same way and have the  05:36
10  categories of repelled, not repelled -- or active,  05:36
11  not active -- active, you know, the chambers, and not  05:36
12  count the -- whatever number of insects were in the  05:36
13  connecting tube, which I continue to say is they  05:36
14  flaw.                                           05:36
15  BY MR. KOPEL:                                   05:36
16      Q.  I appreciate your response.             05:36
17          I asked a very specific question,       05:36
18  and that was:  Based on these peer-reviewed      05:36
19  publications that we've reviewed now, would you say  05:36
20  that it is accepted within the field to have a   05:36
21  protocol in which the insects found in the conduit  05:36
22  are not counted as repelled?                    05:36
23      MR. OSTOJIC:  Object to form, foundation.   05:36
24  Also asked and answered.                        05:36
25          But go ahead.                           05:36
```

**Page 256**

```
 1  BY THE WITNESS:                                 05:36
 2      A.  If the universe of population and -- and  05:36
 3  the generally accepted -- if entomologists look at  05:36
 4  these three citations or papers that we looked at and  05:37
 5  developed generally accepted from them, then, yes.  05:37
 6  BY MR. KOPEL:                                   05:37
 7      Q.  I'd like to ask you, please, some       05:37
 8  questions about your rebuttal report in this case,  05:37
 9  which I think we marked as Exhibit 2.           05:37
10          Okay.  Please turn to Page 5.          05:37
11          So it looks like the first criticism   05:37
12  you had towards the i2L study is that there was no  05:37
13  control for the physical presence of the repeller;  05:37
14  correct?                                        05:37
15      A.  Yes.                                    05:37
16      Q.  Okay.  Now, can you explain how the     05:37
17  physical presence of the repeller could have been a  05:38
18  confounding variable?                           05:38
19      A.  It could have an odor to it.  There could  05:38
20  be a lot of things.  The fact that it's not there,  05:38
21  that it's not present or controlled for is the  05:38
22  deficiency because you don't know what it could be  05:38
23  unless you did the test that way.               05:38
24      Q.  So would you agree that the possibilities  05:38
25  really in terms of this being a deficiency is that it  05:38
```

**Page 257**

```
 1  could either, A, cause pests to move away from the  05:38
 2  physical presence of the repeller; or, B, cause pests  05:38
 3  to move towards the physical presence of the          05:38
 4  repeller?                                       05:38
 5      A.  No, I'm not saying anything about how   05:38
 6  they move.                                      05:38
 7          I'm just saying that the conditions     05:38
 8  are not identical.  The conditions as set up there  05:38
 9  are not identical.                              05:38
10      Q.  But can you explain why it's important to  05:38
11  control for this?                               05:39
12      A.  Oh, it's a variable.  There's a --      05:39
13  there's something present in one cube that's not  05:39
14  present in every other cube.                    05:39
15      Q.  Okay.  So when you say this is a        05:39
16  variable, is the concern that the physical presence  05:39
17  of the repellers could affect the movement of the  05:39
18  insects in the test?                            05:39
19      A.  That's -- that's my -- that's a concern.  05:39
20      Q.  Okay.  And the concern would be either  05:39
21  that the physical presence itself would repel the  05:39
22  insects or the physical presence itself would attract  05:39
23  the insects; right?                             05:39
24      A.  It could have any kind of effect on the  05:39
25  insects.                                        05:39
```

65 (Pages 254 - 257)

```
 1      Q.  But the concern with how this might      05:39
 2 affect the end data from our control study here is   05:39
 3 one of those two things; correct?                    05:39
 4      A.  It could affect the behavior of the        05:39
 5 insects, and by saying observe behavior, that in this  05:39
 6 issue is the locomotion direction of their movement.  05:39
 7      Q.  Okay.  Would you agree that there's a      05:40
 8 difference between testing the efficacy of a device   05:40
 9 and testing the efficacy of its output?              05:40
10      A.  Testing the presence of a device and
11 the --                                               05:40
12      MR. OSTOJIC:  Do you want it read back?        05:40
13      THE WITNESS:  Yes, read back, please.          05:40
14      MR. KOPEL:  Let me rephrase.                   05:40
15 BY MR. KOPEL:                                        05:40
16      Q.  Would you agree there's a difference       05:40
17 between testing the effectiveness of a device and    05:40
18 testing the effectiveness of its output?             05:40
19      A.  There's a -- there could be a difference.  05:40
20 You'd want to test it to find out.                   05:40
21      Q.  Okay.  So in this instance were we trying  05:40
22 to determine in this case the effectiveness of the   05:40
23 device or the effectiveness of the output?           05:40
24      A.  It's all in one.  You can't separate them  05:40
25 because the device is emitting the sound.            05:41
                                              Page 258
```

```
 1 BY THE WITNESS:                                      05:41
 2      A.  Are you -- are you asking me if we have a   05:42
 3 space with -- a homeowner has a space with a repeller  05:42
 4 and without a repeller and what the effect would be?  05:42
 5 BY MR. KOPEL:                                        05:42
 6      Q.  No.                                         05:42
 7      A.  Okay.  Try again then.                      05:42
 8      Q.  Okay.  Would you agree that it's unlikely   05:42
 9 that the homeowner would have the physical repeller   05:42
10 that's not active in its house?                      05:42
11      MR. OSTOJIC:  Object to form, foundation.       05:42
12 May call for speculation.                            05:42
13      But go ahead.                                   05:42
14 BY THE WITNESS:                                      05:42
15      A.  I believe that would be reasonable.        05:42
16 If they're going to buy it, they're                  05:42
17 going to plug it in.                                 05:42
18 BY MR. KOPEL:                                        05:42
19      Q.  So the alternatives are either the         05:42
20 homeowner likely has an activated device or has no   05:42
21 device at all; correct?                              05:42
22      MR. OSTOJIC:  Object.  Same object -- form,     05:42
23 foundation.                                          05:42
24 BY MR. KOPEL:                                        05:42
25      Q.  Against that backdrop don't you think it   05:42
                                              Page 260
```

```
 1      Q.  Well, let's say, in fact --               05:41
 2      A.  And that's why I talk -- that's precisely  05:41
 3 why I made the point that I did in deficiency.       05:41
 4      Q.  Let's say that the pests were              05:41
 5 hypothetically repelled by the mere presence of the  05:41
 6 repeller --                                          05:41
 7      A.  Okay.                                       05:41
 8      Q.  -- okay?  Would that be relevant to the    05:41
 9 Bell + Howell ultrasonic pest repeller's ability to  05:41
10 drive pests out?                                     05:41
11      A.  It could be.  It could be an additive      05:41
12 effect.                                              05:41
13      Q.  And let's say the press -- mere presence   05:41
14 of the device hypothetically had the opposite effect  05:41
15 where it attracted insects, would that be relevant to  05:41
16 the efficacy of the device?                          05:41
17      A.  Yes.                                        05:41
18      Q.  Okay.  Would you agree that the            05:41
19 alternative to having -- for homeowners to having the  05:41
20 device present in their house is to not have the     05:41
21 device present in their house?                       05:41
22      MR. OSTOJIC:  Object to form, foundation.       05:41
23 I'm not sure the question is understandable.         05:41
24      But go ahead.                                   05:41
25
                                              Page 259
```

```
 1 was perfectly reasonable to use no device for the    05:42
 2 control when we're seeking to determine the          05:43
 3 effectiveness of the device rather than the          05:43
 4 effectiveness of its ultrasonic sound waves?         05:43
 5      A.  Was your question perfectly reasonable?     05:43
 6 Is that how you started it?                          05:43
 7      Q.  Against that backdrop don't you think it   05:43
 8 was perfectly normal to use no device for the control  05:43
 9 when we are seeking to determine the effectiveness of  05:43
10 the device rather than effectiveness of its          05:43
11 ultrasonic sound waves?                              05:43
12      MR. OSTOJIC:  Object to the form.               05:43
13      But go ahead.                                   05:43
14 BY THE WITNESS:                                      05:43
15      A.  It depends on the person who -- for me     05:43
16 the answer would be no.                              05:43
17      For Dr. Potter apparently the answer            05:43
18 is yes.                                              05:43
19      It would not be perfectly normal.              05:43
20 BY MR. KOPEL:                                        05:43
21      Q.  What about reasonable?  Let me -- I        05:43
22 probably should have said reasonable.                05:43
23      A.  I would want to test every variable.  I    05:43
24 mean that's what scientific method is.               05:43
25      You systematically tease out factors           05:43
                                              Page 261
```

66 (Pages 258 - 261)

**Page 262**

