1              IN THE UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF NEW YORK

3

4    JOANNE HART and AMANDA        )

5    PARKE, on behalf of          )

6    themselves and all others    )

7    similarly situated,          )

8                    Plaintiffs,  )

9            -vs-                  ) No. 1:15-cv-04804

10   BHH, LLC d/b/a BELL &         ) (WHP)

11   HOWELL and VAN HAUSER,        )

12   LLC,                          )

13                    Defendants.  )

14

15        The deposition of PHILIP C. WHITFORD, Ph.D.,

16   called for examination, taken before GAIL LIVIGNI,

17   CSR No. 84-1965, a Notary Public within and for the

18   County of Will, State of Illinois, and a Certified

19   Shorthand Reporter of said state, at Suite 1100, 33

20   West Monroe Street, Chicago, Illinois, on the 12th

21   day of January, A.D. 2018, commencing at 9:30 a.m.

22

23

24   Pages 1 - 280

                                              Page 1

```
 1   PRESENT:
 2       BURSOR & FISHER, P.A.,
 3       (888 Seventh Avenue,
 4       New York, NY 10019,
 5       (646) 837-7127), by:
 6       MR. YITZCHAK KOPEL,
 7       MR. ALEC LESLIE,
 8          appeared on behalf of the Plaintiffs;
 9
10       LEAHY, EISENBERG & FRAENKEL,
11       (33 West Monroe Street, Suite 1100,
12       Chicago, Illinois 60603,
13       (312) 368-4554), by:
14       MR. ROBERT OSTOJIC,
15       MR. MICHAEL WEISS,
16          appeared on behalf of the Defendants.
17
18   ALSO PRESENT:
19       MR. PAUL BORTH, Ph.D.
20       MR. BEN STANSON, Videographer.
21
22
23   REPORTED BY:  GAIL LIVIGNI, CSR
24       CSR No. 84-1965.
```
Page 2

```
 1   THE VIDEOGRAPHER.  We are now on the record.   09:43:56
 2   My name is Ben Stanson representing Veritext Legal   09:47:40
 3   Solutions.  The date today is January 12, 2018, and   09:47:44
 4   the time is approximately 9:41 a.m.              09:47:48
 5       This deposition is being held at Leahy,    09:47:50
 6   Eisenberg & Fraenkel located at 33 West Monroe   09:47:54
 7   Street in Chicago, Illinois and is being taken by   09:47:56
 8   Counsel for the Plaintiffs.  The caption in this   09:48:02
 9   case is Joanne Hart, et al., versus BHH, LLC, et   09:48:02
10   al.                                             09:48:02
11       This case is being held in the U.S.        09:48:08
12   District Court, Southern District of New York, case   09:48:10
13   number 1:15-CV-04804  The name of the witness is   09:48:14
14   Philip Whitford, Ph.D.  At this time, the attorneys   09:48:20
15   present in the room and everyone attending remotely   09:48:22
16   will identify themselves and the parties they   09:48:26
17   represent.                                      09:48:28
18       MR. KOPEL: Yitzchak Kopel, Bursor & Fisher,   09:48:28
19   P.A. representing Plaintiffs and the certified   09:48:32
20   classes.  With me today is my colleague Alec   09:48:34
21   Leslie.                                         09:48:36
22       MR. OSTOJIC: Robert Ostojic on behalf of the   09:48:36
23   Defendant, BHH, LLC.                            09:48:40
24       MR. WEISS: Michael Weiss on behalf of      09:48:42
```
Page 3

```
 1   Defendant.                                      09:48:42
 2       MR. KOPEL: Whoever is on the phone, please   09:48:56
 3   identify themselves?                            09:48:58
 4       MR. WEISS: Dr. Borth, could you please     09:49:00
 5   identify yourself?                              09:49:02
 6       MR. BORTH: Paul Borth on the phone.        09:49:04
 7       MR. WEISS: Thank you.                      09:49:08
 8       (WHEREUPON, the witness was duly
 9       sworn.)
10       PHILIP C. WHITFORD, Ph.D.,
11   called as a witness herein, having been first duly
12   sworn, was examined and testified as follows:
13           DIRECT EXAMINATION
14   BY MR. KOPEL:
15   Q.   Good morning, Dr. Whitford.               09:49:16
16   A.   Good morning.                             09:49:18
17   Q.   Can you please state your name and        09:49:18
18   address for the record?                        09:49:20
19   A.   Dr. Philip with one L, C. Whitford.       09:49:20
20   W-h-i-t-f-o-r-d, 5491 Schaman Road, S-c-h-u-m-a-n,   09:49:24
21   Cross Plains, C-r-o-s-s, P-l-a-i-n-s, Wisconsin,   09:49:34
22   53528.                                          09:49:42
23   Q.   That's your primary residential address?   09:49:42
24   A.   It is.  My work address had been Capital   09:49:44
```
Page 4

```
 1   University, Columbus, Ohio.  I'm a Professor     09:49:48
 2   Emeritus Biology.                               09:49:56
 3   Q.   Thank you.  I know we met briefly off      09:49:56
 4   the record.  Let me just formally introduce myself.   09:49:58
 5   My name is Yitzchak Kopel.  I represent the      09:50:02
 6   Plaintiffs and the certified classes in a class   09:50:04
 7   action lawsuit against BHH, LLC and Van Hauser,   09:50:06
 8   LLC.                                            09:50:12
 9       I'm going to be asking you some           09:50:12
10   questions today in connection with that lawsuit.   09:50:12
11   Do you understand that?                         09:50:14
12   A.   Yes.                                       09:50:16
13   Q.   And you're not being sued and you're not   09:50:16
14   a party to this lawsuit.  You understand that?   09:50:20
15   A.   Correct.                                   09:50:22
16   Q.   Have you ever sat for a deposition        09:50:22
17   before?                                         09:50:24
18   A.   No.                                        09:50:24
19   Q.   Have you ever served as an expert         09:50:24
20   witness before?                                 09:50:30
21   A.   Yes.                                       09:50:30
22   Q.   How many times?                           09:50:32
23   A.   Once.                                      09:50:34
24   Q.   Okay.  I think that's in your C.V.,       09:50:36
```
Page 5

1 we'll get to that shortly. Did you testify at 09:50:38
2 trial in that case? 09:50:40
3 A. Nope. 09:50:42
4 Q. You submitted expert reports in that 09:50:42
5 case? 09:50:44
6 A. I did. 09:50:44
7 Q. How many? 09:50:46
8 A. Just one. 09:50:46
9 Q. Okay. So before we continue, I just 09:50:46
10 want to discuss some ground rules for today. Do 09:50:56
11 you understand that you're testifying under oath? 09:50:58
12 A. I do. 09:51:00
13 Q. Do you understand that you have the same 09:51:02
14 obligation to tell the truth here today as you 09:51:02
15 would before a judge and a jury? 09:51:04
16 A. I do. 09:51:06
17 Q. So it's very important that we 09:51:08
18 communicate clearly today. I'm going to ask you a 09:51:10
19 lot of questions in connection with this case. If 09:51:12
20 you don't understand anything, please just let me 09:51:14
21 know, and I will try to clarify it for you, okay? 09:51:16
22 A. Very well. 09:51:20
23 Q. Do you understand that you are being 09:51:20
24 represented today by Counsel who is sitting right 09:51:22
Page 6

1 next to you? 09:51:24
2 A. Yes. 09:51:26
3 Q. Today's deposition is being videotaped. 09:51:26
4 Do you understand that? 09:51:28
5 A. Hard not to looking at the camera. 09:51:30
6 Q. Fair enough. Do you understand that 09:51:32
7 there is a Court Reporter here today and the Court 09:51:34
8 Reporter is transcribing everything that we say for 09:51:36
9 the record? 09:51:38
10 A. Absolutely. 09:51:38
11 Q. So let's please try to speak at a 09:51:38
12 reasonable pace so that the Court Reporter is able 09:51:40
13 to take down everything we say, okay? 09:51:44
14 A. Okay. 09:51:46
15 Q. And it's very tough for the Court 09:51:46
16 Reporter to get down what we say if we ever talk 09:51:48
17 over each other, so I will try very hard to never 09:51:52
18 interrupt you while you're giving me answers to my 09:51:54
19 questions, and by the same token, I'll ask you to 09:51:56
20 please let me finish my questions before you begin 09:51:58
21 your answers, okay? 09:52:00
22 A. Fair enough. 09:52:02
23 Q. And also for the benefit of the Court 09:52:02
24 Reporter, please try to answer all my questions 09:52:06
Page 7

1 verbally. Head nods or things like uh-huh are not 09:52:10
2 going to work because it doesn't come out on the 09:52:14
3 transcript, okay? 09:52:16
4 A. I will do my best. 09:52:16
5 Q. Thank you. Is there any reason that you 09:52:18
6 cannot testify truthfully and accurately today? 09:52:22
7 A. Nothing that I'm aware of. 09:52:24
8 Q. Okay. 09:52:26
9 MR. KOPEL: I'm going to ask the Court 09:53:00
10 Reporter to please mark two documents, reports by 09:53:02
11 Dr. Philip C. Whitford as Exhibits Whitford 1 and 09:53:10
12 2. 09:53:10
13 (WHEREUPON, certain documents were 09:53:10
14 marked Whitford Deposition Exhibit
15 Nos. 1 and 2, for identification,
16 as of 01/22/2018.)
17 BY MR. KOPEL:
18 Q. Dr. Whitford, do you have Exhibit 1? 09:53:58
19 A. I do. 09:54:04
20 Q. Have you seen it before? 09:54:04
21 A. Yes. 09:54:06
22 Q. What is it? 09:54:06
23 A. It's a summary of my comments following 09:54:06
24 review of Hari versus et al. -- or Hari, et al. 09:54:10
Page 8

1 versus BHH, LLC following reading the depositions 09:54:14
2 and looking at test results in the case from Hari, 09:54:20
3 Jeanne Hari, Sandra Bueno, and I think it's -- was 09:54:34
4 it Diane Feinstein? 09:54:44
5 Q. Debbie Feuerstein? 09:54:48
6 A. Debbie Feuerstein. 09:54:48
7 Q. Okay, thank you. And when you say 09:54:50
8 summary, is this your expert report in this case? 09:54:50
9 A. That would be my expert report from the 09:54:56
10 first information I received. 09:54:58
11 Q. Okay, thank you. Can you please take a 09:55:00
12 look at Exhibit 2? 09:55:02
13 A. Yes. 09:55:06
14 Q. Do you have Exhibit 2? 09:55:06
15 A. I do. 09:55:14
16 Q. Have you seen it before? 09:55:16
17 A. Absolutely. 09:55:16
18 Q. What is it? 09:55:18
19 A. It's the summary comments and the 09:55:18
20 rebuttal of Plaintiff's expert report for 09:55:22
21 Dr. Michael F. Potter in Hari, et al., versus BHH, 09:55:26
22 LLC, et al. 09:55:32
23 Q. Okay. So these are your two expert 09:55:32
24 reports in this case, correct? 09:55:36
Page 9

| | |
|---|---|
| 1   A. Correct.  09:55:36 | 1   efficacy of Bell & Howell test repellers repelling  09:58:34 |
| 2   Q. Are they complete copies of your expert  09:55:38 | 2   and driving out insects?  09:58:40 |
| 3   reports?  09:55:42 | 3   A. That was actually Dr. Borth's area of  09:58:40 |
| 4   A. I'm just making sure all parts are  09:56:08 | 4   expertise, not mine.  09:58:48 |
| 5   there.  09:56:10 | 5   Q. Okay, understood. So is the answer to  09:58:48 |
| 6   Q. That's fine, take your time.  09:56:10 | 6   my question, no, you're not rendering any opinions  09:58:50 |
| 7   A. Yes, they are.  09:56:12 | 7   as to that topic?  09:58:52 |
| 8   Q. Okay, thank you. Do these reports  09:56:12 | 8   MR. OSTOJIC: Objection, form. Topic being  09:58:54 |
| 9   contain a complete statement of all the opinions  09:56:14 | 9   insects?  09:58:56 |
| 10  you will express and the bases and reasons for  09:56:18 | 10  BY MR. KOPEL:  09:58:56 |
| 11  them?  09:56:24 | 11  Q. Correct.  09:58:58 |
| 12  A. Probably not due to the fact that I  09:56:24 | 12  A. I wasn't asked to address that.  09:58:58 |
| 13  received the last materials in the case only the  09:56:28 | 13  Q. Okay. And I'm sorry, you know, this is  09:59:04 |
| 14  day before Dr. Potter's deposition, and that was  09:56:32 | 14  a deposition, it's not a formal conversation.  09:59:06 |
| 15  the actual data records, testing results and such,  09:56:36 | 15  A. Right.  09:59:08 |
| 16  so I couldn't address those previously, so that was  09:56:42 | 16  Q. Excuse me, it's a more formal setting  09:59:08 |
| 17  not in here yet.  09:56:46 | 17  than a conversation, so my question is just  09:59:12 |
| 18  Q. Okay. And did the documents you  09:56:48 | 18  confirmation that you are not rendering any  09:59:14 |
| 19  reviewed from that production change any of the  09:56:54 | 19  opinions on the efficacy of Bell & Howell repellers  09:59:16 |
| 20  opinions you expressed in these reports?  09:56:56 | 20  as to insects, is that correct?  09:59:22 |
| 21  A. They made the opinions considerably  09:56:58 | 21  A. Only to the extent that, looking at the  09:59:24 |
| 22  stronger.  09:57:00 | 22  tests Dr. Potter has submitted in reference to  09:59:28 |
| 23  Q. Did it change any -- did it make any of  09:57:02 | 23  versus Dr. Borth's and the Chinese tests, that I  09:59:36 |
| 24  your opinions weaker?  09:57:06 | 24  agree that there are differences of opinion between  09:59:40 |
| Page 10 | Page 12 |

| | |
|---|---|
| 1   A. No.  09:57:06 | 1   Dr. Borth and Dr. Potter as to efficacy.  09:59:44 |
| 2   Q. Okay. Now, please take a look at  09:57:08 | 2   But one of Dr. Potter's main things is  09:59:50 |
| 3   Exhibit 1. Was this report signed by you?  09:57:16 | 3   claiming that a study doesn't count unless it's  09:59:52 |
| 4   A. I don't recall having put a signature on  09:57:24 | 4   conducted in real world conditions, none of which  09:59:56 |
| 5   it.  09:57:27 | 5   in his references or his own tests occurred, and  10:00:00 |
| 6   Q. So the answer is no?  09:57:30 | 6   they did not occur in real world environments for  10:00:06 |
| 7   A. It was transmitted by computer, so the  09:57:32 | 7   the Chinese insects test. They were all done in  10:00:10 |
| 8   answer is no, I didn't have a means to sign it.  09:57:36 | 8   artificial containers. So Dr. Potter's main claim  10:00:12 |
| 9   Q. Okay, thank you. And the same question  09:57:40 | 9   is if it's done in an artificial setting, it's not  10:00:18 |
| 10  for Exhibit 2?  09:57:42 | 10  valid.  10:00:22 |
| 11  A. Same answer.  09:57:42 | 11  Q. Other than what you just stated, are you  10:00:22 |
| 12  Q. What is -- what was your assignment in  09:57:44 | 12  rendering any opinions as to the efficacy of  10:00:28 |
| 13  this case?  09:57:50 | 13  Bell & Howell repellers in repelling or driving out  10:00:30 |
| 14  A. To read and evaluate the depositions,  09:57:52 | 14  insects?  10:00:34 |
| 15  the comments, rebuttal comments, and the actual  09:58:00 | 15  A. No.  10:00:34 |
| 16  data of tests and give my best appraisal of the  09:58:04 | 16  Q. Can we agree just for shorthand that  10:00:36 |
| 17  validity or lack of validity of those tests.  09:58:14 | 17  when I say the word insects today, I'm referring to  10:00:40 |
| 18  Q. Are you an expert witness in this case?  09:58:16 | 18  ants, spiders and roaches, is that okay?  10:00:42 |
| 19  A. Yes.  09:58:20 | 19  A. Absolutely.  10:00:44 |
| 20  Q. Are you rendering opinions as to the  09:58:22 | 20  Q. I understand that may not be entirely  10:00:46 |
| 21  efficacy of the Bell & Howell test repellers in  09:58:28 | 21  scientifically accurate. Are you rendering any  10:00:48 |
| 22  repelling and driving out rodents?  09:58:32 | 22  opinions on damages in this case?  10:00:56 |
| 23  A. I am.  09:58:34 | 23  A. I'm uncertain what you mean by damages.  10:01:00 |
| 24  Q. Are you rendering any opinions as to the  09:58:34 | 24  Q. Sure. You understand that in a lawsuit  10:01:02 |
| Page 11 | Page 13 |

4 (Pages 10 - 13)

1 plaintiffs are seeking money from defendants? 10:01:14
2 A. Okay, that form of damages, not damages 10:01:16
3 done by pests to a house? 10:01:18
4 Q. Correct. So going by that definition, 10:01:20
5 are you rendering any opinions as to damages in 10:01:22
6 this case? 10:01:24
7 A. In terms of whether they're appropriate 10:01:26
8 or how much, no, that's not my job. 10:01:30
9 Q. Okay, thank you. Now, take a look at 10:01:32
10 Exhibit 1, please. Does this report contain a list 10:01:40
11 of all facts or data you considered in forming your 10:01:46
12 opinions? 10:01:52
13 MR. OSTOJIC: Object to form, foundation. 10:01:52
14 With respect to this Exhibit 1? 10:01:54
15 BY MR. KOPEL: 10:01:56
16 Q. Correct, with respect to Exhibit 1. 10:01:56
17 A. Okay. The question again, please. 10:02:00
18 Q. Sure. Does Exhibit 1 contain a list of 10:02:00
19 all facts or data that you considered in forming 10:02:04
20 your opinions? 10:02:08
21 A. As I say, I didn't have the last of the 10:02:10
22 data until the day before Dr. Potter's deposition, 10:02:12
23 so it does not contain all of the facts 10:02:16
24 Q. Okay. 10:02:18
Page 14

1 A. It contains the facts that I had at the 10:02:20
2 time that I wrote it. 10:02:24
3 Q. Does this report contain a list of all 10:02:26
4 facts or data you considered in forming the 10:02:30
5 opinions listed in Exhibit 1? 10:02:32
6 A. Yes. 10:02:58
7 Q. Same question for Exhibit 2? 10:02:36
8 A. Yes. 10:02:40
9 Q. Does Exhibit 1 contain a statement of 10:02:44
10 how much you're being compensated in this case? 10:02:48
11 A. I don't know whether it does, but $100 10:02:52
12 an hour. 10:02:58
13 Q. Okay, thanks. But you do have Exhibit 1 10:02:58
14 in front of you, correct? 10:03:02
15 A. Yes. 10:03:02
16 Q. Can you please let me know does 10:03:02
17 Exhibit 1 contain a statement of your compensation 10:03:04
18 in this case? 10:03:08
19 A. I do not recall. I don't see any in the 10:03:14
20 areas I would expect it to be found if I did. 10:03:32
21 Q. Same question for Exhibit 2, please. 10:03:34
22 A. No. 10:03:40
23 Q. I'd just like to talk with you, please, 10:03:56
24 about your qualifications and background. Are you 10:04:00
Page 15

1 an entomologist? 10:04:08
2 A. I am not an entomologist, but I'm a 10:04:08
3 broadly trained biologist who has taught 10:04:10
4 entomology, parasitology, vertebrate biology, you 10:04:14
5 name it, 28 separate courses over the course of 10:04:18
6 32 years. So I'm familiar with a great deal of the 10:04:22
7 entomology from the standpoint of animal behavior 10:04:28
8 which has at least a fourth of the materials in 10:04:32
9 that course dedicated to behavior of insects? 10:04:34
10 Q. Are you a rodentologist? 10:04:38
11 A. I'm not a rodentologist. I have taken 10:04:42
12 mammalogy and I certainly know my rodents well. 10:04:46
13 Dr. Charles Long from UW-Stevens Point who was 10:04:50
14 referenced was my professor. He made sure that I 10:04:54
15 could identify ever mouse, vole, small mammal and 10:04:58
16 large mammal in Wisconsin by one hair or one tooth 10:05:02
17 before I got out of the class, so I do have some 10:05:06
18 background in it, and I have many years of records 10:05:10
19 dealing with rodents in areas around and on my farm 10:05:14
20 and other places. 10:05:20
21 Q. Are you referring to your testing of the 10:05:20
22 Transonic Pro? 10:05:26
23 A. Only in part. 10:05:26
24 Q. What else are you referring to? 10:05:28
Page 16

1 A. 50 years of trapping mice in the house. 10:05:30
2 working with the sheds and barns for the same 10:05:36
3 purposes, always paying attention to what species 10:05:38
4 I'm seeing and numbers of them. 10:05:42
5 Q. Have you covered the topic of 10:05:44
6 rodentology in the courses you've taught? 10:05:50
7 A. I don't think there is a topic of 10:05:52
8 rodentology there; but if one-fourth of the 10:05:54
9 material is on insects, at least one-fourth of 10:05:58
10 animal behavior is dedicated largely to the studies 10:06:00
11 of rats and mice because those are the animals 10:06:04
12 studied in psychology and in animal behavior 10:06:06
13 because they're easy to maintain. 10:06:10
14 Q. Have you ever worked outside of 10:06:12
15 academia? 10:06:16
16 A. Yes. 10:06:16
17 Q. Where? 10:06:18
18 A. I worked for the Area Agency of Aging in 10:06:20
19 Appleton, Wisconsin as a person who was responsible 10:06:24
20 for making connections with aging - I'm trying to 10:06:32
21 think of the right terms for them now - the 10:06:40
22 facilities available to aging residents of eight 10:06:48
23 counties in Wisconsin as to access to medicine, 10:06:52
24 funds, other kinds of needed things, social 10:06:56
Page 17

5 (Pages 14 - 17)

1  interactions and setting up places where they could   10:07:02
2  have meetings, he served stools, other things.   10:07:06
3  working with that cohort and analyzing the needs of   10:07:12
4  elderly people in those eight counties and   10:07:22
5  summarizing them so that we could address them.   10:07:26
6     Q.   Okay, thank you.  Any other jobs outside   10:07:28
7  of academia that you can list?   10:07:32
8     A.   Tending bar in Central Wisconsin,   10:07:36
9  working at Clark Stations being shot at   10:07:38
10  occasionally, beaten and robbed and things that   10:07:40
11  would not have much application here.   10:07:44
12        I guess you'd have to count my   10:07:54
13  consulting for Bird-X of Chicago, Illinois   10:07:56
14     Q.   Okay you've done that for approximately   10:08:00
15  19 -- 18 years, correct?   10:08:02
16     A.   18 years, yes.   10:08:04
17     Q.   Okay.  Are you a salaried employee for   10:08:06
18  Bird-X?   10:08:10
19     A.   I'm not.   10:08:10
20     Q.   Do you get paid hourly?   10:08:10
21     A.   I do, same rate that I asked for this.   10:08:12
22     Q.   Okay.  Do you receive any royalties from   10:08:14
23  sales of products?   10:08:20
24     A.   I do.   10:08:20

Page 18

1     Q.   Is that for all of their products or   10 08:22
2  only certain products?   10:08:26
3     A.   Only the one that I'm responsible for   10:08:26
4  designing and that's the GooseBuster, unfortunately   10:08:28
5  named that, G-o-o-s-e-B-u-s-t-e-r.  It is designed   10:08:34
6  to repel geese, and it's been tested and sold for   10:08:40
7  18 years now.   10:08:44
8     Q.   That's an ultrasonic device?   10:08:46
9     A.   No, that's alarm and alert calls to the   10:08:50
10  Canada geese recorded in the wild used to make them   10:08:52
11  leave.   10:08:56
12     Q.   Okay.  And you provided the recordings   10:08:56
13  used?   10:08:58
14     A.   I did   10:08:58
15     Q.   And do you receive any royalties for   10:08:58
16  sales of their ultrasonic products?   10:09:00
17     A.   Not a cent.   10:09:04
18     Q.   Have you ever performed any consulting   10 09:04
19  in the area of pest management?   10:09:12
20     A.   That's essentially what my Canada goose   10:09:14
21  work is about.   10:09:18
22     Q.   Okay.   10:09:18
23     A.   That's the principal thing I work on.   10:09:20
24  Consulting at the level of services to Bird-X, I   10:09:24

Page 19

1  have tested almost all of their various sonic and   10:09:30
2  ultrasonic devices against whatever species they've   10:09:34
3  requested me to test it on to find out whether they   10:09:38
4  showed efficacy or not; so that included ties,   10:09:42
5  long-legged cellar spiders, ants, bed bugs,   10:09:46
6  squirrels, mice, deer, raccoons.  So whatever they   10:09:54
7  wanted tested, I would test for them and tell them   10:09:58
8  honestly whether I thought they had efficacy or   10:10:02
9  not.   10 10:06
10     Q.   Outside of your work for Bird-X, have   10:10:06
11  you ever done any consulting in the area of urban   10:10:12
12  pest management?   10:10:14
13     A.   Not so much as -- not as a paid   10:10:22
14  consultant, but I spent two years doing research at   10:10:24
15  the Madison Airport which was used by the airport   10:10:28
16  to change its way of managing possible goose   10:10:32
17  aircraft collision probabilities.  By tracking the   10:10:38
18  movements of geese, I was able to recommend that   10:10:44
19  their idea that killing geese in the local parks   10:10:48
20  would reduce the probability of aircraft   10:10:50
21  significantly, it was wrong, that it was caused   10:10:56
22  97 percent by migrant Canada geese and could be   10:11:00
23  resolved by simply removing the attraction near the   10:11:02
24  airport which was unturned fields of grain.   10:11:06

Page 20

1        And the tests showed that was right, we   10:11:12
2  got it down by 97.6 percent by just -- they changed   10:11:14
3  the lease on their fields that they owned nearest   10:11:18
4  the airport, so that's consulting, but I did it not   10:11:20
5  for pay but at the request of a number of people in   10:11:26
6  Madison who had requested my participation when   10:11:30
7  they started the political actions to get   10:11:34
8  permission to kill geese in the local parks.   10 11:40
9     Q.   Outside of your own home, have you ever   10 11:46
10  performed any work involving infestations of   10:11:54
11  rodents?   10:11:58
12     A.   Not to the best of my recollection.   10:12:00
13     Q.   Same question for insects?   10:12:02
14     A.   Nope.   10:12:04
15     Q.   Have you ever trained professionals in   10:12:20
16  the area of rodent control?   10:12:24
17     A.   No, I have not.   10:12:28
18     Q.   Same question for insects?   10:12:30
19     A.   I have not.   10:12:34
20     Q.   Other than your study involving the   10:12:36
21  Transonic Pro, have you published any publications   10:12:40
22  involving rodents?   10:12:48
23     A.   I do not believe so.   10:12:54
24     Q.   And you have a long list of   10:12:56

Page 21

6 (Pages 18 - 21)

Page 22

```
 2  science-based publications.              10:12:58
 2     A.  I do.  But as I run through my mind, I  10:13:00
 3  can't recall any others specifically targeting   10:13:06
 4  them.                                     10:13:08
 5     Q.  It looks like -- would you agree that  10:13:10
 6  the majority of your career has been devoted to  10:13:12
 7  studying geese behavior?                   10:13:16
 8     A.  Well, I'm a bit more of a dilatant than  10:13:18
 9  that, but, yes, that was the focal point.  I tend  10:13:20
10  to branch out and go to whatever attracted me for a  10:13:24
11  while and come back.                       10:13:28
12     Q.  Do you have any publications regarding  10:13:28
13  ants, spiders or roaches?                  10:13:36
14     A.  I do not.                          10:13:38
15     Q.  Do you have any patents involving any  10:13:40
16  sort of pest repellents?                   10:13:44
17     A.  The patent for the GooseBuster is held  10:13:48
18  by Bird-X.  I just hold the copyright to the cause.  10:13:50
19     Q.  Okay, thanks.  Any others?          10:13:54
20     A.  No.                               10:13:56
21     Q.  Have you ever been involved in the     10:13:56
22  design of a repellent, pest repellent?      10:13:58
23     A.  I've been involved in designing several  10:14:02
24  things that Bird-X eventually came to sell,   10:14:06
```

Page 23

```
 1  3-dimensional coyote decoy which rotates in the   10:14:08
 2  wind and keeps moving.  It has a furry tail so that  10:14:12
 3  it's not just something that sits out there and   10:14:16
 4  doesn't move, and it's designed primarily as a   10:14:18
 5  goose repellent.                          10:14:22
 6     Q.  Have you ever been involved in the     10:14:22
 7  design of a repellent for mice or rats?     10:14:26
 8     A.  No.                               10:14:32
 9     Q.  Have you ever been involved in the     10:14:32
10  design of a repellent for ants, spiders or roaches?  10:14:34
11     A.  Absolutely not.                     10:14:40
12     Q.  Other than the Transonic Pro -- and is  10:14:40
13  it called the Yard Gard?                   10:14:50
14     A.  There is a Yard Gard, there is a Quad  10:14:52
15  Blaster.  There is a number of different sonic and  10:14:56
16  ultrasonic devices that they sell.          10:14:58
17     Q.  So other than the Transonic Pro and the  10:15:00
18  Yard Gard, have you been involved in the testing of  10:15:06
19  repellents for mice and rats?              10:15:10
20     A.  Yes, I have.                       10:15:16
21     Q.  That was also in the course of your work  10:15:16
22  at Bird-X?                                10:15:20
23     A.  Yes.  They asked me to run tests on a  10:15:20
24  substance called Natures Defense which was a group  10:15:24
```

Page 24

```
 1  of flavor granules which were meant to be put in   10:15:30
 2  areas where you suspected mice and rats were moving  10:15:36
 3  and see whether they picked enough of that up on   10:15:40
 4  their hands.  It's an adversive chemical.  They   10:15:44
 5  apparently did not like -- animals clean their   10:15:46
 6  paws.  They apparently did not like the intense   10:15:50
 7  salts and garlic and other flavors there.  It was  10:15:52
 8  very effective.  I tested it for four months.   10:15:56
 9     Q.  Have you published the results of your  10:16:00
10  testing?                                  10:16:04
11     A.  No, I just retained those results to   10:16:04
12  Bird-X.  Then they used that as a basis to decide  10:16:06
13  that they would handle the product.  Other aversive  10:16:10
14  chemicals I've been involved with are the use of   10:16:12
15  Goose-B-Gone which is an a grape seed flavoring  10:16:16
16  which has been very effective at keeping geese from  10:16:22
17  eating grass in areas where they congregate.  And  10:16:24
18  I'm familiar with the work on Alachlor and other   10:16:32
19  things which cause geese and birds to behave   10:16:36
20  peculiarly when they ingest it,            10:16:40
21     Q.  Are you an expert on the physics of   10:16:40
22  ultrasonic sound?                         10:16:42
23     A.  I would certainly not say I'm an expert  10:16:46
24  to the extent that somebody whose sole function in  10:16:50
```

Page 25

```
 1  life is to deal with that, but I've worked with   10:16:52
 2  ultrasound in the field and in the lab since 1982.  10:16:54
 3  I have a long familiarity with testing it on   10:17:02
 4  various animals.                          10:17:04
 5     Q.  Have you ever tested its physical   10:17:04
 6  properties in terms of frequency or decibel level  10:17:10
 7  or other physical aspects of ultrasound?    10:17:12
 8     A.  Yeah, back in the eighties in the   10:17:16
 9  science -- sound labs at UW-Milwaukee I was testing  10:17:20
10  such things there.                        10:17:24
11     Q.  Now, there is a portion of Exhibit 1   10:17:34
12  titled, "Summary Comments Re the Amended Complaint  10:17:40
13  Document" in the case of Hurt, et al., et cetera.  10:17:44
14  Can you please flip to that portion of Exhibit 1?  10:17:48
15  It's part of your initial report.  Sorry, there is  10:18:02
16  no numbered pages or paragraphs.  It's a section of  10:18:06
17  your initial report.                      10:18:08
18     A.  Summary Comments Re the Amended   10:18:20
19  Complaint Document.                       10:18:22
20     Q.  So you've got that?                 10:18:22
21     A.  Yes, I do.                         10:18:24
22     Q.  Now, do you see at the bottom of the   10:18:24
23  next page you have some comments regarding West and  10:18:34
24  Terry A. Messmer?                         10:18:40
```

7 (Pages 22 - 25)

```
 1   A.  Uh-huh.                           10:18:40
 2   Q.  And the last sentence of this paragraph  10:18:42
 3   reads, "And both are in a non-peer-reviewed  10:18:46
 4   publication -- I guess that meant to say   10:18:50
 5   publication -- self-published by universities on  10:18:54
 6   the web and neither contain any original test  10:18:58
 7   research on ultrasound effects on rodents."  Do you  10:19:00
 8   see that?                          10:19:02
 9   A.  Yes.                           10:19:02
10   Q.  What does it mean for a publication to  10:19:02
11   be peer-reviewed?                    10:19:06
12   A.  To be peer reviewed means that you  10:19:08
13   submit it to a proper journal or a group for  10:19:10
14   proceedings of a conference and that it is sent out  10:19:14
15   to other experts in the field to be looked over and  10:19:18
16   all aspects of the paper to be evaluated for  10:19:22
17   whether it warranted publication, whether the test  10:19:24
18   designs were adequate, whether the sample size was  10:19:28
19   adequate, whether statistics were proper, and those  10:19:30
20   peers would then send back information to influence  10:19:34
21   the editor whether or not it would be published.  10:19:40
22   I do that and have for 24 years for five  10:19:44
23   different journals including the Journal of  10:19:50
24   Wildlife Management, Wildlife Society Bulletin, and  10:19:52
                                        Page 26
```

```
 1   all the publications in North American  10:19:56
 2   Ornithological Society.                10:20:00
 3   Q.  So when you engaged in peer review of  10:20:00
 4   other people's proposed publications, you're  10:20:04
 5   reviewing them to confirm that they use the correct  10:20:08
 6   methodology, is that correct?          10:20:10
 7   A.  Absolutely.                      10:20:14
 8   Q.  And that the methodology they're using  10:20:14
 9   is generally accepted in the field which they're  10:20:18
10   publishing to, correct?                10:20:20
11   A.  Right, and most importantly that their  10:20:22
12   conclusions match their data.          10:20:22
13   Q.  Okay.  So do you believe that there is  10:20:26
14   greater validity to a peer-reviewed publication  10:20:28
15   than there is to a non-peer-reviewed publication?  10:20:40
16   MR. OSTOJIC:  Object to form, foundation, but  10:20:44
17   go ahead and answer.                 10:20:46
18   BY MR. KOPEL:                        10:20:46
19   Q.  You know what, actually let me rephrase  10:20:46
20   it.  Do you believe that the data produced from a  10:20:48
21   peer-reviewed publication is more reliable than the  10:20:52
22   data produced from a non-peer-reviewed publication?  10:20:54
23   MR. OSTOJIC:  Same objections, but go ahead.  10:20:58
24   THE WITNESS:  Go ahead?               10:21:02
                                        Page 27
```

```
 1   MR. OSTOJIC:  Answer.                10:21:02
 2   BY MR. KOPEL:                        10:21:02
 3   Q.  You can answer.                  10:21:04
 4   A.  Oh, okay.  I would have to say that that  10:21:04
 5   is the general opinion held by scientists.  On a  10:21:06
 6   paper by paper basis, you have to look at the  10:21:12
 7   volume of data, the tests, and even a  10:21:16
 8   non-peer-reviewed paper can be important if they've  10:21:20
 9   done everything correctly.             10:21:24
10   Q.  So why did you raise the point here that  10:21:28
11   these studies are in non-peer-reviewed  10:21:36
12   publications?                       10:21:40
13   A.  Because that means there is reason to  10:21:40
14   question that they've actually contributed valid  10:21:44
15   information.  Ever since the Internet came aboard  10:21:46
16   people have been publishing papers on their own  10:21:50
17   whim and putting them out there on the web.  That's  10:21:58
18   the lowest and least reliable level.  If they're  10:22:02
19   fully vetted and approved by your faculty of your  10:22:06
20   department and peers, it's up at the top level).  10:22:10
21   It is becoming far more common to  10:22:18
22   publish initially on the Internet just to be able  10:22:20
23   to get things out there and in print faster, but  10:22:26
24   that doesn't make it better.           10:22:28
                                        Page 28
```

```
 1   Q.  Now, I've reviewed Exhibit 1, and would  10:22:30
 2   you agree that it's your opinion that the -- let me  10:22:42
 3   rephrase.                           10:22:48
 4   Is it your opinion that the Bell &  10:22:50
 5   Howell ultrasonic pest repellers are effective to  10:22:50
 6   repel and drive out mice and rats?     10:22:54
 7   A.  Absolutely, yes.                 10:22:58
 8   Q.  Okay.                           10:22:58
 9   A.  The qualification is the driving out  10:23:02
10   which is something which Dr. Potter has set as his  10:23:04
11   standard, and it only applied in test environments  10:23:12
12   where the mice cannot leave because they're closed  10:23:14
13   off exits, but the repellers are effective at  10:23:18
14   moving the animals out of the sound range of those.  10:23:26
15   Q.  Are the repellers effective to drive  10:23:30
16   mice and rats out of a house?          10:23:34
17   MR. OSTOJIC:  Object to form, foundation, but  10:23:38
18   go ahead.                           10:23:40
19   BY THE WITNESS:                      10:23:42
20   A.  That's not what they've ever claimed  10:23:42
21   they can do.                        10:23:44
22   BY MR. KOPEL:                        10:23:44
23   Q.  Okay.                           10:23:44
24   A.  You can't drive things out that are out  10:23:46
                                        Page 29
```

8 (Pages 26 - 29)

1  of the range of the frequency or behind walls and   10:23:50
2  under floors where the sound can't reach them or in   10:23:54
3  his own tests under a cardboard box which stops the   10:24:00
4  sound.                                    10:24:02
5       There are limitations, and those are   10:24:04
6  acknowledged on the packaging of the B & H   10:24:06
7  expellers. He set an impossible standard when he   10:24:10
8  says he wants them driven out of the house. If   10:24:22
9  you've closed the place completely as they thought   10:24:24
10  they had done in Modesto, they can't leave, so how   10:24:26
11  can they be driven out if you close the door?   10:24:30
12       Q.  Okay, and I appreciate your criticism   10:24:32
13  towards the study, and my questions are actually   10:24:34
14  geared not towards the studies performed but what   10:24:36
15  the capabilities are in the real world.   10:24:40
16       A.  The capabilities that I've seen are they   10:24:44
17  can keep mice from entering your house, they can   10:24:46
18  get mice that are there to leave if they're used   10:24:50
19  correctly, adequate numbers in the right places.   10:24:54
20       Q.  They can get them to leave certain   10:24:58
21  areas, but they can't get them to leave the entire   10:25:00
22  house, is that correct?   10:25:02
23       MR. OSTOJIC:  Object to form as to house, but   10:25:02
24  go ahead.                                 10:25:04

Page 30

BY THE WITNESS:                              10:25:08
2       A.  Well, I haven't taken down any house to   10:25:08
3  find out if there are any hiding in the walls   10:25:10
4  anywhere; but when you don't see any of them in the   10:25:12
5  house for year on end and you don't find any   10:25:14
6  droppings on the counters or on the floors and   10:25:18
7  there are no beds chewed and no pillows chewed,   10:25:20
8  there are probably no mice in your house, no food   10:25:24
9  is damaged, there is nothing -- no evidence to   10:25:26
10  indicate they're there. I'd say that repelled   10:25:30
11  them.                                     10:25:32
12       Q.  And you're talking about the Transonic   10:25:34
13  Pro right now, correct?   10:25:36
14       A.  Yes.                              10:25:36
15       Q.  Would you agree that in houses mice can   10:25:38
16  typically nest behind walls or underneath floors?   10:25:46
17       A.  Absolutely.                       10:25:50
18       Q.  How about behind a refrigerator?   10:25:50
19       A.  Absolutely.                       10:25:54
20       Q.  How about behind a couch?           10:25:54
21       A.  Yep, or in it.                    10:25:56
22       Q.  Could the ultrasonic sound waves reach   10:25:58
23  behind a couch?                           10:26:04
24       A.  At the floor level, it depends whether   10:26:08

Page 31

1  the couch is right down there, but most couches are   10:26:12
2  six inches off the floor from the bottoms of the   10:26:14
3  seats; and, yeah, they'll get behind it because   10:26:18
4  mice tend to work right along the baseboards. The   10:26:20
5  main thing is as long as you can keep them out of   10:26:26
6  areas where there is any food or water, there is no   10:26:28
7  real attraction for the mice. They need those   10:26:34
8  things to survive.                        10:26:42
9       Q.  So in reviewing Exhibits 1 and 2, and   10:27:02
10  I'm referring specifically to studies that you are   10:27:10
11  relying on in your opinion that the Bell & Howell   10:27:14
12  repellers are effective against rats and mice, I   10:27:18
13  saw that you are relying on tests conducted in   10:27:24
14  China in 2011 and 2014?                    10:27:28
15       A.  Yes.                             10:27:32
16       Q.  I saw that you included two of your own   10:27:32
17  studies regarding the Transonic Pro?   10:27:36
18       A.  Correct.                         10:27:36
19       Q.  Any other studies that you're relying   10:27:38
20  on?                                       10:27:42
21       A.  Not that I have direct information on.   10:27:44
22  I know that the units like these had been approved   10:27:50
23  for use in Canada on the basis of very tough field   10:27:56
24  testing requirements, and they are sold there.   10:28:00

Page 32

1  There has to be publications on that, and Diane   10:28:04
2  Federstein indicated that they had done previous   10:28:10
3  tests for other manufacturers, purveyors of   10:28:12
4  ultrasound units, and so those tests are out there,   10:28:18
5  but in published form, not necessarily.   10:28:22
6       Q.  And the tests that Ms. Federstein ran on   10:28:26
7  the devices from other manufacturers, do you think   10:28:32
8  those can support your conclusion?   10:28:36
9       A.  Those were -- the devices were   10:28:38
10  essentially the same. The only thing that she did   10:28:42
11  was she manufactured or tested and designed them,   10:28:44
12  they were sold in different marketers, but they   10:28:48
13  were the same products with the exception that they   10:28:52
14  raised the amplitude of the sound decibel level of   10:28:54
15  it for the ones that are used by Bell & Howell,   10:28:58
16  brought it up another 20 decibels, so they are the   10:29:02
17  ones that are used by Bell & Howell in her tests.   10:29:10
18       Q.  But you've not seen those tests,   10:29:14
19  correct?                                  10:29:16
20       A.  I've seen the design of them, I've seen   10:29:16
21  the results of them.                      10:29:20
22       Q.  Which tests?                      10:29:20
23       A.  The ones that she did or had done by   10:29:22
24  Intellic.                                 10:29:22

Page 33

9 (Pages 30 - 33)

**Page 34**

```
 1     Q.  intellitec.                         10:29:32
 2     A.  Intellitec.                         10:29:34
 3     MR. OSTOJIC:  No, Intertek.             10:29:34
 4  BY THE WITNESS:                            10:29:36
 5     A.  Intertek, excuse me.                10:29:36
 6     MR. OSTOJIC:  SGS?                      10:29:38
 7     THE WITNESS:  Yeah, and SGS.            10:29:40
 8  BY MR. KOPEL:                              10:29:40
 9     Q.  Okay.  Are those listed in your report?  10:29:40
10     A.  Yes.                                10:29:42
11     Q.  Are you referring to the 2011 and 2014  10:29:42
12  tests?                                     10:29:46
13     A.  Yes.                                10:29:46
14     Q.  Okay.  Any other tests?  Were you   10:29:48
15  referring to tests other than those just now?  10:29:50
16     A.  No.                                 10:29:52
17     Q.  Okay.  But you've not seen the tests 10:29:52
18  that she ran on the devices of other manufacturers.  10:30:00
19  right?                                     10:30:02
20     A.  No, I've not.                       10:30:04
21     Q.  How are you aware of the Canadian   10:30:04
22  approval of these devices?                 10:30:08
23     A.  By talking to Dr. Luc Duchesne of   10:30:08
24  Toronto -- no, not Toronto -- Quebec.      10:30:24
```

**Page 35**

```
 1     Q.  Did you review any documents in     10:30:30
 2  connection with reaching your conclusion that these  10:30:36
 3  devices were approved for use in Canada?   10:30:38
 4     A.  He is the person who got them through  10:30:42
 5  the Canadian process of approval, and so he told me  10:30:44
 6  the manner in which it was done.           10:30:50
 7     Q.  Okay.  So it was done -- I'm sorry to  10:30:50
 8  interrupt you.  I think I'm about to ask the  10:30:54
 9  question you're about to say.  So he communicated  10:30:56
10  this to you orally, but you didn't review any  10:30:58
11  documents in connection with this, is that correct?  10:31:00
12     A.  Correct.                            10:31:02
13     Q.  Okay.  Have you seen any peer-reviewed  10:31:50
14  studies showing that ultrasonic devices are  10:31:08
15  effective to repel or drive out mice and rats?  10:31:12
16     A.  Well, two halves to that comment; no, I  10:31:22
17  have not, and one of the classic statements of  10:31:26
18  science is that absence of evidence is not evidence  10:31:30
19  of absence.  You don't have there until somebody  10:31:34
20  does the test correctly.                   10:31:38
21     Q.  Can you please look back at the section  10:31:50
22  we were looking at, Exhibit 1, summary comments  10:32:02
23  regarding the amended complaint.           10:32:04
24     A.  Right.                              10:32:10
```

**Page 36**

```
 1     Q.  Do you see here right after the title at  10:32:10
 2  the bottom of the page, the last sentence, it says,  10:32:14
 3  "But in this day of fake news, we should also  10:32:16
 4  recognize that there are also dozens of studies  10:32:20
 5  that show -- I think that should say that --  10:32:22
 6  ultrasound can and does work when used correctly  10:32:26
 7  within the limits of its sound intensity and  10:32:28
 8  hearing frequency range of pests targeted," do you  10:32:32
 9  see that?                                  10:32:34
10     A.  I do.                               10:32:36
11     Q.  Can you please list the dozens of    10:32:36
12  studies you're referring to?               10:32:42
13     A.  At the level of peer-reviewed things and  10:32:46
14  officially recognized, no, they're not there.  They  10:32:50
15  haven't been done.  At the level of materials  10:32:52
16  provided from all the different people who are  10:32:56
17  selling these things, they reference small scale  10:33:00
18  studies or go back to some anecdotal evidence.  10:33:02
19  They're out there, but they're not valid, but  10:33:13
20  neither are most of the things that Dr. Potter had  10:33:14
21  used in his references.                    10:33:18
22     MR. OSTOJIC:  Potter.                   10:33:20
23  BY THE WITNESS:                            10:33:20
24     A.  Potter, excuse me.  Most of his     10:33:20
```

**Page 37**

```
 1  references used very small scale tests.  They're  10:33:26
 2  published only because they had the contact with  10:33:30
 3  the people in that field of entomology to be able  10:33:32
 4  to get a small and questionable sample published.  10:33:38
 5  BY MR. KOPEL:                              10:33:44
 6     Q.  Okay.  And I appreciate you have a lot  10:33:44
 7  of criticisms towards Dr. Potter, and we'll get to  10:33:44
 8  that.                                      10:33:48
 9     A.  Right.                              10:33:48
10     Q.  Okay.  I'm just trying to stay organized  10:33:48
11  here and focus on what you wrote here.     10:33:50
12     A.  I think that you would find that to have  10:33:52
13  been a slip of my keys when I did that.    10:33:54
14     Q.  Okay.  So you can't identify dozens of  10:33:58
15  studies?                                   10:34:00
16     A.  No, I don't think I meant to say that  10:34:00
17  because I know that I couldn't come up with that  10:34:02
18  information.                               10:34:04
19     Q.  Is this statement fake news?        10:34:04
20     A.  Could be, unintentional probably    10:34:08
21  because, if I'm not mistaken, that line got  10:34:12
22  repeated somehow coming in below.          10:34:14
23     Q.  Okay.  And the same question for    10:34:16
24  insects, have you reviewed any peer-reviewed  10:34:24
```

10 (Pages 34 - 37)

1 studies showing that ultrasonic technology is 10:34:26
2 effective to repel or drive out insects? 10:34:52
3 A. Not to the best of my knowledge, nothing 10:54:40
4 I can pull off the top of my head. 10:34:42
5 Q. Now, in this section I think you talk a 10:34:48
6 lot about mice adapting to tolerate ultrasonic 10:34:56
7 sound. Do you see that? 10:35:06
8 And just to focus you, there are some 10:35:08
9 bold portions at the next page, "In my research 10:35:12
10 over the course of a full year of constant exposure 10:35:16
11 to the sound of Transonic Pro, there is no sign the 10:35:18
12 mice adapted to tolerate the sounds," do you see 10:35:24
13 that? 10:35:24
14 A. Yes. 10:35:24
15 Q. And then the next bold passage below, 10:35:24
16 you know, only a single line or two about mice and 10:35:28
17 rats quickly learning to ignore the sound. Do you 10:35:32
18 see that? 10:35:34
19 A. I do. 10:35:34
20 Q. Okay. Is that concept called 10:35:34
21 habituation? 10:35:36
22 A. It is, and I went on and gave several 10:35:38
23 references for what habituation is and where it 10:35:40
24 occurs in the second document in response to his 10:35:42
Page 38

1 claiming that I completely ignored it. 10:35:46
2 Habituation is an important part of any 10:35:50
3 animal. If you can't escape from a highly 10:35:54
4 intensive and/or painful sound, the best you can do 10:35:58
5 is find a way to habituate. Now, there is two ways 10:36:02
6 to do that. Neurologically in most cases the 10:36:06
7 neurotransmitters run out in your nerves after 10:36:10
8 prolonged exposure to the same sensations. That's 10:36:14
9 why you're not aware of every twitch of every hair 10:36:16
10 on your face. You're used to having that feedback, 10:36:20
11 it's damped out, it's sorted out, and it's kept so 10:36:24
12 you can keep aware of new information, new stimuli. 10:36:28
13 Q. Now, the concept of habituation, does 10:36:32
14 that mean that mice and rats maybe initially -- 10:36:36
15 after regular exposure to ultrasound will learn to 10:36:46
16 ignore the sound and not be repelled by it? 10:36:50
17 MR. OSTOJIC: Object to form, foundation. 10:36:52
18 BY MR. KOPEL: 10:36:52
19 Q. Does it mean that? 10:36:56
20 A. It means they have to do that if they 10:36:56
21 can't escape it. 10:37:00
22 Q. Okay, fair. And I understand that 10:37:00
23 you're criticizing certain test designs. I'm 10:37:04
24 trying to -- 10:37:06
Page 39

1 A. I'm not criticizing the test. 10:37:06
2 Q. Let me just finish my question, please. 10:37:08
3 A. Sure. 10:37:10
4 Q. At a fundamental level, I just want to 10:37:10
5 discuss the concept of habituation, and we can get 10:37:14
6 to that later, okay. The concept of habituation, 10:37:16
7 does it mean that mice and rats will become used to 10:37:18
8 ultrasound and that ultrasound will fail to repel 10:37:22
9 or drive them out? Is that what habituation means? 10:37:24
10 MR. OSTOJIC: Object to form and foundation, 10:37:26
11 but go ahead. 10:37:28
12 BY MR. KOPEL: 10:37:28
13 Q. Go ahead. 10:37:30
14 A. Okay. In the case of any animal, if 10:37:30
15 they have not habituated to a stimulus, a foreign 10:37:36
16 stimulus which is distressful, it keeps their 10:37:40
17 metabolism high, it causes stress disease and 10:37:46
18 eventually death, so you have two choices. You can 10:37:48
19 continue to respond to that stimulus, or you can 10:37:50
20 adapt to tolerating it when you realize that it is 10:37:58
21 not actually harming you, but that's -- as long as 10:38:00
22 you have a means to get away from it, that's the 10:38:06
23 first option you'd use. 10:38:08
24 Q. Okay. And Dr. Whitford, I know you're 10:38:10
Page 40

1 doing your best to respond to the question and 10:38:14
2 you're explaining how habituation works, but I 10:38:16
3 just -- I want to focus on what habituation is. 10:38:20
4 Can you please explain what habituation is, just 10:38:24
5 the concept of what is habituation? 10:38:26
6 A. It's actually defined right on the page 10:38:30
7 in there in the second one as when subjected to 10:38:34
8 continued stressor of sound, reaching a point where 10:38:40
9 you no longer respond by attempting to avoid it 10:38:48
10 because you can't. 10:38:52
11 Q. Okay. And in the peer-reviewed studies 10:38:52
12 you've reviewed concerning ultrasound, you've seen 10:38:58
13 that habituation has occurred with regards to the 10:39:02
14 mice and rats in those tests, correct? 10:39:06
15 MR. OSTOJIC: Object to form and foundation. 10:39:08
16 BY MR. KOPEL: 10:39:08
17 Q. You may answer. 10:39:12
18 A. The design of the tests left no other 10:39:14
19 option. 10:39:16
20 Q. So the answer is yes? 10:39:18
21 A. Yeah, they couldn't escape. 10:39:18
22 MR. OSTOJIC: As you referring to the tests 10:39:24
23 they did, or I think his question was concerning -- 10:39:26
24 BY THE WITNESS: 10:39:28
Page 41

11 (Pages 38 - 41)

1   A.   No in general, the other tests.   10:39:28
2   MR. OSTOJIC:   Okay.   10:39:30
3   BY MR. KOPEL:   10:39:42
4   Q.   What steps need to be taken in order to   10:39:42
5   prevent habituation from occurring when using   10:39:54
6   ultrasound?   10:39:58
7   A.   You need to have a means for the animal   10:40:02
8   to get away from the source of the sound   10:40:04
9   permanently.   If they can't hear it, you know, then   10:40:08
10   it's not distressing their system.   10:40:18
11   Q.   I'd like to please talk to you about   10:40:28
12   your Bird-X studies.   Now, you've attached two   10:40:32
13   studies here, one concerning bats and the other   10:40:36
14   concerning mice, is that correct?   10:40:40
15   A.   Correct   10:40:42
16   Q.   Okay.   First, with regards to the bats   10:40:42
17   study, is it your contention that this study   10:40:46
18   concluding that the Transonic Pro was effective to   10:40:52
19   repel bats supports your conclusion that the   10:40:58
20   Bell & Howell devices are effective to repel and   10:41:06
21   drive out mice and rats?   10:41:08
22   A.   I'd have to say that on reviewing it,   10:41:14
23   the Transonic Pros used for the bats were set on a   10:41:18
24   loudness setting of 2 which means they were also   10:41:24
Page 42

1   producing some sonic frequencies, and I hadn't   10:41:28
2   known that until I went back and reviewed the   10:41:30
3   literature on those devices.   In the mouse tests,   10:41:32
4   they were always set on 1 which by definition used   10:41:36
5   only sounds above 20,000 cycles per second or 20   10:41:40
6   kilohertz.   10:41:46
7   Q.   And the Bell & Howell repellers, they   10:41:46
8   don't use sonic sound, is that correct?   10:41:52
9   A.   They do not, only sounds from 20,000 to   10:41:56
10   45,000 cycles per second.   10:42:02
11   Q.   So can you actually please explain what   10:42:04
12   the difference is in the simplest terms you can   10:42:06
13   between sonic sound and ultrasonic sound?   10:42:08
14   A.   We use an arbitrary delineation point   10:42:12
15   based on human hearing.   If it's above the level we   10:42:14
16   can hear, it's considered ultrasound.   So we use   10:42:18
17   that baseline of 20,000 to 21,000 cycles per second   10:42:22
18   wavelength, number of waves per second passing   10:42:26
19   point as the distinction.   10:42:30
20   At the bottom end of the sound   10:42:34
21   frequencies, we have infrasound which is below 8   10:42:36
22   cycles per second, something elephants communicate   10:42:40
23   with that we can't hear, so both ends of that   10:42:44
24   spectrum of sonic sound are the ones we can't hear.   10:42:48
Page 43

1   Q.   So does sonic sound operate on a   10:42:50
2   different frequency than ultrasonic sound, is that   10:42:54
3   the distinction?   10:42:58
4   A.   It's a continuum of wavelength from   10:42:58
5   beginning to end, but it's the point we've   10:43:02
6   arbitrarily said, well, we can't hear it, so it's   10:43:06
7   not sonic, and that's literally what defines it   10:43:10
8   because that's when they first were working with   10:43:16
9   sound, they said I can't hear this, it must be   10:43:20
10   above my hearing range. sonic is referring to our   10:43:24
11   hearing range   10:43:26
12   Q.   Forgive my ignorance.   So are certain   10:43:28
13   frequencies considered ultrasonic and other   10:43:36
14   frequencies are considered sonic, is that correct?   10:43:38
15   A.   Yes.   Anything above 20,000 to 21,000   10:43:40
16   cycles per second is ultrasonic.   10:43:44
17   Q.   Got it.   Thank you.   I think this is   10:43:46
18   what you were saying before, correct me if I'm   10:43:52
19   wrong, is what you were saying earlier that your   10:43:54
20   study regarding the Transonic -- use of Transonic   10:44:00
21   Pro on bats was insufficient to support your   10:44:06
22   conclusion -- let me just finish -- regarding the   10:44:12
23   Bell & Howell devices because it included sonic   10:44:14
24   sound in addition to ultrasonic sound, is that   10:44:16
Page 44

1   correct?   10:44:20
2   MR. OSTOJIC:   Object to form.   Go ahead.   10:44:20
3   BY THE WITNESS:   10:44:22
4   A.   At least part of the tests were done   10:44:22
5   using the number 2 setting, and I'd have to go back   10:44:24
6   to my original notes and find out what was done on   10:44:30
7   the number 1 setting, the ultrasound versus the   10:44:32
8   sonic.   They were large buildings, of course; but,   10:44:38
9   yeah, in this case, I'd have to go back and hunt   10:44:44
10   that information up, so it's less relevant to the   10:44:48
11   study.   10:44:52
12   Q.   What about the fact that that test was   10:44:54
13   conducted on bats rather than rodents, would that   10:44:54
14   have been an issue?   10:45:00
15   A.   We're looking for any sign that   10:45:06
16   ultrasound works against anything basically.   10:45:08
17   They've said that it has no efficacy in any case.   10:45:12
18   Q.   So is it your opinion that tests showing   10:45:16
19   that ultrasound is effective or ineffective as to   10:45:24
20   one species can support a conclusion of   10:45:26
21   effectiveness or ineffectiveness as to another   10:45:30
22   species, is that correct?   10:45:32
23   MR. OSTOJIC:   Object to form, foundation.   10:45:34
24   BY MR. KOPEL:   10:45:34
Page 45

```
 1   Q.  Actually, I think I'm misusing the word   10:45:36
 2   species.  Swap the word species with animal.    10:45:40
 3        MR. OSTOJIC:  Same objections.    10:45:42
 4        THE WITNESS:  You want me to go ahead and   10:45:44
 5   answer?    10:45:44
 6        MR. OSTOJIC:  Yeah, go ahead.    10:45:44
 7   BY THE WITNESS:    10:45:46
 8        A.  Okay.  Sound and repelling animals with   10:45:46
 9   sound is going to depend entirely on the hearing   10:45:52
10   range which is known for any individual species   10:45:56
11   that you're going to test it upon.  Bats can hear   10:45:58
12   up to 140,000 cycles per second.  We know that the   10:46:02
13   range of mice and rats includes ultrasound and that   10:46:06
14   they regularly communicate with their pups and each   10:46:08
15   other in that frequency.    10:46:12
16        If you're going to try this against a   10:46:14
17   bear, for evolutionary reasons I'd be willing to   10:46:16
18   bet his hearing range doesn't go above 8,000   10:46:20
19   because there is nothing he needs to find which is   10:46:24
20   ultrasound.    10:46:28
21   BY MR. KOPEL:    10:46:28
22        Q.  With regards to your mice study, do you   10:46:28
23   feel comfortable saying that that can support the   10:46:32
24   same conclusion regarding efficacy as to rats?    10:46:38
                                              Page 46
```

```
 1        A.  I have not tested on rats, but since the   10:46:44
 2   Bell & Howell's have shown efficacy against both   10:46:48
 3   and the Chinese questions without question, I would   10:46:52
 4   say that it should.    10:46:54
 5        Q.  Okay.  And what about the -- but do you   10:46:56
 6   think that your Transonic Pro study regarding mice   10:46:58
 7   supports your conclusion that the Bell & Howell   10:47:04
 8   ultrasonic devices are effective against rats?    10:47:08
 9        A.  Without testing it myself, I won't go   10:47:12
10   there.    10:47:14
11        Q.  Okay.  Is the answer no?    10:47:14
12        A.  It means I don't know the answer because   10:47:16
13   I haven't done those tests.    10:47:20
14        Q.  Fair enough, okay.  Were you involved in   10:47:22
15   designing the Transonic Pro?    10:47:28
16        A.  Not at all.    10:47:30
17        Q.  Was the device already being sold on the   10:47:32
18   market at the time you tested it?    10:47:34
19        A.  Yes.    10:47:36
20        Q.  Were you hired for purposes of claim   10:47:38
21   substantiation?    10:47:42
22        MR. OSTOJIC:  Object to form.  Go ahead.    10:47:44
23   BY THE WITNESS:    10:47:48
24        A.  I'm not so much -- I guess that's what   10:47:48
                                              Page 47
```

```
 1   they were asking for.  They just asked me to find   10:47:52
 2   out whether it worked or not and to have   10:47:54
 3   them -- you know, get back to them; if it didn't   10:47:58
 4   work, they didn't want to be making those claims,   10:48:02
 5   so I guess that's what you are referring to.    10:48:04
 6   BY MR. KOPEL:    10:48:06
 7        Q.  So they were hoping to gather data in   10:48:06
 8   order to support the claims that they were making,   10:48:08
 9   is that correct?    10:48:10
10        A.  Probably.  I didn't ask.    10:48:10
11        Q.  But that makes sense, right?    10:48:12
12        A.  Yes.    10:48:14
13        MR. OSTOJIC:  Object to the form.    10:48:14
14   BY MR. KOPEL:    10:48:14
15        Q.  When was the Transonic Pro -- when did   10:48:18
16   it begin being sold?    10:48:22
17        A.  I don't know the specific date.    10:48:24
18   Probably sometime in the mid nineties.    10:48:30
19        Q.  Okay.  So it's been on the market for   10:48:34
20   decades now?    10:48:36
21        A.  Yes.    10:48:36
22        Q.  Can you please turn to page 11 of   10:49:00
23   Exhibit 2?  Let me know when you're there.    10:49:02
24        A.  Okay.    10:49:12
                                              Page 48
```

```
 1        Q.  Okay.  On the third paragraph of page 11   10:49:16
 2   here, you reference findings by Dr. Richard Mankin,   10:49:20
 3   do you see that?    10:49:24
 4        A.  Yes.    10:49:26
 5        Q.  Are you familiar with Dr. Richard   10:49:26
 6   Mankin?    10:49:28
 7        A.  Only from what I've seen from   10:49:30
 8   Dr. Potter's.    10:49:32
 9        Q.  So before this case, you never heard of   10:49:34
10   him?    10:49:36
11        A.  No.    10:49:36
12        Q.  Do you accept Dr. Mankin's findings?    10:49:38
13        MR. OSTOJIC:  Object to form, foundation.    10:49:40
14   BY THE WITNESS:    10:49:44
15        A.  I would have little reason to doubt   10:49:44
16   them.  He had scientific equipment that tests   10:49:46
17   amplitude frequency of sounds and only relayed what   10:49:48
18   he found from the various devices.  Unless he were   10:49:52
19   consciously falsifying it, there is no reason to   10:49:58
20   doubt him.    10:50:00
21   BY MR. KOPEL:    10:50:00
22        Q.  Can you please look at the last   10:50:00
23   paragraph on page 11?  So beginning with the second   10:50:10
24   sentence of the last paragraph, it reads -- these   10:50:20
                                              Page 49
```

| | |
|---|---|
| 1 are kind of long sentences.                10:50:24 | 1 in it, is that correct?                10:52:50 |
| 2    A.  Yes, I'm sorry, I do run-on sentences.   10:50:26 | 2    A.  One.                10:52:52 |
| 3    Q.  I can say with certainty -- you know   10:50:28 | 3    Q.  Okay.  Can you help me with the   10:52:52 |
| 4 what, this is all one sentence.  I'm going to start 10:50:30 | 4 terminology, please?  On the outside, there is two 10:52:56 |
| 5 from the middle of the first sentence.        10:50:36 | 5 things that people would call speakers, they have  10:53:00 |
| 6    A.  Okay.                10:50:36 | 6 the holes, the sound comes out of them.  Are you  10:53:02 |
| 7    Q.  "I can say with certainty that the sound 10:50:38 | 7 referring to a different --        10:53:06 |
| 8 frequency and amplitudes produced by the Transonic 10:50:40 | 8    A.  It's a different unit.        10:53:06 |
| 9 Pro sound units used in this study matches      10:50:42 | 9    Q.  Different unit.        10:53:08 |
| 10 perfectly with the sound qualities of the B & H  10:50:46 | 10    MR. OSTOJIC:  Object to form.      10:53:08 |
| 11 UPRs as described by both the B & H literature and 10:50:50 | 11    MR. KOPEL:  Let's use some documents and maybe 10:53:10 |
| 12 Dr. Mankin's tests of the B & H models.  Therefore, 10:50:56 | 12 that can help us.  I'll ask the Court Reporter to  10:53:12 |
| 13 since the sound spectrum and force of all these   10:50:58 | 13 please mark as Exhibits Whitford 3 and 4 these two 10:54:24 |
| 14 ultrasound devices was the same, the B & H UPRs   10:51:02 | 14 documents we'll have the witness identify.   10:54:32 |
| 15 should have been just as successful as the      10:51:06 | 15       (WHEREUPON, certain documents were 10:54:32 |
| 16 Transonic Pro device 1 tested if used correctly and 10:51:10 | 16       marked Whitford Deposition Exhibit |
| 17 in accordance with the packaging instructions."  Do 10:51:12 | 17       Nos. 3 and 4, for identification, |
| 18 you see that?                10:51:16 | 18       as of 01/12/2018.) |
| 19    A.  Yes.                10:51:16 | 19 BY MR. KOPEL: |
| 20    Q.  I read it accurately?        10:51:16 | 20    Q.  Dr. Whitford, do you have Exhibit 3?   10:55:20 |
| 21    A.  You did.                10:51:18 | 21    A.  I do.                10:55:22 |
| 22    Q.  Can you just please define what the   10:51:18 | 22    Q.  What is it?                10:55:22 |
| 23 letters UPR are meant to stand for?        10:51:24 | 23    A.  Transonic Pro image.        10:55:24 |
| 24    A.  Ultrasonic pest repeller.        10:51:26 | 24    Q.  It's an image of the unit?        10:55:28 |
| Page 50 | Page 52 |

| | |
|---|---|
| 1    Q.  Thanks.  I know that was an obvious   10:51:30 | 1    A.  Uh-huh.                10:55:30 |
| 2 question, but sometimes these things are just for   10:51:30 | 2    Q.  Do you recognize this to be a printout 10:55:30 |
| 3 the record.                10:51:30 | 3 of the Bird-X website?        10:55:32 |
| 4       And when you say sound spectrum in that 10:51:38 | 4    A.  I do.                10:55:34 |
| 5 last sentence, is that referring to frequency?   10:51:42 | 5    Q.  We'll get to it.  And then do you have 10:55:36 |
| 6    A.  The range of frequency from lowest to   10:51:44 | 6 Exhibit No. 4?                10:55:38 |
| 7 highest.                10:51:46 | 7    A.  Yes.                10:55:38 |
| 8    Q.  And when you say force, is that     10:51:48 | 8    Q.  Have you seen this before?        10:55:38 |
| 9 referring to decibels?        10:51:50 | 9    A.  Absolutely.        10:55:40 |
| 10    A.  Decibels.                10:51:50 | 10    Q.  What is it?                10:55:40 |
| 11    Q.  Okay, thank you.  So did you make a   10:51:52 | 11    A.  It's a description of the Transonic   10:55:42 |
| 12 determination that your findings as to the      10:51:58 | 12 Pro's use, operation and sound settings.      10:55:46 |
| 13 Transonic Pro unit were transferable to the      10:52:02 | 13    Q.  Are these the instructions for the   10:55:56 |
| 14 Bell & Howell repellers on the basis that they had 10:52:08 | 14 Transonic Pro?                10:55:58 |
| 15 the same frequency spectrum and decibel levels?   10:52:10 | 15    A.  Yes.                10:56:00 |
| 16    MR. OSTOJIC:  Object to form.      10:52:14 | 16    Q.  Okay.  Does Exhibit 3 refresh your   10:56:00 |
| 17 BY THE WITNESS:                10:52:18 | 17 recollection as to the construction of the      10:56:06 |
| 18    A.  Yes.  There is really no other way to 10:52:18 | 18 Transonic Pro?                10:56:08 |
| 19 determine the difference between them.  If they   10:52:20 | 19    A.  It does.                10:56:08 |
| 20 have those things, they have the same sound      10:52:22 | 20    Q.  Okay.  How many speakers does the unit 10:56:08 |
| 21 properties, and Dr. Mankin was good enough to give 10:52:26 | 21 have?                10:56:10 |
| 22 me that information.                10:52:34 | 22    A.  Two.                10:56:10 |
| 23 BY MR. KOPEL:                10:52:42 | 23    Q.  Now, would it give you pause to rely on 10:56:20 |
| 24    Q.  Now, the Transonic Pro has two speakers 10:52:42 | 24 results of testing for the Transonic Pro as to   10:56:26 |
| Page 51 | Page 53 |

14 (Pages 50 - 53)

**Page 54**

1  ultrasonic units that have only one speaker?   10:56:32
2  A.  It would not.   10:56:38
3  Q.  Why not?   10:56:40
4  A.  In all probability the two speakers are   10:56:44
5  there because one is for the ultrasound and one   10:56:48
6  produces sonic levels. Speakers are quite   10:56:50
7  different in terms of the sounds that they produce,   10:56:54
8        When I was testing ultrasound earlier on   10:57:00
9  in the eighties, I regularly fried Piezo electronic   10:57:02
10  speakers which were ultrasound speakers by boosting   10:57:16
11  the amplitude a little too high as in burned them   10:57:18
12  up because ultrasound uses different speakers to   10:57:24
13  produce that.   10:57:32
14  Q.  You weren't involved in the construction   10:57:38
15  of this unit, correct?   10:57:40
16  A.  No.   10:57:42
17  Q.  Okay. So when you say in all   10:57:42
18  probability --   10:57:44
19  A.  I have gone back --   10:57:46
20  Q.  I'm sorry, let me just finish my   10:57:46
21  question. Have you verified that, or are you   10:57:50
22  speculating?   10:57:50
23     MR. OSTOJIC:  Object to form.   10:57:52
24  BY THE WITNESS:   10:57:52

**Page 55**

1  A.  I have contacted Bird X and the   10:57:52
2  manufacturer of it and double checked the sound   10:57:56
3  frequencies produced at each setting, according to   10:58:00
4  them and the decibel levels being produced at each   10:58:02
5  setting with them.   10:58:04
6  BY MR. KOPEL:   10:58:06
7  Q.  Were those the only two material   10:58:06
8  considerations in determining whether or not the   10:58:08
9  results from the Transonic Pro were valid towards   10:58:12
10  the Bell & Howell devices?   10:58:16
11  A.  Yes.   10:58:16
12  Q.  Do you see that the Transonic Pro has a   10:58:20
13  metal casing on it?   10:58:22
14  A.  Yes.   10:58:24
15  Q.  Okay. And are you aware that   10:58:24
16  Bell & Howell devices have a plastic casing?   10:58:26
17  A.  Yes.   10:58:30
18  Q.  Is that an issue?   10:58:32
19  A.  Not to the best of my knowledge because   10:58:34
20  the sound moves out from the speakers, not back or   10:58:38
21  around them. It's very directional.   10:58:44
22  Q.  Now, the Transonic Pro, I think you   10:58:50
23  testified earlier that you think it was probably   10:58:52
24  originally built about two decades ago, is that   10:58:58

**Page 56**

1  correct, or in the mid nineties?   10:59:04
2  A.  Mid to late nineties.   10:59:04
3  Q.  Okay. Now, is that an issue that the   10:59:06
4  Transonic Pro was designed one to two decades   10:59:12
5  before the Bell & Howell devices?   10:59:22
6     MR. OSTOJIC:  Object to form.   10:59:24
7  BY THE WITNESS:   10:59:30
8  A.  As long as the frequencies they're   10:59:30
9  producing and the decibel levels they're producing   10:59:32
10  are the same --   10:59:36
11  BY MR. KOPEL:   10:59:36
12  Q.  Yes.   10:59:38
13  A.  It doesn't make any difference really   10:59:38
14  when you made them. Components, post '95,   10:59:40
15  construction, other than the difference between   10:59:50
16  metal and plastic housings, is not that different.   10:59:54
17  Q.  Are the size of the speakers the same on   10:59:56
18  the Transonic Pro as the Bell & Howell devices?   10:59:58
19  A.  Transonic Pros have a slightly smaller   11:00:00
20  speaker.   11:00:02
21  Q.  Does that make a difference?   11:00:04
22  A.  Not if the decibel level and the   11:00:04
23  frequencies correspond.   11:00:08
24  Q.  Does the Transonic Pro use a   11:00:10

**Page 57**

1  solid -- uh, I'm sorry to interrupt you.   11:00:14
2  A.  That's just one of the examples of the   11:00:16
3  change in the equipment over time since the sixties   11:00:18
4  to seventies, eighties, nineties. We're getting   11:00:20
5  smaller units just like you can now do on your cell   11:00:24
6  phone what you used to do on the IBM 360.   11:00:28
7  Q.  Would you agree that even though   11:00:30
8  certain, you know, physical aspects of the   11:00:36
9  Transonic Pro are different than certain physical   11:00:42
10  aspects of the Bell & Howell devices -- let me   11:00:44
11  start the question over because I got confused.   11:00:48
12        Would you agree that, even though   11:00:50
13  certain, physical aspects of the Transonic Pro   11:00:52
14  devices are different from physical aspects of the   11:00:54
15  Bell & Howell devices, that the test results from   11:01:00
16  the Transonic Pro are still transferable to the   11:01:04
17  Bell & Howell devices solely because the frequency   11:01:10
18  and amplitude are the same?   11:01:14
19  A.  Yes.   11:01:16
20     MR. OSTOJIC:  Object to form, foundation.   11:01:18
21     MR. KOPEL:  You got the answer, right?   11:01:18
22     THE COURT REPORTER:  Yes.   11:01:18
23  BY MR. KOPEL:   11:01:18
24  Q.  Okay. I'm almost done with this line of   11:01:20

15 (Pages 54 - 57)

1  questioning, and then we can take a break, does   11:01:38
2  that sound good?                                  11:01:42
3       Okay, thanks.                                11:01:42
4       Can you please take a look at                11:01:46
5  Exhibit 3 -- no, 4, take a look at Exhibit 4.  You   11:01:54
6  see this design here, Figure 1, does that         11:02:12
7  accurately reflect what appears on the back side of   11:02:16
8  the Transonic Pro unit?                           11:02:22
9       A.  It does.                                 11:02:24
10      Q.  Okay.  So there are different settings    11:02:24
11  to choose for sound volume and for sound pattern,   11:02:30
12  is that correct?                                  11:02:34
13      A.  Yes.                                      11:02:34
14      Q.  Okay.  And according to this chart, you   11:02:34
15  should choose which settings to use based on which   11:02:40
16  animals or which pests you're seeking to repel, is   11:02:46
17  that correct?                                     11:02:50
18      A.  That's what's implied.                    11:02:50
19      Q.  Okay.  So sound volume there is -- the    11:02:54
20  options are quiet, medium and loud, correct?      11:03:06
21      A.  Correct.                                  11:03:10
22      Q.  And is that because different animals     11:03:10
23  require different decibel levels in order to be    11:03:12
24  repelled?                                         11:03:18

Page 58

1       A.  Partially that, partially to allow for   11:03:18
2  better comfort levels for people and pests in a   11:03:24
3  house.  If you can keep it from being audible to   11:03:28
4  you, it's not an irritation to you, it doesn't    11:03:30
5  upset your cat and your dog.  If you have to go to   11:03:34
6  one of the audible frequencies, you're not going to   11:03:38
7  like what you're hearing.  You'd use it if you were   11:03:40
8  not occupying the same space it was.              11:03:48
9       Q.  Are you referring to the loud setting?   11:03:48
10      A.  Yeah.                                     11:03:50
11      Q.  Okay.  And can you explain what sound     11:03:50
12  pattern is, please?                               11:03:56
13      A.  Well, by sound pattern there, what       11:03:58
14  they're referring to production of the sound      11:04:02
15  itself.  Sound patterns you can have a steady state   11:04:08
16  sound, just one frequency played continually; you   11:04:12
17  can have an alternation between two or three       11:04:16
18  frequencies, all of them ultrasonic or ultrasonic   11:04:18
19  and sonic; you can have a fluctuating frequency    11:04:22
20  that sweeps up and down from the base frequency to   11:04:28
21  the top frequency.  These patterns may make a     11:04:32
22  difference in an animal's response.               11:04:36
23      Q.  Why would they make a difference?        11:04:40
24      A.  Well, with the sweep pattern, if you're   11:04:44

Page 59

1  not sure exactly of the frequency which will       11:04:48
2  disturb the animal you're dealing with, when it    11:04:50
3  runs through 25,000 cycles per second of           11:04:52
4  fluctuation, you're going to catch all those places   11:05:00
5  instead of if you just set it for 2,500 cycles per   11:05:02
6  second, it might be below or above the frequency of   11:05:08
7  the animal, so the sweep patterns sometimes can be   11:05:12
8  more effective.  It also carries -- the lower end   11:05:14
9  of it carries farther than the high end of it, so a   11:05:18
10  steady 45,000 cycles per second would travel half   11:05:22
11  the distance of a steady 22,000 cycles per second   11:05:26
12  because the attenuation of sound is related to the   11:05:30
13  wavelength.                                        11:05:34
14      Q.  So against that backdrop, can you please   11:05:34
15  explain sound pattern A, what that would be?       11:05:40
16      A.  I have no idea.                            11:05:46
17      Q.  So do you --                               11:05:48
18      A.  I have specifically addressed Bird-X and   11:05:50
19  had them relay my question to the manufacturer.    11:05:54
20  I'm still waiting for a response to get that        11:05:58
21  information exactly from the manufacturer.         11:06:02
22      Q.  And I'm assuming the answer is the same   11:06:04
23  for B and C, correct?                              11:06:06
24      A.  Correct.  Oh, wait -- yeah, sound         11:06:08

Page 60

1  patterns A, B and C, yeah, that's absolutely       11:06:12
2  correct for those.                                 11:06:16
3       Q.  So you don't know --                       11:06:16
4       A.  I don't know if it's a sweep or a         11:06:18
5  steady.                                            11:06:20
6       Q.  And you don't know specifically what      11:06:20
7  frequencies are represented by each of these       11:06:22
8  either, do you?                                    11:06:24
9       A.  All I know is that if it is on quiet, it   11:06:26
10  is supposed to be producing frequencies from 20,000   11:06:30
11  to 45,000 cycles per second, but I don't know that   11:06:32
12  it's producing at steady state, pulsing, sweep.    11:06:38
13  Those are the three main options for the sound     11:06:42
14  patterns; a steady state, you know, continual      11:06:44
15  broadcast either of one frequency or the full      11:06:50
16  spectrum, pulsing, so it stops and starts.         11:06:52
17      Q.  Right.                                     11:06:56
18      A.  Or the sweep up and down, up and down,     11:06:56
19  up and down.  Pulsing is probably more effective    11:07:00
20  against things like bats which are using clicks and   11:07:04
21  chirps.                                            11:07:08
22      Q.  Okay.  And did -- is that a                11:07:08
23  consideration that needs to be made in determining   11:07:16
24  whether or not the Transonic Pro study is          11:07:18

Page 61

16 (Pages 58 - 61)

1  translatable to the Bell & Howell devices, whether  11:07:24
2  or not the Transonic Pro settings added a single  11:07:28
3  state, pulsating, sweeping, et cetera?  11:07:32
4    MR. OSTOJIC: Object to form. Go ahead.  11:07:34
5  BY THE WITNESS:  11:07:36
6    A.  I don't see that it matters in this case  11:07:36
7  because both of them proved effective in moving  11:07:38
8  rats and mice or moving mice.  11:07:42
9  BY MR. KOPEL:  11:07:44
10    Q.  When you say both of them, you mean  11:07:44
11  Bell & Howell as well as Transonic Pro?  11:07:44
12    A.  Bell & Howell in its tests 2011 and 2014  11:07:48
13  proved effective at moving rats and mice, the  11:07:52
14  Transonic Pro has proved effective at moving mice,  11:07:54
15  so the pattern of the sound is apparently not  11:07:58
16  important, the frequency is.  11:08:02
17    Q.  Is that true for mice and rats?  11:08:10
18    MR. OSTOJIC: Object to form.  11:08:14
19  BY THE WITNESS:  11:08:14
20    A.  Apparently from their tests, it works  11:08:14
21  for rats. I have not personally tested those and  11:08:18
22  I'm always reluctant to.  11:08:20
23  BY MR. KOPEL:  11:08:22
24    Q.  So you can't say whether the pattern is  11:08:22

Page 62

1  important for rats?  11:08:24
2    A.  The evidence that I've seen so far says  11:08:26
3  it is.  11:08:28
4    Q.  Okay. Now, can you please repeat -- you  11:08:30
5  said for quiet, you said a range of cycles, right?  11:08:34
6    A.  For quiet setting, it produces a maximum  11:08:38
7  frequency of 45,000 cycles per second or 45  11:08:42
8  kilohertz. It produces a minimum sound at 20,000  11:08:48
9  cycles per second or 20 kilohertz, that's entirely  11:08:52
10  ultrasound. There is no sonic component to it. I  11:08:58
11  can put my head down next to the Transonic Pro and  11:09:02
12  hear nothing when I've got it on in that setting.  11:09:06
13    Q.  How do you know that?  11:09:08
14    A.  I've put my head down and listened to  11:09:10
15  it.  11:09:12
16    Q.  Sorry, I was asking that as to the  11:09:12
17  figures you stated. For the quiet setting, how do  11:09:14
18  you know that?  11:09:18
19    A.  It says right here.  11:09:18
20    Q.  Are those numbers listed here?  11:09:20
21    A.  Yes.  11:09:22
22    Q.  So I must be missing them.  11:09:24
23    A.  Oh, it just says primarily ultrasonic,  11:09:28
24  but that's what that means.  11:09:30

Page 63

1    Q.  Have you seen documents saying that?  11:09:32
2    A.  Yes.  11:09:34
3    Q.  Okay. Did you consider those in forming  11:09:34
4  your opinion?  11:09:36
5    A.  Yes.  11:09:36
6    Q.  Are they listed in your report?  11:09:38
7    A.  I've just recently gone back to the  11:09:42
8  manufacturer to get that information, so, no, they  11:09:46
9  weren't listed there.  11:09:48
10    Q.  So for quiet here, it says sounds that  11:09:50
11  are primarily ultrasonic, do you see that?  11:09:54
12    A.  Yes.  11:09:56
13    Q.  Okay. What do you understand the word  11:09:58
14  primarily to mean?  11:10:00
15    A.  I tend to see it as hedging your bet a  11:10:02
16  little bit. It means that it might be possible  11:10:04
17  that it produces something in the sonic range  11:10:08
18  accidentally. There is always -- sound production  11:10:10
19  is an uncertain thing with equipment. No matter  11:10:14
20  how much you refine your stereo, you may still get  11:10:18
21  excess vibration and base and so forth coming  11:10:22
22  through it.  11:10:24
23    Q.  Okay. So we're not entirely sure  11:10:26
24  whether or not some sonic sounds were coming  11:10:28

Page 64

1  through at the quiet setting, right?  11:10:30
2    A.  Well, by definition, if I couldn't hear  11:10:32
3  anything on it, there is no sonic.  11:10:34
4    Q.  Okay. Would you agree with me that the  11:10:38
5  word primarily would mean for the most part or  11:10:42
6  mainly?  11:10:46
7    MR. OSTOJIC: Object to form, foundation.  11:10:48
8  BY THE WITNESS:  11:10:52
9    A.  That's its meaning.  11:10:52
10  BY MR. KOPEL:  11:10:54
11    Q.  Okay. And by definition, right, if the  11:10:54
12  word primarily is there, that's implying that there  11:10:56
13  is something else there as well, right?  11:10:58
14    MR. OSTOJIC: Object to form, foundation.  11:10:58
15  BY THE WITNESS:  11:11:00
16    A.  We often use words in our sentences to  11:11:00
17  add just a little more meaning or variation to them  11:11:06
18  which don't really have a substantive place in what  11:11:10
19  we're trying to say. Think of our president.  11:11:14
20  BY MR. KOPEL:  11:11:20
21    Q.  So is it -- it's your belief that they  11:11:20
22  added the word primarily here for no reason?  11:11:28
23    MR. OSTOJIC: Object to form, foundation, may  11:11:32
24  call for speculation as to what the manufacturers  11:11:34

Page 65

17 (Pages 62 - 65)

1  did, but go ahead and answer.                11:11:38
2  BY THE WITNESS:                              11:11:40
3      A.   Yeah, I think that it just allows if   11:11:40
4  somebody said, wait, it's making something I can   11:11:42
5  hear, you can say, okay, we did say primarily. It   11:11:46
6  doesn't mean the unit is defective.         11:11:52
7  BY MR. KOPEL:                                11:11:52
8      Q.   Okay. But you would -- and I'm going to   11:11:52
9  move off this real soon, but would you agree that   11:11:56
10  by the -- I understand that people might put things   11:12:00
11  in sometimes purposefully, but would you agree that   11:12:02
12  by the plain meaning of the word primarily implies   11:12:06
13  that there is something else present?        11:12:08
14      MR. OSTOIC: Object, asked and answered, form   11:12:10
15  and foundation, but go ahead.               11:12:12
16  BY THE WITNESS:                             11:12:18
17      A.   I read it to mean that it should all be   11:12:18
18  above -- every intentionally produced sound is to   11:12:22
19  be above 20,000 cycles per second, but there is   11:12:28
20  always a possibility of some side product sound.   11:12:32
21  Nothing is absolute in the realm of sound when   11:12:38
22  you're talking a few thousand or a few hundred   11:12:42
23  cycles per second.                          11:12:42
24  BY MR. KOPEL:                               11:12:46

Page 66

1      Q.   And you're not seen test results     11:12:46
2  indicating whether or not sonic sound is present at   11:12:50
3  the quiet setting, have you?                 11:12:54
4      A.   I'm trying to remember whether Mankin   11:13:00
5  tested it, T-Pro or not.                    11:13:04
6      A.   Mankin did not test it.             11:13:06
7      A.   Okay, then I probably have not seen   11:13:06
8  that                                        11:13:08
9      Q.   Okay. Almost done with this document   11:13:12
10         Okay. Can you please look at the     11:13:18
11  section here which says about ultrasonic and sonic   11:13:20
12  sounds?                                     11:13:24
13      A.   Uh-huh.                           11:13:24
14      Q.   Do you see the second sentence says   11:13:26
15  ultrasound cannot travel through walls or closed   11:13:30
16  doors?                                      11:13:34
17      A.   Uh-huh.                           11:13:34
18      Q.   Do you agree with that?            11:13:34
19      A.   Closed doors is a good question. It   11:13:38
20  depends where the unit is placed. In my case,   11:13:40
21  there is an inch gap under the back door in my   11:13:46
22  hallway. It can get under that. You'd have to   11:13:50
23  have a securely sealed door to stop it.      11:13:52
24      Q.   Okay. But you never -- I mean in the   11:13:54

Page 67

1  course of your work as a consultant for Bird-X, you   11:14:02
2  never mentioned to them that there was anything   11:14:06
3  inaccurate about this statement, correct?    11:14:08
4      A.   Not at all. I mean they're admitting   11:14:10
5  that it doesn't penetrate hard surfaces, it doesn't   11:14:14
6  hold up the decibel level, the sound frees in soft   11:14:18
7  surfaces, carpeting, couches other things will   11:14:24
8  absorb that very quickly. Hard surfaces will   11:14:26
9  reflect the sound which they generally have failed   11:14:30
10  to acknowledge in this.                     11:14:32
11      Q.   So in a room with carpeting, would you   11:14:38
12  say that ultrasonic would struggle to be effective   11:14:40
13  because the carpet would absorb the sound?   11:14:48
14      MR. OSTOIC: Object to form. Go ahead.   11:14:50
15  BY THE WITNESS:                             11:14:52
16      A.   It will reduce the amplitude of the   11:14:52
17  sound with regard to the distance that it travels.   11:14:54
18  Carpeting, any soft material, insulation and so   11:14:58
19  forth greatly reduces the range that the sound can   11:15:04
20  travel                                      11:15:06
21  BY MR. KOPEL:                               11:15:06
22      Q.   And due to that, it could cause it to be   11:15:06
23  ineffective in repelling and driving out rodents?   11:15:10
24      A.   Yes. It's only good for the range that   11:15:12

Page 68

1  the sound can travel, and that's impacted by   11:15:14
2  anything, including cardboard boxes.         11:15:16
3      Q.   Have you seen testing on this point?   11:15:18
4      A.   Yes.                             11:15:20
5      Q.   Can you please describe that testing?   11:15:22
6      A.   Dr. Potter himself provided the       11:15:24
7  reference for Gould 1984, Goeld. et al., 1984.   11:15:31
8  They were testing five different brands of   11:15:36
9  ultrasonic repellers, and their tests included   11:15:40
10  putting up a 3 centimeter barrier of cardboard.   11:15:42
11  and that reduced the effectiveness of sound by   11:15:50
12  60 percent on the other side, the force of sound by   11:15:56
13  60 percent on the other side of that. Now, 3   11:15:58
14  centimeters is just over one-tenth of an inch   11:16:04
15  thick. Most of our cardboard is two to three times   11:16:06
16  that.                                       11:16:08
17      Q.   Do you suppose you would see the same   11:16:08
18  effect with wood?                           11:16:10
19      A.   Hard woods would actually tend to   11:16:14
20  reflect sound on their surface, soft woods would   11:16:18
21  tend to absorb it.                          11:16:20
22      Q.   Okay. But either way it could not   11:16:20
23  penetrate it, is that correct?              11:16:22
24      A.   Yes.                             11:16:26

Page 69

18 (Pages 66 - 69)

1   Q. How about plaster?   11:16:28
2   A. Plaster, good hard plaster and gypsum   11:16:30
3   board with heavy layers of paint in my experience   11:16:36
4   reflects the sound, bounces it into other   11:16:38
5   directions, but it doesn't seem to dump the sound.   11:16:42
6   Q. What about metal?   11:16:46
7   A. Reflects it. The thing is to dampen the   11:16:54
8   sound, you have to have the sound move the   11:16:54
9   molecules and particles of what's there. Particles   11:16:56
10   of glass, particles of steel and such are so   11:17:00
11   thoroughly bound together that they don't get to   11:17:04
12   move them. But in moving a wave of sound through   11:17:06
13   carpet, through fabric, through cardboard, each   11:17:12
14   time it hits something, it loses a little force.   11:17:18
15   Q. Okay. And can you think of any solid   11:17:22
16   material that ultrasound can penetrate?   11:17:24
17   A. Not in any degree, no,   11:17:30
18   Q. What about carpeting, curtains and other   11:17:34
19   soft materials, have you seen testing to show that   11:17:38
20   these materials absorb ultrasound?   11:17:44
21   A. It is understood that they would. I   11:17:46
22   haven't seen specific tests of exactly the degree.   11:17:50
23   Q. Okay. And do you suppose that effect   11:17:54
24   could be seen from a couch?   11:17:56

Page 70

1   A. I think what you'd really have to do is   11:18:00
2   to go to the physics of sound transfer and   11:18:04
3   ultrasound at the professional experts' level, and   11:18:06
4   I think they've tested the sound absorptions of   11:18:10
5   everything you can imagine, but I've not gone to   11:18:12
6   those references for this.   11:18:14
7   Q. Okay. What about the shadow areas, can   11:18:16
8   you please explain what that is?   11:18:28
9   A. A shadow area is something which has   11:18:28
10   been talked about, but they haven't put anything in   11:18:32
11   those areas to document its actual existence to the   11:18:34
12   best of my knowledge. In my own studies, I have a   11:18:38
13   shadow area which should be opaque to ultrasound at   11:18:42
14   the top of my stairs.   11:18:46
15   Q. I'm really sorry to interrupt you. I   11:18:50
16   just want to take a step back. Can you just define   11:18:52
17   what that is, please?   11:18:56
18   A. A shadow area is an area where the   11:18:56
19   presence of objects between you and it reduces the   11:18:58
20   volume of the sound.   11:19:02
21   Q. Could that be like a corner in a wall,   11:19:04
22   for instance?   11:19:08
23   A. Yeah, exactly, a corner in a wall or a   11:19:08
24   corner of a carpet or a corner of a dresser,   11:19:10

Page 71

1   anything like that, some of the sound might be   11:19:12
2   reflected back, some only a small part comes   11:19:16
3   around.   11:19:20
4   Q. So according to this concept, if a   11:19:20
5   repeller is located in an outlet near a corner of a   11:19:28
6   room, the sound waves would not be able to reach   11:19:32
7   around that corner, is that correct?   11:19:34
8   A. Exactly. It's no directional that they   11:19:36
9   should not. If it were facing a very solid, hard   11:19:40
10   smooth surface, like any other sound, there is   11:19:46
11   going to be some bouncing off of that which might   11:19:48
12   reduce the sound shadow, but, yes, it will   11:19:54
13   definitely be an area which should not be fully   11:19:58
14   affected.   11:20:00
15   MR. KOPEL: Okay. Let's take a quick break,   11:20:02
16   please.   11:20:02
17   THE VIDEOGRAPHER: We're off the record at   11:20:04
18   11:3 a.m. at the end of media 1.   11:20:04
19   (WHEREUPON, a short break was had.)   11:31:54
20   THE VIDEOGRAPHER: We are back on the record   11:31:54
21   at 11:25 a.m. with the beginning of media 2.   11:31:56
22   BY MR. KOPEL:   11:31:56
23   Q. Can you please turn back to Exhibit 1?   11:32:00
24   There is no paragraph numbers or page numbers, but   11:22:06

Page 72

1   I'm referencing the second to the last page of your   11:32:10
2   report, not including exhibits where you discuss   11:32:12
3   your work with the Transonic Pro unit.   11:32:18
4   A. Okay.   11:32:22
5   Q. In the middle of the paragraph, there is   11:32:26
6   a sentence starting with the words "the first   11:32:28
7   year," do you see that?   11:32:30
8   A. Second paragraph, you said?   11:32:34
9   Q. The first paragraph on the page. So   11:32:36
10   this was the same page where we talked about the   11:32:42
11   non-peer-reviewed publications.   11:32:44
12   MR. OSTOJIC: It's the tenth line down maybe.   11:32:48
13   THE WITNESS: Before the actual studies?   11:33:14
14   MR. OSTOJIC: Right.   11:33:16
15   THE WITNESS: Got it.   11:33:32
16   BY MR. KOPEL:   11:33:32
17   Q. Do you see that?   11:33:32
18   A. Yes.   11:33:34
19   Q. So the sentence reads, "The first year   11:33:34
20   the sound unit was present but not turned on in the   11:33:36
21   back hall of the house. The second year it was on   11:33:38
22   and producing ultrasounds as low as volume   11:33:40
23   setting," do you see that?   11:33:44
24   A. Uh-huh.   11:33:46

Page 73

**Page 74**

1  Q.  Okay. Can you please flip to the      11:33:48
2  Transonic Pro mice study, and I'm going to be      11:33:50
3  referencing the abstract section, please?      11:33:58
4  A.  Okay.      11:34:06
5  Q.  This looks like it might be -- the      11:34:10
6  second sentence starts with the word test, do you      11:34:12
7  see that?      11:34:16
8  A.  Yes.      11:34:18
9  Q.  Oh, actually, the third sentence starts      11:34:22
10  with the word test also, sorry. "Test used one      11:34:26
11  Transonic Pro in the back mail/entry. Dates 2 of      11:34:28
12  August 5 December in both 2009 and 2010 with the      11:34:32
13  ultrasonic -- with the ultrasound unit set to on in      11:34:38
14  2009 and to off in 2010." Do you see that?      11:34:42
15  A.  Yeah, I obviously reversed that in my      11:34:50
16  writing here.      11:34:56
17  Q.  Can you please look at Exhibit 2 real      11:35:26
18  quick? Keep everything else handy. You can keep      11:35:28
19  it open to the page actually with the study. Can      11:35:32
20  you look at Exhibit 2 on page 12?      11:35:34
21  A.  Page 12.      11:35:54
22  Q.  Middle of the third paragraph, there is      11:35:58
23  a sentence starting, "I removed,"      11:36:02
24  A.  Yes. I've obviously in writing up that      11:36:06

**Page 75**

1  transposed the two years in terms of which was on      11:36:10
2  and which was off,      11:36:14
3  Q.  So which one is correct? Exhibit 1 and      11:36:14
4  2, are those correct, or is the --      11:36:20
5  A.  The abstract will definitely be telling      11:36:22
6  it correctly.      11:36:24
7  Q.  Abstract is correct, okay. So the year      11:36:26
8  that it was on was 2009, the year it was off was      11:36:26
9  2010, right, okay.      11:36:30
10  Can you please take a look at the      11:36:32
11  methods section, so it's the next page?      11:36:34
12  A.  Yeah, 2009 it was off, 2010 it was on,      11:36:38
13  that's correct, that's in the abstract.      11:36:46
14  Q.  Okay. If there is any inconsistencies      11:36:48
15  between --      11:36:50
16  A.  It was just a --      11:36:50
17  Q.  So the actual study is going to have the      11:36:52
18  correct information?      11:36:54
19  A.  Yeah. The abstract has the definitely      11:36:56
20  correct information. It's easy just sitting at the      11:36:58
21  computer to type in backwards. So what was your      11:37:00
22  next question?      11:37:04
23  Q.  Can you please take a look at the      11:37:08
24  methods section, so it's the next page?      11:37:12

**Page 76**

1  MR. OSTOJIC: Next page of which Exhibit?      11:37:18
2  MR. KOPEL: Sure. We're still on Exhibit 1 is      11:37:20
3  the Transonic Pro study.      11:37:22
4  THE WITNESS: Yeah.      11:37:26
5  MR. OSTOJIC: After the abstract?      11:37:26
6  MR. KOPEL: Correct, yes.      11:37:28
7  MR. OSTOJIC: Okay, I got it.      11:37:28
8  BY MR. KOPEL:      11:37:28
9  Q.  By the way, is this whole thing called      11:37:30
10  an abstract or just that first portion, that's      11:37:32
11  called the abstract?      11:37:34
12  A.  The first portion is the abstract. Once      11:37:36
13  you get the introduction, you're past the abstract.      11:37:36
14  The abstract summarizes as briefly as possible the      11:37:40
15  entire content of the paper so somebody can look at      11:37:42
16  it and decide whether they need to read the whole      11:37:46
17  thing or not.      11:37:50
18  Q.  So the first paragraph after      11:37:56
19  methods -- and here's a long paragraph      11:37:58
20  again. It reads, "Rather than use an unnatural      11:38:02
21  lab-based testing using Plexiglas enclosures and      11:38:04
22  confined mice populations, I chose to use free      11:38:08
23  natural populations of mice as in test designs      11:38:12
24  previously used to test efficacy of sound devices      11:38:14

**Page 77**

1  against the Norway rat, Rattus norvegicus, Ashton      11:38:18
2  1999. I feel such real world tests on mice      11:38:22
3  populations produce far more valid results than      11:38:28
4  artificial enclosure studies based on my 35 years      11:38:30
5  field experience doing research in natural settings      11:38:34
6  as a PhD in ethology. Equipment efficacy is best      11:38:38
7  tested in a natural environment for any species for      11:38:42
8  normal responses to novel stimuli are far more      11:38:46
9  likely to be witnessed in such settings than in      11:38:48
10  unfamiliar surroundings. This same principle of      11:38:52
11  testing in natural settings has also been strongly      11:38:54
12  advocated for in print (Meck and Stein 1979)      11:38:56
13  expressly as a means of obtaining the most valid      11:39:00
14  results of new equipment to be tested in repelling      11:39:04
15  vertebrate rests," Did I read that correctly?      11:39:06
16  A.  You did.      11:39:10
17  Q.  Okay, thanks. Do you believe that a      11:39:10
18  test using Plexiglas enclosures and confined mouse      11:39:22
19  populations would be an unnatural lab-based      11:39:26
20  testing?      11:39:30
21  MR. OSTOJIC: Object to form.      11:39:32
22  BY THE WITNESS:      11:39:34
23  A.  It would be the most frequent form of      11:39:34
24  testing done, not necessarily the most natural.      11:39:36

20 (Pages 74 - 77)

1  BY MR. KOPEL:                                    11:39:40
2      Q.  Is that a yes?                           11:39:40
3      A.  I'd have to hear the question again to   11:39:42
4  be sure exactly.                                 11:39:44
5      Q.  I'll say it again, no problem. Do you    11:39:46
6  believe that a test using Plexiglas enclosures and  11:39:48
7  confined mouse populations would constitute       11:39:50
8  unnatural lab-based testing?                     11:39:52
9      A.  Versus the alternative, yes.            11:40:02
10     Q.  Now, here you say that, "I feel such     11:40:22
11 real world tests of free populations produce far   11:40:24
12 more valid results than artificial enclosure       11:40:28
13 studies," do you see that?                       11:40:30
14     A.  Yes.                                     11:40:32
15     Q.  What do you mean by far more valid       11:40:32
16 results?                                         11:40:40
17     A.  Well, when you have an animal in an      11:40:42
18 artificial environment, the things that you record  11:40:46
19 and see may be a reaction to things in that        11:40:50
20 artificial environment, an unnatural environment,  11:40:54
21 so you aren't necessarily measuring the effect of  11:40:58
22 the equipment. You can be measuring how much does  11:41:02
23 being put in a strange environment affect your     11:41:06
24 behavior. I could give you a good analogy.        11:41:10
Page 78

1      Q.  Go ahead.                               11:41:12
2      A.  Do you want to conflict the difference  11:41:14
3  between being at a party with a whole bunch of     11:41:18
4  friends or being the person that goes into the     11:41:20
5  basement to find out what's making that unusual    11:41:22
6  noise? You know, if you're the one goes in the     11:41:24
7  basement, the artificial scary environment, your   11:41:26
8  responses will be very different, your behaviors   11:41:32
9  will be very different.                          11:41:34
10     And so take it out of the natural            11:41:36
11 environment, throw them in a completely strange    11:41:38
12 environment, you know, it's trying to figure out   11:41:40
13 what the hell am I doing here, what are these      11:41:44
14 smells, what are these sounds, nothing around me   11:41:46
15 makes sense.                                     11:41:50
16     Q.  So based on that, would you say that     11:41:50
17 tests conducted in unnatural lab-based environments  11:41:54
18 are -- let me rephrase.                          11:42:00
19     Would you say that it is difficult to        11:42:04
20 make real world conclusions based on tests        11:42:06
21 conducted in unnatural lab-based environments?    11:42:10
22     MR. OSTOJIC: Object to form. Go ahead.       11:42:14
23 BY THE WITNESS:                                  11:42:14
24     A.  I would say that's the most common       11:42:14
Page 79

1  environment in which tests are done, and they can  11:42:18
2  lead to valid results if you have set up proper    11:42:20
3  design and allowed the animals time to adapt       11:42:24
4  BY MR. KOPEL:                                    11:42:28
5      Q.  But those results would be less valid    11:42:28
6  than real world tests, correct?                  11:42:32
7      MR. OSTOJIC: Object to form.                 11:42:34
8  BY THE WITNESS:                                  11:42:36
9      A.  I prefer to see real world, but they are  11:42:36
10 probably less than 1 or 2 percent of all the tests  11:42:42
11 reported or done.                                11:42:46
12 BY MR. KOPEL:                                    11:42:48
13     Q.  Why is that?                            11:42:48
14     A.  Because it's so difficult to do if you   11:42:48
15 don't have them enclosed where you can see them.   11:42:52
16 Most researchers want them on the campus in a room  11:42:54
17 next to their office, you don't have to go out. My  11:42:58
18 research has caused me to drive 120 to 150 miles a  11:43:04
19 day to carry on in-field observations of animals   11:43:08
20 from sunrise to sunset on numerous occasions. It's  11:43:10
21 not convenient.                                  11:43:14
22     Q.  When testing mice or rats inside of      11:43:18
23 Plexiglas enclosures and with confined populations,  11:43:24
24 do you believe that the mice or rats would possibly  11:43:42
Page 80

1  react differently to the equipment than they would  11:43:48
2  in real world environments?                      11:43:50
3      MR. OSTOJIC: Object to form, foundation,     11:43:52
4  incomplete hypothetical. but go ahead.           11:43:54
5  BY THE WITNESS:                                  11:43:58
6      A.  I would say that that test situation     11:43:58
7  allows you to test the efficacy of the one thing   11:44:04
8  you're doing because you've eliminated all the     11:44:08
9  other distractions, sources of error; so if you do  11:44:10
10 it with the two sides absolutely equal from the    11:44:16
11 beginning and expose the animals to it, turn on a  11:44:20
12 sound unit or any other thing to make pests go     11:44:24
13 away, you're measuring the effect only of that     11:44:28
14 action. so there is some reason to do that. It     11:44:30
15 gets rid of confounding sources of error.         11:44:34
16 BY MR. KOPEL:                                    11:44:38
17     Q.  What are the disadvantages to using      11:44:38
18 Plexiglas enclosures and confined mouse           11:44:44
19 populations?                                     11:44:46
20     A.  As long as you keep the mouse numbers at  11:44:48
21 a reasonable level, yes, they have some unnatural  11:44:50
22 behaviors. If you overcrowd them, you're going to  11:44:56
23 have a mess and you won't be testing what you      11:45:02
24 intended to test. Plexiglas allows you to see and  11:45:04
Page 81

21 (Pages 78 - 81)

1  council the creatures which is an important part   11:45:12
2  of getting an answer. And in the case of most   11:45:14
3  studies like that, psychiatry, you're taking the   11:45:20
4  rats which have been used to being in metal cages   11:45:24
5  in the back room and in Plexiglas for their whole   11:45:26
6  lives. The validity of those tests doesn't take   11:45:30
7  into account strange surroundings as bringing in   11:45:36
8  wild animals does.   11:45:40
9  Q. Okay. So if you were to take wild   11:45:46
10  animals and confine them in Plexiglas enclosures,   11:45:48
11  that might affect their behavior due to the fact   11:45:56
12  that they are not used to such an environment, is   11:45:58
13  that correct?   11:46:04
14  A. It might, but if you put them in a   11:46:04
15  pretest situation and find them to not being   11:46:06
16  behaving in abnormal ways, then it's valid to begin   11:46:10
17  the test.   11:46:16
18  Q. Okay. And as it pertains to the manner   11:46:16
19  in which people would typically use ultrasonic pest   11:46:20
20  repellers, you wouldn't typically expect them to be   11:46:24
21  using them inside Plexiglas enclosures, would you?   11:46:26
22  A. You'd expect them to be using them   11:46:30
23  within the design specifications and test   11:46:32
24  specifications recommended.   11:46:36
Page 82

1  MR. KOPEL: Can you please repeat the   11:46:40
2  question?   11:46:40
3  (WHEREUPON, the record was read   11:46:40
4  as requested.)   11:46:40
5  BY THE WITNESS:   11:46:40
6  A. I would not   11:46:58
7  BY MR. KOPEL:   11:47:02
8  Q. It would be reasonable to assume that   11:47:02
9  they would use them in their homes, correct?   11:47:04
10  A. The purchasers?   11:47:08
11  Q. Yes.   11:47:10
12  A. Yes.   11:47:10
13  Q. And people don't live in Plexiglas   11:47:10
14  containers, do they?   11:47:14
15  A. Not most of the ones I know.   11:47:16
16  Q. And people's homes are far larger than   11:47:16
17  Plexiglas containers, correct?   11:47:24
18  MR. OSTOJIC: Object to form.   11:47:24
19  BY THE WITNESS:   11:47:26
20  A. Of course.   11:47:26
21  BY MR. KOPEL:   11:47:28
22  Q. And people's homes have corners in them   11:47:28
23  as opposed to Plexiglas containers, is that   11:47:32
24  correct?   11:47:34
Page 83

1  A. Plexiglas containers have corners.   11:47:34
2  Q. I actually misspoke. There is a   11:47:38
3  possibility for sound shadows in people's homes   11:47:40
4  whereas there would not be that possibility in a   11:47:44
5  Plexiglas container, is that correct?   11:47:48
6  A. No, there is still possibilities for   11:47:48
7  sound shadows. It depends on how exactly you   11:47:50
8  position the unit, but it's very linear, very   11:47:54
9  narrow focus. So even if Plexiglas is only this   11:47:58
10  big by that big --   11:48:00
11  Q. Right.   11:48:02
12  A. -- you got a unit here, it's going to be   11:48:02
13  affecting a path across that Plexiglas container   11:48:06
14  which is at most this wide on the other side.   11:48:10
15  These are sound shadows over here and here.   11:48:14
16  Q. Right. How narrow is it?   11:48:18
17  A. It depends on exactly the size of the   11:48:18
18  speaker and the orientation of it, but it will   11:48:20
19  broaden as it crosses the room just like a pattern   11:48:24
20  of shot from a shotgun gets bigger as it gets   11:48:30
21  farther away.   11:48:32
22  Q. Could an ultrasonic device -- would a   11:48:32
23  single speaker ultrasonic device broadcast -- let   11:48:44
24  me rephrase.   11:48:50
Page 84

1  Would an ultrasonic device affect an   11:48:52
2  area behind it?   11:48:54
3  A. No.   11:48:56
4  Q. Would it affect the area immediately   11:48:56
5  next to it?   11:49:00
6  A. Not at close range.   11:49:02
7  Q. How about underneath it?   11:49:04
8  A. No.   11:49:06
9  Q. And Plexiglas containers don't have   11:49:10
10  furniture, correct?   11:49:12
11  A. Correct.   11:49:14
12  Q. And they don't have carpeting, correct?   11:49:14
13  A. Yes, they do not have any furniture.   11:49:18
14  Q. And furniture is something that could   11:49:26
15  affect the efficacy of ultrasonic devices, correct?   11:49:28
16  A. True.   11:49:32
17  Q. And Plexiglas containers do not   11:49:34
18  have -- I don't know if this was captured on the   11:49:36
19  record earlier -- carpeting, correct?   11:49:40
20  A. One assumes not.   11:49:40
21  Q. And carpeting could affect the efficacy   11:49:42
22  of ultrasonic devices, is that correct?   11:49:46
23  A. Yes.   11:49:48
24  Q. Plexiglas containers do not contain   11:49:50
Page 85

22 (Pages 82 - 85)

1  beds, is that correct?                    11:49:52
2    A.   Yes.                               11:49:54
3    Q.   And the presence of a bed in a room    11:49:56
4  could affect the efficacy of an ultrasonic device,    11:49:58
5  is that correct?                          11:50:00
6    A.   Yes.                               11:50:02
7    Q.   Now, in this test as to the Transonic    11:50:02
8  Pro, you were comparing the amount of mice you    11:50:24
9  found in the year 2010 with the year of -- excuse    11:50:28
10  me, with the amount of mice you found in the year    11:50:32
11  2009, is that correct?                    11:50:36
12    A.   Right.                            11:50:38
13    Q.   And in 2010 with the device off, you    11:50:38
14  found 32 mice, is that correct?           11:50:42
15    A.   Yes.                              11:50:44
16    Q.   And in 2009 with the device on, you saw    11:50:44
17  zero mice, is that correct?               11:50:48
18    A.   Correct.                          11:50:50
19    Q.   Why --                            11:50:50
20    A.   And if you look under the tomatoes    11:50:56
21  gnawed, you'll find that the person who put these    11:51:00
22  labels into the graph messed up. These were both    11:51:00
23  in different points in 2009.              11:51:04
24    Q.   Oh, I see, okay.  But we're sure about    11:51:08

Page 86

1  2009 versus 2010?                         11:51:12
2    A.   On the tomatoes, yes.               11:51:12
3    Q.   Okay, good.  So let's say the device had    11:51:16
4  been off in 2009, how many mice would you have seen    11:51:20
5  in that year?                            11:51:26
6    A.   If it had been off in 2009?  This is the    11:51:28
7  control study, I have no idea, but the ground    11:51:34
8  numbers that I trapped in that farm house year by    11:51:36
9  year since 1960 when I took over emptying the mouse    11:51:40
10  traps would have fallen into the range of 25 to 35    11:51:44
11  mice during the fall.                     11:51:48
12    Q.   Have you reported the numbers that you    11:51:50
13  found year by year other than -- at any point prior    11:51:52
14  to 2009?                                 11:51:58
15    A.   There is a citation about mouse catching    11:52:02
16  by catching by Blue Jays which just covered a    11:52:06
17  little bit.  I mean we went home for the week of    11:52:10
18  Christmas, and I've forgotten whether it was 8 or    11:52:14
19  10 mice that I took out and put in the backyard in    11:52:16
20  that few days in the snow and was curious where    11:52:20
21  they went and watched until I finally found the    11:52:24
22  Blue Jays carrying them off.              11:52:28
23         But I have over the years kept a journal    11:52:30
24  of what was killed in hunting up there, and my late    11:52:36

Page 87

1  wife some point in the 1980s decided to start    11:52:42
2  keeping records of the mice captured throughout the    11:52:44
3  year, so they are there.  They are not absolutely    11:52:48
4  complete, but I mean they're enough to say, yeah,    11:52:50
5  30 to 40 not a bad annual average for mouse caught,    11:52:54
6  mice caught.                             11:53:00
7    Q.   But the only year you reported here is    11:53:00
8  2010 by comparison, correct?              11:53:02
9    A.   Yes.                              11:53:04
10    Q.   And why was it important to report the    11:53:04
11  number you caught in 2010?                11:53:06
12    A.   Because the number caught in 2010 with    11:53:10
13  the unit on -- wait.                      11:53:16
14    Q.   The unit was off in 2010.           11:53:22
15    A.   Unit off.  Yeah, so it was zero trapped,    11:53:24
16  yeah, they're both there.  I'm not sure why we have    11:53:36
17  two graphs in there, but, yes, the number trapped    11:53:38
18  in 2010 with the unit off, that shouldn't -- that    11:53:42
19  should be on the unit on.  I needed to look at that    11:53:50
20  more closely.                            11:53:54
21    Q.   I'm sorry, I'm confused.  What year was    11:53:56
22  the unit on?                             11:53:58
23    A.   I hadn't gone back and looked at these    11:54:14
24  appropriately.                           11:54:36

Page 88

1    Q.   Are you finding an error in there right    11:54:38
2  now?                                     11:54:40
3    A.   I'm finding that the person who did    11:54:40
4  these graphs was the secretary for Bird-X.    11:54:42
5    Q.   Okay.                             11:54:48
6    A.   And I had not caught her mistakes in the    11:54:48
7  keys.                                    11:54:52
8    Q.   I see.  Who drafted this report?    11:54:52
9    A.   I drafted the entire report, but she did    11:54:56
10  the graphics.  My computer skills don't rank at the    11:55:00
11  top.                                     11:55:04
12    Q.   Okay.                             11:55:04
13    A.   And she was the one who put together the    11:55:06
14  poster with the pictures and the other things.    11:55:08
15    A.   And finally I think that she messed up    11:55:10
16  on the information that went with it.    11:55:12
17    Q.   So what's incorrect in this graph, and    11:55:16
18  I'm referring to Figure 2 right now?       11:55:18
19    A.   Mice trapped with the unit off    11:55:24
20  2010 -- okay.  Set to on in 2009, off in 2010,    11:55:28
21  okay.  Or in 2009, off -- oh, they're right.    11:55:52
22    Q.   There's no problem?                 11:55:58
23    A.   I was looking at the graph of the    11:56:00

Page 89

**Page 90**

1 droppings and getting confused at that.   11:56:02
2   Q.  Don't worry about it.   11:56:04
3   A.  So Figure 2, the number caught in 2009   11:56:06
4 with it on, zero; the number caught in 2010, same   11:56:10
5 exact dates to begin the study from August 5th I   11:56:16
6 think till December 5th, so same season both years,   11:56:22
7 same number of days, catching 32 mice in one   11:56:26
8 compared to the other, if you do the Chi-square of   11:56:32
9 it, it's right at the edge of damn near impossible.   11:56:34
10 In fact, I had to add a one, pretend I caught a   11:56:38
11 mouse in 2009 to be able to do a Chi-square test   11:56:42
12 because you can't use a zero in it, so the   11:56:46
13 statistician said we'll put in a one and run the   11:56:50
14 test that way.   11:56:52
15   Q.  So I appreciate that explanation, and I   11:56:54
16 want to talk on a much more basic level. Can you   11:56:56
17 just explain what is the importance of comparing   11:57:00
18 the years 2009 versus 2010?   11:57:02
19   A.  To get a baseline evidence of the 2009   11:57:06
20 with it off is the standard, you know, unconfined   11:57:14
21 test. You know, it's a field test in a natural   11:57:20
22 environment.   11:57:22
23   Q.  I'm sorry to interrupt you. 2009 the   11:57:22
24 unit is on, correct?   11:57:28

**Page 91**

1   A.  Yeah, the mice traps with the unit off.   11:57:28
2 That's simply saying that this is a natural --   11:57:32
3   MR. OSTOJIC:  Isn't 2009 on?   11:57:32
4   BY THE WITNESS:   11:57:38
5   A.  Excuse me, 2009 on, 2010 -- yeah, 2010   11:57:38
6 with it off you get the natural number of mice you   11:57:42
7 expect in this completely unconfined population.   11:57:48
8   BY MR. KOPEL:   11:57:52
9   Q.  Is that the control?   11:57:52
10   A.  That's the control.   11:57:54
11   Q.  Okay. And is that -- I'm sorry, go   11:57:56
12 ahead.   11:57:58
13   A.  And in 2009 with the unit on, that's   11:57:58
14 what happened, so it's the number of mice that came   11:58:02
15 far enough up the stairs to meet the traps but   11:58:04
16 didn't come above that, didn't even step into the   11:58:08
17 traps which means in effect that the sound was   11:58:12
18 going down the staircase a bit because of the   11:58:14
19 reflections.   11:58:22
20   It shows you that the thing being on was   11:58:22
21 very effective at stopping the mice from entering   11:58:26
22 the house. That and the lack of droppings in 2009   11:58:28
23 when it's on meant that they weren't going into the   11:58:32
24 kitchen. The repeat studies, the repeat four years   11:58:34

**Page 92**

1 since then have kept the same pattern.   11:58:38
2   Q.  You know, without the data from 2010 or   11:58:42
3 other years, let's say --   11:58:48
4   A.  It would be meaningless.   11:58:50
5   Q.  Okay, so let me just finish my question.   11:58:52
6 You're anticipating correctly. If you had only   11:58:54
7 looked at 2009 with the unit on and seen zero, it   11:58:56
8 would be a meaningless result, is that correct?   11:59:00
9   A.  From a scientific standpoint,   11:59:02
10 absolutely.   11:59:04
11   Q.  Why?   11:59:06
12   A.  Because you have to have a control.   11:59:06
13   Q.  And without a control, as a matter of   11:59:06
14 science, the data from a study is meaningless, is   11:59:14
15 that correct?   11:59:18
16   A.  Pretty much so, yes.   11:59:18
17   Q.  Can you please look at a portion of   11:59:32
18 this -- of the Transonic report titled, "Study   11:59:40
19 Design?"   11:59:44
20   A.  Yes.   11:59:48
21   Q.  I'm looking at the third sentence here.   11:59:54
22 It reads, "This unit was set to the medium volume   11:59:58
23 and spider setting on the options for sound output   12:00:04
24 for the test. I did not use the mice sound setting   12:00:06

**Page 93**

1 since prior spiders tests had indicated mice   12:00:10
2 responded more strongly to the spider setting than   12:00:14
3 to the predesignated mice setting of the unit's   12:00:16
4 controls," do you see that?   12:00:20
5   A.  I do.   12:00:20
6   Q.  Okay. So during the course of your   12:00:22
7 testing with Transonic Pro when the unit was set to   12:00:26
8 on, was it set to the medium volume and spider   12:00:32
9 setting?   12:00:34
10   A.  No, the medium volume is incorrect.   12:00:36
11 It's never been used where I could hear it which   12:00:38
12 means it had to be on the quiet setting. It has   12:00:42
13 never produced an audible sound for me.   12:00:46
14   Q.  Is that an error in this report?   12:00:50
15   A.  This is an error in that report.   12:00:52
16   Q.  Can you turn back to the abstract,   12:00:54
17 please? You know, never mind,   12:00:56
18   Okay. So your initial and rebuttal   12:01:06
19 export reports, Exhibit 1 and 2, say that it was   12:01:14
20 turned to the quiet setting, whereas the study says   12:01:16
21 that it was turned to the medium setting, is that   12:01:20
22 correct?   12:01:24
23   A.  That's what it looks like.   12:01:24
24   Q.  And here the study you conducted, the   12:01:26

24 (Pages 90 - 93)

1 text of that study is incorrect, but your expert 12:01:54
2 reports are correct, is that right? 12:01:56
3 A. Yes. 12:01:58
4 Q. And there was also a conflict between 12:01:40
5 your expert reports in this case and your Transonic 12:01:42
6 Pro study as to which years the device was turned 12:01:48
7 on and off, correct? 12:01:52
8 A. That was just a typographical error, 12:01:54
9 yes. 12:01:56
10 Q. And in that instance, the actual 12:01:56
11 Transonic Pro study was correct, right? 12:02:00
12 A. Yes. 12:02:02
13 Q. Is there anything else that's incorrect 12:02:10
14 in this text? 12:02:12
15 A. Not to the best of my knowledge. I had 12:02:14
16 gone over it thoroughly in the last couple of days 12:02:20
17 and caught those 12:02:22
18 Q. You did catch those? 12:02:24
19 A. Uh-huh. Oh, wait, there is that one 12:02:26
20 thing under the tomatoes which indicated a date of 12:02:34
21 2009 and 2010 when it was 2009 August to beginning 12:02:36
22 of September and 2009 September to the end of 12:02:44
23 September, so it's just mislabeling the graph. 12:02:46
24 Again, I didn't look closely enough at what had 12:02:54

Page 94

1 been produced, and my recollection is that I got 12:02:58
2 that poster delivered to me the day I had to leave 12:03:00
3 for my conference. 12:03:02
4 Q. Okay. 12:03:04
5 A. And -- 12:03:26
6 Q. Go on. 12:03:28
7 A. The difference between the mouse setting 12:03:28
8 and the spider setting would have been a matter of 12:03:30
9 the sound form, sweeper, but the same frequency and 12:03:34
10 decibel level, so it apparently doesn't make much 12:03:38
11 of a difference. 12:03:44
12 Q. Well, didn't we discuss earlier that the 12:03:46
13 A, B and C in those settings affected whether the 12:03:50
14 sound was constant versus pulsating versus 12:03:56
15 sweeping? 12:04:00
16 A. Yes, that's what I'm saying, the sound 12:04:00
17 pattern, yeah, but not the frequency. 12:04:02
18 Q. And there was different ones -- I'm 12:04:04
19 sorry to interrupt you. Not the frequency? 12:04:04
20 A. Yes. 12:04:06
21 Q. Well, it might affect the frequency 12:04:06
22 range, right, because if it's sweeping, it has 12:04:10
23 different frequencies, but if it's static, there is 12:04:12
24 only one, is that correct? 12:04:14

Page 95

1 A. If it's static, it was broadcasting the 12:04:14
2 full spectrum constantly. 12:04:16
3 Q. Okay. 12:04:20
4 A. The sweep goes up and down in the range. 12:04:20
5 Q. I see, okay. 12:04:22
6 A. And the pulsing is a space, no sound, 12:04:34
7 sound, no sound, no sound, sound, no sound. 12:04:38
8 Q. This passage we just read in the study 12:04:42
9 design, I just wanted to talk about the second 12:04:48
10 sentence here. "I did not use the mice sound 12:04:50
11 setting since prior spider tests had indicated mice 12:04:54
12 responded more strongly to the spider setting than 12:04:54
13 to the predesignated mice setting of the unit's 12:04:56
14 controls." Is that another error? Did prior 12:05:00
15 spider tests indicate that mice responded more 12:05:02
16 strongly? 12:05:04
17 MR. OSTOJIC: Object to form, foundation. Go 12:05:06
18 ahead. 12:05:06
19 BY THE WITNESS: 12:05:08
20 A. I had run spider tests on long-legged 12:05:08
21 cellar spiders at the request of Bird-X, and I did 12:05:18
22 that in my back hall because that's where the 12:05:20
23 long-legged cellar spiders come up from the 12:05:22
24 basement, and that was the first thing that made me 12:05:26

Page 96

1 realize that the mice weren't coming up anymore. 12:05:28
2 BY MR. KOPEL: 12:05:32
3 Q. I see, okay. 12:05:32
4 A. So we started with that, and eventually 12:05:34
5 I tried it on the mouse setting as well and didn't 12:05:38
6 find any difference. 12:05:40
7 Q. Okay. But with regards to your testing 12:05:40
8 as to mice, you used it on the spider setting, is 12:05:44
9 that correct? 12:05:48
10 A. Initially, yes. 12:05:48
11 Q. Well, during the Transonic Pro study. 12:05:48
12 A. Yeah. 12:05:50
13 Q. Or did you switch it during the study? 12:05:52
14 A. No, I've switched it for the last four 12:05:54
15 years. 12:05:56
16 Q. Not during the years 2009 and 2010, 12:05:56
17 right? 12:05:58
18 A. Right. 12:05:58
19 Q. Okay. Do you still have Exhibit 4 12:06:08
20 handy? 12:06:20
21 It's right here. Can you please look at 12:06:20
22 instruction No. 4, slide the sound pattern switch 12:06:26
23 to select which pests to repel, do you see that? 12:06:28
24 A. Yes. 12:06:32

Page 97

25 (Pages 94 - 97)

1    Q.   Okay. Did you follow that instruction?   12:06:32
2    A.   I followed that instruction in setting   12:06:36
3 it for the first -- the spider test. Eventually I   12:06:38
4 went to mice because that's what I was interested   12:06:44
5 in testing. As a scientist, you sort of take what   12:06:46
6 you're given. If you find something that's working   12:06:58
7 that's different than what you imagined, you tend   12:07:02
8 to follow that.   12:07:04
9    Q.   Okay. So I understand that it may be   12:07:06
10 immaterial, and you'll tell me if you believe that   12:07:08
11 it was, but during your testing as to mice during   12:07:10
12 2009 and 2010, you had it switched to the spider   12:07:12
13 setting, is that correct?   12:07:18
14    A.   Yes.   12:07:18
15    Q.   And that technically was not following   12:07:18
16 that direction, is that correct?   12:07:20
17    A.   Correct.   12:07:22
18    Q.   But you believe that was immaterial?   12:07:24
19    A.   Because we used the same sound   12:07:24
20 frequencies, just a difference in the pattern in   12:07:28
21 which they're projected. Whether it's solid, sweep   12:07:32
22 or alternating on off, on off, I don't see that   12:07:36
23 makes a difference, although they could hear them   12:07:40
24 no matter what was happening.   12:07:44

Page 98

1    Q.   So it's possible sometimes that somebody   12:07:44
2 using a product could violate an instruction but   12:07:48
3 that violation might be immaterial, would you agree   12:07:52
4 with that?   12:07:54
5    MR. OSTOJIC:  Object to form, foundation.   12:07:54
6 BY THE WITNESS:   12:07:56
7    A.   If the outcome is that you stay within   12:07:56
8 the same frequency range and decibel production on   12:08:00
9 those different settings, yes.   12:08:04
10 BY MR. KOPEL:   12:08:06
11    Q.   Okay, thank you, and I appreciate your   12:08:06
12 answer that very specifically, and I asked you a   12:08:10
13 more general question which was it's   12:08:12
14 possible -- and let me take a step back. This   12:08:16
15 question does not just pertain to repellers, it   12:08:18
16 pertains to everything. Is it possible that   12:08:20
17 somebody using a product could violate an   12:08:22
18 instruction of use but that violation might still   12:08:26
19 be immaterial?   12:08:28
20    MR. OSTOJIC:  Object to form, foundation,   12:08:30
21 calls for speculation, incomplete hypothetical. Go   12:08:32
22 ahead and answer.   12:08:34
23 BY THE WITNESS:   12:08:34
24    A.   You might very well catch something that   12:08:34

Page 99

1 you were not intending or repel something you   12:08:38
2 weren't intending, I don't know. There is always a   12:08:42
3 chance that you will have unexpected consequences   12:08:44
4 to doing things. But following the instructions is   12:08:46
5 still to my way of thinking the best possible way   12:08:50
6 to find out the answer to a question.   12:08:54
7    It's not necessarily the way my life has   12:08:58
8 been. You give me a model plane, it won't   12:09:00
9 necessarily look like the picture on the box when   12:09:02
10 I'm done because I don't read instructions there,   12:09:06
11 but I follow instructions to find out answers in   12:09:08
12 science.   12:09:12
13 BY MR. KOPEL:   12:09:12
14    Q.   When you say you don't read instructions   12:09:12
15 there, you're referring to instructions on the box   12:09:14
16 of a product?   12:09:16
17    A.   On the box of a model airplane, things   12:09:18
18 which are not science.   12:09:20
19    Q.   Are there other instructions provided   12:09:22
20 inside the box or are the instructions for model   12:09:26
21 airplanes located on the box?   12:09:30
22    A.   Inside.   12:09:30
23    MR. OSTOJIC:  Objection to form, foundation.   12:09:32
24 BY MR. KOPEL:   12:09:32

Page 100

1    Q.   So when you're building a model   12:09:34
2 airplane, do you just build it without reading the   12:09:34
3 instructions?   12:09:38
4    A.   It's been a long time since I did, but,   12:09:40
5 yes, I've actually rebuilt three real airplanes   12:09:42
6 from scratch, so, yes, I do.   12:09:46
7    Q.   Yes, you do build it without reading   12:09:50
8 instructions, correct?   12:09:52
9    A.   Yes.   12:09:52
10    Q.   Okay.   12:09:54
11    A.   But I haven't built one in 30 years.   12:09:54
12    Q.   That's very impressive. I'd be   12:09:58
13 interested in seeing that.   12:10:00
14    How about other products in your house,   12:10:00
15 do you have a microwave?   12:10:14
16    A.   Yes.   12:10:16
17    Q.   Did you read the instructions to the   12:10:16
18 microwave?   12:10:18
19    A.   I honestly haven't seen them. All   12:10:20
20 microwaves I've used since my daughter was born in   12:10:24
21 1985 have been hand-me-downs, you know, that came   12:10:26
22 from my mother and my sister's mother-in-law to my   12:10:30
23 sister to me, to my farm house, and then gradually   12:10:34
24 they've been replaced when other people replaced   12:10:38

Page 101

26 (Pages 98 - 101)

1  microwaves. I don't consider them an important   12:10:42
2  part of my life. I cook real cooking on the stove.   12:10:44
3      Q.   Okay. Do you have a TV?   12:10:50
4      A.   I've gone for years without, but since I   12:10:52
5  remarried, my wife is addicted to TV.   12:10:54
6      Q.   Do you use the TV sometimes?   12:10:58
7      A.   Very rarely.   12:11:00
8      Q.   Did you read the instructions for the TV   12:11:02
9  prior to use?   12:11:04
10     A.   I wouldn't begin to understand the   12:11:04
11  system that she had put into the house we live in.   12:11:06
12  I don't even know which remote does what.   12:11:10
13     Q.   Is that because you're not an expert in   12:11:12
14  that field?   12:11:14
15     A.   It's because I don't really care. If   12:11:14
16  she's not there, I'm not going to turn on the TV.   12:11:16
17  I live my life TV free. My farm house hasn't had a   12:11:22
18  television in it since 1954.   12:11:26
19     Q.   Do you have a car?   12:11:28
20     A.   Yes.   12:11:30
21     Q.   Have you read through the entire manual?   12:11:32
22     A.   Absolutely. I don't fly my airplanes   12:11:34
23  without reading the entire manual either.   12:11:38
24     Q.   Fair enough. So based on that, how do   12:11:42

Page 102

1  you distinguish whether or not you do or do not   12:11:46
2  read the instructions before operating something?   12:11:48
3      MR. OSTOJIC:  Object to form, foundation.   12:11:52
4  BY THE WITNESS:   12:11:54
5      A.   It depends primarily on my range of   12:11:54
6  experience with the things. I've been using a   12:11:58
7  chain saw since I was 11 years old. I don't read   12:12:02
8  the instructions when I buy a new chain saw. You   12:12:06
9  know, it's a matter of need to know; and if it's   12:12:10
10  something I'm not going to be using, I don't read   12:12:12
11  the instructions because I don't intend to pick it   12:12:16
12  up and do anything with it.   12:12:18
13      Q.   And if it's something you feel confident   12:12:20
14  you will know how to operate without the   12:12:22
15  instructions, then you won't read them?   12:12:22
16      A.   Right. But in science, you get all the   12:12:26
17  information you can before you start   12:12:28
18      Q.   And when you say in science, you mean   12:12:30
19  when you're testing something, right?   12:12:32
20      A.   Yes.   12:12:34
21      Q.   Okay. You said that the mice responded   12:12:40
22  more strongly to the spider setting here. Did you   12:12:42
23  find that they were -- the mice were not responding   12:12:44
24  properly to the mice setting?   12:12:50

Page 103

1      A.   I hadn't really sat down and documented.   12:12:52
2  This is a sense of -- just without having counted   12:12:58
3  things during that period, it was a sense of what I   12:13:08
4  was seeing. I set up the test to find out.   12:13:10
5      Q.   Okay   So at the bottom of the same   12:13:14
6  page, the last sentence reads, "Placement of the   12:13:20
7  sound unit in the hall forced the mice to pass   12:13:24
8  within less than 1 meter of the sound generated to   12:13:26
9  gain entry to the main house thus exposing them to   12:13:30
10  the full 96 decibel sound at .5 meters," do you see   12:13:32
11  that?   12:13:36
12      A.   I do.   12:13:36
13      Q.   So obviously you're an expert in the   12:13:38
14  area -- well, let me take a step back.   12:13:42
15      Given that you are a scientist, you were   12:13:48
16  able to identify where the mice were entering the   12:13:50
17  premises, is that correct?   12:13:52
18      A.   Pretty much as anybody who sat in the   12:13:54
19  kitchen and watched the mice come in through the   12:13:56
20  hallway would have been able to, yes, years of   12:14:00
21  being in the kitchen, having mice come around the   12:14:02
22  door and run under the refrigerator.   12:14:06
23      Q.   So do you believe that any homeowner can   12:14:08
24  easily identify where rodents are -- excuse me. If   12:14:12

Page 104

1  a homeowner has a rodent infestation, do you   12:14:18
2  believe any homeowner can easily identify where   12:14:20
3  they're entering?   12:14:22
4      A.   Well, if they've seen the mouse or the   12:14:24
5  rat, they probably have a pretty good idea where it   12:14:26
6  came in or where it went out to because it would   12:14:30
7  have come and gone through the same source in all   12:14:32
8  probability.   12:14:34
9      Q.   But you have no experience working with   12:14:34
10  homeowners on rodent infestations, do you?   12:14:38
11      A.   Not being in the room and advising with   12:14:42
12  them, no.   12:14:48
13      Q.   So what you're saying now is not based   12:14:50
14  on experience but rather speculation, is that   12:14:52
15  correct?   12:14:54
16      MR. OSTOJIC:  Object, form, foundation,   12:14:54
17  mischaracterizes the testimony. You can answer.   12:14:56
18  BY THE WITNESS:   12:15:02
19      A.   More on hearsay. I know a number of   12:15:02
20  people who have bought devices like the   12:15:04
21  Bell & Howell device because they had seen a mouse   12:15:08
22  in one room of their house or two rooms of their   12:15:12
23  house and put them in there, and then they said   12:15:14
24  afterwards they didn't see them again, and this is   12:15:18

Page 105

27 (Pages 102 - 105)

Page 106

1  a woman who has a cat which doesn't do anything    12:15:22
2  about mice.                              12:15:26
3     I have numerous people that I've given    12:15:26
4  the Transonic Pro to as a gift for their cabins    12:15:32
5  particularly, their weekends places in Wisconsin    12:15:36
6  where they complain that there is mice on the    12:15:38
7  ledges and mice on the tables and droppings    12:15:42
8  everywhere, and they've all come back and said that    12:15:44
9  it's made a tremendous difference, but that's not    12:15:46
10 science, that's just...                    12:15:50
11    Q.  If you would have sealed up that hole or    12:15:52
12 entry point where the mice were coming in, would    12:15:58
13 you have still had mice in the absence of the    12:16:00
14 Transonic Pro unit?                       12:16:04
15    A.  I wouldn't have had access to the    12:16:06
16 basement to get all the pumps and the heaters and    12:16:08
17 things if I sealed that.  I mean it's the space    12:16:10
18 under the door of the hallway                12:16:14
19    Q.  So is it sometimes unavoidable as a    12:16:14
20 homeowner, you're not able to seal the entry point?    12:16:18
21    A.  Physically you can't seal that and still    12:16:20
22 be able to go beyond it; but in this case, this    12:16:22
23 provided a sound barrier.  And despite what it says    12:16:26
24 here about blocking that one distance, when we got    12:16:30

Page 107

1  to talking about sound shadows, that unit is two    12:16:32
2  and a half meters from the top of the stairs in a    12:16:36
3  hard floored, hard walled environment, and the mice    12:16:42
4  are avoiding traps that are on the first, second    12:16:46
5  and third steps down the stairs, so it's still    12:16:48
6  having an effect.  I mean if it didn't reach that    12:16:54
7  far, there would be mice in the traps down there,    12:16:56
8  so it's bouncing that sound off the opposite wall    12:16:58
9  as you would when you have a very hard surface.    12:17:00
10    Q.  Isn't it possible that it just prevented    12:17:06
11 the mice that would have otherwise been caught    12:17:08
12 there from entering the premises in the first    12:17:10
13 place?                                12:17:12
14    MR. OSTOLIC:  Object to form    12:17:14
15 BY THE WITNESS:                        12:17:14
16    A.  That's exactly what we're looking at,    12:17:14
17 though.                               12:17:18
18 BY MR. KOPEL:                         12:17:18
19    Q.  Okay.                           12:17:18
20    A.  The mice are always caught on the    12:17:18
21 stairs.  They're not in the kitchen.  So if they're    12:17:20
22 caught on the stairs, it means that they have come    12:17:26
23 up into the sound of that when it's on.    12:17:28
24    Q.  Okay.                           12:17:32

Page 108

1     A.  But if they're not caught, it means that    12:17:32
2  the sound up there and extending down through that    12:17:34
3  back hall into the stair and now talking three and    12:17:38
4  a half meters from where the unit is placed is    12:17:40
5  keeping them from coming high enough up the stairs    12:17:42
6  to get their noses in the peanut butter and be    12:17:46
7  trapped.                              12:17:50
8     Q.  Understood.  Now, as a homeowner, most    12:17:50
9  of the time when you observed mice, was it in the    12:17:52
10 stairs area?  That's where you always had the traps    12:17:54
11 set up?                               12:17:58
12    A.  No.  No, I've had them scattered    12:17:58
13 throughout the entire farm house at times.    12:18:00
14    Q.  Okay.                           12:18:02
15    A.  Before this, you know, we would find    12:18:02
16 mice on the beds in the bedrooms nesting and eating    12:18:06
17 the blankets; we would see them running underneath    12:18:10
18 the refrigerator, underneath the cabinets in the    12:18:14
19 kitchen; we'd see them scurrying along the walls of    12:18:16
20 the living room.  I mean they were pretty much    12:18:20
21 ubiquitous throughout the farm house.    12:18:24
22    Q.  If a mouse was inside of a bed -- would    12:18:26
23 that be common that a mouse could get inside of a    12:18:28
24 bed?                                 12:18:32

Page 109

1     A.  Oh, yeah.                         12:18:32
2     MR. OSTOLIC:  Object to form.    12:18:32
3  BY MR. KOPEL:                         12:18:32
4     Q.  Same for a rat?                    12:18:32
5     A.  Yeah.                           12:18:34
6     Q.  Could an ultrasonic device reach that    12:18:36
7  mouse?                               12:18:38
8     A.  I don't know.  It depends how heavy the    12:18:42
9  covers are on it probably.                 12:18:44
10    Q.  But with heavy covers, probably not?    12:18:44
11    A.  Yeah.                           12:18:46
12    Q.  If you had set up the Transonic Pro on    12:18:48
13 the traps as opposed to facing this entry point,    12:18:52
14 what would have happened?                 12:19:04
15    A.  The difficulty would have been placing    12:19:06
16 it such that the speaker would be pointing down the    12:19:08
17 stairs.  It would have been a fine thing to do to    12:19:10
18 try to stop the mice from coming up from the    12:19:14
19 basement at all, but the sound is directional.  I'd    12:19:16
20 have to have found a way to build a structure which    12:19:22
21 would hold the speaker facing down the stairs,    12:19:24
22    Q.  I understand.                      12:19:28
23    A.  So it's just putting it on the floor    12:19:30
24 right there behind the door where it was out of the    12:19:32

28 (Pages 106 - 109)

1 way of everything was the logical place as far as I   12:19:34
2 could see.   12:19:38
3 Q.   So placement of the unit is a crucial   12:19:38
4 aspect to efficacy, would you agree with that?   12:19:42
5 A.   To some degree, yes. It has to be close   12:19:46
6 enough so the sound force will disturb the animals.   12:19:48
7 Q.   So if a homeowner doesn't have an outlet   12:19:52
8 in the correct location, would that be a problem?   12:20:00
9 MR. OSTOJIC:   Object to form.   12:20:04
10 BY THE WITNESS:   12:20:06
11 A.   For the Bell & Howell units, they   12:20:06
12 recommend not using an extension cord. In my case,   12:20:08
13 because I wanted it to be plugged into the back   12:20:14
14 hall where there is no outlet, it was on an   12:20:16
15 extension cord from the bathroom.   12:20:18
16 BY MR. KOPEL:   12:20:20
17 Q.   I see. So if you had not used an   12:20:20
18 extension cord, you would not have been able to   12:20:22
19 place the unit where you did, is that correct?   12:20:24
20 A.   Exactly.   12:20:24
21 Q.   So you wouldn't be able to replicate the   12:20:26
22 test conditions that you conduct in the Transonic   12:20:34
23 Pro test using the Bell & Howell device, would you?   12:20:38
24 A.   If you had outlets at the right height   12:20:42
Page 110

1 in the house.   12:20:46
2 Q.   But you didn't, right?   12:20:46
3 A.   This house was built in the 1940s. I'm   12:20:50
4 lucky to have any outlets.   12:20:52
5 Q.   Okay. I appreciate that. So to be   12:20:54
6 clear, you didn't have the correctly placed   12:20:56
7 outlets, right?   12:21:00
8 A.   No.   12:21:00
9 Q.   What do you mean by the right height?   12:21:00
10 A.   Well, since the sound is linear, you   12:21:04
11 want to have that placed within two to three inches   12:21:10
12 of floor height because that's where the mice are.   12:21:12
13 Q.   Where are the outlets located in   12:21:18
14 your -- was it a townhouse -- I'm sorry, the farm   12:21:22
15 house.   12:21:24
16 A.   Farm house.   12:21:26
17 Q.   Sorry, farm house. Where are the   12:21:26
18 outlets located?   12:21:28
19 A.   In the side of the cabinet next to the   12:21:32
20 sink, on the top of the counter of the kitchen, in   12:21:34
21 the east wall of the kitchen, in the north wall of   12:21:40
22 the kitchen above a counter where I can plug in my   12:21:46
23 electric griddle.   12:21:48
24 Q.   Okay.   12:21:50
Page 111

1 A.   They're in a few places, you know, one   12:21:52
2 or two outlets per room for lights.   12:21:56
3 Q.   What about the height of the outlets? I   12:22:00
4 know you mentioned one that was above the counter.   12:22:02
5 A.   Other than the kitchen, the heights of   12:22:04
6 the outlets in my farm house tend to be four to six   12:22:06
7 inches above the floor.   12:22:12
8 Q.   Would that be too high to effectively --   12:22:12
9 A.   No, that would be fine.   12:22:16
10 Q.   What would be too high?   12:22:18
11 A.   Once you get above 14 to 16 inches, then   12:22:20
12 the sound is not sweeping the floor. You know, the   12:22:24
13 mice are not hanging in mid air.   12:22:26
14 Q.   I see. So if you plug something   12:22:30
15 in -- first of all, if you plugged it like by your   12:22:32
16 countertop, that would not be effective against --   12:22:34
17 A.   It would be effective if the mice were   12:22:36
18 up there, but of course if you plug it on the back   12:22:38
19 side of the counter, it's shooting out at a narrow   12:22:40
20 range like this.   12:22:44
21 Q.   I understand. So it wouldn't focus on   12:22:44
22 the rest of the room?   12:22:46
23 A.   No, you'd have to point it towards the   12:22:48
24 countertop if you want it to be effective in   12:22:50
Page 112

1 keeping the counter free of mice. This was pretty   12:22:52
2 clean what the instructions say in Bell & Howell;   12:22:56
3 you want to point it towards the area you want to   12:22:58
4 protect.   12:23:02
5 Q.   We'll get to that, thanks. And I think   12:23:02
6 you said was it 14 to 16 inches you said was too   12:23:06
7 high at that point?   12:23:10
8 A.   Then you're above the mice and the rats.   12:23:10
9 Q.   And then the devices couldn't be   12:23:14
10 effective?   12:23:18
11 A.   That is the assumption of most people,   12:23:18
12 but since I'm seeing clearly reflection of the   12:23:22
13 sound off the hard surface back to another and down   12:23:26
14 around the sound shadow, I'm willing to bet that   12:23:30
15 you would get some effect by hitting another hard   12:23:32
16 surface on the other side, you know, instead of   12:23:36
17 being absorbed.   12:23:42
18 Q.   But you haven't tested that, right?   12:23:44
19 A.   I don't have the equipment.   12:23:46
20 Q.   Okay.   12:23:46
21 A.   It's very expensive to go out and get   12:23:48
22 the things which will test frequency and decibel   12:23:50
23 levels to that degree.   12:23:54
24 Q.   I understand. And in order for that to   12:23:54
Page 113

29 (Pages 110 - 113)

| | |
|---|---|
| 1 work, that depends on the shape of the room, right? 12:23:58 | 1 the European house mouse that was brought to this 12:27:00 |
| 2   A. Exactly. 12:24:00 | 2 country, still is present in Europe, still used 12:27:02 |
| 3   Q. So certain shape of rooms you would not 12:24:00 | 3 extensively for all kinds of behavioral tests, 12:27:06 |
| 4 be able to have that effect? 12:24:02 | 4 psychological tests and so forth; but they have 12:27:10 |
| 5   A. Right. It's one reason to have more 12:24:04 | 5 over the years they're no longer subjected to the 12:27:14 |
| 6 than one if you feel that you need them to have 12:24:06 | 6 same natural selective courses that wild mice are. 12:27:22 |
| 7 complete absence of creatures. 12:24:10 | 7 They've been living in protected environments with 12:27:26 |
| 8   Q. I understand. And because they're 12:24:12 | 8 provided food and all the care and so forth for 12:27:30 |
| 9 directional, would you say that in each room you 12:24:14 | 9 probably 300 or 400 years of research, at least 12:27:36 |
| 10 would need them facing in every direction? 12:24:18 | 10 200 years, and the result is that genetically they 12:27:40 |
| 11   A. Probably the best thing is facing across 12:24:24 | 11 have drifted. Their gene patterns have become 12:27:44 |
| 12 entry points. 12:24:26 | 12 highly inbred, they have less variation than the 12:27:48 |
| 13   Q. I understand. But just to -- I don't 12:24:28 | 13 wild mice would do because they haven't been 12:27:52 |
| 14 mean to belabor this point, but you would not have 12:24:34 | 14 subjected to the same forces. 12:27:54 |
| 15 been able to conduct this specific experiment using 12:24:38 | 15   Q. So would it be reasonable to surmise 12:27:56 |
| 16 the Bell & Howell devices, correct? 12:24:40 | 16 that they might react to ultrasound differently 12:27:58 |
| 17   MR. OSTOJIC: Object to form, foundation. 12:24:42 | 17 than other types of mice? 12:28:02 |
| 18 BY THE WITNESS: 12:24:46 | 18   A. White lab mice, probably so. 12:28:02 |
| 19   A. I couldn't have done this test in 12:24:46 | 19   Q. Okay. Last question about this 12:28:06 |
| 20 exactly the same form it was carried out with the 12:24:48 | 20 publication, can deer hear ultrasound? 12:28:10 |
| 21 Bell & Howell, but I would have probably found a 12:24:52 | 21   A. There is a good question about that. I 12:28:16 |
| 22 way to block other points. 12:24:56 | 22 know that people have tried to test it, but they 12:28:20 |
| 23 BY MR. KOPEL: 12:24:58 | 23 test it in a situation where it doesn't reach them 12:28:22 |
| 24   Q. Could you have plugged in the Bell & 12:24:58 | 24 because of its lack of force, and they've also put 12:28:26 |
| Page 114 | Page 116 |

| | |
|---|---|
| 1 Howell devices in your basement -- do you have 12:25:02 | 1 these artificial -- the idea of the little 12:28:30 |
| 2 outlets in the basement? 12:25:06 | 2 ultrasound deer warning systems on cars, there is 12:28:32 |
| 3   A. I do as of a year ago. My daughter 12:25:06 | 3 no proof that they do anything, and of course it 12:28:38 |
| 4 married an electrician. 12:25:10 | 4 wouldn't make any difference because the sound 12:28:40 |
| 5   Q. So you didn't used to? 12:25:10 | 5 wouldn't travel far enough ahead of a car moving 12:28:42 |
| 6   A. And when we put in an electric hot water 12:25:12 | 6 above 15 miles an hour to protect it from anything. 12:28:44 |
| 7 heater, he put in eight outlets and ten lights, and 12:25:16 | 7   So I have not seen tests that indicate 12:28:48 |
| 8 I now have unbelievable lighting down there. It 12:25:18 | 8 that they should hear it. Given the size of the 12:28:52 |
| 9 used to just be one outlet which ran the pump and a 12:25:22 | 9 animal, the size of the ears and so forth and what 12:28:54 |
| 10 single bare light bulb overhead. 12:25:26 | 10 it feeds upon, there is little evolutionary reason 12:29:00 |
| 11   Q. Got it. Okay, great. I'm in the 12:25:30 | 11 to believe they should be able to hear that. You 12:29:02 |
| 12 portion of this text titled, "Discussion," and I'm 12:25:58 | 12 know, dogs, foxes, coyotes, cats all hear into the 12:29:06 |
| 13 on the following page after the title. 12:26:02 | 13 ultrasound frequency because they're hunting mice 12:29:10 |
| 14   A. Yep. 12:26:06 | 14 and rats and things that make those sounds. I 12:29:14 |
| 15   Q. And you have some discussion of white 12:26:08 | 15 haven't heard a carrot give off ultrasound ever. 12:29:14 |
| 16 lab mice, do you see that? It's at the bottom of 12:26:10 | 16   Q. But an ultrasound device made for a car 12:29:18 |
| 17 the page. So not the page that says discussion, 12:26:16 | 17 to be used against deer, that would not work, 12:29:22 |
| 18 the next page. 12:26:18 | 18 correct? 12:29:26 |
| 19   A. Okay, yes. 12:26:30 | 19   A. All studies have shown them to be 12:29:26 |
| 20   Q. What is the difference between white lab 12:26:32 | 20 perfectly worthless. 12:29:28 |
| 21 mice and other types of mice? 12:26:44 | 21   Q. Okay, thank you. You can put that 12:29:30 |
| 22   A. White lab mice are the product of 12:26:46 | 22 Exhibit aside, please. 12:29:32 |
| 23 thousands of generations of breeding in captive 12:26:50 | 23   I want to go off the record for just one 12:29:36 |
| 24 environments. They are the standard mus musculus, 12:26:54 | 24 moment. 12:29:38 |
| Page 115 | Page 117 |

30 (Pages 114 - 117)

1    THE VIDEOGRAPHER: We're off the record at    12:29:38
2    12:23 p.m    12:29:40
3    (WHEREUPON, a short break was had.)    13:20:20
4    THE VIDEOGRAPHER: We are back on the record    13:20:20
5    at 1:14 p.m.    13:20:22
6    BY MR. KOPEL:    13:20:22
7    Q.  Good afternoon. Dr. Whitford.    13:20:26
8    A.  Good afternoon.    13:20:28
9    Q.  I hoped you enjoyed your lunch.    13:20:28
10   A.  Quite adequate, and yours?    13:20:30
11   Q.  I'm sorry?    13:20:32
12   A.  Yours.    13:20:32
13   Q.  It was fine. Can you please grab    13:20:34
14   Exhibit 3, that's your initial report in this case,    13:20:42
15   and turn to the deposition section?    13:20:48
16   A.  Okay.    13:21:02
17   Q.  So was part of your assignment in this    13:21:06
18   case to review deposition transcripts?    13:21:08
19   A.  Uh-huh.    13:21:10
20   Q.  Which transcripts did you review?    13:21:12
21   A.  Sandra Bueno, Joanne Hart, and Debbie    13:21:14
22   Fenerstein.    13:21:20
23   Q.  Any others?    13:21:20
24   A.  Were there any other depositions, you    13:21:22
Page 118

1    mean?    13:21:24
2    Q.  Oh, I'm sorry, did you review any other    13:21:24
3    deposition transcripts besides for the three you've    13:21:26
4    just listed?    13:21:32
5    A.  I listened in on Potts's.    13:21:32
6    Q.  Okay. None others, none besides those    13:21:36
7    you mentioned, correct?    13:21:40
8    A.  No. I wasn't aware that there were any    13:21:40
9    others.    13:21:42
10   Q.  Okay. So let's talk about Bueno,    13:21:56
11   please. What was your understanding of why you    13:22:02
12   were reviewing this transcript?    13:22:04
13   A.  To see whether she had followed    13:22:06
14   instructions which are contained with the package,    13:22:14
15   to put them in the proper positions, whether she    13:22:20
16   felt that they had worked at all at various points,    13:22:22
17   whether she expressed any satisfaction with them to    13:22:30
18   begin with or not.    13:22:34
19   Q.  Okay. Would you say that part of what    13:22:42
20   you did with these deposition transcripts is tried    13:22:48
21   to diagnose perhaps the source of their    13:22:52
22   dissatisfaction with the units?    13:22:58
23   A.  As far as I could see from her    13:23:02
24   disposition, she had no dissatisfaction with the    13:23:04
Page 119

1    units until contacted by the lawyer and told that    13:23:06
2    they didn't work.    13:23:08
3    Q.  Are we talking about Ms. Bueno right    13:23:10
4    now?    13:23:12
5    A.  Yes.    13:23:12
6    Q.  Is that something that you think is    13:23:12
7    apparent to anyone who reads her deposition    13:23:22
8    transcript, or do you believe you needed special    13:23:24
9    training in order to reach that conclusion?    13:23:28
10   MR. OSTOIIC: Object to form.    13:23:30
11   BY THE WITNESS:    13:23:32
12   A.  No, I mean she said essentially or I    13:23:32
13   said nothing in Ms. Bueno's statement provided    13:23:36
14   evidence that the CPR did not work as advertised    13:23:38
15   assuming use instructions were followed. She    13:23:40
16   didn't indicate anything other than having found    13:23:44
17   the one group of ants and having sealed that, which    13:23:48
18   is what the instructions say to do, having had only    13:23:52
19   one or two sneaking around a window. While she was    13:23:56
20   following the instructions, she seemed satisfied    13:24:00
21   with it.    13:24:02
22   BY MR. KOPEL:    13:24:04
23   Q.  I want to just go back to that statement    13:24:04
24   you just made about the lawyer -- contacting the    13:24:06
Page 120

1    lawyer. Now, you made that determination from    13:24:10
2    reading the transcript, right?    13:24:12
3    A.  I believe I did.    13:24:14
4    Q.  Okay. Now, in making that    13:24:16
5    determination, did you apply any sort of    13:24:20
6    scientific, technical or other type of specialized    13:24:22
7    knowledge?    13:24:26
8    A.  To?    13:24:28
9    Q.  To make that determination that    13:24:28
10   Ms. Bueno was satisfied until she was contacted by    13:24:32
11   a lawyer?    13:24:34
12   A.  She didn't indicate dissatisfaction.    13:24:34
13   Q.  Okay, I understand, so please listen    13:24:36
14   carefully to the question because I'm asking a very    13:24:40
15   specific question. In making that determination    13:24:42
16   that you made -- I understand the basis for your    13:24:44
17   determination. I'm saying in making it, did you    13:24:46
18   employ any sort of scientific, technical or other    13:24:50
19   type of specialized knowledge in order to make that    13:24:52
20   determination, or could any lay person have made    13:24:56
21   that determination based on reading the transcript?    13:24:58
22   A.  Of her attitude?    13:25:00
23   Q.  Yes.    13:25:02
24   A.  I think any lay person would get the    13:25:04
Page 121

31 (Pages 118 - 121)

1  same conclusion from reading it.  13:25:06
2  Q.  Okay.  Same question for Joanne Hart, in  13:25:08
3  making that determination for Ms. Hart, did that  13:25:12
4  require any sort of scientific, technical or other  13:25:14
5  specialized knowledge to come to that conclusion,  13:25:18
6  or could any lay person have done so after reading  13:25:20
7  the transcript?  13:25:24
8       MR. OSTOJIC:  Object to form, but go ahead.  13:25:24
9  BY THE WITNESS:  13:25:26
10      A.  Well, because she went back and bought a  13:25:26
11  second set and used them in her brother's house,  13:25:28
12  one gets the impression of satisfaction with them.  13:25:30
13 BY MR. KOPEL:  13:25:34
14      Q.  So we can talk about that, but please  13:25:34
15  just -- please listen to the question carefully.  13:25:36
16  In making that determination, did you require to  13:25:40
17  use any sort of scientific, technical or other  13:25:44
18  specialized knowledge, or could any lay person have  13:25:46
19  reached that determination based on reading the  13:25:50
20  transcript?  13:25:52
21      MR. OSTOJIC:  Object to form.  Go ahead.  13:25:54
22 BY THE WITNESS:  13:25:56
23      A.  Common sense, that's all that's needed.  13:25:56
24 BY MR. KOPEL:  13:25:58

Page 122

1      Q.  So let's talk about Ms. Bueno here.  The  13:25:58
2  first criticism I see listed here is that she  13:26:02
3  plugged the device in four feet above floor level.  13:26:06
4  Do you see that?  13:26:08
5      A.  Uh-huh.  13:26:08
6      Q.  If somebody plugs a device into -- a  13:26:10
7  Bell & Howell device into an outlet four feet above  13:26:18
8  floor level, would that prevent the device from  13:26:20
9  being effective in repelling and driving out  13:26:28
10  rodents?  13:26:34
11      MR. OSTOJIC:  Object to form, but go ahead.  13:26:34
12 BY THE WITNESS:  13:26:36
13      A.  It certainly wouldn't improve it.  13:26:36
14  Maximum efficacy is going to be found when the  13:26:42
15  sound is at the level at which the organisms you're  13:26:44
16  trying to repel are found which means mice and rats  13:26:48
17  on the floor.  Ants and spiders might be  13:26:50
18  appropriate for four feet, but they're more likely  13:26:54
19  to be higher up for spiders because they like the  13:26:58
20  corners of ceilings.  Ants are where you find them.  13:27:00
21 BY MR. KOPEL:  13:27:00
22      Q.  So depending if you wanted to repel  13:27:06
23  rodents or spiders, you might need to plug the  13:27:14
24  device in at different heights, is that correct?  13:27:18

Page 123

1      A.  Yes.  13:27:20
2      Q.  So would it be harder to repel spiders  13:27:20
3  if a device is plugged in on a lower outlet?  13:27:24
4      MR. OSTOJIC:  Object to form, incomplete  13:27:28
5  hypothetical, but go ahead.  13:27:30
6 BY THE WITNESS:  13:27:32
7      A.  Yes and no, I'd have to say, because  13:27:32
8  spiders are usually found in the upper corners, but  13:27:36
9  they had to get there somehow.  13:27:38
10 BY MR. KOPEL:  13:27:40
11      Q.  Right.  13:27:40
12      A.  So it all depends where they're coming  13:27:42
13  from and where they're going to.  13:27:42
14      Q.  But a device plugged in at floor level  13:27:46
15  would not be able to repel a spider that's up on  13:27:50
16  the corner of a wall, is that correct?  13:27:54
17      A.  Actually, in my spider tests in the back  13:27:56
18  hall, they did, but again we were talking about  13:28:00
19  refraction and reflection of sound.  13:28:04
20      Q.  Understood.  That depends on the  13:28:06
21  structure of the room, right?  13:28:08
22      A.  It does.  13:28:10
23      Q.  Okay.  So if the room wasn't structured  13:28:10
24  so that the sound would be bouncing off walls, in  13:28:12

Page 124

1  that scenario, the repeller would not be able to be  13:28:16
2  effective against a spider that's up on the wall  13:28:20
3  that's not ground level, is that right?  13:28:22
4      A.  Yeah.  13:28:24
5      MR. OSTOJIC:  Object to form, incomplete  13:28:24
6  hypothetical, but he gave his answer.  13:28:26
7 BY MR. KOPEL:  13:28:26
8      Q.  So is it -- now, with regards to  13:28:28
9  Ms. Bueno, I think her complaint was about ants.  13:28:32
10  Do you recall reading that?  13:28:34
11      A.  Uh-huh.  13:28:36
12      Q.  Okay.  Was the fact that she plugged it  13:28:36
13  in at four feet a problem for repelling ants in  13:28:40
14  that did it cause the devices to become incapable  13:28:48
15  of repelling ants at that height?  13:28:52
16      A.  The problem was that she plugged it into  13:28:54
17  the wall behind her kitchen counter so that the  13:28:56
18  sound was pointed away from the wall where the ants  13:29:00
19  were.  13:29:02
20      Q.  I really want to talk about that, but I  13:29:02
21  just want to focus on one thing at a time.  Four  13:29:06
22  feet above ground level, did that cause the devices  13:29:08
23  to become incapable of repelling the pests -- the  13:29:12
24  ants, excuse me?  13:29:16

Page 125

32 (Pages 122 - 125)

1    A.   Not if it was pointed towards them at    13:29:18
2  that height.                          13:29:22
3    Q.   So four feet in and of itself was not a   13:29:22
4  problem?                             13:29:24
5    A.   No.                           13:29:24
6    Q.   But it would be a problem for rodents,   13:29:24
7  right?                              13:29:28
8    A.   Yeah.  Plug it into the other wall where   13:29:28
9  it faces the countertop would be --          13:29:30
10    Q.   And I want to get to that in a moment,   13:29:32
11  that's the last part of your sentence here.  What   13:29:36
12  about roaches, what height would it need to be   13:29:38
13  plugged in for roaches?                  13:29:40
14        MR. OSTOJIC:  Object to form, foundation.   13:29:44
15  incomplete hypothetical, but go ahead.       13:29:44
16  BY THE WITNESS:                      13:29:46
17    A.   I thankfully have had very little to do   13:29:48
18  with roaches in my lifetime in my homes.  My best   13:29:50
19  understanding is that they are usually confined to   13:29:58
20  floor and under the sinks and damp places, but I'm   13:30:00
21  sure that they have occasionally been found to get   13:30:06
22  into cupboards and across counters, but I don't   13:30:10
23  know that firsthand.                    13:30:12
24  BY MR. KOPEL:                        13:30:14

Page 126

1    Q.   If a cupboard is closed, can an        13:30:14
2  ultrasonic sounds wave penetrate the cupboard to   13:30:16
3  get at a roach that's inside the cupboard?     13:30:20
4    A.   No                            13:30:22
5    Q.   Same question for rodents?            13:30:22
6    A.   No.                           13:30:26
7    Q.   Same question for ants?              13:30:26
8    A.   No.                           13:30:28
9    Q.   Same question for spiders?            13:30:28
10    A.   No.                           13:30:32
11    Q.   Would you expect that in the event of an   13:30:32
12  infestation, a cupboard would be a typical place   13:30:38
13  where you might find any of these pests?      13:30:40
14        MR. OSTOJIC:  Object to form, foundation, but   13:30:42
15  go ahead.                           13:30:44
16  BY THE WITNESS:                      13:30:48
17    A.   I think, if you did, that the first     13:30:48
18  thing you'd do is take all the foods out of that   13:30:50
19  cupboard and throw them away.             13:30:52
20  BY MR. KOPEL:                        13:30:54
21    Q.   That seems sensible, yes.  But would    13:30:54
22  that be a typical place where you might actually   13:30:56
23  find these pests in the event of a home       13:31:00
24  infestation?                        13:31:02

Page 127

1        MR. OSTOJIC:  Same objections.         13:31:04
2  BY THE WITNESS:                      13:31:06
3    A.   Probably the lower levels of cupboards   13:31:06
4  or pantries.  It depends on how good you are about   13:31:10
5  storing foods, whether you keep them in containers   13:31:14
6  which can be penetrated by the roaches or in     13:31:20
7  plastic.                            13:31:24
8  BY MR. KOPEL:                        13:31:24
9    Q.   Doctor, I know you've described yourself   13:31:24
10  as an obsessive compulsive biologist.  Do you know   13:31:26
11  if people who are not biologists at all, do you    13:31:34
12  know if they typically are very careful about     13:31:40
13  putting away all their food or if that -- you know,   13:31:44
14  food might be open sometimes that's in the pantry?   13:31:48
15    A.   That depends whether you're dealing with   13:31:50
16  people with OCD or people who were raised -- you   13:31:52
17  know, how they were raised will affect how they    13:31:54
18  deal with these things.  I've seen every level of   13:31:56
19  extreme in my lifetime in other people's homes.    13:32:00
20    Q.   But even if food is in the pantry,      13:32:02
21  unless it's very tightly sealed, any of the pests   13:32:08
22  that we mentioned, ants, spiders, roaches, mice,   13:32:12
23  rats, they can all get to it, is that correct?    13:32:18
24        MR. OSTOJIC:  Incomplete hypothetical, but go   13:32:20

Page 128

1  ahead.                             13:32:20
2  BY THE WITNESS:                      13:32:24
3    A.   It depends what you sealed it in, but   13:32:24
4  yes.                              13:32:26
5  BY MR. KOPEL:                        13:32:26
6    Q.   What about underneath a sink?         13:32:26
7  Underneath a sink typically in most people's     13:32:32
8  kitchens there is kind of a cupboard, is that     13:32:36
9  right?  Is that your experience?           13:32:36
10    A.   An access for the piping, yes.         13:32:38
11    Q.   Right.  So if that cupboard is not open,   13:32:40
12  would the ultrasonic waves from a device be able to   13:32:44
13  get inside there?                     13:32:48
14    A.   No.                           13:32:50
15    Q.   So if roaches are living underneath the   13:32:52
16  sink, would the Bell & Howell repellers be       13:32:56
17  effective at driving them out?             13:33:02
18        MR. OSTOJIC:  Object to incomplete         13:33:04
19  hypothetical, but go ahead.               13:33:06
20  BY THE WITNESS:                      13:33:06
21    A.   Open the doors and point the repeller at   13:33:06
22  them.                             13:33:10
23  BY MR. KOPEL:                        13:33:10
24    Q.   I see.  So under those circumstances,   13:33:10

Page 129

33 (Pages 126 - 129)

**Page 130**

1  you would need to keep those doors open, okay.  13:33:12
2  A.  I mean that's common sense.  13:33:20
3  Q.  But in this instance, you don't think  13:33:28
4  the fact that Ms. Bueno plugged it in four feet  13:33:30
5  above floor level caused her to witness an ant  13:33:34
6  infestation, is that right?  13:33:38
7  A.  It didn't cause her to witness it, and  13:33:40
8  it didn't remove it because it was pointed the  13:33:42
9  wrong direction.  13:33:44
10  Q.  And I promise we're going to get to it.  13:33:46
11  okay. We're about to get to that. Four feet, is  13:33:48
12  that kind of -- is that immaterial in terms of  13:33:52
13  diagnosing the source of Ms. Bueno's issue?  13:33:54
14  A.  Probably.  13:33:58
15  Q.  Why did you put it in this paragraph?  13:34:00
16  A.  Well, it reminds me that it was on top  13:34:04
17  of the counter.  13:34:06
18  Q.  Okay.  13:34:08
19  A.  That's what determined the height of the  13:34:08
20  outlet. And, yes, it's the right thing to do for  13:34:10
21  ants on the counter except that it wasn't pointed  13:34:16
22  in the right direction.  13:34:18
23  Q.  I'll show you the transcript. I think  13:34:20
24  you might be mixing her up with Ms. Hart, but I'm  13:34:22

**Page 131**

1  happy to show you the transcript, and it will  13:34:24
2  refresh your recollection, but I'll represent to  13:34:30
3  you that Ms. Hart was the one who plugged it in on  13:34:30
4  the counter, not Ms. Bueno plugged it in four feet, I  13:34:34
5  believe, in a wall, and I'll show you the  13:34:38
6  transcript.  13:34:40
7  A.  Okay.  13:34:40
8  Q.  You know what, let me show it to you  13:34:44
9  right now.  13:34:46
10  MR. KOPEL: I'll ask the Court Reporter to  13:34:58
11  please mark as Exhibit Whitford 5 the deposition  13:35:10
12  transcript of Sandra Bueno.  13:35:14
13  (WHEREUPON, a certain document was  13:35:14
14  marked Whitford Deposition Exhibit
15  No. 5. for identification, as of
16  01/12/2018.)
17  By MR. KOPEL:
18  Q.  Dr. Whitford, do you have Exhibit 5?  13:35:34
19  A.  I do now.  13:35:38
20  Q.  Have you seen this before?  13:35:40
21  A.  Not in this exact form, but certainly  13:35:46
22  I've seen the information.  13:35:48
23  Q.  What is this? It's not a test. It's on  13:35:52
24  the first page. Do you see on the first page it  13:36:00

**Page 132**

1  says deposition of Sandra Bueno, top left  13:36:04
2  corner -- top left quadrant?  13:36:08
3  A.  Uh-huh.  13:36:08
4  Q.  So you recognize this to be a deposition  13:36:10
5  transcript?  13:36:12
6  A.  Yes.  13:36:12
7  Q.  And you read this, right? Maybe perhaps  13:36:12
8  not in this form, but you read the deposition  13:36:14
9  transcript?  13:36:16
10  A.  Right.  13:36:18
11  Q.  Okay. In order to save time -- you  13:36:28
12  didn't reference where you got each of these  13:36:32
13  issues. You've identified where in the transcript  13:36:36
14  they are, but I'll direct you beginning on page 56.  13:36:44
15  Each quadrant of the page is a new page you'll see.  13:36:44
16  A.  Right.  13:36:48
17  Q.  And that's where she begins to discuss  13:36:48
18  placement of the units.  13:36:50
19  Okay. So do you see on page 56, lines  13:37:02
20  16 to 17, Ms. Bueno testifies that she plugged the  13:37:10
21  unit it "in the wall between my kitchen and my  13:37:16
22  dining room, the left side of my unit," do you see  13:37:20
23  that?  13:37:22
24  A.  Yes.  13:37:22

**Page 133**

1  Q.  And on line 20 she identifies that the  13:37:22
2  outlet was located -- it was in a regular outlet in  13:37:28
3  the middle of the wall, do you see that?  13:37:32
4  A.  Yes, but does the middle of the wall  13:37:34
5  mean middle of the height between the floor and an  13:37:36
6  eight-foot ceiling which is what I assumed that it  13:37:40
7  meant?  13:37:42
8  Q.  Well, you don't need to --  13:37:42
9  A.  Next to your light switches.  13:37:44
10  Q.  Well, she identifies on page 57 -- and  13:37:44
11  this is an estimate, I believe. She says on  13:37:48
12  page 57, line 14, she says about two feet. Do you  13:37:50
13  see that?  13:37:56
14  A.  Okay.  13:37:56
15  Q.  And so in --  13:37:56
16  A.  Four feet from ground level. I'm not  13:38:06
17  sure what you're asking about.  13:38:10
18  Q.  Oh, I don't think there is a question  13:38:12
19  pending right now.  13:38:12
20  A.  Okay.  13:38:14
21  Q.  Okay. In your report, you said she had  13:38:14
22  a solid piece in front of the unit. Do you recall  13:38:18
23  what that is referencing?  13:38:22
24  A.  I don't recall absolutely.  13:38:28

34 (Pages 130 - 133)

1  Q.  And if it helps refresh your          13:38:32
2  recollection, I believe pages 59 and 60 talk about  13:38:34
3  what was located in the room.              13:38:40
4       A.  Okay.  So she says on the same side as  13:39:46
5  the kitchen window.  I'm trying to figure out where  13:39:48
6  the bar is relative to the kitchen.  The bar she  13:40:00
7  sees things on, I was assuming that meant --  13:40:32
8       Q.  So the bar here -- my understanding of  13:40:34
9  the testimony is it's in between the kitchen and  13:40:36
10  the dining room.  That's on page 56, line 16.  It's  13:40:40
11  the wall between her kitchen and her dining room.  13:40:50
12  Here, if you look at line 23, "What separates the  13:40:56
13  kitchen from the dining room is a counter.  You  13:40:58
14  have the counter, then you have a raised counter  13:40:58
15  like a bar where you can put bar stools or  13:41:00
16  something."  Question, "So peninsula?"  13:41:02
17       A.  Okay.  So the question is, is that  13:41:06
18  interfering with the height of the plugged in unit?  13:41:08
19  It's a raised bar next to the counter potentially  13:41:20
20  blocking.                                  13:41:24
21       Q.  Okay.  So take a look at page 57 here  13:41:42
22  starting on line 3:  "You're in the kitchen, there  13:41:50
23  is the counter that you use to prepare your food,  13:41:52
24  and then raised up is another formica counter which  13:41:54

                                             Page 134

1  is higher where you can put bar stools on the other  13:41:58
2  side, you know what I'm saying?"  "Yes.  To the  13:42:00
3  left of that is an outlet for a phone or whatever,  13:42:02
4  blender, whatever, and that's where I put it right  13:42:06
5  there."                                    13:42:08
6       A.  To the left of that counter on the wall  13:42:08
7  of the kitchen above the counter means that it's  13:42:12
8  blocked.                                   13:42:14
9       Q.  So, in other words, the obstruction  13:42:16
10  you're referring to was that there was a bar in her  13:42:18
11  house?                                     13:42:24
12       A.  Raised high enough to be a barrier to  13:42:24
13  the sound moving in the direction of the living  13:42:28
14  room.                                      13:42:30
15       Q.  Understood.  So the unit is  13:42:32
16  in the room, but because there is kind of a  13:42:34
17  peninsula in the room, a peninsula of counter  13:42:38
18  space, it can't --                         13:42:40
19       A.  It's directing it just across the  13:42:42
20  short --                                   13:42:42
21       MR. OSTOJIC:  Wait, wait.               13:42:46
22       MR. KOPEL:  All right, that's fine.     13:42:46
23  BY MR. KOPEL:                              13:42:46
24       Q.  You said it's directing that just across  13:42:46

                                             Page 135

1  the short space, right?                    13:42:50
2       A.  Yes.                              13:42:50
3       Q.  Okay.  Because on the other side of  13:42:50
4  counter the sound waves can't reach, right?  13:42:52
5       A.  Right.                            13:42:54
6       Q.  And even to the right and to the left of  13:42:54
7  that bar, the sound waves can't reach, right?  13:42:58
8       A.  Yes.                              13:43:00
9       Q.  Do you have a setup like that in your  13:43:02
10  kitchen?                                   13:43:16
11       A.  Absolutely.                       13:43:16
12       MR. OSTOJIC:  Object to form.           13:43:18
13  BY MR. KOPEL:                              13:43:18
14       Q.  So you have -- can you describe your  13:43:18
15  kitchen, please?                           13:43:20
16       A.  It is connected to the main dining room  13:43:26
17  and living room with a barrier coming off to the  13:43:28
18  right hand of the stoves and ovens and up to the  13:43:36
19  wall, a diagonal piece with a sink and then heading  13:43:42
20  directly across at a height suitable for having bar  13:43:46
21  stools and people sitting there holding a  13:43:50
22  conversation while you're working on things in the  13:43:54
23  kitchen.  a dishwasher underneath it, and then  13:43:54
24  everything to the north is counter, windows, walls  13:43:58

                                             Page 136

1  around to the back.                        13:44:02
2       Q.  Okay, thank you, that's helpful.  If you  13:44:04
3  wanted to use the Bell & Howell repellers  13:44:06
4  effectively in your kitchen, how many units would  13:44:10
5  you need?                                  13:44:12
6       A.  There are three changes in height, so I  13:44:20
7  would suggest three, but it's a very large kitchen.  13:44:24
8  I would use that anyway.                    13:44:28
9       Q.  Do you know how many square feet it is?  13:44:28
10       A.  As I say, it's continuous with my main  13:44:32
11  living room and dining room.               13:44:34
12       Q.  Okay.                             13:44:36
13       A.  That entire space is well over 1,500  13:44:38
14  square feet.                               13:44:40
15       Q.  And you think three units could cover  13:44:42
16  that space, or we're just talking about the kitchen  13:44:44
17  area?                                      13:44:46
18       A.  We're just talking about the kitchen  13:44:46
19  area.                                      13:44:48
20       Q.  Okay.  Do you know what the square  13:44:48
21  footage of the kitchen is?                 13:44:50
22       A.  450.                             13:44:56
23       Q.  Okay.  So now let's move on to what I  13:44:58
24  believe is your -- oh, we're not up to your  13:45:06

                                             Page 137

                                      35 (Pages 134 - 137)

1  favorite pan yet. You say here. "Once she sealed   13:45:12
2  the ceiling crack where the ants were entering, she   13:45:18
3  had only a few ants that she felt entered from   13:45:20
4  outside near/via the kitchen window."   13:45:22
5       Okay. So did I read that correctly?   13:45:24
6  A.  Yes.   13:45:28
7  Q.  Can you look at page 53 of the   12:45:30
8  deposition transcript, please? Are you on page 53?   13:45:34
9  A.  Yes.   13:45:46
10  Q.  Line 12 reads, "Ants coming in through   13:45:46
11  my wall and across the ceiling into my kitchen, a   13:45:48
12  lot of them --   13:45:52
13  MR. OSTOJIC:  Wait.   13:45:52
14  BY THE WITNESS:   13:45:54
15  A.  No, not in this one.   13:45:54
16  BY MR. KOPEL:   13:45:54
17  Q.  Oh, I'm sorry, 63. I misspoke.   13:45:56
18  Okay.  So do you see lines 12 to 16   13:46:06
19  Ms. Bueno is identifying that the ants were coming   13:46:10
20  in from the same wall to which the repeller was   13:46:12
21  plugged in?   13:46:16
22  A.  Uh huh.   13:46:16
23  MR. OSTOJIC:  Object to form, foundation.   13:46:16
24  BY MR. KOPEL:   13:46:18

Page 138

1  Q.  Is that a yes?   13:46:18
2  A.  Yes.   13:46:20
3  Q.  And under those circumstances, it's your   13:46:26
4  opinion Ms. Bueno couldn't have expected the   13:46:30
5  repeller to work because it can't possibly repel or   13:46:34
6  drive out pests that are coming in from the same   13:46:38
7  wall that it's plugged into, is that right?   13:46:44
8  A.  There is that, and it wasn't certainly   13:46:46
9  going to stop them from coming in from the dining   13:46:48
10  room because it wasn't painted there.   13:46:50
11  Q.  Right, okay. Now, with regards to   13:46:54
12  Ms. Hart, in the interest of time, do you remember   13:47:20
13  what, without using the deposition transcript,   13:47:26
14  obstruction you're referring to?   13:47:28
15  A.  I do not, but she specifically described   13:47:50
16  something that was blocking it.   13:47:54
17  Q.  Okay. We'll take a quick look.   13:47:58
18  Hopefully we can find it without wasting too much   13:48:00
19  time.   13:48:02
20  MR. KOPEL:  I'll ask the Court Reporter to   13:48:02
21  please mark as Exhibit 6 the deposition of Joanne   13:48:04
22  Hart.   13:48:06
23
24

Page 139

1       (WHEREUPON, a certain document was   13:48:06
2       marked Whitford Deposition Exhibit
3       No. 6, for identification, as of
4       01/12/2018.)
5  BY MR. KOPEL:
6  Q.  Okay. Can you please -- well, first of   13:48:40
7  all, do you have Exhibit 6?   13:48:42
8  A.  I do.   13:48:44
9  Q.  Have you seen it before?   13:48:44
10  A.  Yes.   13:48:44
11  Q.  What is it?   13:48:46
12  A.  Deposition of Joanne Hart.   13:48:48
13  Q.  Okay, great. Can you please turn to   13:48:50
14  page 77?   13:48:54
15       Okay. Starting at line 5 Ms. Hart   13:49:08
16  identifies that it was plugged into an outlet   13:49:10
17  between a sliding glass door and an entertainment   13:49:14
18  center, but it had no obstruction, do you see that?   13:49:16
19  A.  Yes, I do.   13:49:18
20  Q.  Okay. When you stated obstruction   13:49:20
21  earlier, were you referencing this entertainment   13:49:24
22  center that's next to it?   13:49:26
23  A.  Well, she also says she had two in the   13:49:28
24  living room which are more likely to be the ones   13:49:30

Page 140

1  I'm concerned with.   13:49:34
2  Q.  Okay. Where are you looking right now?   13:49:34
3  At line 11, right?   13:49:38
4  A.  Line 11, yes.   13:49:38
5  Q.  Okay. Then one was on the counter in   13:49:40
6  the kitchen, do you see that?   13:49:44
7  A.  Okay.   13:49:44
8  Q.  That's on lines 14 and 15 on page 77, do   13:49:44
9  you see that?   13:49:48
10  A.  Okay.   13:49:48
11  Q.  So without -- I mean can you identify   13:49:56
12  what the obstruction you are referring to is, or   13:50:00
13  are you not able to right now?   13:50:02
14  A.  I would have to go through.   13:50:04
15  Q.  Well, okay, hold on. Actually, let's go   13:50:06
16  back.   13:50:08
17  A.  "Was there furniture along that wall?"   13:50:08
18  "The only thing that was there is jewelry   13:50:10
19  cabinets."   13:50:12
20  Q.  Sorry to interrupt you. I think I found   13:50:14
21  what might be what you're looking for. Take a look   13:50:16
22  at page 76, please, starting with line 16:   13:50:16
23  Question: "What kind of furniture did you have in   13:50:24
24  your living room?" Answer: "I have a couch, two   13:50:26

Page 141

36 (Pages 138 - 141)

1  end tables on the couch, a leather chair, a lounge   13:50:28
2  chair, a coffee table, an entertainment center, a   13:50:32
3  television." Do you see that?   13:50:32
4  A.  Uh-huh.   13:50:34
5  Q.  Is that what you were referring to?   13:50:34
6  A.  Probably.   13:50:36
7  Q.  So if somebody has all of that furniture   13:50:38
8  in their living room, would that obstruct the   13:50:42
9  devices and prevent them from being effective?   13:50:52
10  MR. OSTOJIC:  Object to form, foundation.   13:50:54
11  incomplete hypothetical, but go ahead.   13:50:56
12  BY THE WITNESS:   13:50:58
13  A.  It would have at least provided what   13:50:58
14  they would have considered a sound shadow if that   13:51:02
15  entertainment center was, you know, far far away   13:51:04
16  from the device plugged in between the sliding   13:51:08
17  glass door and it in a narrow space.   13:51:10
18  BY MR. KOPEL:   13:51:14
19  Q.  Oh, so if the outlet -- so the outlet is   13:51:14
20  located between the glass door and the   13:51:18
21  entertainment center, even though there is nothing   13:51:20
22  directly in front of it, the fact that the   13:51:22
23  entertainment center is right next to it, that's   13:51:24
24  the problem?   13:51:26

Page 142

1  A.  It provides partial.   13:51:26
2  Q.  Understood.  So that's the obstruction.   13:51:28
3  Okay, thanks for helping me understand.   13:51:30
4  A.  Yeah.   13:51:32
5  Q.  Now, have you read instruction -- what   13:51:36
6  are you basing -- your statement here about the   13:51:40
7  height at which the repeller is plugged in was   13:51:44
8  contrary to instructions, what is that based on?   13:51:48
9  A.  I had read through the instructions that   13:51:54
10  came with it.   13:52:00
11  Q.  Okay.   13:52:00
12  A.  That suggests that you need to put it in   13:52:02
13  at the height and directing towards the source of   13:52:04
14  your problem.   13:52:08
15  Q.  Okay.  Well, I'll show you a copy of   13:52:10
16  instructions and maybe you can help me find it.   13:52:16
17  A.  Okay.   13:52:20
18  Q.  I'm going to hand to you a document   13:52:34
19  which was previously marked as Potter Exhibit 3,   13:52:36
20  A.  Do you need to stamp and mark this?   13:52:48
21  Q.  No.   13:52:50
22  A.  Okay.  So we've moved off from --   13:52:52
23  Q.  Yes.  Well, we'll come back to that   13:52:56
24  report, but let's focus on this for now, please.   13:52:58

Page 143

1  So you have Potter Exhibit 3?  The only   13:53:02
2  question is do you have Potter Exhibit 3?   13:53:06
3  A.  I have Potter, yes.   13:53:08
4  Q.  Yeah, okay.  Can you please look at the   13:53:10
5  third page, and actually I'm going to focus you in,   13:53:12
6  please, on pages 3, 4, 5 and 6 of this document,   13:53:16
7  and I will represent to you that these -- actually,   13:53:20
8  I don't need to represent them to you.   13:53:20
9  Can you please look at page 3?   13:53:24
10  A.  Yes.   13:53:28
11  Q.  I'm sorry, you know what, I miscounted.   13:53:32
12  5, page 5.  Do you see here is a photocopy of a   13:53:36
13  package shipping label here, something was shipped   13:53:46
14  to Michael Donahue?   13:53:52
15  A.  Oh, okay.   13:53:58
16  Q.  Do you see here there is a photocopy of   13:53:58
17  a shipping label where a package was shipped to   13:54:00
18  Michael Donahue?  Is that a yes?   13:54:04
19  A.  Yes.   13:54:06
20  Q.  You see it says, "Contents, three   13:54:06
21  4-packs ultrasonic pest repeller, Bell & Howell   13:54:08
22  new," do you see that?   13:54:12
23  A.  Yes.   13:54:12
24  Q.  Turn to the next page, please.  Do you   13:54:14

Page 144

1  see her here -- here is pictures of what the   13:54:18
2  package units look like, do you see that?   13:54:22
3  A.  I do.   13:54:24
4  Q.  Please look at the next two pages.  Do   13:54:24
5  you recognize what these pages depict?   13:54:30
6  A.  I do.   13:54:36
7  Q.  Okay.  What is it?   13:54:38
8  A.  It's the instructions that come with an   13:54:40
9  item this form of Bell & Howell ultrasonic pest   13:54:42
10  repeller.   13:54:48
11  Q.  Okay, good.  Can you please identify for   13:54:48
12  me where it states the height in which it's   13:54:52
13  supposed to be plugged in?   13:54:54
14  A.  I do not see that on this one.   13:55:18
15  Q.  Can you direct me to where the   13:55:20
16  instructions say that the units need to be directed   13:55:22
17  towards probable entrance points of insects and   13:55:26
18  such?   13:55:28
19  MR. OSTOJIC:  Object to form, foundation.   13:55:30
20  You're talking about just this page on the Exhibit,   13:55:32
21  correct?   13:55:36
22  BY MR. KOPEL:   13:55:36
23  Q.  Well, you've identified this as the   13:55:38
24  instructions, have you not?   13:55:40

Page 145

37 (Pages 142 - 145)

1    MR. OSTOJIC: But you want him just on that   13:55:50
2  page?                       13:55:52
3  BY MR. KOPEL:           13:55:52
4    Q.  No, you could look at any page of this   13:55:52
5  Exhibit if you'd like.         13:55:54
6    MR. OSTOJIC: And I don't want to -- but the  13:55:56
7  label in front of the product has also   13:55:58
8  instructions, that's why I didn't know if you  13:56:02
9  wanted that as well. This is the owner's manual.  13:56:04
10    MR. KOPEL: Do you have extra copies of that?  13:56:06
11  Can I have that sheet, do you mind? I actually  13:56:08
12  don't need extra copies. I can use that one label.  13:56:12
13    MR. OSTOJIC: Yeah.        13:56:18
14    MR. KOPEL: Okay, great, thanks.    13:56:18
15  BY MR. KOPEL:          13:56:18
16    Q.  I think there was a question pending.  13:56:24
17  I'm sorry. Have you located anywhere in these  13:56:26
18  instructions where it says --       13:56:30
19    A.  On this page, no.      13:56:30
20    Q.  Let me just finish my question so the  13:56:32
21  record is not confusing. Have you located anywhere  13:56:34
22  in these instructions where it says which direction  13:56:38
23  to point the units in?       13:56:40
24    A.  Let me go back and see if in my notes I  13:56:46

Page 146

1  had that because I know at one point I wrote down  13:56:56
2  the directions in detail.       13:57:04
3      I don't see that.       13:57:20
4    Q.  And, by the way, a portion of your  13:57:22
5  report is devoted to your review of the directions,  13:57:24
6  instructions, right?        13:57:26
7    A.  Uh-huh.         13:57:28
8    Q.  Okay. Please take a quick look at that  13:57:28
9  portion of Exhibit 1, UPR claims and instructions  13:57:34
10  for pest repellers, that's Exhibit 1, your initial  13:57:40
11  report. Keep that Exhibit handy, please, but  13:57:44
12  please take a look at Exhibit 1, your initial  13:57:48
13  report.             13:57:50
14    A.  This one, okay. Now, what page?  13:58:16
15    Q.  There is no pages numbers, but the  13:58:20
16  section is called UPR claims and instructions for  13:58:22
17  BHH pest repellers.       13:58:26
18    A.  Oh, okay.       13:58:54
19    Q.  Do you see that section? Yeah, if you  13:58:54
20  just flip the page you were already on.   13:58:58
21    A.  Okay. So you don't want these things  13:59:02
22  which are definitely on the surface of the package?  13:59:06
23    Q.  I'm sorry, are you at the section  13:59:10
24  entitled UPR claims and instructions for --  13:59:12

Page 147

1    A.  Yes.         13:59:14
2    Q.  Okay. Do you see in any of these  13:59:14
3  instructions where it states a direction for the  13:59:16
4  unit to be pointed in?      13:59:22
5    MR. OSTOJIC: Object to form.    13:59:26
6  BY THE WITNESS:       13:59:40
7    A.  I do not.       13:59:40
8  BY MR. KOPEL:        13:59:42
9    Q.  Same question for the height at which it  13:59:42
10  needs to be plugged in, do you see that here?  13:59:44
11    A.  I do not.        13:59:46
12    MR. KOPEL: I will mark an Exhibit which  13:59:56
13  opposing Counsel kindly gave to me as Whitford  13:59:58
14  Exhibit 7.           14:00:02
15      (WHEREUPON, a certain document was  14:00:02
16      marked Whitford Deposition Exhibit
17      No. 7, for identification, as of
18      01/12/2018.)
19  BY MR. KOPEL:
20    Q.  Okay. Same two questions with regards  14:00:30
21  to Exhibit 7, do you see anywhere on there where it  14:00:32
22  says the height or direction in which consumers are  14:00:34
23  supposed to plug in the devices?    14:00:38
24    A.  I do not.       14:00:54

Page 148

1    Q.  Now, if these instructions were not  14:01:00
2  included with the packaging, would consumers have  14:01:06
3  had any way to know the height and direction in  14:01:10
4  which the repellers were required to be plugged in?  14:01:12
5    A.  One would say common sense means you  14:01:20
6  point them towards where the problem is, height and  14:01:24
7  direction.          14:01:28
8    Q.  So you think average lay people  14:01:38
9  understand that ultrasonic sound is unidirectional?  14:01:40
10    A.  I don't know.      14:01:50
11    Q.  Well, if I turn on a stereo and listen  14:01:50
12  to a rock album, does the sound of the rock album  14:01:54
13  permeate the entire room, or does it only go in a  14:01:58
14  straight line?         14:02:00
15    A.  It tends to permeate the whole room.  14:02:02
16    Q.  But ultrasonic sound does not, correct?  14:02:06
17    A.  Correct.        14:02:08
18    MR. OSTOJIC: Object to form.    14:02:10
19  BY MR. KOPEL:        14:02:10
20    Q.  And you think that average lay person  14:02:10
21  consumers know the distinction between those two  14:02:12
22  types of sounds?        14:02:16
23    MR. OSTOJIC: Object to form, foundation.  14:02:20
24  BY THE WITNESS:       14:02:22

Page 149

38 (Pages 146 - 149)

1   A.  Perhaps not.         14:02:22
2   MR. KOPEL: Let's go off the record very    14:02:38
3 briefly, please.         14:02:38
4   THE VIDEOGRAPHER: We're off the record at   14:02:40
5 1:56 p.m.         14:02:42
6   (WHEREUPON, a short break was had.)   14:08:04
7   THE VIDEOGRAPHER: We are back on the record  14:08:04
8 at 2:01 p.m. at the beginning of media 4.   14:08:12
9 BY MR. KOPEL:         14:08:12
10   Q. Dr. Whitford, can you please turn to   14:08:18
11 page 2 of your rebuttal report in this case?   14:08:18
12 Please let me know when you have it.    14:08:28
13   A. I have it.       14:08:30
14   Q. Okay. So there is a section here   14:08:30
15 titled, "Specific comments relative to the study  14:08:34
16 cited by Dr. Potter to support his claims that   14:08:36
17 ultrasonic pest repellers have been shown to be  14:08:40
18 ineffective in certain studies," do you see that?  14:08:42
19   A. I do.       14:08:44
20   Q. I want to talk with you about some of   14:08:46
21 the studies you've addressed here, please. The  14:08:48
22 first portion addresses some studies regarding  14:08:52
23 electromagnetic technology, do you see that?   14:09:00
24   A. I do.       14:09:04

Page 150

1   Q. Okay. Have you personally seen any   14:09:06
2 evidence showing that electromagnetic technology is  14:09:08
3 effective at repelling or driving out rodents?   14:09:14
4   A. Do you mind if I just say it's   14:09:18
5 irrelevant to this because none of them use it   14:09:20
6 without ultrasound.      14:09:24
7   Q. So you're more than welcome to say that,  14:09:26
8 but I would prefer a yes or no answer to my   14:09:30
9 question in addition to that.     14:09:32
10   A. Okay. And the question was efficacy of  14:09:32
11 electromagnetic?      14:09:32
12   MR. KOPEL: Can you please repeat the   14:09:38
13 question?       14:09:40
14   (WHEREUPON, the record was read   14:09:40
15   as requested.)     14:09:40
16 BY MR. KOPEL:       14:09:40
17   Q. Did you hear the question?    14:09:40
18   A. I did, and the answer is no.   14:10:10
19   Q. Same question for insects.   14:10:12
20   A. No.       14:10:16
21   Q. Now, I know you have cited a lot of   14:10:22
22 studies here. I want to talk to you about some of  14:10:34
23 them. I'm going to show you some of them, and I'm  14:10:36
24 going to try to do this in an organized fashion so  14:10:40

Page 151

1 we're not stuck here all day.     14:10:42
2   A. Okay.      14:10:44
3   Q. So regarding the Lund studies, Lund 1984  14:10:44
4 then Lund 1987, do you see that?     14:10:50
5   A. Yes.      14:10:52
6   Q. So here you write that the study   14:10:54
7 concluded that findings strongly indicate that a  14:11:00
8 practical effect in a warehouse, stable, store room  14:11:02
9 or almost any other large building is out of the  14:11:04
10 question, but since the Bell & Howell product   14:11:06
11 instructions recommend use in an average size room,  14:11:10
12 this study has no bearing on the efficacy of BH   14:11:14
13 ultrasonic pest repellers. Did I accurately   14:11:18
14 summarize what you wrote here?     14:11:22
15   A. Yes.      14:11:24
16   MR. KOPEL: I'll ask the Court Reporter to  14:11:28
17 please mark as Exhibit 8 a Lund 1984 study.   14:11:30
18   (WHEREUPON, a certain document was   14:11:30
19   marked Whitford Deposition Exhibit
20   No. 8, for identification, as of
21   01/12/2018.)
22 BY MR. KOPEL:       14:11:54
23   Q. Do you have Exhibit 8?    14:11:54
24   A. I do now.      14:11:56

Page 152

1   Q. Have you seen this before?    14:11:58
2   A. No.       14:11:58
3   Q. Do you see here that there is a letter   14:12:02
4 written by Mogens Lund on the left side of the   14:12:06
5 page?       14:12:12
6   A. I see that, yes.     14:12:12
7   Q. And you see this is dated December 1984?  14:12:14
8 On the bottom of the page, December 1984.   14:12:24
9   A. Okay, yes, pest control 1984.   14:12:28
10   Q. And can you please look at the third   14:12:30
11 column here, the end of the first paragraph uses  14:12:32
12 the language "strongly indicates that a practical  14:12:40
13 effect in a warehouse situation, in a stable, in a  14:12:44
14 store room, or almost any other building is out of  14:12:46
15 the question," do you see that?     14:12:48
16   A. Yes, I do.     14:12:50
17   Q. And that's the same language you use in  14:12:50
18 your report, right?      14:12:52
19   A. Right.      14:12:54
20   Q. Can you please look at the second   14:12:54
21 column, paragraph 3 starting with the words "the  14:12:56
22 test procedure," do you see that?    14:13:04
23   A. Yes.      14:13:04
24   Q. This reads, "The test procedure has been  14:13:06

Page 153

**Page 154**

1  the most favorable from a producer's viewpoint; a   14:13:06
2  small area to be protected and no obstacles to   14:13:10
3  create sound shadows. As a routine, an established   14:13:12
4  rat population in a modest proof room, 4.5 by 4.5   14:13:16
5  meters, provided with a surplus of shelter, home   14:13:22
6  cages and straw, laboratory food and water, was   14:13:26
7  allowed to explore a neighboring identical room and   14:13:30
8  feed from a tray with a weighted amount of wheat.   14:13:32
9  Rooms were connected by a small doorway, 15 by 15   14:13:34
10 centimeters, at floor level. The ultrasound device   14:13:36
11 was installed in an empty room, the loud speaker   14:13:38
12 pointing against the feeding tray from a distance   14:13:42
13 of 3.5 meters," do you see that?   14:13:42
14   A.  Yes.   14:13:44
15   Q.  So do you understand that the size of   14:13:46
16 the room here was 4.5 by 4.5 meters?   14:13:46
17   MR. OSTOJIC:  Objection, foundation, form.   14:13:50
18 That paragraph indicates that, but I don't know   14:13:54
19 what all the other stuff say, but go ahead and   14:13:56
20 answer.   14:13:58
21 BY THE WITNESS:   14:14:02
22   A.  4.5 by 4.5 meters, okay.  Does it   14:14:02
23 indicate the second of the same size?   14:14:08
24 BY MR. KOPEL:   14:14:12

**Page 155**

1   Q.  Sure, it says here neighboring identical   14:14:12
2  room.   14:14:16
3   A.  Okay, I just hadn't picked up on that.   14:14:16
4  Okay.   14:14:20
5   Q.  In your opinion is 4.5 by 4.5 meters a   14:14:22
6  large room?   14:14:28
7   A.  Yes, but I would need to finish reading   14:14:32
8  the rest of --   14:14:34
9   Q.  Oh, okay, take your time.   14:14:34
10   A.  -- the test to know what's going on.   14:14:36
11 I think I've seen enough to recognize   14:15:10
12 the habituation by them.   14:15:14
13   Q.  Okay, great.  But do you remember my   14:15:18
14 question?  Do you see here that the testing space   14:15:22
15 was in a room that was 4.5 by 4.5 meters?   14:15:26
16   A.  I do, but I had not seen this   14:15:30
17 previously.   14:15:32
18   Q.  You had not seen this previously?   14:15:32
19   A.  All I had was the comments that Potter   14:15:34
20 provided relative to this because I did not access   14:15:40
21 this.  Not all of the papers are relatively easy to   14:15:44
22 obtain.   14:15:50
23   Q.  I see.  And is the same true with all of   14:15:50
24 these studies listed here?   14:15:52

**Page 156**

1   A.  I accessed a number of them that I   14:15:56
2  could; but when you get to older papers, for the   14:15:58
3  most part they have not been transferred to   14:16:04
4  electronic formats and accessible.  And when you   14:16:08
5  get to specific papers on a given part of science,   14:16:10
6  often papers like this are only available to people   14:16:16
7  who are members of the society that is responsible   14:16:20
8  for pest control or entomology studies.   14:16:24
9   I can access almost any paper in the   14:16:28
10 Wildlife Society's archives because I've been a   14:16:30
11 member for 42 years, but I don't have access to   14:16:32
12 papers of societies I don't belong to in journals   14:16:36
13 which are out in print anymore and most of which   14:16:42
14 have been removed from the shelves of libraries and   14:16:44
15 institutions in the last two decades.   14:16:46
16   Q.  I see.  Did you ask a librarian for help   14:16:50
17 at your University?   14:16:52
18   A.  I have not asked because I'm not   14:16:54
19 actually there.   14:16:58
20   Q.  But you're a professor?   14:17:00
21   A.  I'm a professor.  I did not.  But they   14:17:00
22 themselves would have limited access to these   14:17:06
23 special society papers.  They may or may not be   14:17:10
24 able to request papers from those sources because   14:17:20

**Page 157**

1  if you're not a member of the society, you have to   14:17:28
2  pay to go online to get that.   14:17:30
3   Q.  Which of these studies have you read?   14:17:40
4   A.  Let's see, of these the --   14:17:50
5   MR. OSTOJIC:  Object to form.  Go ahead.   14:17:58
6  BY THE WITNESS:   14:18:06
7   A.  Okay.  Most of these I was citing   14:18:06
8  directly from quotes that Dr. Potter gave us   14:18:10
9  especially when they're saying that the studies   14:18:14
10 showed partial repellency as in paragraph 73,   14:18:16
11 temporarily discouraging rodents which showed   14:18:22
12 efficacy in part, No. 74, 71 where it says   14:18:24
13 occasional temporary repellent effects, each of   14:18:28
14 these contradicts Dr. Potter's claims that they   14:18:32
15 have no efficacy.   14:18:32
16 BY MR. KOPEL:   14:18:40
17   Q.  I'm sorry, do you recall the question?   14:18:40
18 I think I asked which ones of these have you read?   14:18:42
19   A.  I know that I have accessed the full   14:18:46
20 Gould, et al. 1984, I have found the online ones   14:18:50
21 that were indicated later on, and then again I'm   14:18:58
22 using the information that was provided on the size   14:19:08
23 of the arenas, the presence of food, other   14:19:12
24 information taken directly from Dr. Potter's   14:19:20

1  quotes.                                14:19:24
2      When you get to paragraph 68 quoting the  14:19:28
3  Koehler study, the Koehler study is an overview of  14:19:32
4  other studies which have been previously done which  14:19:36
5  reference in many cases very old studies. And in  14:19:50
6  this case when we're looking back at those, the  14:19:50
7  conclusions from Koehler, et al. 1990, this is a  14:19:56
8  statement or an opinion. The author has no  14:20:00
9  personal experience working with those animals.  14:20:04
10  He's just summarizing what other people have  14:20:06
11  written. It's hearsay.              14:20:08
12      MR. KOPEL. Okay. I need to go off the  14:20:12
13  record, please.                    14:20:14
14      THE VIDEOGRAPHER: We're off the record at  14:20:16
15  2:13 p.m.                          14:20:18
16      (WHEREUPON, a short break was had.)  14:38:46
17      THE VIDEOGRAPHER: We are back on the record  14:38:46
18  at 2:32 p.m.                       14:38:52
19  BY MR. KOPEL:                      14:38:52
20      Q.  Sorry about that, Dr. Whitford. Was  14:38:56
21  there anything else you wanted to add about  14:38:58
22  Exhibit 8?                         14:39:00
23      A.  Yes.                       14:39:00
24      Q.  Go ahead.                    14:39:00

Page 158

1      A.  Like most of the references that I did  14:39:02
2  find and that are here, this one doesn't have any  14:39:06
3  replicates. The duration of the test is 30, 40  14:39:12
4  minutes. I mean there is no scientific basis that  14:39:16
5  would be acceptable to Dr. Potter in this if he was  14:39:20
6  trying to review it and look at it and evaluate it.  14:39:24
7  This is a letter, it's not peer-reviewed.  14:39:32
8      Q.  Okay. Let's go back. I know you  14:39:38
9  mentioned that you found Gould. Any others that  14:39:46
10  you found?                         14:39:50
11      A.  I found several by putting them in  14:39:52
12  online. I don't have -- I didn't particularly mark  14:40:00
13  down which.                        14:40:04
14      Q.  Okay. So certain of these studies you  14:40:06
15  found?                             14:40:08
16      A.  A few of these are available online if  14:40:08
17  you type in the full --              14:40:10
18      Q.  Okay.                        14:40:12
19      A.  I went through his citations.    14:40:12
20      Q.  Yes.                         14:40:14
21      A.  At the end of his -- not deposition but  14:40:14
22  his commentary. I went through his list of  14:40:20
23  citations, typed them in and tried to Google them  14:40:22
24  and got the ones which would come up.  14:40:26

Page 159

1      Q.  Okay.                        14:40:30
2      A.  But the others are too far back, not  14:40:30
3  changed over to E files. And like this, if they've  14:40:32
4  this obscure, I understand perfectly why.  14:40:38
5      Q.  Okay. But you don't remember which ones  14:40:42
6  you found?                         14:40:44
7      A.  Not absolutely, no.            14:40:44
8      Q.  Aside from Googling, what else did you  14:40:46
9  do to search for these references?   14:40:50
10      A.  Well, if you can't find the reference by  14:40:52
11  Googling it with the full title and authors' names  14:40:56
12  and dates, I can't imagine that, if I sent it to my  14:41:00
13  University and requested them to find it, they'd  14:41:06
14  have any more success with it.       14:41:08
15      Q.  Okay. You didn't try that, right?  14:41:10
16      A.  I did not partly that there has been a  14:41:12
17  great lack of time in my life this last two months  14:41:18
18  because of my late brother-in-law's severe illness  14:41:20
19  and demise and my mother-in-law's illness and  14:41:24
20  demise in the past three weeks.      14:41:28
21      Q.  I'm super sorry to hear about that.  14:41:30
22      A.  Yeah, it's been a struggle from July,  14:41:32
23  and I've worked in this at all points because I  14:41:40
24  didn't have to be there to assist, but my wife has  14:41:44

Page 160

1  been the primary caregiver for those two last  14:41:48
2  members of more family.               14:41:50
3      Q.  Okay, understood. I'm sorry to hear  14:41:52
4  about it.                          14:41:54
5      A.  Thank you.                    14:41:54
6      MR. KOPEL: I'll ask the Court Reporter to  14:42:24
7  please mark this document Exhibit 9.  14:42:26
8      (WHEREUPON, a certain document was  14:42:26
9      marked Whitford Deposition Exhibit  14:42:26
10      No. 9, for identification, as of
11      01/12/2018.)
12  BY MR. KOPEL:
13      Q.  Do you have Exhibit 9?          14:42:54
14      A.  Okay. I've not seen this before.  14:45:44
15      Q.  Okay. Well, you're welcome to. Let me  14:45:48
16  know when you're --                  14:45:52
17      A.  I'm ready.                    14:45:52
18      Q.  Have you looked this over?       14:45:54
19      A.  I have.                      14:45:56
20      Q.  What is Exhibit 9?             14:46:02
21      A.  What is it?                   14:46:06
22      Q.  Yes.                         14:46:08
23      A.  It's a short paper from probably a  14:46:08
24  manufacturer or test place. It's not a recognized  14:46:18

Page 161

41 (Pages 158 - 161)

**Page 162**

1  journal of any kind. Alternatives to toxicants for   14:46:22
2  control of rats and mice. I don't see an author's   14:46:30
3  name on it.   14:46:40
4  Q.  Oh, do you see the first --   14:46:46
5  A.  Oh, Meehan on the front, okay, so yes.   14:46:50
6  Q.  And if you look at page 266, please.   14:46:56
7  A.  Uh-huh.   14:47:00
8  Q.  The first full paragraph which starts   14:47:00
9  "to date," it talks about partial repellency.   14:47:04
10  A.  Uh-huh.   14:47:10
11  Q.  And that's the reference on page 2 of   14:47:10
12  your report, correct?   14:47:18
13  A.  It is.  At the same time, it doesn't say   14:47:18
14  how many replicates were done with each device, it   14:47:22
15  doesn't tell me how long the creatures were   14:47:24
16  subjected to it, or what the frequencies were that   14:47:26
17  they were subjected to in most cases, what the   14:47:30
18  decibel levels were.   14:47:34
19  It does provide one new piece of   14:47:36
20  information that 160 decibels at 20 hertz will kill   14:47:38
21  a mouse in one minute.  I haven't seen anything do   14:47:42
22  that since I dropped a goose at five feet with a   14:47:44
23  high frequency burst of 21,000 cycles per second in   14:47:48
24  a lab environment, so there just -- it's a short   14:47:56

**Page 163**

1  note, it's not apparently peer-reviewed.  It's   14:48:02
2  informational, but it says that there is some   14:48:08
3  repellency.   14:48:12
4  Q.  A short-term repellency?   14:48:16
5  A.  Yeah.  But if you're only doing a   14:48:18
6  short-term test -- I don't know the size of the   14:48:20
7  enclosures they were using, I don't -- there is too   14:48:22
8  much information lacking for me to give this   14:48:28
9  credence.   14:48:32
10  Q.  You've read the entire Exhibit 9, right?   14:48:32
11  A.  I have.   14:48:34
12  Q.  Okay.  Do you have anything else to add   14:48:48
13  on Exhibit 9?   14:48:52
14  MR. OSTOJIC:  Object to form.   14:48:54
15  BY THE WITNESS:   14:48:56
16  A.  No.   14:48:56
17  BY MR. KOPEL:   14:48:56
18  Q.  Okay, thanks.   14:48:56
19  A.  They must have been very close to that   14:49:06
20  mouse or rat to kill it with a burst of ultrasound.   14:49:08
21  Q.  You're the scientist.   14:49:18
22  A.  It would have been the microwave effect,   14:49:26
23  vibrating its internal cells to fry it just like   14:49:32
24  popping dinner in the microwave.   14:49:36

**Page 164**

1  MR. KOPEL:  I'll ask the Court Reporter to   14:49:46
2  please mark as Exhibit 10 Ultrasonics and   14:50:04
3  Electromagnetic Control of Rodents.   14:50:08
4  (WHEREUPON, a certain document was   14:50:08
5  marked Whitford Deposition Exhibit   14:50:08
6  No. 10, for identification, as of   14:50:08
7  01/12/2018.)   14:50:08
8  BY MR. KOPEL:   14:50:08
9  Q.  I can see you're reading that.  Take as   14:50:58
10  long as you need, just let me know when you're   14:51:00
11  ready, please.   14:51:04
12  A.  Yes, I just have to know what they did,   14:51:04
13  what they concluded.   14:51:10
14  Q.  No problem.   14:51:10
15  A.  Okay.  I'm not worrying about the   14:53:18
16  electromagnetic devices since they're not germane   14:53:20
17  to what we're talking about.   14:53:22
18  Q.  Okay.  You've had a chance to review the   14:53:24
19  ultrasound --   14:53:28
20  A.  All the ultrasound tests conclude that   14:53:28
21  there is some limited practical dispersal repelling   14:53:30
22  functions.  Most don't give the size and the area   14:53:34
23  for tests.  Most of the early -- the ultrasonic   14:53:44
24  devices are actually talking about a number of   14:53:50

**Page 165**

1  things which are not ultrasound; 9, 6 and 12   14:53:52
2  kilohertz, 19 kilohertz, those are not ultrasound.   14:53:58
3  They go on, 6 to 12 kilohertz, 6 to 9, 9   14:54:04
4  to 12, 12 to 16, not ultrasound.   14:54:08
5  Okay.  Yeah, you can give facts   14:54:14
6  non-lethal seizures if you do 25 kilohertz at 120   14:54:20
7  to 140 decibels.  They don't say at what distance.   14:54:24
8  There is not enough information there to see what   14:54:26
9  they would do in an average size room or what   14:54:30
10  prolonged exposure would do.  Probably if they   14:54:34
11  can't escape, you'd see habituation, which is what   14:54:34
12  they find, but I don't know how big the place is, I   14:54:42
13  don't know if there is a place a mouse could go to   14:54:46
14  to get away from the sound.   14:54:50
15  There is nothing there that indicates   14:54:54
16  that ultrasound is unequivocally inefficient or   14:54:58
17  unable to dispel a mouse, disperse a mouse.  It's   14:55:04
18  just you have to know what the test conditions,   14:55:10
19  frequencies, intensities of sound are to be able to   14:55:12
20  judge it.   14:55:16
21  Q.  Are you done?   14:55:16
22  A.  Yes.   14:55:18
23  Q.  Are you familiar with this journal?   14:55:20
24  Have you seen this journal before?   14:55:24

42 (Pages 162 - 165)

1    A.   I've seen references to it.  Long ago    14:55:26
2    and far away when I was working on my dissertation    14:55:30
3    and working on biological abstracts. I would page    14:55:32
4    through and find references to it.  Beyond that,    14:55:36
5    it's one of literally thousands of journals which    14:55:46
6    publish articles.    14:55:52
7        This is pretty much an overview of    14:55:56
8    studies. It's not Marsh and Howard carrying out    14:56:00
9    recent tests. He's talking about his 1950's tests    14:56:06
10   and 1962 tests, nothing after that date that's new.    14:56:12
11   and then they're doing a summary of what they found    14:56:20
12   in other people's tests, the conclusions of other    14:56:22
13   people's tests.    14:56:28
14       They're giving us their opinion of the    14:56:28
15   end of looking at these things without giving us    14:56:32
16   the information to judge any of the tests    14:56:34
17   individually. Unless you know the size of the    14:56:36
18   area, the frequencies, the intensities, I can't    14:56:40
19   tell you from this what's valid and what isn't.    14:56:44
20   Final conclusions of it are therefore impossible    14:56:50
21   for me to determine.    14:56:52
22       Q.   Is this a peer-reviewed journal, do you    14:56:54
23   know?    14:56:58
24       A.   It would be. But this is such a small    14:56:58
Page 166

1    paper it might have been sent as a short    14:57:02
2    communication rather than a peer-reviewed paper.    14:57:06
3    This would be the format you'd publish at the end    14:57:10
4    of a journal with a short reference -- short    14:57:12
5    statements of opinions and no new data.    14:57:16
6        Q.   Okay. So you're unsure if this specific    14:57:20
7    article was peer-reviewed?    14:57:22
8        A.   I would find that there is almost no    14:57:24
9    chance it was peer-reviewed simply because it    14:57:28
10   doesn't offer new data to look at. You get    14:57:30
11   peer-review when you design a test and execute the    14:57:32
12   test, analyze the test and produce results. You    14:57:36
13   don't get peer-reviewed for summing up what other    14:57:40
14   people have said.    14:57:42
15       Q.   Okay. And do you see here in the little    14:57:46
16   blurb in the front in smaller type, the first page,    14:57:52
17   is that called an abstract, or what is that?    14:57:56
18       A.   It's what can pass for an abstract in    14:57:58
19   here, but if you don't have a test, there is not    14:58:00
20   really an abstract.    14:58:04
21       Q.   Do you see the second sentence says, "It    14:58:06
22   is well established that such devices will not    14:58:08
23   exterminate, kill or drive rodents out of a    14:58:10
24   favorable habitat?"    14:58:14
Page 167

1    A.   They are not providing adequate basis to    14:58:18
2    make that claim. To be well established means that    14:58:24
3    it's repeated again and again. If you want an    14:58:26
4    example of science going bad, it's the fact that    14:58:30
5    it's impossible to get rid of misinformation    14:58:32
6    because people keep citing it long after its time    14:58:36
7    is done.    14:58:40
8        The Journal of -- New England Journal of    14:58:42
9    Medicine analyzed publications from 1990 to '99 in    14:58:46
10   the Lancet and New England Journal of Medicine. It    14:58:50
11   showed that 90 to 95 percent of those publications    14:58:54
12   were rescinded or proved to be false within five    14:58:58
13   years of their publication date, but the    14:59:04
14   retractions were one page notes in the back part,    14:59:06
15   so people keep citing them as being correct and    14:59:12
16   factual because the retractions don't get the air    14:59:14
17   play that other things do.    14:59:18
18       You remember the big thing about the    14:59:22
19   Framingham studies and cholesterol and you should    14:59:28
20   not eat butter but you should eat margarine, and    14:59:32
21   the fact that ten years later they turned around    14:59:36
22   and say, whoop, sorry, the margarine, no, it    14:59:38
23   doesn't make any difference. In fact it's worse for    14:59:42
24   you because of the trans fats, you go -- but if you    14:59:44
Page 168

1    look, you can still find many people referencing    14:59:48
2    the need to take in margarine instead of fat today.    14:59:50
3    You just can't kill out.    14:59:54
4        Q.   Is that why replication is important?    14:59:56
5        A.   Absolutely, and new publications have to    15:00:00
6    come out to say that it's still being tested, we    15:00:04
7    have not accepted it. When I taught my class, I    15:00:10
8    used to teach my students that you have to be    15:00:12
9    heretics. If you are going to contribute anything    15:00:16
10   to science, you cannot accept that what's been    15:00:18
11   written 10, 20, 30, 40 years ago is factual unless    15:00:20
12   you have gone about questioning it, and they're    15:00:26
13   citing 60 year old, 50 year old materials and not    15:00:34
14   revisiting, not checking with new equipment. It's    15:00:38
15   very skeptical.    15:00:44
16       Q.   Okay, I appreciate your detailed    15:00:44
17   response, and I understand that you disagree with    15:00:50
18   the conclusion of the author, but my only very    15:00:52
19   simple question is do you see that that way, in    15:00:58
20   fact, the author's conclusion that it was well    15:01:02
21   established that such devices will not exterminate,    15:01:04
22   kill or drive rodents out of a favorable habitat?    15:01:08
23       A.   I can see where that's his conclusion.    15:01:12
24       Q.   But you disagree with it, right?    15:01:14
Page 169

43 (Pages 166 - 169)

```
 1    A.  I don't think he's provided the evidence   15:01:16
 2  to say that absolutely  One thing again is that    15:01:18
 3  the equipment which was used in these, 1950, 1964,   15:01:22
 4  that ultrasound equipment is not going to be        15:01:26
 5  producing the same frequencies and things as what   15:01:28
 6  we're looking at. They tell you -- a lot of the     15:01:32
 7  stuff that they're talking about here is sonic      15:01:36
 8  frequencies. Only a few of these specifically       15:01:38
 9  mention ultrasonics.                                15:01:44
10    Q.  The critical thing to keep in mind is        15:01:50
11  the frequency and decibel level, isn't that         15:01:54
12  correct?                                            15:01:58
13    A.  Yes. As long as it's not over 20             15:01:58
14  kilohertz, it's not ultrasound.                     15:02:02
15    Q.  I'm sorry, what number?                       15:02:04
16    A.  20 kilohertz.                                 15:02:06
17    Q.  20 kilohertz or more?                         15:02:08
18    A.  Yes, it has to be above that. So many         15:02:10
19  of these I've cited they were saying 6, 9, 12       15:02:14
20  kilohertz. They tested quite a range of things,     15:02:18
21  not just ultrasonics.                               15:02:20
22    Q.  But certain of these tests cited to here      15:02:22
23  are, in fact, ultrasonics, is that right?           15:02:26
24    MR. OSTOJIC:  Object to form, foundation.         15:02:30
                                                      Page 170
```

```
 1  BY THE WITNESS:                                     15:02:30
 2    A.  Repeated exposure for two seconds to a        15:02:30
 3  frequency of 20 kilohertz at 90 to 100 decibels     15:02:34
 4  causes theresis in rats and cardiac hypertrophy.    15:02:38
 5    Q.  Are you reading a quote?                      15:02:40
 6    A.  I am on page 264, but that's not --           15:02:42
 7    Q.  Hold on, I think we're on different           15:02:46
 8  Exhibits right now.                                 15:02:46
 9    A.  Well, this was the last one you gave me.      15:02:52
10    Q.  Yes -- no, that was not. I'm on the           15:02:54
11  Howard and Marsh Exhibit.                           15:02:58
12    A.  Oh, I'm sorry.                                15:02:58
13        Okay, as test results. Frequencies of 4       15:03:06
14  to 48 kilohertz, that's sonic in ultrasound up to   15:03:16
15  140 decibels. 9, 6 and 12 kilohertz, 19 kilohertz,  15:03:22
16  6 to 12 kilohertz, 6 to 9, 9 to 12, 12 to 16        15:03:30
17  kilohertz. The only thing I'm seeing is a           15:03:34
18  non-lethal seizure at 25 kilohertz at 120 decibels. 15:03:36
19        Marsh '62, found some repellency to           15:03:48
20  rodents but doesn't give us the frequency or the    15:03:52
21  duration except that, you know, 17 to 27 days later 15:03:54
22  there were no sound -- there were rodent tracks in  15:04:00
23  the elevators again.                                15:04:02
24        And Greaves & Rowe, '69, concluded            15:04:08
                                                      Page 171
```

```
 1  strategically placed ultrasound devices may prevent 15:04:12
 2  or reduce invasion by free-moving rodents of        15:04:14
 3  premises with a few entry points, which says they   15:04:16
 4  can be repelled. So I mean his conclusions have     15:04:18
 5  very little support behind them in here.            15:04:24
 6    Q.  Okay. So you disagree with the author's       15:04:28
 7  conclusion that it's well established that such      15:04:30
 8  devices will not exterminate, kill or drive rodents 15:04:32
 9  out of a favorable habitat, is that correct?        15:04:36
10    A.  It's a lovely way to start a sentence if      15:04:36
11  you want to bias somebody without having the data   15:04:40
12  to support it. To say that everybody knows this is  15:04:42
13  true is --                                          15:04:48
14    Q.  Okay, thank you. You can set that             15:04:50
15  aside, please.                                       15:04:52
16    A.  Okay. That everybody says it is true          15:04:52
17  doesn't make it so.                                 15:05:02
18    MR. KOPEL:  I'll ask the Court Reporter to        15:05:08
19  please mark as Exhibit 11, "Efficacy Test Protocols 15:05:10
20  for Evaluation of Ultrasonic Rodent Repellent       15:05:12
21  Devices."                                           15:05:16
22        (WHEREUPON, a certain document was            15:05:16
23        marked Whitford Deposition Exhibit
24        No. 11, for identification, as of
                                                      Page 172
```

```
 1  01/12/2018.)
 2  BY THE WITNESS:                                     15:12:42
 3    A.  I don't know if you've looked at it, but      15:12:42
 4  it doesn't mention the ultrasound frequencies or    15:12:44
 5  decibel levels of anything used at any point in     15:12:50
 6  there.                                              15:12:52
 7  BY MR. KOPEL:                                       15:12:54
 8    Q.  So let's take this one step at a time,        15:12:54
 9  please. Have you had a chance to review the entire  15:12:56
10  Exhibit 117?                                        15:13:02
11    A.  I have.                                       15:13:02
12    Q.  Okay. And I'll give you a complete            15:13:04
13  opportunity to give me your thoughts on it; but     15:13:08
14  taking a look at what you had written about this in 15:13:14
15  your rebuttal report, having reviewed the Exhibit,  15:13:18
16  does that change anything that you wrote or not?    15:13:22
17    A.  It does not because I commented that the      15:13:26
18  spaces that they were testing were very -- much too 15:13:28
19  large, 196 square meters for the grain bins, and    15:13:34
20  the smaller buildings were smaller, but I don't     15:13:38
21  have the information on what frequencies they were  15:13:42
22  using, they don't specify the device's name, they   15:13:44
23  don't specify the decibel levels of it. I don't     15:13:52
24  know that it has any relevance to the Bell & Howell 15:13:54
                                                      Page 173
```

**44 (Pages 170 - 173)**

Page 174

```
1  tests.                              15:13:56
2     Q.  Okay.  So, first of all, you did see   15:14:02
3  that there were smaller testing spaces?     15:14:06
4     A.  I did.                        15:14:08
5     Q.  Okay.  Did you have anything to add in   15:14:52
6  the meantime on this Exhibit in terms of your   15:14:56
7  thoughts on this test?               15:15:00
8     A.  Well, they did two replications three   15:15:02
9  weeks apart.  They don't specify how they    15:15:04
10 determined the rodent activity particularly.  They   15:15:08
11 were using areas with food already present which is   15:15:10
12 in direct contradiction to the way the       15:15:14
13 Bell & Howell units are supposed to be operated.  I   15:15:18
14 don't see that there is enough information here to   15:15:22
15 compare those to the Bell & Howell tests in a   15:15:26
16 residence.                           15:15:40
17    Q.  Now, you mentioned that the replications   15:15:40
18 were several weeks apart.  Is that an issue in your   15:15:42
19 mind?                                15:15:48
20    A.  Not at all.  Two replications is better   15:15:48
21 than no replications, but it's still only two.   15:15:50
22    Q.  Well, how many replications are          15:15:52
23 necessary?                           15:15:54
24    A.  Well, according to Dr. Porter, 10 is the   15:15:54
```

Page 175

```
1  minimum, although he didn't provide any.   15:15:58
2     Q.  Would you agree that the number of    15:16:10
3  replications necessary is related to the number   15:16:16
4  of -- the sample size used in testing?      15:16:26
5     MR. OSTOJIC:  Object to form.          15:16:28
6  BY MR. KOPEL:                        15:16:28
7     Q.  Sorry, I can rephrase that if you're   15:16:30
8  confused.                            15:16:32
9     A.  I'm not confused.  I'm just thinking   15:16:34
10 about it.  Certainly within limits an increase in   15:16:36
11 sample size helps, but of course we saw in the   15:16:42
12 Chinese test that just increasing the number of   15:16:48
13 rats and mice screwed up the whole thing in 2016,   15:16:52
14 so sample size is not a be all and end all.   15:16:56
15 Replications of the same size is what's important.   15:17:04
16    Q.  Okay.  You can put to the side, please.   15:17:10
17    MR. KOPEL:  I'll ask the Court Reporter to   15:17:32
18 please mark as Exhibit 12 "Ultrasound as a   15:17:36
19 Deterrent to Rattus Norvegicus."            15:17:36
20    (WHEREUPON, a certain document was   15:17:36
21        marked Whitford Deposition Exhibit
22        No. 12, for identification, as of
23        01/12/2018.)
24 BY MR. KOPEL:                        15:18:02
```

Page 176

```
1     Q.  And, actually while the Court Reporter   15:18:02
2  is marking that, I see here that you had criticized   15:18:04
3  the Shumake study that we just reviewed on the   15:18:08
4  basis of the size of the testing space, but you did   15:18:12
5  see that there were smaller spaces tested as well?   15:18:16
6     A.  I did, but that wasn't apparent in the   15:18:20
7  abstract that I had seen on it.           15:18:24
8     Q.  Okay.                        15:18:26
9     A.  Which simply told me about 196 square   15:18:26
10 meters which is a tremendously large area and   15:18:30
11 impossible to reach with ultrasound especially when   15:18:34
12 it's filled with grain.                  15:18:36
13    Q.  And you mention here 175 square feet   15:18:42
14 regarding that.  Would it be a problem to use an   15:18:46
15 ultrasonic pest repeller for an area exceeding   15:18:54
16 175 square feet?                      15:19:00
17    A.  That's what the Bell & Howell used   15:19:04
18 because that's what was stipulated by Diane   15:19:10
19 Feuerstein as the proper size for a room to be used   15:19:16
20 in her deposition.  Would it work in a larger room,   15:19:18
21 175 square feet is going to be determined by the   15:19:26
22 nature of the materials that make up the room, what   15:19:28
23 kind of obstacles there are in the room, and the   15:19:30
24 linearity of the elements.               15:19:34
```

Page 177

```
1     Q.  When you say materials, can you please   15:19:38
2  elaborate on that?                    15:19:40
3     A.  Hard surfaced versus carpet for   15:19:40
4  flooring, hard surface versus soft textured walls.   15:19:44
5     Q.  I see.  So if there was a carpeted   15:19:46
6  flooring, what would be the appropriate range for   15:19:52
7  the devices?                         15:19:58
8     MR. OSTOJIC:  Object to form, incomplete   15:19:58
9  hypothetical, but go ahead.              15:20:00
10 BY THE WITNESS:                      15:20:02
11    A.  I don't know the exact answer to that   15:20:02
12 because nobody has done the measurements, but we do   15:20:04
13 know that it attenuates the sound.  It would be a   15:20:08
14 matter of the angle at which the sound waves met   15:20:10
15 the carpet would determine the degree to which it   15:20:14
16 attenuated because a steeper angle will cause more   15:20:16
17 loss of sound and less reflection.          15:20:20
18    Q.  A steeper angle, would that mean that   15:20:24
19 the unit was plugged in at a higher level?   15:20:26
20    A.  And/or pointing down, yes.          15:20:30
21    Q.  Okay.  But assuming it was pointing   15:20:32
22 straight out because you're plugging it into a   15:20:34
23 wall?                                15:20:36
24    A.  Well, if you have it higher up and   15:20:38
```

45 (Pages 174 - 177)

Page 178

```
 1  pointing straight out, then there is this area that   15:20:40
 2  it's not meeting for whatever the distance is out    15:20:44
 3  until the sound broadens for enough --               15:20:46
 4    Q.  I understand.                      15:20:50
 5    A.  -- to make contact with the floor.     15:20:50
 6    Q.  I understand.                      15:20:52
 7    A.  So you're leaving an area unprotected.   15:20:52
 8    Q.  Okay.  Okay, thank you.  Can you please  15:20:54
 9  take a look at this Lavoie and Giahn Exhibit,   15:20:58
10  Exhibit 12 I just handed to you, and let me know   15:21:08
11  when you're ready, please?             15:21:10
12    A.  Okay.                          15:26:24
13    Q.  Have you had a complete opportunity to   15:26:36
14  review Exhibit 12?                    15:26:38
15    A.  Adequately.                     15:26:42
16    Q.  Okay.                          15:26:42
17    A.  More time would lend more, but there is   15:26:44
18  plenty there to discuss.              15:26:46
19    Q.  Does your view of Exhibit 12 alter your   15:26:56
20  comments on the study written in your rebuttal   15:27:02
21  report?                            15:27:06
22    A.  No, it does not.                15:27:06
23    Q.  Okay.  Why not?                15:27:08
24    A.  Because the length of the room is   15:27:12
```

Page 179

```
 1  31 meters and the effective range of these things   15:27:14
 2  is less than 7 meters.  You have three ultrasound   15:27:18
 3  units at the farthest end of that, and they would   15:27:24
 4  reach on this diagram roughly to here (witness   15:27:30
 5  indicating), so you can't drive the things away   15:27:36
 6  from the rest of that with those three sound   15:27:38
 7  repellers at the frequencies and decibel levels   15:27:40
 8  they're at.  This area is completely out of range.   15:27:46
 9    Q.  So for completion of the record just   15:27:48
10  because the Court Reporter can't see where you   15:27:52
11  drew, can you count how many spaces back you just   15:27:54
12  drew?                              15:27:56
13    A.  Between the sixth and seventh margin   15:27:58
14  would represent between the sixth and seventh meter   15:28:04
15  which is 18 to 20 feet.  The range of these things   15:28:08
16  is 20 feet.                          15:28:10
17    Q.  Did you see here that they did measure   15:28:12
18  the decibel levels?                   15:28:14
19    A.  They did.                      15:28:16
20    Q.  Okay.  So they saw at the first row the   15:28:16
21  decibel level was 89, you saw that?       15:28:20
22    A.  Okay.                          15:28:22
23    Q.  Okay.  Is that an adequate amount?   15:28:22
24    A.  It's adequate for that first row's   15:28:24
```

Page 180

```
 1  defense.  It diminishes by the second row and more   15:28:26
 2  by the third row, and by the time you reach the   15:28:30
 3  eighth row, it's going to have a fraction of a few   15:28:32
 4  decibels,                          15:28:36
 5    Q.  Understand.  Well, actually, so you saw   15:28:36
 6  that the last row was measured at 59 decibels, do   15:28:40
 7  you see that?                      15:28:44
 8    A.  The last row in here?         15:28:44
 9    Q.  Yes.                           15:28:46
10    A.  I don't see that as how physically   15:28:48
11  possible with these units unless they were   15:28:52
12  producing -- well, the top decibel level is only   15:28:54
13  111.  Ultrasound should not be at that level 31   15:29:02
14  meters from the source.               15:29:08
15    Q.  Okay.                          15:29:08
16    A.  There is one thing I can say.  They're   15:29:10
17  using three units at once, so the collective force   15:29:12
18  of the three is higher.               15:29:16
19    Q.  I was going to ask you about that.  So   15:29:20
20  I'm actually referencing page 25 here which I   15:29:22
21  believe you're on, and I'm in the results portion.   15:29:26
22  The second sentence says, "The sound attenuated   15:29:28
23  from an average of 89 decibels at the row closest   15:29:32
24  to the generators to an average of 59 decibels at   15:29:34
```

Page 181

```
 1  the last row 22.5 meters from the generators."   15:29:38
 2        The next sentence reads, "In the   15:29:42
 3  non-sound room, sound level readings of less than   15:29:44
 4  50 decibels were recorded at each of the four   15:29:48
 5  feeding stations."  Do you see that?       15:29:50
 6    A.  I do.                          15:29:52
 7    Q.  Okay.  Would 59 decibels have been   15:29:52
 8  sufficient to repel the animals in this study?   15:30:00
 9        MR. OSTOIC:  Object, incomplete hypothetical,   15:30:08
10  but go ahead.                        15:30:08
11        BY THE WITNESS:                  15:30:10
12    A.  Decibels are measured on the logarithmic   15:30:10
13  scale.                             15:30:16
14    Q.  Okay.  Can you please explain that?   15:30:16
15    A.  A factor of 10 for every first place.   15:30:18
16  So 90 decibels, 100 decibels is ten times the   15:30:26
17  strength of 90 decibels, not 10 percent greater.   15:30:30
18  So 89, 69, 79, 89, 99, we're looking at 40 times   15:30:34
19  less volume than we're looking at with 98,   15:30:44
20  99 decibels, and I doubt very strongly whether   15:30:50
21  that's adequate.  It wasn't in Gould's studies,   15:30:52
22  1984 Gould studies, even at short range it wasn't   15:30:54
23  adequate in Gould's studies.            15:31:00
24    Q.  Let's talk about the first row, right,   15:31:02
```

46 (Pages 178 - 181)

**Page 182**

1 because according to the results here, it seemed  15:31:04
2 that after a period the rodents were still coming  15:31:06
3 to eat from the first row where it was 89 decibels,  15:31:12
4 is that correct?  15:31:14
5   A.  I did not catch that line. Can you  15:31:16
6 point me to it?  15:31:20
7   Q.  Well, the last -- the conclusion of the  15:32:10
8 study here is, "Our studies did not demonstrate  15:32:14
9 that either type of ultrasonic generator would be  15:32:18
10 effective in expelling Norway rats from warehouses  15:32:20
11 or preventing them from taking food even quite  15:32:24
12 close to the sound sources."  15:32:26
13   A.  Are you back at the abstract because I  15:32:28
14 don't see a conclusion on my paper?  15:32:30
15   Q.  It's the last sentence of the  15:32:32
16 discussion.  15:32:34
17   A.  Oh, okay. Well, over the course of  15:32:34
18 weeks, they would habituate. The question here is  15:32:48
19 did the rats have an option for leaving the  15:32:52
20 structure entirely or not.  15:32:54
21   Q.  Well, weren't they able to go to the  15:32:56
22 non-sound room?  15:32:58
23   A.  They did that for a considerable length  15:33:00
24 of time.  15:33:02

**Page 183**

1   Q.  However --  15:33:04
2   A.  It implies that they would have left if  15:33:06
3 they could have.  15:33:08
4   Q.  So do you believe that they became  15:33:10
5 habituated to the sound while in the non-sound  15:33:12
6 room?  15:33:14
7   MR. OSTOJIC:  Object, incomplete hypothetical,  15:33:14
8 form, foundation, but go ahead.  15:33:16
9 BY THE WITNESS:  15:33:18
10   A.  Exposure to the level at a sound which  15:33:18
11 is not distressing to them does cause them to  15:33:20
12 realize that it's not harmful to them over time and  15:33:24
13 cause -- you know, promotes habituation. I don't  15:33:26
14 see this as being important in terms of what  15:33:32
15 happens in terms of Bell & Howell's smaller units  15:33:38
16 in smaller spaces.  15:33:42
17 BY MR. KOPEL:  15:33:44
18   Q.  Are you familiar with this journal?  15:33:44
19   A.  Journal of Stored Product Resources? I  15:33:56
20 would not be. I mean it's such a specific area  15:34:00
21 that I mean I've read 45 years worth of Journal of  15:34:04
22 Wildlife Management, Wildlife Management Bulletins  15:34:08
23 and other things. I have not heard of this.  15:34:12
24   This is something which would be known  15:34:14

**Page 184**

1 to people who store large amounts of grain and deal  15:34:16
2 with shipping and purchasing of grain. It's not  15:34:20
3 out there for the general reader, and most of  15:34:26
4 us -- I don't think one biologist out of 100 will  15:34:30
5 have ever heard of it.  15:34:34
6   Q.  I'm going to show you one more.  15:34:38
7   MR. KOPEL:  I'll ask the Court Reporter to  15:34:42
8 please mark as Exhibit 13, "Sound as a Deterrent to  15:34:44
9 Rats and Mice."  15:34:50
10   (WHEREUPON, a certain document was  15:34:50
11 marked Whitford Deposition Exhibit
12 No. 13, for identification, as of
13 01/12/2018.)
14 BY THE WITNESS:  15:34:58
15   A.  Okay, this is the Journal of Wildlife  15:34:58
16 Management, at least I recognize the source of  15:35:00
17 them.  15:35:02
18 BY MR. KOPEL:  15:35:02
19   Q.  Is it peer reviewed?  15:35:02
20   A.  Yes? I'm one of their reviewers.  15:35:04
21   Q.  Okay.  15:35:06
22   A.  Okay, 1967.  15:35:26
23   Q.  Take as long as you want to review it.  15:35:38
24 Let me know when you're ready.  15:35:40

**Page 185**

1   A.  Okay. As I've held all along, the  15:35:42
2 equipment that they were using in this day and age  15:37:36
3 was nothing like what we have since 1995, but the  15:37:40
4 only tests they claim to have done were using  15:37:46
5 frequencies from 200 to 1,600 cycles per second at  15:37:48
6 100 decibels, that's not ultrasound. That's sonic  15:37:54
7 sound.  15:37:56
8   Q.  So how much cycles per second is  15:38:08
9 ultrasound?  15:38:10
10   A.  Above 20,000, from 20,000 to 45,000  15:38:12
11 would be. 19 is audible.  15:38:16
12   Q.  Have you had a chance to read this over?  15:38:24
13   A.  I have not. Since we're not seeing  15:38:28
14 anything going in the sound ranges of the  15:38:38
15 Bell & Howell equipment at decibel levels to the  15:38:42
16 Bell & Howell equipment, again I can't see that  15:38:50
17 this does anything to address Bell & Howell's  15:39:00
18 ultrasound.  15:39:04
19   They're more concerned with causing  15:39:28
20 lethal and non-lethal seizures.  15:39:30
21   Q.  Okay.  15:40:04
22   MR. OSTOJIC:  If we're at a good point, do you  15:40:08
23 want to just take a two-minute bathroom break?  15:40:12
24   MR. KOPEL:  That's fine.  15:40:14

**Page 186**

1    MR. OSTOJIC:  We've gone an hour and a half    15:40:14
2    since the one break.                            15:40:16
3    BY MR. KOPEL:                                   15:40:16
4        Q.  One last question.                      15:40:16
5        A.  Certainly.                              15:40:16
6        Q.  I assume you've seen the Koehler, et al.  15:40:18
7    article?                                        15:40:20
8        A.  Uh-huh.                                 15:40:20
9        Q.  Okay.                                   15:40:22
10       A.  And that, as I said, is a recitation of  15:40:22
11   other people's opinions without -- oh, wait, let me  15:40:26
12   double-check that.                              15:40:30
13           Yeah, quoting the Koehler study, and    15:40:32
14   they were doing -- they were writing based on a  15:40:36
15   review of the published studies that we've already  15:40:42
16   discussed, so all they're doing is saying, well, it  15:40:44
17   didn't work in this 1960 or this 1970 or this 1980  15:40:48
18   study, and so our opinion is it still doesn't work,  15:40:52
19   we haven't tested it ourselves.  That's what a  15:40:56
20   review study does.                              15:40:58
21       MR. KOPEL:  Okay.  Let's take a break, please.  15:41:02
22       THE VIDEOGRAPHER:  We are off the record at  15:41:06
23   3:34 p.m.                                       15:41:06
24
                                                    Page 186

**Page 187**

1        (WHEREUPON, a short break was had.)        15:52:28
2        THE VIDEOGRAPHER:  We're back on record at  15:52:28
3    3:46 p.m.                                       15:52:32
4    BY MR. KOPEL:                                   15:52:32
5        Q.  Dr. Whitford, I know we just used a     15:52:36
6    whole bunch of studies as Exhibits.  You can put  15:52:38
7    those to the side if that's helpful.            15:52:42
8        Dr. Whitford, you cited in your report      15:53:04
9    three tests that Bell & Howell conducted on the  15:53:06
10   ultrasonic pest repellers as it pertained to    15:53:12
11   rodents, one of them in 2011, one of them in 2014,  15:53:16
12   and one of them in 2016, correct?               15:53:20
13       A.  Intertek did the studies for            15:53:22
14   Bell & Howell.                                  15:53:26
15       Q.  Was it just Intertek?                   15:53:30
16       A.  And Qmann?                              15:53:32
17       MR. OSTOJIC:  If you need to reference your  15:53:34
18   report, but answer his question.  I don't think  15:53:34
19   he's asking you for the names.                  15:53:36
20   BY MR. KOPEL:                                   15:53:36
21       Q.  Don't worry, I'll give you the reports.  15:53:38
22   I'm not testing you on the names.               15:53:40
23       Have you looked at any other tests of       15:53:46
24   the Bell & Howell devices aside from those three?  15:53:48
                                                    Page 187

**Page 188**

1        A.  Potter's                               15:53:52
2        Q.  Okay.                                   15:53:52
3        A.  The Modesto apartments.                 15:53:54
4        Q.  Okay.  Any others?                      15:53:54
5        A.  I don't know of any others that were done  15:53:56
6    specifically with the Bell & Howell repellers.  15:53:58
7    Wait, there was Qmann which was a six-room test  15:54:02
8    which is a catastrophic mistake in design.      15:54:06
9        Q.  Okay.  Did you see one Qmann test, or  15:54:10
10   did you see two?                                15:54:14
11       A.  Two, insects and mice.  The mixing of  15:54:14
12   things in a six-room chambers, the very small    15:54:18
13   number of animals used, it just -- it didn't have  15:54:26
14   adequate evidence to determine anything.        15:54:28
15       Q.  So would you say, based on the factors  15:54:34
16   you identified, that the results of those tests are  15:54:38
17   unreliable?                                     15:54:42
18       MR. OSTOJIC:  Object to form, foundation.  Are  15:54:44
19   we referring to Qmann?                          15:54:46
20   BY MR. KOPEL:                                   15:54:50
21       Q.  Yes, thank you, the two Qmann reports.  15:54:50
22       A.  The two Qmann reports and I would throw  15:54:52
23   in the 2016 Chinese test which threw double invalues  15:54:56
24   of rats in the same housing and left us testing the  15:55:00
                                                    Page 188

**Page 189**

1    effects of overcrowding of rats rather than the  15:55:02
2    effects of the repellers.                       15:55:06
3        You have to go back to Calhoun, H.          15:55:08
4    Calhoun's 1965 classic paper on overcrowding of  15:55:12
5    rats.  You find that and you find that any time you  15:55:14
6    exceed one rat per three square feet, you'll have  15:55:18
7    them killing each other, you'll have mayhem.  The  15:55:20
8    repellers would not be what you're measuring when  15:55:26
9    you put 20 rats into 32 square feet,            15:55:28
10       Q.  And by the way, thank you for citing     15:55:32
11   Calhoun because I learned a lot from reading that  15:55:34
12   article.  So with regards to the two Qmann reports  15:55:36
13   and the 2016 report -- and that was done by       15:55:42
14   Intertek, I believe?                            15:55:50
15       A.  Yeah, those were badly designed.        15:55:52
16       Q.  And as a result, would you say that the  15:55:54
17   data produced by them is unreliable?            15:55:56
18       A.  Absolutely.                             15:55:58
19       Q.  Now, I think you said one rat per three  15:56:10
20   square feet, is that what you said?             15:56:16
21       A.  Max.                                    15:56:18
22       Q.  That's the maximum?                     15:56:18
23       A.  The maximum density before you have     15:56:18
24   problems.                                       15:56:22
                                                    Page 189

48 (Pages 186 - 189)

1   Q.   Before there is a problem. And what   15:56:22
2   about mice?   15:56:26
3   A.   I don't have the actual figure for that.   15:56:26
4   but the same pattern holds, they're just not as   15:56:30
5   vicious, they're not as likely to kill each other.   15:56:34
6   But still there is too much interaction, they're   15:56:38
7   too crowded, they're constantly bumping into each   15:56:42
8   other. That brings on aggression, stress.   15:56:46
9        The first tests, the 2011 and 2014   15:56:50
10   tests, the ten rats and ten mice had enough space   15:56:54
11   that you didn't see signs of any adverse agonistic   15:56:58
12   behaviors between them.   15:57:02
13   Q.   Okay. Because I actually wanted to ask   15:57:08
14   you how you know the 2016 was too crowded but the   15:57:10
15   other two weren't, and perhaps it would be helpful   15:57:14
16   if I showed you the 2016 report.   15:57:18
17        And while I look for it, do you mind   15:57:22
18   explaining how do you know that 2016 was too many   15:57:24
19   but 2011 and 2014 was not?   15:57:26
20   A.   Because 2011 and 2014 the design test   15:57:30
21   had the same units, the same Plexiglas units that   15:57:36
22   were used in the 2016, but they had half the number   15:57:42
23   of mice and rats of 2016. In those cases, the   15:57:46
24   pretest showed a uniform distribution of rats or   15:57:52
Page 190

1   mice in both chambers before you started the sound   15:57:56
2   repeller. The chambers were exactly identical to   15:58:00
3   one another, there was no disparity of where there   15:58:02
4   was food and where there wasn't, no disparity of   15:58:04
5   where there was housing, where there wasn't.   15:58:08
6   Everything was exactly as it should be to have a   15:58:10
7   fair test where you're testing only what does the   15:58:14
8   sound of the ultrasound pest repeller do to change   15:58:18
9   cages.   15:58:22
10        In both cases when they turned on the   15:58:24
11   ultrasound unit, all the rats and all the mice   15:58:26
12   moved to the far chamber away from the repeller.   15:58:30
13   That shows that the repeller was effective at   15:58:36
14   moving the rats, and they stayed there for a week   15:58:38
15   in the first test, so they weren't habituating.   15:58:42
16   That was a good -- it was a simplistic test, some   15:58:50
17   people would say, it didn't have repetition till   15:58:52
18   the 2014 test, and yet to some degree it was an   15:58:56
19   extremely elegant test because it tested only the   15:59:00
20   thing you wanted to find out: what does the sound   15:59:02
21   of a UPR at that frequency do to mice or rats in a   15:59:06
22   double-chamber test. It showed efficacy without   15:59:12
23   question in both years.   15:59:20
24   Q.   Now, I think you mentioned that, when   15:59:22
Page 191

1   the repeller was turned off, that there was even   15:59:24
2   distribution --   15:59:30
3   A.   Right.   15:59:32
4   Q.   -- in those two tests, and that that   15:59:34
5   indicated that the test was a fair test, is that   15:59:36
6   accurate?   15:59:38
7   A.   That's the basic concept of a control   15:59:38
8   situation, something that we didn't have with   15:59:42
9   Potter. You have to put them in, and if they don't   15:59:46
10   equalize, you have to assume that some factor that   15:59:50
11   you're not recognizing is causing them to   15:59:52
12   concentrate in one place, not the other.   15:59:54
13        But since all the animals were   15:59:58
14   introduced at once, allowed to roam freely through   16:00:00
15   the pretest so the scent was equal throughout,   16:00:02
16   droppings were equal throughout, everything about   16:00:06
17   those two chambers is equal except when you turn on   16:00:08
18   the ultrasound, that's a valid test.   16:00:10
19   Q.   Okay. So when the equal numbers of rats   16:00:14
20   and mice during the --   16:00:20
21   A.   Pretest.   16:00:24
22   Q.   That actually wasn't the word I was   16:00:24
23   looking for.   16:00:26
24   MR. OSTONIC:  Let him ask the question. Just   16:00:26
Page 192

1   wait, don't anticipate.   16:00:30
2   BY MR. KOPEL:   16:00:30
3   Q.   No, that's fine. So the fact that there   16:00:30
4   were equal numbers of mice and rats on the repeller   16:00:34
5   side as there were on the non-repeller side, in   16:00:40
6   absence of the ultrasonic signals, that indicates   16:00:48
7   that the test was fair in your opinion, is that   16:00:54
8   correct?   16:00:56
9   A.   It indicates that you have valid   16:00:56
10   controls, the two are exactly alike. It also   16:00:58
11   indicates that leaving the physical body of the   16:01:00
12   repeller in the left hand, the A Chamber, didn't   16:01:06
13   disturb the rats at all. It's only when you turned   16:01:10
14   it on. It wasn't a difference of something in the   16:01:14
15   physical environment between them.   16:01:16
16        In many cases, you would think that if   16:01:22
17   you have a new object in one room and not in the   16:01:24
18   other, that animals would be suspicious of it.   16:01:30
19   Q.   Of the new object and that would be   16:01:32
20   cause for avoiding it, is that right?   16:01:34
21   A.   Right, but the balance among them didn't   16:01:36
22   make any difference to them.   16:01:40
23   Q.   Would you agree with me that if you had   16:01:42
24   a new repeller that emitted no sound but that the   16:01:46
Page 193

49 (Pages 190 - 193)

1  presence of that pest repeller caused a pest to be   16:01:52
2  driven out or repelled, then that would be an   16:01:58
3  effective pest repeller, right, even if it didn't   16:02:04
4  emit ultrasonic signals?   16:02:06
5      MR. OSTOJIC:  Objection to form, foundation,   16:02:08
6  incomplete hypothetical.   16:02:10
7  BY MR. KOPEL:   16:02:10
8      Q.  I can rephrase it.   16:02:10
9      A.  I'm confused on it.  If you have an   16:02:12
10  ultrasound pest repeller in there and it's not   16:02:12
11  turned on, hopefully in this test that you're   16:02:18
12  setting it up, it shouldn't cause any avoidance of it.   16:02:22
13      When you turn it on, if they move away   16:02:28
14  from you, that shows it's effective.  Having it   16:02:30
15  there and having them move away would make you   16:02:32
16  question.  Having it there without on would make   16:02:34
17  you question whether it was the sound or the   16:02:40
18  presence of that.   16:02:42
19      Q.  I think I can clarify.  Do you agree   16:02:42
20  that there would be a difference in terms of if   16:02:44
21  your objective was to measure the efficacy of   16:02:48
22  ultrasound being emitted from a repeller versus   16:02:52
23  measuring the efficacy of the repeller all   16:02:58
24  together?   16:03:00

Page 194

1      MR. OSTOJIC:  Object to form, foundation,   16:03:00
2  incomplete hypothetical, but go ahead.   16:03:02
3  BY THE WITNESS:   16:03:08
4      A.  Under those circumstances, you'd have to   16:03:08
5  use a repeller of varying frequencies to find out   16:03:10
6  if they're going to get a response.  If it's on and   16:03:18
7  it's not ultrasound, it may have a different   16:03:22
8  effect, or am I not understanding your question as   16:03:24
9  yet?   16:03:28
10  BY MR. KOPEL:   16:03:30
11      Q.  I think not.  Maybe I'll give it one   16:03:30
12  more try, okay.   16:03:32
13      I'll come back to it.  We'll see if we   16:03:46
14  can get back to it later.   16:03:48
15      MR. KOPEL:  Okay, we'll mark this test as   16:03:52
16  Exhibit 14.   16:03:58
17      (WHEREUPON, a certain document was   16:03:58
18      marked Whitford Deposition Exhibit
19      No. 14, for identification, as of
20      01/12/2018.)
21  BY MR. KOPEL:
22      Q.  Dr. Whitford, do you have Exhibit 14?   16:04:26
23      A.  I do.   16:04:28
24      Q.  Have you seen it before?   16:04:28

Page 195

1      A.  Yes, I have.   16:04:30
2      Q.  What is it?   16:04:32
3      A.  It's the 2016 test reports.   16:04:32
4      Q.  Now, I know that you had stated you're   16:04:36
5  not relying on this report in reaching your   16:04:40
6  conclusions, so I don't want to delay -- I don't   16:04:42
7  want to spend too much time on here, but I was   16:04:46
8  hoping you could please turn to the page bearing   16:04:50
9  the Bates number Feuerstein 90.  Do you know what   16:04:54
10  Bates number is?  That's the marking on the bottom   16:04:58
11  right corner of each page.   16:05:00
12      A.  Okay, I'm on that page.   16:05:02
13      Q.  Do you see a chart daily testing record?   16:05:04
14      A.  Yes.   16:05:08
15      Q.  And do you see the second to bottom row   16:05:08
16  is rats/mice who are suffering physical injury?   16:05:10
17      A.  I do.   16:05:18
18      Q.  And do you see it says no all across the   16:05:22
19  chart?   16:05:26
20      A.  I do.   16:05:26
21      Q.  Would that surprise you given the number   16:05:30
22  of rats and mice that were being used in this   16:05:32
23  experiment?   16:05:36
24      A.  As long as the rats or mice can get   16:05:38

Page 196

1  enough distance between themselves, they wouldn't   16:05:42
2  necessarily do physical harm to each other.  But   16:05:48
3  the fact that they dispersed back into the area   16:05:50
4  where the repeller was in direct contradiction to   16:05:56
5  what the 2011 and 2014 tests showed means that   16:06:00
6  there was enough population pressure to interfere   16:06:04
7  with the valid conclusions from this study.  The   16:06:06
8  only change we've got is the excess number of   16:06:10
9  animals comparing those studies.   16:06:14
10      Q.  Okay.  So in terms of reaching your   16:06:16
11  conclusion that there were too many pests used   16:06:18
12  here, you've identified that there were -- there   16:06:22
13  are records of the pests going into the repeller   16:06:22
14  side, is that correct?   16:06:32
15      A.  Yes.   16:06:32
16      Q.  Is there any other basis for that   16:06:32
17  conclusion?   16:06:34
18      A.  Just the knowledge of the impact of   16:06:36
19  overcrowding in terms of physiological responses,   16:06:38
20  stress activities.  There would have been more   16:06:42
21  interaction between the animals, more   16:06:46
22  just -- not necessarily doing bodily harm, but   16:06:48
23  nipping, running, getting away from.  They're far   16:06:52
24  more active.  That's part of the effect of being in   16:06:56

Page 197

50 (Pages 194 - 197)

1  a crowd.    16:06:58

2    Q.  If they were nipping, wouldn't you see  16:07:00

3  evidence of physical injury?    16:07:02

4    A.  They don't always draw blood. A lot of  16:07:02

5  it is just saying get away from me. And the least  16:07:06

6  dominant mice and rats are going to go back to the  16:07:12

7  side where they're not being pushed by the dominant  16:07:16

8  ones.    16:07:16

9    Q.  I'm going to hand the witness a document  16:07:54

10  which was previously marked as Exhibit 13 in this  16:07:56

11  case. Now, Exhibit 13 has many tests in it, and  16:08:00

12  I'm hoping, Dr. Whitford, that you can please flip  16:08:16

13  to the portion which contains the Intertek test  16:08:20

14  dated July 7th of 2014.    16:08:24

15    A.  Do we have a page number for that?  16:08:54

16    MR. WEISS:  It looks like 43. Do you want  16:09:08

17  this copy?    16:09:10

18    MR. KOPEL:  Yeah, I'm sorry, I've got it in a  16:09:10

19  book. Thank you, Mike.  Was it page 43?  16:09:14

20    MR. WEISS:  I think it's 43.    16:09:16

21  BY MR. KOPEL:    16:09:16

22    Q.  Mike was correct, page 43, so it's Bates  16:09:18

23  number BHH_LLC 43.    16:09:20

24    A.  Okay.    16:09:24

Page 198

1    Q.  And have you seen this test before?  16:09:32

2    A.  Yes, I have.    16:09:36

3    Q.  And this is the 2014 test that you  16:09:38

4  referenced in your report?    16:09:40

5    A.  This one is the spiders, roaches and  16:09:42

6  ants is what I'm seeing.    16:09:46

7    Q.  Then it's the wrong page.    16:09:48

8      Okay, I think it's on page 55. Please  16:10:10

9  try that one instead.    16:10:14

10    MR. WEISS:  Sorry about that.    16:10:14

11    MR. KOPEL:  That's fine. I was going to make  16:10:16

12  new exhibits, but I figured why keep making new  16:10:20

13  exhibits of the same thing.    16:10:22

14  BY THE WITNESS:    16:10:24

15    A.  Okay.    16:10:24

16  BY MR. KOPEL:    16:10:26

17    Q.  Are you at page 55?    16:10:26

18    A.  I am.    16:10:26

19    Q.  Okay. Is this the report you were  16:10:28

20  referencing? Is this the test you were referencing  16:10:30

21  in your report?    16:10:32

22    A.  One of the two, yes. There is 2010 and  16:10:32

23  2014 tests.    16:10:36

24    Q.  Right, okay. Let's see, do you see at  16:10:38

Page 199

1  the bottom here it's been reviewed by Leo Lin and  16:10:44

2  Sam Lin?    16:10:48

3    A.  Yes.    16:10:48

4    Q.  Okay. Do you know who either of them  16:10:48

5  are?    16:10:50

6    A.  I do not.    16:10:50

7    Q.  Do you know what their qualifications  16:10:52

8  are?    16:10:54

9    A.  I do not.    16:10:54

10    Q.  Does that matter?    16:10:56

11    A.  I can't change what their qualifications  16:11:02

12  are. All I can do is guess that they had some  16:11:06

13  experience in designing a test because the nature  16:11:10

14  of the test was a valid balance test, but I don't  16:11:14

15  know their experience.    16:11:18

16    Q.  Okay. Is it important for the  16:11:22

17  individuals conducting the test to be qualified?  16:11:26

18    A.  I would think so.    16:11:30

19    Q.  Are you familiar with Intertek?  16:11:32

20    A.  I am not.    16:11:34

21    Q.  Did you look up which style of  16:11:38

22  Bell & Howell ultrasonic test repeller was used for  16:11:42

23  this test?    16:11:48

24    A.  It's there on the page. It's a fairly  16:11:50

Page 200

1  standard one.    16:11:54

2    Q.  Okay. So did you see if this one has  16:11:56

3  sweeping frequencies?    16:11:58

4    A.  I don't know whether it has sweeping or  16:12:02

5  broad spectrum.    16:12:06

6    Q.  Does it matter?    16:12:08

7    A.  As we discussed before, apparently it  16:12:12

8  didn't matter for spiders or mice in my farm house,  16:12:14

9  so it probably doesn't matter in this case if the  16:12:16

10  frequency is right.    16:12:20

11    Q.  So regardless of whether there was  16:12:20

12  sweeping or pulsating or static, you feel  16:12:22

13  comfortable drawing conclusions based on this model  16:12:26

14  to all the other Bell & Howell models, is that  16:12:30

15  correct?    16:12:32

16    A.  Yes. As long as the frequencies are the  16:12:32

17  same and the decibel levels are the same, I see no  16:12:34

18  difference, and that was pretty much Dr. Mankin's  16:12:40

19  conclusion when he tested the various ones.  16:12:44

20    Q.  What species of mice was used in this  16:12:46

21  test?    16:12:50

22    A.  They weren't stated. The rats were  16:12:50

23  black rats. The pictures show a mouse that could  16:12:54

24  be light gray, or it could have been a white lab  16:13:00

Page 201

1  rat. Dr. Potter seems to think it might have been  16:13:02
2  a white lab rat or mouse, but there is no way to  16:13:06
3  judge that from the picture. The light from a  16:13:10
4  flash would make a gray mouse appear white.  16:13:16
5     Q.  Is it relevant to know what species the  16:13:18
6  pests tested were?  16:13:22
7     A.  Only to a modest extent. I mean the  16:13:24
8  basic structure of mice and the hearing range, the  16:13:30
9  frequencies that they can perceive is pretty  16:13:34
10  consistent because of their body size, and the  16:13:38
11  sounds they produce and can hear and the sounds  16:13:42
12  their offspring produced to communicate with them,  16:13:46
13  the same holds for rats. Until you get at least a  16:13:48
14  50 percent variation in body size, you wouldn't  16:13:52
15  expect to see much of a change in the physiology of  16:13:56
16  the animals.  16:13:58
17     Q.  And is that with the exception of white  16:13:58
18  lab mice which we discussed earlier?  16:14:00
19     A.  White lab mice, because of their long  16:14:02
20  periods in captivity and inbreeding and so forth,  16:14:08
21  might have strayed a bit from the normal realms, but  16:14:14
22  I don't know anything that says that they have.  16:14:18
23  I've seen no data to that effect.  16:14:20
24     Q.  Do black rats live in the United States?  16:14:24

Page 202

1     A.  No, black rats are Chinese.  16:14:28
2     Q.  Do you think it would have been more  16:14:34
3  appropriate for them to test on a species that's  16:14:34
4  common in the United States?  16:14:38
5     A.  Well, let's see, choose from any of the  16:14:42
6  7,000 or 8,000 species rats in the world, is one  16:14:44
7  better than the other to choose?  16:14:48
8     Q.  Well, I asked you the question.  16:14:52
9     A.  They were conducting tests in China,  16:14:58
10  it's what they had access to at the time. Without  16:15:02
11  importing rats from someplace else, starting with  16:15:08
12  the wild black rat seems to make more sense, but I  16:15:10
13  don't think it makes much difference.  16:15:20
14     Q.  Have you seen any evidence of that?  16:15:22
15     A.  The physiology of rats around the world  16:15:26
16  is pretty much the same for hearing ranges and so  16:15:28
17  forth.  16:15:32
18     Q.  Were the pests that were used, were they  16:15:32
19  wild, or were they -- what's the opposite of wild,  16:15:42
20  I'm sorry, captive?  16:15:44
21     A.  Domestic.  16:15:46
22     Q.  Do you know if they were wild or  16:15:48
23  domestic?  16:15:50
24     A.  I believe that I saw in Diane  16:15:52

Page 203

1  Feuerstein's that they used wild caught black rats,  16:15:58
2  but I can't swear to that. I haven't read that in  16:16:02
3  three months.  16:16:04
4     Q.  Due to the fact that putting wild caught  16:16:10
5  pests into an acrylic chamber causes them to be in  16:16:18
6  an unfamiliar environment, could that influence  16:16:24
7  their movement?  16:16:26
8     MR. OSTOJIC:  Object to form. Go ahead.  16:16:30
9  BY THE WITNESS:  16:16:32
10     A.  Their movements were equal between both  16:16:32
11  sides of the chamber. There is nothing else there  16:16:34
12  to influence their movements until you turn the  16:16:38
13  repeller on, and then they all moved away. You're  16:16:40
14  testing only one thing really in this test because  16:16:44
15  you didn't put any confounding variables in there.  16:16:48
16  BY MR. KOPEL:  16:16:50
17     Q.  Okay. So would you agree that -- is it  16:16:50
18  your opinion that although there may be various  16:16:54
19  questions that can be asked, the fact that you  16:17:02
20  witnessed even distribution when the repeller was  16:17:04
21  off indicated that those questions are invalid, is  16:17:10
22  that it?  16:17:14
23     A.  More or less, yes.  16:17:14
24     Q.  Okay. Can you please turn to the page  16:17:16

Page 204

1  with the Bates number 2569?  16:17:22
2     A.  2569?  16:17:24
3     MR. OSTOJIC:  Is it in this document?  16:17:28
4  BY MR. KOPEL:  16:17:28
5     Q.  Oh, I'm sorry, I'm in -- this document  16:17:32
6  was produced several times, and that's why, so  16:17:34
7  that's the source of the confusion. I'm on  16:17:38
8  page 59. Are you at page 59?  16:17:50
9     A.  I am.  16:17:56
10     Q.  And what does this page show?  16:18:02
11     A.  It shows the number of rats in Chamber A  16:18:04
12  versus Chamber B across the timeframe of the seven  16:18:08
13  days of the testing and the preliminary and post  16:18:12
14  testing periods.  16:18:14
15     Q.  Now, is the distribution of rats during  16:18:18
16  the post testing period relevant to your analysis?  16:18:24
17     A.  I can't say that it is because we've  16:18:36
18  taken away the test effect, the thing that we're  16:18:38
19  testing for, the sound.  16:18:42
20     Q.  What would have happened had -- what  16:18:50
21  would the distribution of rats have been if we had  16:18:58
22  the repellers turned off or no repellers for seven  16:19:06
23  days?  16:19:08
24     A.  You mean before testing them to begin  16:19:14

Page 205

52 (Pages 202 - 205)

1  with as in a pretest?                 16:19.18
2     Q.   Yes, correct, okay.           16:19:18
3     A.   We're seeing more or less uniform   16:19:22
4  distribution in the pretest.  If we never turn that  16:19:24
5  on, we expect them to stay at that.   16:19:28
6     Q.   But do you know what would have occurred  16:19:30
7  if we had a control period that was the same length  16:19:32
8  as the actual test?                   16:19:36
9     A.   I can't tell you that without seeing the  16:19.40
10  data, but the probabilities are very strong that  16:19:42
11  there is nothing there to make them move from one  16:19:48
12  side to the other except the presence of food and  16:19:50
13  the rats, and those are -- food is equal in both  16:19:54
14  sides in this test, water is equal in both sides.  16:19:56
15  There is no harborage in these, so they had  16:20:00
16  distributed more or less at random and equally, so  16:20:04
17  it would be pure speculation to see what happens.  16:20:12
18        When they turn on the things the first  16:20.14
19  day of the test, we see what happens, they vanish  16:20:16
20  over the course of three days and all disappear,  16:20:20
21  all move from right -- or from side A to side B.  16:20:26
22     Q.   Well, we see that distributions differed  16:20:30
23  between day 1, day 2, day 3, et cetera, correct?  16:20:36
24     A.   Uh-huh.                        16:20:36

                                        Page 206

1     Q.   But you don't know how distributions  16:20:38
2  would have occurred after day 2 if there were a  16:20:42
3  fulsome control period here, do you?   16:20:46
4     MR. OSTOJIC:  Object to form.  I'm sorry, what  16:20:48
5  did you say, a fulsome?                16:20:50
6  BY MR. KOPEL:                          16:20:50
7     Q.   Yes.                          16:20:52
8     A.   I don't know what you mean by that.  16:20:52
9     Q.   Sure.  So is it your opinion that the  16:20:54
10  preliminary testing counted as a control for this  16:20:58
11  study?                                16:21:00
12     A.   Yes.                          16:21:02
13     Q.   Okay.  But the control period was  16:21:02
14  significantly shorter than the treatment period, is  16:21:04
15  that correct?                          16:21:08
16     A.   It quite often is.             16:21:08
17     Q.   What do you mean by that?        16:21:10
18     A.   Dr. Potter's tests went for a week, and  16:21:12
19  that, unfortunately, tremendously biased his, a  16:21:16
20  week of pretest versus two weeks of tests because  16:21:20
21  of the imbalance of location of the animals in his  16:21:24
22  pretest.                              16:21:26
23     Q.   Dr. Potter used untreated apartments as  16:21:26
24  well, correct?                         16:21:30

                                        Page 207

1     A.   Yeah.                         16:21:30
2     Q.   Okay.  So those were his controls,  16:21:30
3  right?                                16:21:32
4     A.   Not hardly.  But in here, if you turn  16:21:34
5  the sound on, you see an effect.  If you don't turn  16:21:46
6  the sound on, you don't expect to see them all go  16:21:50
7  over in one room.  I mean they're not party  16:21:52
8  animals, they don't have cheese being delivered.  16:21:52
9     Q.   Why did you decide to see the effects in  16:21:54
10  the Transonic protesting for an entire year without  16:22:00
11  the unit on as opposed to two days?  Why wouldn't  16:22:02
12  you base conclusions on two days with the unit  16:22:06
13  turned off?                           16:22:10
14     A.   Because that's not valid.       16:22:10
15     Q.   Why not?                      16:22:12
16     A.   Because I would be comparing it to a  16:22:12
17  full year on.                         16:22:16
18     Q.   Okay.  So do you agree that the  16:22:18
19  comparison of the time off and the time on should  16:22:20
20  have some relationship in terms of length?  16:22:24
21     A.   This is a totally different test.  In my  16:22:26
22  case, you have to recognize the seasonality and  16:22:30
23  annual variation of mouse populations in the wild.  16:22:34
24  They come in not equally throughout the year.  They  16:22:38

                                        Page 208

1  come in during the autumn, and they come in in  16:22:40
2  higher numbers if there are higher numbers out in  16:22:42
3  the wild because of good breeding conditions during  16:22:46
4  the summer and early fall.  I had to go long term  16:22:48
5  for both of those, so what I was testing, was equal.  16:22:52
6        In this case, you've put mice and rats  16:22:56
7  into the chambers.  They're not coming in from  16:23:00
8  someplace else.  Seasonality, annual variation.  16:23:04
9  Wild populations makes no difference to the study.  16:23:08
10  Does that make sense?                  16:23:10
11        I had to be in a position to say, yeah.  16:23:12
12  I've compared exactly the same times of the year in  16:23:16
13  each phase of my studies or you could say but mice  16:23:20
14  are more likely to come in in spring than the fall  16:23:24
15  if you only test one.                  16:23:28
16     Q.   You mentioned that you've worked  16:23:30
17  reviewing publications for peer-reviewed  16:23:32
18  publications, is that correct?         16:23:32
19     A.   Yes.  It's volunteer work.  I don't get  16:23:36
20  paid for it.                          16:23:40
21     Q.   I shouldn't have said work.  Have you  16:23:40
22  ever approved a peer-reviewed publication, a study,  16:23:50
23  in which the control period was less than a third  16:23:54
24  of the treatment period?               16:23:58

                                        Page 209

Veritext Legal Solutions
866 299-5127

| | |
|---|---|
| 1 A. Very little of what I review actually 16:24:04 | 1 BY MR. KOPEL: 16:27:24 |
| 2 deals with a control period versus a test period 16:24:08 | 2 Q. Okay. So if you took a coin and flipped 16:27:24 |
| 3 because most of what I review has to do with field 16:24:12 | 3 it ten times, wouldn't you agree that it's possible 16:27:26 |
| 4 biology and studies that are done outside of a 16:24:14 | 4 to consistently get heads if you're only doing it 16:27:30 |
| 5 captive environment. Those tests in psychology and 16:24:18 | 5 one round or two rounds? 16:27:34 |
| 6 animal behavior are reviewed by people whose 16:24:24 | 6 MR. OSTOJIC: Object to form, foundation, 16:27:36 |
| 7 specialty is controlled environment testing. 16:24:28 | 7 incomplete hypothetical, but go ahead. 16:27:36 |
| 8 Q. Have you ever seen any peer-reviewed 16:24:30 | 8 BY THE WITNESS: 16:27:38 |
| 9 publication in which there was a study that the 16:24:32 | 9 A. You've been watching Rosencrantz and 16:27:38 |
| 10 control period was less than a third of the 16:24:40 | 10 Guildenstern Are Dead too often, that one caused 16:27:44 |
| 11 treatment period? 16:24:40 | 11 them flipping the coin 100 times and always coming 16:27:44 |
| 12 A. I could tell you that the psychologists 16:24:42 | 12 up heads. But, yes, there is probability of that, 16:27:46 |
| 13 at Capital University when they were running study 16:24:46 | 13 but there is not a probability that over the course 16:27:48 |
| 14 tests would always have a short control period 16:24:48 | 14 of seven days of having the unit on, you would have 16:27:50 |
| 15 followed by a much longer study period. The 16:24:52 | 15 zero in the A Chamber and eight or ten in the B 16:27:54 |
| 16 control is only the setup, the proof that the two 16:24:56 | 16 Chamber every one of those days. That 16:28:00 |
| 17 sides don't differ, that you're starting with a 16:25:00 | 17 statistically goes up to being highly improbable. 16:28:02 |
| 18 balanced playing field, in other words, but the 16:25:06 | 18 BY MR. KOPEL: 16:28:04 |
| 19 studies ran on longer to see if there is change 16:25:10 | 19 Q. That would be highly improbable with or 16:28:04 |
| 20 over time. So this is not atypical whatsoever. 16:25:22 | 20 without the pretest period, wouldn't you agree with 16:28:10 |
| 21 Q. If you observed the activity of rats 16:25:38 | 21 that? 16:28:12 |
| 22 over the course of one day, would that distribution 16:25:42 | 22 MR. OSTOJIC: Object to form. 16:28:14 |
| 23 that occurred on that one day, would that be 16:25:52 | 23 BY THE WITNESS: 16:28:16 |
| 24 sufficient to establish a baseline for you? 16:25:56 | 24 A. It would, but the pretest is there to 16:28:16 |
| Page 210 | Page 212 |
| 1 A. Not from a scientific standpoint, no. 16:26:02 | 1 solely give you a sense that the conditions were 16:28:20 |
| 2 Q. So one day -- how about two days, is 16:26:06 | 2 balanced when you started the test; no difference 16:28:22 |
| 3 that sufficient? 16:26:10 | 3 between Chamber A and Chamber B in their 16:28:26 |
| 4 A. If we're looking at a pretest condition 16:26:14 | 4 attractiveness or repellency of the rats. They're 16:28:30 |
| 5 and there is no change over those two days, I would 16:26:18 | 5 not selecting one over the other. That is the 16:28:34 |
| 6 probably say that I'd like to see a few more, but 16:26:22 | 6 condition, that is the function of a control. 16:28:38 |
| 7 that doesn't matter. The tests are consistently 16:26:26 | 7 If you want to go to the worst example, 16:28:42 |
| 8 very short term, even in the things that you've 16:26:30 | 8 you go to Potter's apartment tests where they put 16:28:44 |
| 9 presented to me, some of those peer-reviewed things 16:26:32 | 9 all the rats into the front room before the pretest 16:28:46 |
| 10 had very short pretests. 16:26:36 | 10 period of a week knowing that those rats and mice 16:28:50 |
| 11 It doesn't change the test results. The 16:26:42 | 11 would be -- or the mice in that study would be 16:28:56 |
| 12 test results in this are unequivocally showing 16:26:44 | 12 leaving their odor, their pheromones, their urine, 16:28:58 |
| 13 efficacy at moving rats from Chamber A to Chamber 16:26:50 | 13 their feces there for that week, and Dr. Potter 16:29:04 |
| 14 B, period, the end, no way to disparage or diminish 16:26:54 | 14 admits that that is a major attractant for mice to 16:29:10 |
| 15 that. For that week, they moved everything out. 16:27:02 | 15 stay in the area, so he's already biased it. 16:29:12 |
| 16 Q. Now, we only have a sample size of ten 16:27:06 | 16 When he turned them loose, they tended 16:29:16 |
| 17 rats, right? 16:27:10 | 17 to stay in the front room because he had already 16:29:20 |
| 18 A. But if you put more than ten rats into 16:27:10 | 18 set up a situation where no food in the back room, 16:29:24 |
| 19 that container, we saw what happened. 16:27:12 | 19 no water in the back room, no scent of animals in 16:29:26 |
| 20 Q. But we have ten rats and we're 16:27:14 | 20 the back room. Mice go where mice have been. That 16:29:30 |
| 21 monitoring the movement of ten rats over two days, 16:27:16 | 21 means it's safe. They're like that example of 16:29:34 |
| 22 is that right? 16:27:18 | 22 going into the basement to check for the monster. 16:29:36 |
| 23 MR. OSTOJIC: Object to form, foundation, 16:27:18 | 23 If a mouse has been in a room for a week, it's 16:29:38 |
| 24 mischaracterizes the test, but go ahead. 16:27:24 | 24 reluctant to move to the other one. 16:29:44 |
| Page 211 | Page 213 |

```
 1    Q.  Well, did they stay in the front room in   16:29:44
 2  the untreated apartments?                          16:29:48
 3    A.  Their activity, as he points out and         16:29:48
 4  uses for his conclusion that the effect -- the     16:29:52
 5  repellers were ineffective, he says, well, there   16:29:56
 6  were high levels of activity in the front room, but 16:30:00
 7  that's exactly what any scientist, biologist who    16:30:02
 8  knows mouse behavior would expect if you have set   16:30:06
 9  up a situation -- his control is completely flawed  16:30:08
10  because the rooms are not the same size, not        16:30:14
11  equipped the same way, not smelling the same way.   16:30:16
12  There is nothing about it that makes it a valid     16:30:20
13  test.                                               16:30:24
14    Q.  Okay, we'll get to that.  Let's talk          16:30:26
15  about this.  Now, we see that there was food being  16:30:28
16  consumed in Chamber A throughout this test.         16:30:36
17  correct?                                            16:30:40
18    A.  Yes.                                          16:30:42
19    Q.  Okay.  And that's because rats were           16:30:44
20  going into Chamber A to get the food, is that       16:30:48
21  correct?                                            16:30:50
22    A.  And that's because they weren't counting      16:30:50
23  during the night when rats are active.              16:30:54
24    Q.  Should they have counted during the           16:30:56
                                                   Page 214
```

```
 1  night?                                              16:30:58
 2    A.  They should have certainly done more          16:30:58
 3  counts, but so should Porter who did only two       16:31:00
 4  counts a day.                                       16:31:04
 5    Q.  Now, in many instances here, we see that      16:31:06
 6  the food consumed in Chamber A was almost half as   16:31:12
 7  much as in Chamber B, do you see that, or more than 16:31:18
 8  half, excuse me?                                    16:31:20
 9    A.  Not when we get to the third, fourth,         16:31:26
10  fifth, sixth days of the test period.               16:31:32
11    Q.  Okay.  So let's talk about the sixth          16:31:38
12  day.  We've got 83.4 grams consumed in Chamber B    16:31:40
13  and 43.8 in Chamber A.                              16:31:44
14    A.  More than twice as much.                      16:31:48
15    Q.  Would you agree that 43.8 is more than        16:31:48
16  half of the 83.4?                                   16:31:52
17    MR. OSTOJIC:  It's less, isn't it?                16:31:52
18  BY THE WITNESS:                                     16:31:54
19    A.  Just right on the border, and the other       16:31:54
20  question is we don't know how much total food was   16:31:56
21  put into Chamber B.  If that became exhausted, then 16:31:58
22  they'd have to go to Chamber A to feed.             16:32:00
23  BY MR. KOPEL:                                       16:32:12
24    Q.  No, we do know how much food was put in       16:32:12
                                                   Page 215
```

```
 1  it, don't we?                                       16:32:16
 2    A.  Okay.  I don't know, but, yes, there is       16:32:16
 3  evidence that there are some rats going in there to 16:32:20
 4  food.                                               16:32:22
 5    Q.  Hold on.  Let me get back to that, I'm        16:32:24
 6  sorry.  You see consumption in Chamber A on every   16:32:26
 7  single day of the test, is that correct?            16:32:30
 8    A.  Put it this way, you've got ten rats in       16:32:32
 9  a small room, a small chamber with a small bowl of  16:32:36
10  food.  Not all ten rats can go feed at that at the  16:32:40
11  same time.  There will be trouble.  They will       16:32:42
12  defend their right to stay at the bowl and eat.     16:32:46
13  Somebody has got to go eat at the other bowl        16:32:48
14  whether they like it or not.                        16:32:52
15    Q.  So even when you put food on both sides       16:32:52
16  of a test, you're still going to have the rats      16:32:54
17  going to eat the food from both sides, isn't that   16:32:56
18  correct?                                            16:33:00
19    MR. OSTOJIC:  Object to form, foundation,         16:33:00
20  incomplete hypothetical, but go ahead.              16:33:02
21  BY THE WITNESS:                                     16:33:04
22    A.  Only if you don't give them enough space      16:33:04
23  to stay and eat comfortably on the one side.  That  16:33:08
24  one small bowl of food forces them into contact.    16:33:12
                                                   Page 216
```

```
 1  social interaction which is going to be agonistic   16:33:18
 2  and drive them away.                                16:33:20
 3       If they don't want to be fighting while        16:33:22
 4  they eat, they have to go face far sound of it, but 16:33:24
 5  they're not liking the sound.  It still repels them 16:33:28
 6  when they're not actively feeding.  They're going   16:33:32
 7  back to the more densely occupied side and staying  16:33:34
 8  there, that's repelling, that's the definition of   16:33:36
 9  repelling.                                          16:33:40
10  BY MR. KOPEL:                                       16:33:40
11    Q.  When you say there wasn't enough space,       16:33:40
12  do you know that, or are you speculating?           16:33:42
13    A.  There were ten rats in -- is it               16:33:48
14  16 square feet?  Yeah, there were too many rats,    16:33:56
15  but they tolerated that except when they were       16:34:02
16  trying to feed.                                     16:34:04
17    Q.  So the over-density of rats affected          16:34:08
18  their feeding schedule but not their location; it's 16:34:12
19  not possible they were influenced by over-density   16:34:14
20  and their location?                                 16:34:16
21    MR. OSTOJIC:  Object to form, foundation, but     16:34:18
22  go ahead.                                           16:34:20
23  BY THE WITNESS:                                     16:34:22
24    A.  The fact that when they counted food          16:34:22
                                                   Page 217
```

55 (Pages 214 - 217)

Veritext Legal Solutions
866 299-5127

```
 1   all the rats in the Chamber B versus Chamber A says   16:34:26
 2   that as long as that repeller was on and they        16:34:36
 3   weren't actively trying to go over to the other      16:34:40
 4   side to feed, it was a high probability they were    16:34:42
 5   all in that chamber or else you would have seen       16:34:44
 6   some of them there sooner or later during the         16:34:48
 7   counts.                                               16:34:50
 8   BY MR. KOPEL:                                          16:34:50
 9        Q.  But there wasn't a single day that the       16:34:50
10   pest repeller completely drove out rats, is that      16:34:56
11   correct?                                              16:35:00
12        A.  And there wasn't a single day where they     16:35:00
13   saw a rat in that side of the chamber from day 4      16:35:02
14   on.                                                   16:35:04
15        Q.  But we know there were rats there, isn't     16:35:06
16   that right?                                           16:35:06
17        MR. OSTOJIC:  Object to form.                    16:35:06
18   BY THE WITNESS:                                       16:35:10
19        A.  You have to take the evidence, the           16:35:10
20   visual evidence. If what you're doing is comparing    16:35:12
21   number of rats in one side or the other, then to      16:35:16
22   discount it and say, well, we knew that they were     16:35:20
23   moving there, that's a different measure that         16:35:22
24   you're looking at. Yes, there were some rats that     16:35:24
                                                           Page 218
```

```
 1   went there, but we don't know how long they spent     16:35:28
 2   there.                                                16:35:28
 3   BY MR. KOPEL:                                          16:35:32
 4        Q.  Well, let's say there are rats that have      16:35:32
 5   a nest behind the wall of the house and then there    16:35:34
 6   is food inside the house and there is a repeller on   16:35:36
 7   inside the house, wouldn't it be possible those       16:35:40
 8   rats would be running into the house, grabbing the    16:35:42
 9   food and going back just like they did in this        16:35:44
10   test?                                                 16:35:46
11        MR. OSTOJIC:  Object to form, incomplete         16:35:46
12   hypothetical, foundation, but go ahead.               16:35:48
13   BY THE WITNESS:                                       16:35:52
14        A.  It would depend on the location of the       16:35:52
15   repeller with regard to the food, and it would be     16:35:56
16   in direct violation of everything Bell & Howell        16:36:00
17   says; you have to pick up the food, you should have    16:36:02
18   no food available in the house.                        16:36:06
19   BY MR. KOPEL:                                          16:36:06
20        Q.  If there is no food available in a           16:36:10
21   house, would you expect there would be a rat          16:36:12
22   infestation?                                          16:36:14
23        A.  Probably not.                                16:36:14
24        Q.  Okay. So do you need a Bell & Howell         16:36:16
                                                           Page 219
```

```
 1   pest repeller to fix a rat infestation if there is    16:36:18
 2   no food in your house?                                16:36:22
 3        A.  I don't think so.                            16:36:24
 4        Q.  Okay. So in that case, it's not really       16:36:24
 5   selling anything, is that correct?                    16:36:28
 6        MR. OSTOJIC:  Object to form.                    16:36:30
 7   BY THE WITNESS:                                       16:36:32
 8        A.  You wouldn't have an expeller there          16:36:32
 9   unless you thought you had a rodent, yes.             16:36:36
10   BY MR. KOPEL:                                          16:36:38
11        Q.  But the fact that there is a rodent          16:36:38
12   infestation suggests that there is food in the        16:36:42
13   house, is that correct?                               16:36:44
14        MR. OSTOJIC:  Object to form, foundation.        16:36:44
15   BY THE WITNESS:                                       16:36:48
16        A.  There is food someplace, maybe in your       16:36:48
17   house, maybe in the neighboring apartment maybe       16:36:50
18   but this is all hypothetical. All we can address       16:36:52
19   here for the test is the data as it is which shows    16:36:56
20   that the repellers are functioning to do the only     16:37:00
21   thing that you have to do to claim expellency or      16:37:04
22   repellency.                                           16:37:08
23        There are two tests of whether something         16:37:08
24   is repelling, and that's all that's used in animal    16:37:12
                                                           Page 220
```

```
 1   behavior, and that is, Test 1, do you get a change    16:37:16
 2   in the behavior of the animal in response to          16:37:20
 3   turning the unit on, does it predictably alter its    16:37:22
 4   behavior in a way this shows it's hearing it,         16:37:26
 5   that's step one.                                      16:37:28
 6        Step two, if it moves away from it               16:37:30
 7   consistently, it's repelling it. It doesn't say       16:37:32
 8   that it has to continue to move away from it if       16:37:37
 9   it's starving to death and the food is in the other   16:37:40
10   room which is exactly the hypothesis that Potter in   16:37:42
11   his apartment test with only food to one apartment    16:37:48
12   or one room of the apartment.                         16:37:50
13   BY MR. KOPEL:                                          16:37:52
14        Q.  Now, the food in Chamber A was within        16:37:52
15   the line of the pest repeller in this instance,       16:37:54
16   right?                                                16:37:58
17        A.  I don't doubt it.                            16:38:00
18        Q.  Okay. And notwithstanding that the test      16:38:02
19   repeller was on the food, the rats still went for     16:38:04
20   that food, is that correct?                           16:38:08
21        A.  Well, since it disappeared, that would       16:38:10
22   seem to be the case, but it doesn't indicate that     16:38:14
23   they stayed there for any length of time. It's eat    16:38:16
24   and run because you don't get a chance to eat in      16:38:18
                                                           Page 221
```

1  Chamber B, you're still repelled back to Chamber B.  16:38:22
2  The only question is does it repel, and that is  16:38:24
3  proven absolutely by this, the rats have moved away  16:38:28
4  from it.  16:38:32
5    Q.  Does this test show that the  16:38:32
6  Bell & Howell repellers can drive rats out of the  16:38:34
7  house?  16:38:36
8    MR. OSTOJIC:  Object to form, foundation.  16:38:38
9  BY THE WITNESS:  16:38:40
10    A.  You can't drive rats out of the house if  16:38:40
11  there is no way for them to leave.  All the tests  16:38:42
12  that are done in these circumstances are closed  16:38:46
13  chambers.  16:38:48
14  BY MR. KOPEL:  16:38:50
15    Q.  Okay.  16:38:50
16    A.  That forces habituation.  16:38:50
17    Q.  I think you might have misunderstood the  16:38:52
18  question.  I'm talking about in the real world.  16:38:54
19  Does the data from this test suggest that the  16:38:56
20  Bell & Howell test repellers will drive rats out of  16:39:00
21  the house?  16:39:06
22    MR. OSTOJIC:  Object, incomplete hypothetical,  16:39:06
23  but go ahead.  16:39:08
24  BY THE WITNESS:  16:39:12

Page 222

1    A.  They don't claim that they drive them  16:39:12
2  out of the house.  They claim they repel them, and  16:39:14
3  they can only repel them to the distance to which  16:39:16
4  the sound is audible to them.  16:39:18
5  BY MR. KOPEL:  16:39:20
6    Q.  And rats might have a nest behind the  16:39:20
7  walls of the house, is that right?  16:39:24
8    A.  True.  16:39:26
9    Q.  And they might, when they're hungry,  16:39:26
10  come into the house and get food and go back to the  16:39:28
11  nest, is that correct?  16:39:32
12    A.  Not if you don't have food available for  16:39:32
13  them.  16:39:34
14    Q.  Right.  But is there food in your house?  16:39:34
15    A.  Not on the floor, not out where they can  16:39:36
16  get at it.  16:39:38
17    Q.  And you still had mice coming in, didn't  16:39:40
18  you?  16:39:42
19    A.  Oh, in my farm house?  16:39:42
20    Q.  Yes.  16:39:44
21    A.  I always had food available for them.  16:39:44
22  That was one of the parts that made it a real world  16:39:46
23  test.  My garbage was always between the stove and  16:39:48
24  the sink, and there was always an open container of  16:39:52

Page 223

1  compost materials on the kitchen counter.  16:39:54
2    Q.  Right.  And most people have garbage in  16:39:56
3  their kitchen, right?  16:40:02
4    A.  Yeah, right.  16:40:02
5    Q.  And rats and mice can eat that, right?  16:40:02
6    A.  But if you're concerned about a rat or a  16:40:04
7  mouse in your house, then the first thing any  16:40:06
8  logical person would do is pick up the trash and  16:40:10
9  put it in a garbage can.  16:40:12
10    Q.  Yeah, but rats and mice can still get  16:40:14
11  food from a garbage can, can't they?  16:40:16
12    A.  If you close the top?  16:40:16
13    Q.  They can still get inside a pantry and  16:40:18
14  get food from inside a pantry, can't they?  16:40:22
15    A.  If you let them gnaw through the wood  16:40:24
16  and whatever, yes, it's a matter of --  16:40:26
17    Q.  They can still get behind a refrigerator  16:40:28
18  if there is food there, can't they?  16:40:30
19    A.  We're not talking about --  16:40:34
20    MR. OSTOJIC:  Object, incomplete hypothetical,  16:40:36
21  but go ahead.  16:40:38
22  BY THE WITNESS:  16:40:38
23    A.  We're carrying on things that are just,  16:40:38
24  as far as I'm concerned, off the topic of what  16:40:42

Page 224

1  constitutes proper tests.  16:40:46
2  BY MR. KOPEL:  16:40:46
3    Q.  I know you contend that Bell & Howell  16:40:46
4  never said this, but my question to you from  16:40:50
5  earlier is does the data from this test show that  16:40:52
6  the repellers are capable of driving rats or mice  16:40:56
7  out of the house?  16:41:00
8    MR. OSTOJIC:  Same objections as before, but  16:41:00
9  go ahead.  16:41:02
10  BY THE WITNESS:  16:41:04
11    A.  It is Dr. Potter's posit that you have  16:41:04
12  to drive them out of the house.  He recites that  16:41:08
13  again and again as his designated means of defining  16:41:12
14  whether it repels them.  But even in his apartment  16:41:18
15  tests, he has set up a situation where  16:41:22
16  theoretically they could not escape the apartments,  16:41:24
17  they could not be driven out, and yet the mice  16:41:26
18  proved him wrong.  They chewed through the walls,  16:41:30
19  the barriers, they got out of the apartment, they  16:41:32
20  got out of the sound system range, and he failed to  16:41:34
21  count those as expelled.  16:41:36
22  BY MR. KOPEL:  16:41:40
23    Q.  I want you to please listen to the  16:41:40
24  question and try to answer what I'm asking you  16:41:42

Page 225

57 (Pages 222 - 225)

```
 1  because I didn't ask anything about Mike Potter.   16:41:44
 2         Does the data from this test show that    16:41:46
 3  the Bell & Howell repellers are capable of driving  16:41:50
 4  mice or rats out of the house?              16:41:52
 5     MR. OSTOJIC: Same objections.            16:41:54
 6  BY THE WITNESS:                         16:42:02
 7     A.  Only if you have enough repellers to     16:42:02
 8  cover the entire area of the house and keep them   16:42:04
 9  exposed to the sound.                      16:42:06
10  BY MR. KOPEL:                          16:42:08
11     Q.  That's supported by the data from this    16:42:08
12  test?                               16:42:12
13     A.  It's supported by common sense. The     16:42:14
14  test shows that we will repel them. That is the    16:42:18
15  thing that Bell & Howell claims is it will repel    16:42:24
16  them. Out of the house is Potter's definition of    16:42:28
17  success.                             16:42:32
18     Q.  I understand that you might disagree     16:42:32
19  with me about what is being claimed, and that's    16:42:34
20  not -- you've been on the record stating that, but  16:42:38
21  I'm asking you a specific question, okay?        16:42:40
22         Have you seen anything from this test to   16:42:44
23  imply that the repellers are capable of driving    16:42:46
24  these pests out of the house?               16:42:48
                                        Page 226
```

```
 1     MR. OSTOJIC: Same objection and asked and   16:42:50
 2  answered.                            16:42:50
 3  BY MR. KOPEL:                          16:42:50
 4     Q.  I'll keep asking. I just need a yes or    16:42:52
 5  no.                                16:42:54
 6     A.  The test only covers four square -- or is  16:42:54
 7  32 square foot area. How can you answer that     16:43:02
 8  larger question on the basis of that small a       16:43:06
 9  sample?                             16:43:10
10     Q.  Does that mean that the data does not    16:43:10
11  support that statement, or does it, yes, support    16:43:12
12  that statement? That's my entire question. If the   16:43:14
13  data is insufficient to support it, your answer    16:43:18
14  might be no, but I'm looking for a yes or no, and   16:43:20
15  I'm happy to let you elaborate, but I've asked you  16:43:22
16  a yes or no question several times now.         16:43:26
17     MR. OSTOJIC: Same objections, incomplete    16:43:28
18  hypothetical, but go ahead.               16:43:30
19  BY THE WITNESS:                         16:43:36
20     A.  It only shows that it works over the      16:43:36
21  distances specified here.                  16:43:40
22  BY MR. KOPEL:                          16:43:46
23     Q.  So, in fact, this data cannot support    16:43:46
24  any sort of finding that these repellers would work  16:43:54
                                        Page 227
```

```
 1  in a space larger than 4 feet by 4 feet by 2 feet,   16:44:00
 2  is that correct?                        16:44:04
 3     A.  Let's go to the more realistic or       16:44:08
 4  Potter's tests and then we're dealing with a larger  16:44:12
 5  space.                             16:44:14
 6     Q.  We're going to be stuck here all day if   16:44:14
 7  you keep talking about Potter while I'm trying to   16:44:16
 8  talk to you about this test.               16:44:18
 9     A.  It's a hypothetical. It's a           16:44:18
10  hypothetical.                          16:44:22
11     Q.  It's not. I'm asking if the data        16:44:22
12  supports that. You're a scientist, right?         16:44:24
13     A.  As a scientist, I would say that by the   16:44:26
14  high level of efficacy with all the animals having  16:44:28
15  moved as far away as possible, it does support that  16:44:32
16  conclusion.                          16:44:34
17     Q.  What would have happened if the chambers  16:44:34
18  were twice the size?                     16:44:36
19     A.  I fully believe that you would have seen  16:44:40
20  the same results.                       16:44:42
21     Q.  Do you have evidence of that?          16:44:44
22     A.  How can I?                      16:44:48
23     Q.  What would have happened if this test    16:44:58
24  had gone on for 14 days?                  16:45:00
                                        Page 228
```

```
 1     A.  I have absolutely no way of knowing.     16:45:02
 2     Q.  Would the rats that kept going into     16:45:04
 3  Chamber A to get food, would they have become     16:45:08
 4  habituated and evened out between the two chambers?  16:45:10
 5     A.  I have no way of knowing.            16:45:14
 6     Q.  So can you draw any conclusions         16:45:16
 7  regarding the efficacy of Bell & Howell test      16:45:22
 8  repellers beyond seven days based on these tests?   16:45:26
 9     A.  Looking at it, they were still showing   16:45:32
10  efficacy on the seventh day with all the rats      16:45:34
11  having been forced in the other chamber. If the    16:45:38
12  test had gone on, we would have evidence which     16:45:42
13  would show us whether it persisted, but most other  16:45:44
14  tests that have been done run for only one or      16:45:46
15  two days to show habituation.               16:45:50
16     MR. KOPEL: Can you please read back my      16:45:58
17  question?                            16:46:00
18         (WHEREUPON, the record was read        16:46:00
19         as requested.)                   16:46:00
20  BY MR. KOPEL:                          16:46:00
21     Q.  So I appreciate that explanation, and    16:46:00
22  I'm always going to let you elaborate on any       16:46:56
23  answer, but I did ask you a yes or no question.     16:46:58
24         Can you draw any conclusions on the     16:47:00
                                        Page 229
```

Veritext Legal Solutions
866 299-5127

1 effectiveness of Bell & Howell rest repellers    16:47:04
2 beyond seven days based on the data from those    16:47:06
3 tests, and I'm happy to let you elaborate as much    16:47:10
4 as you like, but it is a yes or no question,    16:47:12
5 please?    16:47:16
6    A.  It's not my habit to speculate without    16:47:16
7 evidence, and a yes or no answer, I don't know.    16:47:20
8    Q.  Is it possible that the mice and rats    16:47:28
9 might have become habituated to the sound in week    16:47:32
10 two?    16:47:36
11    A.  I would say --    16:47:36
12    MR. OSTOJIC:  Object to form and foundation,    16:47:38
13 but go ahead    16:47:40
14 BY THE WITNESS:    16:47:40
15    A.  I would say certainly over time I would    16:47:40
16 expect them to habituate in an enclosed environment    16:47:42
17 where they cannot escape that sound.    16:47:46
18 BY MR. KOPEL:    16:47:48
19    Q.  Do you contend that the mice and rats    16:47:48
20 were able to hear the -- or detect the ultrasound    16:47:50
21 in Chamber B during this experiment?    16:47:56
22    A.  That size chambers, yes, I'm pretty    16:48:00
23 certain they were hearing it, but they were staying    16:48:02
24 away.    16:48:04

Page 230

1    Q.  Even though there was a curved tunnel?    16:48:06
2    A.  Yeah.  Plexiglas caused the sound to    16:48:08
3 bend.  It's a hard surface.  Ultrasound, even if it    16:48:12
4 wasn't aimed directly at it, would bounce through    16:48:18
5 it.    16:48:20
6    Q.  If mice or rats were found in the    16:48:24
7 tunnel, which side was that counted as?    16:48:26
8    A.  I have no recollection.    16:48:32
9    Q.  Well, you have the test in front of you,    16:48:34
10 right?    16:48:36
11    A.  What page again?    16:48:40
12    MR. OSTOJIC:  Go through the whole thing.    16:48:46
13 BY MR. KOPEL:    16:48:46
14    Q.  It starts on page 55.    16:48:48
15    A.  It doesn't state.  Page 58 doesn't state    16:49:30
16 anything other than if they were in Chamber B or in    16:49:40
17 Chamber A.  It doesn't state what they did with    16:49:44
18 ones in between if there were ones in between.    16:49:50
19    Q.  Well, they must have been counted one    16:49:54
20 way or the other because we always equal ten on    16:49:56
21 every single day, is that correct?    16:50:00
22    A.  Well, that would imply that there were    16:50:02
23 no rats in the connecting tube.    16:50:04
24    Q.  Or they were counted as being repelled    16:50:06

Page 231

1 or not repelled but more likely repelled, is that    16:50:10
2 correct?    16:50:12
3    MR. OSTOJIC:  Object to form.    16:50:32
4 BY THE WITNESS:    16:50:16
5    A.  Well, they specifically indicate the    16:50:16
6 presence in Chamber A or Chamber B, not in the    16:50:20
7 tube; therefore, we must assume, if they counted    16:50:22
8 them, they were in Chamber A or Chamber B.    16:50:28
9 BY MR. KOPEL:    16:50:42
10    Q.  Would you please take a quick look back    16:50:42
11 to Exhibit 12?  That's the 2016 test we were    16:50:50
12 looking at earlier.    16:50:58
13    A.  Page?    16:51:02
14    Q.  Page 92 -- yes, page 92 I believe is    16:51:04
15 what I'm referencing.    16:51:10
16    A.  I only go up to 69.    16:51:10
17    Q.  In Exhibit 12?    16:51:12
18    A.  Oh, 12.    16:51:14
19    Q.  No, 14, I'm sorry, the 2016 test right    16:51:22
20 there.    16:51:26
21    MR. OSTOJIC:  What page number?    16:51:26
22 BY MR. KOPEL:    16:51:26
23    Q.  Page number 92.    16:51:28
24    A.  Okay.    16:51:42

Page 232

1    Q.  You're on page 92?    16:51:44
2    A.  I am.    16:51:44
3    Q.  Do you see at the bottom it says,    16:51:46
4 "Remark, the quantity of the tunnel is counted as    16:51:46
5 Chamber B?"    16:51:50
6    A.  That only applies to this 2016 test.  It    16:51:50
7 was not stipulated for 2010 -- excuse me, 2011 or    16:51:54
8 2014, and they probably had to count it in this one    16:51:58
9 because they had so many rats or mice that some of    16:52:02
10 them were always in there to avoid the presence of    16:52:04
11 others.    16:52:06
12    Q.  If the quantity of the tunnel was    16:52:08
13 counted as Chamber B, would that be appropriate?    16:52:16
14    MR. OSTOJIC:  Object to form, foundation, but    16:52:18
15 go ahead.    16:52:22
16 BY THE WITNESS:    16:52:22
17    A.  We have no indications that it was in    16:52:22
18 2011 or '14.    16:52:24
19 BY MR. KOPEL:    16:52:26
20    Q.  Okay.  Did you hear -- my question was    16:52:26
21 would that be appropriate to do so?  They did so in    16:52:28
22 2016, correct?    16:52:30
23    A.  They did.    16:52:32
24    Q.  Was that correct that they did that?    16:52:32

Page 233

59 (Pages 230 - 233)

```
1    A.   Different test group. The tunnel itself   16:52:34
2    should be considered the tunnel.               16:52:40
3    Q.   Should it be considered Chamber B?          16:52:42
4    A.   It shouldn't be considered Chamber B any    16:52:46
5    more than the hallways in the Potter studies should   16:52:48
6    be considered the front room.                  16:52:52
7    Q.   Is that a no, it should not be             16:52:54
8    considered Chamber B?                           16:52:56
9    A.   Yes.                          16:52:58
10   Q.   Okay. And it shouldn't be        16:53:00
11   considered -- okay. And this test was done by    16:53:02
12   Intertek, you see that, right?                 16:53:06
13   A.   Uh-huh.                        16:53:08
14   Q.   And that's the same company that did    16:53:08
15   this other test we're looking at, correct?     16:53:10
16   A.   But since it doesn't specify what they    16:53:14
17   did, we don't know.                   16:53:14
18   Q.   You don't know --                 16:53:16
19   A.   The rules got changed in 2016 when they    16:53:18
20   stuffed more in, and it was different people     16:53:20
21   running the tests, was it not? Well, I guess it's    16:53:26
22   still Leo Lin and Sara Lin.             16:53:30
23   Q.   No, it's the same people.          16:53:32
24   A.   Okay.                          16:53:32
                                                  Page 234
```

```
1    Q.   But you don't know, they might have    16:53:34
2    counted it as Chamber B; you just don't know,     16:53:36
3    correct?                          16:53:40
4    A.   Yes. I'm sorry.                 16:53:42
5    Q.   That's fine. How many mice or rats died   16:53:44
6    during the course of this 2014 testing?         16:53:52
7    A.   During the 2014 testing?          16:53:56
8    Q.   It's not a memory test. You can look at    16:54:02
9    it.                             16:54:06
10   A.   2014, that's this one. Can you give    16:54:06
11   me a -- 2014 test is 13?              16:54:18
12   Q.   Yes, this was 13, and I'm -- it begun --    16:54:28
13       MR. OSTOJIC: I think it was from 55.     16:54:36
14   BY MR. KOPEL:                       16:54:36
15   Q.   55 and onward.                  16:54:40
16   A.   Okay. Since we start with ten rats and    16:54:42
17   on post testing we still have seven and three and    16:55:14
18   eight and four, it would appear that none of them    16:55:18
19   could have died, but there must be -- oh, wait,    16:55:24
20   excuse me, that's six and four for the final post    16:55:28
21   testing day, so you still have ten rats on the    16:55:32
22   final day which means no rats died in that test.    16:55:34
23   Q.   If a rat had died in the middle of the    16:55:36
24   testing period and was replaced by a new rat, would    16:55:42
                                                  Page 235
```

```
1    that be proper?                    16:55:44
2    A.   They did that in the 2016. There is no    16:55:50
3    indication they ever did that in 2011 or 2014. It    16:55:54
4    would not be proper.                 16:55:58
5    Q.   Do you know that they didn't do that in    16:56:06
6    2011, 2014?                        16:56:08
7    A.   They would have had to mention it if    16:56:10
8    they replaced an animal. They mentioned the deaths    16:56:12
9    of them in 2016. Porter was all over it.     16:56:16
10   Q.   Okay. Please take a look at the 2016    16:56:24
11   test and tell me where they mention the death?    16:56:28
12   A.   Actually, it's Potter who mentioned it,    16:56:32
13   complained that there was death and replacement of    16:56:34
14   rats in the 2016 test.                 16:56:36
15   Q.   Okay. My question was can you please    16:56:38
16   identify -- you just said that they mentioned death    16:56:40
17   in the 2016 test, so I'm asking can you please    16:56:44
18   identify where it says that?           16:56:48
19   A.   I'm not sure Intertek mentioned it.     16:56:48
20       MR. OSTOJIC: If you want to go through it,    16:56:50
21   the question is -- he wants you to find it. I    16:56:52
22   think it's Exhibit 14.                 16:56:58
23   BY THE WITNESS:                     16:57:30
24   A.   It doesn't look as though any died.    16:57:30
                                                  Page 236
```

```
1        MR. OSTOJIC: It does.              16:57:34
2        THE WITNESS: Pardon?               16:57:34
3    BY MR. KOPEL:                       16:57:34
4    Q.   In 2016.                       16:57:36
5        MR. KOPEL: Please don't communicate with the    16:57:40
6    witness right now.                    16:57:42
7        MR. OSTOJIC: Go through the entire Exhibit.    16:57:46
8    I know it's late and we've been here hours.     16:57:48
9    BY THE WITNESS:                     16:57:54
10   A.   Okay. They start with 20 rats      16:57:54
11   and -- okay. During preliminary testing they're    16:57:56
12   down to 18 rats, so yes, they did, and then 16.    16:58:00
13   Somehow they must have added rats in there because    16:58:06
14   now you're up to 19 and 20, 20, 19. So, yes, if I    16:58:08
15   recall correctly, five to seven rats died in it.    16:58:14
16       MR. OSTOJIC: Look at the entire Exhibit.    16:58:18
17   Review the entire Exhibit. He wants you to go    16:58:22
18   through the Exhibit.                   16:58:24
19   BY THE WITNESS:                     16:58:52
20   A.   I'm not sure where you're looking or    16:58:52
21   what you're driving at.               16:58:58
22   BY MR. KOPEL:                       16:58:58
23   Q.   Let's slow down, okay. I think you    16:58:58
24   mentioned earlier that the 2016 test notes when the    16:59:02
                                                  Page 237
```

**Page 238**

1  mice and the rats died. Do you recall saying that?  16:59:06
2  A. Well, it certainly shows the decrease in  16:59:12
3  total numbers, and since we're dealing with  16:59:14
4  Plexiglas, it's a little hard to figure out where  16:59:18
5  they disappeared.  16:59:20
6  Q. Right. So it's apparent from the  16:59:22
7  numbers. Do you see any notes discussing how many  16:59:24
8  died?  16:59:26
9  MR. OSTOJIC. Objection. The document speaks  16:59:26
10  for itself, but GO through the entirety of the  16:59:28
11  document, especially --  16:59:32
12  MR. KOPEL: Don't -- please don't do that.  16:59:34
13  MR. OSTOJIC. It's without purpose. It's  16:59:40
14  there.  17:00:10
15  BY MR. KOPEL:  17:01:38
16  Q. The question pending, just as a  17:01:38
17  reminder, is can you please show me where in the  17:01:40
18  2016 report there is a notation that dead rats were  17:01:42
19  found or mice?  17:01:48
20  A. I'm not finding that notation anywhere.  17:01:52
21  The variation in numbers confounds me  17:01:56
22  Q. The variation in numbers seems to imply  17:01:58
23  that mice and rats had died in the middle of the  17:02:02
24  experiment and they were subsequently replaced.  17:02:04

**Page 239**

1  Would you agree with that?  17:02:08
2  A. It would imply that.  17:02:10
3  Q. Okay. Do you have any --  17:02:12
4  A. And Dr. Potter stipulated the same thing  17:02:16
5  about this, that there were rats replaced during  17:02:18
6  the study.  17:02:22
7  Q. Do you have any indication whether the  17:02:24
8  same thing occurred -- do you have any indication  17:02:30
9  that the same thing did not occur in the 2014 test?  17:02:32
10  MR. OSTOJIC. Objection, already asked and  17:02:34
11  answered.  17:02:36
12  BY THE WITNESS:  17:02:36
13  A. There is no indication of fluctuation in  17:02:38
14  the numbers. Everyday's rat total adds to ten.  17:02:40
15  BY MR. KOPEL:  17:02:46
16  Q. Would there need to be, or could they  17:02:46
17  have replaced them at another point in which they  17:02:48
18  were not counted?  17:02:52
19  MR. OSTOJIC. Object to form, foundation.  17:02:52
20  BY THE WITNESS:  17:02:56
21  A. That would be pure speculation since  17:02:56
22  it's not recorded in their tables.  17:02:56
23  BY MR. KOPEL:  17:03:00
24  Q. So we don't know either way, correct?  17:03:00

**Page 240**

1  MR. OSTOJIC. Object to form, foundation.  17:03:02
2  BY THE WITNESS:  17:03:10
3  A. I guess that's true.  17:03:10
4  BY MR. KOPEL:  17:03:12
5  Q. Does that make you question the  17:03:12
6  qualifications of Leo and Sam Lin?  17:03:12
7  A. On the basis of supposition that they're  17:03:20
8  just putting in information?  17:03:24
9  Q. No. So maybe I'll clarify. Does the  17:03:26
10  fact that Leo and Sam Lin replaced dead rats in the  17:03:28
11  2016 study make you question their qualifications  17:03:32
12  to performing these kinds of tests?  17:03:36
13  A. They did it out of desperation trying to  17:03:38
14  keep the test valid which of course we've already  17:03:42
15  said it wasn't.  17:03:46
16  Q. Okay. Do you believe that a qualified  17:03:48
17  scientist would do such a thing?  17:03:50
18  A. I wouldn't, but we don't know whether  17:03:56
19  Intertek decided they needed -- whether Diane  17:04:02
20  Feuerstein said we need to have more rats in here  17:04:08
21  or more mice in here. We don't know the source of  17:04:10
22  it.  17:04:14
23  Q. If Ms. Feuerstein said that to you,  17:04:14
24  would you do it?  17:04:16

**Page 241**

1  A. Would I, no.  17:04:16
2  Q. Would any qualified scientist do that?  17:04:18
3  MR. OSTOJIC. Object to form, foundation, but  17:04:20
4  go ahead and answer.  17:04:22
5  BY THE WITNESS:  17:04:22
6  A. A scrupulous scientist would not, but  17:04:22
7  we're looking at a test that was flawed to begin  17:04:28
8  with.  17:04:32
9  BY MR. KOPEL:  17:04:32
10  Q. So would you agree that this tends to  17:04:32
11  show that Leo and Sam Lin were not scrupulous  17:04:34
12  scientists?  17:04:38
13  MR. OSTOJIC. Object, form, foundation,  17:04:38
14  mischaracterizes his testimony.  17:04:40
15  BY THE WITNESS:  17:04:44
16  A. Yeah, I don't have enough data to  17:04:44
17  support that. It's not my nature to accuse anybody  17:04:46
18  of misdeed or judge on their -- on supposition of  17:04:54
19  misdeeds whether they are conscientious enough  17:04:58
20  about their work to carry out a simple count.  17:05:04
21  BY MR. KOPEL:  17:05:08
22  Q. And I wasn't trying to cast aspersions  17:05:08
23  but --  17:05:16
24  MR. OSTOJIC. Yeah, that's what you did.  17:05:16

61 (Pages 238 - 241)

| | |
|---|---|
| 1  BY MR. KOPEL:                        17:05:16 | 1  her dreams, 15 to 20.                  17:21:50 |
| 2    Q.  Rather than casting aspersions, this   17:05:20 | 2  BY MR. KOPEL:                         17:21:52 |
| 3  might have been -- the two Lins who conducted the   17:05:22 | 3    Q.  Well, I'm glad she got to do that.  How   17:21:52 |
| 4  study might have done -- might have replaced the   17:05:26 | 4  many square feet?                      17:21:56 |
| 5  dead animals out of incompetence, correct?   17:05:32 | 5    A.  Just under 7,000.                 17:21:58 |
| 6    MR. OSTOJIC: Object to form, foundation,   17:05:34 | 6    Q.  That's awesome.                   17:22:02 |
| 7  incomplete hypothetical.             17:05:36 | 7    A.  It was her money, had to let her do   17:22:06 |
| 8  BY THE WITNESS:                      17:05:46 | 8  that.                                   17:22:08 |
| 9    A.  I don't know the mindset of these people  17:05:46 | 9    Q.  What's the maximum coverage area?   17:22:10 |
| 10  and why they did what they did.  They were trying   17:05:50 | 10    MR. OSTOJIC: Object to form.          17:22:14 |
| 11  to -- probably trying to salvage a very flawed   17:05:52 | 11  BY MR. KOPEL:                          17:22:14 |
| 12  experiment which we've already said didn't have any   17:05:54 | 12    Q.  I mean I know you said minimum.  Can you   17:22:16 |
| 13  strong evidence, although looking at the numbers,   17:05:58 | 13  explain what you meant by minimum earlier?   17:22:18 |
| 14  the efficacy of the repellers still shows that they   17:06:02 | 14    A.  Well, that was the minimum considering   17:22:20 |
| 15  all moved to Chamber B.             17:06:04 | 15  that you might have had carpet.  I'd say the   17:22:24 |
| 16  BY MR. KOPEL:                        17:06:06 | 16  maximum it's a matter of the nature of the   17:22:28 |
| 17    Q.  Would a competent scientist try to stuff  17:06:06 | 17  surfaces.  In the absence of carpet, hard surface,   17:22:32 |
| 18  20 rats into a small acrylic chamber?   17:06:10 | 18  the sound will bounce and travel farther with less   17:22:34 |
| 19    MR. OSTOJIC: Object to form, foundation,   17:06:16 | 19  attenuation.                            17:22:38 |
| 20  incomplete hypothetical.             17:06:16 | 20    Q.  When you said 175 square feet, what are   17:22:40 |
| 21  BY THE WITNESS:                      17:06:18 | 21  you basing that on?                      17:22:46 |
| 22    A.  I would say it shows a lack of knowledge   17:06:18 | 22    A.  That was the estimated size of coverage   17:22:46 |
| 23  about the behavior of the animals.   17:06:22 | 23  given by Diane Feuerstein in her deposition as the   17:22:50 |
| 24    MR. KOPEL: Let's take a break, please.   17:06:32 | 24  planned or specified dimensions of the average room   17:23:00 |
| Page 242 | Page 244 |

| | |
|---|---|
| 1    THE VIDEOGRAPHER: We are off the record at   17:06:34 | 1  as they gave that information to Bell & Howell.  I   17:23:06 |
| 2  5:00 o'clock p.m.                     17:06:36 | 2  mean that's a Chinese estimate.         17:23:10 |
| 3    (WHEREUPON, a short break was had.)   17:20:48 | 3    Q.  Okay.  So have you seen any evidence   17:23:14 |
| 4    THE VIDEOGRAPHER: We are back on the record   17:20:48 | 4  that it covers an area of 175 square feet or you're   17:23:18 |
| 5  at 5:14 p.m.                          17:20:50 | 5  just basing that on something she said?   17:23:24 |
| 6  BY MR. KOPEL:                        17:20:50 | 6    MR. OSTOJIC: Object to form, foundation, but   17:23:26 |
| 7    Q.  Dr. Whitford, in a room without carpet,   17:21:06 | 7  go ahead.                               17:23:28 |
| 8  what would the coverage area of a Bell & Howell   17:21:10 | 8  BY THE WITNESS:                         17:23:32 |
| 9  repeller be?                          17:21:14 | 9    A.  I've seen nothing to the contrary, no   17:23:32 |
| 10    A.  In a room without carpet?        17:21:16 | 10  evidence to the contrary other than my own work   17:23:36 |
| 11    MR. OSTOJIC: Object, incomplete hypothetical,   17:21:18 | 11  with it where, you know, in spite of the fact that   17:23:38 |
| 12  but go ahead.                        17:21:20 | 12  it's around the corner and down the stairs with   17:23:42 |
| 13  BY MR. KOPEL:                        17:21:20 | 13  that thing on, I don't have any problem with mice,   17:23:44 |
| 14    A.  Minimum of about 175 square feet   17:21:20 | 14  but that's probably because if they don't come up   17:23:48 |
| 15  depending again on the shape and presence of   17:21:26 | 15  to find food and water, they go someplace else,   17:23:52 |
| 16  structures in that room.             17:21:28 | 16  they leave the house because they will starve down   17:23:56 |
| 17  BY MR. KOPEL:                        17:21:32 | 17  in my basement.                         17:24:00 |
| 18    Q.  If you wanted to protect your whole   17:21:32 | 18  BY MR. KOPEL:                           17:24:16 |
| 19  primary residence using Bell & Howell pest   17:21:36 | 19    Q.  How big -- do you have any rooms in your   17:24:16 |
| 20  repellers, how many would you need?   17:21:40 | 20  house that are 175 square feet or less?   17:24:18 |
| 21    MR. OSTOJIC: Object to form, foundation,   17:21:42 | 21    A.  Which house, my actual farm house?   17:24:24 |
| 22  incomplete hypothetical.             17:21:42 | 22  Virtually every room of the six bedrooms, kitchen   17:24:28 |
| 23  BY THE WITNESS:                      17:21:46 | 23  and living room is under 175 square feet in my farm   17:24:32 |
| 24    A.  Given that my wife built a mansion of   17:21:46 | 24  house.                                  17:24:36 |
| Page 243 | Page 245 |

62 (Pages 242 - 245)

Page 246

1  Q.  How about your primary residence?  17:24:36
2  A.  It's opulent.  17:24:38
3  Q.  Would you agree that the average  17:24:40
4  American room is bigger -- well, let's actually be  17:24:42
5  more specific.  Would you agree the average  17:24:46
6  American kitchen is bigger than 175 square feet?  17:24:48
7  MR. OSTOJIC:  Object to form, foundation, may  17:24:50
8  call for speculation.  17:24:54
9  BY THE WITNESS:  17:24:56
10  A.  On one end of the scale, you have  17:24:56
11  numerous small kitchen apartment -- or small  17:24:58
12  apartment kitchens and small house kitchens.  1  17:25:02
13  mean I grew up in the 1950's and 1940's housing.  17:25:04
14  Those kitchens were rarely 150 square feet.  So now  17:25:08
15  in the present day, you run the gamut of all those  17:25:14
16  small houses and now the McMansions that are going  17:25:22
17  up.  17:25:24
18  BY MR. KOPEL:  17:25:24
19  Q.  If consumers had not been told a  17:25:24
20  specific square footage for the Bell & Howell  17:25:32
21  repellers, they would not know how many would be  17:25:34
22  needed to be used effectively, would you agree?  17:25:40
23  A.  If they weren't told how many or how  17:25:44
24  many square feet it's supposed to cover?  But they  17:25:48

Page 247

1  indicate that you need multiples if it's bigger  17:25:54
2  than that,  17:25:58
3  Q.  When you say they indicated, what do you  17:26:00
4  mean by that?  17:26:02
5  A.  The instructions say that you may need  17:26:02
6  multiple units for a larger space.  17:26:04
7  Q.  Can you turn back to the instructions,  17:26:28
8  please, Exhibit 3?  It's this big -- this is  17:26:30
9  Exhibit 3 from the Potter deposition, Potter 3.  17:27:00
10  And then the instructions are the fourth sheet.  So  17:27:12
11  it's double-sided, the fourth sheet.  17:27:14
12  Okay.  My question regarding  17:27:34
13  instructions is -- I think you referenced earlier  17:27:38
14  that they said you need multiple units for spaces  17:27:40
15  over 175 square feet, and my question is where do  17:27:44
16  you see that here?  17:27:48
17  A.  Do we have the image of the outside side  17:27:48
18  of the packaging, or is this it?  17:27:52
19  Q.  The image of the outside of the  17:27:54
20  packaging, I believe is the page before.  Oh, are  17:27:56
21  you referring to Exhibit 7?  17:28:02
22  A.  I am not seeing that there.  Maybe I'm  17:28:38
23  remembering it from other content.  17:28:40
24  Q.  I'll ask the Court Reporter to please  17:29:02

Page 248

1  mark --  17:29:04
2  A.  Okay, multiple --  17:29:04
3  Q.  Oh, you see it?  17:29:04
4  A.  Multiple units may be necessary for  17:29:06
5  larger rooms.  That's all it says.  17:29:10
6  Q.  Okay.  It doesn't say square footage  17:29:12
7  there, right?  17:29:16
8  A.  No.  17:29:16
9  MR. KOPEL:  I'll ask the Court Reporter to  17:29:22
10  please mark as Exhibit 15 a document bearing Bates  17:29:24
11  number BHIL, LLC 006356.  17:29:28
12  (WHEREUPON, a certain document was  17:29:28
13  marked Whitford Deposition Exhibit
14  No. 15, for identification, as of
15  01/12/2018.)
16  BY MR. KOPEL:
17  Q.  Do you have Exhibit 15?  17:29:52
18  A.  I do.  17:29:58
19  Q.  Okay.  Do you see that is an email?  17:29:58
20  A.  I've never seen this email before.  17:30:04
21  Q.  But you see that it's an email, correct?  17:30:06
22  A.  Yes.  17:30:06
23  Q.  Okay.  Do you see here that there is an  17:30:08
24  email sent from Debbie Feuerstein on February 14,  17:30:10

Page 249

1  2013 at 9:47 a.m., do you see that?  17:30:16
2  A.  I'm sorry, where are we?  17:30:22
3  Q.  Sure.  17:30:24
4  A.  9:47?  17:30:26
5  Q.  Yes, 9:47 a.m., do you see that?  17:30:28
6  A.  Yes.  17:30:30
7  Q.  Do you see here in this email  17:30:30
8  Ms. Feuerstein -- and you recognize Ms. Feuerstein  17:30:32
9  to be the inventor of the pest repellers, correct?  17:30:36
10  A.  Yes.  17:30:38
11  Q.  You see here she says, "It is better NOT  17:30:38
12  to mention specific square feet for pest repellers.  17:30:42
13  our ultrasonic products is good for one average  17:30:46
14  size room.  When we supplied for Sunbeam 10 years  17:30:48
15  ago, we had some issues with FTC (Federal Trade  17:30:50
16  Commission) about footage claims," do you see that?  17:30:56
17  A.  Yes.  17:30:58
18  Q.  So do you understand from this that they  17:30:58
19  specifically chose to not report the square  17:31:00
20  footage?  17:31:04
21  A.  Yes, and then I also see the Qmatn  17:31:04
22  efficiency test reports that its coverage is 318  17:31:06
23  square feet, nearly double.  17:31:10
24  Q.  And you recognize that as the unreliable  17:31:10