```
1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - - -x

5    JOANNE HART and AMANDA PARKE, on behalf

6    of themselves and all others similarly

7    situated,

8                        Plaintiffs,

9              v.

10   BHH, LLC d/b/a Bell + Howell and VAN

11   HAUSER LLC,

12                        Defendants.

13   - - - - - - - - - - - - - - - - - - - -x

14

15

16        Videotaped Deposition of DEBBIE FEUERSTEIN,

17        taken at 888 Seventh Avenue, New York, New

18        York, commencing at 10:38 a.m., Tuesday,

19        November 29, 2016, before Jamie Ann Stanton,

20        a Shorthand Reporter and Notary Public of

21        the State of New York.

22

23

24   JOB No. 2490905

25   PAGES 1 - 223
```

Page 1

| 1 | APPEARANCES: |
|---|---|
| 2 | |
| 3 | Attorneys for Plaintiffs |
| 4 | |
| 5 | BURSOR & FISHER, P.A. |
| 6 | BY: YITZCHAK KOPEL, ESQ. |
| 7 | 888 Seventh Avenue |
| 8 | New York, New York 10019 |
| 9 | 646-837-7127 |
| 10 | |
| 11 | Attorneys for Defendants |
| 12 | |
| 13 | LEAHY, EISENBERG & FRAENKEL, LTD. |
| 14 | BY: SCOTT WING, ESQ. |
| 15 | 33 W. Monroe Street, Suite 1100 |
| 16 | Chicago, Illinois 60603-5317 |
| 17 | 312-368-4554 |
| 18 | |
| 19 | ALSO PRESENT: |
| 20 | Kevin Gallagher, Videographer |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 2

EXHIBITS

PLAINTIFF'S
EXHIBIT    DESCRIPTION    PAGE

Exhibit 14  copy of Debbie Feuerstein FaceBook profile page    42
Exhibit 15  BHH, LLC 006640-006666    52
Exhibit 16  US Design Patent Application    86
Exhibit 17  BHH, LLC 001268-001272    94
Exhibit 18  Fuerstein 0000086-00000100    121
Exhibit 19  BHH, LLC 001531-001544    126
Exhibit 20  BHH, LLC 002509-002580    129
Exhibit 21  BHH, LLC 001545-001544    164
Exhibit 22  BHH, LLC 001810-001815    172
Exhibit 23  BHH, LLC 000712-000717    194
Exhibit 24  Test Report by Qmann    197
Exhibit 25  BHH, LLC 001356-001363    200

Page 4

LITIGATION SUPPORT INDEX

WITNESS    EXAMINATION BY    PAGE
D. Feuerstein   Mr. Kopel    6

DIRECTION TO WITNESS NOT TO ANSWER
Page   Line    Page   Line
92   6

REQUEST FOR PRODUCTION OF DOCUMENTS
Page   Line    Page   Line
161   6

Page 3

1 THE VIDEOGRAPHER: We are now
2 going on the record at, approximately,
3 10:57 a.m. This is the beginning of
4 file number one. My name is Kevin
5 Gallagher representing Veritext, New
6 York. The date today is November 29,
7 2016. The deposition is being held at
8 burrs operating room and Fisher
9 located at 888 Seventh Avenue, in New
10 York, New York. The caption of this
11 case is Joanne Hart, et al., versus
12 Bell + Howell, et al. The case is
13 filed in the US District Court for the
14 Southern District of New York. The
15 case number is 15-CV 04804. The name
16 of our witness this morning is Debbie
17 Fuerstein.
18 At this time the attorneys
19 present in the room will identify
20 themselves for the record.
21 MR. KOPEL: Yitzchak Kopel on
22 behalf of Plaintiff, Joanne Hart.
23 MR. WING: Scott Wing on
24 behalf of Defendants.
25 THE VIDEOGRAPHER: Our court

Page 5

2 (Pages 2 - 5)

D. Feuerstein

| | |
|---|---|
| 1   reporter this morning is Jamie | 1   was -- happened -- happened in Hong Kong. |
| 2   Stanton. She represents Veritext | 2     Q.   Can you please briefly describe |
| 3   Reporting as well. She will now swear | 3   what that case was about? |
| 4   in the witness and we can proceed. | 4     A.   It's just my customer did not |
| 5       REPORTER: Please raise your | 5   pay us, so we were suing him for the money |
| 6   right hand. Do you swear or affirm | 6   he owed. |
| 7   that the testimony you are about to | 7     Q.   Is that still pending? |
| 8   give will be the truth, the whole | 8     A.   No. We actually lost the case, |
| 9   truth, and nothing but the truth? | 9   and then we settled in 2006. |
| 10     THE WITNESS: Yes. | 10     Q.   Thank you. |
| 11       EXAMINATION | 11       Before we continue, I would like |
| 12 BY MR. KOPEL: | 12 to discuss the ground rules today. |
| 13     Q.   Good morning, Ms. Feuerstein. | 13       Do you understand that you are |
| 14     A.   How are you? | 14 testifying under oath today? |
| 15     Q.   Well. Can you state your name | 15     A.   Yes. |
| 16 and address for the record? | 16     Q.   Do you understand that you have |
| 17     A.   Yes. Debbie Feuerstein. My | 17 the same obligation to tell the truth |
| 18 current address is 1162 North Avenue, New | 18 today as you would in the courtroom before |
| 19 Rochelle, New York 10804. | 19 a judge and a jury? |
| 20     Q.   And is that your home address? | 20     A.   Yes. |
| 21     A.   Yes. | 21     Q.   It's important that we |
| 22     Q.   Is that your business address, | 22 communicate clearly today. I am going to |
| 23 as well? | 23 ask you a lot of questions about the case. |
| 24     A.   No. My office is in Flushing, | 24 If you don't understand a question, please |
| 25 Queens. | 25 let me know, and I will try to clarify it |
| Page 6 | Page 8 |

| | |
|---|---|
| 1     Q.   What is the address of your | 1 for you, okay? |
| 2 office? | 2     A.   Okay. |
| 3     A.   43-35, 5G, Queens Avenue, | 3     Q.   Is Mr. Wing representing you |
| 4 Flushing, New York, 11355. | 4 today? |
| 5     Q.   Thank you, my name is Yitzchak | 5     A.   Yes. |
| 6 Kopel. I am a lawyer. I represent | 6     Q.   Are you compensating him for his |
| 7 Plaintiff Joanne Hart. She is a party in | 7 representation today? |
| 8 a class action lawsuit against BHH LLC and | 8     A.   No. |
| 9 Van Hauser LLC. I will be asking you some | 9     Q.   Do you know who is compensating |
| 10 questions in connection with that case. | 10 him for his representation? |
| 11       Do you understand that? | 11     A.   I don't know. |
| 12     A.   Yes. | 12     Q.   Today's deposition is being |
| 13     Q.   And do you understand that you | 13 videotaped. |
| 14 are not being sued and you are not a party | 14       Do you understand that? |
| 15 to this case and that no one is making | 15     A.   Yes. |
| 16 claims against you in this case? | 16     Q.   Do you also understand there is |
| 17     A.   Yes. | 17 a court reporter here today, and the court |
| 18     Q.   Have you ever sat for a | 18 reporter is transcribing everything we say |
| 19 deposition before? | 19 for the record? |
| 20     A.   No. This is first time. | 20     A.   Yes. |
| 21     Q.   Have you ever been a party to a | 21     Q.   So let's please try to speak at |
| 22 lawsuit before? | 22 a reasonable pace to help the court |
| 23     A.   Yes. | 23 reporter take down our words. |
| 24     Q.   When was that? | 24       Will you help me with that? |
| 25     A.   It was in 2004. And the case | 25     A.   Okay. |
| Page 7 | Page 9 |

3 (Pages 6 - 9)

D. Feuerstein

1  Q.  It's also difficult for the
2  court reporter if we talk over each other,
3  so I will try to never interrupt you while
4  you are talking, and I ask that you please
5  try to let me finish my questions before
6  you begin your answers, okay?
7     A.  Okay.
8     Q.  Also, for the benefit of the
9  court reporter, please try to answer my
10 questions verbally because the court
11 reporter cannot see nods or bodily
12 gestures or even verbal non-words such as
13 "uh-huh," okay?
14    A.  Understood.
15    Q.  Is there any reason that you
16 cannot testify truthfully and accurately
17 today?
18    A.  No.
19    Q.  Are you taking any prescription
20 medications or drugs that may affect your
21 ability to think, remember or testify
22 truthfully today?
23    A.  No.
24    Q.  Are you currently employed?
25    A.  Yes.

Page 10

1  Q.  Who is your employer?
2     A.  Intellitec.
3     Q.  What is your job title?
4     A.  Managing director.
5     Q.  Are you an owner of Intellitec?
6     A.  Yes.
7     Q.  Are there any other owners of
8  Intellitec?
9     A.  No.
10    Q.  Is Intellitec incorporated?
11    A.  It's incorporated in Hong Kong.
12    Q.  How many employees does
13 Intellitec have?
14    A.  We have office in Hong Kong, but
15 no one's there.  It's just a corporate
16 office.  And we have our accounting office
17 there and we have accountant there.  So
18 the operation is actually over in China.
19 And we have about a hundred workers.
20    Q.  So to clarify, you do not have
21 employees in Hong Kong, but you have
22 workers in China?
23    A.  Right.  But Intellitec is
24 incorporated in Hong Kong, and our
25 financial operation is through the banks

Page 11

1  in Hong Kong.
2     Q.  And the business address you
3  listed before in Queens, is that an
4  address for Intellitec, as well?
5     A.  Yes.  Intellitec USA, yes.
6  Sorry, I have to rephrase.  Here, we have
7  only two people, me and another colleague,
8  yeah.
9     Q.  What is the name much your
10 colleague?
11    A.  Danny Li.
12    Q.  What is his position?
13    A.  He's an overseas manager.
14    Q.  What are his job duties?
15    A.  He is helping with the company's
16 daily operation, shipment, also provides
17 shipping schedule, and new projects,
18 development.
19    Q.  So let's please take a step
20 back.
21       What does Intellitec do?
22    A.  We are an Audion company.  We do
23 design for customer.  If they come to us
24 for an idea, we do design.  We have an
25 engineer, we do engineering, and we apply

Page 12

1  markup for customer approval.  Then we do
2  the model, then we go into production, and
3  we do -- sometimes we do packaging service
4  as well.
5     Q.  Are you an engineer?
6     A.  Myself is not engineer, but I am
7  in electronic business for
8  twenty-five years.
9     Q.  Where in China is Intellitec?
10 Is it a factory or a warehouse?
11    A.  It's a factory, yes.
12    Q.  Where in China is that?
13    A.  In Dunhuang City.
14    Q.  How big is the space?
15    A.  It's about four or 5,000 square
16 meters.  I don't know how much it is in
17 square foot.
18    Q.  That's no problem.
19       Now, is Intellitec incorporated
20 in the United States, as well?
21    A.  Yes, but it's inactivating.
22    Q.  So when was it incorporated?
23    A.  I don't remember.  A couple
24 years ago.  I don't remember precisely.
25    Q.  And was the entity dissolved?

Page 13

4 (Pages 10 - 13)

D. Feuerstein

1   A.   Dissolved? No.
2   Q.   When did the entity cease being
3 an active entity?
4   A.   I think we formed the company
5 about three years ago.
6   Q.   And why was that?
7   A.   Why is that? No, we just -- no
8 particular reason. No, because, actually,
9 all operation is done in Hong Kong and
10 China. So we just think because -- just
11 have a branch office here, not -- no
12 particular reason.
13  Q.   Is the branch office in the
14 United States, is that owned or is that
15 rented?
16  A.   Rented.
17  Q.   Who pays the rent on that
18 office?
19  A.   Hong Kong office.
20  Q.   The Hong Kong entity?
21  A.   Hong Kong -- yeah, Hong Kong
22 entity.
23  Q.   Where are you from?
24  A.   I'm from Taiwan.
25  Q.   Are you a US citizen?
                                    Page 14

1   A.   Yes.
2   Q.   When did you become a US
3 citizen?
4   A.   I don't remember. I think it's
5 between 2010 and 2012.
6   Q.   Can you please give me some
7 examples of products which Intellitec
8 manufactures?
9   A.   Yes. We do a lot of
10 humidifiers. And my factories are
11 certified, we passed the factory audit by
12 Disney, so we manufacture humidifiers for
13 Disney, and we also manufacture
14 humidifiers for other brands. And we do a
15 lot of other nonelectronic items, like the
16 phone holders and a card that can help
17 people find their car and, what else, we
18 do a scrubber, it's an electrical
19 rechargeable brush to clean the bathroom
20 and pest repellers. And we also do some
21 Aerolizer, air purifier.
22  Q.   Aside from Bell + Howell and
23 Disney, what other brands do you supply
24 products for?
25  A.   In the past, we supply product
                                    Page 15

1 for Sunbeam, Coleman, First Alert and we
2 also do Emson brand and Disney.
3   Q.   Did Intellitec supply pest
4 repellers for Sunbeam?
5   A.   Yes.
6   Q.   Did Intellitec supply pest
7 repellers for any other brand aside from
8 Sunbeam and Bell + Howell?
9   A.   First Alert.
10  Q.   Can you please spell that?
11  A.   F-I-R-S-T, A-L-E-R-T. I think
12 they are very big in the smoke alarm
13 business. Safety products.
14  Q.   And does Intellitec continue to
15 supply pest repellers for First Alert and
16 Sunbeam?
17  A.   Not anymore, because -- not
18 anymore. We stopped doing that.
19  Q.   When did Intellitec first begin
20 supplying pest repellers for First Alert?
21  A.   I don't remember, but it has to
22 be about twelve years ago, twelve,
23 thirteen, fourteen years ago.
24  Q.   Can you give me an estimation of
25 how long Intellitec supplied pest
                                    Page 16

1 repellers for First Alert?
2   A.   For First Alert, about two
3 years.
4   Q.   When did Intellitec first begin
5 supplying pest repellers for Sunbeam?
6   A.   I don't remember precisely, but
7 I think it's about 2000, year 2000 or
8 1999.
9   Q.   And when did that relationship
10 end?
11  A.   End in 2004.
12  Q.   Does First Alert continue to
13 distribute pest repellers?
14  A.   I think after we stopped, they
15 also stopped pest repeller.
16  Q.   What about Sunbeam; do they
17 continue to distribute pest repellers?
18  A.   No.
19  Q.   Why did First Alert decide to
20 cease distributing pest repellers?
21       MR. WING: Object to form.
22       You can answer.
23  A.   It's -- that's related to
24 lawsuit in 2004, because my customer did
25 not -- did not pay, so we stopped working
                                    Page 17

5 (Pages 14 - 17)

D. Feuerstein

1  with that customer, and they have the
2  license for First Alert.
3      Q.  If you know, why did Sunbeam
4  cease distributing pest repellers?
5          MR. WING: Object to form.
6          Go ahead.
7      A.  For the same reason, related to
8  the lawsuit, where my customer was
9  having -- they had the financial issue, so
10 we stopped supplying them.
11     Q.  Are you aware of any
12 correspondence between the Federal Trade
13 Commission and either First Alert or
14 Sunbeam regarding the pest repellers?
15     A.  No.
16     Q.  Can you please explain to me the
17 differences between the pest repellers
18 which you manufactured for First Alert and
19 the pest repellers which you manufactured
20 for Sunbeam?
21     A.  The case and the design's
22 different.  Outside design's different.
23 Inside, it's similar.
24     Q.  And when you say "similar," do
25 you mean that it's virtually identical in

Page 18

1  regards to the ultrasonic sounds which it
2  emits?
3      A.  It's the same frequency, but the
4  circuitry is not identical, because the
5  casing design is different.  My engineer
6  would have to revise according to the case
7  design.
8      Q.  Understood.  As between those
9  two models and the models which Intellitec
10 manufactures for Bell + Howell, can you
11 please explain the differences between
12 those?
13     A.  It's also the case and design's
14 different.  You have to revise the
15 circuitry to meet the casing design.
16 And -- and sometimes, some items we have
17 add-on features like AC outlet or night
18 lights.
19     Q.  But once again, in regards to
20 the ultrasonic sound waves that are
21 emitted, I understood that the circuitry
22 is different, but the ultrasonic sound
23 waves are the same frequency across those
24 three products, correct?
25     A.  Correct, yes.

