## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOANNE HART and SANDRA BUENO, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>BHH, LLC d/b/a BELL + HOWELL, and VAN HAUSER, LLC,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. 1:15-cv-04804-WHP<br><br>JUDGE WILLIAM H. PAULEY<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO PRECLUDE THE EXPERT TESTIMONY OF PLAINTIFFS' PROFFERED EXPERT WITNESS, MICHAEL F. POTTER** |

**TABLE OF CONTENTS**
**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO**
**PRECLUDE THE EXPERT TESTIMONY OF PLAINTIFFS' PROFFERED EXPERT**
**MICHAEL F. POTTER**

Introduction..................................................................................................1

Argument......................................................................................................3

I.     The Articles Relied on by Dr. Potter are Nonscientific, Unreliable
       and Irrelevant as They Concern Different Devices Examined Under
       Different Conditions and Usages..........................................................5

II.    Dr. Potter's Opinions Merely "Parrot" the Opinions of the Authors
       of the Articles He Relied On,,,,,,,,,,,,...............................................10

III.   The Tests Performed by Plaintiffs are Also Nonscientific, Unreliable
       and Irrelevant as They Were Performed in Direct Violation of the
       Devices' Instructions, Intended Use, and Stated Claims of
       Efficacy..............................................................................................11

IV.    Dr. Potter's Opinions Merely "Parrot" Conclusions from the Tests
       Developed and Conducted by Plaintiffs by Non-Disclosed Experts in this
       Case....................................................................................................17

Conclusion...................................................................................................21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amorgianos v. Amtrak,* 303 F.3d 256 (2d Cir. 2002)..........................................................9

*Beyer v. Anchor Insulation Co.,* 238 F. Supp. 3d 270 (D. Conn. 2017)...........................20,21

*Bouygues Telecom, S.A. v. Tekelec,* 472 F.Supp.2d 722 (E.D. N.C. 2007)............................10

*Daubert v. Merill Dow Pharmaceuticals, Inc.,* 293 U.S. 579 (1993)....................................1

*Galoski v. Stanley Black & Decker, Inc.,* 2017 U.S. Dist. LEXIS 80486 (N.D. Ohio 2017)..................................................................................................... 3,5,8,9,16

*General Electric Co. v. Joiner,* 522 U.S. 136 (1997)..................................................9,10

*Lee Valley Tools, Ltd. v. Indus. Blade Co.,* 288 F.R.D. 254 (W.D.N.Y. 2013).......................17

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558 (S.D.N.Y. 2007)........19

*Member Servs. V. Sec. Mut. Life Ins. Co.,* 2010 U.S. Dist. LEXIS 103776 (N.D.N.Y. 2010).....21

*Quiles v. Bradford-White Corp.,* 2012 U.S. Dist. LEXIS 54662 (N.D.N.Y. 2012)................4,10

*Steigerwald v. BHH, LLC,* 2016 U.S. Dist. LEXIS 164308 (N.D. Ohio 2016)...............5,9,14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOANNE HART and SANDRA BUENO, | ) | |
| on behalf of themselves and all others | ) | CASE NO. 1:15-cv-04804-WHP |
| similarly situated, | ) | |
| | ) | JUDGE WILLIAM H. PAULEY |
| Plaintiffs, | ) | |
| | ) | **DEFENDANTS' MEMORANDUM** |
| v. | ) | **OF LAW IN SUPPORT OF THEIR** |
| | ) | **MOTION TO PRECLUDE THE** |
| BHH, LLC d/b/a BELL + HOWELL, | ) | **EXPERT TESTIMONY OF** |
| and VAN HAUSER, LLC, | ) | **PLAINTIFFS' PROFFERED EXPERT** |
| | ) | **WITNESS, MICHAEL F. POTTER** |
| Defendants. | ) | |

NOW COME Defendants, BHH, LLC d/b/a BELL + HOWELL, and VAN HAUSER, LLC, by and through their counsel, LEAHY, EISENBERG, AND FRAENKEL, LTD., and for their Memorandum of Law in Support of their Motion to Preclude the Expert Testimony of Plaintiffs' Proffered Expert Witness, Michael F. Potter, pursuant to Federal Rule of Civil Procedure 702, state as follows:

### INTRODUCTION

Plaintiffs have proffered Dr. Michael F. Potter to provide opinion testimony as to the ineffectiveness of the Bell+Howell Ultrasonic Pest Repellers. Dr. Potter's testimony should be excluded because his opinions fail to meet the standards for admissibility of expert testimony as set forth in *Daubert v. Merill Dow Pharmaceuticals, Inc.*, 293 U.S. 579 (1993). His opinions will not assist the trier of fact because the opinions are based on unreliable principles and methods. *See, Daubert*, at 590-593. The articles and tests Dr. Potter relies on do not address the efficacy of the Bell+Howell Ultrasonic Pest Repellers when put to their intended use. Thus, they do not relate to the facts in the case and will be unhelpful and confusing to a jury. *See, Daubert*, at 590-593.

