**Page 1**

```
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
     ------------------------------------------x
 3   JOANNE HART and AMANDA PARKE, on behalf
     of themselves and all others similarly
 4   situated,
 5                      Plaintiffs,
 6       -against-
 7   BHH, LLC d/b/a BELL & HOWELL, and VAN
     HAUSER, LLC,
 8
                        Defendants.
 9   ------------------------------------------x
10
11                 888 Seventh Avenue
                   New York, New York
12
                   January 9, 2018
13                 9:30 a.m.
14
15        Deposition of DR. MICHAEL POTTER, before
16   Shari Cohen, a Notary Public of the State of New
17   York.
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1   A P P E A R A N C E S:
 2
 3   LEAHY, EISENBERG & FRAENKEL, LTD.
 4   Attorneys for Plaintiffs
 5        33 W. Monroe Street, Suite 1100
 6        Chicago, Illinois  60603
 7   BY:  ROBERT OSTOJIC, ESQ.
 8        PHONE  312-368-4554
 9        EMAIL  ro@lefltd.com
10
11
12   BURSOR & FISHER, P.A.
13   Attorneys for Defendants
14        888 Seventh Avenue
15        New York, New York  10019
16   BY:  YITZCHAK KOPEL, ESQ.
17        PHONE  646-837-7127
18        EMAIL  ykopel@bursor.com
19
20
21   ALSO PRESENT:
22        MICHAEL WEISS, ESQ. - Via Telephone
23        DR. PAUL BORTH - Via Telephone
24        DR. PHIL WHITFORD - Via Telephone
25
```

**Page 3**

```
 1   ------------------ I N D E X ------------------
 2   WITNESS               EXAMINATION BY        PAGE
 3   MICHAEL POTTER        MR. OSTOJIC              5
 4
 5
 6   ---------------- E X H I B I T S --------------
 7   EXHIBIT       DESCRIPTION             FOR I.D.
 8   Exhibit 1     Expert Report of Dr.           9
 9                 Michael Potter
10   Exhibit 2     Rebuttal Report of Dr.        10
11                 Michael Potter
12   Exhibit 3     Documents                     64
13   Exhibit 4     Documents                    137
14   Exhibit 5     Document                     201
15
16
17             (EXHIBITS TO BE PRODUCED)
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                S T I P U L A T I O N S
 2
 3        IT IS HEREBY STIPULATED AND AGREED by
 4   and between the attorneys for the respective
 5   parties herein, that the filing, and sealing
 6   of the within deposition be waived.
 7        IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form of
 9   the question, shall be reserved to the time
10   of the trial.
11        IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn to
13   and signed before any officer authorized to
14   administer an oath with the same force and
15   effect as if signed and sworn to before the
16   Court.
17
18
19                      -oOo-
20
21
22
23
24
25
```



1   M I C H A E L   P O T T E R, called as a
2       witness, having been duly sworn by a
3       notary public, was examined and
4       testified as follows:
5
6   EXAMINATION BY
7   MR. OSTOJIC:
8       Q.   Sir, would you please state
9   your name for the record?
10      A.   Michael Fred Potter.
11      Q.   You are here, Dr. Potter, as an
12  expert witness on behalf of the plaintiffs in
13  a case Joanne Hart and Sandra Bueno on behalf
14  of themselves and all others similarly
15  situated persons versus BHH doing business as
16  Bell & Howell, case number 2015-cv-4804 in
17  the United States District Court, Southern
18  District of New York, correct?
19      A.   Correct.
20      Q.   Have you given a deposition
21  before?
22      A.   Yes.
23      Q.   How many times?
24      A.   Roughly 15.
25      Q.   In what capacity did you give

5

1                    POTTER
2   along, but if at any time you don't
3   understand one of my questions, please state
4   so and I'll try to rephrase it, okay?
5       A.   Yes.
6       Q.   If you give an answer to a
7   question, I'll assume you understood my
8   question, fair?
9       A.   Fair.
10      Q.   Because obviously we both have
11  flights out of New York tonight, I will try
12  to move as quickly as possible so I would ask
13  that you directly answer the question I pose,
14  okay?
15      A.   I'll do my best.
16      Q.   If you need to elaborate on
17  something, just please answer first the
18  question and let me know if you want to add
19  something and obviously if it's okay with
20  your attorney, we can do that, okay?
21      A.   Okay.
22      Q.   You have issued two written
23  reports in this case as an expert, correct?
24      A.   Correct.
25      Q.   Your first report is dated

7

1                    POTTER
2   those depositions?
3       A.   Sometimes on the defense side
4   of cases and sometimes on the plaintiff side.
5       Q.   Have you ever testified in
6   court?
7       A.   Yes, I have.
8       Q.   How many times?
9       A.   From memory about three to
10  four.
11      Q.   Have you testified in court as
12  an expert witness or as a lay person?
13      A.   Expert witness.
14      Q.   Have you ever been barred from
15  testifying in court?
16      A.   No.
17      Q.   Have you had any of your
18  opinions in any way limited or barred by any
19  court?
20      A.   No.
21      Q.   I'm obviously going to be
22  asking you some questions. I will need you to
23  verbalize your responses, okay?
24      A.   Okay.
25      Q.   I will try to move things

6

1                    POTTER
2   October 31, 2017, correct?
3       A.   Correct.
4       Q.   And then you had a rebuttal
5   report dated December 22, 2017, correct?
6       A.   Correct.
7       Q.   Those two reports include all
8   of your opinions and the bases for those
9   opinions, correct?
10      A.   Other than any opinions that I
11  might express in the deposition today of
12  course.
13      Q.   Are you intending on giving
14  opinions today that are not found in your two
15  written reports?
16      A.   If I'm asked questions that are
17  not related to work that I have done in my
18  reports or if I'm asked an interpretation of
19  work or statements made in my reports.
20      Q.   Do you have any right now
21  opinions that are not found in your two
22  written reports with respect to this case?
23      A.   Not without hearing questions
24  from you that might suggest new ground or
25  areas that I need to elaborate on.

8

POTTER

1    POTTER
2        (Exhibit 1, Expert Report of
3    Dr. Michael Potter, marked for
4    Identification.)
5        Q.    Sir, I marked here as expert
6    Deposition Exhibit number 1 and I agreed with
7    counsel that with respect to expert
8    witnesses in this case we would go ahead and
9    designate the exhibits starting from
10   obviously 1 and proceed down the line so I
11   would like you to take a look at Exhibit 1
12   and tell me is that your report dated October
13   31, 2017?
14       A.    Yes, it appears to be what I
15   submitted.
16       Q.    So it has your written report
17   and it includes six appendices, correct?
18       A.    Correct. This last -- let me
19   just take a quick check here. It appears
20   that the last -- I don't know if this is a
21   full exhibit. I can't recall whether this
22   last portion which is appended as an exhibit
23   was included with my report or provided by
24   counsel.
25           MR. KOPEL: I believe it's not

9

1    POTTER
2    appended to this.
3        Q.    I want to go back to Exhibit
4    number 1 and I will probably go through that
5    exhibit first, okay?
6        A.    Okay.
7        Q.    I just want to make sure we
8    both are clear on what all the appendices
9    were to the first report Exhibit number 1,
10   okay?
11       A.    Okay.
12       Q.    Appendix 1 is your curriculum
13   vitae, right?
14       A.    Correct.
15       Q.    That's a true and complete copy
16   of all of your qualifications and experiences
17   as an expert witness?
18       A.    Yes.
19       Q.    Appendix number 2 is
20   essentially just numbers and some data,
21   correct?
22       A.    Of Richard Mankin's acoustical
23   testing of the Bell & Howell device.
24       Q.    Appendix 2 is data that was
25   provided to you by Dr. Mankin, correct, Dr.

11

1    POTTER
2        an appendix to the report.
3        Q.    Let me then on the record let
4    me remove that part and right now what you
5    are holding and we'll just put that in the
6    record as Exhibit 1, that's your complete
7    October 31, 2017 report with all of the
8    appendices, correct?
9        A.    Correct.
10           (Exhibit 2, Rebuttal Report of
11   Dr. Michael Potter, marked for
12   Identification.)
13       Q.    Let me show you what we're
14   marking as Deposition Exhibit number 2. It's
15   titled Rebuttal Report of Dr. Michael F.
16   Potter dated December 22, 2017. Would you
17   confirm for me whether that in deed is your
18   December 22, 2017 rebuttal report?
19       A.    Yes, it is.
20       Q.    The rebuttal report had a list
21   of publications, but I don't think there was
22   anything else designated as an appendix to
23   the rebuttal, correct?
24       A.    The publications was appendix
25   1. I don't believe there was anything else

10

1    POTTER
2    Richard Mankin?
3        A.    Actually there were two
4    devices.
5        Q.    Then appendix 3 is also some
6    data. Is that also from Dr. Mankin?
7        A.    That's correct.
8        Q.    Then appendix number 4 is a
9    report from i2L, correct?
10       A.    Correct.
11       Q.    i2L did testing of the Bell &
12   Howell ultrasonic repeller devices with
13   respect to insects, certain insects, correct?
14       A.    Correct. For simplicity of this
15   deposition when I refer to insects, I mean
16   arthropods because spiders technically are
17   not insects and spiders were included in that
18   so if that's okay I'll just keep saying
19   insects and know we are talking about a
20   report here that also included spiders.
21       Q.    Also for simplicity sometimes
22   I'll be saying Bell & Howell device or
23   repeller, obviously I'm talking about devices
24   which are the subject matter of this lawsuit
25   unless we state otherwise, fair?

12

POTTER

1  POTTER
2      A.    Fair.
3      Q.    Then appendix number 5 to your
4  first report is a report from Sierra,
5  correct?
6      A.    Correct, Sierra Research Labs.
7      Q.    Sierra did testing on the Bell
8  & Howell devices with respect to mice,
9  correct?
10     A.    Correct.
11     Q.    Then appendix number 6 is a
12  list of the materials you reviewed in this
13  case, correct?
14     A.    Correct.
15     Q.    I want to first go over
16  appendix number 1 of Exhibit number 1 which
17  is your CV, okay?
18     A.    Okay.
19     Q.    You hold several degrees in
20  entomology, correct?
21     A.    Correct.
22     Q.    What is entomology?
23     A.    The study of insects.
24     Q.    Since 1991 you have been
25  employed by the University of Kentucky within

13

POTTER

1  POTTER
2  the department of entomology, correct?
3      A.    Correct.
4      Q.    Do you hold any degrees in
5  animal behavior?
6      A.    No.
7      Q.    Are you a rodentologist?
8      A.    Rodentologist is a very
9  specific term much like an entomologist who
10  deals specifically with the study of rodents.
11  I consider myself to be both an entomologist
12  and an urban pest management expert and urban
13  pest management at least from my experiences
14  have involved rodents as well as insects.
15     Q.    Would you consider yourself a
16  rodentologist though?
17     A.    By the definition that it's an
18  individual that specifically has spent their
19  career dedicated to the study of rodents, no,
20  but from the standpoint of do I have
21  tremendous experience working with rodents
22  and their management, yes.
23     Q.    So what is a rodent scientist?
24     A.    I don't know if there is such a
25  term, but I would assume it would mean

14

POTTER

1  POTTER
2  someone again who dedicates their career
3  working specifically on studies involving
4  rodents.
5      Q.    Have you ever used the term
6  rodent scientist?
7      A.    For myself?
8      Q.    No, just in general for anyone?
9      A.    No.
10     Q.    Would you consider yourself a
11  rodent scientist?
12          MR. KOPEL: Objection, lack of
13          foundation.
14     A.    Again, I'm not familiar with --
15  that term is not one that's widely used.
16  There is probably only a handful of
17  rodentologists in the United States that have
18  dedicated their careers to working
19  exclusively with rodents and I'm certainly
20  not within that group, but as I said, I've
21  spent the better part of my professional
22  career working with pests which infest
23  buildings and certainly insects and rodents
24  are probably the two largest groups that do
25  that.

15

POTTER

1  POTTER
2      Q.    Do you hold any degrees in
3  wildlife behavior?
4      A.    No, I do not.
5      Q.    Are you a mammalogist?
6      A.    No, I'm not.
7      Q.    Prior to being employed with
8  the University of Kentucky in 1991 you did
9  work in the private sector, correct?
10     A.    Correct.
11     Q.    I think you have listed in your
12  curriculum vitae your experience, right?
13     A.    Yes.
14     Q.    So from 1982 to 1985 you were
15  an employee of Union Carbide Agricultural
16  Products Company, correct?
17     A.    Correct.
18     Q.    What products if any did Union
19  Carbide manufacture at that time while you
20  were an employee?
21     A.    Union Carbide Corporation
22  manufactured insecticides, herbicides,
23  fungicides and plant growth regulators.
24     Q.    Did you work within the
25  agricultural section of Union Carbide?

16

POTTER

1
2      A.      I worked in a variety of
3   sections.  It's the agricultural products
4   company, but within that umbrella my job
5   responsibilities were evaluating insecticides
6   for use in agriculture, in animal health and
7   urban entomology and forestry, basically
8   anywhere where there could be a pest
9   insecticide that could potentially be
10  utilized on.
11     Q.      Did Union Carbide between 1982
12  and 1985 manufacture any consumer products?
13     A.      Yes.
14     Q.      What were the consumer products
15  that Union Carbide manufactured between 1982
16  and 1985?
17     A.      The most notable one is Sevin
18  also known as Carbaryl.
19     Q.      Is that an insecticide?
20     A.      Yes, it is.
21     Q.      Is that used in agricultural
22  farms?
23     A.      It's used in both agricultural
24  uses as well as for household uses.
25     Q.      Union Carbide essentially was

17

POTTER

1
2   purchased by Rhone-Poulenc?
3      A.      Rhone-Poulenc, a French
4   company.
5      Q.      So you worked for this French
6   company that bought out Union Carbide between
7   1985 and 1988, correct?
8      A.      Correct.
9      Q.      Essentially the same products
10  that were manufactured by Union Carbide still
11  were manufactured by this new French company
12  that purchased Union Carbide?
13     A.      Yes and then Rhone-Poulenc had
14  some of their own products.  If I could back
15  up, the products that I worked with between
16  1982 and 1985 when I was in research and
17  development were experimental materials, they
18  were not yet registered, but we evaluated
19  those products on a wide variety of insect
20  pests in both urban environments as well as
21  agricultural and animal health and forestry.
22     Q.      Were all of the products that
23  you worked on while at Union Carbide and
24  Rhone-Poulenc essentially lethal products?
25     A.      Can you clarify what you mean

18

POTTER

1
2   by lethal?
3      Q.      In other words, they were
4   poisons like an insecticide or a pesticide?
5      A.      From recollection, yes.
6      Q.      From 1988 to 1991 you worked at
7   Orkin Pest Control, correct?
8      A.      Correct.
9      Q.      You mention something about an
10  IPM program while working at Orkin Pest.
11  What's the IPM programs?
12     A.      IPM programs are -- IPM stands
13  for integrated pest management.  It's
14  basically a philosophy of managing pests
15  using a variety of techniques based on
16  inspection, prescribing the appropriate
17  solution using both chemical and non-chemical
18  techniques, but I did a lot more at Orkin
19  than that.
20          I was the national technical
21  director for the company and basically was
22  responsible for all technical decisions of
23  the company.
24     Q.      Did Orkin between 1988 and 1991
25  manufacture any consumer products that it

19

POTTER

1
2   would sell to the general public?
3      A.      We had a distributorship where
4   we were a formulator of materials.  I can't
5   recall whether we sold to consumers as well
6   as to just the branches and offices within
7   Orkin.
8      Q.      Then in your CV which is
9   appendix 1 to Exhibit 1 you indicate the nine
10  things that you do while employed with the
11  University of Kentucky since 1991, correct?
12     A.      Those are not all the things I
13  do, but they are certainly some of the more
14  notable things that I have spent my time on.
15     Q.      Are you a salaried employee at
16  the university?
17     A.      Yes, I am.
18     Q.      Is it fair to say that since
19  1991 you have not been employed by anyone
20  else other than the University of Kentucky,
21  fair?
22     A.      I have done outside consulting,
23  but as far as a full-time employee, no.
24     Q.      Have you ever been hired by the
25  plaintiff's law firm prior to this case?

