IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOANNE HART and SANDRA BUENO, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>BHH, LLC d/b/a BELL + HOWELL, and VAN HAUSER, LLC,<br><br>    Defendants. | CASE NO. 1:15-cv-04804-WHP<br><br>JUDGE WILLIAM H. PAULEY<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE THE REBUTTAL EXPERT TESTIMONY OF STEFAN BOEDEKER** |

LEAHY, EISENBERG & FRAENKEL, LTD.
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
Tel. (312) 368-4554
***Counsel for BHH, LLC, and VAN HAUSER, LLC***

# TABLE OF CONTENTS
## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE THE REBUTTAL EXPERT TESTIMONY OF STEFAN BOEDEKER

Introduction..................................................................................................1

Argument.....................................................................................................3

I. Weir's Supplemental Expert Disclosure is Untimely and Represents an Attempt by Plaintiffs to Retroactively Justify Analysis Weir Either Did Not Perform or Failed to Adequately Explain in Weir's Initial Expert Disclosure...........................................3

II. Expert Testimony Criticizing an Opposing Expert's Methodology and Offering an Alternative Methodology is Proper Rebuttal Opinion..........................................5

    A. Boedeker Opines on Weir's Failure to Consider an Alternative Damages............................................................................................6

    B. Boedeker Criticizes Weir's Failure to Modify His Hypothesis When Faced With Evidence to the Contrary...................................................................7

III. Boedeker's Opinions Are Not Unreliable........................................................10

    A. Boedeker's Hedonic Regression Analysis is Reliable.....................................10

        i. Boedeker Performed a Hedonic Regression Analysis in Order to Demonstrate the Flaw in Weir's Opinion that Hedonic Regression Analysis Was Unnecessary ...................................10

        ii. Boedeker's Analysis Used the Data Available to Him..........................13

    B. Boedeker's Opinion Criticizes Weir's Initial Expert Disclosure Which Lacks Sufficient Explanation or Support for the Analysis Weir Purports to Have Done.....14

Conclusion..................................................................................................17

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Allen v. Dairy Farmers of Am., Inc.*, 2014 U.S. Dist. LEXIS 8343 (D. Vt. 2014)..........9,12,13

*Daubert v. Merill Dow Pharmaceuticals, Inc.*, 293 U.S. 579 (1993)...............................16

*Equant Integrations Servs., Inc. v. United Rentals*, 217 F.R.D. 113 (D. Conn. 2003).............4

*Linde v. Arab Bank*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013)...............................................1

*Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industire*, 2015 U.S. Dist. LEXIS 123591 (S.D.N.Y. 2015)...............................................................................6

*Pharmanetics, Inc. v. Aventis Pharms., Inc.*, 2015 U.S. Dist. LEXIS 45768 (E.D.N.C. 2015)...............................................................................................................7

*Sandata Techs., Inc. v. Infocrossing, Inc.*, 2007 U.S. Dist. LEXIS 85176 (S.D.N.Y. 2007)...............................................................................................................4

*Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33 (S.D.N.Y. 2016)...........................1,6

*In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230 (E.D.N.Y. 2007).........................10

### OTHER AUTHORITIES

Reference Guide on Estimation of Economic Damages, 2011 WL 7724259......................8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOANNE HART and SANDRA BUENO, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BHH, LLC d/b/a BELL + HOWELL, and VAN HAUSER, LLC, <br><br> Defendants. | CASE NO. 1:15-cv-04804-WHP <br><br> JUDGE WILLIAM H. PAULEY <br><br> **<u>DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE THE REBUTTAL EXPERT TESTIMONY OF STEFAN BOEDEKER</u>** |

NOW COME Defendants, BHH, LLC d/b/a BELL + HOWELL and VAN HAUSER, LLC, by and through their counsel, LEAHY, EISENBERG, AND FRAENKEL, LTD., and for their Response in Opposition to Plaintiffs' Motion to Preclude the Rebuttal Expert Testimony of Stefan Boedeker, state as follows:

## INTRODUCTION

Plaintiffs' Motion to Preclude the Rebuttal Expert Testimony of Stefan Boedeker should be denied on two primary bases. First, Mr. Boedeker's testimony is proper rebuttal opinion because Mr. Boedeker opines on Mr. Weir's failure to consider an alternative theory of damages and on Mr. Weir's failure to modify his preliminary damages hypothesis when faced with evidence contradicting his hypothesis. Expert testimony which criticizes an opposing expert's methodology by pointing out an alternative methodology is proper rebuttal opinion. *See, Linde v. Arab Bank*, 922 F. Supp. 2d 316, 330 (E.D.N.Y. 2013) (finding rebuttal opinion admissible where rebuttal testimony challenged whether opposing expert applied "a discernible, appropriate, and thorough methodology"); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) ("A rebuttal expert is permitted to use new methodologies 'for the purpose of rebutting or

1

critiquing the opinions of [the opposing party's] expert witness'") (citing *Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009)).

Second, Mr. Boedeker's testimony regarding hedonic regression analysis performed by Mr. Boedeker in this case, and Mr. Boedeker's testimony criticizing the reliability of Mr. Weir's purported analysis is, itself, reliable. The purpose of Mr. Boedeker's hedonic regression analysis, and the opinion testimony regarding same, was not to present a perfect model for hedonic regression in this case. Indeed, at the time Mr. Boedeker conducted his analysis, the available data was limited and more complete data would likely result in a more complete analysis. Instead, the purpose of Mr. Boedeker's hedonic regression analysis was to simply demonstrate that, with the limited data that was available to Mr. Weir at the time, Mr. Weir could have, and should have, run a hedonic regression analysis himself. Had he, as Mr. Boedeker demonstrates, Mr. Weir would have seen that there was enough correlation between price and certain features of the product to warrant a more complete analysis. Simply "eyeballing" the data was insufficient for Mr. Weir to assume hedonic analysis was unnecessary, and had Mr. Weir run the simple regression with the available data, he would have realized the need for further hedonic analysis. Mr. Weir's failure to do so was a flaw in his overall damages analysis, and Mr. Boedeker's testimony in this regard rebuts Mr. Weir's assertion that such analysis was not necessary.

Further, Mr. Boedeker opines on the insufficiency of Mr. Weir's average price analysis. Mr. Boedeker criticizes the lack of proper explanation or support for the average price analysis Mr. Weir purportedly conducted. To support his opinion, Mr. Boedeker used the limited data in hand to show that Mr. Weir either did not perform, or if he did, incorrectly performed the analysis he purportedly conducted. In doing so, Mr. Boedeker demonstrated that, with the limited

data available to Mr. Weir, and granting Mr. Weir the incorrect assumptions he relied on, a proper average price analysis should have yielded a lower average price than Mr. Weir calculated. This flaw in Mr. Weir's analysis resulted in an inflated damages estimate and Mr. Boedeker pointed this out. This is proper rebuttal testimony.

Finally, Plaintiffs attempt to use an untimely supplemental expert disclosure and an untimely rebuttal declaration to retroactively justify analysis Mr. Weir either did not initially perform, or failed to adequately explain, in his initial expert disclosure. Plaintiffs hope to discredit Mr. Boedeker's expert opinions and testimony by offering the untimely reports as support for Mr. Weir's analysis, even though this additional explanation, and most of the data relied on to support the analysis, was not available to Mr. Weir or Mr. Boedeker at the time of Mr. Boedeker's expert rebuttal report. Plaintiffs cannot rely on the untimely supplemental and rebuttal reports to retroactively address Mr. Boedeker's criticisms of Mr. Weir's analysis. Even if they could inappropriately introduce the supplemental disclosure, Mr. Boedeker's criticism of Mr. Weir's analysis as expressed in the supplemental report remains unchanged as Mr. Weir's analysis remains flawed. Accordingly, Mr. Boedeker's opinions are admissible. For the foregoing reasons, Plaintiffs' Motion to Preclude the Rebuttal Expert Testimony of Stefan Boedeker should be denied.