```
1  that contribute to variability.              05:44
2        And without that control, the          05:44
3  negative control, you don't know what that -- what   05:44
4  the mere presence of the ultrasonic repeller is.     05:44
5        Now, how important is that in the       05:44
6  grand scheme of things, I can't say.         05:44
7        But it is a -- it -- it's a concern     05:44
8  to me. It's a deficiency in my mind.         05:44
9    Q.  Let's say that the device's ultrasonic  05:44
10 sound waves was infective to repel, but the presence 05:44
11 of the device itself was effective to repel, would   05:44
12 the device then be effective?                 05:44
13   A.  You just said it would, yeah.           05:44
14       As a hypothetical you said if it was    05:44
15 effective, would it be effective.             05:44
16       Yes.                                    05:44
17   Q.  Okay. So because of that don't you think 05:44
18 it's important to test for whether -- when you have a 05:44
19 repeller versus when you don't have a repeller?      05:44
20   A.  Yes, that's certainly important.        05:44
21       Or repeller on, repeller off.           05:44
22   Q.  Can you please turn to Page 7.          05:45
23   A.  Okay.                                   05:45
24   Q.  Okay. Do -- do you contend that the use 05:45
25 of a harborage in the i2L experiments invalidates    05:45
```

**Page 263**

```
1  their results?                               05:46
2    A.  In the way that they used them, yes.    05:46
3    Q.  Why?                                    05:46
4    A.  Well, again, there was no negative      05:46
5  control for the presence of the harborages.   05:46
6        And even more important, I think, is    05:46
7  the fact that ultrasonic sound from the       05:46
8  Black & Decker -- sorry -- from the Bell + Howell   05:46
9  repellers does not penetrate cardboard, does not    05:46
10 penetrate glass for ants, so the fact that these     05:46
11 harborages were in place and the insects were  05:46
12 introduced into the chamber in these harborages does 05:46
13 not make any sense to me.                     05:46
14   Q.  What do you mean by a negative control   05:46
15 for the harborages?                           05:46
16   A.  Negative control is -- in this case it  05:46
17 would be -- it would be easily tested, as I say here, 05:47
18 by using arenas with and without harborages.   05:47
19       So he did not have -- Potter did not    05:47
20 have a chamber that did not have a harborage.   05:47
21   Q.  Wouldn't you agree that people's houses  05:47
22 contain furniture?                            05:47
23   A.  I would.                                05:47
24   Q.  Yeah. And it wouldn't be unacceptable to 05:47
25 expect that people might have cardboard in their     05:47
```

**Page 264**

```
1  houses; right?                               05:47
2    A.  Yes.                                    05:47
3    Q.  Okay. How about glass?                  05:47
4    A.  Yes.                                    05:47
5    Q.  Okay. And these are things that insects 05:47
6  can harbor in; correct?                       05:47
7    A.  I don't know about glass.               05:47
8    Q.  Well, how about a cardboard box?        05:47
9    A.  They could, but I don't --             05:47
10   Q.  Okay. So don't you think it would be    05:47
11 reflective of real-world conditions to have    05:48
12 harborages in the test just like they might have in  05:48
13 people's residences?                          05:48
14   A.  Not when you're trying to discern or    05:48
15 tease out the effect the ultrasonic repeller.  05:48
16       This is a very simple question. The     05:48
17 ultrasonic repeller either repels insects or it does 05:48
18 not repel insects.                            05:48
19       Nowhere are we asking whether we're     05:48
20 in -- where there's cardboard involved or sofas      05:48
21 involved or anything.                         05:48
22       You're just asking the question,        05:48
23 very simply: Does the repeller do what the product   05:48
24 is claimed to do?                             05:48
25   Q.  Okay. But don't you agree that it would 05:48
```

**Page 265**