Page 19

1      Q.  Who invented -- who first
2  invented the design for these three models
3  of pest repellers we've been discussing?
4      A.  You mean Sunbeam, First Alert
5  and?
6      Q.  Bell + Howell.
7      A.  Bell + Howell.  It's -- it's
8  designed by my in-house designer and
9  engineers.
10     Q.  Can you please identify your
11 in-house designer and engineers?
12     A.  Names?
13     Q.  Yes.
14     A.  Okay.  Daniel Deng, D-E-N-G.
15 And the electronic engineer, I don't
16 remember, because through the years, we
17 have changed a few.
18     Q.  Do you remember any of their
19 names?
20     A.  The current one is Mr. Wen,
21 W-E-N.  He's been with us for six, seven
22 years.
23     Q.  Do Mr. Deng and Mr. Wen, are
24 they employees of Intellitec?
25     A.  Yes, Intellitec China.

Page 20

1      Q.  They work in the factory in
2  China?
3      A.  Yes.
4      Q.  Did Mr. Deng have a role in the
5  invention of the First Alert, Sunbeam and
6  Bell + Howell pest repellers?
7      A.  No.  No.  That was another
8  designer.
9      Q.  How about Mr. Wen; did he have a
10 role?
11     A.  No.
12     Q.  Do you remember the names of any
13 individuals who had roles in the invention
14 of these pest repellers?
15     A.  I remember the first name of the
16 designer for First Alert and Sunbeam.
17 It's Kenneth.  He's in Hong Kong.
18     Q.  He is American?
19     A.  No.  He's Hong Kong.  Chinese.
20     Q.  Would you have his last name in
21 your records?
22     A.  It's been more than -- almost
23 seventeen, eighteen years.  I don't
24 remember.  I have to check, and I don't
25 even know if I still have it.

Page 21

6 (Pages 18 - 21)

D. Feuerstein

1  Q.  What role did you play in the
2  invention of the pest repellers?
3  A.  I do -- I supervise the cosmetic
4  design, make sure it's nice and appealing.
5  And I also supervise the specifications.
6  Q.  Can you please elaborate what
7  you mean by supervising specifications?
8  A.  I will -- I will approve their,
9  for example, the power conception, input
10  output wattage, the intervals, the
11  frequency, and the tolerance of the
12  frequency.
13  Q.  Now, going back to the initial
14  invention of these pest repellers, did you
15  play any other roles in the invention of
16  these pest repellers?
17  A.  Invented from scratch?  No.
18  Q.  Whose idea was it to first
19  invent/manufacture pest repellers?
20  A.  I don't know.
21  Q.  Was it someone at Intellitec?
22  A.  No.  We are not the first one to
23  make pest repeller.
24  Q.  Let me rephrase my question,
25  please.

Page 22

1  Whose idea was it for Intellitec
2  to first begin manufacturing pest
3  repellers?
4  A.  It's one agent in Hong Kong.
5  They represented other companies.  So they
6  came to us, asked us to make that for
7  them.
8  Q.  What's the name of the agent?
9  A.  I don't remember his company,
10  but his name is Larry Slobin.
11  Q.  And was he asking you on behalf
12  of First Alert?
13  A.  At that time, he was
14  representing the company.  At that time
15  they don't have the license yet.  So we
16  was -- he asked me on behalf of his
17  client.
18  Q.  And who was his client?
19  A.  Team Products.
20  Q.  And was Team Products the
21  predecessor to the company First Alert?
22  A.  Yes.
23  Q.  Did Intellitec use any other
24  products as prototypes when it first began
25  manufacturing pest repellers?

Page 23

1  MR. WING:  Object to form.
2  A.  I'm sorry, I don't understand
3  the question.
4  Q.  Sure.  When Intellitec decided
5  to first begin manufacturing pest
6  repellers, which sources did it use to
7  pull information from as to how to make
8  pest repellers?
9  A.  Okay.  They provide us samples
10  for evaluation.
11  Q.  And what type of samples were
12  these?
13  A.  It's -- it's a product they
14  current bought from other companies.
15  Q.  Which other companies?
16  A.  I think it's -- the company I
17  think is Long Whale in Taiwan.
18  Q.  Do you know any American brands
19  that Long Whale supplies for?
20  A.  I don't have any association
21  with the company, so I don't know.
22  Q.  Any other samples that you
23  received at that time?
24  A.  No.
25  Q.  Did Long Whale have the same

Page 24

1  ultrasonic frequency as the pest repellers
2  that Intellitec went on to make?
3  A.  Yes.
4  Q.  So was Intellitec's role
5  basically to emulate the Long Whale
6  samples that it received?
7  A.  We actually -- we do some
8  improvements.
9  Q.  Can you please elaborate on the
10  improvements?
11  A.  Long Whale's design is very out
12  of date, so we redesign the whole case and
13  we redo the model to make it more updated.
14  And we also improved the -- make the
15  frequency more precise.  We make it more
16  precise and we improve the speaker output.
17  And we change from constant on to -- to
18  intervals, to have intervals.  So we make
19  some improvement from Long Whale samples.
20  Q.  Who decided that Intellitec
21  should make the frequency more precise?
22  A.  I don't remember at that time.
23  Q.  Did you have any role with that?
24  A.  Yes, yes.  I would consult with
25  the customer, so -- because I guess some

Page 25

7 (Pages 22 - 25)

D. Feuerstein

1  manufacturers that have bigger range,
2  but -- and we just targeted the more
3  precise -- we choose a better supply for
4  the frequency speaker.
5      Q.   You were aware of who the
6  supplier for the frequency speaker was for
7  Long Whale, and you decided to go with
8  another supplier?
9      A.   No, I don't know their supplier.
10 We don't know.
11     Q.   Same question with improving the
12 speaker output.  Was there something wrong
13 with the speaker output in Long Whale
14 products?
15     A.   The DB output was a bit low, so
16 we make it louder.
17     Q.   Now, when you say "a bit low,"
18 do you mean a bit low for the pests to
19 hear?  Can you explain what you mean by "a
20 bit low"?
21     A.   Yes, a bit low for the pests to
22 hear.
23     Q.   What basis did Intellitec have
24 for determining that the speaker output
25 was not sufficiently loud for pests to

Page 26

1  hear?
2      A.   We have a lot we have a lot of
3  equipment to test.
4      Q.   I'm sorry, can you please
5  repeat?
6      A.   We've a lot of testing equipment
7  in the factory to test.
8      Q.   So what tests did you run during
9  that initial development phase?
10     A.   We have computer system to test
11 the frequency.  We have the decibel
12 testing equipment to determine the output.
13     Q.   So I understood that you had
14 equipment to measure the frequency and the
15 volume.
16     A.   Yes.
17     Q.   But how did you determine that
18 those were insufficient to repel pests?
19     A.   I --
20         MR. WING:  Object to form.
21         Continue.
22     Q.   Or I can even rephrase.  How did
23 you determine that you even wanted to
24 improve upon those issues with the Long
25 Whale repellers?

Page 27

1      A.   Because louder decibel, louder
2  output represents a better -- better
3  effectiveness.  And better -- a bigger
4  area.
5      Q.   So the louder it is, the greater
6  the repelling effect; is that what you are
7  saying?
8      A.   Yes.
9      Q.   And what basis do you have for
10 that statement?
11     A.   I have done some research
12 through the years.
13     Q.   Can you explain what research
14 you have done?
15     A.   I have some research from -- I
16 don't remember precisely, you know, but
17 we -- one of the research is from Heffner
18 -- I don't remember his last name.
19 H-E-F-F-N-E-R.  He has a lot of good
20 reports.
21     Q.   Where did you find these
22 reports?
23     A.   I found it online.
24     Q.   Do you know if -- is that a
25 Mr. Heffner or Mrs. or Dr.?

Page 28

1      A.   Mr. I think there are a few.
2  There are a few Heffners.  They are
3  brothers in a family.  They specialize in
4  ultrasonic.
5      Q.   Are they Chinese?
6      A.   No.
7      Q.   Are they American?
8      A.   I don't know that.  Sorry, I
9  don't know their background.  I don't know
10 their nationality.
11     Q.   Are they academics?
12     A.   Yes.
13     Q.   Do you know which university
14 they were affiliated with?
15     A.   I don't remember, but I think --
16 I think -- I don't remember which
17 university.
18     Q.   Do you remember what field they
19 worked in at the university?
20     A.   I don't know the field they work
21 in the university.  I only read a report
22 regarding ultrasonic and rat, rats.
23     Q.   To your recollection, did
24 Heffner or did you read any reports from
25 Heffner regarding other pests, other

Page 29

8 (Pages 26 - 29)

D. Feuerstein

1 critters aside from rats?
2    A.   Yes.
3    Q.   Which critters?
4    A.   Sorry, what do you mean,
5 critter?
6    Q.   Oh, sure. Which pests or
7 animals?
8    A.   I know they do rats and mice
9 and -- and they do other -- other -- other
10 small animals, but I don't remember.
11 It's -- this is back to seventeen,
12 sixteen, eighteen years ago.
13    Q.   Understood.
14    A.   But they do have research for
15 different small animals.
16    Q.   So based on the indications you
17 read from Heffner, I guess siblings, you
18 made the determination that you want to
19 make these improvements to the pest
20 repellers that Intellitec was
21 manufacturing over the Long Whale
22 repellers; is that correct?
23    A.   Correct, yes.
24    Q.   What other sources did you
25 research at the time?

Page 30

1    A.   I don't remember. But we did
2 some research. And later we did testing,
3 also.
4    Q.   What method did you use for
5 conducting the research? This was, I
6 guess, eighteen years ago, approximately?
7    A.   Yes.
8    Q.   What methods did you use for
9 conducting research on the topic?
10    A.   Mostly online.
11    Q.   So you conducted testing of the
12 repellers before they hit the market,
13 correct?
14    A.   Yes.
15    Q.   Where was this testing
16 conducted?
17    A.   The initial testing was
18 conducted in China by Beijing University
19 Agriculture Department.
20    Q.   Did you search for copies of
21 those tests?
22    A.   Search for copy? No. This is
23 done by us with Beijing University.
24    Q.   Right. Do you have copies of
25 the test?

Page 31

1    A.   No, I don't. Yeah, because --
2    Q.   Was anything published as a
3 result of these tests?
4    A.   No. I don't -- these are
5 private tests. We did not publish in
6 public.
7    Q.   Did they provide you with
8 results of the test?
9    A.   Yes.
10    Q.   Were the results e-mailed to
11 you?
12    A.   Yes. E-mailed to my factory in
13 China at that time and I got a copy.
14    Q.   Was it in Chinese or was it in
15 English or some other language?
16    A.   I think it's in English. I
17 think both. They have both, mm-hm.
18    Q.   Do you still have a copy of
19 those test results?
20    A.   No, I don't have those copy
21 anymore.
22    Q.   Did you search for a copy of
23 those test results before today?
24    A.   No.
25    Q.   What other tests did Intellitec

Page 32

1 run before manufacturing the pest
2 repellers?
3    A.   From eighteen years ago to now?
4    Q.   Excuse me. Before the pest
5 repellers hit the market.
6    A.   This is the important one with
7 Beijing University. The test was -- I
8 think it took a few -- a few weeks, a few
9 months to -- to finish.
10    Q.   Who wrote the protocol for that
11 test?
12    A.   At that time the professor in
13 Beijing University.
14    Q.   Do you know --
15    A.   We explained -- I don't remember
16 the name because I don't contact the
17 professor. It's through my operation in
18 China.
19    Q.   So you mean employees in the
20 China branch of Intellitec contacted the
21 university, and you had no direct contact?
22    A.   No. It was my partner. I did
23 not have direct contact. At that time --
24 at that time I was based in Hong Kong, so
25 it was done through my China operation.

Page 33

9 (Pages 30 - 33)

D. Feuerstein

1    Q.   Did you have a partner
2 eighteen years ago?
3    A.   Yes, eighteen years ago, I did.
4    Q.   Do you still have a partner?
5    A.   No.
6    Q.   What is that individual's name?
7    A.   Jong Sue.
8    Q.   And Jong is a man, right?
9    A.   Yes, a male, Chinese.
10    Q.   And he is no longer affiliated
11 with Intellitec?
12    A.   No.
13    Q.   When did he stop being
14 affiliated with Intellitec?
15    A.   2004.
16    Q.   Did he give you any -- well, how
17 did he stop being affiliated with
18 Intellitec?
19    A.   It's part of the lawsuit.
20 Breach of contract.
21    Q.   So there was a falling out with
22 Mr. Sue?
23    A.   Yes.
24    Q.   Was Mr. Sue bought out as a
25 result of that lawsuit?

Page 34

1    A.   No.
2    Q.   What resolution came about; did
3 he just quit and leave?
4    A.   He breached the contract by
5 contacting my customer. We have
6 noncompete agreement. So I stopped
7 working with him. Then -- then we got
8 into a lawsuit and I think the lawsuit
9 last two years and then he went out of
10 business.
11    Q.   What do you remember about the
12 test that was run in Beijing University?
13    A.   It was done by the head
14 professor of the Agriculture Department of
15 Beijing University and he led a few --
16 it's not students. It's more senior than
17 student to do the research. So -- and
18 they operated, we do mice, rat, roaches
19 and spiders. And I remember it took them
20 at least eight weeks -- two to
21 three months to finish the testing. The
22 chamber, the protocol, the chambers and
23 all the testing.
24    Q.   Did you review the protocol
25 before the test was run?

Page 35

1    A.   Yes. I had discussed with my
2 partner.
3    Q.   So did you and Mr. Sue
4 collaborate with the university on the
5 protocol?
6    A.   Yes.
7    Q.   But the professor initially
8 wrote it and then you provided comments;
9 is that the case?
10    A.   Yes.
11    Q.   What, if anything, did you
12 change from the original protocol the
13 professor provided to you?
14    A.   No, we didn't --
15         MR. WING:   Object to form.
16    A.   I don't remember. But I don't
17 think we changed much because they are the
18 professional for pests.
19    Q.   Had you ever run any tests at
20 Beijing University on the pest repellers
21 since that time?
22    A.   I think we did once or twice
23 test with them through one or two years,
24 and then -- then that's it. Yeah, yeah.
25 I think professor, I think, left. I think

Page 36

1 he is no longer in Beijing University, so
2 we end up switch our testing to
3 professional laboratories.
4    Q.   So you conducted, perhaps, one
5 or two more additional tests?
6    A.   Including original one, one or
7 two more total.
8    Q.   But this was prior to your
9 manufacture of the Bell + Howell devices,
10 correct?
11    A.   Yes, that's much -- much
12 earlier.
13    Q.   Can you please tell me about
14 your educational background?
15    A.   I studied in Taiwan. My
16 background is international trade.
17    Q.   So what degrees have you
18 received?
19    A.   Here, it's a BA. Not master.
20 Pre master, what is it?
21    Q.   That's a Bachelors?
22    A.   A Bachelors, yes.
23    Q.   So you received a Bachelors from
24 where?
25    A.   From Ming Chuan University.

Page 37

10 (Pages 34 - 37)

D. Feuerstein

1 Sorry, Ming Chuan University. It's a
2 university for business.
3   Q.   So it's a business university.
4       Did you have any schooling
5 beyond that Bachelors degree?
6   A.   No.
7   Q.   And your degree is in
8 international trade, correct?
9   A.   Yes.
10  Q.   Do you have any sorts of
11 professional certifications?
12  A.   Professional, no.
13  Q.   This individual you mentioned
14 earlier, Kenneth, do you know what his
15 background was?
16  A.   Designer. He's a professional
17 designer.
18  Q.   Is he a scientist?
19  A.   No. He was mostly for the
20 cosmetic, the casing design.
21  Q.   How about Mr. Wen; what's his
22 background?
23  A.   He's electronic -- mechanical
24 engineer.
25  Q.   So he has a degree in mechanical

Page 38

1 engineering?
2   A.   Yes.
3   Q.   And what about Mr. Deng?
4   A.   Mr. Deng is also a designer.
5   Q.   Do you know what his degree is
6 in?
7   A.   Also in design.
8   Q.   Intellitec does not employ any
9 entomologists, correct? An entomologist
10 is an expert in insects.
11  A.   No.
12  Q.   Were you affiliated with the
13 Home Improvement Company at any point?
14  A.   No, but we've been selling
15 product to home improvement stores.
16  Q.   So it's just the two employees
17 come to work in your Queens office,
18 correct?
19  A.   Yeah. Just me and Danny.
20  Q.   Does the office space from
21 desks?
22  A.   Yes.
23  Q.   Is there carpeting?
24  A.   Yes.
25  Q.   There's tables?