1

Dr. Potter's opinions are based on two items:

1) Articles written by others which concern devices different than the Bell+Howell Ultrasonic Pest Repellers and tested against different, sometimes unknown, usages and claims of efficacy; and

2) Tests of the Bell+Howell Ultrasonic Pest Repellers designed, conducted, and interpreted by others, in violation of the device's instructions and intended uses.

In both cases, Dr. Potter's opinions merely "parrot" those of others in an attempt by Plaintiffs to make Dr. Potter the "mouthpiece" for the testimony of non-testifying experts. Even more egregious, Plaintiffs have thwarted Defendants' attempts to properly challenge Dr. Potter's testimony. Specifically, Plaintiffs have withheld from Defendants the articles Dr. Potter allegedly relied on until after Dr. Potter's deposition despite Defendants' requests. Plaintiffs have also prevented Defendants' access to the individuals whose opinions Dr. Potter adopts as his own by declaring them "non-testifying expert consultants." Thus, Defendants have been deprived of an opportunity to properly challenge the methods and results of these articles and tests relied on by Dr. Potter because the information, data and the individuals underlying them have been shielded from cross-examination.

Apart from the above criticisms, and Dr. Potter's mere "parroting" of the opinions of others, the articles and testing Dr. Potter bases his opinions on, are nonscientific, unreliable, and irrelevant. The articles do not mention, involve or relate to the Bell+Howell Ultrasonic Pest Repellers. Instead, the articles concern different products with different usages and different claims of efficacy. None of the articles tested the Bell+Howell Ultrasonic Pest Repeller. Many of the articles involved testing the claims of manufacturers that the devices

2

could rid a dwelling of a pest infestation (not the Bell+Howell claim), and the articles often involved testing for industrial/warehouse use. Remarkably, several of the articles cited by Dr. Potter were authored by Roger Gold, whose prior studies and expert testimony has been excluded under *Daubert* because Gold's studies and other studies Gold relied on suffered from the same flaws as those relied on by Plaintiffs in this case. *See, Galoski v. Stanley Black & Decker, Inc.,* 2017 U.S. Dist. LEXIS 80486, at P5-11 (N.D. Ohio 2017).

Further, the tests conducted by Plaintiffs on the Bell+Howell Ultrasonic Pest Repellers, and relied on by Dr. Potter in forming his opinions, were also nonscientific, unreliable, and irrelevant. The tests were designed and conducted in direct violation of the devices' instructions, intended use, and stated claims of efficacy. The entirety of Dr. Potter's opinions are offered to refute claims regarding the efficacy of the Bell+Howell repellers to perform in a manner <u>not</u> intended by Bell+Howell and never claimed on the product's packaging. For instance, the Bell+Howell devices specifically and expressly state that the sound waves cannot reach behind walls and under floors. Yet, Plaintiffs' testing provided pests with harborages, bait stations and other protection from the ultrasonic sound waves. Thus, Plaintiffs' testing is unrelated to the issues in this case because the testing was not conducted in accordance with the device's user instructions. As such, Dr. Potter's testimony in this regard is unreliable, irrelevant, and will only serve to confuse the jury. Accordingly, this Court should exclude Dr. Potter's testimony in its entirety, or in the alternative, those portions that are irrelevant and nonscientific.

## ARGUMENT

Dr. Potter's opinions are based on decades-old articles that were authored by others and which concern devices different from the Bell+Howell Ultrasonic Pest Repellers under

different, sometimes unknown, conditions and usages; and on Plaintiff-commissioned tests, designed and conducted by others, in violation of the device's instructions and intended uses. In both cases, Dr. Potter merely "parrots" the opinions of others and does not add independent analysis or conclusions. *See, Quiles v. Bradford-White Corp.*, 2012 U.S. Dist. LEXIS 54662, P.25-26 (N.D.N.Y. 2012). Further, Plaintiffs' clear attempts to utilize Dr. Potter as a "mouthpiece" for the opinions of others is even more egregious when considering Plaintiffs' repeated efforts to thwart Defendants' attempts to obtain documents and information that go to the core of Dr. Potter's bases for his supposed opinions.

For instance, the articles allegedly relied on by Dr. Potter were not in Dr. Potter's file produced to Defendants pursuant to a subpoena of Dr. Potter's file. According to Dr. Potter, his entire file was produced except for privileged material. *See Exhibit A,* Deposition of Dr. Michael Potter ("Potter Deposition"), at 39:9-13. Subsequently, Dr. Potter testified that not all of the articles were part of his file. *See,* Potter Deposition, at 45:25-46:13. Dr. Potter also testified that the articles were given to Plaintiffs' counsel. *See,* Potter Deposition, at 152:15-20. Since the articles were not part of Dr. Potter's file, it is apparent that Dr. Potter did not actually read the articles, and, therefore, the articles cannot form the basis for any opinions. To date, neither Dr. Potter nor Plaintiffs have produced all of the articles cited by Dr. Potter. Instead, Plaintiffs' counsel "produced" select articles as exhibits to the depositions of Defendants' experts. Similarly, Plaintiffs have prevented Defendants from examining Dr. Potter's reliance on Plaintiff-commissioned tests conducted by other, non-testifying experts.