20

POTTER

```
 1                    POTTER
 2        A.    For this particular case?
 3        Q.    Prior to this case for other
 4   cases?
 5              MR. KOPEL: You are referring
 6        to Bursor & Fisher, correct?
 7              MR. OSTOJIC: Yes.
 8        A.    No.
 9        Q.    Have you ever worked with
10   counsel next to you before on any other
11   cases?
12        A.    No.
13        Q.    How were you contacted in this
14   case?
15        A.    My recollection is I was
16   contacted by Yitzchak Kopel.
17        Q.    Do you recall when the first
18   contact was made?
19        A.    It's just a guesstimate from
20   memory, but about a year and change ago.
21        Q.    I gather since 1991 you have
22   been hired by companies that make
23   insecticides, correct?
24        A.    Correct.
25        Q.    You have also been hired by
                                        21
```

```
 1                    POTTER
 2   companies that make pesticides, correct?
 3        A.    Correct.
 4        Q.    How much of your income do you
 5   estimate comes from your consulting work?
 6              MR. KOPEL: Objection, calls
 7        for speculation.
 8        A.    It would be a guesstimate, but
 9   it varies year to year, but perhaps a third.
10        Q.    What is your salary at the
11   University of Kentucky, annual salary?
12        A.    It's approximately 122,
13   125,000.
14        Q.    Do you then receive a 1099 from
15   any companies that you do consulting work
16   for?
17        A.    Yes.
18        Q.    Have you maintained those 1099
19   records?
20        A.    Yes.
21        Q.    Have you ever personally
22   designed a product that was ultimately sold
23   to the general public?
24        A.    Can you clarify what you mean
25   by the general public?
                                        22
```

```
 1                    POTTER
 2        Q.    Where anybody out in the public
 3   could buy it, in other words, it's not
 4   specific to simply one group?
 5        A.    I don't believe so.
 6        Q.    Have you designed any product
 7   that was ultimately sold to consumers?
 8        A.    I assisted in designing a
 9   product that is being marketed to the
10   professional pest control industry currently.
11        Q.    Is that product a pesticide?
12        A.    No.
13        Q.    What kind of product is it?
14        A.    It's a resistance management
15   kit or a detection kit primarily for bed bugs
16   determining whether they have a resistance or
17   susceptibility to insecticides.
18        Q.    Is that product currently on
19   the market?
20        A.    Yes, it is.
21        Q.    Who is it being sold to?
22        A.    The primary target is the
23   professional pest control industry.
24        Q.    What's the name of the product?
25        A.    Well, I think it's Black Out
                                        23
```

```
 1                    POTTER
 2   Resistance Detection Kit or Insecticide
 3   Testing Kit.  I'm sorry, Lab In A Bag I think
 4   is the branded name that they gave it.
 5        Q.    Are you the sole designer of
 6   that product?
 7        A.    No.
 8        Q.    Have you ever personally
 9   manufactured a product that was sold to the
10   public?
11        A.    No.
12        Q.    Have you ever been involved in
13   marketing a product that was sold to the
14   public?
15        A.    Not to my recollection.
16        Q.    Do you know if there is any
17   written standards in the U.S. that have to be
18   followed before a product is sold in the
19   U.S.?
20        A.    Can you clarify when you say
21   product; are you talking about an insecticide
22   or just a product in general?
23        Q.    Just a product in general?
24        A.    No, I'm not familiar.
25        Q.    Are you familiar with any
                                        24
```

POTTER

1 written standards in the U.S. where a
2 non-lethal product has to abide by before
3 it's sold to the general public?
4      A.    Can you restate the
5 question?
6      Q.    Do you know of any written
7 standards in the U.S. that have to be
8 followed before a non-lethal product is sold
9 to the general public?
10      A.    That's not my area of
11 expertise. I have some knowledge of devices
12 and so forth in terms of EPA requiring
13 efficacy data and statements, but it's really
14 not my area of expertise.
15      Q.    Is it fair to say that the EPA
16 governs the sale of lethal products such as
17 insecticides and pesticides?
18           MR. KOPEL: Objection, calls
19      for a legal conclusion.
20      A.    They certainly do regulate the
21 sale and registration of insecticides, but
22 they also regulate the sale of devices, in
23 other words, non-pesticidal materials.
24      Q.    Have you ever had to advise any

25

POTTER

1 devices for monitoring and detection of
2 insect populations.
3      Q.    Is that bed bugs that you are
4 referring to?
5      A.    That's the one that comes to
6 mind, yes.
7      Q.    I'll ask this, but, well, is it
8 correct that you haven't dealt with any
9 products to be sold to the general public
10 other than in some degree with respect to
11 either insecticides or the detection of bed
12 bugs; is that fair?
13      A.    Can you repeat the question.
14      Q.    Sure. I gather that your
15 involvement to whatever degree it is with
16 respect to any products that are ultimately
17 to be sold to the public is limited to either
18 insecticides or the detection of bed bugs,
19 correct?
20      A.    I'm not sure that's entirely
21 true. Again, I'm asked so many questions
22 from so many different entities, both basic
23 manufacturers and even individuals who want
24 to develop something and it's not as narrow

27

POTTER

1 clients with respect to the specifics of any
2 industry practice to sell a consumer product
3 in the U.S.?
4      A.    Can you restate the question.
5      Q.    Have you ever been retained to
6 advise a client with respect to any industry
7 practices within the U.S. in order to sell a
8 consumer product in the U.S.?
9      A.    If I'm interpreting your
10 question correctly, I have consulted and
11 provided advice to basic manufacturers of
12 insecticides about the markets that they work
13 in and the effectiveness of various products
14 and what's necessary to develop a product for
15 those sorts of uses.
16      Q.    Is it fair to say that the
17 advice you have given to clients as an expert
18 with respect to any products is limited to
19 insecticides?
20      A.    No.
21      Q.    What other products have you
22 given clients advice to in selling those
23 products in the U.S. other than insecticides?
24      A.    One that comes to mind is

26

POTTER

1 as that.
2           I mean as recently as a few
3 months ago I was asked about developing a
4 device to capture carpenter bees so I get
5 asked by consumers, I get asked by the
6 professional pest control industry, by
7 manufacturers and it involves both pesticidal
8 and non-pesticidal methods of control.
9      Q.    What non-pesticidal methods of
10 control are you referring to?
11      A.    Traps, monitoring devices,
12 vacuums, heat treatments, heaters so for the
13 physical killing or removal of insects.
14      Q.    Can you identify any products
15 that are currently being sold in the U.S.
16 that you have either designed, manufactured,
17 marketed or worked on to aid in the sale of
18 that product?
19      A.    I believe so, yes.
20      Q.    What product?
21      A.    I had quite a bit of
22 involvement with heat treatments for bed bug
23 control.
24      Q.    What's the product for that

28

POTTER

1 heat treatment?
2
3       A.    One was a -- the commercial
4 brand of the product or the concept?
5       Q.    Is it a product that you are
6 referring to that's being sold?
7       A.    It's a system of treating with
8 heaters to eradicate bed bugs.
9       Q.    Your work with respect to a
10 consumer product?
11      A.    when you say consumer product,
12 sold to the professional pest control
13 industry or to a house holder?
14      Q.    Either way, I'll accept either
15 one?
16      A.    To the professional pest
17 control industry I have had input on heat
18 treatment technology, I had input on vacuum
19 cleaners for removal of bed bugs. I probably
20 had others, but I would have to think
21 carefully because I've worked in a lot of
22 different pests over the years.
23      Q.    Are you advising clients on
24 concepts of how to rid either homes or
25 commercial settings of pests or are you

29

POTTER

1 working on the actual product that's being
2 sold?
3      A.    Primarily the former, but a bit
4 of the latter.
5      Q.    Are you familiar then with any
6 industry practices in the U.S. for a
7 manufacturer before a product is sold in the
8 U.S.?
9      A.    Restate the question.
10     Q.    Sure. Are you aware of any
11 industry practices in the U.S. that a
12 manufacturer has to follow before a product
13 is sold in the U.S.?
14           MR. KOPEL: Objection, vague.
15     A.    Yes.
16     Q.    What are those industry
17 practices?
18     A.    They would basically relate to
19 the agrochemical industry and development of
20 insecticides and registering those products,
21 toxicology studies, environmental studies,
22 stability of formulations. This goes back to
23 my chemical industry days.
24     Q.    Could you point to me where

30

POTTER

1 those industry practices are located in any
2 written form?
3      A.    Those practices are mandated by
4 U.S. Environmental Protection Agency so
5 there's probably a great deal of data
6 requirements that can be found in terms of
7 what the agrochemical company is required to
8 do to register their products.
9      Q.    I take it when you talk about
10 the EPA you are talking about it regulates
11 insecticides and pesticides, correct?
12     A.    And they also regulate devices
13 intended to kill, repel or control pests.
14     Q.    Is it your understanding that
15 the EPA governs, for instance, ultrasonic
16 pest repellers?
17     A.    I believe that's correct, yes.
18     Q.    What's the basis for that
19 conclusion?
20     A.    It's my understanding that the
21 EPA regulates all products whether it's a
22 chemical or whether it's a physical device
23 that controls, repels, captures insects. I
24 think it would be in the federal register,

31

POTTER

1 but they have a specific area where they talk
2 about the requirements for regulation of
3 ultrasonic devices as well as other types of
4 devices so, in other words, they don't just
5 regulate pesticides.
6      Q.    You believe the EPA also
7 regulates non-lethal products?
8      A.    Correct, that's my belief.  I'm
9 not an expert in this area, but that's my
10 understanding.
11     Q.    In your report Exhibit number 1
12 you listed one deposition that you gave in
13 the last four years, correct?
14     A.    Correct.
15     Q.    You indicate I think earlier
16 that you have given approximately a dozen
17 depositions, right?
18     A.    Something like that, yes.
19     Q.    Is it fair to say because you
20 didn't include those other 11 or so
21 depositions you are not necessarily relying
22 upon anything you did in those other 11
23 depositions for this case here?
24     A.    Correct, but those were also I

32

Dr. Michael Potter 01/09/2018

POTTER

1 think more than five years ago, that's why
2 they were -- because I'm not relying on this
3 one that I mentioned either for this case,
4 but I stated it because I was in the past
5 five years.
6 
7      Q.    Do you have a list though of
8 the depositions you have given in your
9 career?
10     A.    Not a list, no.  I would have
11 to go back to files and hunt through some of
12 which I save and many of which I don't.
13     Q.    Have you retained any of the
14 transcripts that you have given in the past?
15     A.    I may have.  I'm not sure.  I
16 tend to purge files, but occasionally I'll
17 save something.
18     Q.    I'm going over still your CV
19 which is appendix 1 of Exhibit 1 where it
20 shows publications, book chapters on page 4,
21 do you see that?
22     A.    Yes.
23     Q.    These publications, they all
24 deal with bed bugs or termites, correct?
25     A.    No, that's not correct.

33

POTTER

1 typically with a conference.  These are
2 submitted proceedings like a paper, often a
3 research paper that is reviewed by those that
4 assemble the proceedings of the conference
5 and publish it in some bound form. Today a
6 lot of it is online, but it goes down as
7 proceedings of a conference.
8 
9          For example, I just did one for
10 the Intellectual Conference of Urban Pests
11 that was in Birmingham, England last year.
12     Q.    I did review some of your
13 publications and proceedings and it appears
14 that since 2000 most of the work you have
15 done relates to bed bugs; is that fair?
16     A.    Certainly in terms of
17 publication, that's been the squeaky wheel so
18 I would say that's correct, but I have
19 published in some other areas. I just
20 published an article on Brown Marmorated
21 Stink Bug.  I have to look through this, but
22 I think it's a fair statement that certainly
23 in the last 10 or 12 years most of my
24 research publications have involved bed bugs.
25     Q.    Is it also fair to say that in

35

POTTER

1     Q.    Which one of the publications
2 that you have for book chapters does not deal
3 with either termites or bed bugs?
4     A.    Well, first of all, if we are
5 just talking about book chapters, the last
6 publication biting and stinging pests in the
7 Entomological Society of America Handbook of
8 Turfgrass Insects involved pests such as
9 stinging insects, biting insects, wasps,
10 bees, fire ants, ticks, things like that.
11          The others under book chapters
12 did involve bed bugs and termites. I thought
13 you were referring to the journal articles as
14 well.
15          MR. OSTOJIC: Off the record.
16          (Discussion off the record.)
17     Q.    Sir, I'm now looking at the
18 subtitle here on your CV Journal Articles and
19 Proceedings, do you see that?
20     A.    Yes.
21     Q.    What does that mean
22 proceedings?
23     A.    Proceedings are published
24 articles that were written associated with --

34

POTTER

1 the last 10 to 12 years most of your
2 consulting work has revolved around bed bugs?
3     A.    No, that's not correct.
4     Q.    What percentage would you say
5 your consulting work has been devoted to bed
6 bugs in the last 10 to 12 years?
7     A.    When I define consulting work,
8 that would encompass expert work.
9          MR. OSTOJIC: Let's go off the
10     record.
11          (Discussion off the record.)
12     A.    Expert witness work, speaking
13 at conferences, advising companies on
14 products and methods so how much of it
15 involved bed bugs, was that your question,
16 maybe 60 percent.
17     Q.    Then I'm on page 10 of your CV
18 where it has here patents.  Are you with me
19 on patents?
20     A.    Yes.
21     Q.    It includes such two patent
22 numbers, correct?
23     A.    Correct.
24     Q.    The first one has an assignee