## ARGUMENT

I. **Weir's Supplemental Expert Disclosure is Untimely and Represents an Attempt by Plaintiffs to Retroactively Justify Analysis Weir Either Did Not Perform or Failed to Adequately Explain in Weir's Initial Expert Disclosure.**

As mentioned above, it was not until after Mr. Boedeker's criticism of Mr. Weir's lack of transparency in his initial disclosure, following close of the expert disclosure deadline, close of

3

the rebuttal disclosure deadline, after completion of expert depositions, and after close of expert discovery, that Plaintiffs filed an untimely "supplemental" disclosure on February 1, 2018. *See,* Doc. # 116 (Order setting close of expert discovery on January 21, 2018). Even more egregious, Plaintiffs seek to introduce new expert opinions by submitting a "Response to Boedeker Report" along with the filing of their Motion to Preclude the Rebuttal Expert Testimony of Mr. Boedeker on March 9, 2018. Only at this late time, when it could no longer be challenged, did Mr. Weir attempt to provide justification for his previously unsupported analysis. Further, Mr. Weir's untimely rebuttal disclosure belatedly introduces new, rebuttal opinion about certain of Mr. Boedeker's criticisms. *See,* 3/9/18 Weir Declaration, Doc. #136.

The Court should not be fooled by Plaintiffs' inappropriate attempt to retroactively correct the record and address deficiencies in their expert's opinions and testimony. The Court should, therefore, ignore in its entirety any opinions cited in Plaintiffs' motion that are expressed in the February 1, 2018 Weir supplemental disclosure and in the March 9, 2018 Weir rebuttal declaration. *See, Sandata Techs., Inc. v. Infocrossing, Inc.,* 2007 U.S. Dist. LEXIS 85176, *14 (S.D.N.Y. 2007) (in rejecting two supplemental expert reports, the court noted, "nearly all of the discussion in the first Supplemental Report serves as a response to Sandata's expert. This is simply not the type of 'additional or corrective' information contemplated by Rule 26"). *See also, Equant Integrations Servs., Inc. v. United Rentals,* 217 F.R.D. 113, 116 (D. Conn. 2003) (rejecting argument that an untimely expert report was supplemental rather than rebuttal opinion).

To permit Plaintiffs to rely on the untimely supplemental and rebuttal reports would result in substantial prejudice to Defendants. *See, Sandata Techs.,* at *25 (preventing opposing party from deposing expert on his untimely supplemental/rebuttal opinions was substantial

4

prejudice). Plaintiffs have subverted the discovery process by preventing Defendants from challenging Mr. Weir's supplemental and new opinions. Defendants are not afforded the opportunity to cross examine Mr. Weir as to his new opinions regarding his average price calculations, explanation of which was either absent or purposefully withheld from Defendants at Mr. Weir's initial deposition. *See,* Weir Rebuttal, at ¶¶ 24-29, attached hereto as Exhibit A. Nor is Mr. Boedeker able to respond to the untimely criticism of his opinions, specifically regarding his use of wholesale price data as opposed to incomplete, limited retail price data, and his decision to calculate an average price that did not include price data unmatched to a specific SKU. *See, Id.,* at ¶¶ 6-12, 13-23. Accordingly, the court should disregard any untimely expert reports, supplemental and rebuttal, in their entirety, or in the alternative, disregard any opinions that offer new expert testimony at this belated time.

**II.     Expert Testimony Criticizing an Opposing Expert's Methodology and Offering an Alternative Methodology is Proper Rebuttal Opinion.**

Plaintiffs argue that Mr. Boedeker's opinions go beyond the scope of expert rebuttal testimony. In particular, Plaintiffs assert Mr. Boedeker opines on the efficacy of the Bell+Howell Ultrasonic Pest Repellers. However, Plaintiffs confuse the purpose of Mr. Boedeker's testimony. Mr. Boedeker offers his opinions, not to show whether the products work or do not work, but rather, to show that there exists evidence contradicting Mr. Weir's assumptions and theory of damages that Mr. Weir failed to consider when conducting his damages analysis. Mr. Boedeker explained at his deposition the purpose of his testimony in this regard:

> Q.    You're not offering any testimony about the efficacy of the products at issue in this case, right?
>
> A.    Not about the efficacy itself, but I reviewed defense witnesses analysis of experimental data, and the only opinion that I offered there is with respect to the proper use of statistical methodology to analyze test data, but not about what the test

> data mean by itself. But I looked at the statistical results and came to the conclusion that the data were analyzed properly from a statistical point of view, but I don't testify about the efficacy of the product, only what the proper use of statistics analyzing test results because that would be my expertise...
>
> Q. So you take issue with Mr. Weir's starting assumption about the effectiveness of the products?
>
> A. I mean, I'm not taking issue with him making a starting assumption. Experts are quite frequently asked to calculate certain scenarios under certain assumptions. Along the way, there just have been data and information that - - that would give some reason to the contrary, right, that the hundred percent worthlessness assumption might not be correct, but I did not see Mr. Weir changing the cause of his work because of that, that additional data information that was available.

Boedeker Deposition at 25:12-26:24.

In so opining on Mr. Weir's failure to consider certain data, Mr. Boedeker's testimony is wholly appropriate rebuttal opinion. Rebuttal expert testimony may criticize an opposing expert's methodology, the assumptions the expert relies on, and that expert's failure to consider alternative theories of liability. *See, Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 54 (S.D.N.Y. 2016) ("[Defendant] is entitled to challenge [plaintiff's expert's] methodology and assumptions for performing his calculations. They may present their own rebuttal expert witness, who may refute [plaintiff's expert's] testimony"); *Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G. Fur Chemische Industire*, 2015 U.S. Dist. LEXIS 123591, *32 (S.D.N.Y. 2015) ("A rebuttal expert, by nature, criticizes the methodology and/or opinions of another").

### A. Boedeker Opines on Weir's Failure to Consider an Alternative Theory of Damages.

Mr. Boedeker's rebuttal opinion is offered to challenge Mr. Weir's failure to consider the possibility that Plaintiffs may not succeed on a theory of full compensatory damages based on Plaintiffs' theory of worthlessness. *See,* Boedeker Expert Report, Doc. #133, Kopel Decl. Ex. 26,

6

at ¶¶ 11-14. Mr. Boedeker's testimony regarding evidence of the products' effectiveness is intended to demonstrate that there was reason for Mr. Weir to consider an alternative theory of liability. *See,* Boedeker Expert Report, at ¶ 36. Mr. Boedeker clearly expressed this opinion at his deposition:

> **Q.** **You don't think it was a mistake for Mr. Weir to assume that the products are ineffective and worthless, do you?**
>
> **A.** **I mean, when you're - - when you're looking at data that then contradicts such an assumption, then I would call it a mistake to keep that assumption alive, in a sense, and not adjust it to the new evidence or the new data that - - that somehow surfaced during the analysis. And then keeping an assumption alive only because I was told to - - or he was told to assume it, then it becomes improper or mistake because now there's data out there that invalidate the assumption.**

Boedeker Deposition at 39:10-23.

Mr. Boedeker elaborated at his deposition that a damages model need not assume full liability is achieved, but only needs to assume "some kind of liability" or "partial liability." *See,* Boedeker Deposition, at 43:20-25. Indeed, where a plaintiff succeeds on some, but not all of its theories of liability, failure to adjust for the alternative theories may render a damages model unreliable. *See, Pharmanetics, Inc. v. Aventis Pharms., Inc.,* 2015 U.S. Dist. LEXIS 45768, *27 (E.D.N.C. 2015) (finding inadmissible plaintiff's expert's damages model premised upon plaintiff's success on all of its causes of action, and not allowing, even in the alternative, for an adjustment of damages to account for claims no longer remaining). Therefore, it was proper for Mr. Boedeker to opine that, based on available evidence contradicting a theory of full compensatory damages, Mr. Weir's damages analysis was deficient in not considering an alternative theory of damages.