```
1  be more reflective of real-world conditions to have a 05:48
2  harborage in the test?                        05:48
3    A.  No, it's not the purpose of that test.  05:48
4    Q.  Well, now --                            05:48
5    A.  That's the purpose of --                05:48
6    Q.  Who ran the test, you or somebody else? 05:48
7    A.  No, you're right. It's Potter's         05:48
8  hypothesis. He is trying to -- I think -- trying to  05:48
9  demonstrate that in a fully-occupied house, okay,    05:49
10 that has furniture, maybe that's -- his simulation   05:49
11 there is the harborage, that these devices can repel 05:49
12 insects in the harborage.                     05:49
13       But the product literature does not     05:49
14 claim. It claims that it repels. It doesn't claim    05:49
15 that it repels things out of furniture or out of     05:49
16 cardboard.                                    05:49
17   Q.  Can the product repel things out of     05:49
18 furniture or cardboard?                       05:49
19   A.  If the insects cannot -- are not exposed 05:49
20 to the ultrasonic waves, then they would not be      05:49
21 repelled from the ultrasonic waves.           05:49
22   Q.  So if you have insects inside furniture 05:49
23 or cardboard in a house where the ultrasonic pest    05:49
24 repeller is plugged in, the ultrasonic pest repeller 05:49
25 would not be effective to repel or drive out those   05:50
```

67 (Pages 262 - 265)

1 insects; correct?                                   05:50
2     MR. OSTOJIC: Object to form.              05:50
3 BY THE WITNESS:                                  05:50
4     A. If the insects are not exposed to the      05:50
5 ultrasonic sound, then there would be no effect on   05:50
6 them. You would not expect that, and it's clearly   05:50
7 stated in the product literature.                    05:50
8     Q. Okay. So it sounds to me, and correct me  05:50
9 if I'm wrong, like -- the issue that you're taking   05:50
10 with this test is that it had the wrong objective,   05:50
11 not that it was invalid, it had the wrong objective;  05:50
12 is that correct?                                     05:50
13     A. One is --                                    05:50
14     MR. OSTOJIC: Object -- I'm sorry.          05:50
15          Mischaracterizes his prior           05:50
16 testimony.                                           05:50
17          But go ahead. You've answered.       05:50
18 BY MR. KOPEL:                                       05:50
19     Q. Is that correct?                            05:50
20     A. That's one of my criticisms, if you will,  05:50
21 of the --                                            05:50
22     Q. But what I was saying was correct, that    05:50
23 it's -- it's a matter of -- your -- your criticism in  05:50
24 this instances when we're talking about the          05:50
25 harborages is that the test had the wrong objective.  05:50

Page 266

1          It's not that it was an invalid        05:50
2 test, it had the wrong objective as -- as it relates  05:50
3 to this case in your opinion; correct?              05:51
4     MR. OSTOJIC: Same objection.              05:51
5          But go ahead.                          05:51
6 BY THE WITNESS:                                  05:51
7     A. In addition, the harborages protected the  05:51
8 insects from the ultrasound.                         05:51
9          As soon as they stick their little     05:51
10 head outside of that harborage, it's likely that they  05:51
11 were going to be exposed to the ultrasonic.         05:51
12          So you -- so the fact that the         05:51
13 insects did not move in Dr. Potter's test does not   05:51
14 surprise me, it's what I wrote in my report, because  05:51
15 they were protected.                                 05:51
16 BY MR. KOPEL:                                       05:51
17     Q. Where do insects typically nest inside of  05:51
18 the house?                                           05:51
19     MR. OSTOJIC: Object to form, foundation.  05:51
20 BY THE WITNESS:                                  05:51
21     A. Any place that suits their requirements.  05:51
22 BY MR. KOPEL:                                       05:51
23     Q. And what's that?                          05:51
24     A. Usually -- I mean I -- I would -- I would  05:51
25 list -- put a list together. It would be safety,    05:51

Page 267

1 they need food, they need water, and they are born to  05:51
2 breed.                                               05:51
3     Q. What do you mean by safety?              05:51
4     A. Oh, they feel protected.                  05:52
5     Q. So they prefer -- they prefer to nest in   05:52
6 a place with harborage; correct?                    05:52
7     A. Well, cockroaches and ants do, which are  05:52
8 the case here.                                       05:52
9     Q. And those are areas where the -- the      05:52
10 Bell + Howell repellers cannot reach; correct?      05:52
11     A. Ultrasound cannot reach them. Clearly    05:52
12 stated on the product literature.                   05:52
13     Q. Okay. Let's talk about the pheromones,    05:52
14 please.                                              05:52
15          And I -- I suspect that the issue      05:52
16 here is similar to the last one.                     05:52
17          Would you agree that in a -- in a      05:52
18 residence that has an insect infestation that the    05:52
19 insects would have left pheromones in that house?   05:52
20     MR. OSTOJIC: Object to form, but go ahead.  05:52
21 BY THE WITNESS:                                  05:52
22     A. Yes.                                      05:52
23 BY MR. KOPEL:                                       05:52
24     Q. Okay. So in that respect would you agree  05:52
25 that the i2L testing was emulative of real-world     05:52

Page 268

1 conditions in the event of an insect infestation?     05:52
2     MR. OSTOJIC: Same objection.              05:53
3          Go ahead.                              05:53
4 BY THE WITNESS:                                  05:53
5     A. To a -- to an extent.                     05:53
6          Because one harborage in a testing     05:53
7 chamber is not the same as a room that has different  05:53
8 possible nesting sites where aggregation pheromones  05:53
9 could be deposited.                                  05:53
10 BY MR. KOPEL:                                       05:53
11     Q. But people don't live in Plexiglass       05:53
12 cubes; right?                                        05:53
13     A. No.                                       05:53
14     Q. Okay. Where people live there --          05:53
15     A. Well --                                   05:53
16     Q. Where people live if there is an insect   05:53
17 infestation, there is more likely to be deposits of   05:53
18 pheromones than there would be in a Plexiglass cube;  05:53
19 correct?                                             05:53
20     MR. OSTOJIC: Object to form.              05:53
21 BY THE WITNESS:                                  05:53
22     A. Yes, I think Dr. Potter stated that.       05:53
23          That's one of the reasons he used a    05:53
24 harborage is because his objective was to test, in   05:53
25 his words, under real-world conditions.              05:53

Page 269

68 (Pages 266 - 269)

**Page 270**

1 BY MR. KOPEL:                                          05:53
2     Q.  So here, too, would you agree that your     05:53
3 criticism with regards to the pheromones is not so   05:53
4 much as that the test results are invalid as much as 05:53
5 that you believe he had the wrong testing objective;  05:54
6 is that correct?                                       05:54
7     A.  That's certainly correct, that he had --     05:54
8 in my opinion -- the wrong testing objective for what 05:54
9 is at issue here.                                      05:54
10        But because sound -- ultrasound              05:54
11 cannot penetrate these harborages, that's another    05:54
12 flaw.                                                  05:54
13    Q.  Well, if your objective is to see if the     05:54
14 Bell + Howell repellers can drive pests out of a      05:54
15 house, would this have been an appropriate way to     05:54
16 structure the experiment?                              05:54
17    MR. OSTOJIC:  Object to form, foundation.         05:54
18        But go ahead.                                 05:54
19 BY THE WITNESS:                                        05:54
20    A.  In Potter's opinion, yes; but, again, I      05:54
21 say that's not the claim being made by the            05:54
22 Bell + Howell repellers.                               05:54
23 BY MR. KOPEL:                                          05:54
24    Q.  Oh, sure.                                     05:54
25        And -- but please listen carefully           05:54

**Page 271**

1 to my question.                                        05:54
2     A.  I did.                                        05:54
3     Q.  If you wanted to test whether or not the     05:54
4 Bell + Howell ultrasonic pest repellers are capable   05:55
5 of driving pest out of the house, in that instance do 05:55
6 you -- would you agree that the i2L tests were        05:55
7 conducted properly?                                    05:55
8     A.  If my --                                      05:55
9     MR. OSTOJIC:  Same objection.                     05:55
10        Go ahead.                                     05:55
11 BY THE WITNESS:                                        05:55
12    A.  If my objective was to determine whether     05:55
13 the Bell + Howell ultrasonic repellers could repel   05:55
14 pests out of the house, I would have used real       05:55
15 house -- houses and rooms.  I would not have used and 05:55
16 relied, state my claim on lab scale experiments.     05:55
17 BY MR. KOPEL:                                          05:55
18    Q.  Would you agree that use of these smaller    05:55
19 cubes is actually more advantageous to showing a      05:55
20 repellency effect given the smaller space than you    05:55
21 would find in a house?                                 05:55
22    A.  If it doesn't have any sound shadow --       05:55
23 something that creates a sound shadow.               05:56
24    Q.  Well, all houses have things that can        05:56
25 create sound shadows; right?                          05:56

**Page 272**

1     A.  Ones that I know of, yes.                    05:56
2     Q.  Okay.  So in this regard, if we're          05:56
3 comparing the cube used, between a larger space in a  05:56
4 house and a smaller space in a cube enclosure,        05:56
5 wouldn't you agree that the cube enclosure is more    05:56
6 advantageous to showing repellency effects than you   05:56
7 would have in a larger house?                          05:56
8     A.  I think it would be because you should be   05:56
9 able to control for it, and you've got captive       05:56
10 insects that can't, you know, hide all around the    05:56
11 place.                                                 05:56
12    Q.  So in this regard if -- if a repeller is    05:56
13 shown to be infective in the more advantageous        05:56
14 environment, wouldn't it be reasonable to come to a   05:57
15 conclusion that it would also not be effective in a   05:57
16 less advantageous environment?                         05:57
17    MR. OSTOJIC:  Object.  Incomplete               05:57
18 hypothetical.  States facts that are not in evidence. 05:57
19        But you can answer.                          05:57
20 BY THE WITNESS:                                        05:57
21    A.  I --                                         05:57
22    THE WITNESS:  Would you repeat the question?    05:57
23    MR. KOPEL:  Can you please read it back?        05:57
24        (WHEREUPON, the record was                   05:57
25        read by the reporter.)                       05:57

**Page 273**

1     MR. OSTOJIC:  Same objections.                   05:57
2     THE WITNESS:  Wow, that's a long one.            05:57
3        Is it possible to break that up into         05:57
4 a couple questions?                                    05:57
5     MR. KOPEL:  Sure.                                05:57
6 BY MR. KOPEL:                                          05:57
7     Q.  So we've agreed that testing in a smaller   05:57
8 space is more advantageous to showing a repellent    05:58
9 effect; correct?                                       05:58
10    A.  Yes.                                         05:58
11    Q.  Okay.  And a cube is a smaller space than   05:58
12 a house; correct?                                     05:58
13    A.  Yes.                                         05:58
14    Q.  Okay.  So if testing in a cube, which is    05:58
15 a less advantageous -- excuse me.  Let me start over. 05:58
16        If testing in a cube, which is a            05:58
17 more advantageous space to showing a repellency      05:58
18 effect, shows that there is no repellency effect,     05:58
19 wouldn't it be reasonable to draw a conclusion, based 05:58
20 on that, that there would be no repellency effect in  05:58
21 a house, which is a less advantageous environment?    05:58
22    MR. OSTOJIC:  Object.  Form, foundation,         05:58
23 incomplete hypothetical, and assumes facts not in     05:58
24 evidence.                                              05:58
25        But go ahead and answer.                     05:58

69 (Pages 270 - 273)

1 BY THE WITNESS:                              05:58
2      A.  It's not -- I -- the answer -- the short   05:58
3 answer to your question is -- is yes.          05:58
4      But -- but, again, to go back to          05:58
5 the -- the claims on the label of this repeller don't  05:58
6 require that you have harborages or sofas or chairs   05:59
7 or walls.                                     05:59
8 BY MR. KOPEL:                               05:59
9      Q.  So even if the repellers don't work in an   05:59
10 environment where you have all the furniture you just  05:59
11 mentioned, the claims would still be correct because  05:59
12 the packaging does not mention those items; is that   05:59
13 what you're saying?                          05:59
14     A.  That's --                           05:59
15     MR. OSTOJIC:  Object to form, foundation,   05:59
16 incomplete hypothetical, misstates the evidence.   05:59
17     But go ahead.                           05:59
18 BY THE WITNESS:                            05:59
19     A.  That's what I'm saying.               05:59
20 BY MR. KOPEL:                              05:59
21     Q.  Can we talk about the starvation concept  05:59
22 that you're talking about on Page 8 here.      05:59
23     Is it your contention that the            05:59
24 repellers would be less likely to have a repellent   06:00
25 effect if insects are satiated?               06:00
Page 274

1      A.  It would be less likely to see the      06:00
2 repellent effect because they're not encouraged to   06:00
3 seek out any food, they're satiated.           06:00
4      Q.  And you cited some studies involving     06:00
5 starvation here, and none of those studies were --   06:00
6 none of those studies involved ultrasound; correct?   06:00
7      A.  No, they did not.                     06:00
8      Q.  And none of those studies had the       06:00
9 objective of testing the effectiveness of a specific   06:00
10 repellent; did they?                         06:00
11     A.  No.                                 06:00
12     Q.  Okay.  Have you found any studies       06:00
13 involving ultrasound in which the insects were   06:00
14 starved?                                    06:00
15     A.  I can't recall any, but that's not the   06:00
16 purpose of this criticism.                   06:01
17     Q.  Okay.  Have you seen any published     06:01
18 studies seeking to evaluate a repellent in which the   06:01
19 insects were starved?                        06:01
20     A.  Again, I cannot recall any.            06:01
21     Q.  We've looked at several peer-reviewed   06:01
22 studies today; correct?                      06:01
23     A.  Yes.                                06:01
24     Q.  Okay.  Do you have any recollection of   06:01
25 any of them saying that the insects were starved?   06:01
Page 275

1      A.  Not those that we -- I do not have any   06:01
2 recollection of that.                        06:01
3      The point I'm trying to make here is   06:01
4 that for testing insects that are -- that -- where   06:01
5 your results are dependent upon locomotion in a lab   06:01
6 scale, controlled environment, what you want to do is   06:01
7 encourage locomotion.                        06:01
8      And when you feed them and you put    06:02
9 them in a harborage with aggravation pheromones and   06:02
10 protect them from the repeller, you're not    06:02
11 encouraging locomotion.                      06:02
12     They're certainly expected to stay    06:02
13 where they are.                              06:02
14     Q.  If insects have infested somebody's     06:02
15 kitchen, would you expect that those insects are   06:02
16 starving?                                   06:02
17     MR. OSTOJIC:  Object to form, foundation.   06:02
18 BY THE WITNESS:                            06:02
19     A.  It depends on the cleanliness, but I   06:02
20 wouldn't know.  I mean if they are -- if there's   06:02
21 adequate food, crumbs and everything around, I would   06:02
22 expect they're not starving.                 06:02
23 BY MR. KOPEL:                              06:02
24     Q.  But would you -- do you believe -- most   06:02
25 kitchens would have adequate crumbs or food that   06:02
Page 276

1 insects could access; right?                 06:02
2      A.  Yes, I'll agree to that.             06:02
3      Q.  Insects can get inside of people's     06:02
4 garbages; right?                             06:02
5      A.  Yes.                               06:02
6      Q.  Okay.  So it looks as -- it looks that in  06:02
7 your -- like in your statistical analysis of the i2L   06:03
8 reports you added the missing pests in the conduit to  06:03
9 the pests counted in the non-released chamber;    06:03
10 correct?                                    06:03
11     A.  I did.                              06:03
12     Q.  Have you made any calculations as to    06:03
13 whether or not your same criticism would apply had   06:03
14 you not done that?                          06:03
15     A.  I have to refer to this Reference 10.   06:03
16     Can you point me to where in this    06:03
17 report -- we're on --                        06:03
18     Q.  Absolutely.  I'm on Page 11.          06:03
19     A.  Okay.                              06:03
20     Okay.  And your question, again, now   06:04
21 that I'm there.                              06:04
22     Q.  Okay.  So you had specific statistics-   06:04
23 based criticism of the i2L data; correct?     06:04
24     A.  Yes.                               06:04
25     Q.  Okay.  Have you done any calculations to  06:04
Page 277

70 (Pages 274 - 277)

1 see if that criticism would still apply had you not   06:04
2 added the missing pests in the conduit to the pests   06:04
3 counted in the non-released chamber?   06:04
4     A.  I believe in working this up that I   06:04
5 considered that, but because the actual numbers in   06:04
6 the -- in the tubes were not specified, I did not run   06:05
7 the statistics on that.   06:05
8     Q.  Can you please turn to your initial   06:05
9 report in this case.  It's Exhibit 1 from earlier   06:05
10 today.   06:05
11     A.  What page?   06:05
12     Q.  Okay.  Great.  Please turn to Page 5.   06:05
13         Okay.  So I'm looking at Opinion 1   06:05
14 here, and the last sentence states:  "In my opinion   06:05
15 if a customer does not follow the use instructions   06:05
16 provided in succinct native language using common   06:05
17 vernacular that is not overly burdensome to read and   06:05
18 comprehend, then the customer has defaulted on   06:05
19 his/her obligation to use the product in good faith   06:05
20 and as intended by the entities; and, therefore, must   06:05
21 take full responsibility for the end result to be at   06:05
22 the desired result that the entities and the   06:05
23 customers intended or not."   06:06
24         Do you see that?   06:06
25     A.  I do.   06:06

Page 278

1     Q.  Okay.  Do you agree that this is -- these   06:06
2 are things which are governed by applicable legal   06:06
3 statutes or case law?   06:06
4     MR. OSTOJIC:  Object to form, foundation.   06:06
5 BY THE WITNESS:   06:06
6     A.  I don't know case law.  I -- I can't cite   06:06
7 government regulations.   06:06
8         What I can cite is the fact that if   06:06
9 someone buys a device, a TV, a -- whatever, it's   06:06
10 incumbent upon that customer to read how to use it   06:06
11 according to the manufacturer.   06:06
12         Or else if it's not used in   06:06
13 accordance with the manufacturer, then who knows what   06:06
14 the results going to be, and that customer has to   06:06
15 accept the responsibility.   06:06
16         That's what I say here.   06:06
17     Q.  Do you base this -- this opinion on, you   06:06
18 know, science or other specialized or technology   06:07
19 knowledge, or do you believe that this is common   06:07
20 sense?   06:07
21     A.  Both.  And I'll -- I'll give you the --   06:07
22 the -- example of my Dow employment.   06:07
23         One of the reasons that I was very,   06:07
24 very careful on the language, the labeling language   06:07
25 was because -- just like in this case -- the   06:07

Page 279

1 manufacturer is held to the responsibility -- has the   06:07
2 responsibility to have the product perform according   06:07
3 to the claims made on the label.   06:07
4         So we were very specific.  And we   06:07
5 were very specific because we weren't -- we   06:07
6 weren't -- we didn't want class action suits to be   06:07
7 filed against us.  In Dow.   06:08
8     Q.  When you gave an opinion about what you   06:08
9 think the interpretation of drives pests out means,   06:08
10 was that based on your own personal interpretation,   06:08
11 or was that based on how you believe consumers would   06:08
12 interpret the phrase?   06:08
13     A.  It was based on what the words say.   06:08
14     Q.  So -- so is that the former?  It's based   06:08
15 on your own interpretation, or is it based on how you   06:08
16 believe consumers would interpret the phrase?   06:08
17     MR. OSTOJIC:  Object to the form.   06:08
18         Go ahead.   06:08
19 BY THE WITNESS:   06:08
20     A.  It's not an interpretation.  It's what   06:08
21 the words say.   06:08
22 BY MR. KOPEL:   06:08
23     Q.  Okay.   06:08
24     A.  Very clearly.  It says, "drive pests   06:08
25 out."   06:08

Page 280

1     Q.  Have you spoken to any consumers?   06:08
2     A.  I speak to consumers every day.  I'm a   06:08
3 consumer.   06:08
4     Q.  I take that back.   06:08
5         Have you spoken to any consumers   06:08
6 about Bell + Howell ultrasonic pest repellers?   06:08
7     A.  No.   06:08
8     Q.  Do any -- do you have any data on -- on   06:08
9 how they interpret this phrase?   06:09
10     A.  Only the depositions of Hart and Bueno.   06:09
11     Q.  Do -- have you performed any sort of   06:09
12 conjoint analysis on this phrase?   06:09
13     MR. OSTOJIC:  Sorry.  What?   06:09
14 BY MR. KOPEL:   06:09
15     Q.  Have you performed any sort of conjoint   06:09
16 analysis regarding this phrase?   06:09
17     A.  I don't understand conjoint.   06:09
18     Q.  Okay.  Have you done any sort of study or   06:09
19 other examination of consumer insight in consumer   06:09
20 preference regarding this phrase?   06:09
21     A.  Regarding the phrase drive pests out?   06:09
22     Q.  Correct.   06:09
23     A.  Indirectly through that Amazon exercise I   06:09
24 went through that's in the report.   06:09
25     Q.  So the Amazon exercise tells you how the   06:09

Page 281

71 (Pages 278 - 281)

Page 282