Page 39

1   A.   Yes.
2   Q.   Do you work at a company called
3 SGS?
4   A.   Yes.
5   Q.   How do you divide your time
6 between Intellitec and SGS?
7   A.   I worked for SGS when I still
8 lived in Taiwan and I left SGS in Taiwan
9 in 1995 and I moved to Hong Kong and I
10 established my own company.
11  Q.   So when did you begin working
12 for SGS?
13  A.   I think it's about 1989.
14  Q.   Do you still work for SGS?
15  A.   No.
16  Q.   When did you stop working for
17 SGS?
18  A.   1995.
19  Q.   What was your position at SGS?
20  A.   I was the executive assistant.
21  Q.   For whom?
22  A.   For Mr. Alegart. He was the CEO
23 of SGS in Taiwan.
24  Q.   Can you please spell his name?
25  A.   A-L-E-G-A-R-T.

Page 40

1   Q.   What were your duties as an
2 executive assistant at SGS?
3   A.   I run a lot of reports, monthly
4 reports, and manager meeting reports. A
5 lot of administration stuff. And the
6 company grew bigger and -- and I assist
7 Alegart to do operational stuff. But
8 many -- everything's about administration.
9   Q.   Can you please explain what kind
10 of reports you are referring to? You said
11 you drafted reports?
12  A.   We have monthly meeting with all
13 the -- we have -- SGS at that time had one
14 CEO and nine vice presidents. So every
15 month we had manager meeting. So I --
16 when there meeting, I wrote a report and I
17 submit it to the head office in Geneva.
18  Q.   Is Mr. Alegart still the CEO of
19 SGS?
20  A.   No. He retired.
21  Q.   When?
22  A.   I don't know when, because after
23 I left SGS I don't contact him anymore,
24 but I know he retired. He's Belgian, but
25 he live in Taiwan right now.

Page 41

11 (Pages 38 - 41)

D. Feuerstein

1   Q.   How many employees are in the
2 SGS office?
3   A.   At that time, it was about six
4 to seven hundred.
5   Q.   That's the office in Taiwan?
6   A.   They have several offices in
7 Taiwan.
8   Q.   I see. How many were in your
9 office?
10   A.   We had office in Taiwan, I
11 assume about two to three hundred. I
12 don't remember, but I remember total at
13 that time was about six to seven hundred.
14       MR. KOPEL: I ask the court
15   reporter to please mark as Exhibit 14
16   a copy of the FaceBook profile.
17       (Plaintiffs' Exhibit 14 was
18   marked for identification, as of this
19   date.)
20   Q.   Ms. Feuerstein, do you have
21 Exhibit 14?
22   A.   It's my FaceBook page, but I'm
23 not very active on FaceBook.
24   Q.   I see here references to SGS
25 Taiwan?

Page 42

1   A.   Mm-hm.
2   Q.   When did you write this on your
3 FaceBook page?
4   A.   I don't remember. Two, three,
5 four years ago.
6   Q.   Are you still in touch with
7 anyone from SGS Taiwan from the time of
8 your employment?
9   A.   No.
10   Q.   Okay, thanks. You can put that
11 aside.
12   A.   (Complying.)
13   Q.   Can you please explain what the
14 purpose of the Bell + Howell pest
15 repellers is?
16   A.   The function or the purpose?
17   Q.   Thank you. Can you please
18 explain what the function is?
19   A.   We use ultrasonic technology,
20 which is safe and environment friendly,
21 but effective to repel insects -- pests.
22   Q.   Which pests are those?
23   A.   Rats, mice, spiders, ants and
24 roaches.
25   Q.   Had you considered using --

Page 43

1 well, the Bell + Howell repellers are,
2 they only face in one direction, right,
3 the speakers only face in one direction,
4 correct?
5   A.   Some of the -- yes, it's
6 directional, because some of the pest
7 repellers, we have two speakers.
8   Q.   Some of the Bell + Howell pest
9 repellers have two speakers?
10   A.   Mm-hm.
11       THE COURT REPORTER: Yes or
12   no?
13       THE WITNESS: Yes.
14   Q.   Why do some of them have one
15 speaker and some of them have two?
16   A.   Depends on the design and the
17 product.
18   Q.   Is there an advantage to the two
19 speaker models over the one speaker
20 models?
21   A.   Two speakers, advantage? Yes.
22 Two speaker one, we have two different
23 frequencies. And again it's because there
24 are two speakers, so the coverage is -- is
25 bigger.

Page 44

1   Q.   Who decided to manufacture
2 models that are two different frequencies?
3   A.   I have discussed this with the
4 customer.
5   Q.   Who had the idea?
6   A.   Whose idea, because I did make
7 these in the past for Sunbeam and First
8 Alert, so we making two speaker and we
9 making one speaker.
10   Q.   What frequencies do the Bell +
11 Howell repellers emit?
12   A.   40 kilohertz and plus/minus
13 about five kilohertz. So it's a range.
14   Q.   Did you or anyone else at
15 Intellitec confer with outside scientists
16 in developing Bell + Howell pest
17 repellers?
18   A.   Scientists? No.
19   Q.   Did you or anyone at Intellitec
20 consult any treatises on pest management?
21   A.   What is treatises?
22   Q.   A treatise is like a textbook?
23   A.   For pest management?
24   Q.   Correct.
25   A.   No.

Page 45

12 (Pages 42 - 45)

D. Feuerstein

1   Q.   Have you heard of a handbook or
2 a book called the Handbook of Pest
3 Control?
4   A.   I probably read some of it
5 online.
6   Q.   Oh, so you think that you saw
7 that book online and read it? When was
8 that?
9   A.   A couple years ago. Maybe not
10 the same book, but I do research from time
11 to time to understand.
12   Q.   Can you explain how the
13 ultrasonic technology works to repel
14 pests?
15       MR. WING: Object to form.
16       You can answer.
17   A.   Because these pests have a poor
18 range of hearing range. And for them,
19 mostly it's ultrasonic, meaning it's
20 inaudible to human ear. So in order to
21 repel them, we made very loud noise.
22 That's why I said output of speaker is
23 important. We can't hear them, but for
24 them, it's very loud and annoying. And we
25 also designed this pause, on/off, on/off,

Page 46

1 so that we are better than constant on and
2 off. Because of the noise, constantly
3 emits such a loud noise, they can't take
4 it, and eventually will leave the place.
5   Q.   When did you first make contact
6 with anyone at Bell + Howell?
7   A.   2006.
8   Q.   Who was that with?
9   A.   You mean who introduced me or
10 who do I meet?
11   Q.   Good question. First of all,
12 who introduced you?
13   A.   Through a mutual friend.
14   Q.   And who did you first speak to
15 at Bell + Howell?
16   A.   Stephen. Stephen Michelle.
17   Q.   Was this in person or by
18 telephone?
19   A.   I think our first meeting was in
20 person.
21   Q.   And at this meeting, did you
22 suggest that you could manufacture pest
23 repellers for Steven's company?
24   A.   Yes.
25   Q.   What materials did Stephen ask

Page 47

1 from you or what materials did you provide
2 to him in connection with this sales
3 pitch?
4       MR. WING: Object to form.
5   A.   I presented the product we did
6 in the past. And I presented AEP
7 registered factory, American Environmental
8 Protection Agency we are registered,
9 because -- and I presented -- I presented
10 a design we have for Sunbeam and I
11 presented the stores we used to work in
12 the past, through Team Product. We don't
13 do direct sales. So through Team Product,
14 we do resale. And ultrasonic technology,
15 how we repel the pest.
16   Q.   Did you supply him with any test
17 results at the time?
18   A.   During first meeting, no.
19   Q.   When did Intellitec first begin
20 supplying pest repellers to Bell + Howell?
21   A.   I think it's the following year,
22 2007.
23   Q.   How big was the first shipment
24 of pest repellers?
25   A.   It's a test shipment. I think

Page 48

1 it's about 5,000 pieces.
2   Q.   Which model of pest repeller was
3 that shipment?
4   A.   It's a pest repeller with AC
5 outlet on the side, so you can plug the
6 cable on the side.
7   Q.   Did that have the Bell + Howell
8 name on it?
9   A.   Yes.
10   Q.   Was there an agreement made
11 between Intellitec and Bell + Howell for
12 Intellitec to supply the pest repellers to
13 Bell + Howell?
14   A.   We have the authorization later
15 to manufacture product for and some
16 purchase order, but there is no agreement.
17   Q.   Have there been set prices at
18 which Intellitec provides the pest
19 repellers to Bell + Howell?
20   A.   Yes.
21   Q.   How often have those prices
22 fluctuated?
23   A.   Very seldom. We very stable in
24 manufacturing business.
25   Q.   So how has Bell + Howell gone

Page 49

13 (Pages 46 - 49)

D. Feuerstein

1 ahead and made orders from Intellitec over
2 the years?
3    A.  I don't -- how? You mean?
4    Q.  What mode of communication has
5 Bell + Howell used to make orders for --
6    A.  Oh, they will -- at the
7 beginning, it was faxed. The order was
8 done by e-mails.
9    Q.  So would Bell + Howell request a
10 number and then you would give them a
11 quote each time?
12    A.  No. We quote by models. So
13 even it's one piece or -- yeah, for big
14 order, for big quantity, we will
15 probably -- we will work on the cost. But
16 mostly just very stable.
17    Q.  Who designed the packaging for
18 the Bell + Howell repellers?
19    A.  My designer.
20    Q.  That's Mr. Deng?
21    A.  Yes.
22    Q.  Did you have input on it?
23    A.  Yes. Once he's done, he will
24 send it to me for approval.
25    Q.  Then?

Page 50

1    A.  Then I send it to -- to Van
2 Hauser for approval.
3    Q.  So along the way, you might have
4 made comments, Van Hauser might have made
5 comments, in order to arrive at the
6 finished product, correct?
7    A.  Mm-hm.
8       THE COURT REPORTER: Yes or no?
9       THE WITNESS: I'm sorry, say
10 that again.
11    MR. KOPEL: Oh, sure, read
12 that back.
13       (Whereupon, the requested
14 testimony was read back by the Court
15 Reporter.)
16    A.  Yes.
17    Q.  What about the instruction sheet
18 that comes inside the pack packaging, who
19 wrote that?
20    A.  Also Mr. Deng. Because we've
21 been manufacturing pest wear for all these
22 years, so he has a lot of template.
23    Q.  I see. So Intellitec used the
24 instructions sheet from the First Alert
25 and the Sunbeam repellers as a template

Page 51

1 for the instruction sheet --
2    A.  Yes.
3    Q.  -- used here?
4    A.  Yes.
5    Q.  Understood.
6       MR. KOPEL: I ask the court
7 reporter to please mark as Exhibit 15
8 a document bearing Bates numbers
9 BHH, LLC 006640 to 6666.
10       (Plaintiffs' Exhibit 15 was
11 marked for identification, as of this
12 date.)
13    Q.  Ms. Fuerstein, please take a
14 moment to flip through it, if you would
15 like, and let me know when you are ready.
16    A.  (Reviewing exhibit.) Okay.
17    Q.  Do you have Exhibit 15? Have
18 you seen it before?
19    A.  Yes.
20    Q.  What is it?
21    A.  These are the artwork, the
22 packing artwork for pest repeller.
23    Q.  Thank you. I apologize. I
24 intended for this to actually be provided
25 to you in color, and I see it's in

Page 52

1 black-and-white.
2    A.  That's okay. Because --
3    Q.  Because you are familiar with
4 it?
5    A.  Yes. It's done by my designer.
6    Q.  And you had a role in approval
7 each of these pieces of artwork --
8    A.  Yes.
9    Q.  -- before it hit the market?
10    A.  Yes.
11       MR. WING: Object to form.
12    Q.  Now, I know this is a difficult
13 question because there are
14 twenty-six pages here, but off the top of
15 your head, can you think of any pieces of
16 artwork for the Bell + Howell repellers
17 that were used not already contained in
18 this document?
19    A.  I don't know.
20    Q.  But none come to mind, right?
21 There's none that you can specifically
22 think of?
23    A.  No. You have a lot of repeat
24 pages here, so it's the same -- same
25 stuff.

Page 53

14 (Pages 50 - 53)

D. Feuerstein

1  Q.  So can you give me an example of
2 a page that was a repeat page, please?
3      Well, for ease of use, do you
4 see on the bottom, there's -- well, it's
5 on the side of your document there, it's a
6 BHH, LLC number.
7  A.  Okay.
8  Q.  So that is a good way to
9 describe the pages.
10  A.  Okay.
11  Q.  Can you give me an example of
12 any pages that you think are repeat pages
13 in this document, please?
14  A.  Oh, repeat pages?  Okay.  40 and
15 41 are repeated.
16  Q.  I'm sorry, can I please stop you
17 there?
18  A.  40 and 41 are the same.
19  Q.  40 -- are you sure 40 and 41,
20 because these designs actually look
21 different.  You mean the first page and
22 the second page of the --
23  A.  I mean the same product.  So
24 maybe we updated the artwork.
25  Q.  Okay.  I understand.
                                    Page 54

1  A.  Sorry, what I mean is the same
2 product.  You see, the same six pack, and
3 we update it.  We changed the -- we moved
4 the words and we updated the pictures, the
5 insert pictures.
6  Q.  Okay, understood.
7  A.  But it's the same product.  And
8 the words -- actually, the contents are
9 the same, but use different font and we
10 move around.
11  Q.  Okay, so you weren't saying that
12 you see copies of the actual package
13 design in this, you just see different
14 designs used for the same product within
15 this document, correct?
16  A.  Correct, yes.
17  Q.  Please turn to the last page, so
18 that's Bates number BHH, LLC 006666.
19  A.  (Complying.)
20  Q.  So it says at the top, Bell +
21 Howell Ultrasonic Pest Repellers with Dawn
22 to Dusk Sensors.
23      Do you see that?
24  A.  Yes.
25  Q.  Have all the pest repellers --
                                    Page 55

1      MR. KOPEL:  Strike that.  Let
2 me rephrase the question.
3  Q.  Have all the packaging designs
4 for the Bell + Howell pest repellers
5 stated that they are ultrasonic pest
6 repellers?
7  A.  Yes.
8  Q.  And do you see below, it says --
9 there's pictures and words.  It says:
10 Ants, mice/rats, spiders, roaches?
11  A.  Yes.
12  Q.  And the same question:  Have all
13 the artwork for the packaging that you
14 recall, have they all included that
15 illustration?
16  A.  I think so, yes.
17  Q.  And do you understand that
18 illustration to mean that these products
19 will repel those pests that are depicted
20 on the image?
21  A.  Yes.
22  Q.  Below it, it says:  Plug it in,
23 and there is an ellipsis, drive pests out.
24      Do you see that?
25  A.  Yes.
                                    Page 56

1  Q.  Who originally wrote that?
2  A.  I think my designer took it from
3 the artwork we have in the past.
4  Q.  Sorry, he took it from the what?
5  A.  From the artwork we work before.
6  Q.  Are you referring to previous
7 artwork from Bell + Howell or previous
8 artwork for --
9  A.  Previous artwork for others.
10  Q.  I see.  So this phrase, you
11 think, appeared on either First Alert or
12 Sunbeam or both?
13  A.  Yes.
14  Q.  What do you interpret this
15 phrase to mean?
16  A.  Plug it in, drive pest out?
17  Q.  Correct.
18  A.  Yeah.  This is the plug-in unit.
19 So you plug into AC outlet.  Meaning don't
20 do any work.  And then ultrasonic work use
21 to drive pest out.
22  Q.  Drive pests out of a home or
23 office?
24  A.  Of the area.
25  Q.  Of the area.
                                    Page 57

Veritext Legal Solutions
866 299-5127

D. Feuerstein

1  A.   Of area of room where pest
2  repeller is.
3     Q.   So this phrase was not intended
4  to mean that the repellers could drive
5  pests out of a home or office?
6        MR. WING: Object to form.
7     A.   It is. The repeller drive the
8  pests out from the home.
9     Q.   Oh, so it means it drives pests
10 out from the home?
11    A.   Right, right.
12    Q.   Okay, thank you.
13    A.   Right, but the thing -- that's
14 why we do multiple packs, because each one
15 is perfect for the average size of the
16 room.
17    Q.   So the multipack, so drive pests
18 out, means if you use --
19    A.   You put in multi rooms.
20    Q.   Let me just finish the question,
21 please.
22        The use of the multipack and
23 that statement on it is intended to mean
24 that if a consumer uses all of the
25 repellers in this pack, they will be able
                                        Page 58