Ultimately, the articles (authored by others) and Plaintiffs' tests (conducted by others) allegedly relied on by Dr. Potter are unreliable and inadmissible under *Daubert*. The decades-old articles concern different products than the Bell+Howell repellers, and the tests performed

by Plaintiffs were designed and conducted in direct violation of the device's instructions, intended use, and stated claims of efficacy.

**I.     The articles relied on by Dr. Potter are nonscientific, unreliable and irrelevant as they concern different devices examined under different conditions and usages.**

The articles relied upon by Dr. Potter are nonscientific, unreliable and irrelevant to the instant case. None of the articles tested, reference or pertain to the Bell+Howell Ultrasonic Pest Repellers. The articles pertain to different devices examined under different conditions and tested against different usages and claims of efficacy which are irrelevant to the Bell+Howell devices. Some of these articles tested devices not based on ultrasonic technology, without a control or replication, that prevented the pests from escape, involved pests not claimed by Bell+Howell to be repelled by their device, and in some cases even showed that the devices had an effect on the pests.

The gist of Dr. Potter's opinion is that the Bell+Howell devices are ineffective because the authors of these articles determined that other, different devices were ineffective. *See Exhibit B,* Expert Report of Dr. Michael Potter ("Potter Report"), at ¶54. Such reasoning is unreliable, flawed and very unscientific. Expert testimony which relied on certain of these, and similar articles has already been excluded by two Federal District Courts. *See, Steigerwald v. BHH, LLC,* 2016 U.S. Dist. LEXIS 164308, at P5 (N.D. Ohio 2016). *See also, Galoski v. Stanley Black & Decker, Inc.,* 2017 U.S. Dist. LEXIS 80486, at P6-8 (N.D. Ohio 2017) (excluding expert testimony that relied on studies of ultrasonic pest repellers that, in some cases, "were not even ultrasonic devices," were not "in a situation that allowed the pests an escape from the effects of the device," and "did not have a control, and others had no replications").

It is undisputed that these articles do not reference or involve the Bell+Howell Ultrasonic Pest Repellers. *See,* Potter Deposition, at 143:19-22.  In referencing the articles, Dr. Potter ignores the differences in the physical properties of the devices, such as speaker size, number of speakers, device casing, etc. Dr. Potter conveniently dismisses these characteristics as being "largely immaterial." Potter Deposition, at 152:8-9. Dr. Potter's reliance on these decades-old articles also fails to acknowledge the general advancements in technology occurring over the 30-40 year period spanning these articles. Indeed, some of the articles concede that, over time, advancements in ultrasonics may improve the efficacy of the devices. *See Exhibit C-1,* Meehan, A.P., *Rats and Mice: Their Biology and Control,* Rentokil Library Series (1984). P. 267 (stating in 1984, "there is a possibility that a successful device will eventually be produced"). *See also Exhibit C-2,* Sprock, *et al.*, *Sound as a Deterrent to Rats and Mice,* 31 J. Wildlife Mgmt. 729, 739 (1967).

Even accepting that frequency, amplitude and variability are the only physical characteristics from which one can compare devices, none of the articles cited by Dr. Potter, as presented in the table on page 29 of his report, tested devices exactly within the frequency and amplitude range of the Bell+Howell device. *See,* Potter Report, table p. 29. Each of the articles, where the physical characteristics of the devices tested was even available, tested devices with frequency and/or amplitude that ranged above, below, or both when compared with the Bell+Howell repeller. For example, the devices tested by *Koehler, et al. (1986)* had a frequency as low as 17 and as high as 71 kHz and amplitude as low as 51 and as high as 103 dB, both well below and above the ranges that the Bell+Howell repeller operates within (36-40 kHz and 88-99 dB respectively). Further, no specific information is provided as to the variability of the various devices tested in the articles, particularly the intervals between sound

waves, beyond a determination of whether the device was or wasn't variable. Finally, Dr. Potter admitted that whether an "apples to apples" comparison of amplitude can be done is dependent on the distance at which the devices are tested, and some of the articles tested devices at distances "either further away or at varying distances away" in comparison to the Bell+Howell amplitude testing. *See,* Potter Deposition 146:6-14 and 147:15-18.