36

POTTER

1   of Novartis Corp.?
2
3        A.    Novartis Corporation, yes.
4        Q.    What is that patent?
5        A.    This was a patent that I was a
6   primary author on when I worked in the
7   agrochemical industry basically developing a
8   certain class of insecticides that had
9   effectiveness against parasites in animals,
10  fleas, flies, mites, lice. Basically
11  parasites that feed on the outside of an
12  animal and also parasites that work
13  internally.
14       Q.    What is the second patent here
15  mentioned microfabricated surfaces?
16       A.    That was a co-patent with
17  professors at University of California Irvine
18  developing fabricated surfaces designed to
19  entrap bed bugs so biomimicry basically.
20       Q.    Was there a product that was
21  actually manufactured based on that patent?
22       A.    Not yet. If I might add
23  because you asked me about my publications
24  and maybe I didn't clarify, but if you look
25  at the totality of my publications, I've

37

POTTER

1
2   published work on mosquitoes, I've published
3   work on various outdoor pests, I've published
4   work on ants, but certainly again as you I
5   believe asked as part of your question in the
6   last 10 or 12 years it was primarily bed bugs
7   and I have written extensively on other pests
8   as well, but not in peer reviewed research
9   journals.
10       Q.    I want to make sure that I have
11  a complete copy of your file so I do want to
12  go over appendix number 6 of Exhibit 1 which
13  is the list of materials that you considered
14  in this case, okay?
15       A.    Okay.
16       Q.    Did you receive a Subpoena to
17  produce your file for this case?
18       A.    Yes.
19       Q.    Have you produced your entire
20  file on this case to at least counsel for the
21  plaintiffs?
22       A.    Yes.
23       Q.    We were provided with a
24  privilege log of some documents that were
25  being withheld from production. Are you aware

38

POTTER

1
2   of that?
3        A.    No.
4        Q.    The privilege log essentially
5   included -- the general gist of it was
6   communications between you and plaintiffs'
7   counsel concerning this case, okay?
8        A.    Okay.
9        Q.    I take it then everything in
10  your file other than those documents that
11  have been withheld pursuant to that privilege
12  log have been produced; is that correct?
13       A.    Correct.
14       Q.    Is there anything that was a
15  part of your file in this case that was
16  removed other than what was in the privilege
17  log and not produced?
18       A.    Could you restate the question.
19       Q.    At any time during your work on
20  this case, has there ever been a document
21  that was removed from your file and not
22  produced to at least plaintiffs' counsel?
23       A.    Not to my knowledge, no.
24       Q.    Appendix number 6 of Exhibit 1
25  has essentially a list of I guess they are

39

POTTER

1
2   either articles, some of them are power point
3   presentations, correct?
4        A.    Yeah, most of them are research
5   articles.
6        Q.    Starting on page 5 of appendix
7   number 6, it has the First Amended Complaint
8   for this case, correct?
9        A.    Correct.
10       Q.    Then it has documents which
11  were Bates stamped BHH and you have examined
12  those documents with those Bates stamped
13  numbers, correct?
14       A.    Correct.
15       Q.    You did not attend any
16  depositions in this case, correct?
17       A.    Correct.
18       Q.    Did you receive any abstracts
19  or summaries of depositions in this case?
20       A.    I received a copy of Ms.
21  Feuerstein's deposition.
22       Q.    It was the actual deposition
23  transcript from Ms. Feuerstein, correct?
24       A.    I believe that's correct.
25       Q.    Is that the only deposition you

40

POTTER

| | |
|---|---|
| 1 | POTTER |
| 2 | received in this case? |
| 3 | A.    The only deposition, yes.  I |
| 4 | read some excerpts from depositions in some |
| 5 | of the other documents, I think in some of |
| 6 | the reports of the experts for the defense, |
| 7 | but as far as deposition transcripts, that's |
| 8 | the only one. |
| 9 | Q.    Then you examined a Bates stamp |
| 10 | from Ms. Feuerstein's deposition which was |
| 11 | Bates stamped Feuerstein 55 to 100, correct? |
| 12 | A.    Correct. |
| 13 | Q.    Obviously you reviewed the |
| 14 | reports which were attached to your first |
| 15 | report Exhibit number 1 the appendices 2 to 5 |
| 16 | and the associated data and videos, correct? |
| 17 | A.    Can you show me what you are |
| 18 | talking about? |
| 19 | Q.    The last item? |
| 20 | A.    Yes. |
| 21 | Q.    So appendix 6 is a complete |
| 22 | copy of all or a listing of all the documents |
| 23 | you reviewed in this case, correct? |
| 24 | A.    Correct. |
| 25 | Q.    I take it then you didn't read |

41

| | |
|---|---|
| 1 | POTTER |
| 2 | to speak to either Joanne Hart or Sandra |
| 3 | Bueno? |
| 4 | MR. KOPEL: Request to whom? |
| 5 | Q.    To anyone? |
| 6 | MR. KOPEL: I want to caution |
| 7 | you communications with counsel are |
| 8 | privilege so you should not reveal the |
| 9 | content of any communications with |
| 10 | counsel.  If you can answer that |
| 11 | question without doing so, then fine, |
| 12 | but if answering the question would |
| 13 | require you to do so, then I would |
| 14 | instruct you not to answer. |
| 15 | A.    Can you repeat the question? |
| 16 | Q.    Sure. Did you ever seek to |
| 17 | interview either Joanne Hart or Sandra Bueno |
| 18 | as part of your work in this case? |
| 19 | A.    No. |
| 20 | MR. KOPEL: I just want to use |
| 21 | the restroom. |
| 22 | MR. OSTOJIC: I'm fine.  Let's |
| 23 | take a two or five minute break. |
| 24 | (Recess taken.) |
| 25 | Q.    Sir, have you ever had any |

43

| | |
|---|---|
| 1 | POTTER |
| 2 | the deposition of Joanne Hart, correct? |
| 3 | A.    May I back up, please.  You are |
| 4 | referring to Exhibit 1, these are attachments |
| 5 | to that from my original report.  I believe |
| 6 | there are some additional reference citations |
| 7 | that I included in my rebuttal report that |
| 8 | were not in this. |
| 9 | Q.    I understand that.  We'll get |
| 10 | to the rebuttal as well.  You didn't review |
| 11 | Joanne Hart's deposition, correct? |
| 12 | A.    Correct. |
| 13 | Q.    You didn't review Sandra |
| 14 | Bueno's deposition, correct? |
| 15 | A.    Correct. |
| 16 | Q.    You didn't review Jeffrey |
| 17 | Mishan's deposition, correct? |
| 18 | A.    Correct. |
| 19 | Q.    Have you talked at all with |
| 20 | Joanne Hart? |
| 21 | A.    No. |
| 22 | Q.    You have talked at all with |
| 23 | Sandra Bueno? |
| 24 | A.    No. |
| 25 | Q.    Did you ever make any request |

42

| | |
|---|---|
| 1 | POTTER |
| 2 | discussions with an Amanda Parke? |
| 3 | A.    No. |
| 4 | Q.    The file materials we received |
| 5 | in this case did not include all of the |
| 6 | articles, publications, power points that you |
| 7 | have listed in appendix 6 of Exhibit 1, do |
| 8 | you know why? |
| 9 | A.    I assume that you are asking |
| 10 | for my file and these are all articles that |
| 11 | are readily accessible in the public domain |
| 12 | so I guess I just didn't assume that they |
| 13 | would be deemed file materials of what you |
| 14 | were requesting. |
| 15 | Q.    Did you have any assistance in |
| 16 | gathering these articles, publications or |
| 17 | power points that you have listed in appendix |
| 18 | 6? |
| 19 | A.    No, but I think one or two I |
| 20 | might have gotten through inter-library loan |
| 21 | so when you say assistance, no, I gathered |
| 22 | the articles and there were a few that I |
| 23 | requested that I could not find myself with |
| 24 | the assistance of a librarian. |
| 25 | Q.    The only two articles that we |

44

POTTER

1  received as part of your file in this case
2  were two publications by Huang and
3  Subramanyam, are you aware of that?
4       A.    No, I don't know which files
5  you were provided by counsel.
6       Q.    Are all of the publications and
7  articles that you have listed in appendix 6,
8  are they printed and part of your file?
9       A.    They are readily available
10 online. I thoroughly read and reviewed all
11 these articles and I guess it's an
12 interpretation of what you mean by my file,
13 but I assumed since these are all widely
14 available online, find them, I thoroughly
15 read every one. There's a lot of details in
16 them that are pertinent to this case which I
17 basically tried to summarize in my reports.
18      Q.    I haven't been able to find any
19 of these articles online.
20      A.    You have to know how to search
21 I guess. I would have assumed that your two
22 experts would have been able to help you with
23 that.
24      Q.    So when you searched and found

45

POTTER

1  these articles online, you didn't print them
2  out, you just read them online?
3       A.    No, some I printed out, some I
4  read online. For example, I'm sure you could
5  find National Association of Home Builders
6  website that talks about the average size of
7  a room in the United States or a kitchen. A
8  number of these were actually accessible
9  through Google Scholar online and some I
10 think required additional searching, but
11 these are all real research articles by real
12 people.
13      Q.    Are you aware that we issued
14 subpoenas to Dr. Mankin, i2L and Sierra for
15 their file materials?
16      A.    I can't recall if I was copied
17 on that or not, but I can't recall actually
18 whether that's how that was done and whether
19 I was copied or not. I thought I remember
20 getting e-mails that I was copied on, but I
21 can't recall.
22      Q.    Do you know if those entities
23 referring to i2L, Sierra and Dr. Mankin
24 produced their entire file materials in this

46

POTTER

1  case to you?
2       A.    Could you repeat the question.
3       Q.    Do you know if these entities,
4  i2L, Sierra and Dr. Mankin produced their
5  entire files for this case to you?
6       A.    I received their reports.
7  Whether there were other items that you would
8  consider their file I'm not sure.
9       Q.    Sir, are you aware of any
10 written standards for the testing of consumer
11 products?
12      A.    No.
13      Q.    Are you aware of any written
14 standards for the testing of consumer
15 products that determine their effectiveness?
16           MR. KOPEL: Objection. What do
17      you mean by written standards?
18      Q.    Do you know what written
19 standards means? I'll use your definition.
20      A.    No. Could you give me yours
21 because written standards means a lot of
22 different things and at least in some of the
23 cases I have been involved with in terms of
24 standards of practice and best practices so

47

POTTER

1  if you could clarify.
2       Q.    Do you know of any written
3  standards out there in your field of
4  expertise with respect to the testing of a
5  consumer product?
6           MR. KOPEL: Same objection.
7       A.    Well, there are certain
8  standards, for example, the EPA requires some
9  laboratories depending on the studies and
10 what it's being used for to use what they
11 call good laboratory practices where they
12 have to retain records and their labs have to
13 be set up in a specific way documenting
14 things carefully so there are standards like
15 that through some government agencies, but
16 I'm not an expert in that area.
17      Q.    Do you need expertise to design
18 the testing of a product to determine its
19 efficacy?
20      A.    Absolutely.
21      Q.    What kind of expertise do you
22 need?
23           MR. KOPEL: Objection, vague.
24      A.    Depends on the product.

48

POTTER

1
2      Q.     What about for ultrasonic
3  repellers?
4      A.    So can you please repeat the
5  question in that context?
6      Q.     What kind of expertise do you
7  need if any to design the testing of an
8  ultrasonic repellant to determine its
9  efficacy?
10             MR. KOPEL: Objection, vague.
11     A.    Are you talking about an
12  ultrasonic repeller to control pests; I
13  assume so, I'm sorry, so if we are talking
14  about ultrasonic pest repellers, you would
15  need expertise in the biology and the habits
16  of the pest that it was targeted for whether
17  that be insects or rodents or nuisance
18  wildlife, birds.  You would need expertise in
19  how to set up a proper experimental design so
20  you could evaluate whether the effects that
21  you were seeing were real or by coincidence.
22             The answer is you would really
23  need to have somebody who had some biological
24  background because science is a broad field.
25  If they were a mechanical engineer, that

49

POTTER

1
2  can cross species, for example, I would not
3  have to necessarily be an expert on flies to
4  evaluate an ultrasonic repeller's effect on
5  flies although it would be helpful to have an
6  understanding of the biology and habits of
7  flies so basically you have to be a biologist
8  if you're evaluating the effects of these
9  devices on living organisms.
10     Q.     I know you examined the
11  documents of testing that was performed on
12  the Bell & Howell devices by Intertek,
13  correct?
14     A.    Correct.
15     Q.     You also examined the documents
16  of testing on the Bell & Howell devices that
17  was performed by SGS, correct?
18     A.    Correct.
19     Q.     You also examined documents
20  relating to the testing of the Bell & Howell
21  devices that was done by Qmann, correct?
22     A.    Correct.
23     Q.     All three of those entities
24  after completing their tests concluded that
25  the Bell & Howell devices were effective to

51

POTTER

1
2  certainly would not be sufficient to set up
3  studies on living organisms and the effect of
4  repellant devices.
5      Q.     Would you also need expertise
6  to actually conduct a test that's being
7  designed to test the efficacy of an
8  ultrasonic pest repeller?
9      A.    Could you repeat the question?
10             MR. OSTOJIC: Could you read
11      that back.
12             (Record read.)
13     A.    As I'm interpreting your
14  question I would say yes for the reasons I
15  said before.
16     Q.     How about would you also need
17  expertise to evaluate the data or the results
18  of any testing of an ultrasonic pest repeller
19  to determine its efficacy?
20     A.    Certainly you would need the
21  expertise as a scientist and a biologist to
22  evaluate those products.  You wouldn't
23  necessarily have to be an expert on each
24  individual organism, but because some of
25  these principals of evaluating these devices

50

POTTER

1
2  repel the enumerated pests, correct?
3      A.    That was their conclusion,
4  correct.
5      Q.     I know you disagree with the
6  conclusion, right?
7      A.    Yes.
8      Q.     We'll get to that, but I just
9  wanted to first make sure we are on the same
10  page with respect to those three entities and
11  their testing.  Do you know of any testing
12  performed on the Bell & Howell devices before
13  2017 other than those that were performed by
14  Intertek, SGS and Qmann?
15     A.    Not to my knowledge, no.  There
16  may have been because those devices according
17  to Feuerstein's deposition have been utilized
18  and sold by other manufacturers as well, but
19  I don't know if those tests were done by
20  these companies or by others.
21     Q.     Have you had any contact with
22  anyone from Intertek?
23     A.    No.
24     Q.     Have you had any contact with
25  anyone from SGS?