### B. Boedeker Criticizes Weir's Failure to Modify His Hypothesis When Faced With Evidence to the Contrary.

7

Similarly, Mr. Boedeker also opines on Mr. Weir's failure to modify his starting hypothesis for full compensatory damages once there was available evidence that contradicted that hypothesis:

> Q. So was it proper for Mr. Weir to accept the assumption, for purposes of his opinion in this case, that the products are ineffective and worthless?
>
> A. I mean, as long as there's no evidence to the contrary, I mean, I don't think it's un - - unheard of that experts calculate data for certain scenarios, right? So in that sense, I - - that's just what he did. He was asked to do it, and he did it. And he did it later on when evidence to the contrary may have been available to him, and he still did it, that's kind of like how I see it…I mean, in a sense that that is as a working assumption that he starts out with because his client asked him to, and I said, experts do that, right? If other evidence becomes available, they may have to adjust their assumptions…

Boedeker Deposition at 37:22-38:20.

> Q. You don't think it was a mistake for Mr. Weir to assume that the products are ineffective and worthless, do you?
>
> A. I mean, when you're - - when you're looking at data that then contradicts such an assumption, then I would call it a mistake to keep that assumption alive, in a sense, and not adjust it to the new evidence or the new data that - - that somehow surfaced during the analysis. And then keeping an assumption alive only because I was told to - - or he was told to assume it, then it becomes improper or mistake because now there's data out there that invalidate the assumption.

Boedeker Deposition at 39:10-23.

Plaintiffs' Motion to Preclude Mr. Boedeker's testimony argues that Mr. Weir assumed full compensatory damages, *as he must*, when in actuality, the reference guide they rely on in making that assertion does not go that far. As they point out, it states, "*In almost all cases*, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful." Reference Guide on Estimation of Economic Damages, 2011 WL

8

7724259, at 432 (emphasis added). The reference guide does not require an assumption that plaintiffs will succeed on their liability claim, in every case. Still, based on what he was told by his client, Mr. Weir began with an assumption of liability, *as he may*. While it would make little sense to assume no liability as plaintiffs' damages expert, as Mr. Boedeker pointed out, Mr. Weir is under no obligation to assume *full liability*.

> Q. **And it says, On almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful. Accordingly, throughout this discussion, we assume that the plaintiff is entitled to compensation for losses sustained form a harmful act of the defendant. Do you see that?**
>
> A. Yes.
>
> Q. **And what do you understand that to mean?**
>
> A. **…the way I would read the sentence - - or two sentences, is that, for whatever the damages expert does, there is - - it is done under the assumption of** *some kind of liability* **due to the harmful act, otherwise, again, there would be no need for damages expert. So the damages expert now is using the liability,** *partial liability, full liability,* **as his or her assumption when they start the damages modeling.**

Boedeker Deposition at 43:5-44:2. (emphasis added)

As noted above, criticism of an opposing expert's methodology and assumptions is proper rebuttal opinion. *See, Allen v. Dairy Farmers of Am., Inc.,* 2014 U.S. Dist. LEXIS 8343, *9 (D. Vt. 2014) ("[Defendant's Expert] has not rendered an opinion regarding his definition of the relevant geographic market; rather he has criticized as too narrow Plaintiffs' proposed geographic market"); *See also, id.,* at *20 ("to the extent [Defendant's Rebuttal Expert's] univariate analysis is offered for the sole purpose of challenging [Plaintiff's Expert's] assertions that prices and premiums in Order 1 are uniform, it is admissible"). Therefore, Mr. Boedeker's testimony in this regard is admissible.

9

### III. Boedeker's Opinions Are Not Unreliable.

Plaintiffs also misstate the purpose of Mr. Boedeker's hedonic regression analysis. Mr. Boedeker, as a rebuttal expert, is under no burden to affirmatively demonstrate that a full refund theory of damages is or is not appropriate. *See, In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) (Defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts"). Mr. Boedeker's opinions are offered to rebut Mr. Weir's assertion that a full refund theory of damages is the only theory of damages that is appropriate in this case. In so challenging Mr. Weir's opinion in this regard, Mr. Boedeker demonstrates examples of failures in Mr. Weir's analysis. Mr. Boedeker is not offering a perfect model for damages, or even an alternative model for damages. He is simply presenting examples of how Mr. Weir, using the data that was available at the time of his initial disclosure, would have and should have identified potential flaws in his assumptions and methodology that would have suggested the need for additional, more granular analysis.