```
1  consumers interpret that phrase?              06:09
2      A.  No, it doesn't.                        06:09
3          It tells you whether these certain    06:09
4  percentage of verified users were satisfied with the  06:09
5  product.                                       06:10
6      Q.  How often did you take Amazon reviews  06:10
7  into account in your time at Dow?              06:10
8      A.  It would be an additional data point  06:10
9  if -- if it was ever thought of being used.   06:10
10     Q.  Can you identify -- can you remember a  06:10
11 single instance in which it was used?         06:10
12     A.  Well, we didn't have to use Amazon    06:10
13 because we had real-world customers that we would  06:10
14 bring in for focus groups and feedback workshops and  06:10
15 didn't need to go to Amazon in Dow.           06:10
16     Q.  Have you ever seen any sort of        06:10
17 publication or peer-reviewed journal article which  06:10
18 takes Amazon reviews into account when evaluating the  06:10
19 efficacy of a product?                         06:10
20     A.  No.                                    06:10
21     Q.  Do you think that taking Amazon reviews  06:10
22 into account when evaluating the efficacy of a  06:10
23 product is a generally accepted practice in the field  06:10
24 of entomology?                                 06:11
25     A.  I don't know that I've ever seen that.  06:11
```

Page 283

```
1          But, like I said in my report, it's  06:11
2  not what I -- what I solely base my opinions on.  06:11
3  It's an extra data point.  And I gather as much data  06:11
4  as I can.                                      06:11
5          And this was specific to the claim   06:11
6  about worth of the -- it was claimed that these were  06:11
7  worthless products, and I think, you know, a very  06:11
8  quick way to take a look at -- maybe a first order of  06:11
9  proclamation, easily accessible to me, was the Amazon  06:11
10 reviews.                                       06:11
11     Q.  All right.  And how -- and there are  06:11
12 multiple different varieties of Bell + Howell pest  06:11
13 repellers available for sale on Amazon; correct?  06:11
14     A.  Yes.                                   06:11
15     Q.  Okay.  How many of them did you take into  06:11
16 account when you were doing their analysis?    06:11
17     A.  Every one that came up in a review, as  06:11
18 long as it was from a verified purchaser.      06:11
19          And I do remember there is a number  06:12
20 in the report somewhere that -- if we turn to that  06:12
21 section.  I think I did -- yes, it's Page 18 of my  06:12
22 report, number of ultrasonic pest repeller indoor  06:12
23 models with customer reviews, 11, so there were 11  06:12
24 different ones.                                06:12
25     Q.  Let's say your analysis of the Amazon  06:12
```

Page 284