1  to drive pests out of their home, correct?
2        MR. WING: Object to form.
3     A.   Yes.
4     Q.   Okay, thank you.
5        You see midway through the page,
6  it says: Home and office use? Do you see
7  that?
8     A.   Yes.
9     Q.   Who wrote that?
10    A.   My designer took it from the
11 past artwork.
12    Q.   Who determined that these
13 devices were suitable for home and office
14 use?
15    A.   From our experience of
16 manufacturing pest repellers.
17    Q.   So who made that determination?
18    A.   We took it from past artwork,
19 our experience of manufacturing and how we
20 do the packing in the past.
21    Q.   Do the pest repellers work in
22 any other setting aside from home and
23 office use?
24    A.   It should be.
25    Q.   Would they work in a warehouse?
                                        Page 59

1  A.   Depends how big's the warehouse.
2     Q.   Well, let's say you have
3  multiple repellers.
4     A.   Then it should work in a
5  warehouse.
6     Q.   What about a commercial setting,
7  let's say, a commercial restaurant?
8        MR. WING: Object to form.
9     Q.   Would they work in a restaurant
10 setting?
11        MR. WING: Object to form.
12    A.   Restaurant, I don't -- I don't
13 know.
14    Q.   What about outdoors? Could the
15 repellers work outdoors?
16        MR. WING: Object to form.
17    A.   I don't know.
18    Q.   Do you see on the right-hand
19 column of this page, there's a word, it
20 says, all capitals, note, with a colon.
21        Do you see that?
22    A.   No. Wait.
23    Q.   Do you see towards the
24 right-hand side there is -- it says the
25 words: LED indicator and LED lights?
                                        Page 60

1  A.   Yes, yes.
2     Q.   And below that, it says: Note.
3        First sentence reads:
4  Ultrasonic signals will lose intensity as
5  it travels.
6        Do you see that?
7     A.   Yes.
8     Q.   Who wrote that?
9     A.   My designer.
10    Q.   And was that also taken from
11 previous packaging?
12    A.   Yes.
13    Q.   Who originally wrote that, then?
14    A.   I think the packaging we had for
15 Sunbeam and First Alert.
16    Q.   Right. So who originally wrote
17 that?
18    A.   I think it's -- I believe it's
19 Team Product's -- they -- they wrote it.
20 The company I work in the past who has the
21 license.
22    Q.   I see. Did you independently
23 verify this information?
24    A.   Yes.
25    Q.   So do you agree with this
                                        Page 61

16 (Pages 58 - 61)

D. Feuerstein

1 statement that the ultrasonic signal will
2 lose intensity as it travels?
3    A.   Yes.
4    Q.   The next sentence reads: It is
5 also absorbed by soft objects such as
6 carpeting and is reflected by hard
7 surfaces such as furniture.
8         Do you see that?
9    A.   Yes.
10   Q.   And this was also taken from
11 previous packaging, correct?
12   A.   Correct.
13   Q.   And this was also originally
14 written by either First Alert or Sunbeam,
15 correct?
16   A.   Yes.
17   Q.   Do you agree with this
18 statement?
19   A.   Yes.
20   Q.   Have you independently verified
21 it?
22   A.   Yes, we test it in a factory.
23 Yeah, we test -- our engineer constantly
24 do the testing.
25   Q.   Can you -- I'm sorry, can you

Page 62

1 repeat what you just said?
2    A.   We test -- we test this -- this
3 statement in a -- in a factory.
4    Q.   Can you please elaborate on what
5 you mean by that?
6    A.   We have the equipment. We test
7 behind the furniture. We tested in
8 different -- because, when it travel a big
9 piece of furniture, it will reduce or
10 block the ultrasonic. And we put the
11 statement here. And we did test, it did
12 lose the intensity.
13   Q.   So when did you run this test?
14   A.   We did this I think in the
15 beginning stage of our -- when we start
16 making pest repellers.
17   Q.   Can you describe the tests that
18 you ran?
19   A.   We have very good equipment of
20 testing decibel and ultrasonic. We have
21 computer equipment. So we did run tests
22 from different angles and if it's blocked,
23 we test behind the furniture. So we -- we
24 do understand -- that's why we put it
25 here, to remind the consumer.

Page 63

1    Q.   Now, did you test the actual
2 repelling effects in those tests or you
3 tested the decibel levels?
4    A.   The decibel levels.
5    Q.   How about soft objects; did you
6 test that in-house?
7    A.   I don't understand the question.
8    Q.   It says here it is also absorbed
9 by soft objects such as carpeting?
10   A.   Right. We also test even on
11 carpeting, it will be absorbed, yes.
12   Q.   What kind of furniture did you
13 use in your testing?
14   A.   I don't remember. I believe a
15 big piece of sulfur or maybe cabinets.
16   Q.   So it might have been wood?
17   A.   Right.
18   Q.   Did you keep any sort of
19 documentation? Did you take any notes?
20 Did anyone take any notes when this
21 testing was conducted?
22   A.   At that time, yes, they did take
23 note, and they send me the result.
24   Q.   Would you still have that?
25   A.   No. I have been changing my

Page 64

1 computer every year and I have so much
2 data, so I don't keep everything.
3    Q.   Can you please describe the
4 tests you ran showing that it was absorbed
5 by soft objects such as carpeting?
6    A.   We can test before and after
7 carpeting. With and without carpeting and
8 before and after the furniture. We
9 compare the decibel output result.
10   Q.   So you placed carpeting on the
11 floor, and you placed the repeller near
12 the carpeting, and you found that the
13 carpeting absorbed --
14   A.   Yes.
15   Q.   -- the signals?
16        And would you suppose that might
17 extend to rugs, as well?
18   A.   Yes, carpet and rug, the same
19 thing.
20   Q.   What about beds? Beds are
21 another soft object, right?
22   A.   Right.
23   Q.   So you think a bed could
24 probably absorb the signals, as well?
25   A.   Yes, it would block the signal.

Page 65

17 (Pages 62 - 65)

D. Feuerstein

**Page 66**

1 Q. What about if you had a lot of
2 clothing; could that absorb the signal?
3 A. I guess, yes, but we haven't
4 tested clothing.
5 Q. Understood. Do you have an
6 understanding of what kind of materials
7 could reflect the signal aside from wood
8 and sulfur? Do you think metal would
9 probably reflect it?
10 A. Metal, yes.
11 Q. What about hard plastic; do you
12 think that might reflect it, as well?
13 A. Maybe. I don't -- we didn't
14 test that one.
15 Q. Do you have carpeting in your
16 house?
17 A. Yes.
18 Q. Do you have couches in your
19 house?
20 A. Yes.
21 Q. Do you have beds in your house?
22 A. Yes.
23 Q. Would you suppose that most
24 people have those things in their houses,
25 as well?

**Page 67**

1 A. Yes.
2 Q. Moving on. The next sentence
3 reads: Ultrasonic signals cannot reach
4 nesting or feeding places behind walls,
5 under floors or within cracks.
6      Do you see that?
7 A. Yes.
8 Q. And was this sentence also
9 pulled from either First Alert or Sunbeam
10 packaging?
11 A. Yes.
12 Q. Do you agree with this
13 statement?
14 A. Yes.
15 Q. What basis do you have for
16 agreeing with this statement?
17 A. Based on few facts. Number one,
18 ultrasonic is very directional. Number
19 two, it discuss in the -- in the -- if
20 it's blocked, or it's covered by some --
21 doesn't matter it's wood or it's soft
22 sulfur or metal, it might block some of
23 the decibel emission.
24 Q. So would the Bell + Howell
25 devices be able to repel pests that are in

**Page 68**

1 nesting or feeding places behind walls,
2 under floors or within cracks?
3 A. I believe it will, but it
4 depends on -- if the crack is behind the
5 pest repeller, because it's very
6 directional, then it won't be able to
7 reach it.
8 Q. Understood. So if a pest is not
9 in the line of sound of a repeller, it
10 can't work to repel the pest, right?
11 A. Please say that again? Sorry.
12 Q. Sure. So if a pest is not
13 within the line of sound, right, the sound
14 waves, that they are on the line of the
15 sound waves --
16 A. Right.
17 Q. -- then the pest cannot be
18 repelled? It can only be repelled if it's
19 within the line of the sound waves,
20 correct?
21 A. Possible, yes.
22 Q. So if ultrasonic signals can't
23 reach these nesting and feeding places
24 behind walls, under floors and within
25 cracks, then the pests are only repelled

**Page 69**

1 if the ultrasonic signals can reach them,
2 correct?
3 A. Yes.
4 Q. So the repellers cannot repel
5 pests from these places because the
6 ultrasonic signals cannot reach there,
7 correct?
8 A. Correct.
9 Q. Now, would you agree that all
10 structures have nesting or feeding places
11 behind walls, under floors and within
12 cracks?
13      MR. WING: Object to form.
14 A. I don't understand the question.
15 Say that again.
16 Q. Sure. Let me actually make it
17 simpler.
18      Would you agree that all
19 structures have spaces behind walls?
20      MR. WING: Object to form.
21 A. All spaces have -- I don't know.
22 Q. Would you agree that every
23 structure that has a floor has a space
24 that is under the floor?
25      MR. WING: Object to form.

18 (Pages 66 - 69)

D. Feuerstein

1  A.  Could be, yeah.
2  Q.  Would you agree that nearly all
3 structures have cracks somewhere, in the
4 floor, in the wall, et cetera, that pests
5 can get in and out of?
6     MR. WING: Object to form.
7  A.  I cannot say that. Maybe.
8 Maybe yes, maybe not.
9  Q.  Do you know whether ants
10 typically dwell out in the open, or
11 whether they typically go to these spaces
12 behind walls, within cracks, underneath
13 the floor?
14     MR. WING: Object to form.
15  A.  They could be anywhere. In the
16 cracks, outside the cracks.
17  Q.  And what about mice; the same
18 thing, right?
19     MR. WING: Object to form.
20  A.  It could be -- yeah, I can't
21 tell. It could be anywhere, too.
22  Q.  Same question for rats and
23 roaches?
24     MR. WING: Objection.
25  A.  Yes.

Page 70

1  Q.  That, as well, correct?
2  A.  Yeah, correct.
3  Q.  Because of that, would you agree
4 that by themselves, the pest repellers are
5 insufficient to rid an entire home of
6 pests if it cannot reach these places
7 where these pests might live?
8     MR. WING: Object to form.
9  A.  Depends, it's within the reach
10 of the ultrasonic sound wave.
11  Q.  I'm sorry, can you repeat that,
12 please?
13  A.  Depends on how big is the home
14 and if it's out of reach of the ultrasonic
15 sound wave.
16  Q.  So assuming that a home has a
17 space under the floor, right? Let's
18 assume a home has that?
19  A.  Could be different floors.
20  Q.  Right. Could be one floor,
21 could be many floors?
22  A.  Right.
23  Q.  If a home has a space under the
24 floor, an ultrasonic signal cannot reach
25 there, right?

Page 71

1  A.  If it's multiple floors, yes.
2  Q.  Even one floor, the ultrasonic
3 signals can't reach underneath the floor
4 if the floor is made of wood, correct?
5  A.  Yes.
6  Q.  So assuming that a home has a
7 space under the floor, do you agree that
8 the ultrasonic, that the Bell + Howell
9 pest repellers cannot rid that home of
10 pests completely if it cannot reach that
11 space?
12  A.  We have different models. We
13 also have -- this is ultrasonic. We also
14 have models that can reach much bigger
15 area.
16  Q.  Now, do you have any models of
17 the Bell + Howell pest repellers that can
18 reach spaces underneath floors?
19  A.  Through the wires, yes. We have
20 electromagnetic pest repeller.
21  Q.  How many repellers have
22 electromagnetic technology?
23  A.  A few. I don't remember. Three
24 or five. Three or four?
25  Q.  Can you identify which, if any,

Page 72

1 in Exhibit 15?
2  A.  Yes. 6642. 6643. These are
3 the two -- same model, but different
4 packaging.
5  Q.  Understood.
6  A.  6650. 6651. 6652. 6658.
7 6659. That's it.
8  Q.  Thank you. We will come back to
9 those in a moment, but let's put those
10 aside for now and let's discuss the models
11 that solely have ultrasonic technology.
12  A.  Okay.
13  Q.  Assuming that a house has a
14 space that's underneath the floors, would
15 you agree that the Bell + Howell pest
16 repellers by themselves cannot rid that
17 house of pests?
18     MR. WING: Object to form.
19  A.  I don't know.
20  Q.  So you think they might be
21 sufficient to rid that house of pests?
22     MR. WING: Object to form.
23  A.  I don't know. I don't see the
24 house structure, so I cannot say, I cannot
25 comment.

Page 73

19 (Pages 70 - 73)

D. Feuerstein

1  Q.  Have any of the Bell + Howell
2  pest repellers, have you ever tested them
3  inside someone's house?
4  A.  Yes.  We did test in a real
5  house.
6  Q.  In whose house?
7  A.  In China, a real apartment
8  house.
9  Q.  Who conducted these tests?
10  A.  We have done so many different
11  testing.  This one is done by Qmann.  It's
12  a quality control company.
13  Q.  When was that done?
14  A.  2011 or twelve.
15  Q.  Whose house was it?
16  A.  That's in China, so I don't know
17  whose house is that.
18  Q.  Did you retain documentation of
19  that test?
20  A.  Yes.
21  Q.  Did you produce that
22  documentation?
23  A.  I think, yes.  What do you mean
24  produce?  You mean provide?
25  Q.  Yes.

Page 74

1  might be able to or might not be able to?
2  A.  Possible.
3  Q.  What material do you think a
4  wall could be made of in which case it
5  would be able to?
6      MR. WING:  Object to form.
7  A.  I don't know.
8  Q.  Can you list a single material
9  you think a wall might be made of that it
10  could actually pass through?
11      MR. WING:  Object to form.
12  A.  Don't know.
13  Q.  And the same question for the
14  floor?
15  A.  Yes.
16  Q.  Same answer?
17      MR. WING:  Same objection.
18  A.  Yeah.
19  Q.  Thank you.  We'll go for a
20  little bit longer and then we will take a
21  break, because I know we have been going
22  for awhile.  Let me just finish this line
23  of questioning.
24  A.  Sure.
25  Q.  So it also says:  In some cases,

Page 76

1  A.  Yes.
2  Q.  We can come back to that.
3      Assuming that a house or an
4  office has that space that's behind walls,
5  would you agree that Bell + Howell pest
6  repellers are insufficient to rid that
7  whole home or office of pests assuming
8  that it has that space?
9      MR. WING:  Object to form.
10  A.  I can't answer that.
11  Q.  Last question:  Assuming that
12  there are cracks in that space somewhere,
13  whether it be in the floor, in the wall,
14  would you agree that the Bell + Howell
15  pest repellers are insufficient to rid
16  that whole space?
17      MR. WING:  Object to form.
18  A.  I can't answer that.
19  Q.  Why can't you answer that?
20  A.  Because I don't see the crack,
21  so you might be able to.  I don't know the
22  material of the wall.  You might be able
23  to pass through.  I don't know.
24  Q.  So depending on what the wall
25  looks like and what it's built on, it

Page 75

1  over time, certain rodents might be
2  accustomed to ultrasonic signals, some may
3  return to their feeding or nesting areas
4  even in the presence of an ultrasonic
5  product.
6      MR. WING:  We're looking at
7  666?
8      MR. KOPEL:  Yes, correct.
9      MR. WING:  I know we jumped
10  around, so.
11  Q.  Do you see that?
12  A.  Yes.
13  Q.  Did that also come from packing
14  of either First Alert or Sunbeam?
15  A.  Yes.
16  Q.  And you also don't know exactly
17  who wrote that sentence, correct?
18  A.  No.  I think we provided a copy.
19  Q.  Do you agree with that?
20  A.  Yes.
21  Q.  Who made the decision to include
22  this passage on the Bell + Howell
23  packaging?
24  A.  My designer -- I asked my
25  designer to provide -- to design the

Page 77

20 (Pages 74 - 77)

D. Feuerstein

1 artwork based on the artwork we have in
2 the past.
3     Q.   I see. Do you know why your
4 designer or anyone else decided to include
5 this on the packaging?
6     A.   Why? Because he was instructed
7 to refer to previous packaging.
8     Q.   Understood.
9         What basis do you have for your
10 agreement with this passage?
11     A.   From experiences.
12     Q.   Can you please describe the
13 experience that led you to agree with this
14 passage?
15     A.   I have discussed this with my
16 previous customer about this term, about
17 this situation.
18     Q.   Which customer?
19     A.   People in Team Products.
20     Q.   So which customer was this?
21     A.   The name of the customer? I
22 don't remember. There are several people
23 I work with.
24     Q.   Do you know if it was an
25 individual or if it was a business? Was