Additionally, many of the articles tested ultrasonic devices, again not the Bell+Howell devices, against claims not made by the Bell+Howell product packaging and for usages not intended by the Bell+Howell device. For example, several articles explained the claims they were evaluating were whether the device "will rid the premises of rats and mice," and "will kill, or disrupt the behavior of rats and mice thus clearing buildings of an infestation." *See Exhibit C-3,* Howard & Marsh, *Ultrasonics and electromagnetic control of rodents,* 173 Acta Zool. Fennica 187, 187 (1985); and Meehan (1984), at 267. One study even evaluated a manufacturer's claim that "ultrasound can penetrate voids to control pests," a claim explicitly contradicted by the Bell+Howell product packaging. *See Exhibit C-4,* Koehler, *et al., Efficacy of Ultrasound for German Cockroach (Orthoptera: Blattellidae) and Oriental Rat Flea (Siphonoptera: Pulicidae) Control,* 79 J. Econ. Entomol. 1027, 1030-1031 (1986).

Equally irrelevant, some articles involved testing the effectiveness of devices in areas far larger than recommended by the Bell+Howell product packaging, including "warehouse conditions" and "industrial situations." *See Exhibit C-5,* Lavoie & Glahn, *Ultrasound as a Deterrent to Rattus Norvegicus,* 13 J. Stored Prod. Res. 23, 23 (1977); and Howard & Marsh. (1985), at 188. In testing these devices in impractical situations and conditions, Howard & Marsh recognized that "[w]hat is needed is research designed to identify those limited situations where ultrasonic devices can be used advantageously and practically to reduce rodent

problems, even if it is only a reduction in the rate of reinvasion." Howard & Marsh (1985), at 188.

Finally, Dr. Potter relies on several articles authored by Dr. Roger Gold, whose own studies and reliance on studies of others, much like Dr. Potter attempts to do here, has been excluded as expert testimony. *See, Galoski v. Stanley Black & Decker, Inc.,* 2017 U.S. Dist. LEXIS 80486, at P5 (N.D. Ohio 2017) ("Dr. Gold's opinion on the products ability to drive out pests does not appear to be scientifically valid and his reasoning and methodology cannot be properly applied to the facts at issue in this case"). The court pointed out that Dr. Gold's studies showed that cockroaches moved away from the device, which "certainly does not prove that [the device] had no deterrent effect." *Id.,* at P8. Similarly, other articles relied on by Dr. Potter demonstrate that ultrasonic sounds can have a deterrent effect on pests. *See,* Howard & Marsh (1985), at 187 ("ultrasound provided some repellency to rodents" and "strategically placed ultrasound devices may prevent or reduce invasion by freemoving rodents of premises with few entry points"); Sprock, *et al.* (1967), at 739 ("It is possible, however, that high-intensity ultrasonic tweeters installed within a few feet of a small opening will to some extent deter rats and mice from passing through the opening"); Meehan, A.P. (1984), at 265-66 ("Strategically placed devices may reduce entry to a building").

Results supporting the repellant effects of ultrasound were not limited to articles testing the effectiveness of ultrasound against rodents, as several of the articles cited by Dr. Potter also found deterrent effects of ultrasound on insects. *See Exhibit C-6,* Ahmad, *et al., Responses of mosquitoes and German cockroaches to ultrasound emitted from a random ultrasonic generating device.* 123 Entomologica Experimentalis Applicata 25, 31-32 (2007) ("In the paired tests with KSU ultrasound device after the device was turned on (active), the

number of cockroaches in the chambers with active ultrasound device were lower than that found in the chambers with the inactive device throughout the first 3-day test period" and "the results of the first experiment indicated that cockroaches responded to ultrasound"); *Exhibit C-7*, Huang, *et al., Laboratory and Field Trials with Commercial Ultrasonic Devices Against Three Ant Species (Hymenoptera: Formicidae)*, 19(1) J. Agric. Urb. Entomol. 25, 26 (2002) ("Device C may have initially repelled the workers in trial 3").

   "When an expert opinion is based on data, a methodology, or articles that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Amtrak,* 303 F.3d 256, 266 (2nd Cir. 2002). *See also, General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997) (Where studies relied on by an expert are so dissimilar to the facts in the instant litigation, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"). Indeed, expert testimony has been excluded on the basis that articles relied on by the expert to support the position that Bell+Howell repellers are ineffective did not involve the Bell+Howell device, nor could the devices that were tested be identified. *See, Steigerwald v. BHH, LLC,* 2016 U.S. Dist. LEXIS 164308, at P10 (N.D. Ohio 2016). *See also, Galoski v. Stanley Black & Decker, Inc.,* 2017 U.S. Dist. LEXIS 80486, at P7 (N.D. Ohio 2017) (excluding expert testimony that relied on studies of ultrasonic pest repellers not at issue in the litigation because the studies tested devices that were not "identically the same" even where frequency and decibels were "not unlike" the repeller at issue, and notably the devices tested in the studies had "a different frequency peak kilohertz range" than the device at issue). For all of the foregoing reasons, Dr. Potter's testimony regarding the various articles cited in his report should be excluded.