52

Dr. Michael Potter 01/09/2018

POTTER

1
2          A.     No.
3          Q.     Have you had any contact with
4   anyone from Qmann?
5          A.     No.
6          Q.     Have you done any research with
7   respect to the qualifications of Intertek?
8          A.     Only inferred research based on
9   the conduct and the manner that these studies
10  were not conducted by biologists much less
11  entomologists or people with rodent expertise
12  and in reading Feuerstein's deposition I
13  think by her admission she knew of none of
14  these people having any scientific or biology
15  background so I'm concluding from reviewing
16  the studies and the conduct of the studies
17  and the conclusion of the studies and from
18  her deposition that the people that were
19  conducting these trials were not biologists,
20  not entomologist, not rodentologists, but
21  that said, I don't have any deep knowledge of
22  who actually works in these companies.
23         Q.     I take it your knowledge of
24  Intertek, SGS and Qmann is limited to the

53

POTTER

1
2   Gold at Texas A&M about conducting a study on
3   it.
4          Since then I get asked by many
5   different entities whether it's a commercial
6   restaurant or a food plant or a pest control
7   industry or consumers whether these devices
8   are effective or not so I have done a great
9   deal of reading about them.
10         I have had experience observing
11  the ineffectiveness of these device in simple
12  experiments. As one example my brother is
13  also a professor at the University of
14  Kentucky. Every year in one of his classes he
15  conducts a basic experiment using a
16  ultrasonic device where he places one of the
17  devices on the side of two interconnected
18  garbage cans with a tunnel between and
19  introduces American cockroaches and has the
20  students score which side the cockroaches end
21  up on; the side with the repeller or the
22  other side that they are supposed to be
23  repelled to.
24         Since I also lecture in that
25  class occasionally, I am very familiar with

55

POTTER

1
2   reports that those entities produced and Ms.
3   Feuerstein's deposition, fair?
4          A.     Fair.
5          Q.     I take it prior to this case
6   you personally never tested any Bell & Howell
7   device, correct?
8          A.     Correct.
9          Q.     Have you tested any ultrasonic
10  repeller device prior to this case?
11         A.     Can you -- let me say that in
12  terms of have I evaluated these devices, have
13  I read literature on them, when I was at
14  Orkin, did we consider the use of these
15  devices, yes. There was one in particular
16  back when I was at Orkin that was called the
17  Electrocat. At that time I can't remember if
18  it was purely electromagnetic or a
19  combination of electromagnetic and
20  ultrasonic, but the marketing of the product
21  was similar, you plug it in and it drives
22  rodents out of your building. We looked
23  carefully at that product. This is from
24  memory so I may be a little fuzzy, but we may
25  have been the ones that spoke with Dr. Roger

54

POTTER

1
2   the results.  Essentially every year that
3   that study has been conducted, a
4   disproportionate number of cockroaches end up
5   on the side with the repeller because it's
6   considered harborage and warmth generating so
7   I have a lot of experience in evaluating
8   these products.
9          Have I done peer reviewed
10  refereed research on these products over the
11  years, no, largely because there is such a
12  large body of evidence, prior art saying that
13  they were effective and it's often difficult
14  to continue to publish work in an area that
15  others have published before.
16         I guess the last thing I'll say
17  is that I have had a lot of experience
18  evaluating repellents, not ultrasonic type
19  pest repellers, but repellant insecticides
20  and a lot of that work has been peer
21  published and a lot of the properties and the
22  ways that these studies are set up and
23  conducted are similar to the types of design
24  that you would need for experiment on an
25  ultrasonic device.

56

POTTER

1
2          Q.     Have you personally done any
3    laboratory testing of any ultrasonic
4    repeller?
5          A.     I have -- when you say
6    personally done, I would say that setting up
7    and overseeing the conduct of the experiments
8    we did with the Bell & Howell devices would
9    fulfill that.
10         Q.     You're talking about the
11   testing that was done for this case?
12         A.     Correct.
13         Q.     In this case and I know it's
14   part of your first report, did you hire Dr.
15   Mankin to perform the testing that he did?
16         A.     Dr. Mankin was referred to me
17   by Christine Styer, the director of i2L as
18   being an expert that could quantify the
19   acoustical output of the ultrasonic devices.
20   We had initially intended to have that work
21   done with i2L, but they felt that the
22   expertise that Dr. Mankin had and his
23   equipment and capabilities would get a better
24   answer in terms of a true output of the
25   devices they could accomplish so Dr. Mankin

57

POTTER

1
2    was referred to me by Christine Styer.
3                I knew of him before so in
4    terms of hiring him, I guess indirectly yes
5    because we basically worked through Christine
6    Styer to conduct those tests and I spoke with
7    Dr. Mankin on several occasions about what we
8    wanted to evaluate and what the results of
9    his studies were.
10         Q.     Were you personally present
11   during any of the testing done by Dr. Mankin
12   in this case?
13         A.     No.
14         Q.     Where is Dr. Mankin located?
15         A.     University of Florida
16   Gainesville, USDA, but he's somewhat
17   affiliated.
18         Q.     Did Dr. Mankin produce a report
19   with respect to the work that he did relating
20   to this case?
21         A.     He produced the results which I
22   think I have appended to my report of his
23   testing of both the ultrasonic device and the
24   electromagnetic device.
25         Q.     In our Subpoena to Dr. Mankin

58

POTTER

1
2    there was a single page of a summary of his
3    test results produced. Have you ever seen
4    that?
5          A.     There was a short, a few
6    paragraphs or one large paragraph summarizing
7    some of the results. It was basically
8    nothing different than the conversations that
9    I had had with him and really was reflected
10   in all those pages of attachments of the
11   studies.
12         Q.     Is there anything with respect
13   to the findings made by Dr. Mankin that you
14   disagree with?
15         A.     No.
16         Q.     I take it you accepted Dr.
17   Mankin's findings?
18         A.     Yes, he's a recognized expert
19   on both entomology, physics and the impact or
20   the effects of sound on animals, particularly
21   insects. He's well published and while I
22   carefully read his reports, we discussed back
23   and forth about the results, I would defer to
24   his conclusions as being accurate.
25         Q.     What are Dr. Mankin's

59

POTTER

1
2    qualifications to do the testing that he did
3    on the Bell & Howell device?
4          A.     Well, as I said, he's
5    considered an expert on acoustical detection
6    or sensory reception of insects to sound. It
7    He's published on this subject. It seemed
8    like a reasonable person to try to quantify
9    the output characteristics of these devices.
10         Q.     Was there a written
11   protocol with respect to the testing that was
12   performed by Dr. Mankin?
13         A.     Not a formal protocol, but we
14   had asked i2L to try to characterize the
15   output of the devices and I think some of
16   that information was probably conveyed to Dr.
17   Mankin. I think it was actually in the
18   original proposal or report that I had
19   submitted to i2L.
20         Q.     Have you worked in the past
21   with i2L?
22         A.     Not with i2L. i2L had a
23   different name, it was previously ICR, same
24   company, just different name and I guess
25   different owners. I was a colleague. I

60

POTTER

1              POTTER
2   would see him at professional meetings, Dr.
3   Robin Todd who was the director prior to
4   Christene Styer, but in terms of setting up
5   specific testing with i2L, no.
6        Q.    Where is i2L located?
7        A.    Baltimore, Maryland is their
8   U.S. office and then they have I think their
9   corporate office maybe in England or Cardiff
10  is that whales?
11       Q.    i2L did laboratory testing of
12  the Bell & Howell devices with respect to
13  insects and spiders, correct?
14       A.    Yes and cockroaches, ants and
15  spiders were the three arthropods that they
16  evaluated.
17       Q.    Were you personally present
18  during any of the testing done by i2L?
19       A.    The last part of the study that
20  was conducted on ants I was present, yes.
21  We evaluated in sequence German cockroaches
22  first, cellar spiders second and the third
23  organism was odorous house ants.
24       Q.    Appendix 4 to your first report
25  Exhibit 1 is the report from i2L concerning

61

1              POTTER
2   their testing in this case, correct?
3       A.    Correct.
4       Q.    Is there anything in I2L's
5   report that you disagree with?
6       A.    I noticed there was an omission
7   in one of the appendices and I had meant to
8   bring this up I guess to counsel and even to
9   i2L and I haven't had a chance, but there was
10  some data cells missing in appendix 2 where
11  it was just an omission of transcription
12  because if you go back to the tables
13  basically on the previous page and you can
14  insert those numbers, but I did notice a
15  typographical omission from the Chi-square
16  analysis that was done on cellar spiders and
17  odorous house ants.  That data was generated,
18  just simply through a transcription error did
19  not appear in appendix 2 in those charts.
20       Q.    Is there anything that you
21  disagree with that's included in i2L's report
22  which is marked as appendix 4 to your first
23  report?
24       A.    No.
25       Q.    I take it you accepted their

62

1              POTTER
2   findings, i2L's findings and conclusions?
3       A.    Yes.
4       Q.    Then I believe a company Sierra
5   conducted some testing of the Bell & Howell
6   devices with respect to mice, correct?
7       A.    Correct, Sierra Research Labs
8   is the name of the company.
9       Q.    If I say Sierra, will we
10  understand I'm referring to Sierra Research
11  Labs?
12       A.    Yes.
13       Q.    Sierra Research Labs provided
14  you with a written report concerning their
15  testing and the results of their testing
16  which is marked as appendix 5 of your first
17  report Exhibit 1, correct?
18       A.    Correct.
19       Q.    Is there anything you disagree
20  with that's found in the Sierra report marked
21  as appendix 5 to Exhibit 1?
22       A.    No, there's nothing that I
23  disagree with in this report.
24       Q.    You accepted Sierra's findings
25  and conclusions?

63

1              POTTER
2       A.    I do.
3         (Exhibit 3, Documents, marked
4     for Identification.)
5       Q.    We were given a supplemental
6   production of documents that were in your
7   file which I've now marked as Exhibit number
8   3.  I would like you to take a look at it and
9   confirm for me if you can if these materials
10  were part of your file?
11        MR. KOPEL: Do you have a copy
12    for me?
13        MR. OSTOJIC: That's one of the
14    things I don't have a copy of.
15        MR. KOPEL: I'm going to try to
16    look on, but if I need a copy --
17        MR. OSTOJIC: If you want to
18    take a break now to make a copy.
19        MR. KOPEL: Let me see what
20    this is. Off the record.
21        (Discussion off the record.)
22        (Record read.)
23       A.    Many of these materials are
24  familiar to me, the testing protocols for
25  example and the e-mails.  Some of this other

64

POTTER

1    material, some of the raw data from the
2    Sierra Research Lab mouse study I had not
3    seen in this format until a few days ago, I
4    think Friday I received a copy of these
5    e-mailed to me by counsel.
6              In other words, some of this
7    raw data tabular summaries was not included
8    in the initial expert report that was
9    submitted to me or the final expert report
10   submitted to me by Bill Donohue at Sierra
11   Research Labs, but I have since seen them
12   subsequently.
13        Q.    In the scientific world when
14   doing a test of a product, do you first have
15   to establish either a theory or a goal before
16   the testing is performed?
17        A.    Usually it starts with an
18   observation or a question followed by a
19   hypothesis of what you are considering may be
20   essentially what you are investigating so I
21   would say yes.
22        Q.    So with respect to Sierra, what
23   was the goal or the hypothesis of the
24   testing?
25                                              65

POTTER

1         A.    The goal was to evaluate the
2    ability of the Bell & Howell ultrasonic pest
3    repeller to repel and drive pests out in a
4    residential setting to try to evaluate the
5    veracity of the claims of the manufacturer's
6    device.
7         Q.    Was the goal that you gave
8    Sierra with respect to their testing was the
9    goal to disprove the defendants' claim that
10   the devices repel pests?
11        A.    No.  The goal was to try to set
12   up as realistic an experiment as possible to
13   evaluate the device and report the results.
14   We spent a tremendous amount of time
15   developing this protocol. Three Ph.D.
16   scientists arguably the top rodentologist in
17   the world, myself who spent a career
18   evaluating pest control products and Dr. Bill
19   Donohue, Ph.D. entomologist trained at Texas
20   A&M who has probably 30 plus years experience
21   evaluating these devices and other type,
22   well, all manner of pest control materials so
23   we did the very best we could to set the
24   experiment up in a way that would be
25                                              66

POTTER

1    realistic and simulate the manner in which
2    these devices would be utilized by a consumer
3    to observe what effect it would have on mice.
4         Q.    Is it fair to say that to
5    determine the effectiveness of the product,
6    the product should be tested in accordance
7    with its intended use?
8         A.    I would say that's correct.
9         Q.    Did you approach your
10   assignment in this case as an independent
11   scientist without any bias?
12        A.    Yes.
13        Q.    Did you contact defendants'
14   experts in this case to participate in any
15   joint testing of the Bell & Howell device?
16        A.    Can you repeat the question?
17        Q.    Sure.  Did you attempt to
18   participate in any joint testing of the
19   devices?
20        A.    No.
21        Q.    Why not?
22        A.    Well, apart from wanting to
23   look at this in an independent capacity, I
24   have no stake in this game. I'm getting paid
25                                              67

POTTER

1    one way or the other and I didn't even
2    consider it because at least in this
3    particular case I thought we had sufficient
4    expertise to evaluate these devices based on
5    our expertise and the prior literature on the
6    performance of these products and how those
7    tests were conducted as well so I didn't see
8    the need.
9         Q.    Would it have been
10   inappropriate in this case as an independent
11   scientist to set the goal for the testing to
12   disprove the defendants' claim that the
13   devices repel pests?
14        A.    Can you repeat the question?
15        Q.    Sure. Would it be inappropriate
16   to set the hypothesis for the testing of this
17   Bell & Howell device as to whether you can
18   disprove the defendants' claim that the
19   devices repel pests?
20        A.    One more time.
21              (Record read.)
22        A.    There is a semantic associated
23   with the word disprove. Certainly when you
24   conduct any experiment, you perform a
25                                              68

POTTER

1   hypothesis. Your hypothesis is that typically
2   there is no effect for evaluating a device or
3   insecticide and the alternate hypothesis
4   being is there an effect and then you design
5   your experiments accordingly to see what the
6   outcome is.  I think it's inappropriate to
7   assume that you never have a thought or an
8   opinion going into the experiment.
9
10          For example, in this case there
11  was a lot of literature, a lot of past
12  experience saying there was not an effect,
13  but we wanted to obviously test the Bell &
14  Howell device which defense argues is
15  different than devices in the past to see how
16  it would perform so we went into this very
17  open minded and I think it's reflected in the
18  time and the attention to trying to set up a
19  study that was realistic, but in no way did I
20  go in -- I mean I consider the word bias
21  which I think you used earlier as being
22  really a prejudice against a person or a
23  thing or a belief that's unfair, unwarranted.
24          I think that, you know, it's
25  reasonable as an expert in this case to

69

POTTER

1          A.    I got one here from August 17.
2   I got another one from August 17.
3          Q.    Can I see if it's the same one
4   I'm referring to?
5          A.    Look at those.
6          Q.    Yeah, it's that one.  This is
7   an e-mail August 17 that you sent to Robert
8   Corrigan and cc.'d a Bill from Sierra
9   Research Labs, correct?
10         A.    Correct.
11         Q.    It says whatever is decided
12  upon needs to comply with the usage
13  instructions of the manufacturer and then in
14  parenthesis you put Bell & Howell, right?
15         A.    Correct.
16         Q.    That means you are telling them
17  that the testing has to be done in accordance
18  with the instructions of this device provided
19  by Bell & Howell, fair?
20         A.    Correct and specifically in
21  this case we were talking -- I believe the
22  conversation involved dimensions of the space
23  because if you go to the previous e-mail on
24  the string, at this time we were considering

71

POTTER

1   seriously question the effectiveness of the
2   class, the category of ultrasonic devices
3   based on all 50 years of prior literature.
4   That said, because again it was alleged that
5   there were differences in these devices
6   compared to some of the ones that were used
7   in those other studies, we wanted to set it
8   up as an unbiased experiment so I would say
9   absolutely not, we did not go into this thing
10  trying to prove one way or the other.
11         Q.    I mean obviously if you are
12  going to go into the testing of a product to
13  determine its effectiveness, it would be
14  wrong to set the hypothesis as trying to
15  disprove the effectiveness of the product; is
16  that fair?
17         A.    Yeah, that's fair.
18         Q.    In the Exhibit number 3 there
19  was an e-mail from you dated August 17, 2017
20  to Robert Corrigan and Bill at Sierra
21  Research Laboratories.
22         A.    It's going to take me a while.
23  What was the date?
24         Q.    August 17, 2017.