#### A. Boedeker's Hedonic Regression Analysis is Reliable.

##### i. Boedeker Performed a Hedonic Regression Analysis in Order to Demonstrate the Flaw in Weir's Opinion that Hedonic Regression Analysis Was Unecessary.

In order to challenge Mr. Weir's opinions regarding the lack of impact additional features has on the price of the Bell+Howell product, Mr. Boedeker performed a hedonic analysis, which Mr. Weir describes in his report but fails himself to perform. *See,* Weir Disclosure, Doc. #133, Kopel Decl. Ex. 24, Oct. 31, 2017 Weir Rpt., at ¶ 19-20. Mr. Boedeker described the purpose of his hedonic analysis:

> A.   In this case, I modeled the price of a product dependent on the features the product has, and that's the methodology that

> Mr. Weir describes in his report as hedonic regression, and the analysis where the overall price of a product is viewed as the weighted average of its components...

Boedeker Deposition at 109:12-17.

Plaintiffs contend, however, that Mr. Boedeker's hedonic analysis demonstrates that there is no correlation between the price of the Bell+Howell product and the product's additional features. Doc. #133, at p. 9-10. This contention is inaccurate and mischaracterizes the results of Mr. Boedeker's analysis and Mr. Boedeker's conclusions about the correlation between certain product features and price. Mr. Boedeker concluded, "I found significant evidence in the data that prove wrong the assumption in the Weir Report that product features don't impact prices. For example, extra features like safety covers, night lights, and photo cells significantly changed the product prices in my hedonic regression analysis." Boedeker Report, at ¶ 60. Regardless of Plaintiffs' attempts to minimize the results of Mr. Boedeker's hedonic regression analysis, Mr. Boedeker recognized that his analysis was not a complete analysis, but instead a high level analysis to rebut Mr. Weir's assumption that no analysis was necessary:

> Q. In this case, you weren't tasked with performing a full and complete hedonic analysis of these devices, correct?
>
> A. That is correct, I was not asked to do that.
>
> Q. And Mr. Weir's report that we have referenced, he provides an opinion that he was able to view the data and determine that there was no statistical significance to any of the various features of the devices, correct?
>
> A. That is correct. He talked about looking at data without doing any analysis and then concluding that analysis wouldn't be necessary because there are no differences.
>
> Q. So based on the top level analysis that you did here with respect to the features, would you have an opinion with respect to Mr. Weir's report on that issue?
>
> A. Yeah. First of all, just eyeballing, visual inspecting data, is not the same as statistically analyzing data. So since I wasn't asked to come up with a hedonic of my own, I wanted to see

11

> if Mr. Weir's assessment of the data he looked at would result in some support for his assertion that hedonic wouldn't show any differences because they are not there. So I used the same data that he had, ran some very simple specifications of hedonics, which are, by far, not the fully developed model, but it only showed at this level that Mr. Weir's conclusion, based on no analysis but only visual inspection of the data, was incorrect.

Boedeker Deposition at 180:7-181:13.

Plaintiffs further mischaracterize the purpose of the hedonic analysis when in their Motion to Preclude the Rebuttal Expert Testimony of Mr. Boedeker, they argue that nobody would purchase a repeller for its nightlight feature. At his deposition, Mr. Boedeker corrected this mischaracterization:

> Q. If a pest repeller with an LED is being sold for $20, or so, and a consumer knows that it's not going to repel pests, do you think there's anybody out there who's going to buy that product?
>
> A. …Yeah, but what I'm measuring is not that, right? What I'm measuring is if somebody buys the repeller, do they pay extra, or is there, like, more money they pay if it has an LED nightlight? So once the repeller is in place, there's the additional functionality of having a nightlight. That's what I'm measuring.

Boedeker Deposition at 177:15-178:6.