```
1  reviews turned out that consumers were dissatisfied  06:12
2  with the product.                             06:12
3          Would that have made you question    06:12
4  your opinions in this case?                    06:12
5      A.  I would have put that in the totality of  06:12
6  everything else, yeah, it would have been     06:12
7  supplemental, additional data.                06:12
8      Q.  Now, you've expressed some opinions here  06:13
9  in which you stated that you thought the testimony by  06:13
10 the plaintiffs were indicative of satisfied   06:13
11 customers.                                     06:13
12          Do you recall that?                  06:13
13     A.  Yes, that's back in the original report,  06:13
14 expert -- I don't know what number.  No. 1 I guess.  06:13
15     Q.  Is that opinion based on scientific,  06:13
16 technical, or other specialized knowledge, or do you  06:13
17 think that's common sense based on reading the  06:13
18 transcript?                                    06:13
19     A.  It's -- it's my common sense.         06:13
20          If you're going to go on, could you  06:13
21 tell me what page you're on so I can get to it.  06:13
22     MR. KOPEL:  All right.  Let's take a break.  06:14
23     THE VIDEOGRAPHER:  The time is 6:16.      06:14
24          We're off the record.               06:14
25
```

Page 285

```
1          (WHEREUPON, a recess was
2          had.)                               06:20
3      THE VIDEOGRAPHER:  The time is 6:22.      06:20
4          We're back on the record.            06:20
5  BY MR. KOPEL:                                  06:20
6      Q.  Dr. Borth, earlier today we discussed  06:20
7  your statement that you reject the allegation that  06:20
8  these devices do not repel pests, and one of the  06:20
9  references you cited was a study by Ballard and Gold.  06:20
10          Do you recall that?                  06:20
11     A.  Yes.                                   06:20
12     Q.  Okay.  What did -- what examinations of  06:20
13 the devices used in Ballard did you do in order to  06:20
14 make a determination that the results of that study  06:21
15 were relevant to the Bell + Howell ultrasonic  06:21
16 devices?                                       06:21
17     A.  If it's the same Ballard document, it's  06:21
18 the statement they made that cockroach activity was  06:21
19 increased to a significant degree in at least one of  06:21
20 the reps, replications, in the chambers or cubes that  06:21
21 they had the repeller active in.               06:21
22     Q.  Now --                                06:21
23     A.  That's my recollection.               06:21
24     Q.  Did you do any analysis of whether the  06:21
25 devices in Ballard had multiple speakers?      06:21
```

72 (Pages 282 - 285)

1    A.  No.                        06:21
2        Q.  Did you do any analysis of the speaker    06:21
3  size in the Ballard study?              06:21
4    A.  No.                        06:21
5        Q.  How about speaker direction?  Did you do  06:22
6  any analysis of that?                 06:22
7    A.  No, I relied on their own words.        06:22
8        I mean I should read the report.       06:22
9  It's in one of these exhibits, but I didn't have   06:22
10  access to their repellers.  They did not report on  06:22
11  speaker size or shape or anything else.        06:22
12      Q.  Okay.  But despite not knowing speaker   06:22
13  size or shape or number, you still made a       06:22
14  determination that the results of the study were   06:22
15  relevant to determining the efficacy of the      06:22
16  Bell + Howell devices; correct?           06:22
17      MR. OSTOJIC:  Object to form.          06:22
18      Go ahead.                     06:22
19  BY THE WITNESS:                     06:22
20      A.  I used their experience, their research    06:22
21  to try to make the point that in their case -- in   06:22
22  their research one of their cockroach replications  06:23
23  created increase -- significantly increased the    06:23
24  activity of cockroaches in that test; and, thereby,  06:23
25  that ultrasonic waves are capable of affecting the  06:23
                                    Page 286

1  behavior of a cockroach.               06:23
2        Q.  Even though they didn't test the       06:23
3  Bell + Howell device in the Ballard study; correct?  06:23
4    A.  They did not.                 06:23
5        Q.  Okay.  Is that any different than      06:23
6  Dr. Potter's reliance on studies where the      06:23
7  Bell + Howell device wasn't tested?          06:23
8    A.  Well, Dr. Potter is making the         06:23
9  allegation.                       06:23
10        And if I was making an allegation, I     06:23
11  would want to use the exact device that's under    06:23
12  question.                        06:23
13      Q.  So you think using studies regarding     06:23
14  other devices is acceptable in order to make a    06:23
15  determination of efficacy but not in order to make a  06:24
16  determination of non-efficacy?            06:24
17      MR. OSTOJIC:  Objection.  Mischaracterizes   06:24
18  his testimony.                     06:24
19  BY THE WITNESS:                     06:24
20      A.  Yeah, and I have to have you repeat it    06:24
21  because I -- it was long for me.            06:24
22  BY MR. KOPEL:                       06:24
23      Q.  Okay.  So, in other words -- I'm trying   06:24
24  to understand what you're saying.           06:24
25      A.  Uh-huh.                    06:24
                                    Page 287

1        Q.  Is what you're saying that it is       06:24
2  acceptable to use studies of devices other than the  06:24
3  Bell + Howell repellers to make a finding of     06:24
4  efficacy.  However, it is not acceptable to do so in  06:24
5  making a finding of non-efficacy?           06:24
6    A.  I don't think I'm saying that.         06:24
7        MR. OSTOJIC:  Objection.  Mischaracterizes   06:24
8  his testimony.  Also asked and answered I think like  06:24
9  seven hours ago.                    06:24
10        But go ahead.                 06:24
11  BY THE WITNESS:                     06:24
12      A.  What I'm saying is that it -- the Gold    06:24
13  standard in this question is actually using       06:24
14  Bell + Howell devices.                 06:24
15        It's not to use surrogates that were    06:24
16  in commercialization 20, 30 years ago because they   06:25
17  weren't the devices that are in question.  Things are  06:25
18  improved, things change.               06:25
19        I have admitted that the frequency      06:25
20  and the decibels are important; but, again, even so,  06:25
21  you're not -- there's so many things that -- that   06:25
22  could affect the results that you obviously want to   06:25
23  use -- if you're going to make a claim like this,   06:25
24  you're going to want to use the devices that are at  06:25
25  issue.                          06:25
                                    Page 288

1  BY MR. KOPEL:                       06:25
2        Q.  All right.  And -- but you didn't analyze  06:25
3  any of those things with regards to the Ballard    06:25
4  study; right?                      06:25
5        MR. OSTOJIC:  Objection.  Asked and answered.  06:25
6  BY THE WITNESS:                     06:25
7    A.  Those things being the physicality of --  06:25
8  the physics of the device?  Is that what you mean by  06:25
9  those things?                      06:26
10  BY MR. KOPEL:                       06:26
11      Q.  Anything other than the frequency and    06:26
12  amplitude?                       06:26
13      A.  No, I did not.                06:26
14      MR. KOPEL:  Okay.  Dr. Borth, thanks for your  06:26
15  time.  I have no further questions but reserve the  06:26
16  right to ask you more questions should new issues   06:26
17  come up on redirect.                  06:26
18      MR. OSTOJIC:  Sure.                06:26
19        Dr. Borth, I have a few questions      06:26
20  for you.                        06:26
21        First of all, I want to mark as        06:26
22  Exhibit 13 I believe is the next number.        06:26
23        (Whereupon, a certain             06:26
24        document was marked Borth
25        Exhibit 13 for
                                    Page 289

73 (Pages 286 - 289)

```
 1            identification.)
 2            EXAMINATION              06:26
 3 BY MR. OSTOJIC:                     06:26
 4      Q.  Dr. Borth, Exhibit 16 [sic] was     06:26
 5 Defendants' Disclosure of Retained Experts that    06:26
 6 accompanied your reports and the reports of     06:26
 7 Dr. Philip Whitford, okay.          06:26
 8            Underneath your name under the     06:26
 9 No. 1, it indicates that you charge $300 U.S. per    06:26
10 hour.                              06:26
11           Do you see that?          06:26
12      A.  I do.                     06:26
13      Q.  Is that the amount that you are charging   06:26
14 per hour for your work in this case?     06:26
15      A.  Yes.  Up -- for any -- any reports, for    06:26
16 depositions.  It changes if -- if court appearance is    06:27
17 required.                          06:27
18      Q.  Court appearance.  By that you mean if    06:27
19 there's a trial?                   06:27
20      A.  Yes.                      06:27
21      Q.  And what do you charge in the event that   06:27
22 there's a charge?                  06:27
23      A.  $450 per hour.             06:27
24      Q.  Okay.  And is that the extent of the     06:27
25 compensation you have charged in this case or will    06:27
                                      Page 290
```