Page 78

1 it a big customer or a small customer?
2     A.   You mean -- this is the -- we
3 are talking about Team Product. That
4 company.
5     Q.   Right.
6     A.   I don't remember who's the
7 person there I have spoken with about this
8 term.
9     Q.   Oh, okay. Let me take a step
10 back.
11         So when you said you spoke with
12 a customer, you don't mean a consumer who
13 bought the product?
14     A.   No, no, no. I mean my customer
15 who buy the product, who is importer for
16 the product.
17     Q.   So somebody at teamwork told you
18 that this passage was correct?
19     A.   Mm-hm.
20     THE COURT REPORTER: Yes or no?
21     THE WITNESS: Yes.
22     Q.   Who was that?
23     A.   I don't remember the name, but
24 normally I went to the office and we have
25 meeting with several people, so I don't

Page 79

1 remember who.
2     Q.   Have you ever tested this?
3     A.   Yes. We test in China all the
4 time.
5     Q.   And you have seen this to be
6 correct, that this passage --
7     A.   Yes.
8     Q.   -- to be correct?
9     A.   Yes.
10    Q.   Can you please describe the
11 testing you have seen which shows this
12 passage is correct?
13    A.   We always do live testing, so we
14 always plug-in pest repellers in different
15 areas. We will mark down the date when we
16 begin the testing, and we observe the
17 result.
18    Q.   So when did you do this
19 particular testing?
20    A.   I think this is the beginning of
21 when we start beginning manufacturing pest
22 repeller.
23    Q.   And can you please describe what
24 the testing was and what the results were?
25    A.   It says here. This script is

Page 80

1 too small for me to read.
2     Q.   I apologize. I had hoped for a
3 better copy, but let me see if there is
4 another page on this exhibit, actually,
5 that has it clearer for you.
6     A.   Very small.
7     Q.   So if you see the second page,
8 and that is Bates number BHH, LLC 006641.
9 I think it's -- the formatting may be
10 different, but I think it's the exact same
11 sentence here. And it's on the right-hand
12 side.
13    A.   Yes.
14    Q.   And the sentence begins, in some
15 cases.
16        Can you read that one better?
17    A.   Yes.
18    Q.   Okay.
19    A.   In some cases, right?
20    Q.   Yes.
21    A.   Yes. So --
22    Q.   Okay. So my question was, just
23 to refresh your recollection, you said
24 that you did testing that confirmed that
25 this was true?

Page 81

21 (Pages 78 - 81)

D. Feuerstein

1    A.   Yes.
2    Q.   And I asked you to please
3 describe that testing and the results of
4 that testing.
5    A.   We do -- we -- we -- our
6 engineering department, we plug-in the
7 pest repeller and then we see the read --
8 my company after a few weeks, a few
9 months, use the ultrasonic, so through
10 that, we will change the location of pest
11 repeller.
12    Q.   I see. So when you say you did
13 this testing, this wasn't done by any
14 professional lab; this was done in-house
15 by Intellitec, correct?
16    A.   Yes.
17    Q.   And it was done in Intellitec's
18 China --
19    A.   In China.
20    Q.   -- factory?
21    A.   For this particular test, yes.
22    Q.   And was there a pest problem
23 before they were plugged in in the
24 factory?
25    A.   Was yes, mm-hm.

Page 82

1    Q.   And then pest repellers were
2 plugged in and you saw some effectiveness
3 for a time.
4    A.   Yes.
5    Q.   But then you saw the pests
6 started to return, correct?
7    A.   Maybe, but not hundred percent,
8 mm-hm.
9    Q.   What do you mean?
10    A.   For some, we were doing
11 different tests. Some you might see the
12 pests again, where the pests were nearby,
13 but some we don't see the problem.
14    Q.   Which pests? Was this something
15 that was seen across the spectrum of ants,
16 mice, rats, spiders and roaches?
17    A.   Yes.
18    Q.   How long of a period did you see
19 it took until these pests began returning?
20    A.   After three months.
21    Q.   So it worked for, approximately,
22 three months, and then the pests began
23 returning despite the fact that they were
24 still plugged in?
25    A.   Right. But then we switched the

Page 83

1 pest repeller and it's okay again.
2 Switched the location of the pest
3 repeller.
4    Q.   Did you take readings to ensure
5 that the repellers were still emitting
6 ultrasonic frequencies --
7    A.   Yes.
8    Q.   -- at the end of three months?
9    A.   Yes.
10    Q.   And they were still emitting the
11 same frequencies just like the first day
12 you plugged them in, right?
13    A.   Right.
14    Q.   So you took out those repellers.
15         Did you replace them with new
16 repellers, or did you replace them with
17 the same repeller?
18    A.   Same repeller.
19    Q.   And then you plugged them in in
20 different places?
21    A.   Mm-hm.
22    Q.   And you saw a reduction of pests
23 in those new places where you plugged them
24 in, correct?
25    A.   Yes.

Page 84

1    Q.   Do you see here, it starts: In
2 some cases? That's how the sentence
3 starts: In some cases.
4    A.   Mm-hm.
5         MR. WING:  Yes?
6    Q.   Can you please answer that yes
7 or no? "Mm-hm" is not good enough for the
8 court reporter.
9    A.   In some cases, yes, sorry.
10    Q.   Can you explain what that means?
11    A.   It means sometimes the pests
12 still were after three months, sometimes
13 you see the pest may return. Then
14 people -- my engineer, we know to change,
15 to put in a different plug.
16         MR. KOPEL:  Okay. Let's take
17 a break right now, please.
18         THE VIDEOGRAPHER:  We are off
19 the record, approximately, 12:30 p.m.
20         (Whereupon, a luncheon recess
21 was taken at this time.)
22
23
24
25

Page 85

22 (Pages 82 - 85)

D. Feuerstein

1  (Whereupon, after a luncheon recess was
2  taken, the deposition continued as
3  follows:)
4
5  A F T E R N O O N   S E S S I O N
6
7
8       THE VIDEOGRAPHER: This is
9  the beginning of file number two. We
10  are going back on the record at,
11  approximately, 1:10 p.m.
12       MR. KOPEL: I would like to
13  ask the court reporter to please mark
14  as Exhibit 16 a copy of the United
15  States Design Patent Application.
16       (Plaintiffs' Exhibit 16 was
17  marked for identification, as of this
18  date.)
19  BY MR. KOPEL:
20  Q.  Ms. Feuerstein, do you have
21  Exhibit 16?
22  A.  Yes, I do.
23  Q.  Have you seen it before? Have
24  you seen it before?
25  A.  Yes.

Page 86

1  Q.  What is it?
2  A.  It's a design patent document
3  for one of my pest repellers.
4  Q.  Excuse me, I think I said
5  earlier that this is an application. This
6  isn't actually an application. This has
7  been granted, right?
8  A.  Yeah, we have a few design
9  patents.
10  Q.  Can you please tell me how many
11  patents you have for the Bell + Howell
12  pest repellers?
13  A.  I don't remember precisely. I
14  would say about two to four.
15  Q.  And that's all pest repellers,
16  all together, not just Bell + Howell?
17  A.  We have design patent when we
18  work for Sunbeam and First Alert, but that
19  was back to fifteen years ago, maybe
20  longer than that, so I don't remember.
21  Q.  Okay.
22  A.  But those patents are not for
23  the US. Those were for -- I believe it
24  was for China. And this is a US patent.
25  Q.  Thank you.

Page 87

1  And do you have Chinese patents
2  for pest repellers, the Bell – Howell pest
3  repellers, as well?
4  A.  No.
5  Q.  Do you see, it says: Inventor:
6  Debbie Feuerstein?
7  A.  Yes.
8  Q.  Is that correct?
9  A.  Correct.
10  Q.  And you consider yourself the
11  inventor of the Bell + Howell pest
12  repellers, correct?
13  A.  Yes.
14  Q.  Do you see here references
15  cited, it says, US Patent documents, and
16  there are a list of patent documents
17  there?
18  A.  Mm-hm, yes.
19  Q.  Do you have a recollection of
20  what these are?
21  A.  You see there are a few Levine
22  Design Patent 2002, 2003. I did -- that
23  represents Levine Team Products -- Levine,
24  its the Levine family who owns Team
25  Products, the company I worked before, but

Page 88

1  I was not aware of this patent. Maybe --
2  I don't remember, but I believe it's the
3  Levine family.
4  Q.  Where is Team Products located?
5  A.  Parsippany, New Jersey.
6  Q.  Okay, thank you.
7       You can put that aside, please.
8  A.  (Complying.)
9  Q.  Did you speak with Mr. Mishan
10  over the break at all?
11  A.  Very briefly. We just talk
12  about what to eat for lunch.
13  Q.  Did you discuss your testimony
14  today at all with Mr. Mishan?
15  A.  He -- no, we did not discuss.
16  Q.  He never said anything to you
17  about it either?
18  A.  He said I did okay, that's it.
19  That was the only thing we talk about.
20  Q.  What did you do to prepare for
21  today's deposition?
22  A.  I did not really prepare
23  anything, because I have pretty good
24  memory. And I probably just checked the
25  test report. We have so many test report

Page 89

23 (Pages 86 - 89)

D. Feuerstein

1  through the years, so I double checked
2  yesterday which year did we do which test
3  yesterday.
4      Q.   So to your knowledge, have you
5  found any additional testing --
6      A.   Yes, I did.  I did find two test
7  reports we did 2008 and 2009.
8      Q.   And I believe -- and you gave
9  those to --
10     A.   I gave them to Scott yesterday,
11 yes.
12     Q.   Aside from those, are you aware
13 of any additional testing that hasn't been
14 produced to us in this case?
15     A.   No, I believe everything is
16 there.
17     Q.   Did you discuss -- in
18 preparation for your deposition, did you
19 have any conversation with anyone about
20 the deposition?
21     A.   We did have some conversation.
22     Q.   Who is "we"?
23     A.   Me and Scott mainly and
24 Mr. Mishan was -- was part of it, the
25 discussion.

Page 90

1      Q.   Was this on the phone or in
2  person?
3      A.   In person.
4      Q.   When was this?
5      A.   Yesterday.
6      Q.   Where was this?
7      A.   At Mr. Mishan's office.
8      Q.   Was anyone else present?
9      A.   No.
10     Q.   Was anyone on the phone?
11     A.   No.
12     Q.   How long did you guys speak for?
13     A.   A couple hours, three hours.
14     Q.   Do you remember the substance of
15 what was discussed?
16     A.   Just -- just -- mostly review of
17 the test report we have had in the past.
18     Q.   Did Mr. Mishan give you any
19 advice about today's deposition?
20     A.   No.
21     Q.   Did Mr. Wing give you any advice
22 about today's deposition?
23     A.   No.
24          MR. WING:  I'm going to
25     object.  It's attorney-client

Page 91

1      privilege.
2      A.   No.
3      Q.   What did you guys discuss about
4  the tests?
5          MR. WING:  Same objection.
6          I'm going to instruct her not
7  to answer.
8      A.   We reviewed --
9          MR. WING:  Ms. Fuerstein, the
10 substance of our discussions
11 yesterday, I would say, was
12 attorney-client privilege.
13     Q.   Mr. Mishan was present for this
14 discussion, right?
15     A.   Yes.
16          MR. KOPEL:  So she is not a
17 Defendant in the case, right?
18          MR. WING:  But I am
19 representing her for purposes of the
20 deposition.
21          MR. KOPEL:  Right.  But you
22 are representing her, but Mr. Mishan
23 broke that privilege; did he not?
24          MR. WING:  I would dispute
25 that.  That my other client, that our

Page 92

1  co-representation would break the
2  attorney-client privilege.
3          MR. KOPEL:  We might have to
4  revisit that, because I'm not sure
5  that's correct.  For the record, I
6  don't think that's an appropriate
7  instruction not to answer.  Sorry, he
8  just grabbing a document I thought we
9  had.
10          MR. WING:  That's fine.  So
11 off the record for thirty seconds or
12 whatever?
13          MR. KOPEL:  We can go off the
14 record.
15          THE VIDEOGRAPHER:  We are off
16 the record at 1:19 p.m.
17          (Whereupon, a discussion was
18 held off the record.)
19          THE VIDEOGRAPHER:  This is
20 the beginning of file three.  We are
21 going back on the record at 1:19 p.m.
22 BY MR. KOPEL:
23     Q.   I am actually going to hand the
24 witness a document which was previously
25 marked as Exhibit 4.

Page 93

24 (Pages 90 - 93)

D. Feuerstein

1    MR. KOPEL: Can I ask the
2  court reporter, would you mind
3  re-marking this as Exhibit 4, because
4  I don't have the originally marked
5  exhibit?
6        (Plaintiffs' Exhibit 4 was
7  remarked for identification, as of
8  this date.)
9  Q.  Are you ready?
10 A.  Yes.
11 Q.  Do you have Exhibit 4?
12 A.  Yes.
13 Q.  Have you seen it before?
14 A.  Yes.
15 Q.  What is it?
16 A.  This is the instruction manual
17 for one of my -- our pest repellers.
18 Q.  I suppose this has been updated
19 since it looked like this, correct?
20 A.  Because I'm not the one who is
21 in charge of the owner's manual with my
22 factory, Mr. Deng is doing it, so I am not
23 sure this is the most updated version.
24 Q.  So Mr. Deng is the most involved
25 person --

Page 94

1  A.  With Daniel, in China, yes.
2  Q.  Did Mr. Deng draft this himself,
3  or did he take it from somewhere else?
4  A.  He take it from previous
5  manuals.
6  Q.  Was that from Sunbeam or First
7  Alert?
8  A.  Yes.
9  Q.  Do you think what, if anything,
10 Mr. Deng added to this sheet that might
11 not have appeared on the original manual?
12 A.  The -- because all or product
13 has to be approved by UL, so I'm not sure
14 if UL has caution in the back. This
15 manual has to be approved and sometimes we
16 might revise it by Underwriter Laboratory,
17 so I'm not sure the caution is from Deng.
18 I believe the caution is from UL.
19 Q.  I see. Anything else?
20 A.  No.
21 Q.  Do you see on the bottom left
22 corner, it states: Make sure that all
23 food away. The smell of food attracts
24 pests and will decrease the efficiency of
25 ultrasonic pest repeller?

Page 95

1  A.  Yes.
2  Q.  Now, that statement was on the
3  original manual, correct, first; either
4  Sunbeam or First Alert, correct?
5  A.  Correct.
6  Q.  Do you agree with this
7  statement?
8  A.  Yes.
9  Q.  Why do you agree with it?
10 A.  Because food and smell with
11 attract pests.
12 Q.  So if there is food present, it
13 could cause the repellers to not properly
14 repel the pests, correct?
15 A.  Possible --
16    MR. WING: Object to form.
17 A.  -- but not --
18    MR. WING: Go ahead.
19 Q.  You can answer.
20 A.  Possible, but not -- we cannot
21 say for sure.
22 Q.  Have you tested this?
23 A.  Yes, in China.
24 Q.  Can you please describe the
25 testing and the results?