**II.     Dr. Potter's opinions merely "parrot" the opinions of the authors of the articles he relied on**

In his report, Dr. Potter cites several articles on the efficacy of ultrasonic sound at repelling pests, but when Defendants requested Dr. Potter's file in advance of his deposition, only two articles were produced. It was not until after Dr. Potter's deposition that Plaintiffs' counsel finally produced several more, but still not all of, the articles. Even now, Plaintiffs have failed to produce all of the articles cited in Dr. Potter's report. Without access to the authors of these articles to examine the validity of their findings, Dr. Potter's mere recitation of the findings is inadmissible. *See, Quiles,* at 26 ("An expert cannot simply parrot the findings of another arrived at in another context...To allow otherwise would deprive the opposing party of the opportunity to cross examine the expert on the basis for the nontestifying expert's opinion.") (citing *Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558 (S.D.N.Y. 2007)).

By simply aggregating the opinions of the authors of the articles, Dr. Potter fails to exercise independent analysis or expertise beyond an *ipse dixit* recitation of the existing data in those articles. *See, General Electric Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by *ipse dixit* of the expert."). Dr. Potter confirmed the extent of his "analysis" during his deposition. "There's a lot of details in [the publications listed in appendix 6 of the Potter report] that are pertinent to this case which I basically tried to summarize in my reports." *See,* Potter Deposition, at 45:16-18. *See also,* Potter Deposition, at 143:11-18 and at 192:25-193:2. As the gatekeeper under *Daubert*, courts must ensure that an expert does not merely "parrot" the expert opinions of others. *See,*

*Bouygues Telecom, S.A. v. Tekelec,* 472 F.Supp.2d 722, 729 (E.D. N.C. 2007).

**III.    The tests performed by Plaintiffs are also nonscientific, unreliable and irrelevant as they were performed in direct violation of the devices' instructions, intended use, and stated claims of efficacy.**

The tests Plaintiffs commissioned, and which Dr. Potter relied on, are flawed and unreliable and should be excluded. Plaintiffs' tests, which Dr. Potter relies on, were conducted in violation of the device's stated instructions and intended uses. The tests conducted by Plaintiffs concern the device's ability to repel and drive pests out from behind walls and underneath floors, a claim <u>not</u> at issue in this case. Thus, the tests conducted by Plaintiffs do not pertain to the issues in the case, but instead attempt to rewrite the actual claims made on the product packaging with a so-called "real world" claim. The packaging for the Bell+Howell Ultrasonic Pest Repeller clearly states, "[u]ltrasonic signals cannot reach nesting or feeding places behind walls, under floors, or within cracks." *See Exhibit D,* Bell+Howell Packaging and Owner's Manual. Yet, Plaintiffs' tests provided the pests with harborages and other areas of protection from the ultrasonic sound waves, contrary to Bell+Howell instructions.

> **Q.    In the Sierra testing there were bait stations that were utilized, correct?**
>
> **A.    Correct. Harborages, an empty bait station with a nest and cardboard box over it.**

Potter Deposition, at 88:13-18.

> **Q.    The Bell & Howell instructions that you reviewed in this case do not mention providing harborages to pests, correct?**
>
> **A.    Correct.**

Potter Deposition, at 90:14-17.

Dr. Potter knew that the harborages and bait stations provided to the pests acted as a protective barrier to the device's sound waves.

> Q.   Was there any testing done that you know of to determine the impact of the cardboard boxes to act as a barrier of the ultrasonic waves?
>
> A.   Not other than it's been known for many years that ultrasound does not penetrate solid objects.

Potter Deposition, at 102:7-13.

> Q.   But I take it from what Dr. Mankin did, you would expect that the cardboard boxes would act as a barrier to ultrasonic sound waves, fair?
>
> A.   I would, yes.

Potter Deposition, at 104:8-12.

> Q.   I take it though based on what Dr. Mankin did, you would expect that the bait stations would act as a barrier to the Bell & Howell ultrasonic waves, fair?
>
> A.   If they were in direct line with the device, yes.

Potter Deposition, at 104:22-105:3.

> Q.   The ultrasonic waves of the Bell & Howell device could not penetrate that wood cabinet, would you agree with me?
>
> A.   Correct, if they were not oriented directly into the opening.

Potter Deposition, at 111:2-6.

The Bell+Howell Ultrasonic Pest Repeller owner's manual clearly states, "[m]ake sure that all food is put away. The smell of food attracts pests and will decrease the efficiency of the Ultrasonic Pest Repeller." *See,* Bell+Howell Packaging and Owner's Manual. Yet, Plaintiffs' tests provided the pests with food and water, and provided it only in the enclosure/room with the repeller, contrary to Bell+Howell instructions.

> Q.   The Bell & Howell device states that you should make

> certain that all food is put away, correct?
>
> A.   That's what they say on their label.
>
> Q.   The testing that was done by Sierra by placing food and water for mice was contrary to the Bell & Howell usage instructions, correct? Is it yes or no?
>
> A.   I would say that it's contrary to their instructions...

Potter Deposition, at 87:14-24.