70

POTTER

1   utilizing garages attached to a structure and
2   I wanted to be sure that we set up the study,
3   it was done consistent with the manner in
4   which the manufacturer recommended using
5   their products.
6          Q.    Would it be inappropriate in
7   the scientific world to test a product
8   contrary to its intended use?
9          A.    Can you repeat the question?
10         Q.    Sure.  In the scientific world
11  would it be inappropriate to test a product
12  contrary to its usage instructions?
13         A.    I would say for the most part
14  yes, but having had personal experience with
15  testing a product contrary to a
16  manufacturer's instructions sometimes can
17  reveal very interesting outcomes.
18         Q.    But if you are testing for the
19  effectiveness of a product, you should test
20  that product pursuant to the manufacturer's
21  usage instructions, fair?
22         A.    Yeah, if the manufacturer is
23  paying for the work and specifying it and
24  saying how it should be done.  I keep putting

72



POTTER

1 the caveat on this because we changed the way
2 termite control is done around the world by
3 striking out in a different direction from
4 manufacturer's instructions, but admitted
5 generally you want to evaluate a product in
6 the manner that it's intended to be used if
7 it's specified commercial product by the
8 manufacturer so I'll grant you that.
9 Q.    For instance, let's say if you
10 are testing the effectiveness of a pesticide
11 and you use that pesticide in a swimming
12 pool, it's really not going to be too
13 effective; is that fair?
14 A.    Yes.
15 Q.    I'm coming at it as a lay
16 person.
17 A.    If there are label instructions
18 specifying the manner in which it should be
19 used, you should attempt to evaluate the
20 product in that fashion.
21 Q.    Going back to Exhibit 3, your
22 e-mail of August 17, 2017, I know the first
23 sentence you actually tell Robert Corrigan
24 and Bill from Sierra Research Laboratories

73

POTTER

1 that whatever is decided upon and I assume
2 you mean by the future testing of this Bell &
3 Howell device, correct?
4 A.    Correct.
5 Q.    You're telling them whatever
6 testing is decided upon it would need to
7 comply with the usage instructions of the
8 manufacturer Bell & Howell, right?
9 A.    Correct.
10 Q.    Then you cited -- I guess you
11 gave them two links to a Bell & Howell
12 website where they would find usage
13 instructions; is that fair?
14 A.    Correct.
15 Q.    Then you write to them, I'm
16 looking at that last sentence, you write the
17 thing we need to ultimately (hopefully)
18 disprove is the claim that the devices repel
19 and drive pests out of the home. Did I read
20 that sentence correctly?
21 A.    Correct.
22 Q.    Was that the goal you provided
23 to Robert Corrigan and Bill of Sierra that
24 ultimately you were hopeful that their

74

POTTER

1 testing would disprove the claim that the
2 device's repellant drives pests out?
3 A.    No, that's incorrect.  First of
4 all, whenever you set up an experiment as I
5 said you have a hypothesis.  When you set up
6 these hypothesis, it's common to have, in
7 other words, the words hope and expected, you
8 have an expectation because you have a theory
9 based on an observation of what may be
10 occurring.
11 In this case the theory was
12 that this device would behave differently
13 than prior devices in the literature in terms
14 of repelling mice out of the structure so in
15 no way -- we tried to set up a study that was
16 realistic and you could say in this case that
17 the known hypothetical was that these devices
18 don't work based on the past literature and
19 the alternative hypothesis would be that they
20 in fact do work or maybe you could flip it
21 around because you could do that. It's
22 typically not done this way, but if the known
23 hypothetical was the claims, the veracity of
24 the claims was that these devices were

75

POTTER

1 effective, the alternative hypothesis would
2 be that they are not effective.
3 When I phrase this e-mail,
4 there is no intent in stacking the deck in
5 any fashion whatsoever.  I mean to the
6 contrary, if you read through the series of
7 e-mail correspondences between myself, Bobby
8 Corrigan and Bill Donohue, it was try to get
9 a study that would be reflective of the real
10 world testing these things in residential
11 settings.
12 Q.    Is it correct to state though
13 if Robert Corrigan and Sierra Research took
14 your August 17, 2017 e-mail to mean that the
15 goal in this case was to disprove the claim
16 that the device's repellant drive pests out
17 of the home, that would be inappropriate?
18 A.    That would be inappropriate and
19 knowing these two gentlemen if you knew them
20 as I know them, they have a lot more at stake
21 with their professional reputations as do I
22 in trying to conduct an experiment with an
23 inherent bias at the outset.
24 Q.    Sir, why is it necessary in

76



POTTER

1   testing the efficacy of the Bell & Howell
2   repellers that the testing labs should follow
3   the product's use instructions?
4       A.    Well, if you are trying to
5   evaluate the effects of those products as
6   they would be sold to the consumer, it would
7   make sense to set that test up in a fashion
8   that would be realistic of not just how a
9   consumer would use them, but basically do
10  they perform according to the claims of the
11  manufacturer which in this case are to repel
12  pests and drive them out and presumably out
13  of the building because I don't know where
14  you drive pests within a structure out of if
15  you don't drive them out of the building.
16          It's not of any value if you
17  drive a mouse from its nest behind the
18  compressor of the refrigerator to the void
19  space between the kitchen and the room above.
20      Q.    If you want to turn to the
21  beginning of Exhibit number 3, I want to go
22  over these documents in some orderly fashion,
23  okay?
24      A.    Okay.
25                                              77

POTTER

1       Q.    The first four pages of Exhibit
2   number 3 is essentially the protocol for the
3   testing of the Bell & Howell devices with
4   respect to mice, correct?
5       A.    This was a preliminary
6   protocol, a draft for discussion where we are
7   trying to come up with a residential setting
8   where we could evaluate these devices.
9   Elements of it are the same as in the final
10  protocol, but there are some elements that
11  are quite different.
12      Q.    The first four pages of Exhibit
13  3, they were authored by Bobby Corrigan,
14  correct?
15      A.    I would have to look at the
16  date on this because there was a lot of
17  dialogue back and forth.  In other words,
18  Bobby had in his mind a protocol for
19  evaluating an ultrasonic device and then we
20  had quite a bit of discussion back and forth
21  in terms of would that reveal or demonstrate
22  the efficacy of this device based on claims
23  and based on intents of how it's used so I
24  can't say whether all these words are written
25                                              78

POTTER

1   by Bobby.  There may have been some that were
2   not. I would say the majority of these words
3   were written by Bobby.
4       Q.    Who else do you believe would
5   have written the words in the first four
6   pages of Exhibit 3 other than Bobby Corrigan?
7       A.    Myself or Bill Donohue because
8   we were interacting back and forth, but
9   again, the bulk of this looks like it was the
10  first go around with Bobby in coming up with
11  what would be a reasonable protocol.
12          We started with a slightly
13  different iteration of this in keeping
14  rodents out, but this is certainly -- the
15  bulk of this is definitely Bobby Corrigan's
16  words.
17      Q.    If you go into Exhibit 3 the
18  next couple of pages and I'm looking at two
19  pages that have on the top research notes and
20  has Sierra Research Laboratories logo on the
21  left side?
22      A.    Okay.
23      Q.    This is a handwritten document
24  from someone at Sierra Research Laboratories,
25                                              79

POTTER

1   correct?
2       A.    Correct. Mike is I believe the
3   first name there and I believe he's the
4   brother of Bill Donohue who's one of his
5   experimentalists.
6       Q.    If you go -- I'm looking at a
7   diagram that I assume was provided by Sierra
8   Labs to you concerning the apartments where
9   they were doing some testing of the Bell &
10  Howell devices with respect to mice?
11      A.    Correct.
12      Q.    In doing the test that Sierra
13  did, they did not follow Bell & Howell's
14  usage instructions, correct?
15      A.    If you could give me specific
16  instructions that you're saying it doesn't --
17  well, first of all, we had to modify the
18  experiment because no one was going to allow
19  you to test against an established rodent
20  infestation or certainly it would be
21  difficult to get three units that we tested
22  the device and three units that we didn't
23  have at all quantifiable similar quantities
24  of rodents so we had to obviously do things a
25                                              80

POTTER

1              POTTER
2   bit different here.
3              People will not allow you to
4   wall off your house to try to keep the mice
5   in the evaluation spaces, but in terms of
6   setting up the experiment to be consistent
7   with what we consider to be the most relevant
8   instructions, numbers of devices per unit
9   area was consistent.  Obviously there's some
10  things here that you might say are not
11  consistent like the presence of food and
12  water, but in fact that is consistent with
13  the real world.
14             What's not the real world is
15  inferring that a consumer can pick up all the
16  potential food scraps and debris that mice
17  feed on.  These things can get a scrap of
18  bread and bring it behind the refrigerator
19  and live on it very nicely for a long period
20  of time so what we try to do in design this
21  experiment was simulate real world
22  conditions.
23             What does a mouse need?  It
24  needs a warm place. That's why we typically
25  find them around compressors and heaters and

81

1              POTTER
2   stoves and dishwashers. It wants harborage.
3   It wants food in the vicinity because mice
4   prefer not to forage long distances and
5   moisture so we tried to simulate a typical
6   residential setting in the presence of all of
7   those comfortable things that a mouse or a
8   nest of mice needs and would have if it was
9   established in a dwelling before you
10  introduce these devices to try to drive them
11  away so generally we tried to design this
12  protocol to be consistent with the way the
13  product is used in the environment that the
14  product is used.
15      Q.    The Bell & Howell devices state
16  that you have to make certain that all food
17  is put away?
18      A.    Yes.
19      Q.    And the Bell & Howell
20  instructions you agree with me state that the
21  efficiency of the device decreases if there
22  is food and water available to the pest,
23  correct?
24      A.    They say it on their label.
25  It's not realistic of the real world.

82

1              POTTER
2       Q.    Just so I understand in the
3   Sierra testing, food and water was
4   specifically provided to the mice, correct?
5       A.    Correct.
6       Q.    Wouldn't the test that was done
7   then be contrary to the Bell & Howell usage
8   instructions?
9       A.    First of all, every published
10  study in the prior art on the effects of
11  ultrasonic devices on rodents provided food.
12  The China study, all the studies that Bell &
13  Howell conducted provided food.  It would be
14  a very unrealistic situation to put rodents
15  into a box, a plexiglass box, it's
16  unrealistic as it is, but to deny them
17  sustenance alters the behaviors -- these are
18  very successful animals.
19             A house mouse is probably the
20  most successful mammal probably second to
21  humans based on its prevalence.  They are
22  more common in residential settings than cats
23  and dogs so there is a reason why they've
24  established these infestations in these
25  dwellings in the presence of food.

83

1              POTTER
2            If you've ever pulled back your
3   refrigerator, you will know that there's
4   plenty of food for a mouse or it goes into a
5   wall void or it goes down into the basement
6   and then back up feeding on the bird seed so
7   we are trying to create a real world
8   environment to evaluate, not something that
9   was artificial.
10      Q.    I just want to know is the
11  placement of food and water for mice in the
12  Sierra study, is that contrary to the Bell &
13  Howell usage instructions, yes or no?
14            MR. KOPEL: Objection, asked
15      and answered.
16      A.    The Bell & Howell user
17  instructions are unrealistic and frankly have
18  no influence in my professional opinion on
19  the performance of these products.
20      Q.    So you in either designing or
21  assisting to design these tests did not take
22  into account the Bell & Howell usage
23  instructions, fair?
24      A.    Not fair.
25      Q.    Let me go back. Is the

84



POTTER

1    placement of food and water in that Sierra
2    testing contrary to the usage instructions on
3    the Bell & Howell device?
4        MR. KOPEL: Objection, asked
5        and answered.
6    A.    I've answered it to the best of
7    my ability.  I've said that every study
8    that's been done in the past peer reviewed
9    incorporated the presence of these essential
10   resources.  We tried to duplicate those kinds
11   of results.  These are strong claims of this
12   product and we wanted to evaluate them in as
13   close as we could to the real world what a
14   consumer would face.  They could say remove
15   all food and water and it's a prudent
16   practice in pest management to clean up
17   spills and excess stuff, but whether it's
18   house mouse, cockroach, ant, there is plenty
19   of food -- you cannot sanitize a residential
20   dwelling or a commercial kitchen to the point
21   where there's none of these resources for
22   these pests to sustain themselves so we set
23   up the test with those thoughts.
24   Q.    Doctor, at the beginning of the

85

POTTER

1    deposition I thought you agreed when I said
2    if I ask you a question you will directly
3    answer my question and if you need to
4    elaborate, counsel could ask you questions
5    later, but I really want to get an answer and
6    then we can move on.
7    A.    The devil is in the details in
8    these questions so on the label it says don't
9    put them behind a couch or a large object.  We
10   did not do that.  The label says use roughly
11   one device per average size room.  We in fact
12   used two.  If you look at the dimensions of
13   the two bedroom and one bedroom apartments,
14   we probably could have gotten by with one
15   unit so we tried to accommodate the usage
16   instructions, but there were other factors
17   that we could not ignore to try to come up
18   with a real test.
19       We had one shot at this to try
20   to design something that would reflective of
21   the real world and how these products are
22   used by consumers.  If we had five years to
23   work on this, we might have teased out these
24   various effects.