In opining that hedonic analysis was not necessary, Mr. Weir did not argue that no consumer would pay for a non-functioning repeller that had additional features. He opined that prices for repellers with and without additional features did not vary enough to warrant hedonic analysis. Mr. Boedeker's analysis was offered to challenge that assertion, and the results of his analysis, as much as Plaintiffs may disagree, demonstrate that Mr. Weir's assertion was incorrect. *See, Dairy Farmers of Am.,* at \*18-19 ("[Defendant's Rebuttal Expert] has not offered a univariate analysis to challenge Plaintiffs' claim of price suppression. Instead, he uses it to establish '*the fact of* variation in milk pricing and premiums' and to respond to [Plaintiff's

Expert's] assertion that no such variation exists...A univariate analysis offered for the limited purpose of challenging a claim of uniformity in prices or premiums is not inadmissible") (emphasis in original). Accordingly, Mr. Boedeker's opinions regarding his hedonic regression analysis is admissible.

### ii. Boedeker's Analysis Used the Best Data Available.

Plaintiffs also challenge Mr. Boedeker's hedonic analysis based on his use of wholesale rather than retail price data. Doc. 133, at 8-9. Mr. Boedeker explained the use of wholesale prices in his analysis:

> A. **The retail price, overall, would be different. The wholesale price is, obviously, a determining factor, one of the determining factors for the retail price. So here I, basically, followed Mr. Weir's example of using the whole price - - wholesale price data set that were available, and, again, this is just to demonstrate that Mr. Weir's method of eyeballing, looking at data and not seeing differences, is just incorrect. So I used the data, again, to show at the wholesale level, certain features do have an impact on the price of the product.**

Boedeker Deposition at 177:15-178:6.

Mr. Boedeker used the data that was available to him, and to Mr. Weir, and ran a high level hedonic analysis for the purpose of showing that there was reason to question Mr. Weir's assertion that hedonic analysis was unnecessary. The fact that Mr. Boedeker used wholesale data, which was the most complete data available at the time, does not invalidate his analysis or render it irrelevant. *See, Dairy Farmers of Am.*, at *25 (Defendant's rebuttal expert's use of USDA survey data on pricing, the only pricing data available, as opposed to actual prices paid, did not render the data meaningless nor inherently unreliable, so long as the expert accurately reflected both the source of the data and its limitations). Here, Mr. Boedeker used the best available data,

13

and acknowledged that individual transactional data would be better and would likely show greater impact of additional features on price:

> A. I think I testified earlier that I - - I have not seen a single transaction data point. So all the data that we're - - that were available here are either averages of wholesale prices or average of a very limited number of retail prices, but I have not seen an individual transaction data point...I don't have that kind of data.

Boedeker Deposition at 118:23-119:7.

> A. And by seeing something that uses average data, right, I can expect if I have no transactional data that are much more granular and tell me the exact number of units, that I can see more effects...what I concluded here is from having these highly summarized average data and seeing effects, is that if I have more granular data with more detail, I would expect to see even more pronounced effects.

Boedeker Deposition at 123:15-124:5.

Mr. Boedeker's opinion regarding his hedonic analysis, when viewed in the proper context for which it was offered, demonstrates that Mr. Weir failed to perform analysis that would have brought into question one of the fundamental assumptions he makes in calculating damages. As such, these opinions are proper rebuttal testimony and are admissible.

### B. Boedeker's Opinion Criticizes Weir's Initial Expert Disclosure Which Lacks Sufficient Explanation or Support for the Analysis Weir Purports to Have Done.

Finally, Plaintiffs criticize Mr. Boedeker's opinion regarding the flaws in Mr. Weir's average price calculation. Specifically, Plaintiffs argue that Mr. Boedeker's criticism of Mr. Weir's calculations is unreliable because Mr. Boedeker did not know what data Mr. Weir relied on and because Mr. Boedeker's own calculations did not include sales data which was unmatched to a specific SKU number. Doc. 133, at p. 11-13. These criticisms fail for several reasons.