```
 1 charge?                            06:27
 2      A.  Yes.                      06:27
 3      Q.  Sir, it's your opinion that the      06:27
 4 Bell + Howell devices that were the subject matter of   06:27
 5 this lawsuit are effective in repelling the insects,    06:27
 6 being spiders, roaches, and ants, in the area that is    06:27
 7 covered by the sound waves of those devices; correct?   06:27
 8      A.  Yes.                      06:27
 9      Q.  Based on your expertise, and, in     06:27
10 particular, your expertise with respect to product     06:27
11 development at Dow, is it reasonable for     06:27
12 Bell + Howell to rely upon the tests of the     06:27
13 Bell + Howell devices that were conducted before 2017   06:28
14 to state that those devices were indeed ultrasonic     06:28
15 repeller devices?                  06:28
16      A.  Yes.                      06:28
17      Q.  Is it, based on your expertise,     06:28
18 reasonable for Bell + Howell to rely upon the tests    06:28
19 conducted on the Bell + Howell repeller devices prior   06:28
20 to 2017 to state that those devices do, in fact,    06:28
21 repel the pests enumerated in the product literature?   06:28
22      A.  Yes.                      06:28
23      Q.  Sir, I want to talk a little bit about    06:28
24 the product literature and the labeling with respect   06:28
25 to the Bell + Howell devices, okay?     06:28
                                      Page 291
```

```
 1      A.  Okay.                      06:28
 2      Q.  Do you have that somewhere within the    06:28
 3 materials in front of you and maybe part of your     06:28
 4 Exhibit No. 1, your first report?     06:28
 5      A.  Here it is.  I think they're actually --   06:28
 6 the -- you're talking about the photocopies of the     06:28
 7 product packaging and the labeling?     06:29
 8      Q.  And the user instructions, yes.     06:29
 9      A.  Yeah, that's all contained.     06:29
10      MR. KOPEL:  I don't think so.  We haven't     06:29
11 used that today.                   06:29
12      THE WITNESS:  I think they're in -- weren't    06:29
13 they in Potter's report, though?     06:29
14      MR. KOPEL:  I don't believe so.     06:29
15      THE WITNESS:  No?               06:29
16      MR. OSTOJIC:  Sir, let me show you what we'll   06:29
17 mark as Deposition Exhibit 14.  I'll make a copy of    06:29
18 it if you want to take a look at it.     06:29
19      MR. KOPEL:  But didn't we mark at the     06:29
20 Whitford deposition something very similar?     06:29
21      MR. OSTOJIC:  Do you have the Whitford?     06:30
22           Let me see.  If we did, I'll use     06:30
23 that.                              06:30
24      MR. KOPEL:  This?               06:30
25      MR. OSTOJIC:  Is there another one, the user   06:30
                                      Page 292
```