Page 96

1  A.  They -- when we tested lifespan
2  and efficiency of the test and we did try
3  to put some food.
4  Q.  What food did you put?
5  A.  That, I don't know, because I
6  did not contact -- I did not do the test
7  myself.
8  Q.  And was this for all the listed
9  pests; in other words, ants, spiders,
10 roaches, mice and rats?
11 A.  Yes.
12 Q.  And the results of the tests
13 were that that despite the fact that the
14 repellers were plugged in, the presence of
15 food still attracted the pests, even at
16 the presence of the repellers, correct?
17 A.  Might be, but not hundred
18 percent.
19 Q.  Can you explain what you mean?
20 A.  Sometimes they would put the
21 food and sometimes the pests came out,
22 sometimes they don't. So it's not 100%
23 that when food's there, it's not working.
24 Q.  Do you know what the difference
25 was between the times they came out and

Page 97

25 (Pages 94 - 97)

D. Feuerstein

**Page 98**

1 the times they didn't; did they use
2 different types of food, perhaps?
3    A.   I don't remember.
4    Q.   Who ran these tests?
5    A.   My engineering department in
6 China.
7    Q.   What was the name of the
8 individual?
9    A.   This is go back to early stage,
10 so I don't remember who run the test.
11    Q.   Were any documents produced as a
12 result of those tests? Were the results
13 written down anywhere?
14    A.   At that time, yes.
15    Q.   But you don't have those
16 anymore?
17    A.   I don't have the copy.
18    Q.   This was done in the Intellitec
19 factory in China?
20    A.   Yeah, in our facility.
21    Q.   Do you know of any disparity in
22 the results between different types of
23 pests in this test?
24    A.   No, I don't remember.
25    Q.   Do you see, it says right

**Page 99**

1 underneath there, repair any openings in
2 your home where pests can get in?
3    A.   Yes.
4    Q.   And this also appeared on a
5 previous manual for another product,
6 correct?
7    A.   Correct.
8    Q.   Do you agree with this?
9    A.   Agree, yes.
10    Q.   What is the basis for your
11 agreement?
12    A.   From my experience, because in
13 my home, if there's a crack, especially in
14 wintertime, pests might come in, you know.
15    Q.   So even in the presence of a
16 properly functioning repeller, if there
17 are openings in the home, pests can still
18 come in?
19    A.   Right. Depends how big is the
20 home, and where is the pest repeller.
21    Q.   Can you please elaborate on
22 that?
23    A.   Our pest repeller has -- it
24 works for average American-size room. So
25 if the home is like 10,000, 5,000-square

**Page 100**

1 foot, so it really depends on how far is
2 it from the pest repeller.
3    Q.   So you are saying that if there
4 are pest repellers in each room in a
5 house, that this instruction is not
6 necessary, you no longer have to repair
7 the openings in the home?
8          MR. WING:  Object to form.
9    A.   I can't say that.
10    Q.   Would it still be necessary?
11    A.   Necessary for?
12    Q.   To repair the openings in the
13 home?
14          MR. WING:  Object to form.
15    Q.   Do you need me to rephrase the
16 question or?
17    A.   Mm-hm, yes, please.
18    Q.   So as I understand it, you just
19 testified that pests can get into openings
20 in the home if they are not within reach
21 of a repeller?
22    A.   Correct.
23    Q.   Because a repeller is made to
24 cover a standard American-size room?
25    A.   Yes.

**Page 101**

1    Q.   So if there is an opening
2 outside the reach of a repeller, then
3 pests can get in?
4    A.   Correct, yes.
5    Q.   What if there is a repeller in
6 every room of the house; is this
7 instruction still necessary --
8          MR. WING:  Object to form.
9    Q.   -- to repair openings in the
10 home?
11    A.   It will help.
12    Q.   So is it necessary?
13          MR. WING:  Same objection.
14    A.   I think it will help to increase
15 the efficiency.
16    Q.   This instruction, was this ever
17 tested by Intellitec?
18    A.   What, repair the home?
19    Q.   Correct.
20    A.   No, not this one.
21    Q.   Okay, thank you. You can put
22 that aside, please.
23    A.   (Complying.)
24    Q.   Which third parties have you
25 utilized to test the repellers?

26 (Pages 98 - 101)

D. Feuerstein

1   A.   All through the years?
2   Q.   Yes.
3   A.   The earliest one is Beijing
4   University, the agriculture department.
5   Q.   I'm sorry to jump in.  And but
6   we no longer have documentation of that
7   test, correct?
8   A.   No, we no longer have
9   documentation.
10   Q.   Okay.
11   A.   Number two is SGS, in Taiwan.
12   We did two tests with SGS in Taiwan.  Then
13   in Qmann, the quality company, quality
14   control company, we did two tests with
15   them in -- I don't remember precisely, I
16   believe it's 2011.
17   Q.   And were those the house tests
18   that you were referring to?
19   A.   Yeah, that's the house test.
20        And then we did with SGS in
21   China.  We do several testing with SGS in
22   China.  And we do two tests with Intertek
23   and we did one test with CTO lab.  So they
24   are professional -- SGS and Intertek are
25   the two largest laboratories in the world.

Page 102

1   Q.   What about Certified Testing
2   Service?  Does that ring a bell?
3   A.   What about certified testing?
4   Q.   Certified Testing Service?
5   A.   Oh, yes, the CTO, right?  Sorry,
6   I don't know their full name.  I know the
7   initials, CTO.
8   Q.   Are they affiliated with STS?
9   A.   No.  They are all independent
10   companies.
11   Q.   You can tell me if, you know,
12   you need to see individual tests for this
13   question, but can you tell me:  Where were
14   these tests performed?
15   A.   In different laboratories.
16   Q.   Were any of the tests that were
17   supervised by these laboratories, were
18   they performed in the Intellitec factory
19   in China?
20   A.   I don't recall.  Not inside our
21   factory, because during the testing, the
22   smell, they're horrible.  This is a really
23   bad smell.  And the testing lasts several
24   days, but the preparation might last
25   several weeks, so it's not ethical in

Page 103

1   hygiene not to do inside of factory.
2   Q.   Who typically writes the
3   protocols for these tests?
4   A.   Some of the protocol, we took it
5   from -- I remember the protocol from the
6   previous testing we have with SG in Taiwan
7   and earlier on in Beijing University.  And
8   the chamber, the chamber design we have
9   later on, I actually got the -- we got the
10   proposal from Michigan University in 2011,
11   they proposed the size of chamber and the
12   curve tunnel because ultrasonic cannot
13   travel through curve tunnel.  So actually
14   the size of chamber was based on Michigan
15   University's recommendation.
16   Q.   So was this a proposal made
17   directly to Intellitec from Michigan
18   University?
19   A.   Yes.
20   Q.   Did Michigan University ever
21   carry out any tests?
22   A.   No, they did not.  I guess they
23   realized the difficulty of the testing.
24   They did not even give us a quote.
25   Q.   What do you mean by the

Page 104

1   difficulty of the testing?
2   A.   Just to keep the pests alive
3   through several weeks, they require a
4   special technician to carry on, to keep
5   the test alive.  And also the smell, the
6   hygiene and -- so they did give us a
7   proposal, but they did not give us a
8   quote.  So we took the proposal and we
9   combined a few tests and we wrote a very
10   nice -- a very thorough test protocol at
11   the end of 2011.
12   Q.   When you say that we wrote a
13   thorough test protocol --
14   A.   Me.
15   Q.   You wrote that?
16   A.   Me, I -- I wrote that.
17   Q.   The chambers that were utilized
18   throughout the tests, were they reused
19   between tests?
20   A.   No.  Because the pests we buy,
21   normally we need the new chamber almost
22   for every new test because they won't
23   survive, the chamber.  They bite, they eat
24   and it's very disgusting, so we don't
25   reuse the testing.  But the construction,

Page 105

27 (Pages 102 - 105)

the design is the same for the last few tests.
Q. Have you tested other products at these labs that we just discussed?
A. All the products?
Q. Other products, aside from pest repellers.
A. Yes. My company does a substantial amount of testing for products every year.
Q. With SGS?
A. With different lab. Depends on which lab. We do with different laboratory. Depends on what's their specialty. Depends on what type of testing.
Q. Who selected the insects to be used in the tests? Who supplied the insects?
A. We have a pest supply company to supply the insect. Some of the rats, we actually called, because the black one is hard to get now.
Q. The black rat?
A. Yeah, the black rat, yeah.

Q. Who selected the species that were being tested in each test?
A. We test different species because all the test reports you could see the pictures of the pest. So they are all different. It really depends on the season. Depends on what can we get. And so we test different species.
Q. Who selected which species were tested in each instance; was that part of the protocol?
A. In the protocol, we did not specify any special species. It really depends on what we can get.
Q. And the pests were supplied directly to Intellitec, correct?
A. Yes.
Q. And the design, in terms of the size of the chambers used, was that also recommended by the University of Michigan?
A. Yes.
Q. Have you ever tested the repellers in an office environment?
A. Not for the pest, not for the efficiency. For the function, yes, we do.

Q. Understood.
A. Efficient to everything with rat and mice and pest, normally we don't do in the office because just for the hygiene of the employees, we don't do that in the factory. The smell's really bad. Because the test is a long testing, it lasts for several weeks. The testing is eleven days, but preparation, before and after, you need extra days, so...
Q. How do you select the term of eleven days?
A. The previous testing, initial testing we have, I think it's -- I don't remember it's five days or seven days, but we want to see how the pest react before -- post -- pre and post ultrasonic. So we want to compare the difference under influence of ultrasonic.
Q. Can you explain just briefly why it's important to have a pretest period where the repeller is not on?
A. So then we want to see when you turn on and before it was turned on and after you turn off, we want to see how the

pests react so while testing shows the activity, including where they move, including the water and for conception.
Q. So if, for instance, you might see a big disparity between the chambers pretesting, right, so that might suggest that there might be some reason other than the repellers that the pests prefer one chamber over the other, correct?
A. Yeah, I don't know.
Q. Do you understand the question?
A. No, can you say it?
Q. Okay. Would you agree that the purpose of pretesting is to see whether the pests have a preference for one chamber over the other in the absence of a pest repeller?
A. Correct, yes.
Q. And if there is a preference for one chamber over the other in the absence of a pest repeller, that might suggest that the results of the test, even in presence of a pest repeller, would be called into question, correct?
MR. WING: Object. Object to

D. Feuerstein

1 form.
2    A.   Sorry, I don't quite 100%
3 understand the question.
4    Q.   Sure, it's a complicated
5 question.
6         Would you agree if the pretest
7 period -- let me use a more concrete
8 example, so it's easier to understand.
9 Let's say you have chamber A and chamber B
10 and let's say the repeller is in chamber
11 A, all right?
12    A.   Yes.
13    Q.   So in the pretest periods before
14 the repeller is turned on, let's say all
15 the pests that you are testing, they go to
16 chamber B.
17    A.   Mm-hm.
18    Q.   So that might suggest that they
19 prefer chamber B for reasons entirely
20 unrelated to the pest repeller, correct,
21 because the pest repeller is not on?
22         MR. WING:  Object to form.
23    A.   It's possible.  I don't know.
24 It's possible.
25    Q.   And is that the reason why you

Page 110

1 David.  He's in New York.  So he's a
2 specialty in quality control.  So I also
3 asked his advice.
4    Q.   What is his last name?
5    A.   McVoy, M-C-V-O-Y.  I'm not sure.
6 I have to check my record.
7    Q.   So we've got the proposal from
8 University of Michigan, right?
9    A.   Mm-hm.
10    Q.   And we've got advice from David
11 McVoy.
12    A.   Yes.
13    Q.   What else did you use?
14    A.   And I also referred to the
15 previous testing we have.
16    Q.   You mean, are you referring to
17 the previous testing from the University
18 of Taiwan?
19    A.   No.  The University of --
20    Q.   Beijing, excuse me.
21    A.   Yeah, Beijing, yes.  And we also
22 have two pest tests we have prior to the
23 new protocol from SGS in Taiwan.
24    Q.   Who designed those?
25    A.   Those are pretty much based on

Page 112

1 run a pretest?
2    A.   Yes.  We want to compare pre and
3 after.  We want to see the influence of
4 the ultrasonic with and without and how it
5 really move, how do they consume the food
6 and water.
7    Q.   Now, the test protocol that you
8 utilize was based on, I believe you
9 testified, it was the University of
10 Michigan, the proposal they sent to you,
11 right?
12    A.   For the chamber design, yes,
13 mm-hm.
14    Q.   And that proposal was designed
15 specifically for Intellitec, correct?
16    A.   Correct, yes.
17    Q.   And that was the sole basis for
18 the protocols that you wrote later on,
19 correct?
20         MR. WING:  Object to form.
21    A.   Not the sole basis.
22    Q.   What else did you use?
23    A.   I have referred to previous
24 testing we have.  And I also have talked
25 to Qmann, the owner of the Qmann, he's

Page 111

1 Beijing's protocol.
2    Q.   Okay.  And Beijing made its
3 protocol solely -- this was a new protocol
4 Beijing made --
5    A.   Yes.
6    Q.   -- to test Intellitec's --
7    A.   Right.  The new protocol is,
8 number one, our testing period is longer.
9 Number two, we have pre and post the test
10 to observe the influence, ultrasonic
11 influence for the pest.  And number three,
12 the chamber design is from the University
13 of Michigan.  So it's a combination of
14 this.  And we also, as per David's advice,
15 we also add observation and record the
16 water and food consumption.
17    Q.   Whose idea was it to have that?
18    A.   David.
19    Q.   I see.  Are there any other
20 sources that you used that we haven't
21 covered in writing the protocols for these
22 tests?
23    A.   No.
24    Q.   Who paid the labs for these
25 tests?

Page 113

29 (Pages 110 - 113)

D. Feuerstein

1    A.   Intellitec.
2    Q.   For all of the tests, Intellitec
3 paid?
4    A.   All of the tests, yes.
5    Q.   Were retainers given beforehand?
6    A.   What do you mean, retainer?
7    Q.   That means prepayment before the
8 test was conducted.
9    A.   Oh, no. Everything has to be
10 paid hundred percent before they conduct
11 the test. All the laboratory require full
12 payment before they start it.
13    Q.   And did the amount paid for the
14 test, did those ever change? Did they
15 ever alert you that you owe more money,
16 for instance?
17    A.   No. They -- yeah, every time
18 the test is different because it depends
19 on who is the person who was in charge of
20 that particular test. So every time every
21 new test, we submit a protocol and we get
22 a quote from them.
23    Q.   I see.
24    A.   So it's different every time.
25    Q.   And when you were deciding, for
                                                Page 114

1 instance, like which spiders to use, if
2 you were running a test with spiders, so
3 you would go to your pest supplier and you
4 would say what spiders do you have
5 available to you right now?
6    A.   Yes. Because we test different
7 models different seasons and it really
8 depends what they have.
9    Q.   Have you ever tested the
10 repellers in the United States?
11    A.   No.
12    Q.   Have you ever tested them
13 outside, and you will forgive my political
14 ignorance, China, I mean China as in
15 Taiwan, Hong Kong, have you ever tested
16 them outside that area?
17    A.   No.
18    Q.   Do you know what David McVoy's
19 background is?
20    A.   He specializes quality control
21 and inspection and he also have some
22 laboratory experiences.
23    Q.   Okay.
24    A.   But I don't know him personally.
25 I have never met him. I talked to him on
                                                Page 115

1 the phone several times.
2    Q.   How about SGS in Taiwan? Who
3 was your contact there?
4    A.   I don't -- I think it's Owen. I
5 don't remember the name. He is the head
6 of the department.
7    Q.   Head of which department is
8 that?
9    A.   I don't remember. It says on
10 the report, but I don't remember.
11    Q.   It says it on the report?
12    A.   Yes. I think he is the one who
13 signed the report. He is also the
14 department supervisor.
15    Q.   And were you in touch with the
16 labs over the course of testing to see how
17 the testing progressed?
18    A.   Unless they have problem or
19 issues about protocol, no, I just wait for
20 their result.
21    Q.   But if problems arose then they
22 informed you and you dealt with it?
23    A.   If the pest died during the
24 testing, then it would require the field
25 to do a new test and they also mention in
                                                Page 116

1 the report. Because sometimes they die
2 from natural cause, then we have to fill
3 in the same number of the pests.
4    Q.   Have any of these laboratories
5 ever conducted field tests on the
6 repellers as opposed to laboratory tests?
7 And if you need me to --
8    A.   You mean outdoor?
9    Q.   No, that's not what I mean. I
10 mean field tests as in try placing them in
11 a site where there was already a pest
12 problem, let's say?
13    A.   No. No.
14    Q.   Now, in the copies of the tests
15 which were produced, it looks like most of
16 them lasted right around a
17 week-and-a-half, give or take a couple
18 days, does that sound right to you?
19    A.   Mm-hm, yes.
20    Q.   Did you consider testing the
21 repellers for a longer period than that?
22    A.   Longer period? No. We haven't
23 done longer period than our current
24 protocol.
25    Q.   Why do you think that a
                                                Page 117

30 (Pages 114 - 117)

D. Feuerstein

1 week-and-a-half was the correct amount of
2 time to use in the protocol?
3        MR. WING: Object to form.
4   Q.  You can answer.
5        MR. WING: You can.
6   A.  Because from our experience, it
7 would take a few days for the ultrasonic
8 to kick in. The pests really cannot
9 endure the constant loud noise. They
10 don't move from day one. They move from a
11 few days. So that's how we determine
12 eleven period, eleven days, it's the
13 appropriate testing period.
14   Q.  I see. So these tests were
15 designed to see if the -- would you agree
16 when I say that the purpose of these tests
17 were designed to see if the repellency
18 effect of these devices would kick in,
19 rather than to measure their long-term
20 effects, let's say?
21   A.  Sorry, I don't understand the
22 question.
23   Q.  Would you agree that none of
24 these tests measured the efficacy of the
25 devices over a longer period of time?