Testing the efficacy of the Bell+Howell repeller contrary to its user instructions is unscientific, inappropriate, and irrelevant, and Dr. Potter agrees:

> Q.   Is it fair to say that to determine the effectiveness of the product, the product should be tested in accordance with its intended use?
>
> A.   I would say that's correct.

Potter Deposition, at 67:5-9.

> Q. Sure. In the scientific world would it be inappropriate to test a product contrary to its usage instructions?
>
> A. I would say for the most part yes...

Potter Deposition, at 72:11-15.

> Q. But if you are testing for the effectiveness of a product, you should test that product pursuant to the manufacturer's usage instructions, fair?
>
> A. Yeah, if the manufacturer is paying for the work and specifying it and saying how it should be...generally you want to evaluate a product in the manner that it's intended to be used if it's specified commercial product by the manufacturer so I'll grant you that.

Potter Deposition, at 72:19-73:9.

> Q. I'm coming to it as a lay person.
> A. If there are label instructions specifying the manner in which it should be used, you should attempt to evaluate the product in that fashion.

Potter Deposition, at 73:16-21.

Despite Dr. Potter acknowledging the importance of following product instructions when testing a device, Dr. Potter concedes that the Bell+Howell Ultrasonic Pest Repellers were tested contrary to the product's express use instructions. Any testing that is contrary to the product's instructions is simply unreliable, irrelevant to this case, and will only be confusing to a jury. Indeed, expert testimony has been excluded on the basis that field tests conducted by the expert on the Bell+Howell repellers was contrary to the product's instructions. *See, Steigerwald v. BHH, LLC,* 2016 U.S. Dist. LEXIS 164308, at P24 (N.D. Ohio 2016) (regarding testing repellers outdoors and in the presence of food, both contrary to Bell+Howell instructions, the Court excluded the expert's testimony, stating "[o]n this basis, the Court agrees with defendants that Kaae's tests are flawed and, therefore, unreliable. Further, his testimony would probably mislead rather than assist the trier of fact").

To be clear, the flawed design of the mouse tests was by no means accidental. Dr. Potter confirmed that the tests were designed specifically to test the Bell+Howell repellers in what Plaintiffs and he consider a "real world" setting, even if contrary to the product's instructions. *See,* Potter Deposition, at 81:9-22. Never mind that Dr. Potter is in no way qualified to opine on consumer perceptions of "real world" use of the Bell+Howell repellers, having failed to even review Plaintiffs' depositions or talk to any consumers who purchased Bell+Howell repellers. *See,* Potter Deposition, at 42:11-16; 43:16-19; 180:13-25. Nor is he qualified to testify on the standards companies must abide by in the testing and sale of non-lethal, consumer products. *See,* Potter Deposition, at 25:7-15; 48:3-17. Despite those deficiencies in his qualifications, Dr. Potter clearly believes "real world" means contrary to stated user instructions.

14

> Q. The Bell & Howell devices state that you have to make certain that all food is put away?
>
> A. Yes.
>
> Q. And the Bell & Howell instructions you agree with me state that the efficiency of the device decreases if there is food and water available, correct?
>
> A. They say it on their label.

Potter Deposition, at 82:15-24.

> Q. I just want to know is the placement of food and water for mice in the Sierra study, is that contrary to the Bell & Howell usage instructions, yes or no?
>
> A. The Bell & Howell user instructions are unrealistic and frankly have no influence in my professional opinion on the performance of these products.

Potter Deposition, at 84:10-19. *See also,* Potter Deposition, at 87:19-25.

Based on this flawed test design, mice found in the provided harborage or kitchen cabinets were counted as not repelled, even though they were protected from the ultrasonic effects of the Bell+Howell repellers. *See,* Potter Deposition, at 109:25-110:7; 111:2-6. The tests provided no means for the mice to escape the ultrasonic sounds, except for the provided harborages. Mice found in the hallway connecting the front room where the repeller is located to the back room were also scored as not being repelled, with the rationale being that the hallway was in a direct line from the repeller. Potter Deposition, at 120:24-121:7. The hallway stretched as far as 21' and 24'6" away from the source of the ultrasonic sound, depending on the apartment layout. *See,* Sierra Laboratories Report, P. 7-8. Counting mice found such distances away from the repeller ignores the note on the Bell+Howell packaging which clearly states, "[u]ltrasonic signals lose intensity as it travels." *See,* Bell+Howell Packaging and Owner's Manual. Mice, thus, could have been found in the hallway and been out of the

effective range of the repeller.

> **Q.     If we did calculate mice in the hallway or dead mice as
> being repelled, it would show greater effectiveness of the
> Bell & Howell device, fair?**
>
> **A.     Fair.**

Potter Deposition, at 121:17-21.