86

POTTER

1    Q.    In the real world do you know
2    of any person that places food and water in
3    their residence to attract the mice?
4    A.    No, but I have been in hundreds
5    upon hundreds of residential and commercial
6    buildings where the sanitation was so abysmal
7    that it was a feast for pests so it's not --
8    whether we placed it intentionally or whether
9    these food resources were present, these food
10   resources are present for these animals in
11   residential settings or they wouldn't be
12   there.
13   Q.    The Bell & Howell device states
14   that you should make certain that all food is
15   put away, correct?
16   A.    That's what they say on their
17   label.
18   Q.    The testing that was done by
19   Sierra by placing food and water for the mice
20   was contrary to the Bell & Howell usage
21   instructions, correct?  Is it yes or no?
22   A.    I would say that it's contrary
23   to their instructions, but their instructions
24   are unrealistic of the real world.

87

POTTER

1    Q.    I get it and I understand you
2    don't agree with the instructions, but I just
3    want the answer and then we could say
4    good-bye to each other in a shorter span of
5    time.
6    A.    Sorry.
7    Q.    The Bell & Howell device
8    instructions states that the ultrasonic waves
9    cannot penetrate walls and floors and other
10   barriers, correct?
11   A.    Correct.
12   Q.    In the Sierra testing there
13   were bait stations that were utilized,
14   correct?
15   A.    Correct.  Harborages, an empty
16   bait station with a nest and cardboard box
17   over it.
18   Q.    The bait station was
19   manufactured by who?
20   A.    I can't recall if it was a
21   protector.  It was a plastic commercial
22   station that pest control companies use to
23   either install bait or other types of traps
24   and devices within.  I would have to go back

88



POTTER

1
2  to the methods to see the brand because
3  there's a bunch of different makers of these
4  things.
5       Q.    In the Sierra testing the bait
6  stations included bedding for the mice,
7  correct?
8       A.    Correct.
9       Q.    And also the bait stations were
10 then covered by cardboard boxes, correct?
11      A.    Correct.
12      Q.    Providing bait stations and
13 cardboard boxes as harborage for the mice,
14 that's contrary to the Bell & Howell usage
15 instructions, fair?
16      A.    The question requires
17 clarification because they neither instruct
18 or not.  We tried to simulate harborage that
19 would be present in a typical dwelling in an
20 unoccupied apartment.  It's a very unnatural
21 thing to confine mice in a chamber or an
22 arena with no place to be.  That's probably
23 the number one thing that they require
24 because these are nervous, skitterish, shying
25 creatures so our cardboard box was intended

89

POTTER

1
2       Q.    I'm looking at the diagram I
3  believe of the one bedroom apartment, do you
4  have that in front of you?
5       A.    Yes.
6       Q.    And this is a document that
7  someone at Sierra put together, right?
8       A.    Correct.
9       Q.    I take it the gist of this
10 testing was to put these mice in a room, have
11 them acclimated for a week or so with food
12 and water and harborage, right?
13      A.    Correct just as a natural
14 infestation would be prior to purchasing and
15 using these devices.
16      Q.    And then there was a back room
17 door was open for an inch to see if those
18 mice would then leave the front room and go
19 into this back room bedroom, correct?
20      A.    Correct.
21      Q.    There was no food and water
22 provided in the back room, right?
23      A.    Correct.
24      Q.    Why not?
25      A.    We as I said previously tried

91

POTTER

1
2  or our bait station nest in a cardboard box
3  was intended to simulate clutter or a sofa or
4  the void space under a kitchen sink.
5            All of these void spaces are
6  present within a dwelling and we just tried
7  to provide a simulation of those where we
8  could still quantify the effects of the
9  device.
10      Q.    The Bell & Howell instructions
11 that you read do not mention bait stations,
12 correct?
13      A.    Correct.
14      Q.    The Bell & Howell instructions
15 that you reviewed in this case do not mention
16 providing harborages to pests, correct?
17      A.    Correct.
18      Q.    So Sierra in conducting its
19 testing, they had two sets of apartments,
20 correct?
21      A.    Correct.
22      Q.    One was -- some were one
23 bedroom apartments, others were two bedroom
24 apartments, correct?
25      A.    Correct.

90

POTTER

1
2  to devise this experiment like the real
3  world.  In a real situation where a consumer
4  has a mouse, an existing mouse problem, they
5  purchase this device, they put it into
6  various rooms, in this case let's say the
7  front room of the house or this is a small
8  apartment so they had a kitchen connection,
9  those mice are comfortable.  They have food,
10 warmth, harborage, moisture and we wanted to
11 simulate that.
12           We patterned this after other
13 repellency work that was done by a very
14 famous urban entomologist Dr. Walter Ebeling
15 often considered the father of urban
16 entomology who designed a device called the
17 Ebeling Choice Box studies where he was
18 looking at the repellency of an insecticide
19 and what he did is he had a split box with a
20 divider down the middle with a hole in the
21 top and half of that box was treated with the
22 insecticide and half was not and then he
23 darkened the side of the box where the
24 insecticide was applied that you are testing
25 the repellency of that product because a

92

POTTER

1    cockroach wants to be in the dark so it was a
2    way to pressure the repellency of the
3    insecticide to see if it truly was repellant
4    because if it was, the cockroach would end up
5    on the light side so we somewhat adapted this
6    from that concept that if this device will be
7    effective, we want to give the mice the
8    conditions they want.
9             That's why we acclimated them
10   for a period of a week in this portion of the
11   apartment because if they were present in the
12   dwelling, they would be acclimated.  Mice are
13   constantly dropping fecal pellets, they are
14   urinating all over the place, they have
15   pheromones, they have all their essential
16   resources and then we are going to come in
17   with this device and see if it could drive
18   them away so that was the main reason we did
19   it.
20            As a practical matter, if your
21   question is heading towards well, could it
22   have biased the results of this study,
23   clearly it didn't because literally within
24   one day of setting this up with no food in
                                            93

POTTER

1    test was biased because it did not have food
2    and water in the back room where there was no
3    repeller as it did in the room where there
4    was a repeller, fair?
5         A.   No, bias, no, the test was not
6    biased.  You set up experiments to
7    demonstrate different things.  If you look at
8    all of the rodent literature or the insect
9    literature, much of which I suspect you may
10   have not read, you will realize that those
11   studies were conducted in a number of
12   different ways to try to tease out the
13   effects of these devices. That's what we were
14   trying to do here.
15        Q.   Do you believe that the Sierra
16   testing was biased because the room where the
17   repeller was was approximately three times
18   the size of the room without the repeller?
19        A.   No, I don't.  If anything mice
20   like tight secure spaces and clearly it was
21   not biased because in the untreated controls
22   there were just as many mice in the back room
23   as the front room.
24        Q.   So the repeller in this case
                                            95

POTTER

1    the back, roughly three-quarters of the mice
2    initially with the device had moved to the
3    back room and in the untreated controls they
4    were pretty much evenly distributed
5    throughout the entire experiment even though
6    there was no food initially placed in the
7    back.
8             Mice are constantly exploring
9    their territories especially initially and
10   they are constantly moving back to and from
11   food so as a practical matter it didn't
12   really make a lot of difference whether the
13   food was on one side or the other.
14        Q.   Did you ever tell Sierra to put
15   food in the back room where there was no
16   repeller to make the testing more fair?
17        A.   We talked about it and I think
18   we came to the conclusion that this would be
19   a more realistic test to try to demonstrate
20   the claims of the product, the ability to
21   drive the pests out of an area where they
22   were currently residing with all the
23   resources they need.
24        Q.   So you don't believe that the
                                            94

POTTER

1    that Sierra conducted the testing it showed
2    that the repeller was effective in repelling
3    mice, correct?
4         A.   In the first week, roughly the
5    first five to seven days, there did appear to
6    be a movement of mice from the front room to
7    the back room, a disproportionate movement so
8    there was an statistical effect of the device
9    for the first roughly five, six, seven days,
10   but by the second week with the repeller
11   installed apartments, the distribution of the
12   mice had evened out which is consistent with
13   studies that have been done in the past in
14   terms of the habituation of rodents to these
15   ultrasonic devices.
16        Q.   Did you analyze the actual data
17   that was provided by Sierra with respect to
18   the counting of mice?
19        A.   Yes.
20        Q.   So I take it then for the first
21   week at least it's your opinion that the Bell
22   & Howell devices were effective in repelling
23   the mice based on the Sierra test, correct?
24        A.   They certainly caused mice to
                                            96

POTTER

1   move.  I guess the term effective is
2   semantics.  In the larger scheme of things
3   the device was not effective because it's no
4   value to move mice around for five or seven
5   days, but certainly there was a significant
6   effect of the device in the first week of the
7   experiment.
8
9        Q.    Is there any time line that's
10  set forth in any of the Bell & Howell
11  instructions as far as how long it would take
12  to repel pests?
13       A.    My recollection was that they
14  were very nebulous on that and open ended
15  that it could depend on in some cases it
16  would take longer than others.  Wearing my
17  science hat for a minute, I could see how
18  that could be the case depending on the
19  degree of clutter and complexity and where
20  the rodents were and the level of festation,
21  how well established they were, but in this
22  case where we had essentially a vacant
23  apartment with two simple harborages in the
24  front and the back, two weeks to me seemed
25  more than sufficient to determine whether

97

POTTER

1   there was a long lasting effect of this
2   device.
3        Q.    Do you believe the Sierra
4   testing was biased because it allowed only
5   the mice to acclimate in the front room where
6   the repeller was for a week?
7        A.    Not in the sense that we again
8   tried to set up this experiment to reflect
9   the real world where you would be purchasing
10  this device, installing it in your home where
11  there was an existing mouse infestation.
12       Q.    Were the harborages identical
13  in the front room as in the back room with
14  respect to the Sierra testing?
15       A.    They were very similar.  We had
16  the same unused brand new rodent plastic
17  rodent bate stations, we nested them with a
18  cardboard box.  The reason we did that was to
19  provide them a further protective location
20  because mice are always going to try to find
21  the place that's the safest and quietest and
22  where they feel most secure.  My recollection
23  is that we added some wood shavings as a
24  nesting material to the boxes in the front,

98

POTTER

1   but not the back, again, trying to simulate
2   real world conditions.
3        Q.    So they were not identical
4   because you provided nesting materials, wood
5   shavings in the bait stations in the front
6   room, but not the back room, correct?
7        A.    Repeat the question one more
8   time.
9        Q.    So the bait stations in the
10  front and back room were not identical
11  because you provided wood shavings to the
12  bait stations in the front room and not the
13  back room, fair?
14       A.    That is correct, but again, as
15  a practical matter, they clearly were very
16  comfortable utilizing the back boxes because
17  it was a uniform distribution in the
18  untreated controls so all the untreated
19  controls and all the treated apartments had
20  while granted a slightly different make-up,
21  the distribution of the mice would show that
22  the mice were -- the important thing is the
23  harborage, okay.  It's not the location of
24  the food because these mice are moving back

99

POTTER

1   and forth and I think that's what lacking
2   untreated controls some of these questions
3   might be raised which is one of the problems
4   with all the studies that were done in China.
5             MR. KOPEL: Were you done with
6        your answer?
7             THE WITNESS: Yes.
8        Q.    How many mice would have gone
9   into the front room if there was food and
10  water placed in the back room, do you know?
11       A.    You're saying we would have the
12  devices positioned in the same location and
13  put the food and water in the back room, but
14  only -- switch the rooms around with just
15  harborage in the front room, probably the
16  results would be -- I would suspect they
17  would be very similar because these mice were
18  clearly moving back and forth.
19       Q.    How do you know if you didn't
20  do it?  How would you know as a scientist if
21  you didn't do that test?
22       A.    Well, when you look at all the
23  data of the study and you look at the fact
24  that we had untreated controls and you look

100



POTTER

1    at the fact that we replicated the study and
2    you look at the locations of the mice and you
3    look at the web camera, the photographs of
4    locations of the mice, these mice were
5    running back and forth all over this
6    apartment and would the results have come out
7    exactly the same, you would have to test it,
8    but substantively I think we would have
9    gotten a very similar result.
10       Q.    But unless we test something,
11   as a scientist you would agree that unless
12   you test something, you really don't know,
13   fair?
14       A.    The nature of science and the
15   nature of manufacturing has been pointed out
16   by your experts as based on trying to come up
17   with the best answer you can with the data
18   you have and hopefully you generate enough
19   data to come to a meaningful conclusion. We
20   have not gotten to the China studies yet,
21   perhaps we never will, but if we want to
22   critique methodologies in terms of what's
23   completely appropriate, in other words, if
24   these label instructions of the manufacturer

101

POTTER

1    testing?
2       A.    I'll have to go to the
3    methodology. The cardboard boxes were placed
4    four feet from the walls. I can do that --
5    if you want, I can go to the methods. Would
6    you like me to do that?
7       Q.    No, I don't want you to.
8       A.    But you could see from the
9    diagram, you could see from the photographs,
10   I think there's a couple of photographs in
11   the report that show the position of the food
12   dishes and the boxes in relation to the
13   repellers and we made a very conscious effort
14   not to put those harborages in front of the
15   repellers trying to comply with the
16   instructions.
17       Q.    I take it there was no testing
18   done to actually determine the impact that
19   the cardboard boxes would have to act as a
20   barrier with respect to the Bell & Howell
21   ultrasonic waves, fair?
22             MR. KOPEL: Objection, asked
23        and answered.
24       A.    In the context with all the

103

POTTER

1    were based on the China studies, I'm not sure
2    how you could base those -- I don't know what
3    they base those recommendations on those
4    instructions because it was not based on
5    research that was credible.
6       Q.    Was there any testing done that
7    you know of to determine the impact of the
8    cardboard boxes to act as a barrier of the
9    ultrasonic waves?
10       A.    Not other than it's been known
11   for many years that ultrasound does not
12   penetrate solid objects. In the case of
13   specifically of the Bell & Howell devices,
14   Dr. Mankin placed a half inch thick corkboard
15   in front of the ultrasonic device which
16   greatly reduced its amplitude and its waves
17   and there's been other studies like that so
18   we did not specifically evaluate the
19   cardboard boxes, but you notice from the
20   diagram and the photographs that we did not
21   place a cardboard box directly in front of
22   the device.
23       Q.    How far was the cardboard box
24   placed in front of the device in the Sierra

102

POTTER

1    qualifications I just said, I would say that
2    we did not do specific testing on these
3    cardboard boxes in terms of deterring the
4    waves of these devices, but they again were
5    not in line with the devices so it's kind of
6    a moot point.
7       Q.    But I take it from what Dr.
8    Mankin did, you would expect that the
9    cardboard boxes would act as a barrier to
10   ultrasonic sound waves, fair?
11       A.    I would, yes.
12       Q.    Did you do in this case any
13   testing with respect to whether the bait
14   stations that were used by Sierra would act
15   as a barrier to the Bell & Howell ultrasonic
16   waves?
17       A.    We did not because it really
18   was an irrelevant question because we didn't
19   put the bait stations or the boxes in front
20   of the devices.
21       Q.    I take it though based on what
22   Dr. Mankin did, you would expect that the
23   bate stations would act as a barrier to the
24   Bell & Howell ultrasonic waves, fair?