First, Plaintiffs fail to acknowledge that Mr. Weir's exact methods and reliance data was

14

unknown to Mr. Boedeker because it was not adequately explained in his initial disclosure or in Mr. Weir's work papers and reliance materials produced by Plaintiffs. When asked to explain it in more detail at his deposition, Mr. Weir was vague and evasive. This lack of transparency was a contributing factor to one of Mr. Boedeker's criticisms of Mr. Weir's report. In his report, Mr. Boedeker states, "it is unclear where [Weir's] summed total of units sold and dollar volume come from," "the numbers from which [Weir] calculates his average price for are unverifiable," and "my detailed analysis of all the data analyzed in the Weir Report as well as all the Stata programs documenting all the analyses from the Weir Report, I did not find any trace of these two analyses." *See*, Boedeker Report, ¶¶ 19, 21, 45.

Mr. Boedeker explained that he used the data that Plaintiffs produced and represented was Mr. Weir's reliance material:

> Q.   So does that data reflected in this tab here include all of the available retail sales data?
>
> A.   I mean, these are the retail sales data that Mr. Weir had in his reliance materials, and that's what I used…
>
> Q.   So it's your understanding that the retail sales data that you've relied on in this tab is the only data that Mr. Weir relied on…for calculating his averages?
>
> A.   The 24.80 and the 24.10, I mean, they were hard coded in some of the spreadsheets, so I don't know what he used…
>
> Q.   So it's your understanding that he didn't rely on any other data in calculating his averages, right?
>
> A.   I don't know. This is the data that I worked with, so I don't know what other data he worked with *that were not documented*, but I used this data *that he provided*, and I came up with two different numbers.

Boedeker Deposition at 130:23-132:2 (emphasis added).

No other data, analysis or explanation for analysis was provided to Defendants, despite a request for all work papers and reliance materials, at the time of Mr. Boedeker's report. It was

not until months after Mr. Boedeker's criticism of Mr. Weir's lack of transparency, that Mr. Weir submitted an untimely "supplemental" disclosure offering a retroactive justification for his opinions and analysis. Despite the lack of support for Mr. Weir's analysis, Mr. Boedeker was still able to articulate the general method, though flawed, that Mr. Weir followed in calculating his average price, as confirmed by Mr. Weir at his deposition. *See,* Boedeker Report, at ¶ 19. *Compare,* Weir Deposition, attached hereto as Exhibit B, at 195:11-18.

Next, Plaintiffs criticism that Mr. Boedeker did not include unmatched pricing data in his average price calculation also fails. Mr. Boedker explained the reasoning for this decision:

> Q.  And that's the 91,000 units…minus the one product that we don't have sales pricing for, right?
>
> A.  Yeah, there is one product with no dollar information, and if I put that in, but keep the units in, then I'm, obviously, not getting the correct results. So therefore, I excluded Item Number 50184…

Boedeker Deposition at 129:17-25

Again, Plaintiffs may take issue with the conclusion Mr. Boedeker reaches, but any criticisms of his average price calculation is properly challenged on cross-examination. *See, Daubert v. Merill Dow Pharmaceuticals, Inc.,* 293 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). As a rebuttal expert, Mr. Boedeker can properly challenge Mr. Weir's average price calculation, which substituted an uncertain, and incorrectly calculated, average price for all unknown, unmatched SKU number. For the foregoing reasons, Mr. Boedeker's testimony is proper rebuttal testimony and is admissible.

## CONCLUSION

WHEREFORE, Defendants, BHH, LLC d/b/a BELL + HOWELL, and VAN HAUSER, LLC respectfully request that the Court enter an order denying Plaintiffs' Motion to Preclude the Rebuttal Expert Testimony of Stefan Boedeker.

                                              Respectfully submitted,

                                              **E. MISHAN & SONS, INC.**

                        By:       */s/ Scott Wing*
                                       One of Its Attorneys

Scott Wing
LEAHY, EISENBERG & FRAENKEL, LTD.
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
Tel. (312) 368-4554
***Counsel for BHH, LLC, and VAN HAUSER, LLC***

17