```
 1 instructions?                      06:30
 2      MR. KOPEL:  I believe --          06:30
 3      MR. OSTOJIC:  Then -- let me just mark this   06:30
 4 as a new exhibit.                  06:30
 5      MR. KOPEL:  Fine.               06:30
 6      MR. OSTOJIC:  And I'll make a copy.     06:30
 7      MR. KOPEL:  No problem.          06:30
 8           (Whereupon, a certain           06:30
 9           document was marked Borth
10           Exhibit 14 for
11           identification.)            06:30
12 BY MR. OSTOJIC:                     06:30
13      Q.  Sir, let me show you what we've marked   06:30
14 as Borth Exhibit No. 14.             06:31
15           Do you recognize that?          06:31
16      A.  Yes.                      06:31
17      Q.  And what is it?             06:31
18      A.  It's two pieces.  The packaging of     06:31
19 Bell + Howell Ultrasonic Pest Repellers would be the   06:31
20 first -- the first piece.            06:31
21           The second piece is the Ultrasonic     06:31
22 Pest Repeller Owner's Manual.          06:31
23      Q.  Okay.  Based on your expertise, and in    06:31
24 particular the work you have done in your prior     06:31
25 employment in drafting, supervising, and approving    06:31
                                      Page 293
```

74 (Pages 290 - 293)

1 product literature and labeling, is the product   06:31
2 literature that you find with respect to the   06:31
3 Bell + Howell ultrasonic pest repeller accurate based   06:31
4 on all the analysis you have done in this case?   06:31
5    A.  Yes, it is.   06:31
6    Q.  Is the labeling and product literature   06:31
7 shown in Exhibit No. 14 true based on all of your   06:31
8 analysis in this case?   06:31
9    A.  Yes, it is.   06:31
10    Q.  Sir, is it your opinion that the   06:31
11 Bell + Howell devices which are the subject matter of   06:32
12 this lawsuit do indeed drive pests out from the area   06:32
13 covered by the sound waves of the devices?   06:32
14    A.  Yes.   06:32
15    Q.  Does Bell + Howell at any -- within any   06:32
16 part of its product literature claim that their   06:32
17 devices can penetrate walls?   06:32
18    A.  No.   06:32
19    Q.  Do the -- does the product literature   06:32
20 from Bell + Howell at all claim that its devices and   06:32
21 the sound waves emitted from those devices will drive   06:32
22 pests out from behind walls or under floors?   06:32
23    A.  No.   06:32
24    Q.  Sir, based on your work in this case and   06:32
25 your expertise, is it true that it is not reasonable   06:32

Page 294

1 given the Bell + Howell product language that   06:32
2 consumers would believe that the Bell + Howell   06:32
3 devices would repel and drive pests out from behind   06:32
4 walls or under floors?   06:33
5    A.  Just -- could you ask the first part of   06:33
6 that question again because it's a -- I think it's a   06:33
7 double negative.   06:33
8    MR. OSTOJIC:  It is a double negative.  Let   06:33
9 me ask you this.   06:33
10 BY MR. OSTOJIC:   06:33
11    Q.  Sir, is it your opinion that it would not   06:33
12 be reasonable, given Bell & Howell's product   06:33
13 literature, that consumers would believe in   06:33
14 purchasing the devices that the devices would repel   06:33
15 and drive pests out from behind walls or under   06:33
16 floors?   06:33
17    A.  All right.  I got it.   06:33
18       It would not be reasonable for   06:33
19 consumers to believe that based on the product   06:33
20 literature.   06:33
21    Q.  Why not?   06:33
22    A.  Because it doesn't say they do.  It makes   06:33
23 no claim for that.   06:33
24       When I wrote labels, approved,   06:33
25 reviewed, and wrote labels for Dow, very specifically   06:33

Page 295

1 we -- we scrutinized every word that was used, as I   06:34
2 did in reviewing these, and they're very clear.   06:34
3       And I don't know how a customer   06:34
4 could read into this anything more than what's   06:34
5 stated, that they're going to drive pests out and   06:34
6 help -- help repel unwanted pests.   06:34
7    Q.  Dr. Borth, is it true that your opinions   06:34
8 with respect to the labeling of product literature of   06:34
9 the Bell + Howell devices is based upon your specific   06:34
10 expertise in drafting, supervising, and working on   06:34
11 drafting similar product literature warnings and user   06:34
12 instructions for products?   06:34
13    A.  That's what I'm relying on, and that's   06:34
14 why I feel I'm in -- an expert or qualified to talk   06:34
15 about this.   06:34
16    Q.  Sir, earlier, many, many hours ago you   06:34
17 gave a statement I believe at one point where the   06:35
18 question was asked maybe with a double negative about   06:35
19 the reasonableness of consumers in reading the   06:35
20 literature.   06:35
21       Do you recall that?   06:35
22    A.  Vaguely.   06:35
23    Q.  Okay.  Just so I'm clear, it's your   06:35
24 opinion, based upon your expertise, that the   06:35
25 Bell + Howell product literature, the user   06:35

Page 296

1 instructions are clear; correct?   06:35
2    A.  Yes.   06:35
3    Q.  And that consumers, based on your   06:35
4 expertise and what you've seen in the product   06:35
5 literature, should have understood that these   06:35
6 ultrasonic repellers would repel and drive pests out   06:35
7 when the pests are exposed to the sound waves;   06:35
8 correct?   06:35
9    A.  Yes.   06:35
10    Q.  And that does not mean that it would   06:35
11 drive pests out that are protected from the sound   06:35
12 waves, for instance, pests behind walls or under   06:35
13 floors; correct?   06:35
14    MR. KOPEL:  Objection.  Leading.   06:36
15 BY THE WITNESS:   06:36
16    A.  It does not mean that.   06:36
17 BY MR. OSTOJIC:   06:36
18    Q.  Sir, earlier in the deposition you were   06:36
19 asked whether you had seen -- s-e-e-n -- any evidence   06:36
20 of the effectiveness of the Bell + Howell devices   06:36
21 when pests were inside of a bed.   06:36
22       Do you recall that?   06:36
23    A.  Yes.   06:36
24    Q.  And you haven't seen any actual testing   06:36
25 done where a bed was placed in a room and the   06:36

Page 297

75 (Pages 294 - 297)

Page 298

1  Bell + Howell devices were then activated, for   06:36
2  instance, insects in the bed; correct?   06:36
3      A.  I have not.   06:36
4      Q.  But is it -- and I think you asked the   06:36
5  same question as to whether you've seen evidence of   06:36
6  the Bell + Howell devices with furniture and with   06:36
7  carpeting.   06:36
8          Do you recall that?   06:36
9      A.  Yes.   06:36
10     Q.  Is it fair to say, though, even though   06:36
11 you haven't seen those tests, it's still your opinion   06:36
12 that the Bell + Howell devices are effective in   06:36
13 repelling pests to the extent that the sound waves   06:36
14 can reach those pests; fair?   06:36
15     A.  Yes, fair and correct.   06:37
16     Q.  Does it matter to you whether there --   06:37
17 whether or not you've seen tests involving furniture   06:37
18 and carpeting in the Bell + Howell devices?   06:37
19     Does it matter with respect to your   06:37
20 opinion that the Bell + Howell devices are effective   06:37
21 to repel pests?   06:37
22     MR. KOPEL:  Can you repeat the question,   06:37
23 please?   06:37
24     MR. OSTOJIC:  Sure.   06:37
25

Page 299

1  BY MR. OSTOJIC:   06:37
2      Q.  Let me ask you:  Does it matter with   06:37
3  respect to your opinion that the Bell + Howell   06:37
4  devices do repel pests that are exposed to the sound   06:37
5  waves from those devices, whether or not you've now   06:37
6  looked at tests where they included furniture or   06:37
7  carpeting or floors and walls?   06:37
8      A.  My opinions are the same as what I've   06:37
9  stated in -- in my reports.   06:38
10     Q.  Okay.  Sir, you indicated during your   06:38
11 deposition when you were questioned about what   06:38
12 Ms. Feuerstein said with respect to the product   06:38
13 literature, and I believe one of your responses was:   06:38
14 Words in a product literature prevail.   06:38
15     Do you recall that?   06:38
16     A.  Yes.   06:38
17     Q.  What did you mean by that?   06:38
18     MR. KOPEL:  Objection.  That calls for a   06:38
19 legal conclusion.   06:38
20     MR. OSTOJIC:  I'm asking what he meant.   06:38
21 BY THE WITNESS:   06:38
22     A.  The way I think of product literature and   06:38
23 the way I operated in Dow, to the satisfaction of   06:38
24 Dow, was that the product literature, as written, was   06:38
25 akin to a contract.   06:38

Page 300

1      Now, I know -- I know contract has   06:38
2  legal language or legal meaning, and I don't know   06:38
3  that I'm going -- I'm not a legalese person, so   06:38
4  contract is:  We give you the -- you buy the product;   06:38
5  here's the instructions on how to use it; if you use   06:39
6  it according to these instructions, we claim it will   06:39
7  work the way we claim it will.  If you don't use it   06:39
8  that way, then who is breaking the contract.  It's   06:39
9  not us, we've given it to you.  It would be the   06:39
10 consumer, the enduser.   06:39
11     MR. KOPEL:  I'm going to -- I'm going to   06:39
12 object to the extent that this line of questioning is   06:39
13 asking an entomologist for his legal opinions.   06:39
14     Go on.   06:39
15 BY MR. OSTOJIC:   06:39
16     Q.  Sir, you were asked several questions   06:39
17 about the testing done by SGS and Intertek and   06:39
18 whether that testing had been peer reviewed.   06:39
19     Do you recall that?   06:39
20     A.  Yes.   06:39
21     MR. KOPEL:  Objection.  That misstates the   06:39
22 testimony.   06:39
23 BY MR. OSTOJIC:   06:39
24     Q.  Did -- did Dow, in performing testing on   06:39
25 products, ever publish the results of the testing of   06:39

Page 301

1  products?   06:40
2      A.  That depended on the phase of the   06:40
3  development.   06:40
4          Certainly we did not -- and reserve   06:40
5  the right not to -- we didn't need to.   06:40
6          I mean if it was felt that it would   06:40
7  help commercialize, we would, but for the most part   06:40
8  we did not.   06:40
9          We considered it proprietary for our   06:40
10 own use.   06:40
11     Q.  Do companies typically, when they're   06:40
12 developing and testing a new product, for instance,   06:40
13 will they then publish in a publication the testing   06:40
14 of the product before putting the product out to   06:40
15 market?   06:40
16     A.  No.  In fact, that's illegal.   06:40
17     Q.  Okay.  So is it fair to say that for most   06:40
18 product and manufacturers who test products, they   06:40
19 don't publish the results of their test; is that   06:40
20 true?   06:40
21     A.  That's true.  Until commercialization,   06:40
22 and then there's the opportunity if they want to.   06:41
23 They're not obliged, obligated to.   06:41
24     Q.  Now, does the fact that a testing of a   06:41
25 product is not published in a peer-reviewed article,   06:41

76 (Pages 298 - 301)

1 does that change the results of that testing or the   06:41
2 analysis?                                        06:41
3     A.   No.                                     06:41
4     Q.   Sir, is it improper to test a product   06:41
5 contrary to its user instructions?               06:41
6     A.   No.                                     06:41
7     Q.   Listen to the question.                 06:41
8          Is it improper to test a product        06:41
9 contrary to its user instructions in determining the   06:41
10 effectiveness of the product?                    06:41
11     A.   Is it improper?                          06:41
12          Yes.                                    06:41
13     Q.   Okay.  Why?                              06:41
14     A.   Because -- go back to those words.       06:41
15          It is the manufacturer who tells the    06:41
16 customer how to use it.                           06:41
17          If you're researching it or testing     06:41
18 it in conflict with the user instructions, then   06:41
19 there's no basis for any claims.                  06:41
20     Q.   I -- I take it, sir, with most products   06:42
21 there are pros and cons to products; correct?     06:42
22     A.   Always, yes.                             06:42
23     Q.   And I take it with each product there are   06:42
24 certain -- there are limitations to every product;   06:42
25 correct?                                         06:42
                                         Page 302

1     A.   Yes.                                     06:42
2     Q.   For instance, pesticides can be          06:42
3 effective; true?                                  06:42
4     A.   They can be.                             06:42
5     Q.   If the pesticide is not used in          06:42
6 accordance with its instructions, it -- its       06:42
7 effectiveness will be decreased, if not nullified.   06:42
8          Would you agree with that?               06:42
9     A.   It could very well happen.               06:42
10     Q.   So if a pesticide is used to, for        06:42
11 instance, eradicate pests from a home and you applied   06:42
12 the pesticide inside the toilet, how effective would   06:42
13 it be?                                           06:42
14     A.   It would not be effective at all.        06:42
15     Q.   Would that be true then with the         06:42
16 Bell + Howell devices as with any device that's being   06:42
17 used?                                            06:42
18     A.   Yes.  Same -- same concept, same logic.   06:42
19     Q.   Sir, when you gave your opinion that      06:42
20 the -- that the two named plaintiffs in this case who   06:42
21 were deposed, that the devices used in their home,   06:42
22 based on their testimony, actually was effective, was   06:43
23 that based on your experience and knowledge as an   06:43
24 expert in this field?                            06:43
25     A.   It sure was.                             06:43
                                         Page 303

1     MR. OSTOJIC:  Sir, I don't have any further   06:43
2 questions.                                       06:43
3          Thank you.                               06:43
4     MR. KOPEL:  I've got some.                     06:43
5          EXAMINATION                              06:43
6 BY MR. KOPEL:                                    06:43
7     Q.   The -- have you ever seen any test of any   06:43
8 ultrasonic pest repeller, including all tests you've   06:43
9 seen done on Bell + Howell repellers that did not   06:43
10 include food?                                     06:43
11     A.   I cannot recall any.                      06:44
12     Q.   And the Chinese tests that were          06:44
13 commissioned by Intellitec on the Bell + Howell   06:44
14 repellers, those all included food; correct?      06:44
15     A.   They did.                                06:44
16     Q.   Is that contrary to the instructions?    06:44
17     A.   Instructions of the pest repeller?       06:44
18     Q.   Yes.                                     06:44
19     A.   The instructions say to increase the     06:44
20 efficiency of the repeller -- maybe I should get it   06:44
21 back -- but to remove all food and so forth.      06:44
22 Different -- different purpose.                   06:44
23     Q.   I don't understand.                      06:44
24          Is that -- is that a violation of        06:44
25 the instructions?                                06:44
                                         Page 304

1     A.   It's counter to what the instructions   06:44
2 say.                                             06:44
3     Q.   Does that invalidate the results of those   06:44
4 tests?                                           06:44
5     A.   I don't think so.                         06:44
6     Q.   Okay.  Does it -- does the fact that the   06:44
7 food was included in the tests commissioned by an i2L   06:45
8 and ICR research lab, does that invalidate the     06:45
9 results of those tests?                          06:45
10     A.   Well, what it does is -- is causes you to   06:45
11 ask a question, the questions that you're asking.   06:45
12          It would be more straightforward if      06:45
13 they didn't, then we could compare apples to apples.   06:45
14          But because they did, then we have       06:45
15 to ask these questions.                          06:45
16          And similarly with the China tests,      06:45
17 no one claimed in this room that they were perfect   06:45
18 tests.                                           06:45
19          You always learn things in testing;      06:45
20 and if you had the time and the resources, you would   06:45
21 test more and improve, test more and improve, so I   06:45
22 don't see that that invalidates their -- their test.   06:45
23          Maybe you weren't asking that.           06:45
24     Q.   No, that's a -- that -- and when you say   06:45
25 you don't see that invalidates their tests, that was   06:45
                                         Page 305

77 (Pages 302 - 305)