Page 118

1   A.  But there's --
2   Q.  Sorry, go ahead.
3   A.  Sorry, we did provide a format,
4 but these are independent labs. They
5 refer it, but they actually have their own
6 form and their own document.
7   Q.  So in other words, for instance,
8 if you were contracting with Intertek to
9 do tests for you, you provided them with
10 the SGS reports so they would know how to
11 format their report?
12   A.  They know how to conduct the
13 test as per the report, yes. It give them
14 better understanding.
15   Q.  So in many instances where the
16 language mirrors -- right, if an Intertek
17 report, the language sounds the same as
18 the SGS report, that's because they pulled
19 that from the SGS report, correct?
20        MR. WING: Object to form.
21   A.  I don't know about it.
22   Q.  You don't know?
23   A.  Yeah.
24        MR. KOPEL: I ask the court
25 reporter to mark as Exhibit 17 a

Page 120

1        MR. WING: Object to form.
2   A.  Sorry, I still don't understand,
3 I'm sorry.
4   Q.  That's okay.
5        So --
6   A.  Because you could see from a
7 test report the pests gradually moved
8 after two or three days.
9   Q.  Right. So if a test lasts for
10 eleven days, let's say, right?
11   A.  Mm-hm, yes.
12   Q.  So this test was designed to see
13 what the effect would be over eleven days,
14 the test was not designed to see what the
15 effect would be over twenty days or
16 forty days or fifty days, correct?
17   A.  No. We haven't done that test.
18 We have not done that test.
19   Q.  When you conducted a test with
20 these laboratories, did you give them
21 copies of prior testing reports?
22   A.  Yes. Some of them, because some
23 of them, they don't know how to do the
24 test, so we did provide them the format.
25   Q.  So --

Page 119

1 document bearing the Bates numbers
2 BHH, LLC 001268 through 1272.
3        (Plaintiffs' Exhibit 17 was
4 marked for identification, as of this
5 date.)
6   Q.  Please let me know when you are
7 ready.
8   A.  Yes.
9   Q.  Do you have Exhibit 17?
10   A.  Yes, I do.
11   Q.  Have you seen it before?
12   A.  Yes.
13   Q.  What is it?
14   A.  It's the progress report
15 regarding new testing.
16   Q.  Is this an e-mail from you to
17 Jeffrey Mishan, dated April 1, 2016?
18   A.  Yes.
19   Q.  So this e-mail was sent during
20 the course of testing to update Mr. Mishan
21 on what was happening in the testing,
22 correct?
23   A.  Yes.
24   Q.  You see it says 3/18 to 3/24.
25 There is a bullet point that says that?

Page 121

31 (Pages 118 - 121)

D. Feuerstein

1    A.    That's the date, yes.
2    Q.    Do you see just below, it says:
3 SGS and Intertek were onsite to supervise
4 testing?
5    A.    Yes.
6    Q.    Who were SGS and Intertek
7 supervising?
8    A.    They have their own technician.
9 They send their own -- each lab have their
10 own technician. So there's different
11 technicians from two different labs.
12    Q.    Were they collaborating on this
13 test?
14    A.    No. They came in different
15 time.
16    Q.    Where was this?
17    A.    It was in Dunhuang. It's
18 independent facility because this test is
19 so unhealthy, so it cannot be conducted in
20 any lab or factory environment.
21    Q.    So what was this independent
22 location? Can you please describe it?
23    A.    It's a building in Dunhuang.
24 Dunhuang City, in China.
25    Q.    It's a building, you said?

Page 122

1    A.    Yes, it's a -- I wasn't there,
2 so I don't know the full description of
3 the building.
4    Q.    Do you see on the fifth bullet
5 point under that heading, it says: SGS
6 and Intertek technicians ordered us to
7 stop testing?
8    A.    Right.
9    Q.    Who did they order to stop
10 testing?
11    A.    Ordered -- I shouldn't say
12 order. They told us they would stop
13 testing because the chamber was broken, so
14 they refused to pursue. The chamber was
15 broken by the rat. They bite it and it
16 was broken. So we need to -- I don't
17 remember. I think one chamber, we have to
18 remake it and some of them we have to
19 repair it.
20    Q.    So when you say ordered us to
21 stop testing, who was conducting this
22 testing that was ordered to stop it?
23    A.    Maybe my English wasn't right.
24 Just they required to stop the testing.
25 So because the chamber was broken, the

Page 123

1 mice might escape from the chamber so it
2 would affect the test results. So they
3 want us to repair everything before they
4 continue.
5    Q.    So at that point you made a
6 decision to move the testing to another
7 location?
8    A.    Yes. Also because it was a
9 rainy season and it was very -- the
10 humidity was 80, 90 percent and this
11 testing, we have video onsite seven -- I
12 mean, twenty-four hours. And because the
13 humidity was so hot, they won't be able to
14 see through the chamber to see inside the
15 pest activity. So then we have to move to
16 another location with less humidity.
17    Q.    Did SGS and Intertek, did they
18 have access to each other's testing within
19 that same location?
20    A.    No, no, no.
21    Q.    How do you know that?
22    A.    You mean access to each other?
23    Q.    Yes.
24    A.    Means that they met each other?
25    Q.    In other words, they were

Page 124

1 running separate tests in one location?
2    A.    Yes. They came -- they came in
3 different times, so they don't see each
4 other.
5    Q.    They didn't see each other?
6    A.    No, they didn't see.
7    Q.    How long were they there for
8 each visit?
9    A.    A couple hours. But again, this
10 testing is filmed with camera the whole
11 time.
12    Q.    And were they in contact with
13 each other about the testing?
14    A.    No.
15    Q.    How do you know that?
16    A.    Because this is their policy.
17 All the laboratory are independent. They
18 are highly ethical. They have to be --
19 you know, they cannot have influence from
20 any third-party about their own test
21 result.
22    Q.    Thanks. You can put that aside.
23    A.    (Complying.)
24        MR. KOPEL: I ask the court
25 reporter to please mark as Exhibit 18

Page 125

32 (Pages 122 - 125)

D. Feuerstein

1  a document bearing the Bates number
2  Feuerstein 000086 to 000100.
3       (Plaintiffs' Exhibit 18 was
4  marked for identification, as of this
5  date.)
6  Q.  Please let me know when you are
7  ready.
8  A.  (Reviewing exhibit.)  Yes.
9  Q.  Do you have Exhibit 18?
10  A.  Yes.
11  Q.  Have you seen it before?
12  A.  Yes.
13  Q.  What is it?
14  A.  It's pest test report from
15  Intertek.
16  Q.  Is this the test report, does
17  this reference the same test that you were
18  discussing in the e-mail we just talked
19  about, Exhibit --
20  A.  Yes.
21  Q.  -- 17?
22       Do you see about halfway down
23  the page, it says test:  Standard/method,
24  according to client's requirements.
25  A.  Which page are you on?

Page 126

1  Q.  Sure.  I am on page 86, Bates
2  number 86.
3  A.  Okay.
4  Q.  And there is a heading that
5  says:  Test content.
6       Do you see that?
7  A.  Yes.
8  Q.  And then it says:  Test
9  standard/method, it says, according to
10  client's requirements.
11  A.  Yes.
12  Q.  So this is referencing the fact
13  that you gave them the protocol first,
14  right?
15  A.  Correct, yes.
16  Q.  Do you see on too top of that,
17  it says:  Test requested, witness for
18  performance testing, rats and mice?
19  A.  Yes.
20  Q.  Is that true; were they a
21  witness for performance testing?
22  A.  Yes.  Witness means that they
23  record -- we provide the chambers.
24  Chamber, the design's ours, we provide the
25  chambers, so they come in to witness and

Page 127

1  record the result.
2  Q.  Who were they witnessing?
3  A.  Their technician from Intertek.
4  Q.  So you are saying they conducted
5  the test?
6  A.  They -- they --
7  Q.  I'm sorry, maybe I can clarify.
8  A.  Okay.
9  Q.  Did they conduct these tests, or
10  did they witness the test?
11       MR. WING:  Object to form.
12       THE WITNESS:  I can answer?
13       MR. WING:  Yes.
14  A.  They -- I don't know how to say
15  conduct or witness.  They come in, they
16  see the chamber and they record the result
17  and they weigh the water and the food
18  consumption, so I don't know how you say
19  it's witness or conducted.
20  Q.  So they were not observing a
21  third-party conducting the test; they were
22  conducting it themselves?
23  A.  Yes.
24  Q.  Please keep that handy.  I would
25  like to come back to it.

Page 128

1  A.  Okay.
2       MR. KOPEL:  I ask the court
3  reporter to mark as Exhibit 19 a
4  document bearing Bates number BHH, LLC
5  1531 to 1544.
6       (Plaintiffs' Exhibit 19 was
7  marked for identification, as of this
8  date.)
9  Q.  Please let me know when you are
10  ready.
11  A.  (Reviewing exhibit.)  Yes.
12  Q.  Are you ready?
13  A.  Yes.
14  Q.  Do you have Exhibit 19?
15  A.  Yes.
16  Q.  Have you seen it before?
17  A.  Yes.
18  Q.  What is it?
19  A.  It's a cover letter that I sent
20  to SGS 2016 test report to Mr. Mishan.
21  Q.  And is this referencing an SGS
22  test that was run concurrent with Intertek
23  tests in Exhibit 18?
24  A.  Yes.
25  Q.  Can you please turn to the last

Page 129

33 (Pages 126 - 129)

D. Feuerstein

1 page of Exhibit 19, that's page BHH, LLC
2 001544?
3    A.   What's the number again?
4    Q.   Sure. It's BHH, LLC 001544.
5    A.   Okay.
6    Q.   It's the last page of
7 Exhibit 19.
8    A.   Got it.
9    Q.   Do you see halfway in the page,
10 it says: Note: In accordance with
11 client's instructions -- now, they are
12 referring to you, you are the client,
13 that's Intellitec?
14    A.   Yes.
15    Q.   -- the company involvement has
16 been limited to witnessing/observing a
17 third-party's interventions at the
18 facility where the interventions took
19 place. The company's sole responsibility
20 was to be present at the time of the
21 third-party interventions and to confirm
22 and report the occurrence of the
23 interventions. The company is not
24 responsible for the methods applied, the
25 qualifications, actions or omission of the

Page 130

1    A.   The company -- who are they
2 referring to, the company? It's Intertek
3 or? This is done in an independent
4 facility and the chambers are all sealed,
5 they mention it in their previous report.
6 And as I say, they can't do this testing
7 inside their own lab because the hygiene
8 reason, right. So this facility we rented
9 for the testing.
10    Q.   Okay.
11    A.   Yes. So I guess that they are
12 referring to the third-party, maybe, just
13 referring to the third-party who owns the
14 facility.
15    Q.   Okay.
16    A.   And you see on the last page,
17 1544, on the top, do you see the pictures?
18 There are several cameras, actually
19 installed, in the facility to film the
20 entire process of the testing. Do you see
21 the last page, there are actual cameras?
22    Q.   So you believe the third-party
23 that is referenced in this paragraph is
24 referring to the owner of the facility?
25    A.   Yes.

Page 132

1 third-party's personnel or results or
2 effectiveness of the interventions.
3        Do you see that?
4    A.   Yes.
5    Q.   Is that true or false?
6    A.   I think this is just a general
7 term the lab put in to -- it's just a
8 general term.
9    Q.   Who is the third-party they are
10 referencing?
11    A.   I guess they are referring to
12 the facility.
13    Q.   Was the facility's personnel
14 conducting the interventions in the test?
15    A.   I'm sorry, the question again?
16    Q.   Sure. Was the facility's
17 personnel conducting the interventions in
18 this test?
19    A.   No, because all the chambers was
20 sealed by them, so no other body can open
21 the chambers.
22    Q.   Do you see here it says: The
23 company's sole responsibility was to be
24 present at the time of the third-party's
25 interventions? Sentence two.

Page 131

1    Q.   Do you know who the owner of the
2 facility was?
3    A.   No, I don't. I don't get
4 involved about their renting the space.
5 We just -- they just tell me the space,
6 it's good enough for us to run the
7 testing.
8    Q.   To your knowledge, did the owner
9 of the facility or its personnel have any
10 scientific, specialized scientific
11 knowledge or capability to run tests?
12    A.   No, no.
13    Q.   Do you agree that where it says
14 here the company's involvement has been
15 limited to witnessing/observing a
16 third-party's interventions at the
17 facility where the interventions took
18 place, do you believe that's true or
19 false?
20        MR. WING: Object to form.
21        You can answer.
22    A.   I believe they have the full
23 control because since they seal
24 unbreakable seal on the chambers, so no
25 one else can open the thing. But as a

Page 133

34 (Pages 130 - 133)

D. Feuerstein

1 laboratory, I think they just put this
2 clause to protect themselves.
3    Q.   Do you believe that it was put
4 here to protect themselves, but it's not
5 true?
6        MR. WING: Object to form.
7    A.   Protect themselves, yes.
8    Q.   But do you believe that this is
9 false?
10       MR. WING: Same objection.
11   A.   Yes. Because no one's -- no
12 one's able to touch those chambers.
13   Q.   Okay.
14   A.   From the picture before, you
15 could see the seal of the -- on the
16 chambers and design close, so nobody can
17 open it.
18   Q.   Did you look over this test
19 before you sent it to Mr. Mishan?
20   A.   I did read it.
21   Q.   Did you go back to the company
22 and say why did you put something false in
23 the test?
24   A.   No.
25   Q.   Did it concern you that there

Page 134

1 was something --
2    A.   For me, I just think it's a
3 general clause for laboratory to put that
4 term on.
5    Q.   So it didn't concern you that
6 you thought something in there was false?
7    A.   No.
8        MR. WING: Object to form.
9    A.   No. Especially testing is the
10 most thorough testing we have with a video
11 recording, so I don't believe any
12 personnel except their lab technician is
13 doing the testing.
14   Q.   Did you ever reach out to
15 Intertek and say, why did you list
16 yourself as a witness; you are the one who
17 conducted the test?
18   A.   No, I don't contact Intertek,
19 no.
20   Q.   Did it concern you that they
21 listed themselves as a witness when you
22 believe that they were more than a
23 witness?
24   A.   I did think about that, but I
25 also thought of because this testing is

Page 135

1 supported by video recording, so I'm not
2 concerned.
3    Q.   On Exhibit 18, when it says
4 witness for performance testing, do you
5 disagree with that?
6        MR. WING: Object to form.
7    A.   Yes. Sometimes the English is
8 not really the best I would like, but this
9 lab, we can't really make them change
10 much.
11   Q.   But to clarify, you do disagree
12 with that statement, right?
13       MR. WING: Object to form.
14   A.   I don't have particular opinion
15 about this term because for me, I think
16 most important is the result, they record
17 it in the report.
18   Q.   Okay, sure. I'm just asking if
19 you agree with this term or not.
20   A.   I think I'm okay with it.
21   Q.   So you think that they were a
22 witness?
23   A.   They witness, but they are also
24 conducting the report. It says in the
25 report. So I am not -- no, I think it's

Page 136

1 okay, because for me, the most important
2 is the result, effect of the test.
3    Q.   Who is Leo Lynn?
4    A.   I believe it's the technician
5 who performed this test.
6    Q.   Do you know what his
7 qualifications are?
8    A.   I do. I do. But I don't have
9 it with me right now. I think he's --
10 they are specialists, professionals.
11   Q.   Do you know if they have ever
12 conducted other tests on ultrasonic pest
13 repellers?
14   A.   No, I don't know.
15   Q.   Do you know if they have ever
16 conducted other tests on pest management
17 products?
18   A.   Yes. Intertek performed a test
19 a couple years earlier.
20   Q.   What was that?
21   A.   I don't remember which year,
22 2013 or '14, they did another test,
23 ultrasonic pest repeller, but it's not
24 done by Leo Lynn. It was a different
25 technician.