Plaintiffs' tests of the Bell+Howell Ultrasonic Pest Repellers on ants, spiders, and cockroaches suffered from many of the same design and methodological flaws as the mouse testing. Ants, spiders, and cockroaches were prevented from escaping the test arenas, food and water was placed in the arena with the repeller only, the pests were acclimated to the arena with the repeller only, and pests who sought refuge from the ultrasonic sounds in harborage or the connecting tube were not counted as repelled. *See Exhibit E*, i2L Research Report. Like the Modesto mouse testing, failing to provide escape and not counting pests that sought shelter from the ultrasonic effects of the device is not scientifically reliable. Indeed, expert testimony on the efficacy of ultrasonic pest repellers at repelling pests has already been excluded because the tests were not conducted "in situations that allowed the pests an escape from the effects of the device." *See, Galoski v. Stanley Black & Decker, Inc.,* 2017 U.S. Dist. LEXIS 80486, at P6-9 (N.D. Ohio 2017) ("However, based on the design of the test, as explained by Dr. Gold, it appears there was no way for them to escape the cube. Entering the pitfall trap was the closest option to exiting that was possible under the design of the experiment"). These deficiencies make Plaintiffs' testing on ants, spiders, and cockroaches equally nonscientific, unreliable and irrelevant.

Most importantly, the tests Plaintiffs commissioned on ants, spiders, cockroaches and mice all suffered from the same improper hypothesis which sought to test whether the

16

Bell+Howell devices repel pests from behind walls, under floors or otherwise from areas of harborage protected from the ultrasonic effects of the repeller. Potter Deposition at 157:4-15. This is not the claim made on the Bell+Howell packaging.

> **Q. Is there anywhere in the Bell & Howell instructions that you recall seeing where it says it will repel pests that are located behind walls or under floors?**
>
> **A. May I look at a copy of the Bell & Howell label?...**
>
> **A. No.**

Potter Deposition at 158:12-159:2.

The fact that the tests' hypothesis was based on a claim not at issue in the lawsuit, and that the tests were conducted contrary to the stated use instructions on the Bell+Howell packaging, makes the tests unreliable and unhelpful to the jury and, therefore, inadmissible under *Daubert*. Accordingly, Dr. Potter's testimony with regard to Plaintiffs-commissioned tests should be excluded.

## IV.   Dr. Potter's opinions merely "parrot" conclusions from tests developed and conducted on behalf of Plaintiffs by non-disclosed experts in this case.

Plaintiffs have engaged several so-called non-testifying, consulting experts to develop test protocols, conduct tests on the Bell+Howell Ultrasonic Pest Repellers, and to draw conclusions on the results of these tests. Despite these experts' significant involvement, Plaintiffs offer only Dr. Potter whose role in protocol design was minimal, who did not conduct the tests and who was not even present for the majority of the testing, and who recites the findings, sometimes verbatim, of these non-testifying experts rather than providing independent opinion. "An expert report that is merely a conduit for the opinion of a non testifying expert must be excluded." *Lee Valley Tools, Ltd. v. Indus. Blade Co.,* 288 F.R.D. 254, 266 (W.D.N.Y. 2013) (citing *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.,* 285 F.3d 609,

613 (7th Cir. 2002)). Defendants' sought access to the non-testifying experts' file materials through subpoena, which Plaintiffs initially objected to based on the consulting privilege. To date, Plaintiffs have produced limited file materials related to these tests, which prevents Defendants from properly examining the actual tests conducted and the actual results purportedly observed.

Perhaps the most egregious example is Plaintiffs' use of Robert Corrigan, a so-called uncompensated, non-testifying expert identified as a "rodentologist" by Dr. Potter. *See,* Potter Deposition 66:17. Corrigan's influence on the Plaintiff-commissioned tests of the Bell + Howell repellers is undeniable.

> **Q.** **Bobby Corrigan, he initially designed the protocol for the testing of the Bell & Howell devices with respect to mice, correct?**
>
> **A.** **Correct.**

Potter Deposition, at 132:15-19.

Yet, Plaintiffs have shielded Defendants' access to Corrigan by claiming he is a non-testifying expert consultant. Instead, Plaintiffs offer Dr. Potter, an entomologist by education and by trade, but who has no educational background in rodents or mammals generally, and who has limited experience dealing with rodent biology and behavior. *See Exhibit F,* Curriculum Vitae of Michael F. Potter. Dr. Potter himself admitted such education and experience is necessary to develop the protocols for testing the effect of ultrasonic pest repellers on a given pest.

> **Q.** **What kind of expertise do you need if any to design the testing of an ultrasonic repellant to determine its efficacy?**
>
> **A.** **...so if we are talking about ultrasonic pest repellers, you would need expertise in the biology and the habits of the pest that it was targeted for...**

Potter Deposition 49:6-16.