104

POTTER

```
 1                  POTTER
 2       A.    If they were in direct line
 3  with the device, yes.
 4       Q.    Do you know of any repeller in
 5  the market today that would repel rodents
 6  when a bait station and cardboard harborage
 7  is placed in a room and food and water is
 8  supplied to the rodents?
 9       A.    I don't know any repeller on
10  the market that would repel rodents under any
11  circumstances and I think that's what the
12  past literature shows and what these studies
13  showed so I guess the answer is no with that
14  qualifier.
15       Q.    If you turn the pages on
16  Exhibit 3, I'm looking at a page that has
17  total number of mice counted and percentage
18  of distribution, that's something that
19  someone at Sierra created?
20       A.    Yes.
21       Q.    I take it 12 mice were put into
22  these apartments by Sierra, correct?
23       A.    Initially, yes.
24       Q.    And then at some point Sierra
25  would go in and count the mice to see which
                                              105
```

```
 1                  POTTER
 2  room they were in either the back room or
 3  front room, correct?
 4       A.    Correct.
 5       Q.    Did it concern you that the
 6  front room was three times larger than the
 7  back room?
 8            MR. KOPEL: Objection, asked
 9       and answered.
10       A.    First of all, the thing that
11  concerned me the most was that the ultrasonic
12  output of the devices was deemed sufficient
13  by the manufacturer instructions based on the
14  square footage of where they were installed
15  and as I said previously that in this
16  particular instance two devices is more than
17  adequate based on the manufacturer's
18  instructions for this size space. It didn't
19  concern me as I said that the back room was a
20  different dimension than the front room in
21  this particularly designed study because
22  again the rodents clearly did not avoid the
23  slightly smaller bedroom in the untreated
24  controls.
25       Q.    The document that you are
                                              106
```

```
 1                  POTTER
 2  looking at --
 3       A.    If we had no untreated controls
 4  or no replication as was done in the China
 5  studies, these would all be legitimate
 6  questions, but they don't concern me because
 7  we did have them.
 8       Q.    Sierra also provided
 9  handwritten notes with respect to the
10  counting of the mice in the apartments. It's
11  further down where they provided the counts
12  that they did in the morning and afternoon?
13       A.    Okay.
14       Q.    I take it the summary document
15  that we saw as part of Exhibit 3, that
16  essentially just is a summary of what is in
17  these handwritten notes; would you agree with
18  that?
19       A.    Yes, this document we just
20  talked about with the 14 days with the
21  assessments made twice a day is a compilation
22  of these results.
23       Q.    Do you know -- actually the
24  handwritten notes are even further from the
25  counting?
                                              107
```

```
 1                  POTTER
 2       A.    Okay, correct.
 3       Q.    Do you know how Sierra entered
 4  the apartments to do the counting?
 5       A.    Yes.
 6       Q.    How?
 7       A.    The inspector was instructed to
 8  go into the apartment and try to use the
 9  minimal degree of disruption possible because
10  again these are vacant apartments, you have a
11  dozen or so mice running all over the place
12  so they were instructed to carefully observe
13  the room as they came in for any presence of
14  mice that were visible.
15            In some cases they were not in
16  the harborages, they were, for example, I
17  think there is a photograph showing some in
18  an open door pantry in the corners and then
19  they were instructed to carefully lift up the
20  cardboard box and some of the mice were
21  nesting between the cardboard box and the
22  plastic bait station within and count those
23  and then open the box carefully and count
24  those and then put everything back and do the
25  same thing in the back room in the hallway so
                                              108
```

POTTER

1  the idea was to not spend an hour in every
2  apartment for a variety of reasons, but the
3  most crucial one from a science reason is to
4  not be disturbing the location of the mice
5  anymore than is possible.
6      Q.    If the mice in the front room
7  of the apartments were inside the bait
8  station and the harborages to seek protection
9  from the repeller, would you consider the
10 repeller to be effective?
11     A.    No.  First of all, the thing
12 that mice want more than anything is a
13 protected place, a harborage, a space, a
14 void, a pile of boxes in your garage and in a
15 vacant apartment like this we took away all
16 of the prime harborage locations other than
17 these boxes so no, the natural tendency of
18 these mice is to go into these boxes, but
19 being territorial and there's going to be
20 only so many mice that will accommodate other
21 mice within those boxes, some ended up
22 nesting or residing in other locations in the
23 apartment corners and so forth.
24     Q.    You considered mice inside the

109

POTTER

1  bait station which was covered by the
2  cardboard box to have -- in the front room to
3  have not been repelled even though the
4  ultrasonic sound waves could not penetrate
5  the cardboard box and the bait station, fair?
6      A.    Correct and again the
7  supposition is that these mice are constantly
8  foraging looking for food and resources.
9  They go to resources constantly in the course
10 of a day or a night so it was not like mouse
11 was in this box for 14 days.  They were
12 moving all around and I think the web camera
13 stuff demonstrate that as well.
14     Q.    There was a cabinet in the
15 front room of the apartments where the
16 repeller was located, correct?
17     A.    Correct.
18     Q.    Did that -- what was that
19 cabinet made of, do you know?
20     A.    From the pictures it looks like
21 wood.  It's actually sort of a pantry.  These
22 are small apartments and the front room sort
23 of blended into the kitchen area before they
24 put that divider up.

110

POTTER

1      Q.    The ultrasonic waves of the
2  Bell & Howell device could not penetrate that
3  wood cabinet, would you agree with me?
4      A.    Correct, if they were not
5  oriented directly into the opening.
6      Q.    Wouldn't mice that are found in
7  that cabinet, wouldn't you assume that they
8  are seeking shelter from the ultrasonic waves
9  of the Bell & Howell device?
10     A.    If they were seeking shelter
11 from the ultrasonic device, all of the
12 replications and the untreated controls would
13 have demonstrated that these mice would only
14 have been in those areas and probably
15 disproportionately on the backside because
16 again these mice are constantly moving
17 around.  They are not like in those cabinets.
18     You could see that these mice
19 were bringing resources back into the
20 cabinets so they are out there in the open
21 feeding on the food dishes, feeding on the
22 water, whether they are nesting in the back
23 bedroom or the front bedroom and that's the
24 way mice behave in a residential setting.

111

POTTER

1      Q.    If the mice were in the kitchen
2  cabinet, would you assume then that the mice
3  are seeking shelter from the repeller?
4      A.    No, I would not assume that.
5      Q.    Why not?
6      A.    Based on the totality of the
7  other data in this study and 50 years worth
8  of other research, peer reviewed work that
9  shows that these rodents are not impacted by
10 ultrasonics.
11     Again, we did have a temporary
12 effect for five days and it treated so there
13 does definitely appear to be some effect of
14 the device, but they quickly habituated.
15     To answer your question, I
16 cannot prove with absolute certainty that the
17 mice in the cabinet were not somewhat being
18 impacted, but clearly as a practical matter
19 it doesn't effect the inability of these
20 devices to drive pests out of an area or of a
21 dwelling because if you look at the picture,
22 there is an ultrasonic device, two ultrasonic
23 devices cross wise within a foot or two of
24 where these mice were nesting.

112

POTTER

```
 1              what good does it do to move --
 2    even if it did move the mice over, what good
 3    does it do to move a mouse over 12 inches in
 4    the kitchen.  How do these devices drive
 5    pests out of a dwelling, that one I'm still
 6    struggling with.  Where do they go?
 7         Q.    Sir, this is my only
 8    opportunity to ask you questions and then I
 9    want to get out of here and go back home so I
10    understand you are intrigued, you have a lot
11    to say about the case and all that and maybe
12    if they ever make a movie of this case, it
13    will be more interesting, but for now if we
14    can just answer my questions so we can get
15    out of this thing.
16              MR. KOPEL: Give full and
17         complete answers.  You do not need to
18         limit your answers.
19         A.    I'm trying to provide
20    clarification of my opinions because this
21    stuff is more complicated.
22         Q.    I take it Sierra Lab in
23    conducting its count, it counted mice in the
24    kitchen cabinet as not being repelled,
25                                              113
```

POTTER

```
 1    it was considered repelled.
 2         Q.    I'm looking at the handwritten
 3    notes from Sierra which are dated October
 4    12th, the evaluation time is 9:20 a.m., do
 5    you see that? I think it was the first day of
 6    the study.
 7         A.    October 12th, 9:20 a.m., yes.
 8         Q.    They found five mice located in
 9    the harborages of the front room, correct?
10         A.    Which apartment are we talking
11    about?
12         Q.    I'm talking about all three
13    apartments where the Bell & Howell devices
14    were in place?
15         A.    Okay, you are looking at the
16    sum at the bottom?
17         Q.    Yes.
18         A.    Correct.
19         Q.    If you look at the summary,
20    this summary here, Sierra wrote that there
21    were eight mice found in the front room, do
22    you see that?
23         A.    I'm trying to get the days
24    right here.
25                                              115
```

POTTER

```
 1         correct?
 2         A.    Correct.
 3         Q.    It counted mice that were
 4    inside bait stations and the cardboard
 5    harborages of the front room as not being
 6    repelled, correct?
 7         A.    Correct.
 8         Q.    It counted mice that were in
 9    the hallway by the back room as not being
10    repelled, correct?
11         A.    Correct.  There was a reason
12    for that.
13         Q.    It also counted mice that were
14    stuck in a doorjamb in the back room as not
15    being repelled, correct?
16         A.    I would have to know whether
17    that was -- I would have to look at that
18    specific mouse and see where it was scored
19    and why it was scored that way, but yes, if
20    the mice were present either within a
21    harborage or somewhere else in the apartment,
22    if they were in the front area with a
23    connection to the hallway, the score is being
24    not repelled, if they were in the back room,
25                                              114
```

POTTER

```
 1         Q.    This is day one of the study so
 2    it would be the first item?
 3         A.    Got it.
 4         Q.    They counted a mouse that was
 5    dead in the back hallway as not being
 6    repelled, fair?
 7         A.    Yeah, again, first of all, the
 8    counts that you are showing on this page with
 9    the notes is the front room and the back room
10    in the boxes and then they have comments on
11    each of these valuation dates in terms of
12    other mice that were found and where they
13    were located and if you tally those with
14    these, it should tally to this. At least when
15    I went through these, essentially all of them
16    they tallied, they may have all tallied so I
17    think if we go back to --
18         Q.    I'm staying -- I would like to
19    stay on this document.
20         A.    But the other three mice were
21    counted for in the front room in the comments
22    if you read this.
23         Q.    One of the three mice is a dead
24    mouse in the back hallway that was counted as
25                                              116
```

POTTER

1
2  being in the front room, correct?
3       A.    Right.
4       Q.    So that mouse that's dead you
5  would consider as not being repelled by the
6  Bell & Howell devices, correct?
7       A.    We discussed this of the
8  handling of dead mice. There were some
9  granted and it was primarily a couple
10  apartments B104 and 108, but the scoring of
11  how do you score a dead mouse that you find
12  in a box in the front room or how do you
13  score a dead mouse that you find in the back
14  room.  We decided to score those as that's
15  where they were found and that was where they
16  were scored.
17            There could be some question as
18  to how did it get there and was it at some
19  point in the back room and the front room,
20  but you have to look at the totality of the
21  data which is very clear in terms of where
22  these mice were in the untreated and the
23  treated groups.
24       Q.    On the next handwritten notes
25  which is their 4:53 p.m. count?

117

POTTER

1
2       A.    What day?
3       Q.    October 12th, there were two
4  mice in a doorjamb in the comments in
5  apartment B108?
6       A.    Yes.
7       Q.    Do you know which doorjamb the
8  mice were in?
9       A.    Well, I'll have to do the
10  calculation comparing this to -- I went
11  through every one of these and comparing the
12  data that they -- the raw data handwritten
13  and the transcribed data and the vast
14  majority of them came out to be clear and
15  understandable of why they scored it and how
16  they did, but I'll have to go and look at
17  this one if you want me to.
18       Q.    If the doorjamb they are
19  referring to is for the back room, wouldn't
20  you consider those mice to have been repelled
21  by the Bell & Howell device?
22       A.    Not i it was the front
23  doorjamb.  If you look at this diagram --
24       Q.    No, but my question was if it
25  was the back door.  I want to give you every

118

POTTER

1
2  opportunity to answer me.
3       A.    My assumption because I also
4  had to put a sharp pencil to these comments
5  and how they came up with these results and
6  my assumption is if they scored these in the
7  front room or the back room, it was because
8  they deemed looking at this diagram that they
9  would have been on the outside of that
10  doorjamb facing the hallway rather than the
11  back.
12       Q.    Is it fair to say we don't
13  know, at least you and I don't know at this
14  time what doorjambs Sierra was referring to?
15       A.    That's correct and I would
16  again question if it wasn't looking at all
17  this other data, it was quite clear the
18  thoroughness of these comments which are
19  pretty darn extensive for this kind of a
20  study and they were consistent with the
21  tabulation of the data and the formation of
22  these graphs so if we are nitpicking
23  something, okay, granted, I don't know in
24  that particular case, but if there is, you
25  know, show me other things that are

119

POTTER

1
2  problematic with the way they scored this
3  data and transcribed it to the chart and
4  maybe we can --
5       Q.    If dead mice and mice in the
6  hallway were counted as being repelled or
7  just not counted at all, wouldn't it show
8  greater effectiveness of the Bell & Howell
9  devices with respect to the Sierra test?
10       A.    There were dead mice in the
11  untreated controls as well I believe.  I
12  can't remember the proportionality compared
13  to the treatments and the numbers of dead
14  mice were -- throughout the course of the
15  experiment while the device was activated
16  were rather small limited primarily to two
17  units.
18            We still ended up with nine
19  live mice extracted from each of those
20  apartments at the end of the study so it's
21  not like all the mice were dead, but it was a
22  decision that had to be made how do you score
23  a mouse in terms of where it was located.
24            If it was in the hallway, it
25  was scored as the front room because it was a

120



Dr. Michael Potter 01/09/2018

POTTER

1 POTTER
2 direct line from the repeller in the front of
3 the room straight down the hallway,
4 therefore, we made that decision that based
5 on the distance, it would be reasonable to
6 include the hallway as part of the front
7 room.
8      Q.    Have you tried to do the
9 calculations from the Sierra testing by
10 calculating dead mice or mice in the hallways
11 as being repelled what that would look like?
12      A.    First of all, why would we
13 score mice in the hallway as being repelled?
14      Q.    I take it you have not done
15 that calculation, right?
16      A.    No, I'm sorry.
17      Q.    If we did calculate mice in the
18 hallway or dead mice as being repelled, it
19 would show greater effectiveness of the Bell
20 & Howell device, fair?
21      A.    Fair.
22      Q.    You indicated that there was
23 either 11 or initially there were 12 mice put
24 into at least the majority of these
25 apartments, correct?