```
 1  referring to i2L and ICR; correct?           06:45
 2      A.  And China.                           06:46
 3      Q.  Okay.  Thank you.                     06:46
 4          Now when -- you talk about consumer  06:46
 5  understanding of these -- the claims on the label.  06:46
 6      Can you identify what facts and data     06:46
 7  you have concerning consumer understanding of these  06:46
 8  claims?                                       06:46
 9      A.  It's -- it's based on my experience.  06:46
10  I -- I have written labels and product literature for  06:46
11  enduser -- for customer use.                  06:46
12          And the burden in that -- in that    06:46
13  role is to -- and, as I said in here, make it  06:46
14  succinct, make it understandable, use the native  06:46
15  language for the customers.                   06:46
16          And I think that the Bell + Howell   06:46
17  product literature that I've seen fulfills those  06:46
18  requirements.                                 06:46
19      Q.  I understand your experience, but I was  06:46
20  asking something entirely different.          06:46
21          Have you seen any data regarding     06:46
22  consumer understanding of these claims?       06:47
23      MR. OSTOJIC:  Object to the form as to data  06:47
24  and foundation.                               06:47
25          But go ahead.                        06:47
                                        Page 306
```

```
 1  BY THE WITNESS:                               06:47
 2      A.  I -- I -- indirectly, yes.           06:47
 3          Indirectly with the Amazon review    06:47
 4  that I did before, that I talked about before.  06:47
 5  BY MR. KOPEL:                                 06:47
 6      Q.  Okay.  But did the Amazon reviews say  06:47
 7  what the consumers thought the claims meant?  06:47
 8      A.  No, they do not -- I don't know whether  06:47
 9  they say it or not.  They're taking their whole  06:47
10  experience and lumping it into a one of five star  06:47
11  rating.                                       06:47
12          And their experiences have to        06:47
13  include that they got a package that had these kind  06:47
14  of words on it, and they got a user manual that said  06:47
15  this.                                         06:47
16      Q.  Did you ask -- ever ask a single consumer  06:47
17  how they understood these claims?             06:47
18      A.  No.                                  06:47
19      Q.  What if I told you that the Amazon rating  06:47
20  for this product is below average, would that change  06:48
21  your opinion?                                 06:48
22      A.  You already asked that question, and I  06:48
23  said I would -- I would certainly --          06:48
24      Q.  I think I -- I think I -- you might have  06:48
25  misunderstood what I was saying.  I'm sorry to cut  06:48
                                        Page 307
```

```
 1  you off, but you might have misunderstood.    06:48
 2          What if I told you that the Amazon    06:48
 3  rating that you've observed for this product in fact  06:48
 4  is below the average Amazon rating across all  06:48
 5  products on Amazon, would that change your opinion?  06:48
 6      MR. OSTOJIC:  Object to form as to what  06:48
 7  opinion, but go ahead and answer it.          06:48
 8  BY THE WITNESS:                               06:48
 9      A.  I've never -- I've never said in any  06:48
10  reports or in this setting that Amazon -- the Amazon  06:48
11  words that you see in that report are the sole basis  06:48
12  for me rendering an opinion.  It's supplemental data.  06:48
13  It's a piece of data.  I look at all the data.  It  06:48
14  certainly does not have the weight of the experiments  06:48
15  that were -- that were done.                  06:49
16  BY MR. KOPEL:                                 06:49
17      Q.  Do you -- have you seen any evidence that  06:49
18  ultrasonic sound waves are capable of reaching pests  06:49
19  within a room that contains carpeting?        06:49
20      MR. OSTOJIC:  Objection.  Asked and answered.  06:49
21  BY THE WITNESS:                               06:49
22      A.  I don't think so.  I don't know that it's  06:49
23  relevant to the case.  Why is it relevant to the  06:49
24  case?  We're talking about the claims made on this  06:49
25  packaging.                                    06:49
                                        Page 308
```

```
 1  BY MR. KOPEL:                                 06:49
 2      Q.  Have you seen any evidence that the  06:49
 3  ultrasonic waves emitted by the Bell + Howell  06:49
 4  repellers are capable of reaching pest in a room that  06:49
 5  contains furniture?                           06:49
 6      MR. OSTOJIC:  Objection.  Asked and answered  06:49
 7  and may call -- and foundation.               06:49
 8          Also incomplete hypothetical to type  06:49
 9  of furniture, where it's located.             06:49
10          Go ahead.                            06:49
11      MR. KOPEL:  That's called witness coaching.  06:49
12  Please stop that.                             06:50
13  BY THE WITNESS:                               06:50
14      A.  I've not seen Bell + Howell --       06:50
15  Bell + Howell devices tested in rooms that have  06:50
16  furniture or carpeting.  Though it still doesn't  06:50
17  change my opinion.                            06:50
18  BY MR. KOPEL:                                 06:50
19      Q.  Do you believe that if submitted for  06:50
20  publication in a peer-reviewed journal, the Chinese  06:50
21  studies conducted on the Bell + Howell repellers  06:50
22  would be potentially selected for publication?  06:50
23      MR. OSTOJIC:  Objection.  Asked and answered  06:50
24  like two to three hours ago.                  06:50
25          Common, we got to move on to other   06:50
                                        Page 309
```

78 (Pages 306 - 309)

1  things. We're just repeating the same questions.   06:50
2          But go ahead and answer it again.   06:50
3  BY THE WITNESS:   06:50
4      A.  No, that wasn't the purpose of their   06:50
5  studies. Feuerstein said that. It did not want to   06:50
6  publish.   06:50
7      MR. KOPEL:  All right. I have no further   06:50
8  questions.   06:50
9      MR. OSTOJIC:  We're going to reserve   06:50
10  signature.   06:50
11      THE VIDEOGRAPHER:  The time it now 6:53 p.m.   06:51
12  This is the end of Media No. 5. This concludes this   06:51
13  deposition.   06:51
14          We're off the record.   06:51
15      MS. REPORTER:  Are you ordering the   06:51
16  transcript at this time?   06:51
17      MR. KOPEL:  Not at this time.   06:51
18          Do you know pricing? Can I look at   06:51
19  pricing? I'm going to have my office contact   06:51
20  Veritext in regards to ordering.   06:51
21      MS. REPORTER:  Would you like a copy if it's   06:51
22  ordered?   06:51
23      MR. OSTOJIC:  I will not need one now; but   06:51
24  obviously if the plaintiff orders one, please contact   06:51
     me, I will probably get a copy.   06:51
25  (Whereupon, at 6:53 p.m. the deposition was concluded.)

Page 310

---

1          CERTIFICATE
2              OF
3      CERTIFIED SHORTHAND REPORTER
4
5      I, Lynn A. McCauley, a Certified
6  Shorthand Reporter of the State of Illinois, CSR,
7  RPR, License No. 84-003268, do hereby certify:
8      That previous to the commencement of the
9  examination of the aforesaid witness, the witness was
10  duly sworn by me to testify the whole truth
11  concerning the matters herein;
12      That the foregoing deposition transcript
13  was reported stenographically by me, was thereafter
14  reduced to typewriting under my personal direction
15  and constitutes a true and accurate record of the
16  testimony given and the proceedings had at the
17  aforesaid deposition;
18      That the said deposition was taken before
19  me at the time and place specified;
20      That I am not a relative or employee or
21  attorney or counsel for any of the parties herein,
22  nor a relative or employee of such attorney or
23  counsel for any of the parties hereto, nor am I
24  interested directly or indirectly in the outcome of
25  this action.

Page 312

---

1      UNITED STATES DISTRICT COURT
2      SOUTHERN DISTRICT OF NEW YORK
3
4      I hereby certify that I have read the
5  foregoing transcript of my deposition given at the
6  time and place aforesaid, consisting of Pages 1 to
7  311, inclusive, and I do again subscribe and make
8  oath that the same is a true, correct and complete
9  transcript of my deposition so given as aforesaid,
10  and includes changes, if any, so made by me.
11
12      _____
13      DR. PAUL W. BORTH
14
15
16
17
18
19
20
21
22
23
24
25

Page 311

---

1      IN WITNESS WHEREOF, I do hereunto set my
2  hand at Chicago, Illinois, this 19th day of January
3  2018.
4
5      Lynn McCauley
6      LYNN A. MC CAULEY, CSR, RPR
7      License No. 84-003268
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 313

79 (Pages 310 - 313)