Page 137

35 (Pages 134 - 137)

D. Feuerstein

1 Q. Okay. So that was also a test
2 on an ultrasonic repeller?
3 A. Yes.
4 Q. Other than a test done on your
5 ultrasonic repellers, are you aware of any
6 tests that Intertek has done on pest
7 management products or --
8 A. We don't know. They won't
9 reveal that information to us.
10 Q. The same goes for the other labs
11 we discussed before, right?
12 A. Yes.
13 Q. Who is Sam Lin?
14 A. It's a supervisor of Leo.
15 Q. Is he related to Leo?
16 A. Hm? I'm sorry?
17 Q. Is he related to Leo?
18 A. No. They are -- no, I'm sure --
19 I'm sure they are not related. Lin is a
20 pretty big Chinese name in China. It's
21 very common. I am sure they are not
22 related.
23      I think I asked for their
24 qualification a few weeks ago, but I don't
25 have it with me right now.
Page 138

1      We provide the chambers and the
2 chamber design is per our protocol, so we
3 provide the chambers. And because the
4 rat -- they eat each other, rat will eat
5 mice, mice will eat spiders, so we have
6 separate chambers for each pest.
7 Q. What's Mr. Li's background?
8 A. Mr. Li's engineer. He is also a
9 qualified certified ISO 9000 engineer. He
10 work for my company. He is doing
11 everything about operation. He is
12 responsible.
13 Q. So his position at your company
14 is engineer?
15 A. Not engineer. He is actually a
16 manager for operation.
17 Q. Do you know where he has his
18 degree from?
19 A. I don't remember. He is a
20 university graduate. And he has a lot of
21 certifications.
22 Q. Do you know what those
23 certifications include?
24 A. I know including ISO 9000. He
25 can certify factory with ISO 9000 system.
Page 140

1 Q. In this experiment, who prepared
2 the experiment? Was that Intertek?
3 Intertek prepared the experiment?
4 A. What do you mean, "experiment"?
5 Q. This test, who set up this test?
6 A. You mean the chambers?
7 Q. Yes.
8 A. We provide the chambers.
9 Q. Who set up the chambers with the
10 insects?
11 A. I think my people set it up.
12 When they set it up, they come in, we have
13 to spread the test evenly, it was with the
14 supervision of the labs.
15 Q. Who -- which of your people set
16 it up?
17 A. Jason.
18 Q. Who --
19 A. Jason Li of my office in China.
20 The chambers --
21 Q. I'm sorry, did we discuss Jason?
22 What is his last name?
23 A. Jason Li.
24 Q. D?
25 A. No. Li, L-I.
Page 139

1 And he, himself, is a mechanical engineer.
2 Q. So Intertek watched Mr. Li set
3 up the experiment, correct?
4 A. We -- we -- when we say set up,
5 we just set up the chambers. But when we
6 put the pests into the chambers, that was
7 with the supervision of the laboratories.
8 Q. Okay, so Mr. Li put the pests
9 into the chambers while the laboratories
10 were watching, right?
11 A. Yes.
12 Q. And sometimes there were
13 additional pests added to the chambers
14 during the course of the experiment when
15 certain pests died, right?
16 A. Yes.
17 Q. Who did -- did Mr. Li do that,
18 as well?
19 A. We had to do that with the
20 supervision of the lab because they have
21 to open the chamber, otherwise we don't
22 have any access to touch any of the pests.
23 Q. Okay.
24 A. So everything -- everything --
25 they do the head count of the pests, they
Page 141

36 (Pages 138 - 141)

D. Feuerstein

1 have to come in, open the chamber, take
2 off the seal and then do whatever they
3 have to do, count the pests, add water,
4 weigh the water and weigh the food and
5 they have to record all the consumption of
6 the water and the food.
7          So they did all of that
8 themselves, and we were just on the side
9 to see what else, you know.
10    Q.   When food and water was added,
11 Mr. Li added that and they were watching?
12    A.   No. They added. The lab was
13 added. We are not allowed to touch. They
14 added themselves.
15    Q.   Mr. Li set up the experiments
16 and the pests for all the laboratory tests
17 you've produced?
18    A.   Yes, the chambers only.
19    Q.   And he was onsite for the
20 testing?
21    A.   He was not, unless -- I mean,
22 the room was locked, but he was there when
23 the laboratory technicians were there.
24    Q.   Mr. Li had a key to that, to the
25 premises, right?

Page 142

1    A.   No. We are two -- there are two
2 different test equipment. Rat has cats on
3 chamber A and B and mice have cats on
4 chamber A and B, because if we put them in
5 one chamber, the rats will be eaten by the
6 rats -- the mice will be eaten by the
7 rats. Rat is more vicious and they are
8 much bigger size. So you could see -- you
9 don't see mice and rat together in one
10 picture.
11    Q.   Do you see other pictures here
12 depicting the separate devices used?
13    A.   From 000094, you could see there
14 are multiple chambers. And then you could
15 see from the same page, 0094, you could
16 see these four pictures are for the black
17 rat. And the next page, you can only see
18 white. So these are separate testing
19 chambers for the mice. So they are
20 testing different chambers.
21    Q.   What was the species of rats
22 used in this experiment?
23    A.   I don't know the species.
24 Depends on the season, what we can get.
25    Q.   Is it helpful to know this was

Page 144

1    A.   I'm sorry?
2    Q.   Mr. Li, Mr. Li had access to the
3 premises?
4    A.   Yes.
5    Q.   Referring to Exhibit 18, this
6 was a test of rats and mice, correct?
7    A.   Yes. They have separate reports
8 for other pests.
9    Q.   Were the rats and mice tested
10 together?
11    A.   Different chambers. The rats
12 eat mice.
13    Q.   So one of them was in chamber A,
14 one of them was in chamber B?
15    A.   I'm sorry, they all say chamber
16 one and chamber B, because chamber one
17 they are connected with a curve tunnel,
18 but they are in different chambers.
19    Q.   I am just trying to understand.
20 So let's say the rats might have been in
21 chamber A and the mice might have been in
22 chamber B --
23    A.   No.
24    Q.   -- and they were connected with
25 the tunnel?

Page 143

1 conducted in May?
2    A.   No. Actually, it was conducted
3 in April.
4    Q.   Excuse me.
5    A.   Testing from April 7th to
6 April 18th.
7    Q.   Okay.
8    A.   And they issue a report in May.
9    Q.   Do you know what species of rats
10 were used?
11    A.   No, I don't.
12    Q.   Can you please turn to page 91?
13    A.   (Complying.) Yes.
14    Q.   Now, to be clear, this page
15 depicts observations of the quantity of
16 rats in chamber A and chamber B throughout
17 the test, correct?
18    A.   Correct.
19    Q.   This test ran seven days with
20 two days of preliminary testing and two
21 days of post testing, correct?
22    A.   Total eleven days, correct.
23    Q.   Right, total of eleven days,
24 thank you.
25          And at the outset of this

Page 145

37 (Pages 142 - 145)

D. Feuerstein

1 experiment, the rats were divided 50/50?
2     A.   Yes.
3     Q.   Right, between the two chambers?
4     A.   Correct.
5     Q.   And then how much time passed
6 between when the experiment was set up and
7 10:30 a.m. on April 8th?
8     A.   Sorry, can you rephrase the
9 question again?
10    Q.   Sure. How much time passed in
11 between when this experiment was set up
12 and 10:30 a.m. on April 8th?
13    A.   You mean how -- when did we set
14 up the thing until they actually began the
15 testing on April 8th?
16    Q.   Well, so April 8th, there are
17 some figures here where they observed,
18 right, the amount of rats in each chamber
19 and the amount of food that was consumed
20 in each chamber, right?
21    A.   Yes.
22    Q.   So how much time passed in
23 between when the rats were placed in the
24 chamber, and when this first reading was
25 taken?

Page 146

1     A.   I -- I assume either the day
2 before or a couple hours -- any way -- no.
3 Because normally we put the mice and rat
4 inside when they are there, so I don't
5 know what time do they arrive on the day.
6     Q.   Okay.
7     A.   Yes.
8     Q.   So you are not sure how much
9 time passed?
10    A.   I'm not sure, but we did it with
11 the supervision of the technician.
12    Q.   So we are not sure how much time
13 passed but in between the time it was set
14 up -- all right, so if there were -- it
15 appears that there were, I guess, a total
16 of twenty-four rats.
17    A.   Yeah.
18    Q.   Right? Then we see that -- we
19 see that on April 8th, several of the rats
20 moved from chamber A to chamber B and then
21 April 9th, even more rats moved such that
22 there were twice as many rats in chamber B
23 as there were in chamber A, right?
24    A.   Right, yes.
25    Q.   Do you have any understanding of

Page 147

1 why that might have happened?
2     A.   No. April 8th and April 9th,
3 the ultrasonic pest repeller was not
4 turned on, so they are just roaming freely
5 into chamber A and chamber B for no
6 reason.
7     Q.   So there is no explanation for
8 why one chamber had doubled the amount?
9     A.   No. We put the same amount of
10 the food in chamber A and chamber B, so
11 that just -- there's no reason. They have
12 no ultrasonic and we just record it.
13    Q.   Okay.
14    A.   Mm-hm.
15    Q.   So you would agree that the fact
16 that there were seven more rats in chamber
17 B on April 9th than there were on chamber
18 A, nothing can be read into that, correct?
19    A.   Nothing, yeah.
20    Q.   And let me ask you something.
21 What if we had started with a hundred rats
22 or two hundred? Let's say we started with
23 two hundred rats. And at this point,
24 there were also twice as many in chamber B
25 than there were in chamber A.

Page 148

1     Would that have suggested
2 anything to you?
3          MR. WING:   Object to form.
4     A.   No. No, I think it's just the
5 nature of the activity of the pest.
6     Q.   Where they can roam freely and
7 where they end up might be a matter of
8 coincidence?
9     A.   Yes.
10    Q.   How would you be able to
11 establish that the movement of a rat was
12 not due to coincidence or roaming freely?
13 Would there be a certain number of rats
14 you would need? Would there be a certain
15 amount of repetitions? What would you
16 need to show that it was not a coincidence
17 that rats moved from one chamber to
18 another?
19          MR. WING:   Object to form.
20    A.   I'm sorry, I don't know how to
21 answer the question.
22    Q.   Sure. So I believe you
23 testified that the fact that many rats
24 moved from chamber A to chamber B before
25 the devices were on, that was a matter of

Page 149

38 (Pages 146 - 149)

D. Feuerstein

1 coincidence, right?
2   A.   Yes.
3   Q.   So we have established that rats
4 can move from chamber to chamber --
5   A.   Yes.
6   Q.   -- by their own fruition, right?
7   A.   Correct.
8   Q.   So how can we -- if we are
9 looking at an experiment that tracks the
10 movement of rats, how can we establish
11 that their movement was due to anything
12 but coincidence?
13         MR. WING: Object to form.
14   A.   Because we have -- we run so
15 many tests all through the years and we
16 make sure both chambers have equal
17 condition, equal size, equal food and
18 water. And you see, it's varying, you
19 know, it's varying every test the number
20 of the rats and mice or the other pests in
21 the chambers. So you could see the
22 result, it vary, you know, at the
23 beginning, before the influence of the
24 ultrasonic. So we can see the pet and
25 that it moved for no reason, you know.

Page 150

1   Q.   So if there had before -- let's
2 say you had waited an extra day and there
3 were zero rats in chamber A and twenty in
4 chamber B, would you have been able to
5 read into that?
6         MR. WING: Object to form.
7   A.   Even with that, I still believe
8 that's just the nature of the pest.
9 There's no -- any time there is no -- we
10 make sure both chambers have the equal
11 condition so they just move. They're
12 pests. They just move for no reason.
13   Q.   Would you agree one way to
14 eliminate that element of coincidence
15 would be to use a larger sample size?
16         MR. WING: Object to form.
17   A.   That I cannot answer. I don't
18 know.
19   Q.   Why can't you answer?
20   A.   You mean the bigger size of the
21 pest number?
22   Q.   Yes.
23   A.   I assume the result would be the
24 same. It's just -- they just move, you
25 know. They -- because run so many test,

Page 151

1 we don't see any particular reason
2 before -- before we turned on the
3 ultrasonic, because the number can be
4 varied; can be more, can be less in
5 chamber B.
6   Q.   So it appears that rats were
7 added midway through this experiment; is
8 that correct?
9   A.   Let me see. Yes.
10   Q.   Where had these new rats been
11 prior to the time they were added?
12   A.   We were keeping them separately
13 because we always know that -- we always
14 knew that some pests might die during the
15 course of the testing, so we always have
16 extra pest stand by in case some pest die
17 we have to add more.
18   Q.   They were stored someplace
19 outside the chambers, outside the
20 experiment?
21   A.   Outside the chamber, yes.
22   Q.   So they came in during the
23 middle of the test; they had not been
24 present for the pre conditioning period,
25 correct?

Page 152

1   A.   Correct, yes.
2   Q.   Where were they placed when they
3 were added?
4   A.   I think it's a separate room in
5 the building.
6   Q.   No, when they were added to the
7 experiment, where in the device were they
8 added? Were they put in chamber A? Were
9 they put in chamber B? Were they put in
10 the middle?
11   A.   That, I don't know. I have
12 to -- I think -- nobody was under the
13 supervision of the lab technician.
14   Q.   But -- okay, but --
15   A.   I do not know --
16   Q.   -- based on this, you don't know
17 how --
18   A.   I don't know, because I wasn't
19 there. But, you know, with this
20 laboratory, ethical and their independency
21 is very important, so I'm sure we don't
22 want do anything to -- to interfere with
23 the test.
24   Q.   Now, if you look at the amounts
25 of food and water consumed in chamber A,

Page 153

39 (Pages 150 - 153)

D. Feuerstein

1 there was food and water consumed even on
2 days when zero rats were observed,
3 correct? So for instance on day four and
4 five?
5     A.    Could be. They might come in,
6 eat and leave.
7     Q.    So would you agree that this
8 shows that they did come into chamber A on
9 those dates to eat food; they were just
10 not observed at that time?
11    A.    Right. Might be. Might be.
12 But you see, on this particular test, one
13 rat remain in chamber A. So maybe he eat
14 that food. And you see the quantity is
15 much less in the other chamber. I'm not
16 sure that that particular rat ate that
17 food or some other rat came in, but...
18    Q.    I'm sorry, so you think it's
19 possible that another animal could have
20 come into the test from outside the test
21 to eat it?
22    A.    You mean from chamber B? They
23 might come in and if they eat and they run
24 fast and they go back --
25    Q.    But it's clear they had to enter

Page 154

1 chamber A in order to get the food, right?
2     A.    They have the access to both.
3 They are free to move during the whole
4 testing.
5     Q.    Do you know if the frequency of
6 the device was tested during the course of
7 this test?
8     A.    Yes.
9     Q.    Do you know if that is reflected
10 anywhere in the document?
11    A.    Some document, yes, mention the
12 frequency. Some test reports don't
13 mention. For this one, they do not
14 mention.
15    Q.    What was the floor of the
16 chamber made of?
17    A.    Clear acrylic. Very thick
18 acrylic.
19    Q.    Why was that selected?
20    A.    Number one, it's durable.
21 Number two, we need to see through the
22 chamber to see the pest activity.
23    Q.    And it was acrylic, the floor
24 was acrylic for all the tests, to your
25 knowledge?

Page 155

1     A.    The whole chamber, whole
2 dimension is made clear acrylic, maybe
3 about two inches thick.
4     Q.    And if you could just briefly go
5 to page 92 with the mice.
6     A.    (Complying.) Yes.
7     Q.    I don't want to belabor this
8 point.
9         On April 9th, it looks like
10 there were thirteen mice in chamber B and
11 five in chamber A.
12        Do you think that was the result
13 of a coincidence?
14    A.    Yes.
15    Q.    So disparate numbers could
16 happen just because, right?
17    A.    Yes.
18    Q.    At no time during this
19 experiment was the repeller placed in
20 chamber B, correct?
21    A.    No time.
22    Q.    There was no separate experiment
23 run with the repeller in chamber B, right?
24    A.    No.
25        MR. KOPEL: Let's take a

Page 156

1 quick break, please.
2         THE VIDEOGRAPHER: We are now
3 going off the record at,
4 approximately, 2:34 p.m.
5         (Whereupon, a recess was
6 taken at this time.)
7         THE VIDEOGRAPHER: This is
8 the beginning of file number four. We
9 are going back on the record,
10 approximately, 2:49 p.m.
11 BY MR. KOPEL:
12    Q.    Ms. Fuerstein, I think you said
13 all the chambers on all of the tests run
14 were made of acrylic; is that correct?
15    A.    Yes.
16    Q.    Was there furniture in any of
17 the tests run?
18    A.    Sorry?
19    Q.    Was there furniture in the
20 chambers in any of the tests run?
21    A.    No, no.
22    Q.    And there wasn't any carpeting
23 or anything of that sort in the tests,
24 right?
25    A.    No.

Page 157

40 (Pages 154 - 157)