It's no wonder Dr. Potter leaned so heavily, nearly exclusively, on Corrigan to design the Modesto mouse test protocols. "Bobby had in his mind, a protocol for evaluating an ultrasonic device...I would say the majority of these words were written by Bobby." Potter Deposition 78:19-25 and 79:1-4. *See also,* Potter Deposition 78:13-17 ("We started with a slightly different iteration of this in keeping rodents out, but this is certainly -- the bulk of this is definitely Bobby Corrigan's words"). Reliance on experts in a different specialization cannot be permitted to mitigate significant deficiencies in an offered expert's qualifications. *See, Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, at 564 (S.D.N.Y. 2007) (citing *Dura Automotive Sys. Of Indiana, Inc. v. CTS Corp.,* 285 F.3d 609, 614 (7th Cir. 2002)).

Apart from relying on other experts for their assistance in protocol design, Dr. Potter did not directly participate in the testing that was conducted on the sound output of the Bell+Howell devices, or the testing on cockroaches, spiders or mice. *See,* Potter Deposition 58:10-13; 61:17-23; 172:4-9. As a result, Dr. Potter was unable to answer important questions such as whether the apartments used for the mouse testing were carpeted.

> **Q. But if the Bell & Howell instructions state that the effectiveness of its product is decreased when there's a barrier such as carpeting, why would you test the effectiveness of the product in an apartment with carpeting?**
>
> **A. First of all, I don't know if there was carpeting in the apartments. That would be a question that Bill Donahue would have to answer...**

Potter Deposition, at 171:9-18.

Dr. Potter admitted that when it came to certain questions, Bill Donahue would be in a

better position to explain the Modesto mouse testing. *See,* Potter Deposition, at 172:4-16. Had Bill Donahue, and the other non-testifying consultant experts, like Robert Corrigan, Timothy Ford, Christine Styer, and Richard Mankin, been made available to Defendants for cross-examination, perhaps some of these important questions could have been answered.

Further, Dr. Potter's report merely summarizes the opinions of the non-testifying experts by paraphrasing, and in some instances taking word-for-word, the conclusions written in the non-testifying experts' reporting. Compare, for example, the Sierra Laboratories report (attached hereto as Exhibit G) authored by Bill Donahue with Dr. Potter's report:

> "Mouse activity was very evident in each of the six test apartments with visual counts, utilization of food, water, nesting material, harborages and with urine in fecal deposits throughout the apartments...The mice were actively moving resources into the "mouse stations" primarily in the front rooms, food and nesting materials were constantly being moved around...Most of the mouse activity was in the front rooms of both the treated and control apartments."

(Sierra Laboratories Report, P. 4)

> "Mice were very active in both treated and untreated (control) apartments as indicated by visual counts, utilization of food, water and nesting materials, and urine and fecal deposits within the unit. Mice were actively moving resources into the nesting/harborage boxes, and food and nesting materials were constantly being moved around. Based on these aggregate observations, most of the activity was in the front rooms of both the treated and control apartments."

(Potter Report, ¶ 46)

Apparently, Dr. Potter's independent analysis consisted of changing the word "mouse stations" to "nesting/harborage boxes." This is but one example of many in Dr. Potter's report where he does not demonstrate independent analysis, but instead improperly passes off the findings of non-testifying experts as his own. *See, Beyer v. Anchor Insulation Co.,* 238 F. Supp. 3d 270, 285-287 (D. Conn. 2017) (excluding expert testimony where, in some places, the expert appeared to repeat a non-testifying expert's findings verbatim without application of

independent judgment). In short, Dr. Potter relies on the work of the non-testifying experts without the independent verification and critical evaluation necessary to ensure he is not merely the mouthpiece for the non-testifying experts. *See, Beyer*, at 285-287. *See also, Member Servs. V. Sec. Mut. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 103776, at P91 (N.D.N.Y. 2010) ("While an expert may rely upon another expert to form an opinion under Rule 703, an expert may not merely recite another expert's opinion as his own").

Despite requests, Defendants' access to the non-testifying experts' file materials has been limited, and even then, provided only under objection. Defendants are unable to cross-examine these individuals who are the true authors behind the expert opinions advanced by Plaintiffs in this case. Thus, the jury will be left with only testimony from Dr. Potter, cross-examination of whom, without independent verification of the non-testifying experts' opinions, is unreliable. Thus, Plaintiffs will have effectively shielded the opinions of the non-testifying experts behind a veneer of credibility of Plaintiffs' testifying expert, Dr. Potter. For these reasons, Dr. Potter's testimony with respect to the i2L and Sierra Laboratories testing should be excluded.

## CONCLUSION

WHEREFORE, Defendants, BHH, LLC d/b/a BELL + HOWELL, and VAN HAUSER, LLC respectfully request that the Court enter an order granting Defendants' Motion to Preclude the Expert Testimony of Plaintiffs' Proffered Expert Witness, Michael F. Potter.

Respectfully submitted,

**E. MISHAN & SONS, INC.**

By:    /s/ Scott Wing
          One of Its Attorneys

Scott Wing
LEAHY, EISENBERG & FRAENKEL, LTD.
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
Tel. (312) 368-4554
***Counsel for BHH, LLC, VAN HAUSER, LLC, and VAN HAUSER, LLC***