121

1 POTTER
2 fair?
3      A.    Yeah, they would escape to the
4 back room which is what they were shown in
5 the untreated controls if they were trying to
6 get away from the device.
7      Q.    All of the mice in the
8 apartments were not actually discovered on
9 numerous days during this testing, correct?
10      A.    Correct.
11      Q.    Why not?
12      A.    Because this is a real world
13 experiment.  As I said, they spent -- they
14 tried not to be destructive in their
15 assessments in the count so they had a
16 limited amount of time in the apartment.
17 They didn't pry back masonite to see -- in
18 some cases some of these mice chewed through
19 the bottom of the baseboard, but these things
20 are small and cryptic and get into small
21 spaces so the answer is if it was a plastic
22 cube we could have counted, but in the real
23 world it's darn difficult to find and count
24 every last mice, not surprising at all.
25      Q.    Could some of the mice have

123

1 POTTER
2      A.    Correct.
3      Q.    One of the apartments they only
4 introduced 11 mice, correct?
5      A.    I would have to go back and
6 look at the records, but the intent was to
7 put 12 in, acclimate them for a week.  In some
8 cases some mice died.  We did replenish mice
9 before we activated the device to begin the
10 experiment.  We never replenished mice after
11 that.  If you show me where it says 11, it
12 may have been 11 in one, but the intent was
13 to put 12 mice in each apartment.
14      Q.    The apartments were constructed
15 to prevent the mice from escaping the
16 apartments, correct?
17      A.    As best we could that was the
18 intent of the masonite.  It was successful
19 most of the time, but in some cases it
20 wasn't.
21      Q.    Even if the mice wanted to
22 escape, let's just assume because of the
23 ultrasonic waves of the repeller, they really
24 could not except to go into the back room,
25 the kitchen cabinets or the bait stations,

122

1 POTTER
2 escaped the apartment?
3      A.    They could have which is why we
4 did a final more of a destructive count at
5 the very end of the study where they removed
6 the masonite panels and I think there is a
7 page in here that talks about the post mortem
8 counting of numbers of mice in the units and
9 the numbers are fairly reflective.  There
10 were some that were never recovered, but the
11 numbers were pretty good.
12           One unit 205 we had problems
13 and it was documented in the comments, a
14 large hole was chewed so several of the mice
15 escaped.  102 had 12 that they recovered, 106
16 had 10, 104 and 108 had 9 each and 103, 12
17 alive, four dead, that was the apartment that
18 initially we introduced -- we lost a lot of
19 mice so we wanted to be sure we had enough to
20 have that be a reasonable experimental unit
21 so we probably added more than 12 which is
22 why we have a number that's basically higher
23 than the initial 12.
24      Q.    If you go to the October 16,
25 2017 date and I'm referring to the 4:54 p.m.

124



```
 1                POTTER
 2  comment?
 3       A.    Okay.
 4       Q.    With respect to the treated
 5  apartments, there were ten mice found in the
 6  two boxes in the front room, correct?
 7       A.    Correct.
 8       Q.    Sierra calculated though 19
 9  mice as being in the front room in their
10  summary, correct?
11       A.    Is this the table?
12       Q.    October 16th, yes.
13       A.    This is day five?
14       Q.    Day five, yes.
15       A.    It's the second evaluation so
16  your question again?
17       Q.    Sierra calculated 19 mice as
18  being found in the front room, correct?
19       A.    Correct.
20       Q.    Again, Sierra included dead
21  mice as well as mice inside the cabinet, the
22  wood cabinet, right?
23       A.    Mice that were not in the
24  boxes, but were in the front room were
25  counted as being in the front room so in the
                                          125
```

```
 1                POTTER
 2  cabinet, along the baseboard, in a corner of
 3  the room, correct.
 4       Q.    In total there were -- to begin
 5  with there should have been 36 mice in the
 6  three apartments where the Bell & Howell
 7  device were placed, right?
 8       A.    If we introduced 12 in each of
 9  those and I'd have to go back to the first
10  page.
11       Q.    And we saw in some of these
12  some mice ended up dying, right?
13       A.    Correct.
14       Q.    Do you know how Sierra then
15  counted 40 mice in the treated apartments on
16  October 16, 2017?
17       A.    October 16th, are we talking
18  about the first evaluation or the second?
19       Q.    The second. They calculated
20  finding 40 mice?
21       A.    Can you show me -- in the
22  treated group 19 in the front room and 21 in
23  the back room.
24       Q.    That's 40 mice, right?
25       A.    Correct.
                                          126
```

```
 1                POTTER
 2       Q.    That's clearly wrong, right?
 3       A.    Because you are saying that --
 4  I'm going to need a break because I'm
 5  starting to have a hard time doing what
 6  should be a simple task here.
 7       Q.    19 plus 21 is 40, right?
 8       A.    Correct.
 9       Q.    There's no way there were 40
10  mice found in the three apartments with the
11  Bell & Howell device, correct?
12       A.    You are saying if they only
13  introduced 36 to begin with?
14       Q.    Yes.
15       A.    But I said there was one
16  apartment where -- let me go back to the data
17  sheet on day zero.  You notice in apartment
18  B104 which was one of the treated apartments
19  they said that some escaped, they had some
20  holes, they added three new mice and then in
21  102 -- I can't explain how the numbers don't
22  add up, but whether it should be 36 or 40,
23  they clearly added additional mice at the
24  beginning of the experiment if they found
25  reason to do so like why start an experiment
                                          127
```

```
 1                POTTER
 2  for example in 205 where they found a hole
 3  and two mice when they went in there so they
 4  introduced ten more.  They tried to start the
 5  experiment with proportionately the same
 6  numbers of mice to begin things, but this is
 7  the real world.
 8            You have to remember these are
 9  field collected mice, wild mice collected
10  from a poultry house and conditioned or
11  residing for a week or two weeks before they
12  are introduced.  Stuff happens.  They eat
13  each other.  Some might just die from
14  handling, but we tried to start the
15  experiment with a proportionately similar
16  number of mice.
17       Q.    Is it fair to say that you
18  don't know when they introduced if they did
19  at all mice into the apartments that were
20  treated by the Bell & Howell devices?
21       A.    Could you repeat that?
22       Q.    Do you know when Sierra if it
23  did at all introduce any mice into the three
24  apartments where the Bell & Howell devices
25  were placed after activation of the devices?
                                          128
```

| | POTTER |
|---|---|
| 1 | POTTER |
| 2 | A.    I think the protocol said that |
| 3 | they basically introduced the devices or they |
| 4 | introduced the mice and then they activated |
| 5 | the devices, but let me read this again. |
| 6 | Turned on 3:15 p.m. Bell & |
| 7 | Howell devices in the front room.  First of |
| 8 | all, they replenished the mice before they |
| 9 | turned the devices on is my interpretation of |
| 10 | this. |
| 11 | Q.    Okay so there should not have |
| 12 | been 40 mice in the three apartments on |
| 13 | October 16, 2017, correct? |
| 14 | A.    There might have been 39. |
| 15 | Q.    Do you know one way or the |
| 16 | other? |
| 17 | A.    No, I don't. |
| 18 | Q.    I'm looking at October 19, |
| 19 | 2017, the five p.m. count.  I show that there |
| 20 | were three mice found inside the harborages |
| 21 | of the front room, but Sierra calculated 12 |
| 22 | mice as being in the front room? |
| 23 | A.    Can you -- are we talking about |
| 24 | the first time? |
| 25 | Q.    Study day 8, 5:00 p.m.? |

129

| 1 | POTTER |
|---|---|
| 2 | A.    Okay and the question? |
| 3 | Q.    There are only three found in |
| 4 | the harborages of the front room, but they |
| 5 | calculated 12 in their chart as being found |
| 6 | in the front room? |
| 7 | A.    I really do need to take a |
| 8 | break. |
| 9 | MR. OSTOJIC: Okay.  Let's take |
| 10 | a break. |
| 11 | (Luncheon recess taken at |
| 12 | 12:25 p.m.) |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

130

| 1 | POTTER |
|---|---|
| 2 | A F T E R N O O N   S E S S I O N |
| 3 | (Time Noted: 1:10 p.m.) |
| 4 | |
| 5 | M I C H A E L   P O T T E R, resumed and |
| 6 | testified as follows: |
| 7 | |
| 8 | CONTINUED EXAMINATION |
| 9 | BY MR. OSTOJIC: |
| 10 | Q.    Doctor, we're back from our |
| 11 | lunch break.  I wanted to finish up on some |
| 12 | of the testing that Sierra Research Labs did |
| 13 | on the repellers and mice, okay? |
| 14 | A.    Okay. |
| 15 | Q.    Was there ever any discussion |
| 16 | to either remove that wood cabinet in the |
| 17 | front room or seal it to prevent mice from |
| 18 | entering? |
| 19 | A.    Not to my knowledge. |
| 20 | Q.    At some point there were rats |
| 21 | that got into the apartment, do you recall |
| 22 | that? |
| 23 | A.    Yes. |
| 24 | Q.    Do you know how the rats got |
| 25 | into the apartments? |

131

| 1 | POTTER |
|---|---|
| 2 | A.    I have no idea. |
| 3 | MR. KOPEL: I think you were in |
| 4 | the middle of looking at a specific |
| 5 | tabulation just before lunch and Dr. |
| 6 | Potter might have something to add. |
| 7 | If you don't want to go back to that, |
| 8 | that's fine. |
| 9 | Q.    Are you intending on doing |
| 10 | further calculations from what Sierra |
| 11 | Research Labs did in counting mice that were |
| 12 | repelled and not repelled depending upon |
| 13 | where they were located? |
| 14 | A.    No. |
| 15 | Q.    Bobby Corrigan, he initially |
| 16 | designed the protocol for the testing of the |
| 17 | Bell & Howell devices with respect to mice, |
| 18 | correct? |
| 19 | A.    Correct. |
| 20 | Q.    And then Mr. Donohue -- |
| 21 | A.    Dr. Donohue. |
| 22 | Q.    Dr. Donohue of Sierra Research, |
| 23 | he inputted or made some revisions to the |
| 24 | design protocol, correct? |
| 25 | A.    As did I, yes. |

132

POTTER

1
2    Q.   Initially it was thought to use
3  house mice for the testing that Sierra
4  Research was going to do, correct?
5    A.   Yes.
6    Q.   Ultimately wild mice were found
7  and used?
8    A.   They were house mice, but wild
9  mice.  House mice could live in the wild as
10  well so they were field collected wild mice
11  of the species Mus musculus, they were house
12  mice.
13    Q.   Conducting a test in a barn or
14  a commercial setting would not have been
15  appropriate for these Bell & Howell devices,
16  correct?
17    A.   Could you restate the question?
18    Q.   Conducting testing of the Bell
19  & Howell devices in a barn or a commercial
20  setting such as a warehouse would not be
21  appropriate, fair?
22    A.   No, not necessarily because I
23  think the label talks about using the devices
24  in homes and offices and other places.  I
25  don't think they specifically exclude other

133

POTTER

1  I wanted to try to accomplish that if we
2  could.
3
4    Q.   Did the Bell & Howell
5  instructions mention anything about using it
6  in barns or warehouses or kind of
7  agricultural settings or rural settings I
8  should say?
9    A.   I would have to look at the
10  label.  If you have one, I could look at it,
11  but as I recall, it talked about homes and
12  offices and other places so I got the
13  impression that if you want to put these
14  things into a restaurant or a tool shed
15  behind your house assuming it was closed,
16  that there would be no reason why a consumer
17  would not assume that, but I could see the
18  main uses of these things would be probably
19  by householders in residential settings.
20    Q.   Robert Corrigan in an e-mail to
21  you wrote rural and urban structures are not
22  equal and the environmental variables
23  affecting barns, sheds, livestock buildings
24  are not close to those of a suburban home.
25  Would you agree with that?

135

POTTER

1  types of structures provided you use enough
2  of the devices for the square footage.
3    Q.   On August 17, 2017 you wrote an
4  e-mail where you stated that you would be a
5  bit concerned about getting too far astray
6  from a set up that's not translatable to
7  usage in a residential setting (devices claim
8  to drive pests out of homes, offices, etc.)
9  You wrote that e-mail, right?
10    A.   Correct.
11    Q.   Why did you at that time think
12  that you needed a residential setting rather
13  than barns and such?
14    A.   I think it was because in
15  talking on the telephone or by e-mail or both
16  with Bill Donohue he mentioned he had some
17  other possibilities for rodent infestation. I
18  think one of them involved a rat infestation
19  if I'm not mistaken and I wanted to be sure
20  that one, we designed this study with
21  adequate replication and untreated controls
22  and an experimental design that would be most
23  reflective of a residential setting where
24  presumably most of these devices were used so

134

POTTER

1
2    A.   I would.
3    Q.   So testing done in barns,
4  sheds, livestock buildings rather than a
5  residence would not be appropriate for the
6  testing of the Bell & Howell devices to
7  determine its efficacy, fair?
8         MR. KOPEL: Objection, asked
9         and answered.
10    A.   It would be less desirable, but
11  if you look back on 50 years worth of
12  literature, it's difficult to do studies on
13  these devices in residential settings so you
14  can design your experiments in warehouses and
15  vacant buildings and still get meaningful
16  data on these devices, but again, we wanted
17  to try to make this as close as possible to a
18  residential setting.
19         Most commercial settings,
20  office buildings, restaurants and so forth
21  have professional pest control services and
22  again the pest control industry over many
23  years has concluded these devices are
24  ineffective so I don't think you would find
25  many of them used in those kinds of

136

