```
 1  UNITED STATES DISTRICT COURT
 2  SOUTHERN DISTRICT OF NEW YORK
    -------------------------------------------x
 3  JOANNE HART, and SANDRA BUENO, on behalf of
    themselves and all others similarly situated,
 4
                      Plaintiffs,
 5
         vs.
 6
    BHH, LLC d/b/a Bell + Howell and VAN HAUSER LLC,
 7
            Defendants.
 8
    Case No. 1:15-cv-04084-WHP
 9  -------------------------------------------x
10
11                 888 Seventh Avenue
                   New York, New York
12
                   January 10, 2018
13                 9:31 a.m.
14
15       DEPOSITION of COLIN WEIR, taken pursuant
16  to Notice, before Toni Freeman Greene, a Notary
17  Public of the State of New York.
18
19
20
21
22
23
24
25
```
1

```
 1  A P P E A R A N C E S :
 2
 3  BURSOR & FISHER, P.A.
 4  Attorneys for Plaintiffs
 5       888 7th Avenue
 6       New York, New York  10019
 7  BY:  JOSHUA ARISOHN, ESQ.
 8       (646) 837-7103
 9       jarisohn@bursor.com
10
11
12  LEAHY, EISENBERG & FRAENKEL, LTD.
13  Attorneys for Defendants
14       33 West Monroe Street
15       Suite 1100
16       Chicago, Illinois  60603-5317
17  BY:  SCOTT WING, ESQ.
18       ADAM McCABE, ESQ. (via telephone)
19       (312) 368-4554
20       sw@lefltd.com
21
22
23  ALSO PRESENT:
24       STEFAN BOEDEKER (via telephone)
25
```
2

```
 1  ------------- I N D E X -------------------
 2  WITNESS              EXAMINATION BY       PAGE
 3  COLIN WEIR           MR. WING              4
 4
 5
 6  -------- INFORMATION/DOCUMENT REQUESTS ---------
 7  PAGE:   161   Spreadsheet reflecting the use of
 8                economic indices
 9
10
11  --------------- E X H I B I T S ----------------
12  DEFENDANT     DESCRIPTION            FOR I.D.
13  Exhibit 1     Statement of Qualifications    44
14  Exhibit 2     Subpoena                       72
15  Exhibit 3     Spreadsheet Document          138
16                Containing Walmart Sales
17                Data
18  Exhibit 4     Spreadsheet Document          141
19  Exhibit 5     Spreadsheet Document          142
20  Exhibit 6     Spreadsheet Document          145
21  Exhibit 7     Spreadsheet Document          214
22  Exhibit 8     Spreadsheet, Walmart Sales    248
23                Data
24
25            (EXHIBITS TO BE PRODUCED)
```
3

```
 1  C O L I N   W E I R ,
 2       the witness herein, having been first duly
 3       sworn by a Notary Public, was examined and
 4       testified as follows:
 5            THE REPORTER:  Would you state and
 6       spell your full name and state your address
 7       for the record, please.
 8            THE WITNESS:  My name is Colin B.
 9       Weir, C-O-L-I-N, middle initial B, last
10       name W-E-I-R.  My business address is
11       1 Washington Mall, Floor 15, Boston,
12       Massachusetts 02108.
13  EXAMINATION
14  BY MR. WING:
15       Q.   Good morning, Mr. Weir.  My name is
16  Scott Wing.  We met earlier.
17            You are here on behalf of the
18  Plaintiffs in the case titled Joanne Hart and
19  Sandra Bueno vs. BHH LLC and Van Hauser LLC as a
20  26(a)(2) expert witness under the Federal Rules,
21  correct?
22       A.   I'm not a lawyer, but I believe that's
23  right.
24       Q.   You were a retained expert on behalf
25  of the Plaintiffs in that case, correct?
```
4



WEIR

1
2   A.   Yes, sir.
3        Q.   And that case, to your understanding,
4   is a class action lawsuit involving ultrasonic
5   pest repellers, correct?
6        A.   The Bell & Howell pest repellers.
7        Q.   Mr. Weir, what is your highest level
8   of education?
9        A.   I hold an MBA from Northeastern
10  University and, I don't know whether or not it
11  will become relevant in this case, but, I have
12  advanced training in conjoint analysis.
13       Q.   When you say "advanced training in
14  conjoint analysis," where was that advanced
15  training?
16       A.   It's postgraduate work through
17  Sawtooth Software, the leading developer of
18  conjoint design and analysis software.
19       Q.   And just to give me a sense, what is
20  "conjoint analysis"?  You said it may not be
21  relevant.
22       A.   It's a representative survey technique
23  that asks people to answer discrete choice
24  questions in order to understand myriad things,
25  depending upon the research objective.

5

WEIR

1
2        Q.   So, with regard to this case, did you
3   perform any conjoint analysis?
4        A.   I did not.
5        Q.   Did you consider performing any
6   conjoint analysis in this case?
7        A.   No.
8        Q.   Other than Northeastern, what other
9   education do you have?
10       A.   The other degree that I hold is a
11  Bachelor's degree in Business Economics from the
12  College of Wooster.  That's Wooster, Ohio,
13  W-O-O-S-T-E-R.
14       And I have, coming up, 14 and a half
15  years of on-the-job experience with economics
16  statistics, finance, data analytics and related
17  fields.
18       Q.   With respect to your MBA, what was
19  your concentration?  Did you have a specific
20  concentration?
21       A.   The primary areas of focus in that
22  program included economics, finance, accounting,
23  marketing, innovation.  There may be some others,
24  but, that's what comes to mind as I sit here
25  today.

6

WEIR

1
2        Q.   Do you currently hold any licenses or
3   certifications in your field?
4        A.   There's no such thing as a license or
5   certification in the field of economics, so I do
6   not possess one.
7        Q.   Where are you currently employed?
8        A.   I work at Economics and Technology
9   Incorporated, which I would propose, for short,
10  we refer to as "ETI."
11       Q.   That seems fair.  So, how would you
12  describe the business of ETI?
13       A.   ETI is a consulting firm.  We provide
14  myriad different types of services to our
15  clients, but, largely relating to the fields of
16  economics, statistics, data analytics and related
17  fields.
18       Some of our work is involved in
19  litigation or contested proceedings, some of our
20  work is involved in public policy, some of our
21  work is involved in helping private businesses
22  succeed at their own enterprise.
23       Q.   And are you involved in all of those
24  aspects of the business?
25       A.   Yes.

7

WEIR

1
2        Q.   How would you say you divide your
3   time?  Are you more on the litigation side as
4   opposed to public policy and other consulting?
5        A.   The answer to that question is
6   obviously going to depend on the time period that
7   you're asking about.
8        So, today, 100 percent of my work will
9   be involved in the litigation sphere, because
10  we're going to be doing this deposition and then
11  I'm going home.
12       But, if you were to ask about the last
13  year or two to three years, I would say about
14  50 to 60 percent of my time is engaged in
15  litigation and the remainder is involved in the
16  other arenas and the management of the business.
17       Q.   And what is your title at ETI?
18       A.   I am Vice President.
19       Q.   And how long have you been employed
20  with ETI?
21       A.   Again, about 14 and a half years.
22       Q.   And prior to ETI what was your
23  employment?
24       A.   I worked for seven years at Stop &
25  Shop Supermarkets.

8

WEIR

1
2      Q.   And what was your role with Stop &
3  Shop Supermarket?
4      A.   I had various roles, but I would
5  define them as three different categories.
6           One, I served as a cash department
7  head, which is the person who manages the
8  register area of the store, literally manages
9  cash, but also helps with any consumer issues
10 that come up at the checkout.
11          The second, I served as a grocery
12 receiving clerk, where I would bring products
13 into the store and deal with the transactions
14 with the vendors that brought those products to
15 the store.
16          And the third is price file
17 maintenance head, where I was responsible for the
18 maintenance and changing of pricing within the
19 store.
20          So, at least in Massachusetts and, I
21 believe, in other states, there are requirements
22 that most grocery products have a shelf tag that
23 indicate both a price and unit price, as well as
24 that each individual unit of product be stamped
25 with its total price.

9

WEIR

1
2           So, I would monitor that, make changes
3  in the computers and have a staff of people that
4  would change the prices within the supermarket.
5      Q.   Okay.  So, this was at a specific
6  Stop & Shop location that you were employed?
7      A.   Correct.
8      Q.   And how did you come to be employed
9  with ETI?
10     A.   I responded to an ad in the Boston
11 Globe, maybe the last of the generation that got
12 a job through a newspaper.
13     Q.   What was your initial title with ETI?
14     A.   Economic Analyst.
15     Q.   And as an economic analyst, what was
16 your function?
17     A.   I would analyze economic and other
18 related data on behalf of the senior staff.
19     Q.   So, you would take projects from
20 senior staff and accomplish whatever analysis
21 needed to be done; is that fair?
22     A.   I don't know whether it's fair or not.
23     Q.   How long were you an economic analyst?
24     A.   I probably served in that role for
25 between one and two years.

10

WEIR

1
2      Q.   And after those one or two years, what
3  was your next title, if you can?
4      A.   I was promoted to Senior Economic
5  Analyst.
6      Q.   And what was your role as a senior
7  economic analyst?
8      A.   I would -- it was similar to the role
9  as Economic Analyst, but I would be involved in
10 more difficult analyses and also marshalling the
11 people one rung down, the junior analysts.
12     Q.   So, you had some supervisory role?
13     A.   In a limited sense.
14     Q.   And how long were you a senior
15 economic analyst?
16     A.   Again, that might have been about two
17 to two and a half years, subject to check.  I
18 don't have all those dates memorized.
19     Q.   And what was your next title with ETI?
20     A.   I was promoted to the rank of
21 Consultant.
22     Q.   And as a consultant what was your
23 role?
24     A.   As a consultant I began to take on
25 project management responsibility.  I had client

11

WEIR

1
2  interactions and I continued to conduct economic
3  and related analyses on behalf of our clients.
4      Q.   In respect to all the three roles
5  you've discussed so far, were you involved in all
6  three of the aspects of the business that we
7  discussed earlier, litigation, public policy and
8  other consulting work?
9      A.   Yes.
10     Q.   And was your time divided similarly to
11 how it is now?
12     A.   Again, if you were to take a period of
13 analysis of a year or more, it would be roughly
14 the same.  If you get to any smaller time period,
15 it depends on whatever project happened to be on
16 on any given day or week.
17     Q.   In your role as Economic Analyst and
18 Senior Economic Analyst and Consultant, were you
19 deposed at any point at that time?
20     A.   I was not deposed as an economic
21 analyst.  I don't believe I was deposed as a
22 senior economic analyst, although, the promotion
23 to Consultant would have been at about the time
24 that I began to testify as an expert.
25          So, I would say I don't think I was

12

WEIR

1          WEIR
2   deposed as a senior analyst, but it could have
3   happened once.
4       Q.   So, you were first disclosed as an
5   expert witness sometime around the transition
6   between your change from a senior economic
7   analyst to a consultant?
8       A.   I think that's right.  And the time
9   period would have been approximately 2007-ish,
10  but, that would be reflected in the Statement of
11  Qualifications that I've submitted in this case.
12      Q.   And how long were you a consultant
13  with ETI?
14      A.   Again, I believe that would be about
15  one to two years.
16      Q.   And what was your next title?
17      A.   I was promoted to Senior Consultant.
18  These are very creative titles, you can see.
19      Q.   And what was your role as Senior
20  Consultant?
21      A.   These sort of exist on a continuum,
22  so, I continued to increase my client
23  interactions, I took on greater responsibility
24  for the management of projects, I took on greater
25  responsibility for the management of junior staff

13

1          WEIR
2   working on projects for me and I continued to
3   perform my own economic analysis.
4       Q.   In all these roles were you a salaried
5   employee with ETI?
6       A.   Yes.
7       Q.   Is this a fixed salary?
8       A.   Yes.
9       Q.   Do you have any bonus compensation?
10      A.   I would occasionally receive -- I
11  think it's called a Safe Harbor retirement
12  contribution.  But, I think that was just because
13  people that made more money than me were taking a
14  lot of retirement contributions.
15      Q.   So, there may be some tax benefit
16  bonuses, but no performance bonuses?
17      A.   That's correct.
18      Q.   How long were you a senior consultant
19  with ETI?
20      A.   Again, that would be about one to two
21  years, bringing us into the 2010 and '11
22  timeframe, when I was promoted to Vice President.
23      Q.   And how many vice presidents are there
24  with ETI?
25      A.   Just me.

14

1          WEIR
2       Q.   How many total employees are there
3   with ETI?
4       A.   Presently four.
5       Q.   And what are the roles of those
6   employees?
7       A.   Dr. Lee L. Selwyn is president of the
8   company, there's myself, presently a consultant
9   is Andrew J. Kearns, K-E-A-R-N-S, and Emily Stein
10  is our accountant and bookkeeper.
11      Q.   Over the course of your employment
12  with ETI, how many employees have there been,
13  generally?
14      A.   I think when I started there were
15  approximately 12 employees and at the end of 2004
16  and beginning of 2005 there was a landmark
17  regulatory decision known as USTA II, U-S-T-A
18  Roman two, and that eliminated a chunk of the
19  company's business.
20           So, there was a major downsizing at
21  that point and we've been four, five, three, four
22  or five ever since that situation.
23      Q.   As vice president of the company, what
24  are your roles and responsibilities?
25      A.   So, very similar to the senior

15

1          WEIR
2   consultant, only I now have managerial
3   responsibilities for the enterprise itself, as
4   well as managing junior staff, interfacing with
5   clients, testifying as an expert and conducting
6   economic and related analyses on behalf of our
7   clients.
8       Q.   So, you're still performing a lot of
9   the functions you were previously, you said,
10  increased managerial roles?
11      A.   Correct.
12      Q.   With your time at ETI, approximately
13  how many cases have you been disclosed as an
14  expert witness?
15      A.   I would advise you to look at my
16  Statement of Qualifications to get a precise
17  answer to that.  That's not a data point that I
18  have memorized.  Certainly more than 50.  It may
19  very well be close to a 100, but, again, I don't
20  have the precise number.
21      Q.   Your Statement of Qualifications
22  provided for the last four years, do you have
23  just a general sense -- is that representative of
24  your time with ETI?
25      A.   Your assumption that my Statement of

16

WEIR

```
 1              WEIR
 2  Qualifications reflects only the last four years
 3  is incorrect.
 4      Q.   I see.  So, your Statement of
 5  Qualifications provides all of the cases in which
 6  you've been disclosed as an expert?
 7      A.   Unless, by inadvertent omission,
 8  something has been left off, it is complete as of
 9  the date of the execution of the testimony.
10      Q.   So, it's your intention that it
11  reflects the entirety of your disclosure as an
12  expert witness?
13      A.   Correct.
14      Q.   Approximately, to your recollection,
15  what percentage of those cases in which you have
16  been an expert witness have been in class action
17  litigation?
18      A.   Again, I don't have that number
19  memorized.
20      Q.   What types of cases have you been
21  disclosed as an expert in?
22      A.   I've been disclosed in class action
23  cases, I've been disclosed in other types of
24  litigations that are not class actions, I've been
25  disclosed in various regulatory proceedings or
                                          17
```

```
 1              WEIR
 2  regulatory disputes, I've been involved in
 3  proceedings -- I guess at some levels they're
 4  adversarial, but they're not Side A vs. Side B,
 5  if you will.  So, for example, the analysis and
 6  the evaluation of a proposed merger transaction.
 7      Q.   With respect to the class action
 8  litigation that you have been involved in, how
 9  often would you say you are disclosed by the
10  plaintiffs in those cases?
11      A.   I'm not sure how to answer that.  I
12  sometimes work for plaintiffs, I sometimes work
13  for defendants.
14      Q.   Do you have a general sense of the
15  breakdown between the two of those?
16      A.   Not off the top of my head.  Again,
17  that's not a statistic that I keep memorized.
18      Q.   You don't have an estimate?
19      A.   I do not.
20      Q.   Previous to this case have you been
21  disclosed in class action litigation involving
22  consumer products?
23      A.   Yes.
24      Q.   Do you have an estimate of how many
25  times?
                                          18
```

```
 1              WEIR
 2      A.   Not off the top of my head.
 3      Q.   Have you been disclosed as an expert
 4  with respect to consumer electronic products?
 5      A.   Yes.
 6      Q.   Do you have a sense of how many times?
 7      A.   More than one, but, again, I don't
 8  have that statistic memorized.
 9      Q.   Have you previously been retained as
10  an expert by Bursor & Fisher?
11      A.   Yes.
12      Q.   Do you have an estimate of how many
13  times?
14      A.   Not off the top of my head.
15      Q.   Would it surprise you if it's more
16  than 25?
17      A.   I don't know that I would register an
18  emotion to that statistic one way or the other.
19      Q.   Would you disagree with me if I said
20  it's more than 25 times?
21      A.   I would say I would want to check my
22  record of prior testimony.
23      Q.   With respect to your work for Bursor &
24  Fisher, have all of those cases involved class
25  action litigation?
                                          19
```

```
 1              WEIR
 2      A.   No.
 3      Q.   What types of cases have they
 4  involved?
 5      A.   I remember one engagement that related
 6  to a FOIA request.
 7      Q.   Was that a FOIA request being made by
 8  Bursor & Fisher?
 9      A.   Correct.
10      Q.   And to whom was that being made?
11      A.   The FOIA request?
12      Q.   Yes.
13      A.   I believe the request was levied of
14  the Federal Communications Commission.
15      Q.   And was that with respect to
16  anticipated litigation, to your knowledge?
17      A.   I think it related to the ability to
18  evaluate the propriety of the then-proposed
19  AT&T and T-Mobile merger.
20      Q.   Other than that case involving a FOIA
21  request, what other cases with Bursor & Fisher
22  were you involved in that were not class action
23  litigation?
24      A.   Again, without reviewing the Statement
25  of Qualifications, that's the one that comes to
                                          20
```

WEIR

1  mind, but there may be others.
2
3      Q.   With respect to your work for Bursor &
4  Fisher, other than the FOIA request you
5  mentioned, have the cases been on behalf of class
6  action plaintiffs?
7      A.   Would you just ask the question one
8  more time, please.
9      Q.   Your work for Bursor & Fisher, is that
10 generally on the plaintiff's side?
11     A.   I feel comfortable saying it's
12 generally on the plaintiff's side.
13     Q.   Have you been disclosed as an expert
14 by Bursor & Fisher on the side of the defense?
15     A.   I think on at least one occasion.
16     Q.   And what was that occasion?
17     A.   The case was in re cellphone
18 termination fee cases.
19     Q.   And what was the party in that case?
20     A.   The case involved a class of
21 plaintiffs and the company Sprint.
22     Q.   And in that case you were being
23 disclosed as an expert on behalf of Sprint?
24     A.   In that case the class successfully
25 sued Sprint and then Sprint countersued its own

21

WEIR

1      So, that's an engagement that, if I
2  wasn't paying attention to the news, I would not
3  have known was over.
4
5      So, there's a lot of ins and outs in
6  terms of understanding that and I don't
7  necessarily profess to have all of that
8  information, as I sit here today.
9      Q.   In the past year, how many times have
10 you been deposed as an expert witness?
11     A.   Again, that's knowable from the
12 Statement of Qualifications, but I don't know the
13 number off the top of my head.
14     Q.   Prior to this case have you testified
15 as an expert witness in a case involving full
16 compensatory damages for breach of warranty
17 claim?
18     A.   So, again, I have to profess that I'm
19 not a lawyer.  So, what I can tell you is, I've
20 been involved in several cases that involve what
21 I would describe as full compensatory damages.
22 What the precise nature of the legal claims were,
23 I can't speak so that.
24     Q.   Were those cases involving consumer
25 products?

23

WEIR

1
2      A.   Yes.
3      Q.   Other than this case in the past year,
4  have you had any case involving consumer products
5  where you opined it to full compensatory damages?
6      A.   And when we say "the past year," we're
7  talking about the past 12 months, not the past
8  week or two?
9      Q.   Yes.  The past 12 months.
10     A.   I believe the answer to that is, yes,
11 but I would need to check my Statement of
12 Qualifications.
13     Q.   You say, "Yes."  Do you recall what
14 those cases were?
15     A.   I can think of one case that I believe
16 was within the past 12 months.  Although, again,
17 I don't memorize those dates, so I could be
18 mistaken.
19     But, I believe one case, for example,
20 involved the sale of what are known as
21 homeopathic remedies.
22     And homeopathy is a practice by which
23 a remedy is made by taking something ridiculously
24 small, like one part per hundred million of not a
25 remedy, but actually something that would cause

24

WEIR

1  customers, which struck me as remarkable.  So, I
2  was brought in at the stage of the case where I
3  was representing the counterclaim defendants.
4
5      Q.   I see.  So, you were being disclosed
6  on behalf of the class, but in a defense capacity
7  based on the state of that litigation?
8      A.   Correct.
9      Q.   Other than the case that we're
10 involved in here, are you currently under
11 retention by Bursor & Fisher in any other
12 litigation?
13     A.   Yes.
14     Q.   How many cases?
15     A.   I don't know off the top of my head.
16     Q.   You don't know how many that you are
17 currently involved in?
18     A.   Part of the problem is understanding
19 the state of play of cases.
20     So, just as an example, I gave a
21 deposition just three or four weeks ago in a case
22 involving Bursor & Fisher and I happened to have
23 heard by the trade press that, for reasons
24 unrelated to damages, that case was terminated by
25 the judge.

22

WEIR

1   the symptoms that somebody is suffering from, and
2   putting that into a sugar water solution and then
3   either giving the solution or a pill derived
4   therefrom to consumers.
5           And if you ask a scientist, at least,
6   they'll tell you that that practice is hogwash.
7           And so, I sponsored testimony
8   suggesting that, if that in were, in fact, the
9   case, a full refund would be the correct remedy
10  in that case.
11          Q.   So, in that case your testimony
12  regarding full compensatory damages was based on
13  the assumption that the products were, in fact,
14  ineffective?
15          A.   I don't know if I would state it quite
16  like that.  What I would say is that plaintiffs
17  alleged that the products were ineffective and
18  valueless.
19          And the first step in any damages
20  calculation is to assume, depends on which way
21  you want to phrase it, either that plaintiffs
22  established their theory of liability or that
23  defendants are held liable for the alleged
24  behavior.

25

WEIR

1           Q.   I see.  So, you based your analysis on
2   the allegations in that matter?
3           A.   The reference manual on scientific
4   evidence as it relates to the quantification of
5   damages is crystal clear on that being the very
6   first step that any damages quantifier should
7   take in a contested proceeding such as this.
8           Q.   I see.  So, in that case your
9   understanding was that, for liability to attach
10  to the defendants, it was necessary that the
11  products be entirely ineffective?
12          A.   I was not testifying as to the nature
13  of liability, so I was not offering an opinion
14  about what would or would not satisfy a finding
15  of liability in the eyes of the court, which is
16  the same situation in which I find myself here in
17  this incident litigation.
18          Q.   Are you aware of the dispensation of
19  the homeopathic remedy case?
20          A.   I've testified in a couple of them.  I
21  believe one settled, I believe one or two of the
22  others are still pending.
23          Q.   In the past year have you testified at
24  trial?

26

WEIR

1           A.   That's a good question.  That I don't
2   know off the top of my head.  I would have to
3   refresh my recollection from my Statement of
4   Qualifications.
5           Q.   We may do that in a bit.  In your
6   career how many times would you estimate you have
7   testified at trial?
8           A.   I believe I've given testimony in
9   front of a jury maybe three or four times.
10          I've given testimony in front of a
11  judge, whether or not you call that a trial or
12  not, maybe another one or two or three times.
13          I've literally been at the airport to
14  go testify at trial many times and been told that
15  the parties have settled on the eve of the
16  litigation.
17          Q.   And you prepped for trial a number of
18  times, but not necessarily testified?
19          A.   Correct.
20          Q.   In what types of cases have you
21  testified at trial?
22          A.   Two such cases involved the sale of a
23  product that was alleged to be a natural hair
24  regrowth suite of products and it turned out to

27

WEIR

1   be nothing more than common Minoxidil.  And so, I
2   gave testimony as to the damages in that case.
3           Q.   And so, that was a class action case?
4           A.   It was.
5           Q.   You testified on behalf of the class?
6           A.   Correct.
7           Q.   Was that case on behalf of Bursor &
8   Fisher?
9           A.   It was not.
10          Q.   Was a verdict rendered in that case?
11          A.   There was a verdict rendered in both
12  of the trials.
13          Q.   Both of the trials involving the
14  natural hair growth products?
15          A.   Correct.
16          Q.   And what was the verdict?
17          A.   The jury adopted my damages testimony
18  to the penny.
19          Q.   Did either of those cases involve full
20  compensatory damages?
21          A.   They did.
22          Q.   Other than those two cases, what other
23  cases have you testified at trial?
24          A.   I testified at trial in a wrongful

28

WEIR

2 death case where I provided an estimate of the
3 lost wages potentially due to the estate of the
4 deceased.
5     Q.   So, that was not a class action case?
6     A.   It was not a class action.
7     Q.   What other cases have you testified at
8 trial?
9     A.   Again, without the ability to refresh
10 my recollection from the documents, those are the
11 instances that I recall testifying in front of a
12 jury.
13          As I mentioned before, there have been
14 a couple of times that I've been before a judge.
15 In one case that comes to mind it was in the
16 Seventh Circuit, I was before Judge Kennelly.
17          I was brought in to testify as to
18 whether the attorney's fees being sought in a
19 settlement were fairly characterized as being
20 market-based rates.
21          And so, I conducted a survey of
22 attorney's fees, looked at firm reputation,
23 educational background, years of experience and
24 offered testimony that related to whether the
25 rates that were being requested were, in fact,

29

WEIR

2 market-based.
3     Q.   Do you recall the ultimate finding in
4 that matter?
5     A.   To be honest, I don't.
6     Q.   With respect to your testimony in
7 front of -- non-jury, in front of judges, did any
8 of those involve class action litigation?
9     A.   It's possible.  But, again, without
10 the benefit of my Statement of Qualifications, I
11 can't precisely remember.
12     Q.   With respect to this case that we're
13 sitting here today, when were you retained?
14     A.   I think it would have been, to the
15 best of my recollection, late 2016 or early 2017,
16 but that's not a date that I memorized in advance
17 of the deposition.
18     Q.   And how were you initially contacted
19 with respect to this case?
20     A.   I don't have a precise memory.  The
21 typical experience in almost any of my cases is
22 that I receive a phone call and somebody says,
23 "Hey, I have a case, are you willing to talk to
24 me about it," and I run a conflict check and then
25 I have a conversation about the case.

30

WEIR

2     Q.   Do you recall who contacted you with
3 respect to this case?
4     A.   I can't state with certainty, but it
5 may have Yitz Kopel.
6     Q.   Did you previously know Yitz Kopel?
7     A.   Yes.
8     Q.   Was Yitz Kopel counsel on any cases in
9 which you had previously been disclosed as an
10 expert?
11     A.   That's possible, but I don't really
12 think about, you know, whose name appears on the
13 case caption, so, I don't know that I can state
14 with certainty.
15     Q.   Had you previously worked with Yitz
16 Kopel with respect to cases on which you were
17 disclosed as an expert?
18     A.   Yes.
19     Q.   Do you have an approximate sense of
20 how many?
21     A.   Maybe one or two, to the best of my
22 recollection.
23     Q.   And those one or two cases,
24 approximately, when was that?
25     A.   I would say it was probably within the

31

WEIR

2 one or two years prior to my engagement on the
3 Bell & Howell matter.
4     Q.   And the one or two cases, were those
5 class action litigation?
6     A.   To the best of my recollection, yes.
7     Q.   Did either of those cases involve
8 consumer products, to your recollection?
9     A.   The one that I can think of
10 definitively did involve consumer products.
11     Q.   And which case was that?
12     A.   The Ebin vs. Kangadis cases.
13     Q.   And what did those cases involve?
14     A.   The deceptive sale of a product known
15 as pomace oil that was being sold as olive oil.
16     Q.   And you worked with Yitz Kopel on both
17 of those cases.  Are those cases currently
18 pending?
19     A.   I believe all of those cases have been
20 resolved.
21     Q.   And in both of those cases you
22 submitted an expert report?
23     A.   To the best of my recollection, yes.
24     Q.   Were you deposed in either of those
25 cases?

32

WEIR

1    A.   In at least one of them, yes.
2
3         Again, I would advise the reader of
4    the transcript to consult my Statement of
5    Qualifications for definitive answers on these
6    dates and cases rather than this memory quiz, but
7    you can proceed as you will.
8         Q.   Fair enough.  Prior to your retention
9    in this matter were you familiar with Bell &
10   Howell?
11        A.   I had a vague recollection of them as
12   formerly having been producers of optical
13   equipment, like movie projectors.
14        Q.   So, you weren't familiar with Bell &
15   Howell as a purveyor of consumer products?
16        A.   Well, I would view movie projectors
17   that they sold as being consumer products, but I
18   was unaware, for example, of the pest repeller
19   products as being sold by Bell & Howell.
20        Q.   Prior to your retention in this case,
21   did you have any experience with ultrasonic pest
22   repellers?
23        A.   Not personally.  No.
24        Q.   Prior to your retention in this case,
25   were you familiar with Joanne Hart and/or Sandra

33

WEIR

1    Bueno?
2
3         A.   Not to my knowledge.  I always give
4    the caveat that you never know who you're talking
5    to when you're sitting on an airplane, but, I
6    don't know them.
7         Q.   So, to this date, have you spoken with
8    either Joanne Hart or Sandra Bueno?
9         A.   Again, not to the best of my
10   knowledge.
11        Q.   With respect to this case you have not
12   spoken with them?
13        A.   Correct.
14        Q.   And with respect to this case, what
15   was your compensation arrangement?
16        A.   Economics and technology as being
17   compensated at the rate of $600 an hour for my
18   time, however that time is spent.  And I believe
19   that --
20             Well, other members of my firm, to the
21   extent that they work on the case, are
22   compensated at other rates.  But, that's the sum
23   total of the arrangement.
24             We get paid for our time.  There are
25   no contingency fees or performance bonuses or

34

WEIR

1    anything like that.
2
3         Q.   Approximately how many hours would you
4    say you billed them?
5         A.   I can probably comfortably say dozens,
6    but I did not consult my billing records in
7    anticipation of the deposition.  So, again, the
8    answer to your question is knowable, but I don't
9    know it as I sit here today.
10        Q.   Other than yourself, did anyone else
11   with ETI assist in your work on the case?
12        A.   I know that Andrew Kearns, who we
13   discussed earlier today, has assisted with some
14   of the data analytics.
15             To the best of my knowledge, he's the
16   only other person that has provided what I would
17   describe as substantive work on the case.
18        Q.   And when you say he performed data
19   analytics, what kind of work did Andrew do on
20   this case?
21        A.   I think he assisted in summarizing the
22   sales data in conducting, under my direction, the
23   state-by-state apportionments, that kind of, I
24   would describe it as, spreadsheeting exercises.
25        Q.   So, his work on this case would have

35

WEIR

1    been at your direction?
2
3         A.   Yes.
4         Q.   When you were first retained by Bursor
5    & Fisher, what was your understanding of your
6    assignment in this matter?
7         A.   I was asked at the outset just to
8    understand the nature of the case, so, to review
9    the Complaint, do some background research as to
10   the products and then to make a determination
11   about whether or not --
12             Well, within the framework of the
13   allegations, to determine what type of damages
14   might be at issue in the case.
15             Once having made that determination,
16   determining whether or not it would be possible
17   to determine those damages using class-wide
18   common evidence, and if I was able to make that
19   determination in the affirmative, to then set
20   forth an estimate of those damages.
21        Q.   When you say you were asked to do
22   background research on the products, what kind of
23   background research did you do?
24        A.   The common practice for me would be to
25   check out the defendant's website, if I know

36



WEIR

1                  WEIR
2 anything about the retailers of the product, to
3 investigate them to the extent I don't already
4 know who they are.
5      Just to do some, you know, some
6 research to understand the nature of the product
7 and what's at issue in the litigation.
8     Q.  So, in this case what kind of
9 background research did you do?
10     A.  Again, I would have looked, for
11 example, at any available information online
12 about Bell & Howell, the pest repellers.
13     As I became aware of some of the major
14 retailers, I didn't really need to look up
15 Walmart. I've researched them many times in the
16 past.
17     But, there were some other retailers
18 that I just checked out their websites just to
19 understand what the nature of the retail
20 relationship was like.
21     Q.  When you say, "the nature of the
22 retail relationship," what do you mean by that?
23     A.  Who the retailer is, do they sell
24 online, in a store, via catalog, could I see the
25 Bell & Howell products for sale, et cetera.

37

1                  WEIR
2     Q.  Would you maintain any notes or draft
3 any documents with respect to that research?
4     A.  I'm not a note taker. My seventh
5 grade history professor would comment on that.
6 If anything that I found was particularly
7 salient, it would have found its way into my
8 Declaration.
9     But, typically what I'm doing is kind
10 of confirming my expectation about the nature of
11 the retail market, which is that, there are many
12 retailers, there's competition that Bell & Howell
13 either -- well, that Bell & Howell was not a
14 primary retailer in and of themselves.
15     Again, I'm just trying to get some
16 background; nothing, you know, overly serious
17 about the case.
18     Q.  So, to the extent that there is
19 nothing in your Declaration reflecting that
20 research, you would say that that was not
21 particularly salient? Is that your testimony?
22     A.  I guess I would say that it just -- to
23 the extent it factored into anything, it was into
24 my understanding of whether or not I felt damages
25 could be calculated on a class-wide basis in this

38

1                  WEIR
2 case. And then, you know, formulating my
3 understanding.
4     So, at the outset of the case, for
5 example, when I found out that Walmart was a
6 retailer, I know from past experience that
7 Walmart can provide retail sales data and will
8 provide retail sales data subject to protective
9 order in the course of a litigation.
10     So, that helps me frame my
11 understanding that that type of data can and will
12 be available in a particular case.
13     Q.  So, after you performed your
14 background research, you stated that you did an
15 analysis of the types of damages that would be
16 available; is that correct?
17     MR. ARISOHN:  Object to form.
18 Misstates the prior testimony.
19     THE WITNESS:  I think what I would
20 have been thinking about throughout all of
21 this is what type of damages are at issue in
22 the case and I would have made that
23 determination based upon a review of the
24 Complaint and based upon my discussions with
25 counsel.

39

1                  WEIR
2     Because, the type of damages that are
3 going to be available stem directly from the
4 nature of Plaintiffs' theory of liability.
5     My background research related, I
6 think, maybe more to the next step, which
7 is, is it likely that we would be able to
8 put together a framework and analysis that
9 would demonstrate what those damages are and
10 how they can be calculated.
11     Q.  So, the nature of damages, your
12 understanding of the nature of damages was based
13 on your review of the Complaint and your
14 discussions with counsel?
15     A.  And my 14 years of experience in
16 understanding this particular type of litigation
17 scenario.
18     Q.  When you say, "this type of litigation
19 scenario," what are you referring to?
20     A.  Talking about a product that has one
21 central professed value and where the litigation
22 is challenging the very existence of any of that
23 value.
24     Q.  So, we discussed your understanding of
25 the nature of your assignment. Following your

40



WEIR

1    retention and your background research, what did
2    you do next?
3
4        A.   Just so that the record is clear,
5    you're characterizing these things as if they are
6    linear in a timeline and I think there would be
7    some overlap to all of these processes.
8            But, subject to that caveat, I was
9    retained, I did some background research, I came
10   to the conclusion that, based upon Plaintiffs'
11   stated theory of liability, full compensatory
12   damages would be the correct measure of economic
13   damages in the case.
14       Q.   Let me stop you there.
15           MR. ARISOHN:  Were you done with your
16   answer?
17       Q.   Sorry.  I know that I asked sort of a
18   lengthy, compound question, so I will break it up
19   for purposes --
20       A.   I don't mind if you break it up, just
21   so long as the record reflects that I was not
22   finished with my reply.
23       Q.   I'll let you finish and then I can go
24   back.  Go ahead.
25           THE WITNESS:  I'm sorry.  Would you

41

WEIR

1    mind reading back the question and the
2    fractional answer?
3        (Record read.)
4        THE WITNESS:  Okay.  So, as the record
5    will reflect, I had given consideration to
6    the nature of the type of damages, made a
7    determination that full compensatory damages
8    would be a legitimate model of economic harm
9    for this case.
10       I gave consideration to statutory
11   remedies and then gave consideration to the
12   type of data that I would want in order to
13   make a determination of what the full
14   compensatory damages would be in this case
15   under any of the class or subclass scenarios
16   being proposed by the Plaintiff.
17       Q.   When you say that you determined that
18   full compensatory damages would be the proper
19   measure, what analysis did you do to come to that
20   conclusion?
21       A.   Again, it was based on a review of the
22   Plaintiffs' complaints, my discussion with
23   counsel and the background research into the
24   nature of the products.

42

WEIR

1        Q.   And the background nature into the
2    nature of the products, what was that research?
3        A.   Again, that involved some of the
4    online research that we've already discussed, as
5    well as a review of, I think, some of the product
6    labels that had been produced in litigation and,
7    perhaps, other document production.
8            But, we're going back almost a year
9    now, so, I don't remember exactly everything that
10   I've looked at at that preliminary stage.
11       Q.   Did you review any scientific studies
12   with respect to ultrasound pest repellant?
13       A.   By that do you mean their
14   effectiveness?
15       Q.   Yes.
16       A.   Since it's beyond the scope of my
17   retention to evaluate the pest repeller's
18   effectiveness, I did not look at any such
19   studies.
20       Q.   You quantified my question.  Did you
21   review any scientific studies with respect to
22   other aspects of the ultrasound pest repellers?
23       A.   Well, it depends on how you take that
24   question.

43

WEIR

1        So, for example, the work that I did I
2    believe is a scientific study relating to these
3    pest repellers, but it relates to the economics
4    of the pest repellers, not, per say, to their
5    efficaciousness.
6        Q.   Did you review any scientific studies
7    with respect to the economic questions that you
8    just raised?
9        A.   Again, I performed and reviewed such
10   studies.
11       Q.   Other than your own study.
12       A.   I would have to look back at the
13   documents reviewed in order to answer that
14   question.  I don't recall as I sit here today.
15       (Defendant's Exhibit No. 1, Statement
16   of Qualifications, marked for identification
17   as of this date.)
18       Q.   Can you review Exhibit 1?
19       A.   Subject to check, this appears to be a
20   copy of my October 31st, 2017 Declaration
21   submitted in this matter.
22       Q.   So, to your understanding, this is
23   your report of your expert determination in this
24   matter?

44

WEIR

A.   Again, subject to check, this is a copy of the Declaration that I submitted with some of my findings as of October 31st, 2017.

Q.   Did you want to check just to make sure it's complete?

A.   The check that I would do would be to go back to my computer and hold it side by side. So, I'm willing to accept your representation that it's okay, but, it wouldn't be the first time there had been a clerical error involving a missing page or something that didn't photocopy correctly.

So, I apologize that I'm overly focused on semantics, but, it appears to be a copy, subject to check, of my Declaration submitted as of October 31st, 2017.

Q.   Fair enough.  So, to your understanding this document includes all the opinions that you have rendered in this matter?

A.   Almost certainly not.

Q.   So, there are opinions that you are rendering on which you would testify that are not included in this report?

A.   Well, for example, I submitted a

45

WEIR

report prior to this and, although they're similar, there may be differences.

In addition, I'm sitting for deposition today and you're going to ask questions and I'm going to offer opinions in response to that.  So, I would anticipate giving potentially hours of additional opinions.

In addition, I know that there has been new data that has become available in this case.  And so, if we talk about that new data, I may offer opinions as it relates to that additional data.

Q.   So, this report reflects the scope of opinions that you were requested to provide by counsel in this matter?

A.   I don't know what that means.

Q.   Are there any opinions that you were requested to provide by counsel that are not in this report?

A.   Well, I don't know that there were specific opinions that I've been asked to provide by counsel, but they've asked me to appear here today and answer your questions and to do so truthfully and honestly.

46

WEIR

And so, whatever opinions I may need to give in response to your question, I would give them and have been so requested.

Q.   If you can turn to Exhibit 1.

A.   By which you mean Exhibit 1, Statement of Qualifications to deposition Exhibit 1?

Q.   Yes.  Exhibit 1 to Exhibit 1, if you look at page 2 of that.  And you can take a second to review it.

Would that refresh your recollection as to the number of cases in which you have been retained by Bursor & Fisher?

A.   Page 2?

Q.   Page 2 and the following pages. Correct.  Oh.  I apologize.  It would begin on page 3.

MR. ARISOHN:  For clarification --

Q.   For clarification, page 2, I believe, begins publications, page 3 of the document would then list matters of that.

Would that refresh your recollection as to how many times you have been retained by Bursor & Fisher?

A.   I can tally the number of times that I

47

WEIR

have appeared on behalf of Bursor & Fisher from this list; it will take me a few moments.  I'm happy to do so if you would like.

Q.   We will be taking a break, I think, in five minutes or so, so, maybe you we can do it over the break.

But, this document would refresh your recollection as to that?

A.   Yes.

Q.   To your understanding, would there be any cases in which you had been retained as an expert witness that would not be reflected in this document?

A.   To the extent that there were ever matters that did not result in public appearance, there may be engagements that are not listed on this document.

Q.   So, to the extent that there are cases in which you may have provided opinions but were not deposed or testified, they would not be reflected in this document?

A.   Starting on page 3, the document that we are looking at provides a list of written deposition and oral testimony not at deposition

48

WEIR

that I have given since I began testifying as an
expert witness.

So, the caveat would be, any retention
that did not result in written deposition or
other oral testimony would not be reflected on
this list.

Q. And we can have you review that over
the break that we take.

If you can then turn to Exhibit 2 of
Exhibit 1.

A. Okay.

Q. The following document, that is the
list of "Documents Reviewed," is how that is
stylized, correct?

A. That's correct.

Q. And to your understanding, that
document reflects all of the documents that you
reviewed in connection with your retention in
this matter?

A. I think I would want to direct you to
paragraph 6 of the body of the report, where I
say:

"The documents, data and other
materials that I relied upon in forming my

49

WEIR

opinions are identified throughout the report and
in Exhibit 2 attached hereto.

"In addition, I have relied upon my
educational background and more than 14 years of
experience."

So, I would say, anything that's cited
in the body of the report in Exhibit 2 and those
things that I bring tangentially to bear through
my educational background and experience are the
things that I reviewed and relied upon in forming
my opinions in this case.

Q. So, the documents that you reviewed
and relied upon would be reflected in this
document and anywhere that documents are
referenced in the body of the report, correct?

A. I think I would let paragraph 6 speak
for itself.

Q. With respect to your general
background, are there any documents relative to
this specific case that you reviewed?

A. I don't think I re-reviewed anything,
but, for example, I bring to bear years of
experience with hedonic regression.

So, if we were to have a discussion

50

WEIR

about that, I would be drawing upon my knowledge
of dozens or hundreds of articles that relate to
that technique, interpretation of the results,
execution of that kind of study.  Same thing with
analyzing statistical data.

So, nothing that I've reviewed again
in preparation for this testimony.  If I had done
that, I would have listed it.

But, that's not to say that I won't
point you to a particular resource if you ask me
about something where it's a resource that I'm
familiar with as a result of my education or
experience.

Q. So, those would be educational
materials or literature with regard to the
general field of economics, for lack of a more
precise term?

A. I'd say the field of economics and
surrounding are tangential fields, including
things like statistics, econometrics, finance,
accounting, marketing, et cetera.

Q. But, are there any other documents or
information specific to the Bell & Howell
ultrasonic pest repellers involved in this case

51

WEIR

that you reviewed, other than what is reflected
in your report?

A. I think the report is complete, unless
by inadvertent omission, as of October 31, 2017.

I have since reviewed the Declaration
or report of Mr. Boedeker, as well as -- I know
there were exhibits to that report.  I'm trying
to remember if I've seen any sort of motion or
other paperwork filed by Defendants.

I've also received additional data
that came as part of the class notice process
that are not reflected in this Declaration.

Q. And what is that additional data?

A. It reflects sales information from
some of the retailers that I cite in here and
some additional retailers.

Q. And when did you receive that
information?

A. Between October 31, 2017 and the
present.  As to the precise date, I don't
recollect as I sit here today.

MR. WING:  Should we take a break and
allow measurement of the room?

MR. ARISOHN:  Sure.  Hopefully he'll

52



53

```
 1                    WEIR
 2      be on time.
 3           (Recess taken.)
 4  BY MR. WING:
 5      Q.   Mr. Weir, we just discussed over the
 6  break, but, if you could take a second and look
 7  through Exhibit 1 and let me know if that
 8  refreshes your recollection as to how many times
 9  you have been retained by Bursor & Fisher with
10  respect to disclosure as an expert witness.
11      A.   Okay.
12      Q.   And just, as you're looking, if you
13  could note which of those involve class action
14  litigation involving consumer products.
15      A.   So, you want me to just call these
16  out?
17      Q.   Sure.
18      A.   Otherwise I'm not going to remember by
19  the time I get to the end of the list.
20           Okay.  So, there's Brenner vs.
21  Procter & Gamble.
22      Q.   And what did that case involve?
23      A.   The sale of baby wipes.
24      Q.   I apologize.  The sale of baby wipes.
25  What were the issues involved?
```

54

```
 1                    WEIR
 2      A.   The issue was that the wipes were
 3  labeled as being natural and contained numerous
 4  synthetic chemicals.
 5      Q.   Did you give an opinion in that case
 6  with regard to full compensatory damages?
 7      A.   I don't think full compensatory
 8  damages were at issue in that case.
 9           Next on the list is Martinelli vs.
10  Johnson & Johnson.
11      Q.   And then, what did that case involve?
12      A.   That involved the sale of a
13  cholesterol-lowering, quote/unquote, butter
14  substitute product known as Benecol and the
15  allegations related to the labeling of that
16  product as containing no trans fats.
17      Q.   And that states that your Declaration
18  was submitted on August 28th, 2017.  To your
19  knowledge, is that case still pending?
20      A.   To the best of my understanding it is.
21      Q.   To your knowledge, the prior Procter &
22  Gamble case, is that case still pending?
23      A.   I believe that has been resolved.
24      Q.   Continue.
25      A.   Next on the list is Porter vs. NDTY.
```

55

```
 1                    WEIR
 2      Q.   And what does that case involve?
 3      A.   Trying to remember.  My engagement on
 4  that was limited and I think it might have even
 5  just involved summing up some of the total sales.
 6  I think it involved a protein supplement of some
 7  kind, to the best of my recollection.
 8      Q.   And so, this would have been
 9  statements made with respect to the
10  supplements --
11      A.   Right.  I think it related to the type
12  of protein that was involved.
13      Q.   To your knowledge, is that case still
14  pending?
15      A.   That one I don't have a sense one way
16  or the other.
17           Bottom of the page, McMillion vs. Rash
18  Curtis.
19      Q.   And what does that case involve?
20      A.   Violations of the Telephone Consumer
21  Protection Act.
22      Q.   And to your knowledge, is that case
23  still pending?
24      A.   It is.
25           So, there's a listing for this case,
```

56

```
 1                    WEIR
 2  Hart and Bueno vs. BHH, et al.  Hopefully we
 3  don't need to summarize that one.
 4      Q.   It's still pending, to your knowledge?
 5      A.   I wouldn't mind going home if you
 6  resolve the matter today.
 7           Gulkis vs. Zicam on page 5.
 8      Q.   And what does that case involve?
 9      A.   That is one case that involves
10  homeopathic remedies.
11      Q.   Is that one of the cases that we
12  discussed earlier?
13      A.   It is.
14      Q.   And to your knowledge, is that case
15  still pending?
16      A.   To the best of my understanding it is.
17  But, again, some of these, you know, I gave the
18  deposition six months ago and I haven't heard
19  much about it since.
20           So, I haven't heard that it's over,
21  but I also haven't had any active work on it
22  recently.
23      Q.   Continue.
24      A.   Famular vs. Whirlpool Corporation.
25      Q.   And what does that case involve?
```

WEIR

1
2    A.   That relates to the Energy Star
3  certification of various washing machines.
4         Q.   And is that case still pending?
5    A.   To the best of my understanding.
6         Q.   Continue.
7    A.   In re: 5-Hour Marketing.
8         Q.   And what does that case involve?
9    A.   The quantity of energy provided by a
10  5-Hour Energy drink.
11        Q.   And to your recollection, is that case
12  still pending?
13   A.   To the best of my understanding.
14        Q.   And just to go back, the case we've
15  discussed so far, in each of these cases you've
16  been testifying on behalf of class action
17  plaintiffs, correct?
18   A.   Yes.
19        Q.   Continue.
20   A.   Jacqueline Dean vs. Colgate.
21        Q.   And what does that case involve?
22   A.   The sale of Colgate Optic White
23  toothpaste.
24        Q.   And that was similarly a class action
25  plaintiff case, a case in which you were

57

WEIR

1
2         Q.   And what does that case involve?
3    A.   That's a parallel action to the
4  Famular matter, so, Energy Star appliances.
5         Q.   And to the best of your knowledge, is
6  that case still pending?
7    A.   It is, I believe.  Class cert was just
8  granted a week or two ago.
9         Q.   So, do you anticipate that you will be
10  providing further assistance in that case?
11   A.   I have no assignments right now, but,
12  if the case is going to move forward to trial, I
13  would anticipate continuing in my role as a
14  damages quantifier.
15        Q.   Continue.
16   A.   Melgar vs. Zicam.
17        Q.   Is that similar to the other Zicam
18  case?
19   A.   It is.
20        Q.   And to your knowledge, is that case
21  still pending?
22   A.   To the best of my understanding it is.
23        Patrick Hendricks vs. StarKist
24  Company.
25        Q.   And what does that case involve?

59

WEIR

1
2    A.   The sale of underfilled cans of tuna
3  fish.
4         Q.   And you have been retained on behalf
5  of class plaintiffs in that case?
6    A.   Correct.
7         Q.   And to your knowledge, is that case
8  still pending?
9    A.   I believe that settlement -- that case
10  has settled and been resolved, to the best of my
11  understanding.
12        Q.   Continue.
13   A.   There are three cases coming up that
14  relate to the Kangadis family and companies.
15  They basically are the same litigation, just
16  being pursued against different defendants or in
17  different venues.  That was the case we discussed
18  earlier that related to the sale of pomace oil as
19  being olive oil.
20        Q.   And that is a case that you testified
21  that you previously worked with Yitz Kopel,
22  correct?
23   A.   Yes.
24        Q.   To your recollection, any of the other
25  cases that we've discussed thus far, have you

60

WEIR

1
2  testifying on behalf of class action plaintiffs?
3    A.   Correct.
4         Q.   And is that case still pending, to the
5  best of your knowledge?
6    A.   It is.
7         Q.   Continue.
8    A.   In re: Nest Labs Litigation.
9         Q.   And what does that case involve?
10   A.   The sale of Nest Learning Thermostats
11  and the promised energy savings from using said
12  thermostats.
13        Q.   And are you testifying on behalf of
14  the class action plaintiff in that case?
15   A.   Yes.
16        Q.   Does that case involve full
17  compensatory damages?
18   A.   Not to the best of my recollection.
19        Q.   To your knowledge, is that case still
20  pending?
21   A.   I appreciate that you are clarifying
22  to the best of my recollection.  I don't think
23  so, but, again, I could always be wrong on these.
24        Next one at the bottom of the page,
25  Dzielak, D-Z-I-E-L-A-K, vs. Whirlpool.

58

WEIR

1   WEIR
2  worked with Yitz Kopel?
3      A.   I worked with Mr. Kopel on the Brenner
4  case.
5           To the best of my recollection, at
6  least so far, those are the cases where Mr. Kopel
7  has had, I guess what I would say, memorable
8  involvement in the case.
9           I can't say for certainty that he's
10 never done any work in any of the other cases,
11 but he's not been a primary point of contact.
12     Q.   You have personally worked with Yitz
13 Kopel, to your knowledge, on those cases,
14 correct?
15     A.   Correct.
16          Dei Rossi vs. Whirlpool is another
17 case involving Energy Star compliance.
18          In re: Scott's EZ Seed Litigation.
19     Q.   And what did that case involve?
20     A.   A combination grass seed product that
21 was emblazoned, "Grows 50 percent thicker with
22 half the water," when in reality it grows no
23 grass with half the water.
24     Q.   And what was your role in that
25 litigation?

61

1   WEIR
2      A.   I provided a number of frameworks for
3  calculating damages and then worked with another
4  team of experts to estimate price premium
5  damages.
6      Q.   And to your recollection, is that case
7  still pending?
8      A.   To the best of my understanding, it
9  is.
10          So, there's the Bursor & Fisher vs.
11 FCC matter, that's the FOIA request that we
12 discussed earlier today.
13          And my work involved -- some ways it
14 was mathematics exercise to determine whether or
15 not certain information could be used to
16 reverse-engineer what the telephone companies
17 claim was sensitive information to them.
18     Q.   And to the best of your knowledge, is
19 that issue resolved with respect to your
20 involvement?
21     A.   Yeah.  I haven't heard about that case
22 in a long time.  It's my understanding that
23 that's over.
24          Hendricks vs. AT&T Mobility.
25     Q.   And what did that case involve?

62

1   WEIR
2      A.   That related to AT&T Mobility's
3  billing system and its accuracy as it related to
4  data services.
5           And I think those are the last of my
6  engagements with Bursor & Fisher.
7      Q.   So, it looks like that was 2011.
8  Between 2011 and today you've been retained more
9  than 15 times on behalf of Bursor & Fisher?
10     A.   If that's what we just tallied up.  I
11 stopped counting, because I was trying to answer
12 your questions.  But, if that's the tally --
13     Q.   You wouldn't disagree with that
14 statement?
15     A.   No.  I think this document should be
16 accurate as to that.  I know Bursor & Fisher is a
17 satisfied customer.
18     Q.   Since this Declaration has been filed,
19 are there any additional cases on which you have
20 been retained by Bursor & Fisher?
21     A.   There may be one or two other
22 engagements; I'm not positive that they have
23 resulted in a public appearance yet.
24          So, I think I can comfortably say
25 there are one or two additional engagements, but,

63

1   WEIR
2  as to their nature or the precise case, I don't
3  know that I'm at liberty to disclose.
4      Q.   So, you believe you've entertained,
5  but, at this point, you have not provided a
6  written opinion; is that fair?
7      A.   I believe that's correct.
8      Q.   Turning to Exhibit 2, to that report,
9  the list of documents.
10          The documents listed in this
11 Declaration, are those documents that were
12 provided to you by counsel?
13     A.   Some of them, but not all of them.
14     Q.   So, there are two, it appears,
15 journals or journal articles that are cited
16 there, correct?
17     A.   Yes.
18     Q.   Were those provided to you by counsel?
19     A.   No.
20     Q.   Then you list the websites for five
21 retailers, correct?
22     A.   Correct.
23     Q.   Do you recall what you reviewed on
24 those five websites?
25     A.   I think we talked about this at a high

64

WEIR

1  WEIR
2  level earlier today, but I would have been
3  looking at the general nature of the retailer, as
4  well as for the information relating to the
5  Bell & Howell products.
6      Q.   Other than those five websites, did
7  you review any other websites with respect to
8  your retention in this case?
9      A.   I suppose it's possible, but, without
10  doing some additional review, I don't know that I
11  could recollect.
12      Q.   You don't recall any specific websites
13  that you reviewed with respect to this case?
14      A.   Again, I would say there's some small
15  possibility, but nothing is jumping to mind.
16      Q.   Going back to the list of documents,
17  other than the two journal articles we discussed
18  and the five websites that are listed at the
19  bottom, the remaining documents listed in that
20  list, were those provided to you by counsel?
21      A.   They were provided to me by counsel at
22  my request.
23      Q.   So, these are documents that you
24  specifically requested from counsel?
25      A.   I don't know that I specifically

65

WEIR

1  WEIR
2  requested each document by name, but I requested,
3  for example, documents that relate to the sales
4  of the Bell & Howell products at issue in this
5  litigation, and these are documents that were
6  responsive or semi-responsive to that query.
7      Q.   Were there documents that you
8  requested from counsel that you did not receive?
9      A.   Not to the best of my recollection.
10      Q.   So, to the best of your recollection,
11  the documents listed in this report are the
12  entirety of the documents that you requested from
13  counsel?
14      A.   As of the time of this Declaration.
15  And again, I want to just say, I would
16  refer the reader of the transcript to the whole
17  document, not just this specific list, which, as
18  I described to you, may or may not be the
19  totality of everything I reviewed, pursuant to
20  paragraph 6 of the Declaration.
21      Q.   Well, when you're putting together
22  your report, you list this as "Documents
23  Reviewed" in this exhibit, correct?
24      A.   I try to make Exhibit 2 a handy
25  reference guide, but it doesn't always capture

66

WEIR

1  WEIR
2  everything that has been reviewed.  That's why I
3  put the catchall that, if it's cited in the
4  report, the fact that it doesn't make it into the
5  exhibit doesn't make it something that I haven't
6  reviewed.
7      Q.   So, again, everything would be listed
8  either in this Declaration or somewhere else in
9  the body of the exhibit?
10      A.   Other than my educational background
11  and more than 14 years of experience and
12  everything that that entails and that I bring to
13  bear.
14      Q.   But, the documents specific to this
15  litigation would be listed somewhere in this
16  report, correct?
17      A.   Unless by inadvertent omission they
18  have been left out.
19      Q.   Have you supplemented this list of
20  exhibits with any new documents that you have
21  received?
22          MR. ARISOHN:  Object to form.
23      Q.   You testified earlier that you have,
24  since this Declaration was filed, that you have
25  received additional documents and information,

67

WEIR

1  WEIR
2  correct?
3      A.   Correct.
4      Q.   Have you supplemented this list of
5  documents?
6      A.   No.
7          MR. ARISOHN:  Object to form.
8          THE WITNESS:  Not at this time.
9      Q.   Do you anticipate supplementing your
10  list of "Documents Reviewed"?
11      A.   At this time I have not been asked to
12  do so, but, if I am asked to do so, I will.
13      Q.   Going back to our earlier discussion,
14  you stated that after you were retained you did
15  some analysis to determine the proper measure of
16  damages for the --
17      A.   Correct.
18      Q.   Some initial analysis?
19          MR. ARISOHN:  Object to form.
20          THE WITNESS:  I think what I said was
21  something along the lines of, I determined
22  the framework for damages that would be
23  economically appropriate or that would seek
24  to measure the economic harm suffered by the
25  Plaintiffs, pursuant to their theory of

68



WEIR

---

**Page 69**

1   liability in this litigation.

2   Q.   And is that analysis reflected in this

3   report?

4   A.   It is.

5   Q.   And you also stated that you performed

6   an analysis of potential statutory damages; is

7   that correct?

8   A.   I think that is a mischaracterization

9   of what I said before.

10   Q.   What did you do with respect to

11   statutory damages?

12   A.   I gave consideration to the statutory

13   remedies that may be available.

14   And again, I'm not a lawyer, so I was

15   relying on instructions from counsel as to what

16   the law may provide for additional damages and I

17   provided a high-level summary of how those

18   damages could be calculated, either by me or by

19   the judge or the jury, should such statutory

20   damages be awarded.

21   And I believe in this case it relates

22   to the determination of a multiplier for damages

23   in California, which would result in either the

24   judge or the jury making a determination of a

69

---

**Page 70**

1   multiplier and then taking the economic damages

2   that I've calculated and doing that

3   multiplication.

4   Q.   So, the application of statutory

5   damages was something that's based on the advice

6   of counsel?

7   A.   I don't fully understand that

8   question.

9   Q.   Did you do anything independently to

10   determine potential statutory damages?

11   MR. ARISOHN:  Object to form.

12   THE WITNESS:  Again, I'm not

13   testifying as to whether statutory damages

14   should apply, I'm testifying as to how they

15   could be applied and calculated should

16   whatever legal triggers be met in order to

17   allow for those statutory damages.

18   Q.   So, you have no opinion as to the

19   actual application of the statute?

20   A.   Again, it's my understanding that the

21   statute calls for a multiplication of a factor

22   that is to be determined by the judge or the jury

23   against the measurement of economic damage.

24   And so, I am offering an opinion that

70

---

**Page 71**

1   relates to the quantification of economic

2   damages, but not as to the determination if or

3   what multiplier should be used to determine

4   statutory damages.

5   Q.   Other than the documents that you

6   requested from counsel and received and the two

7   journal articles on the five websites, are there

8   any other documents that you independently

9   gathered specific to this litigation?

10   A.   There are documents that were

11   generated by me, my work papers, but I don't

12   believe there were additional source documents

13   that I have relied upon other than what we've

14   discussed and that have subsequently been

15   supplemented following this October 31, 2017

16   Declaration.

17   Q.   So, with respect to your initial

18   evaluation, your testimony that full compensatory

19   damages were the proper measure in this case, did

20   you generate any documents with respect to that

21   opinion?

22   A.   I did.

23   Q.   Other than this report?

24   A.   No.  The report constitutes my

71

---

**Page 72**

1   opinions about the correct measure of economic

2   damages in this case.

3   Q.   Did you perform any statistical

4   analysis with respect to that opinion?

5   A.   Well --

6   MR. ARISOHN:  Object to form.

7   THE WITNESS:  -- I guess I would say

8   that I came to the conclusion that that

9   would be the correct form of damages and

10   then later affirmed that conclusion with

11   some statistical analysis.

12   Q.   And that statistical analysis would be

13   reflected in the report?

14   A.   It's described at a high level in the

15   report.  Yes.

16   (Defendant's Exhibit 2, Subpoena,

17   marked for identification as of this date.)

18   Q.   Please take a second to review that.

19   Mr. Weir, do you recognize that

20   document?

21   A.   I've seen this or something like it.

22   Q.   And if you could, what is that

23   document?

24   A.   It is a subpoena for the production of

72

WEIR

1
2  documents.
3      Q.   So, it's a subpoena to you for
4  production of certain documents?
5      A.   Again, I'm not a lawyer, but that's my
6  best understanding of what this document
7  reflects.
8      Q.   And if you turn to the last page of
9  that document, it's titled, "Rider to Subpoena,"
10  correct?
11      A.   I see that.
12      Q.   And that document lists 13 categories
13  of documents that are being requested, correct?
14      A.   There are 13 document requests.
15      Q.   And have you reviewed that document or
16  something similar?
17      A.   Yes.
18      Q.   And have you done anything to comply
19  with the document requests in that document?
20      A.   To the best of my recollection,
21  documents were collected that were responsive to
22  this list of requests and provided to counsel for
23  Plaintiffs.  I can only presume that they pass
24  them along to you, subject to their own
25  objections to these requests.

73

WEIR

1
2      Q.   To the best of your knowledge, you
3  have produced any documents responsive to this
4  request to counsel, correct?
5      A.   Subject to their objections to certain
6  requests.
7      Q.   As far as what they passed on to us,
8  I'm not discussing that.  I'm saying, you have
9  produced anything to them that would be
10  responsive to this request?
11      A.   And what I'm saying is, I've produced
12  anything that is responsive to the requests that
13  I was informed were legitimate requests not
14  subject to objection by counsel for Plaintiffs.
15      Q.   So, your understanding is that counsel
16  may have advised you not to provide certain
17  documents?
18      MR. ARISOHN:  I think we're going
19      beyond the scope of communications that are
20      to be asked at depositions of an expert here
21      under Rule 26.
22      MR. WING:  I'm questioning with
23      regards to documents that he produced
24      in this litigation, subject to the
25      subpoena that --

74

WEIR

1
2      MR. ARISOHN:  I think you asked him
3      about a communication of counsel.  So, if
4      you rephrase the question.
5      Q.   So, there may have been documents that
6  were responsive to these requests that you did
7  not produce to counsel?
8      A.   I don't have a precise recollection
9  one way or the other.
10      Q.   You understand that this is a subpoena
11  to you that you were bound to respond to,
12  correct?
13      A.   I understand that it's a subpoena.
14      Q.   I guess we will go down the list.
15      The first request:  Your complete file
16  related to this litigation.
17      Do you understand that you produced
18  your complete file related to this litigation?
19      A.   Subject to the Rules of Disclosure
20  under Federal Rule 26, I believe that I have.
21      Q.   And your understanding of the scope of
22  disclosure under Federal Rule 26 is that based on
23  discussions with counsel?
24      A.   Yes.
25      Q.   Do you have an understanding of what

75

WEIR

1
2  documents you may have withheld pursuant to
3  Rule 26 of the Federal Rules of Disclosure?
4      A.   The thing that immediately jumps to
5  mind is any draft work product.
6      Q.   So, to the extent that you have drafts
7  of this report, those were not produced, correct?
8      A.   I believe drafts in any form were not
9  produced.
10      Q.   Are there any other documents that you
11  recall that you did not produce pursuant to
12  Federal Rule 26?
13      A.   Not that I can recollect as I sit here
14  today.
15      Q.   So, any documents in your file with
16  respect to this litigation, other than documents
17  that you were instructed not to produce by
18  counsel, you have produced in this litigation, to
19  your understanding?
20      A.   I believe I produced anything in my
21  file that was subject to disclosure under Rule 26
22  that had not already been produced in the
23  litigation.
24      So, for example, documents that came
25  from Defendant, I don't believe I produced those

76

WEIR

back.

Q.   I see.  But, to the extent that those documents were something that you reviewed and relied on and would be in your file, those would be reflected in your report, correct?  Either in that list of documents or somewhere in the body, correct?

A.   Correct.  And would be, at least, I would presume, in your possession.

Q.   Thank you.

If we turn back to Exhibit 1, which is your report.

A.   Okay.

Q.   If we look at paragraph 3, that states you have "been advised that Plaintiffs allege that this claim is misleading to reasonable consumers because the products do not repel pests at all and are ineffective and worthless."

Correct?  Do you see that?

A.   I see that.  Yes.

Q.   And that statement is based on the allegations of the complaints in your discussions with counsel, correct?

A.   Correct.

77

WEIR

Q.   Did you do anything independently to research whether the devices were ineffective?

A.   That's beyond the scope of my assignment to make that determination, so I did not conduct any further independent research to make a determination as to whether liability should or should not be established in this case.

Q.   So, you are not offering an opinion as to whether the devices were, in fact, ineffective, correct?

A.   That is correct.  I am not offering an opinion one way or the other as to whether the devices are ineffective.

My opinions stem from an assumption that Plaintiffs are able to establish their theory of liability, which is the noted first step in a damages analysis.

But, as to whether they are successful in that endeavor, I have not offered an opinion one way or the other.

Q.   So, you haven't reviewed any studies with respect to the effectiveness of ultrasonic pest repellers, correct?

A.   Again, because I'm not offering an

78

WEIR

opinion as to liability, to the best of my recollection I have not looked at studies as to the effectiveness of pest repellers.

Q.   And other than the rebuttal report of Mr. Boedeker, which you've said you reviewed, have you reviewed any of the expert reports in this case?

A.   Again, because establishing liability was beyond the scope of my assignment, I did not look at the other experts who are, I guess, involved in the establishment of liability one way or the other.

Q.   And you didn't do any other research with respect to the general effectiveness of the ultrasonic pest repellers?

A.   Again, because it's beyond the scope of my assignment to determine liability, I did not conduct any additional research to determine whether liability should or should not be established.

Q.   Did you do any independent research with respect to whether the pest repellers were worthless?

A.   I did do some research in that regard.

79

WEIR

Q.   And what research did you conduct with respect to whether they were worthless?

A.   After the assumption of Plaintiffs' theory of liability, I did research to determine whether what I would describe as ancillary or subsidiary features of the product garnered any value in the marketplace as measured by price.

Q.   So, that's a discussion that's later in your report, correct?

A.   Correct.

Q.   We will get there.

Other than that, prior to that analysis that you just described, did you do any other research with respect to whether repellers were worthless?

A.   Other than my understanding of the Complaint and Plaintiffs' claims in this action and that further analysis, I have done no additional analysis to make a determination that the repellers are worthless.  I understand that that is part and parcel of the theory of liability.

Q.   So, that is based entirely on the assumption based on the allegations in the

80

WEIR

Complaint that the devices are entirely ineffective with respect to pests, correct?

A.   No.  It's an assumption that Plaintiffs are able to establish their theory of liability.  What that will require is beyond the scope of my engagement.

Q.   Did you do any independent market research with respect to whether these devices were, in fact, worthless?

A.   I guess maybe we're talking around in circles.  The market research that I did is based on the assumption that Plaintiffs establish their theory of liability that these products don't repel pests.

And so, my research finds that, if these products that are designated as pest repellers do not repel pests, then they have no value in the marketplace.

And I did some additional research to determine whether or not, within the context of the type of product that we were dealing with, any ancillary features would provide any market value as measured by price and made the determination that they do not.

81

WEIR

Q.   Did you review any customer reviews or ratings with respect to the devices?

A.   No, I did not.

Q.   Did you review the return rates of the devices in the documents that were provided to you?

A.   I did review those rates, but, much like the customer reviews, I don't believe they are dispositive as to whether liability should or should not be established and they're certainly not dispositive as to what the damages should be if Plaintiffs are successful in establishing their theory of liability.

Q.   So, that is not data that you utilized in providing any of your opinions?

A.   Well, the return data is something that I did include, because I subtracted from my damages analysis the returns.

Q.   So, you considered them from a mathematical standpoint, correct?

A.   Correct.  If a customer already got their money back, they did not recover damages in the case.

Q.   But, you did not consider them with

82

WEIR

respect to any other component of your analysis?

A.   Again, in terms of determining full compensatory damages, subtracting the returns from the analysis is the appropriate way to account for them.

If you're talking about whether or not I gave consideration as to whether liability should be established based upon that information, that is beyond the scope of my engagement, and so I did not consider that data that way.

Q.   Did you use that data with respect to your analysis of whether full compensatory damages would be appropriate in this case?

A.   No.  It would not be appropriate to do so given Plaintiffs' stated theory of liability.

Q.   So, it's your understanding that, based on Plaintiffs' established theory of liability, that, in order to establish liability, they must establish that the devices in question were entirely ineffective?

A.   You've asked that three times now and you keep mischaracterizing my testimony, so I would ask you to pay attention to what I'm saying

83

WEIR

and please don't intentionally mischaracterize the testimony, which is that, I'm not offering an opinion as to what Plaintiffs must do to establish liability, I'm simply assuming that they are able to establish liability in this case.

Q.   And beyond your review of what your understanding of what Plaintiffs must establish or must show to establish liability in this case, did you review anything else to determine that full compensatory damages were appropriate?

A.   I reviewed the Complaint, I reviewed the nature of the product, I looked at the retail market for these products and I conducted a statistical exercise to determine whether or not, above and beyond repelling pests, whether there was any value of the ancillary features of some of these products as measured by price in the marketplace and determine that there was not.

Q.   Is that statistical analysis that you conducted, is that reflected in the documents that were in your file that were produced?

A.   To the best of my understanding, yes.

Q.   And when did you conduct this

84



WEIR

statistical analysis of the ancillary features,
as you described them?

A.   Sometime prior to October 31, 2017.
But, as to the precise date, I don't have a
recollection, as I sit here today.

Q.   And what did that statistical analysis
consist of?

A.   In comparison of the prices of various
pest repellers against one another to determine
whether or not there was a statistically
significant difference in price that was
resulting from the inclusion of one or more of
the ancillary features.

And that analysis, as confirmed by
your own expert, actually, indicates that there
is little or no value associated with those
ancillary features.

Q.   When you drafted this report, did you
quantify the ancillary features that you were
analyzing in your statistical analysis?

A.   I did quantify them and determined
that the value was zero.

Q.   And where is that quantification of
the ancillary features on this report?

85

WEIR

A.   Paragraph 19, I state:

"My analysis of this data indicates
that there is no statistically significant price
premium for additional features such as a night
light.

"It is my professional opinion that
the retail sales data presently available in this
litigation indicate that such features have no
additional value in the marketplace and as such
no additional adjustments need to be made as to
my analyses presented above."

Q.   And that states that your professional
opinion is that there is no statistical
significance. I'm asking, where is that
statistical analysis set forth in this report?

I'm asking, where is that statistical
analysis set forth in this report?

A.   So, again, I describe the statistical
analysis in the preceding sentence, where I say:

"I have examined the sales data
available in this litigation, including data from
retailers such as Walmart."

And that examination is included in my
work papers that are the background to this

86

WEIR

report.

Q.   So, it's your understanding that any
and all statistical evaluation that you did would
be reflected in the documents that you provided
as part of your file to this report?

A.   Anything that involved a precise
calculation would be present there. Anything
that was determined based upon review of the
sales data would be based upon the sales data
that's been provided to you, but may not be
explicitly reflected in those documents. So,
there's probably a combination of both.

Q.   Your review of the sales data wouldn't
be a statistical analysis, correct?

A.   I would disagree with that
characterization.

Q.   Do you believe that your eyeball
review of the documents consist of a statistical
evaluation of that data?

A.   It can be. Yes. When you have sales
information from one product and sales
information from another product that is
otherwise identical but for one attribute, one
can analyze that data with a simple review of the

87

WEIR

data without needing to do a complicated
analysis.

Q.   And you did not conduct any such
detailed analysis with respect to the majority of
the products involved in this litigation,
correct?

A.   There was a detailed analysis
conducted from some products and a less detailed
analysis conducted for other products.

Q.   Looking at paragraph 7 of your report,
it says:

"As a threshold matter, it is my
opinion that it is possible to determine
class-wide damages in this case using the
Defendant's own available business records and
documents, third-party retailer business records
and available market research data."

Correct?

A.   I believe you read paragraph 7, but
I'll let the document speak for itself.

Q.   Well, you have it in front of you. Is
that accurate, what I just read?

A.   Again, I wasn't listening word for
word, I was looking at paragraph 7. I'll let the

88

WEIR

document speak for itself.

Q.   And those three items that you
identify, are those items that you reviewed with
respect to drafting this report?

A.   Yes.

Q.   You say, "Defendant's own available
business record and documents."  That's the
wholesale records that were provided to you,
correct?

A.   Amongst other things.

Q.   That would also involve the product
descriptions; is that --

A.   Product descriptions, labels.  There
may be some others things.  It's been awhile
since I've looked through all of those documents.

Q.   Other than the wholesale records, the
product descriptions and the product labels, did
you review any other business records or
documents of the Defendant?

A.   Anything that is cited in the body of
the report for Exhibit 2 thereto I reviewed.

Q.   Next you discuss third-party retailer
business records, correct?

A.   Yes.

89

WEIR

Q.   With respect to this report, that
would be the sales figures from five retailers,
correct?

A.   I don't remember the precise number,
but there were several retailers.  Yes.

Q.   To your recollection, that would be
Walmart, Dr. Leonard's, Home Shopping Network,
Harriet Carter and Family Dollar, correct?

A.   If that's stated in the report, then
I'll accept your representation.  Yeah.  Here it
is, paragraph 13, Dr. Leonard's, Family Dollar,
Harriet Carter, Home Shopping Network and
Walmart.

Q.   Did you receive any third-party
retailer business records from any entities other
than those five?

A.   I have subsequently received retail
data from additional retailers, but not as of the
time of this Declaration.

So, this retail data comprised, I
believe, call it 70-odd percent of the totality
of retail sales and, again, I've received
additional retail sales data subsequent to the
signing of this Declaration.

90

WEIR

Q.   To the extent that you've received
subsequent retail sales information, have you
supplemented your response to the document
request we reviewed earlier?

A.   You mean deposition Exhibit 2?

Q.   Yes.

A.   I am aware that counsel for Plaintiff
is in possession of any additional retail sales
figures; whether or not they have provided them
to you, I can't speak for them.

Q.   Have you instructed counsel to
supplement its production pursuant to your
obligations under that subpoena?

MR. ARISOHN:  Objection to the extent
it calls for communication with counsel.

You can answer the question.

THE WITNESS:  No.

Q.   With respect to those additional
business records you have received, have you
performed any analysis of that data?

A.   Yes.

Q.   Have you generated any documents with
respect to that analysis?

A.   It's possible.  Yes.

91

WEIR

Q.   For which retailers have you received
additional information subsequent to this report?

A.   There was at least one pharmacy chain.
Again, without the documents in front of me, I
may be misspeaking.  But, I believe it was
Rite Aid.  But, if you told me it was Walgreen's,
that could be the case.  I would let the data
speak for itself.

I believe I received data from
Publishers Clearing House and there may be --
there may be additional retailer data that was
included.  But, those are the ones that stick in
my mind as I sit here today.

Q.   And for Rite Aid and Publishers
Clearing House, what type of data have you
received?

A.   I believe it is similar to that that I
received for the five retailers mentioned in this
Declaration.  It relates to the retail sales data
of the Bell & Howell pest repellers that are the
subject of this litigation.

Q.   And when you say "retail sales
information," without having had the documents
produced and in front of me, what information,

92

WEIR

1   with respect to Rite Aid and Publishers Clearing
2   House, again, what type of data have you
3   received?
4       A.   It's going to relate to the
5   identification of customers that purchased
6   Bell & Howell and information relating to the
7   quantity of units and/or price that are involved
8   in those transactions, to the best of my
9   recollection, as I sit here today.
10      Q.   So, with respect to Rite Aid, have you
11  received data reflecting the number of units of
12  the Bell & Howell pest repellers that have been
13  sold?
14      A.   To the best of my recollection, we
15  received data from Rite Aid that relates to the
16  number of units of Bell & Howell pest repellers
17  that they sold, I think, on a nationwide basis,
18  as well as on a state-by-state basis.
19      Q.   With respect to Rite Aid, have you
20  received data with respect to the dollar amount
21  of retail sales of the Bell & Howell pest
22  repellers?
23      A.   That I would have to go back and
24  refresh my recollection.  I don't recall

93

WEIR

1   precisely as I sit here today.
2       Q.   With respect to Publishers Clearing
3   House, have you received documents reflecting the
4   amount of units sold of the Bell & Howell pest
5   repellers?
6       A.   Again, it's my recollection that we
7   received information that relates to the number
8   of units sold of the Bell & Howell pest
9   repellers.
10      Q.   To be more precise, have you received
11  documents that specifically state the number of
12  units sold of the Bell & Howell pest repellers
13  during the class period?
14      A.   Again, whether they make such an
15  express statement or whether they allow you to
16  understand that answer, I don't quite recollect.
17  But, it's information that relates to the number
18  of units sold during the class period.
19      Q.   "Information that relates" is a very
20  broad statement.
21           With respect to the retailers set
22  forth in your report, it is my understanding that
23  you have received data and relied on data that
24  specifically states this is the number of

94

WEIR

1   repellers that were sold by our company during
2   the relevant class period, correct?
3       A.   Again, I don't know that there is such
4   an express statement, but there's data that's
5   available that can allow you to understand that
6   information.
7       Q.   With respect to the the five retailers
8   that are set forth in your report, it is your
9   express understanding that the data that you have
10  been provided is intended to be a quantification
11  of the number of units sold during the relevant
12  class period, correct?
13      A.   It's my understanding that that is one
14  data point that the collection of data that I
15  have received is able to answer that question.
16      Q.   Well, with respect to Walmart, it is
17  your understanding that the information provided
18  by Walmart includes a specific statement as to
19  the number of units sold by Walmart during the
20  relevant class period, correct?
21      A.   See, you keep describing this as a
22  specific statement and it sounds like you're not
23  understanding the nature of the data that's been
24  produced.

95

WEIR

1           They produced either PDF or
2   spreadsheet data that allows you to answer that
3   question, but I don't know that Walmart said this
4   is the number of repellers that has been sold
5   during the class period.
6           So, we can answer that question
7   precisely using the Walmart data, but I don't
8   know that Walmart has issued an express statement
9   the way that you are describing it.
10      Q.   And the data that has been provided by
11  Rite Aid, is that substantially similar to the
12  data that's been provided by Walmart?
13      A.   Again, without having them in front, I
14  believe they relate to the same topic, which is
15  the unit sales of the Bell & Howell pest
16  repellers and other information salient to
17  determining class-wide damages.  Whether they are
18  substantively the same, that may be in the eye of
19  the beholder.
20      Q.   With respect to Publishers Clearing
21  House, have you received data reflecting the
22  monetary sales of Bell & Howell pest repellers?
23      A.   Again, I would need to go back and
24  check that data specifically for that.

96

WEIR

1
2    Q.   So, these are the two retailers for
3  which you recall receiving updated data following
4  this Declaration, correct?
5    A.   Those are the two that I can recollect
6  as I sit here today.  There may be others.
7    Q.   You don't recall whether you have
8  received anything from those retailers with
9  respect to the price of the units?
10   A.   Again, the problem is, I haven't
11  memorized everything that's in these voluminous
12  spreadsheets.
13       So, there may very well be data as to
14  aggregate sales that can be used to determine
15  price, but I don't recollect the precise format
16  of the data, so I'm hesitant to promise exactly
17  what's in the spreadsheets that have been
18  produced.
19   Q.   Since your receipt of this data
20  subsequent to the expert report that has been
21  filed in this case, have you performed any
22  analysis of the price of the Bell & Howell pest
23  repellers?
24   A.   The analysis that I've done is to
25  affirm my calculation of aggregate class-wide

97

WEIR

1
2  damages and the additional sales data that I have
3  received indicates that my analysis in the
4  October 31, 2017 report is a good estimate of the
5  aggregate class-wide damages for any of either
6  the nationwide class, multistate class or
7  California class.
8        And if we were to make a revision
9  based upon the new data, it would result in a
10  slight increase in the total of class-wide
11  damages.
12       So, I feel very comfortable with the
13  conservative and accurate nature of the numbers
14  that I have set forth in the October 31st, 2017
15  Declaration.
16       MR. ARISOHN:  Can we take a break
17     sometime soon?
18       MR. WING:  Yeah.  We can take a break
19     now.
20       (Recess taken.)
21  BY MR. WING:
22   Q.   Before the break, Mr. Weir, we were
23  discussing the additional retailer records that
24  you have received since this report was
25  completed.

98

WEIR

1
2        With respect to those records, are
3  those records that you requested from counsel?
4    A.   I believe I was made aware of their
5  existence and then I requested them.
6    Q.   Since this report was filed, have you
7  requested any other documents from counsel or
8  anyone else?
9    A.   I don't think I've requested any
10  additional documents.  As I said before, I did
11  receive the Boedeker report and exhibits and
12  potentially some moving papers that came with it,
13  I don't recall precisely what.
14   Q.   Since this report was submitted, you
15  have receive Mr. Boedeker's report and any
16  associated documents, correct?
17   A.   Correct.
18   Q.   And the records from retailers that we
19  were discussing earlier, correct?
20   A.   Correct.
21   Q.   Have you received any other documents
22  since this report was submitted?
23   A.   To the best of my recollection, not as
24  it relates to this case.  I mean, obviously I get
25  documents all the time.

99

WEIR

1
2    Q.   You have not received any documents
3  specific to your retention in this matter since
4  this report was submitted?
5    A.   Other than the things we just talked
6  about, not to the best of my recollection.
7    Q.   Is it possible that you received other
8  documents that you don't recall?
9    A.   My memory is not perfect.  So, there's
10  nothing that's jumping to mind, but I'm leaving
11  myself a caveat that it's possible.  It's
12  possible.
13   Q.   With respect to the additional
14  third-party retailer records that you have
15  received, have you conducted an analysis with
16  respect to those records similar to the analysis
17  you performed with respect to the prior records?
18   A.   I guess what I would describe is that
19  I have ongoing work to analyze those records
20  within the framework -- a similar framework to
21  what I've produced in the October 31st document.
22   Q.   So, by "ongoing," you mean have not
23  completed any analysis that you would perform
24  with respect to those documents?
25   A.   Correct.

100

WEIR

2   Q.   Have you requested any additional
3   documents with respect to your work in this case
4   that you have not yet received?
5       A.   I think I said if there are any more
6   retailer documents that become available I would
7   like to receive them.
8       Q.   Do you anticipate receiving any
9   additional retailer records?
10      A.   I don't know whether I can anticipate
11  or not.
12      Q.   In paragraph 7, the third item
13  reflected there, "available market research
14  data," did you review available market research
15  data with respect to your opinion in this case?
16      A.   I often use that language as sort of a
17  catchall for, you know, other things I might find
18  independently or that may come from a third
19  party.
20          So, what I would describe is my review
21  of some of the retailer websites in the way that
22  we discussed earlier today, but I don't think I
23  have other market research that has come into my
24  possession that I'm relying upon.
25      Q.   So, when you state "available market

101

WEIR

2   research data," that is just a general category
3   of information, correct?
4       A.   That in this case relates to my review
5   of retailer websites and sort of the background
6   research that we talked about earlier today.
7       Q.   So, other than your cursory review of
8   the websites, you are not in possession of any
9   market research data?
10      A.   I object to your characterization of
11  my research as cursory, but I am not in
12  possession of additional market research data
13  above and beyond the background work that we just
14  described on the record earlier today.
15      Q.   Did you perform any market research
16  data other than any analysis that is reflected in
17  this report?
18          MR. ARISOHN:  Object to form.
19          THE WITNESS:  I don't know how you can
20      perform market research data.
21      Q.   Did you analyze any market research
22  data other than the analysis reflected in this
23  report?
24      A.   Again, I've looked at information such
25  as pricing on the various retailer websites.  I

102

WEIR

2   don't think that plays in, per se, to the
3   analysis that I've performed here, where I'm
4   relying on the actual retail sales records.
5          But, it was, again, underpinned my
6   background research to get ready for my work on
7   this case.
8       Q.   So, you reviewed pricing data on the
9   websites reflected in that list of "Documents
10  Reviewed"?
11      A.   Of course.  Yes.
12      Q.   And did you utilize that pricing
13  information in the analysis reflected in this
14  report?
15      A.   No.  I relied on the retail sales data
16  that was produced in this litigation.
17      Q.   Any pricing information on those
18  websites was not utilized by you, correct?
19      A.   Again, you keep mischaracterizing what
20  I've said.  I used it to form my background in
21  this case before moving forward with an analysis
22  of the actual retail sales data.
23      Q.   Paragraph 9 of your report states,
24  "For the purposes of this precertification
25  analysis," correct?

103

WEIR

2       A.   That's what it says in paragraph 9.
3   Yes.
4       Q.   I'm imagining that's an error, a
5   remnant of a prior analysis that you performed?
6       A.   I think that's right.  Well, I think
7   it was a remnant from the first report that I put
8   in of which this was designed to reflect as
9   closely as possible, but did not capture that
10  temporal change in the state of the case.
11      Q.   And the remainder of paragraph 9, "I
12  assumed a class period of April 20, 2011 through
13  the present."  Correct?
14      A.   Correct.
15      Q.   When you say "the present," is that
16  October 31st, 2017?
17      A.   I think the date range would be
18  ongoing through whatever litigation occurs.  My
19  analysis here is based upon the sales data that I
20  had, which I think reflected, maybe, an end date
21  of June 2016, but it would certainly be easy to
22  basically gross up the sales to reflect the
23  present date.
24          The primary indicator that I wish to
25  give here is in footnote 2, which is that,

104

WEIR

1    subject to whatever the court may determine is
2    the appropriate timeframe, my analysis can be
3    conducted to match that timeframe.
4        Q.   So, did counsel advise you what the
5    relevant end date of the class period was?
6        A.   Yes.
7        Q.   And it is your understanding that the
8    class period is ongoing?
9        A.   That's to the best of my
10   understanding.
11       Q.   So, you were not advised that the
12   class period ends in June of 2016?
13       A.   Again, now that you mention that, that
14   may have been information that was given to me
15   because that is the time period for which I
16   analyzed the data.
17       Q.   Okay.  But, so, when you say "through
18   present," did you perform an analysis of data
19   that postdates June of 2016?
20       A.   No.
21       Q.   Have you been provided, to your
22   knowledge, with data regarding sales that
23   postdates June of 2016?
24       A.   I don't know whether any of the sales

105

WEIR

1        So, the output that I report here
2    should be in accordance with that June date.
3        Q.   It should be, but have you done
4    anything to confirm that it does?
5        A.   Again, that's part of the work that I
6    have done.  It's my best intention for that to
7    have been the case.
8        Q.   And I'm asking whether you took any
9    steps to confirm that your analysis was limited
10   to the appropriate class period.
11       A.   Yes.  That's done in the analysis and
12   the spreadsheet and the data files that I've used
13   to generate my analysis.
14       Q.   So, it is your understanding that when
15   you say "through present" and you state that your
16   understanding was the class period was ongoing,
17   that you, in fact, did go through these
18   spreadsheets and confirm that you are not
19   utilizing data from after June 15th of 2016?
20       A.   So, I think, again, if you will look
21   at that paragraph, that paragraph is probably the
22   same as was included in my March 16th, 2017
23   Declaration, and at that point the class period
24   would have been ongoing.

107

WEIR

1    data that I have obtained goes beyond that
2    June 2016 date.  It may be possible that it's
3    available, but my analysis would tailor to the
4    June 2016 date.
5        Q.   So, you may have been provided with
6    data that postdates June of 2016?
7        A.   I just don't recall one way or the
8    other.
9        Q.   Did you do anything to confirm that
10   any data you received did not postdate June of
11   2016?
12       A.   I guess maybe I don't understand your
13   question.  Are you asking did I do anything to
14   make sure that the data I analyzed for purposes
15   of the damages analysis went through June 2016 or
16   are you saying did I just verify what was in the
17   data?
18       Q.   I'm asking whether you confirmed that
19   the data you were analyzing is data from the
20   appropriate class period.
21       A.   So, again, I just don't recall whether
22   the data that came into the report extends beyond
23   June 15th, 2016, but the framework of analysis is
24   supposed to terminate at June 15th, 2016.

106

WEIR

1        So, I think that language is maybe
2    ill-suited for the time period at which this
3    Declaration was filed, where, as I state down
4    below, I calculated the total sales for the
5    various classes from April 20th, 2011 through
6    June 15th, 2016.
7        Q.   So, despite what is stated in
8    paragraph 9, it is your understanding that any
9    analysis and data set forth in this report would
10   be for the class period of April 20th, 2011
11   through June 15th of 2016?
12       A.   To the best of my understanding, yes.
13       Q.   Going down the report to paragraph 11:
14   "I understand that Plaintiffs assert
15   these products do not repel pests and are thus
16   ineffective and worthless."
17       Correct?
18       A.   That's my recitation of Plaintiffs'
19   allegations.
20       Q.   And that, again, is based on your
21   reading of the Complaint and the representations
22   of counsel, correct?
23       A.   Correct.
24       Q.   Paragraph 12, you state:

108

WEIR

1       "As such, this litigation calls for
2   calculation of full compensatory damages."
3       Correct?
4   A.  Yes.
5   Q.  And again, did you do any independent
6   analysis to determine that this litigation calls
7   for full compensatory damages?
8   A.  Yes.  I did all the background
9   research that we talked about, I gave great
10  thought to Plaintiffs' Complaint and theory of
11  liability.
12      I reviewed the reference manual on
13  scientific evidence to make sure that I was
14  correct that the first step that you should
15  undertake in a damages analysis is to assume that
16  Plaintiffs established their theory of liability.
17      I went through and looked at the sales
18  data.  I then made a determination as to the
19  market value based upon price of the ancillary
20  features and determined that there was no such
21  value.
22      And all of that together is the work
23  that I did to determine that the full
24  compensatory damages is the correct framework of

109

WEIR

1   damages for this case pursuant to Plaintiffs'
2   stated theory of liability.
3   Q.  So, again, that is based on your
4   understanding of Plaintiffs' asserted theory of
5   liability, correct?
6   A.  It is.  Yes.  Amongst all the work
7   that I did.
8   Q.  And that work would be reflected in
9   this report, correct?
10  A.  Yes.  And in the conversations that
11  we've had today.
12  Q.  Going down, we have paragraph 13.  So,
13  as we discussed earlier, at this point you had
14  received retail sales data for five retailers,
15  correct?
16  A.  That's the best of my recollection,
17  based on a review of my report.  And it's my
18  memory that they comprised something like
19  70 percent of the retail sales.
20  Q.  And it's your understanding that this
21  report is correct, correct?
22  A.  It's my intention for it to be
23  correct.
24  Q.  So, to the extent that this states

110

WEIR

1   that you had received and reviewed information
2   from five retailers, it would not be your
3   expectation that that would be incorrect?
4   A.  It's correct as of the time of this
5   Declaration.
6   Q.  Did you perform an analysis of those
7   sales figures to determine the percentage of
8   sales that they consisted of?
9   A.  I looked at the total number of units
10  within that data set, which was 1.8 million and
11  change, and compared that to the wholesale sales
12  on a nationwide basis, which was, I think,
13  2.5 million, and the back-of-the-envelope math is
14  plus or minus 70 percent.
15  Q.  So, other than that arithmetic, did
16  you perform any other analysis to determine
17  whether these were representative retailers with
18  respect to sales of Bell & Howell pest repellers?
19  A.  Statistically, having a sample of more
20  than 70 percent of the target universe is well
21  more than representative.  So, I need not have
22  conducted any additional analysis.
23      Subsequently I've confirmed that that
24  analysis was correct by looking at the additional

111

WEIR

1   retail sales data that shows that my calculations
2   in this report are accurate and, if anything, are
3   conservative.
4   Q.  But, you have not, as of the date of
5   this deposition, you have not supplemented this
6   report in any way, correct?
7   A.  I don't believe I've issued a
8   supplement to this report as of this date.
9   Q.  In your report you state that you
10  utilized wholesale data from Bell & Howell,
11  correct?
12  A.  Yes.
13  Q.  You agree that wholesale sales are
14  different than retail sales, correct?
15  A.  In what context?
16  Q.  Not every repeller that is sold to a
17  retailer is sold to a customer, correct?
18  A.  One would have an expectation that
19  those amounts would be very close to one another,
20  especially when you're analyzing net wholesale
21  sales net of returns.
22      So, again, we have a strong
23  expectation and understanding based upon the
24  experience that walmart doesn't buy 200,000 units

112

WEIR

1  to put them in a warehouse and not sell them.
2  Walmart is buying these units at wholesale to
3  sell them.
4       Q.   Did you do any analysis to confirm the
5  relationship between wholesale and retail sales
6  with respect to Bell & Howell repellers?
7       A.   Yes.
8       Q.   And where is that analysis reflected
9  in your report?
10      A.   I don't know that it's reflected in
11  the report.  It's reflected in my work papers,
12  where we've compared the wholesale and retail
13  data from individual retailers and the retailers
14  identified in the wholesale data.
15      Q.   So, it's your understanding that there
16  are work papers that reflect your analysis of the
17  comparison between wholesales and retail sales in
18  this case?
19      A.   Yes.
20      Q.   And it's your understanding that those
21  documents would have been produced with respect
22  to that subpoena?
23      A.   They were produced by me.  Whether
24  they've been produced to you, I can't speak to

113

WEIR

1  that.
2       Q.   And those documents, would they be
3  spreadsheets?
4       A.   They would either be spreadsheets or
5  Stata files.
6       Q.   And those would specifically reflect
7  the relationship between wholesale and retail
8  sales in this case?
9       A.   It would be a pairing of the wholesale
10  and retail data.  The spreadsheet may do other
11  things, as well.  So, it might require a nuanced
12  eye to understand where in the spreadsheet that
13  information lies.
14      But, that information confirms the
15  strong relationship between the number of units
16  sold at wholesale and the number of units sold at
17  retail through the specific retailers.
18      Q.   Did you quantify that relationship
19  between the wholesale and retail sales?
20      A.   I guess I don't quite follow.
21      Q.   You state that that information is set
22  forth in the spreadsheets.  Did you perform that
23  analysis?
24      A.   Yes.  There's a pairing of the

114

WEIR

1  wholesale and retail data.
2       Q.   And when you say "pairing," what do
3  you mean?
4       A.   We sold 200,000 units to Walmart,
5  Walmart retail sales.  We sold 200,000 units at
6  retail.
7       When you see that relationship, we
8  understand that there's a direct translation
9  between the number of net wholesale units, net of
10  returns that are sold to retailers, that are then
11  sold on by those retailers to their customers.
12      Q.   And you perform that analysis with
13  respect to each of the retailers for which you
14  have received retail sales information?
15      A.   I would have to go back and review to
16  know whether I did that for every retailer, but I
17  know that I did it for a sufficient quantity of
18  data to satisfy myself that the wholesale data
19  units on a net basis could be used as a proxy for
20  total retail sales during the class period.
21      Q.   So, you received retail sales for five
22  retailers, correct?
23      A.   Comprising some 70 percent of the
24  market.

115

WEIR

1       Q.   And you're not certain whether you
2  performed this spreadsheet analysis of all five
3  of those retailers?
4       A.   Again, this is going back nine months
5  to a year.  So, as I sit here today, I don't
6  recollect whether I did it for all five retailers
7  or whether I did it for a sample of the
8  retailers.  I just don't recall as I sit here
9  today.
10      Q.   So, you believe that it is possible
11  that you were unable -- that you chose not to
12  perform an analysis of those numbers with respect
13  to one of the five retailers that you received
14  information for?
15      A.   It's possible that I analyzed the data
16  for all five retailers.  It's also possible that
17  I analyzed sufficient data to cause me to
18  believe, from a perspective of statistics, that
19  it was unnecessary to conduct further evaluation.
20  I just don't recall as I sit here today.
21      Q.   So, it is your understanding, from
22  your analysis of those records, that every item
23  that was wholesale to these retailers was then
24  sold to the public?

116

WEIR

1       A.   On a statistical basis, yes.
2       Q.   Well, with respect to the five
3   retailers that you received, you could determine
4   that on a specific basis, correct?
5       A.   I guess I don't understand.  I was
6   looking at this from a statistical basis, which
7   is to understand, is it acceptable to use the
8   wholesale data as a proxy for the number of units
9   sold at retail?  I made the determination that it
10  was and then used the data that way.
11      Q.   And I'm asking, with respect to the
12  five retailers which you received data, would you
13  have needed to use a statistical proxy for that
14  ratio?
15      A.   I think you're misunderstanding.  I
16  conducted an analysis that shows that the retail
17  data is reflected in the wholesale data and that
18  I feel comfortable using the wholesale data on a
19  statistical basis as an analysis for the class.
20      Q.   And my question is, with respect to
21  Dr. Leonard's, for an example, could you not
22  determine from the records you had what
23  percentage of items that were wholesale to
24  Dr. Leonard's were ultimately sold to the public

117

WEIR

1   as retail sales?
2       A.   I was able to determine that,
3   statistically speaking, all of the wholesale
4   sales were sold to the public by Dr. Leonard's.
5       Q.   Did you do that specific analysis with
6   respect to Dr. Leonard's?
7       A.   What I said before is, I can't
8   remember for the specific retailer, but I did it
9   sufficiently amongst the five retailers to
10  satisfy myself that that relationship existed and
11  that the use of the wholesale sales on a net
12  basis would be a reasonable proxy of the retail
13  sales to the class.
14          That information has been confirmed by
15  the subsequent retail data that's been produced.
16      Q.   So, with respect to any subsequent
17  data, you have performed an analysis of the
18  wholesale data compared to the retail sales data?
19      A.   What I've understood is the nature of
20  the total marketplace and the nature of the
21  amount of the marketplace for which I have total
22  sales data.
23          So, these five retailers alone
24  comprise 70 percent of the wholesale sales, and

118

WEIR

1   then, the additional retail data that we have
2   comprises an even larger fraction of that.
3       So, we're getting near having
4   100 percent of the retail data that matches and
5   reflects the quantity of the wholesale data.
6       Q.   And again, I'm asking you, where in
7   this report have you provided your analysis that
8   reflects that all of the wholesale --
9           MR. ARISOHN:  Objection, asked and
10          answered.  And I object to form.
11          THE WITNESS:  What I'm telling you is
12          that I satisfied myself with the
13          relationship and then used the wholesale
14          data as I believe is statistically
15          appropriate, for example, in Table 1.
16          So, that is one area where the
17          analysis -- the end results of that analysis
18          are shown.
19      Q.   If you had documentation that reflects
20  that a certain number of items were wholesale to
21  a retailer and that those were different than the
22  retail sales figures, would you take that into
23  account in conducting your analysis?
24      A.   That's far too vague of a

119

WEIR

1   hypothetical.  I would need to understand the
2   facts and circumstances to understand what I
3   might do to the analysis.
4       Q.   And it's your understanding that the
5   documents that you produced reflect an analysis
6   of the percentage of items that were wholesaled
7   to the retailer that were then sold to the
8   public?
9       A.   I don't know that it calculates a
10  percentage, but it compares the wholesales sales
11  and the retail sales in a way that allowed me to
12  satisfy myself that there is a direct
13  relationship between the wholesale sales on a net
14  basis and the retail sales, and that, on an
15  aggregate basis for the class, the use of the net
16  wholesale sales for the number of units is a
17  reasonable proxy for the total retail sales in
18  the marketplace.
19      Q.   But, you don't recall whether you did
20  a individual analysis of each the retailers for
21  which you had the full information for which you
22  could form that analysis?
23          MR. ARISOHN:  Objection.  Asked and
24          answered.

120



WEIR

1          WEIR
2          THE WITNESS:  I've looked at many of
3      the retailers, it's very possibly I've
4      looked at all of them.
5          But, this is work that I did a year
6      ago and so, as I sit here today, I don't
7      have a precise recollection of the exact
8      quantity of retail data that I compared to
9      the wholesale data, except that is was
10     sufficient, from a statistical standpoint,
11     to give me the comfort that using the net
12     wholesale units would be statistically
13     appropriate for the determination of damages
14     in this case.
15         Q.   And to the extent that any of the
16     retailers were inconsistent with that, your
17     statistical finding, would you have incorporated
18     that information in your analysis?
19         A.   Inconsistent in what way?
20         Q.   As I stated, for a specific retailer,
21     the relationship between wholesale and retail
22     sales was not 100 percent?
23         A.   In what way?
24         Q.   If a retailer had purchased,
25     wholesale, a number of items and the retail sales

121

1          WEIR
2      did not equal that number of items, would you
3      have taken that into account in your analysis?
4          A.   Again, that's not sufficient
5      information for me to understand what's going on.
6          Are we talking about temporally
7      matching these sales data?  Are we talking about
8      understanding sales to a particular area?
9          Again, all I can say is, the research
10     that I have done has satisfied me that, from a
11     statistical perspective, the net wholesale sales
12     are at reasonable proxy for the total units sold
13     at retail on a nationwide basis, and then as
14     apportioned on a state-by-state basis for the
15     multistate class or California.
16         Q.   With respect to the nationwide class
17     or, I guess, all these classes, you then
18     conducted some analyses to determine the retail
19     pricing, correct?
20         A.   Would you just ask that question
21     again, please?
22         Q.   So, your analysis involved two
23     components, it would be the number of items that
24     were sold and the retail price, correct?
25         A.   I don't know if I'll accept that

122

WEIR

1          WEIR
2      characterization of what my analysis involved,
3      but I did determine the number of units sold and
4      I also determined typical or average prices per
5      unit.
6          Q.   So, if you look at your report, the
7      damages that you ultimately calculated or
8      estimated involve two components; one being the
9      wholesale numbers that we discussed and the other
10     being a retail price that you estimated, correct?
11         A.   Again, that's where you ultimately get
12     to.  There's a lot of work that went into making
13     a determination that the wholesale units were
14     appropriate as to what the retail prices are, the
15     correct apportionment between states.
16         But, ultimately the damages are
17     calculated by looking at the number of units and
18     the typical average price per unit.
19         Q.   And again, the work with regard to the
20     wholesale units, that is encompassed entirely in
21     those spreadsheets that you have provided?
22         A.   In my work papers.  Correct.
23         Q.   There's nothing in this report that
24     specifically states what you did with respect to
25     the wholesale numbers and the retail numbers?

123

1          WEIR
2          MR. ARISOHN:  Object to form.
3          THE WITNESS:  I think I described how
4      I use both the wholesale and retail data in
5      this case.
6          As to the specifics of satisfying
7      myself that the wholesale data is a
8      reasonable proxy for the total retail sales
9      on a nationwide basis or as apportioned by
10     state, I think that work is reflected in the
11     work papers.
12         Q.   When you say that you satisfied
13     yourself, is there a specific standard that you
14     used in that regard?
15         A.   It would be looking at the comparison
16     of the total retail sales and total wholesale
17     sales and understanding the issues of the ongoing
18     nature of ongoing retail sales and ongoing
19     wholesale sales to these particular retailers.
20         It's also understanding the total
21     universe of the retail sales that we have
22     already.
23         So, if we were talking about a sample
24     of retail sales that were one percent of the
25     total of wholesale, it might be something

124



WEIR

1     different than when I have 70 percent of the
2     entire marketplace already.
3         Q.   When you say, "the understanding of
4     the ongoing nature of the business," what did you
5     do to analyze the nature of these sales?
6         A.   I don't follow that question.
7         Q.   You gave a number of factors that you
8     looked at with regard to this wholesale versus
9     retail.  Where is that reflected in this report
10    and/or your work papers?
11        MR. ARISOHN:  Objection.  Asked and
12    answered.
13        THE WITNESS:  It is reflected in the
14    work papers and it's reflected in my use of
15    the wholesale data as one of the inputs in
16    my calculations throughout the report.
17        And the report speaks for itself as to
18    the description of how I have used the
19    wholesale and retail data.
20        Q.   It discusses how you used the
21    wholesale and retail data.  I'm asking for the
22    basis for your use of the wholesale data.  Where
23    is that reflected in the report?
24        A.   So, that's reflected in the report

125

WEIR

1     where I discuss my 14 years of experience, my
2     educational background, my review of the
3     documentary evidence in the case and within the
4     work papers where I do the research to satisfy
5     myself that the wholesale data, on a net basis,
6     is a reasonable proxy for the retail data in this
7     case.
8         Q.   And in that regard, is there a
9     specific standard that you utilized to determine
10    that that was appropriate, other than your own
11    subjective, whether or not you were satisfied,
12    standard?
13        A.   I don't agree that it was a subjective
14    evaluation in any way and don't accept your
15    characterization.
16        Q.   What was the objective standard that
17    you used?
18        A.   A comparison of the retail and
19    wholesale sales and understanding that the retail
20    sales that I had already represented 70 percent
21    of the wholesale sales that Bell & Howell claims
22    are the totality of the sales of the products at
23    issue in the case.
24        Q.   With respect to the specific retailers

126

WEIR

1     that you've discussed, you received records with
2     respect to the number of items that were
3     wholesaled by Bell & Howell to those specific
4     retailers, correct?
5         A.   That's my best recollection.
6         Q.   And you received, to your
7     understanding, information reflecting the retail
8     sales of those repellers, correct?
9         A.   For the retailers for which I received
10    data, yes.
11        Q.   So, whether or not they consisted of
12    70 percent of the total wholesales of the
13    devices, did you do a specific analysis of each
14    of these retailers to determine whether or not
15    each of these retailers had sold 100 percent of
16    the items that were wholesaled to them?
17        A.   You've asked that question a hundred
18    times now and the answer is yes.  And it's
19    reflected in my work papers and it's done on a
20    statistical basis, understanding that the data is
21    never going to line up exactly, but it's
22    reflective of the wholesale data matching the
23    retail data.
24        Q.   And that analysis that you state that

127

WEIR

1     you have performed, is that reflected in your
2     report, other than the fact that you used the
3     wholesale numbers?  Do you discuss the method
4     that you used in this report anywhere?
5         A.   It's reflected in the work papers, not
6     in the report.
7         Q.   And the work papers being spreadsheets
8     of sales data?
9         A.   And Stata analysis.
10        Q.   When you say "Stata analysis," what do
11    you mean by that?
12        A.   Stata is a statistical software
13    program.  So, some of our research was done in
14    Microsoft Excel and some of my research was done
15    in Stata.
16        Q.   And what type of analysis did you
17    perform with Stata?
18        A.   Well, there were many analyses
19    performed with Stata, but the subject of this
20    inquiry has been a comparison of the wholesale
21    and retail sales data.
22        Q.   And did you receive an output with
23    respect to that analysis?
24        A.   The Stata output appears on the

128

WEIR

1
2  screen.  So, I probably saw something on the
3  screen.  Yes.
4       Q.   Did you document that output in any
5  way?
6       A.   Again, now we're going back nine
7  months.  So, I don't recall whether there's a log
8  of that output or not.
9       Q.   I mean, is that output reflected
10  anywhere in your report?
11       A.   Is it reflected in the report?  It's
12  reflected, again, in my choice and use of the
13  wholesale sales data as a proxy for retail sales
14  data.
15       Q.   But, do you discuss the mechanism of
16  that analysis anywhere in the report or the
17  results of that analysis, other than just purely
18  the fact that you used the wholesale data?
19       A.   Again, I reference my experience, my
20  on-the-job experience, my educational background
21  as the basis for my being able to analyze and
22  understand the reasonableness of the use of
23  wholesale data.  The mechanics of the analysis
24  that I used to satisfy myself are contained
25  within the work papers.

129

WEIR

1
2       Q.   Did you do any research, outside of a
3  analysis to the data, to confirm that the
4  wholesale figures were a reasonable proxy for
5  retail sales?
6       A.   Again, that's something where I bring
7  my 14 years of experience to bear, where, in
8  many, many cases, litigations and otherwise,
9  wholesale sales on a net of returns basis are
10  used as a proxy for the totality of retail sales
11  absent evidence to the contrary, and that's
12  standard practice.
13       Q.   Is that standard practice documented
14  anywhere?
15       A.   I think you could probably find a
16  hundred different studies that base their
17  analysis on the wholesale data.
18       Q.   Did you do any further investigation,
19  specific to this case, other than your analysis
20  of the data to determine that wholesale figures
21  were an appropriate proxy for retail?
22       A.   That's a great "Other than that,
23  Mrs. Lincoln, how was the theater" type of
24  question.
25            But, what I did was to satisfy myself

130

WEIR

1
2  in this case based upon a comparison of the
3  wholesale and retail sales data.
4            I did not need to conduct additional
5  independent research, because I bring to bear
6  tremendous expertise, having done this exact same
7  type of thing on numerous occasions.
8       Q.   So, the answer is, no, you did not,
9  correct?  You did not perform any other specific
10  investigation with regard to this case?
11       A.   My fulsome answer is as I just gave
12  it.
13       Q.   With respect to the nationwide retail
14  price, for some of the items you were able to
15  perform an analysis to determine what you believe
16  to be a specific retail price for those items,
17  correct?
18       A.   Average retail price.
19       Q.   What do you mean when you say "average
20  retail price"?
21       A.   Well, you said "specific retail
22  price."  And "specific retail price" could be any
23  one thing at any given time.
24            But, I'm talking about a class-wide
25  average retail price that is reflective in the

131

WEIR

1
2  aggregate of the retail price paid for the
3  specific products.
4       Q.   I suppose I meant specific to the
5  product.  You were able to determine an average
6  retail price specific to that product, correct?
7       A.   For some of the products.  Correct.
8       Q.   And for those products, how did you
9  determine that average retail price?
10       A.   That was based on an analysis of the
11  available retail sales data from the five
12  retailers, where it was possible to break apart
13  the retail sales data into specific Bell & Howell
14  SKUs.
15       Q.   Did you receive monetary sales data
16  for each of the five retailers?
17       A.   As I sit here today, my recollection
18  is, yes.  But, it's possible that we did not
19  receive monetary sales from one of the retailers.
20       Q.   Is it possible that you didn't receive
21  monetary sales for more than one of the
22  retailers?
23       A.   Again, I don't have a precise
24  recollection, so, I can't testify one way or the
25  other, as I sit here today.

132



WEIR

2  Q.   In preparing for this deposition, did
3  you review your report in this case?
4  A.   I did review the report.  Yes.
5  Q.   Did you review your file with respect
6  to this case?
7  A.   No.
8  Q.   Did you review any other documents
9  other than your report?
10  A.   I looked through Mr. Boedeker's
11  report.  I reviewed the deposition notice, I
12  reviewed the Complaint in the case.
13  Q.   You did not review any of your prior
14  work with respect to the analysis in this report?
15  A.   I read my March 2017 Declaration.  I
16  did not go back and review the voluminous work
17  papers that had been produced in the case.
18  Q.   With respect to the items for which
19  you were able to make a determination of average
20  retail price, did you do any analysis of whether
21  the prices for those retailers were
22  representative of the prices in the market?
23  A.   Yes.
24  Q.   And what was that analysis?
25  A.   It was based on the totality of the

133

WEIR

2  pricing data that we received as a fraction of
3  the total sample of sales that we were analyzing.
4  And subsequent to that, where we have
5  received additional data, we have confirmed that
6  the dollar sales that are contained in this
7  October 31st, 2017 Declaration are indeed
8  accurate representations of the total sales on a
9  class-wide basis or are inherently conservative.
10  Q.   I'm not asking you to testify to
11  anything subsequent.
12  You drafted this report as of October
13  of 2017, correct?
14  A.   Correct.
15  Q.   As of the date that you drafted this
16  report, did you do any analysis of the retail
17  pricing for the units between retailers?
18  A.   I believe we did conduct comparisons
19  as between retailers.
20  Q.   You believe that you did?
21  A.   I believe that we did.
22  Q.   Is this analysis reflected anywhere in
23  this report?
24  A.   It is likely reflected in the work
25  papers that analyze the retail-specific data.

134

WEIR

2  Q.   I mean, this report reflects your
3  opinions in this case, correct?
4  A.   It reflects my opinions in the case as
5  of the date of the report.
6  Q.   As of the date of the report.  And
7  there's nothing in here that states that you did
8  an analysis of the prices as between -- a
9  comparison between the retailers, correct?
10  A.   I mean, I think it discusses that I
11  analyzed the sales data from the retailers.  As
12  to the specifics of what is contained in that
13  analysis, you would need to look at the work
14  papers that contain that voluminous detail.
15  Q.   And the work paper that you discuss
16  are spreadsheets of the data, correct?
17  A.   They are spreadsheets that contain
18  data, they are spreadsheets that contain
19  analyses, they are Stata files that contain
20  analyses as well as data.
21  Q.   To the extent that the Stata files
22  contain analysis, is that analysis documented
23  other than in the Stata system?
24  A.   I mean, they're Stata files, so they
25  are documented within state.  That would be

135

WEIR

2  asking, like, if I could put the computer code
3  from Microsoft Excel into the report, which,
4  obviously you can't do.
5  Q.   Based on your analysis of the retail
6  pricing between retailers, was there a difference
7  between retail pricing as between the different
8  retailers?
9  A.   So, if you understand the retail sales
10  in the aggregate, the difference in price between
11  retailers does not matter in terms of
12  understanding class-wide damages.
13  But, as long as you understand that
14  caveat, there are some differences between the
15  prices charged for certain products as between
16  different retailers, but, in the aggregate, the
17  sales data reflects all of those difference
18  prices in the averages that are used.
19  And those -- any such differences are
20  accounted for in the analysis that I set forth in
21  my Declaration.
22  Q.   For any retailers that you have not
23  received your retail sales information, you have
24  no information as far as what their retail
25  pricing was, correct?

136

WEIR

A. That's not quite right. Part of my understanding of the retail sales data here reflects the particular retailers that we have and it is confirmed that those retail prices tend to be lower than the prices that we do not have, as of the date of this report.

Q. As of the date of this report, for any retailers for which you didn't have information you didn't have that information, correct?

A. Well, you say that as if that means I don't know anything about the retailers that we had or the retailers that we didn't have.

But, for example, I have sales data from Walmart and we all know that Walmart is a historically low-priced retailer.

So, where I'm using data from Walmart, I know that that's going to understate the market-wide average price for these repellers and that, if we have another retailer, it is highly likely that those price points would be even higher than those ones that we have from Walmart.

So, I had a good sense from the analysis that I did -- and this is going back to the background of understanding the retailers.

137

WEIR

The background research that I did gives me confidence to understand that the average prices that I used here are either representative of the marketplace or conservative representations of the marketplace.

Q. Did you do any specific analysis to determine that Walmart's pricing would be lower than the marketplace?

A. That's just a general understanding that I have of Walmart, and I believe some of the retailer-specific price comparisons will bear that out.

Q. Do you have a specific analysis where that bears itself out?

A. I would look in my work papers, which have been provided to you.

MR. WING: Let's mark this as Exhibit 3.

(Defendant's Exhibit 3, Spreadsheet Document Containing Walmart Sales Data, marked for identification as of this date.)

Q. Do you recognize that document? Take a second to review it.

A. I know I've seen data like this, but I

138

WEIR

don't recollect this precise document in this format.

Q. If I represent to you that this is a spreadsheet that was produced in response to that subpoena that purports to be Walmart sales data, would that help your recollection?

A. Well, it's clearly sales data, but I would have to accept your representation. I don't see any indicia here that this is Walmart versus some other retailer without, again, going back to the original file.

Q. With respect to the work papers that you've discussed, does this appear consistent with those work papers as you've discussed them?

A. This looks like it would be consistent with the raw data that would be used in a work paper to analyze the data. I don't see anything here that analyzes the data.

So, again, this, whether it's Walmart or somebody else, looks to be raw retail sales data. The work papers that I'm referring to would take this type of data and then analyze it.

Q. Okay. So, as part of your work in this case, you received raw data from counsel

139

WEIR

with respect to these retailers, correct?

A. I received raw data from retailers that was passed along to me by counsel. Yes.

Q. Does this document reflect wholesale numbers anywhere on it?

A. Without the benefit of the whole spreadsheet in front of me, my recollection is that this reflects somebody's retail sales or a portion of them.

Q. And so, to your recollection, does this appear consistent with a document that would have been generated by you or on your behalf, sort of collecting raw data that was received?

A. No. This is reflective of a document that would have been produced by one of the retailers in the case.

Q. So, you believe that this document in this format was produced to you directly -- well, produced directly by one of the retailers in this case?

A. Again, it's been some time since I've looked at this, but, to the best of my recollection, this would be the raw retail data, not an analysis that was performed by me.

140



WEIR

2    Q.   I'm not stating whether it's an
3  analysis performed by you.  Is this a document
4  that would have been generated by you or your
5  office?
6    A.   To my best recollection, and I
7  apologize that this is some time ago now, this
8  would have been produced to me, not produced by
9  me.
10         (Defendant's Exhibit No. 4,
11       Spreadsheet Document, marked for
12       identification as of this date.)
13    Q.   Do you recognize that document?
14    A.   Again, to the best of my recollection,
15  I've seen data in this format before, but whether
16  or not I've seen this precise document, I can't
17  recall specifically.
18    Q.   It looks to be in a similar format to
19  the prior document, outside of the specific
20  categories of data?
21    A.   I mean, they're both spreadsheets that
22  contain information about Bell & Howell pest
23  repellers.  We could take issue with whether or
24  not they are similar in terms of what they
25  contain.

141

WEIR

2    Q.   In your review of this document, do
3  you have any recollection as to which retailer
4  this data might relate to?
5    A.   Again, without looking at the totality
6  of the file that might identify that, I don't
7  have a specific recollection, by looking at this
8  printout, from some of the spreadsheet.
9    Q.   So, this document and the prior
10  document includes a description of the item or
11  item description, correct?
12    A.   Well, in Exhibit 4 there is a column
13  called "Item Description."  In Exhibit 3 there's
14  both "Primary Description" and "Signing
15  Description."
16    Q.   And both these documents include a
17  figure of number of units sold in both California
18  and nationwide, correct?
19    A.   Correct.
20    Q.   And dollar sales figures for those
21  numbers, correct?
22    A.   It would appear to be.  Yes.
23         (Defendant's Exhibit No. 5,
24       Spreadsheet Document, marked for
25       identification as of this date.)

142

WEIR

2    Q.   Do you recognize this document?
3    A.   Again, the type of data is familiar to
4  me, but I don't -- I don't have a recollection of
5  this specific document.
6    Q.   Does this document refresh your
7  recollection as to whether there were retailers
8  for which you were provided unit sales but were
9  not provided actual monetary sales figures?
10    A.   It does not provide that recollection
11  one way or the other.
12    Q.   This document that is in front of you,
13  it includes what appears to be columns for units
14  sold nationwide and units sold in California,
15  correct?
16    A.   It would appear to be.  Yes.
17    Q.   This document does not include any
18  reference to monetary retail sales figures,
19  correct?
20    A.   Not in the format that you've marked
21  it as an exhibit.
22    Q.   Looking at that Exhibit 5, there are a
23  number of item descriptions.  If we look at the
24  second one down, it reflects the B&H Solar Animal
25  Repeller, correct?

143

WEIR

2    A.   That's what it states there.  Yes.
3    Q.   Are you aware that the Bell & Howell
4  Solar Animal Repellers are not a part of this
5  litigation, correct?
6    A.   That's my understanding.
7    Q.   So, it's your understanding that, to
8  the extent that information was provided with
9  respect to the Solar Animal Repellers, that
10  information would have been omitted from any
11  analysis?
12    A.   Again, that was our best intention.  I
13  don't believe that any solar animal repeller was
14  included in the analysis.
15    Q.   Did you do anything to confirm that no
16  solar animal repeller was included in the
17  analysis?
18    A.   Well, it was the active exclusion of
19  them upon which I'm making my statements.  That's
20  the basis for my statements.
21    Q.   So, you confirmed that the Bell &
22  Howell solar -- so, any sales figures for Bell &
23  Howell solar animal repellers were specifically
24  excluded from your analysis?
25    A.   Yes.

144

WEIR

Q.   Is that reflected anywhere in your report?

A.   I believe you can see it in the summary of the data that I have here, which is that these are relating to the pest repellers, not the animal repellers.

Q.   I mean, that's what's stated there. I'm speaking, when we're discussing the totality of retail sales, did you do anything to confirm that any retail sales figures that were provided to you by these retailers were not then included in the aggregate sales that you used to perform your analysis?

A.   Again, we actively excluded those records from the analysis of the ultrasonic pest repellers.

Q.   And that is reflected in your report, simply in the fact that they are not identified? Is that your --

A.   They're not identified and they're not included in the analysis.

(Defendant's Exhibit No. 6, Spreadsheet Document, marked for identification as of this date.)

145

WEIR

Q.   Do you recognize that document?

A.   Again, it looks familiar, but I don't have a specific recollection of this particular document as I sit here today.

Q.   And again, this document includes the number of unit sales, but not any monetary figure, correct?

A.   That's what it appears to show is unit sales.

Q.   Just for ease, I'm going to show you -- this is the electronic format in which these documents were produced, just so we have -- so, we have a spreadsheet.  This was included in the materials that were provided to us by counsel.

A.   Okay.

Q.   So, this specific spreadsheet we're looking at now is the spreadsheet that would be Exhibit 6, correct?

MR. ARISOHN:  Do you want to review it?

THE WITNESS:  Again, subject to, maybe, a more thorough check, it would appear that this Family Dollar tab is

146

WEIR

captured by depo Exhibit 6.

Q.   Okay.  So, as you stated, the tab for that spreadsheet in the document that was provided in response to the subpoena reflects that that is information from Family Dollar, correct?

A.   That's what the tab in the spreadsheet says.

Q.   Do you have any reason to believe that the tab in the spreadsheet provided in response to the subpoena would be incorrect?

A.   No.

Q.   I mean, does this refresh your recollection as to whether you were provided monetary sales figures from Family Dollar?

A.   Again, since this isn't the universe of the sales data that I had in possession, I can't state with certainty one way or the other about whether Family Dollar provided retail sales dollar figures.

Q.   When you state "the universe of the sales data you received," what are you referring to?

A.   Well, I cite in the body of my report

147

WEIR

and in Exhibit 2 thereto any number of spreadsheets which are not this one.

So, in order for me to state categorically one way or the other, I would need to look at all of those documents that I received.

Q.   To the extent that you had received any of those documents, would you have provided them to counsel in response to that subpoena?

A.   Whether I would have provided them or whether they were already in possession of them, I don't know.

Q.   If you look at the second tab that -- if you want to look at that, I believe that would be Exhibit 4.

A.   That's many pages.  Again, subject to more detailed review, Exhibit 4 appears to correspond to the tab HSN.

Q.   So, it's your understanding that would reflect retail data that was received from Home Shopping Network?

A.   Or at least part of it.  Yes.

Q.   And looking at the spreadsheet, to the extent that this was provided in this format from

148

WEIR

1   counsel, would this indicate that this data was
2   received and input in spreadsheets by you and/or
3   on your behalf?
4       A.   Again, it could be that this data came
5   from a PDF and was input into a spreadsheet, it
6   could be that this data was provided as a
7   spreadsheet.  I just don't recall the specifics
8   of how the production took place.
9       Q.   Do you have any reason to believe that
10  this spreadsheet would not reflect the totality
11  of the data that was received with respect to
12  these individual retailers?
13      A.   Without looking back at the original
14  data, I couldn't answer that question one way or
15  the other as I sit here today.
16      Q.   And I believe you testified earlier
17  that you believe this to be the original data
18  that was received.
19      A.   I said that this is not an analysis
20  that was performed by us.  I believe it is
21  reflective of original data that would be
22  produced, but, whether it is reflective of the
23  totality or not, without going back to the source
24  documents, I can't state with certainty, as I sit
25

149

WEIR

1   here today.
2       Q.   The next tab, this would be Exhibit, I
3   believe, 3.
4       A.   Again, subject to a more detailed
5   check, it appears that depo Exhibit 3 is
6   reflective of the Walmart tab in the spreadsheet
7   that you have on your computer.
8       Q.   And this would be Exhibit 5.  This
9   one's relatively short.  Is it fair to say that
10  Exhibit 5 reflects the Dr. Leonard's tab?
11      A.   I don't know whether it's fair, but I
12  believe that Exhibit 5 is a printout of the
13  Dr. Leonard's tab of this spreadsheet.
14      Q.   So, looking at the documents, at least
15  as reflected in this spreadsheet, monetary sales
16  figures are included in the spreadsheets for HSN
17  and Walmart, correct?
18      A.   I think that's what these exhibits
19  reflect.  Yes.
20      Q.   And the exhibits in the spreadsheet
21  that was provided for Dr. Leonard's and Family
22  Dollar do not reflect monetary sales figures,
23  correct?
24      A.   At least in this particular

150

WEIR

1   spreadsheet that you've printed out.
2       Q.   Do you recall whether you received
3   monetary sales figures for Family Dollar or
4   Dr. Leonard's?
5       A.   Again, as I sit here today, I don't
6   have a recollection one way or the other.
7       Q.   To the extent that you did receive
8   that information, would it have been your
9   expectation that it was provided in response to
10  the subpoena that you received in this case?
11      A.   Yes.
12          (Recess taken.)
13  BY MR. WING:
14      Q.   Back on the record.  Just to follow up
15  briefly on where we were prior to lunch, we were
16  discussing the spreadsheets, Exhibits 3, 4, 5 and
17  6.
18          Looking at those documents, as we
19  discussed, they include nationwide sales figures
20  and California sales figures, correct?  At least
21  with respect to units sold?
22      A.   I believe that's correct.  Yes.
23      Q.   None of these documents reflect any
24  state-specific sales information other than
25

151

WEIR

1   California, correct?
2       A.   So, it includes the California
3   state-specific and it includes the nationwide
4   data, which is, of course, the sum of all of the
5   states.
6       Q.   It does not include a breakdown
7   specific to the individual states for that sales
8   information, correct?
9       A.   It does not itself include a
10  breakdown, but it includes data that permits you
11  to breakdown to the individual states.
12      Q.   In and of itself it includes data that
13  allows you to break it down into individual
14  states?
15      A.   It includes some of the data necessary
16  to break down into individual states.
17      Q.   You would need additional information
18  to do that calculation?
19      A.   Well, I don't need additional
20  information, because I have the information
21  necessary.  But, Exhibits 3, 4 and 5 by
22  themselves would provide some, but not all, of
23  the information you would want to look at.
24      Q.   So, the information in those documents

152

WEIR

was information you testified that was provided
by those retailers, correct?

A.   To the best of my recollection, the
data contained here is the data that was provided
by the individual retailers.

Q.   So, the individual retailer provided a
specific breakdown of sales figures for
California, correct?

A.   It's my understanding that they did.

Q.   It's your understanding?  I mean,
that's part of your work in this case, correct?

A.   I don't understand.

Q.   One of the things you did in this case
was break down a California class of damages,
correct?

A.   Yes, I did.

Q.   And that was based, according to your
report, on specific information relating to
California that was provided by the retailers,
correct?

A.   Yes.

Q.   The four retailers for which we have
spreadsheets there did not provide you with a
breakdown of state-specific retail information,

153

WEIR

correct?

A.   They provide retail information that
can be broken down on a state-specific basis,
along with other information.

Q.   The information they provided, you did
not break that information down, correct?

A.   Again, they provided information that
could be broken down, but you would require
additional data that I have from other sources to
do that.

Q.   What data is that?

A.   So, we used the sales information that
was broken down by a retailer on a state-by-state
basis, which, I believe that retailer was Harriet
Carter.

Q.   So, you used the information for a
single retailer to determine what the
state-by-state breakdown would be?

A.   Yes.  I used the information from a
single retailer, Harriet Carter, after I
confirmed that the estimates from Harriet Carter
met various sanity checks, to verify the accuracy
of that data.

Q.   When you say "sanity checks," what are

154

WEIR

you referring to?

A.   I did the state-by-state breakdown
using the Harriet Carter data and then compared
those results with a state-by-state breakdown
based upon various government indices, such as
population data and personal consumption
expenditure data and GDP data to verify the
reasonableness of the estimate being generated by
the Harriet Carter data.

Q.   Where did you acquire the data with
respect to populations and et cetera?

A.   That's data that we use regularly for
the same purpose in my firm.  I believe it
originally hails from the Bureau of Economic
Analysis.

Q.   Where in your report is your analysis
of those population figures and that data?  Where
is that reflected in your report?

A.   Well, again, what I used the BEA data
for was to sanity check and verify the
reliability of the Harriet Carter data.

So, my report relies upon the Harriet
Carter data, but I have validated the use of that
data using these government agency data points.

155

WEIR

Q.   So, you testified earlier that any
documents and information you relied upon was
reflected in that list of documents or the body
of the report, correct?

A.   As well as things that I bring from my
prior experience and educational background.

Q.   Population data is not something you
bring from your prior experience or educational
background, correct?

A.   It certainly is something that I bring
from my prior experience.  I've used population
data specifically to apportion sales by state on
many occasions using that same data.

Q.   The data itself is nowhere reflected
in this report, correct?

A.   That's because I didn't rely
specifically on that data.  I used it as a tool
to validate the Harriet Carter data.

Q.   Did you perform any comparative
analysis between the population data and
et cetera on the Harriet Carter data, other than
in your own head?

A.   It was done in a spreadsheet.

Q.   In a Excel spreadsheet?

156

WEIR

2    A.   Yes.

3    Q.   And was that Excel spreadsheet in your
4  disclosures in this case?

5    A.   I would have to go back and
6  double-check, but I believe so.

7    Q.   And it sets forth the data from the
8  economic bureau that you've discussed?

9    A.   It would be the state-by-state index
10  results for -- my recollection was, there were
11  three different indices that we used to verify
12  the Harriet Carter data.

13    Q.   And it's your understanding those were
14  in Excel spreadsheets and that those were
15  provided as part of your report?

16    A.   Well, the spreadsheets were provided
17  as part of the production, they were not put into
18  the report.

19         But, to the best of my recollection,
20  the data is included in a spreadsheet and was
21  part of the production.

22    Q.   The indices that you reference, which
23  were these indices?

24    A.   One related to the Census Bureau's
25  population by state in the United States, another

157

WEIR

2    Q.   And so, the indices that you discussed
3  that you used, where is that information kept?

4    A.   It's kept in the work papers.

5    Q.   I mean, where did you get that data
6  from?

7    A.   I mean, at some point in time we would
8  have downloaded it from the Bureau of Economic
9  Analysis and its subsidiary agencies, like Bureau
10  of the Census.  But, this is data that we
11  regularly use in the course of generating work
12  product like this, so, I believe I already
13  possessed it.

14    Q.   So, it's data that you have on hand in
15  your office, is your understanding?

16    A.   Yes.  We use this so routinely that
17  it's just on our network.

18    Q.   And again, it's nowhere referenced in
19  this report that that information was referred or
20  utilized?

21    A.   Again, it's referenced in the work
22  papers that underpin the report.

23    Q.   And it's your understanding that there
24  is a specific document wherein this analysis was
25  performed?

159

WEIR

2  related to gross domestic product or similar data
3  by state and a third reflected consumer
4  expenditures on pest control by state.

5    Q.   Where in your report that you
6  disclosed in this case do you provide the opinion
7  that the state-by-state sales figures were
8  collaborated by these various indices?

9    A.   I don't know that I state that
10  expressly, but, in my confidence in using the
11  Harriet Carter data, to make the allocation,
12  which is described -- let's see.  I described it
13  in paragraph 18, my use of the Harriet Carter
14  data.

15    Q.   You said you use the Harriet Carter
16  data.  If we look at paragraph 18, is there
17  anywhere in that paragraph 18 where it references
18  any comparative analysis between state economic
19  indices or any other comparative analysis or
20  opinion?

21    A.   I don't think I make reference to the
22  background work that I did to beat myself to the
23  confidence in the Harriet Carter data that I use
24  in paragraph 18.  That's reflected in my work
25  papers.

158

WEIR

2    A.   To the best of my recollection, yes.

3    Q.   And was this analysis that you,
4  yourself, personally performed?

5    A.   It was probably done under my
6  direction by Andrew Kearns.

7    Q.   And do you recall specifically whether
8  or not you performed that analysis?

9    A.   I recall that the analysis was done.
10  Whether it was me that compiled the spreadsheet
11  or Andrew, I don't recall as I sit here today.

12    Q.   Do you recall what analysis was
13  performed on that?  Was it purely comparative
14  eyeballing?

15    A.   The comparison that was done was to
16  take the Harriet Carter data index for the
17  multistate class and to determine the percent of
18  the nation reflected therein and to compute the
19  same values with the alternate indices to see
20  whether they corroborated that data or suggested
21  something else.

22         And all of the data points
23  suggested -- I forget what the number is off the
24  top of my head, but something like 55-odd percent
25  of the nationwide data -- yeah, 55 percent, plus

160

WEIR

1  or minus, comes from the proposed multistate
2
3  class.
4     Q.   So, the number that you were
5  referencing, the 55 percent, that comes from the
6  table in your report, correct?
7     A.   That's the result of the Harriet
8  Carter data that is affirmed by the other
9  indices.  Yes.
10    Q.   But, this data is purely from Harriet
11 Carter, correct?
12    A.   To the best of my recollection, it is.
13 RQ       MR. WING:  And I'm going to say that
14          we have received no spreadsheet reflecting
15          the use of economic indices, so, I would
16          request that, to the extent they exist, they
17          be produced immediately.  That was not part
18          of any document production that has been
19          thus far received by us.
20    Q.   I'm going to show you again this --
21 for ease I'm using the spreadsheet on my
22 computer.  This is a spreadsheet that we did
23 receive as part of the document production in
24 this case, which we understand to be complete as
25 to the underlying documentation.

161

WEIR

1
2        If we look at the bottom tabs, we have
3  a "Percentage Price" tab, a "U.S. Sales" tab, a
4  "California U.S. Sales" tab and then a "25-State
5  Class" tab, correct?
6     A.   That's what's on this document that's
7  on your screen right now.
8     Q.   Is this a document that you recognize?
9     A.   I believe this is the work paper that
10 was used to generate Exhibit 3 to my Declaration.
11    Q.   So, this was used to generate
12 Exhibit 3.  This document reflects --
13        So, we are now looking at the tab that
14 is labeled "25-State Class," correct?
15    A.   Correct.
16    Q.   And this has the 25 states that are,
17 to your understanding, states that are included
18 in the multistate class, correct?
19    A.   The "25-State Class" tab is a summary
20 of the individual state tabs that are to the
21 right that show the state retail dollar sales
22 that comprise the 25-state multistate class.
23    Q.   So, thereafter we have an individual
24 tab for each of these states that are listed in
25 this summary spreadsheet, correct?

162

WEIR

1
2     A.   It should be.  Yes.
3     Q.   And this spreadsheet, this summary,
4  includes the state, that includes the -- a "State
5  U.S. Retail Dollar Sales Percentage" column,
6  correct?
7     A.   Yes.
8     Q.   And that state retail dollar sales
9  percentage is based on your analysis of the
10 Harriet Carter data, correct?
11    A.   It is.
12    Q.   That is not based on your analysis of
13 any other retail sales data, correct?
14    A.   It's based on the Harriet Carter data
15 that was validated for accuracy using the indices
16 that we've described before.
17    Q.   Other than those indices, did you do
18 anything else to validate the accuracy of those
19 sales figures?
20    A.   The work that I did to validate the
21 accuracy of the use of the Harriet Carter data
22 was the comparison to the U.S. government data
23 indices.  I have done no additional work, because
24 that validation corroborated the use of the
25 Harriet Carter data.

163

WEIR

1
2     Q.   And then you have a state retail
3  dollar sales figure, correct?
4     A.   That's the third column on this
5  particular tab.
6     Q.   And that column was generated -- you
7  multiply the state retail dollar sales percentage
8  by the total wholesales for the repellers,
9  correct?
10    A.   No.  It's multiplied by the total
11 retail dollar sales.
12    Q.   I believe that's what I meant.
13        So, if we look at the next tab, so,
14 here we have Alaska sales.  We'll look at the
15 first tab, "Alaska Sales by SKU," correct?  That
16 would be the title of the next document?
17    A.   It's not another document, it's a tab
18 in the spreadsheet.
19    Q.   Next tab in the spreadsheet.
20    A.   That should be equivalent to page 1 of
21 Exhibit 3 to my Declaration.
22    Q.   Does that appear accurate?
23    A.   Can you just expand --
24    Q.   Outside of the --
25    A.   -- column G there?

164

WEIR

2  Q.  And it may be easier for us to then
3  look -- we'll look at your report hereafter.
4  A.  Yeah.  Yeah.  This -- those tabs
5  should each -- this -- this particular document,
6  to the extent I understand what it is, and I
7  believe you've represented it fairly, is the
8  Excel sheet that created each of the individual
9  pages for Exhibit 3 to my Declaration.
10  Q.  To your understanding, the data in
11  this spreadsheet, who entered that data into the
12  spreadsheet?
13  A.  Most of this spreadsheet is drawn from
14  other locations, so, I don't believe it was a
15  matter of data entry.
16  Q.  Who took the steps to populate this
17  spreadsheet?
18  A.  That work was undertaken by myself and
19  Andrew Kearns.
20  Q.  So, you personally did some work in
21  populating these spreadsheets?
22  A.  Correct.
23  Q.  And from where was this information
24  drawn?
25  MR. ARISOHN:  Object to form.

165

WEIR

2  THE WITNESS:  So, the column labeled
3  "Item Number," that is the Bell & Howell
4  SKU number.  The "Wholesale Item
5  Description" comes from Bell & Howell's own
6  wholesale description of each of its
7  products.
8  The "Total Units Sold Nationwide" I
9  believe is the wholesale data that was
10  corroborated by the retail data.
11  The "Alaska U.S. Retail Sales
12  Percentage" is drawn from the Harriet Carter
13  data, apportioning, in this case, .19
14  percent of sales to Alaska.
15  The "Nationwide Retail Price" comes
16  from the various different retail pricing
17  data that's available and the "Alaska Retail
18  Dollar Sales" is a multiplication of the
19  units times the allocation percentage and
20  the nationwide retail price for each SKU.
21  And down at the bottom I believe there
22  are some summary statistics to add those
23  things up.
24  Q.  Is there anything in that document
25  that reflects the comparative analysis with the

166

WEIR

2  various government indices that you discussed
3  earlier?
4  A.  This particular tab includes only the
5  Harriet Carter data that was validated elsewhere.
6  Q.  In this spreadsheet, is there anywhere
7  where it reflects the comparative analysis with
8  the government indices that you discussed?
9  A.  I don't know off the top of my head
10  whether this spreadsheet contains that comparison
11  or not.
12  Q.  Let's look at the spreadsheet.  So,
13  the first tab is the "CA, U.S." -- I believe
14  that's the California and United States percent
15  price tab, correct?
16  A.  That's what it says.  Yes.
17  Q.  Do you recognize this spreadsheet?
18  A.  Yes.  I believe this is the work paper
19  that I generated to make Exhibit 3 to my
20  Declaration.
21  Q.  And this document reflects, to your
22  understanding, your comparative analysis of
23  California sales to U.S. sales?
24  A.  It does many things, this document.
25  Q.  This document does not include a

167

WEIR

2  breakdown of state sales, other than California,
3  correct?
4  A.  When you say "the document" --
5  Q.  This tab of this spreadsheet.
6  A.  I don't see it as you've got it there
7  on the screen.
8  Q.  The next tab of this spreadsheet is
9  titled "U.S. Sales," correct?
10  A.  It says "U.S. Sales" on the tab.
11  Q.  And this spreadsheet appears to be
12  what was used to populate what would be the
13  nationwide sales class in your report; is that
14  correct?
15  A.  I mean, I don't know what the
16  nationwide sales class is, but, if you're talking
17  about, does it provide data for Table 1, then I
18  would say, yes, it provides data for Table 1.
19  Q.  And Table 1 is labeled "Nationwide
20  Sales by SKU"?
21  A.  "Nationwide Sales by SKU."
22  Q.  The next document is -- "California
23  U.S. Sales" is what the tab is titled, correct?
24  A.  "CA-U.S. Sales."  Yeah.
25  Q.  Did you do anything to corroborate

168

WEIR

that the California sales figures that you
received passed your sanity test as you did with
the other states?

A.   I did.

Q.   And that would be included in the
spreadsheet that you generated that has not been
produced today?

A.   Correct.  Well, I don't know whether
it's been produced or not.  Judging from
Mr. Boedeker's report, there are plenty of things
that were produced that seem to have been missed
by your team.

Q.   Have you been provided a set of all
the documents that were produced in response to
that subpoena?

A.   You mean, has my production been given
back to me?

Q.   I'm saying, do you have personal
knowledge of what was produced to us, to Defense
counsel, in response to that subpoena?

MR. ARISOHN:  You should only answer
that question to the extent that you can do
so without exposing communications with
attorneys for Plaintiffs in this case, other

169

WEIR

than those specifically called for in
Rule 26 as they relate to compensation,
identified facts or data that the party's
attorney provided to you or that identify
functions that you relied on.

MR. WING:  And my question is, he has
made representations as to documents and
information that have been produced in this
case and I am asking what the scope of his
personal knowledge is with respect to what
has been produced in this case.

THE WITNESS:  So, first of all, if you
don't mind, I would appreciate it if you
would take your seat at the table rather
than stand over my shoulder.

But, as to your question, I don't have
a way to verify what Plaintiffs' counsel has
transmitted to you.

Q.   Thank you.

And other than that spreadsheet of
governmental information, did you do anything
else to verify that the sales percentages for
each of these states was accurate?

A.   I have re-verified that data based

170

WEIR

upon the Claims Administration data that has been
provided to me.

Q.   As of the date of this report, had you
done anything else to verify that data?

A.   As of the date of this report, the
verification that I did was based upon the
government indices.  Because of the way in which
that analysis panned out, I did not feel it
necessary to conduct additional validation.

Q.   And again, nowhere in this report are
those governmental indices identified as
documents or information that you reviewed or
relied upon, correct?

A.   Again, I don't know that I accept your
characterization.  Because, as I stated earlier,
they were documents that I routinely rely upon
and have knowledge of, so, when I speak to my
experience and understanding of the background
that I bring to the case, I believe that I do
implicitly reference them.

Q.   You believe that your knowledge and
experience implicitly references governmental
data with respect to population and GDP of
individual states?

171

WEIR

A.   Again, that's not something that I
researched specifically for this case, that's
knowledge that I brought to the table in advance
of this case.

Q.   You reviewed those documents
specifically to populate those spreadsheets we
referred to, correct?  You or someone on your
behalf?

A.   I believe the data was just populated.
I don't believe I reviewed it to populate the
spreadsheet.

Q.   The data was specifically populated
into a spreadsheet; you didn't, off the top of
your head, know that data, correct?

A.   It's true that I did not memorize the
data, but it is data that I had in mind.

Q.   And again, nowhere in this document do
you specify what those indices were or identify
that you refer to them in this document?

A.   The document will speak for itself.

Q.   Please take a look.  If you can point
to me where you refer those pieces of
information, please let me know.

A.   Again, I would point you to

172

WEIR

paragraph 18, where I refer to my use of the
Harriet Carter data, said confidence in which is
bolstered by the work that I did.  That work is
contained in the work papers that I have now
referenced many times on the record.

Q.   You just stated, "said confidence is
bolstered."  Where does that appear in that
paragraph?

A.   Those words do not appear in that
paragraph.

Q.   So, that paragraph simply states:
"I first calculate state-specific
retail sales shares using Harriet Carter retail
data."
Correct?

A.   That's one of the things that that
paragraph states.

Q.   Anywhere in that paragraph does it
state that you corroborated or otherwise referred
to other data in your analysis?

A.   That paragraph does not state that,
but the work papers support it.

Q.   Anywhere in this report does it state
that you collaborated or did any other analysis

173

WEIR

with respect to the Harriet Carter state-specific
sale information?

A.   I may not make reference to that
directly in the report, but, again, it is implied
in my work papers.

Q.   And which specific work papers is it
implied in?

A.   Without all of them in front of me, I
cannot tell you.

Q.   So, you are testifying that it is in
your work paper; you cannot identify which work
papers this analysis is included in?

A.   That's a mischaracterization of my
testimony.  What I said is, without having them
in front of me, I can't tell you what work paper
it is, but, if I had them in front of me I can
easily identify it.

Q.   I'm saying, your testimony is that you
have work papers that reflect this analysis,
correct?

A.   I have work papers that reflect this
analysis.  Correct.

Q.   And it is your understanding that you
have provided these work papers to counsel,

174

WEIR

correct?

A.   I believe that's correct.

Q.   What have you done to verify that you
produced all of the relevant documents to
counsel?

A.   I made best efforts to go through my
file, identify those documents that were
responsive to the subpoena and that were
permissible for production, subject to
Plaintiffs' objections, and then produced them to
counsel.

Q.   To your understanding, the document
that you were referring to that includes your
comparative analysis with the various
governmental indexes, that was a document that
you reviewed personally and determined was
responsive to the subpoena and produced to
counsel?

MR. ARISOHN:  Object to form.  To the
extent you're asking for a legal conclusion,
I'll object, as well.

MR. WING:  I'm asking, did he produce
that to you?

MR. ARISOHN:  You're asking whether a

175

WEIR

document's responsive or not.  That sounds
like a legal question.

MR. WING:  If he determined that it
was responsive, that is his own personal
knowledge.

THE WITNESS:  I don't have a
recollection as to every document of what
was deemed responsive or permissible for
disclosure under the subpoena.

Q.   Do you have a personal recollection
that you produced the document reflecting that
analysis to counsel?

A.   I produced hundreds, if not thousands
of pages of documents, and so I don't have a
precise recollection of whether it was produced
by me or not.

Q.   Is it your expectation that it would
have been?

A.   I would have to go back through the
process of identifying what was responsive to
this subpoena and what was permissible for
disclosure, subject to Plaintiffs' objections.

Q.   So, to some extent your analysis was,
you've testified, completed in the Stata program,

176

WEIR

correct?

A.   I did use Stata to complete some of the analysis.  Yes.

Q.   And to the extent that you used Stata, was Stata something that you personally used or was that used on your behalf by someone else in your office?

A.   Both.

Q.   So, it's my understanding that Stata involves coding on certain items, correct?

A.   I don't follow that question.

Q.   What is the process of using Stata? If you have a certain question that you want to analyze, how would you use Stata to do so?

A.   It's going to depend on what question you're trying to analyze.

Q.   Well, just give me the most general top line.  How would you describe Stata?

A.   It's a program that houses data and then can act on that data pursuant to your commands.

Q.   So, you, as the user, would input commands and the program would then analyze the data utilizing those commands?

177

WEIR

A.   Correct.

Q.   With respect to the analysis performed in this case, the commands that were entered into Stata, did you personally enter those commands?

A.   In some cases, yes.

Q.   And to the extent they weren't entered by you, they were entered by Andrew; is that correct?

A.   Mr. Kearns under my direction.

Q.   And was any work done by Mr. Kearns under your specific direction?

MR. ARISOHN:  Object to form.

THE WITNESS:  I don't know what that means.

Q.   Would you tell Mr. Kearns exactly what to program into the system or was it left up to him to decide what exactly was input into the system?

A.   The specifics of the analysis were specified by me.

Q.   So, you specified the analysis that you wanted to be completed and Mr. Kearns determined the mechanism by which that would be accomplished in Stata; is that fair?

178

WEIR

A.   I don't know whether it's fair or not.

Q.   Is it true?

A.   I guess I don't agree with the characterization.  Mr. Kearns was acting under my direction to complete various analytical tasks using the tools that are available in Stata.  And in other programs, as well.

Q.   And for some of the tasks that you wish to accomplish, do you personally utilize Stata to accomplish those tasks?

A.   Yes.  I use Stata on a -- mostly daily basis.

Q.   And you used it with respect to this case?

A.   Yes.

Q.   How did you determine which tasks you would personally accomplish and which you would have Mr. Kearns accomplish?

A.   I don't know that there was a specific set of guidelines for that.  Some tasks I would give to Mr. Kearns and others things I would do myself.

Q.   What did you do to verify that the work done by Mr. Kearns was done accurately?

179

WEIR

A.   I would either review his spreadsheet work or his Stata analysis and have him work through the process by which he was generating any data or analysis on my behalf.

Q.   So, when you say you would "review the spreadsheets," that would be any Excel spreadsheets that were generated based on his work in Stata?

A.   Well, if we were working in Excel, I would review his Excel spreadsheets.  If we were working in Stata, I would look at his -- either Stata code or output or watch him perform the analysis.

Q.   So, there were times when you would be physically present and watch him perform the analysis?

A.   Yeah.  His desk is just down the hall from mine, so we very often work together collaboratively that way.

Q.   When you say you would review the output, that would be output that would be generated in Stata?

A.   Correct.  So, if you type in a command, such as "Compute this regression," the

180

WEIR

1
2  regression results then appear on the screen.
3  So, I would look at the results of whatever it
4  was that we were doing as they would appear on
5  the screen.
6      Q.   And those results, they are then saved
7  by the system in Stata?
8      A.   Not necessarily.
9      Q.   Would you be able to later access
10  those results?
11      A.   If not access the results, then
12  certainly recreate them.
13      Q.   But, as far as the actual output for
14  what you had accomplished, would those be saved
15  as -- actually, maybe a DOT log file?  Is that
16  something you're familiar with?
17      A.   I'm familiar with the concept, we
18  don't always use it.
19          Sometimes, if all I want to do is
20  verify something, I'll run an analysis, satisfy
21  myself with the results on the screen and move
22  along and not save that.
23      Q.   If there is something that you are
24  doing more than just verifying, would it be your
25  standard practice to maintain a DOT log file?

181

WEIR

1
2      A.   Again, not necessarily.  If the Stata
3  analysis is going to be then used to export a
4  table or a spreadsheet, I would let the table or
5  spreadsheet stand for itself as a result of that
6  analysis.  I don't need a log file to say, "Hey,
7  I generated a spreadsheet."
8      Q.   Did you maintain DOT log files for any
9  of the work that you did in this case?
10      A.   I don't have a recollection one way or
11  the other.
12      Q.   As part of the subpoena, if you were
13  requested to provide DOT log files for any work
14  done on this case, would it be your expectation
15  that those were produced?
16      A.   If DOT log files were produced for
17  final and not draft work product, then I would
18  expect them to be produced.  But, that does not
19  necessarily mean that there are any such DOT log
20  files responsive to that request.
21      Q.   So, you would differentiate DOT log
22  files created for drafting the report as opposed
23  to DOT log files that generated the final data in
24  the report?
25      A.   I've been led to believe that the

182

WEIR

1
2  Federal Rules of Evidence provide for disclosure
3  only of final work product, not draft work
4  product in any form.
5      Q.   So, the DOT log files for the analysis
6  that you performed in this case, you would
7  classify that as a draft?
8      A.   Would you ask that question again,
9  please?
10      Q.   Yes.  So, if you performed analysis of
11  data that is set forth in the final report that
12  you have produced in this case, your statistical
13  analysis of that data you have classified as a
14  draft for purposes of disclosure?
15      A.   If the analysis is set forth in my
16  final Declaration, then I would not call it
17  draft, I would call it final work product.
18      Q.   So, your analysis of, for example,
19  retail sales versus wholesales, you testified,
20  was likely performed in Stata, correct?
21      A.   I said there was comparison of retail
22  or wholesale sales.  I did not say that it was
23  likely performed in Stata versus Microsoft Excel.
24      Q.   Do you know whether it was performed
25  in Stata or Microsoft Excel?

183

WEIR

1
2      A.   As I sit here today, I don't have a
3  precise recollection.  I use both of those tools
4  regularly.
5      Q.   To the extent that it was performed in
6  Microsoft Excel, do you know if it was produced
7  to counsel?
8      A.   Again, as to any specific document, I
9  would have to go back and look.  I don't have a
10  recollection as I sit here today.  I produced
11  thousands of pages of documents.
12      Q.   So, to the extent that you performed
13  an analysis of wholesales versus retail sales,
14  you do not recall whether that was done in
15  Microsoft Excel or Stata?
16      A.   It might have been a combination of
17  the two, I just don't have a specific
18  recollection as I sit here today.
19      Q.   Did you personally perform that
20  analysis?
21      A.   It was likely performed in conjunction
22  between myself and Mr. Kearns.
23      Q.   To your knowledge, to the extent that
24  that analysis was performed, did you determine
25  that analysis to be a draft for purposes of

184



WEIR

1      WEIR
2    disclosure?
3         A.  I don't have any recollection as I sit
4    here today.
5         Q.  Did you, in responding to the subpoena
6    that was Exhibit 2 that we looked at earlier, did
7    you review the DOT log files, any DOT log files
8    that were generated in Stata with respect to this
9    case?
10        A.  I don't have a particular recollection
11   of there being any DOT log files.  There may be,
12   but I don't have a specific recollection of
13   looking at any in this case.
14        Q.  Did you review them in the process of
15   responding to that subpoena or did you verify
16   they did not exist for purposes of responding to
17   the subpoena?
18             MR. ARISOHN:  Object to form.
19        Q.  With respect to responding to the
20   subpoena that we looked at earlier, did you
21   review the Stata program to determine whether or
22   not there were DOT log files generated with
23   respect to this case?
24        A.  I would have reviewed to make that
25   determination, but I don't have a recollection of

                                                    185

WEIR

1      WEIR
2    whether there were any specific to this case or
3    not, as I sit here today.
4         Q.  To the extent that there were DOT log
5    files that were generated with respect to this
6    case, did you produce any DOT log files in
7    responding to that subpoena?
8         A.  I don't have a recollection one way or
9    the other, as I sit here today.
10        Q.  Did anyone else in your office assist
11   in responding to the subpoena?
12        A.  I believe Mr. Kearns assisted in
13   collecting some of the documents that I
14   requested.
15        Q.  So, Mr. Kearns' work in responding to
16   the subpoena was done at your direction?
17        A.  Correct.
18        Q.  Did you verify with Mr. Kearns that he
19   performed a diligent search of any records that
20   would be responsive to the subpoena?
21        A.  I believe he collected all the
22   documents that I had requested.
23        Q.  So, did you review the documents that
24   Mr. Kearns compiled prior to providing them to
25   counsel in this case?

                                                    186

WEIR

1      WEIR
2         A.  At the time, yes.
3         Q.  And as you sit here today, you are not
4    aware of any documents that would be responsive
5    to that subpoena that you have not produced?
6         A.  I don't have an awareness one way or
7    the other.
8         Q.  Other than reviewing the code and/or
9    being personally involved, did you do anything
10   else with respect to Mr. Kearns' work to verify
11   that the Stata program was being used accurately?
12        A.  Again, I re-ran some of the analyses
13   to verify that the numbers were coming out
14   correctly.  Some of the data was then output back
15   to Microsoft Excel that would allow
16   cross-checking back and forth.
17        Q.  When you say it would be output to
18   Microsoft Excel, would that be similar to the
19   spreadsheets that we were just looking at, the
20   state-specific spreadsheets?
21        A.  I don't know whether that spreadsheet
22   was generated in part by Stata, but I do know
23   that there is a responsibility that there were
24   spreadsheets generated by Stata containing the
25   output or tally of the information that had been

                                                    187

WEIR

1      WEIR
2    input and processed by Stata.
3         Q.  Did you determine what data would or
4    would not be exported to a spreadsheet from
5    Stata?
6         A.  I guess the answer would be yes and
7    it's really more of a practical matter than an
8    analytical matter.
9             So, for purposes of importing
10   information into Microsoft Word, for example, I
11   had the tables made in Excel.  Whether or not
12   those tables were made from Stata, I don't recall
13   precisely as I sit here today, but, that would be
14   the type of reason for asking for Excel output
15   from Stata.
16        Q.  So, going back, with respect to the
17   items for which you had retail sales pricing,
18   that was done as an average of the data that was
19   provided to you, correct?
20        A.  Where we had SKU-specific retail sales
21   data, I used the SKU-specific average pricing
22   data.  Where we did not have SKU-specific data, I
23   used market-wide average pricing data.
24        Q.  And when you say "SKU-specific data,"
25   so, there is an item number that Bell & Howell

                                                    188



                              WEIR
1                             WEIR
2  generates that is the SKU for each of these
3  specific items, correct?
4       A.   Shelf-keeping unit, and the SKUs are
5  generated by Bell & Howell.
6       Q.   And that information was provided by
7  Bell & Howell, but was not necessarily included
8  in the retail sales figures that were provided by
9  the retailers, correct?
10      A.   That's correct.
11      Q.   Not that it was omitted, but that may
12 not have been the manner in which they kept their
13 records, correct?
14      A.   There could be any number of reasons
15 why they don't use Bell & Howell's internal SKU.
16      Q.   Do you recall for which retailers you
17 had SKU-specific sales figures?
18      A.   I don't recall them off the top of my
19 head, but, we can infer that based on, for
20 example, Table 1, where, if the nationwide retail
21 price is $24.10, we were using the market-wide
22 average and, if it is other than $24.10, we were
23 using the SKU-specific information.
24      Q.   My question is, for which retailers
25 did you have SKU-specific information?
                                                    189

1                             WEIR
2       A.   Oh.  There's basically two categories
3  of products.  I think we had, literally, the
4  SKU-by-SKU match-ups from Walmart.
5            But, there were other SKUs that we
6  were able to match up based on a comparison of
7  the wholesale and retail data.
8            So, some of the retailers, other than
9  Walmart, provided SKU-by-SKU information after a
10 comparison to the wholesale transaction
11 information.
12      Q.   Some of the retailers provided
13 SKU-by-SKU information at some point?
14      A.   Well, again, you keep using these
15 words that are a little bit of a
16 mischaracterization.
17           Walmart literally provided the SKUs
18 for the products, other retailers provided -- let
19 me call them product-by-product information,
20 where I was able to determine the appropriate
21 Bell & Howell SKU based upon a comparison of the
22 wholesale and retail data in such a way that I
23 was able to use the retailer product-by-product
24 specific information to generate SKU-by-SKU
25 average retail sale price data from retailers
                                                    190

1                             WEIR
2  other than walmart.
3       Q.   I see.  I thought you said that they
4  subsequently provided.  This was -- you made an
5  analysis and you made a determination as to
6  match -- you matched up SKUs using some analysis
7  and data, correct?  This wasn't specific data
8  provided by the retailers.
9       A.   We took data provided by the
10 retailers, analyzed it, compared to the wholesale
11 data and, in many instances, were able to
12 determine what SKU corresponded to the retail
13 sales data, and thus we were able to use it as
14 SKU-specific information.
15      Q.   And that analysis that you just
16 described, where was that analysis documented?
17      A.   So, I mentioned it here in
18 paragraph 15, where I say in the middle of the
19 paragraph:       "Retail products were
20 matched to specific Bell & Howell SKUs by
21 analyzing the distribution of wholesale sales to
22 each retailer by SKU and the distribution of
23 retail sales by products, as well as by matching
24 Defendants' product descriptions and retail
25 product descriptions."
                                                    191

1                             WEIR
2            And then that work was performed in
3  various work papers.
4       Q.   Which work papers would those be?
5       A.   Again, without having them in front of
6  me, I don't know that I could identify them from
7  memory, but, if I had the work papers in front of
8  me, I could identify for you which work papers
9  they are.
10      Q.   Was that analysis the product-by-
11 product analysis, performed in an Excel
12 spreadsheet?
13      A.   I don't recall that specifically as I
14 sit here today.
15      Q.   Did you personally perform that
16 analysis?
17      A.   That work would have been done by
18 Mr. Kearns at my direction.
19      Q.   So, did Mr. Kearns, based on your
20 direction, generate a document for you to review
21 with respect to that analysis?
22      A.   I don't recall whether we would have
23 looked at a document like an Excel spreadsheet or
24 whether we would have been looking at data
25 produced on a monitor by Stata.
                                                    192



WEIR

1            WEIR
2       Q.   That analysis was ultimately utilized
3  in some other fashion, correct?
4       A.   I don't know if the analysis was used.
5  We used the retail data to generate the average
6  price points used in Table 1.
7       Q.   And was that analysis performed in
8  Stata?
9       A.   You just asked me that and I said I
10 don't recall as I sit here today.
11      Q.   I'm saying the subsequent analysis.
12 You said that you then used analysis of the SKUs
13 and et cetera to perform a price analysis.  Was
14 that analysis performed in Stata, the utilization
15 of the earlier data that you just testified?
16      A.   I don't recall whether the average
17 price points were generated first in Stata or
18 Microsoft Excel, but, for example, as you saw in
19 Exhibit 3, the final results were used in
20 Microsoft Excel to generate the data in these
21 tables in my Declaration.
22      Q.   But, the analysis that went into those
23 final results, you don't recall whether those
24 were in Excel or in Stata?
25      A.   Yeah.  I use Excel and Stata almost

193

1            WEIR
2  every day of my professional life and so, I don't
3  have a recollection often of what software
4  program I'm using to perform any one specific
5  task unless I'm looking back at that
6  documentation.
7       Q.   So, to the extent that that analysis
8  was performed in Microsoft Excel, would you have
9  produced that to counsel in response to this
10 subpoena?
11      A.   Off the top of my head, I don't know.
12      Q.   So, again, it's your understanding
13 that at some point you did perform an analysis of
14 Bell & Howell SKUs and the product descriptions
15 set forth in the retail sales figures, correct?
16      A.   Correct.
17      Q.   And that that analysis is somewhere
18 either in an Excel spreadsheet or was performed
19 on Stata, correct?
20      A.   I'm not sure where the analysis would
21 be kept, but, that analysis allowed us to
22 understand what SKU corresponded with what in the
23 retail data.
24           MR. WING:  Again, I would represent
25      that there has been no Microsoft Excel

194

1            WEIR
2  spreadsheet that reflects that analysis.
3           To the extent that that has been
4  provided or to the extent that it exists and
5  has not yet been produced, I would request
6  that it be so produced.
7       Q.   So, after you performed this analysis
8  of the Bell & Howell SKUs and product
9  descriptions, how was that utilized to determine
10 your price figures?
11      A.   Well, that analysis was not, per se,
12 used to determine the pricing figures.  What was
13 done with the pricing figures was to take the
14 average -- well, the total dollar sales for any
15 particular SKU and divide by the total
16 corresponding unit sales for that particular SKU
17 to determine the average price point paid during
18 the class period for that SKU.
19      Q.   And that would be the number that's
20 reflected in Table 1 of your report for certain
21 of the items?
22      A.   In the "Nationwide Retail Price"
23 column for those price points other than those
24 marked $24.10.
25      Q.   With respect to the other item

195

1            WEIR
2  numbers, how was that retail price figured?
3       A.   That was an aggregation of all of the
4  dollar sales that we had data for at retail
5  divided by all of the corresponding unit sales
6  for all products.
7           So, it reflects a market-wide average
8  price point for Bell & Howell pest repellers for
9  the data that we had available to us.
10      Q.   And that average price that you
11 calculated, you have used that regardless of the
12 particular device for which you are calculating
13 retail sells, correct?
14      A.   I don't know if that's a good
15 characterization.  What I've done is to use it
16 for devices that we don't have SKU-specific
17 pricing information for, but I've done it in such
18 a way that it is reflective of all of those
19 myriad devices in the aggregate for sales to the
20 class during the class period.
21      Q.   You're using that specific price for
22 each specific item, correct?
23      A.   In the table it's lined up per item,
24 but the goal of the analysis is to determine the
25 average total retail sales to the class in the

196

WEIR

1  WEIR
2  aggregate.
3       So, I'm looking at across the entirety
4  of the product category that is the subject of
5  the litigation.
6       Q.   But, the -- the sales figures for the
7  items on the wholesale basis you've used, those
8  vary greatly amongst the various items, correct?
9       MR. ARISOHN:  Object to form.
10      THE WITNESS:  I don't follow that
11      question.
12      Q.   So, I mean, certain of the item
13  numbers have significantly different sales
14  figures than other items, correct?
15      A.   What are you talking about when you
16  say "sales figures"?
17      Q.   So, the numbers that you're using for
18  total units sold nationwide, there are items that
19  have sold less than a thousand units and there
20  are items that have sold hundreds of thousands of
21  units, correct?
22      A.   Correct.
23      Q.   So, the impact of the pricing figure
24  for units that sell a large number of items would
25  impact the damage calculation much greater than

197

WEIR

1  WEIR
2  units that sell a much smaller number, correct?
3       A.   Again, I'm not sure how you're using
4  those terms.  Obviously those products that sell
5  more units will have higher damages associated
6  with them than those products that have fewer
7  units at issue.
8       Q.   If a product that has a high number of
9  sales, if that is multiplied by a higher average
10  sales price, that will inflate the damage figure
11  more than if a higher sales price is used for a
12  low sales figure item, correct, in the aggregate?
13      A.   No.  In the aggregate, absolutely not.
14  In the aggregate we're looking at average prices
15  across many products and average units across
16  many products, and so, those all come out in the
17  aggregate to be reflective of the actual prices
18  and total dollars spent by consumers during the
19  class period.
20       There's no artificial inflation of the
21  nationwide or state subclass sales in the
22  aggregate to the class based upon the use of the
23  averages, regardless of the unit sales of any
24  particular item.
25      Q.   Did you do any analysis with respect

198

WEIR

1  WEIR
2  to which items numbers were sold by which
3  retailer?
4       A.   I don't know that we analyzed it
5  per se, but, that information is understandable
6  for many of the items.
7       Q.   Some retailers sell some item numbers
8  and not other item numbers, correct?  Not all
9  retailers sell all of the specific items listed
10  in this table, correct?
11      A.   I believe that's correct.
12      Q.   Did you do anything to determine the
13  differences in pricing between items that were
14  sold by one retailer as opposed to another?
15      A.   We talked about this earlier today
16  when you asked a similar question and I told you
17  that I endeavored to understand the pricing
18  between different retailers and understand the
19  retailers that I had pricing information for to
20  know whether the average pricing data that I had
21  would be conservative.
22       And I did conduct such an analysis and
23  made a determination that has since been
24  validated, that my pricing information here and
25  measurement of total sales to the class is indeed

199

WEIR

1  WEIR
2  accurate, if not conservative.
3       Q.   And that analysis is reflected in your
4  work papers; is that your understanding?
5       A.   Well, the subsequent validation is
6  still ongoing, but I know that that is one of the
7  conclusions that I have drawn from the additional
8  presentation of the Claims Administration data.
9       Q.   As of the date of this report, was
10  that analysis of the comparative pricing between
11  retailers documented in your file?
12      A.   I think it's just self-evident in the
13  retail data itself and is maybe not self-evident
14  but became evident in my review of the retailers
15  and understanding of the pricing of those
16  retailers.
17      Q.   What is the basis for your
18  understanding of the pricing of the retailer?
19      A.   I mean, I've made a career of studying
20  how businesses operate and I know, based upon my
21  review of Walmart data time and time again,
22  reading books about Walmart, that they are going
23  to do everything possible to sell products for
24  the lowest possible price.
25       So, I know that using Walmart sales

200

WEIR

1    WEIR
2    data as part of a sales average is going to
3    result, typically, in either an accurate estimate
4    of average price points or a conservative
5    estimate of average price points.
6        Q.   Outside of your own experience, did
7    you do anything to verify that the Walmart
8    pricing data was representative of the pricing
9    data for each of the retailers?
10       A.   Again, we did side-by-side
11   comparisons, which I think can be done with just
12   visual inspection of the retailer data, to
13   understand that Walmart was on the lower end.
14   So, to the extent it's not representative, it's
15   conservative in the data.
16       Q.   Would that analysis be documented in
17   your file?
18       A.   I don't know that it's an express
19   analysis as per se and just an examination of the
20   retail data, along with an understanding of who
21   the retailers are.
22       Q.   Did you generate a spreadsheet of your
23   side-by-side comparison of the pricing of the
24   various retailers?
25       A.   I don't recall doing so.

201

1    WEIR
2        Q.   Did you direct Mr. Kearns to produce a
3    spreadsheet of your side-by-side analysis of the
4    retail pricing?
5        A.   I don't recall doing so.
6        Q.   Did you perform an analysis in Stata
7    of your side-by-side comparison of the retail
8    pricing?
9        A.   I don't have a recollection of that.
10       Q.   Did you direct Mr. Kearns to perform
11   such analysis?
12       A.   I don't have a recollection of that,
13   as we sit here today.
14       MR. ARISOHN:  We've being going for
15   about an hour, do you want to take a quick
16   break?
17       MR. WING:  Sure.
18       (Recess taken.)
19   BY MR. WING:
20       Q.   Mr. Weir, in questioning today you've
21   referred a number of times to your work papers,
22   correct?
23       A.   Correct.
24       Q.   When you refer to your work papers,
25   what would be encompassed within that term as you

202

1    WEIR
2    have used it?
3        A.   A number of Excel spreadsheets and
4    Stata files.
5        Q.   Would there be anything other than
6    Excel spreadsheets and data files that you are
7    referring to as your work papers?
8        A.   Just to be clear, what I had said was
9    "Stata files."
10       Q.   Sorry.  That's what -- Stata files.
11       A.   There were -- I don't know that I
12   would call them my work papers, but, some of the
13   raw data, I believe, had come in PDF form, so,
14   there are probably some PDF documents that were
15   produced natively by retailers.
16       Q.   I mean, again, in answering my
17   questions you have referred time and time again
18   to, "That analysis is in my work papers,"
19   et cetera, correct?
20       A.   I have talked about my work papers.
21       Q.   And your work papers would refer to
22   these Excel spreadsheets that you just mentioned,
23   correct?
24       A.   And the Stata files.
25       Q.   And again, is it your understanding

203

1    WEIR
2    all of these Excel spreadsheets have been
3    produced to counsel?
4        A.   I just went back and double-checked my
5    records as it related to a couple of the lines of
6    inquiry that you have asked about.
7             The one document that we have
8    discovered that was not produced because, at the
9    time, it was felt to be draft work product, is
10   this comparison of the Harriet Carter data with
11   the government indices data.
12            I've just produced that to Counsel, I
13   understand during the break he just produced to
14   you.  It is a single-page document with five or
15   six columns of data that compare percentage
16   factors across the 25 multistate class.
17            As to some other categories of data,
18   there are a number of things that we've looked at
19   that are either raw data or are part of other
20   work papers, but did not result in an analysis in
21   and of themselves.
22            So, as an example, we were just
23   talking before the break about the identification
24   of SKU-specific information on a retailer-by-
25   retailer basis.

204

WEIR

There is no intermediary analysis that I can turn over to you that identifies or demonstrates that process. But, the identification that has been made of the SKU-by-SKU data is self-evident within the Stata files that have been produced to you.

Q. So, they would be an output within the Stata file that reflects this analysis of the SKU-by-SKU comparison that you've just referenced?

A. I don't know whether I'd describe it as an output, but, one of the things that we provided to you are Stata do-files, which are lines of code that cause Stata to execute various things. And those do-files themselves contain information.

So, either within the do-file or within the underlying data that the do-file acts upon, there should be information sufficient to determine the SKU-by-SKU determinations that have been made as to the individual specific retailers.

But there is no intermediate work paper that has not been produced to you that

205

WEIR

would guide you through that process.

Q. You testified earlier that you are not aware of what had or had not been produced to me, correct?

A. That's correct. I don't know precisely what's been produced to you.

Q. So, when you testified that that document or work product, as you understand it, that document does not exist?

A. I don't follow.

MR. ARISOHN: Object to form.

Q. You stated that it had not been produced to me.

MR. ARISOHN: Object to form. It --

Q. Sorry. You said that there had been no intermediary work product that had not been produced to me, I believe, was what you stated.

A. Right. I'm saying no such document exists at all in any shape or form, other than the Stata file and the raw data that would serve to represent the work that was done to identify SKU-by-SKU retailer-specific data.

Q. And the analysis that was done in Stata in that regard, who determined the method

206

WEIR

by which that analysis would be completed?

A. I determined the method, it was likely executed by both myself and Mr. Kearns.

Q. And what was the process by which that data was analyzed?

A. Again, I compared the retail sales data with the wholesale sales data on a SKU-by-SKU basis and also looked at product descriptions, both at the wholesale and retail level, and made determinations where I was comfortable that certain products would or would not be classified as a specific SKU or an indeterminate SKU.

And that -- the results of that effort are self-evident in the Stata files that I have been led to believe that have been produced to you.

Q. So, you reviewed the sales figures and made an independent determination yourself which product descriptions would correspond to which SKUs?

MR. ARISOHN: Objection to the extent it mischaracterizes the Witness's prior testimony.

207

WEIR

THE WITNESS: I was about to say --

Q. Is that true?

A. It's an oversimplification, is what it is.

What I said before is that I identified the methods by which this could be done and the work was done both by Mr. Kearns and myself, and that work involved a comparison of wholesale and retail SKU-by-SKU data, as well as SKU and product-specific product descriptions to make a determination of when and where I felt comfortable matching retail and wholesale SKU data, the results of which are evident within the Stata files, which I have been led to believe have been produced to you.

Q. So, the input into the Stata system, with respect to your comparative analysis of wholesale data and SKUs, the data to be input, was that determined by you?

A. Again, I think you're not understanding, because the question is suggesting something that doesn't make any sense to me.

Q. At some point data would be input into

208

WEIR

the system to make those comparative analysis, correct?

A.   No.

MR. ARISOHN:  Object to form.

Q.   Does Stata allow you to make some kind of determination as to product description?

A.   No.  What I'm saying is, I've looked with my own eyes at the product descriptions made by retailers and the product descriptions made by Bell & Howell, and where that and other information would lead to the match of a SKU between Bell & Howell SKUs and the retailer data, I would flag that retailer data with that SKU.

That flagging is self-evident within Stata, but the determination was not made by Stata.  It was made by me.

Q.   That was my initial question.  So, the determination of which -- or the items that would be matched up for purposes of this analysis, that was a determination that was made by you?

A.   Correct.  I feel like we've being going in circles on that.

Q.   And so, what analysis would Stata have done with respect to that information that you

209

WEIR

input?

A.   That I would need to go back and look at the Stata do-files to remember everything.

But, for example, that might have generated an average sales price based upon the SKU and total sales information.

Q.   You testified that you were involved in developing in performance analysis, correct?

A.   I have oversaw and participated in all of the work done in this case.

What I've told you repeatedly is that I use many tools to perform the tasks that I do, including Excel, including a pocket calculator, including Stata and many other things.  So, whether something was done in Stata or in Excel, I don't have a precise memory of that.

I just looked up to identify that the flags that you're looking for are in the Stata files but, everything else that's in there, I would need to go back and refresh my recollection as to that.

Q.   You are testifying here today as an expert with respect to analysis that you did in these numbers in various Excel or Stata programs.

210

WEIR

And all I'm asking is, your analysis that you personally performed or directed and that you just stated was performed in Stata, with respect to the comparative analysis between the product descriptions and the SKUs, what did that analysis consist of?

A.   That statement completely mischaracterizes my prior testimony.  I just said five times in a row that the comparison was not made in Stata.

The Stata files identify the results of the comparison that were made by looking at the raw data by me and Mr. Kearns under my direction.

Q.   So, you compared the product descriptions for items for which you had no SKU and items for which you did have a SKU, correct?

A.   I compared the wholesale data and the wholesale product descriptions to the retail data and the retail product descriptions, and when it was possible to identify a retail product that was not previously matched to a Bell & Howell SKU, I assigned it a Bell & Howell SKU when the data permitted that identification.

211

WEIR

The identification of those SKUs is self-evident in other work that has been done in the Stata files, but that analysis was performed without using Stata.

Q.   And so, the output from Stata, based on that input, what was the output from Stata based on the input you just described?

MR. ARISOHN:  Object to form.

THE WITNESS:  What I'm suggesting is, I can tell you about the output of my analysis.  What came from Stata and what came from Excel, I'm not prepared to identify exactly as we sit here today.

So, I can tell you that, the analysis that we've talked about, the flagging of SKU numbers resulted in average prices per SKU that could be seen, for example, in Table 1 in my Declaration.

Whether that was done in part in Stata, in part in Excel, I don't have a recollection as I sit here today.

But, it doesn't really matter what tool I use, per se, the results of that analysis are found in the "Nationwide Retail

212

WEIR

1     Price" column.
2         Q.   To the extent that that analysis was
3     performed in Excel, would those Excel files be
4     part of your work papers that you have described
5     thus far?
6     A.   Yes.  And we can see that in one of
7     the work papers that you already raised.  I think
8     this was a work paper that had these various
9     tables and the computations of these average
10    prices included in them.
11        Q.   And the data in that Excel file, to
12    your understanding, to the extent that it
13    identifies wholesale figures by SKU, my
14    understanding is that those figures are both
15    sales information for items that Bell & Howell was
16    provided by the retailers and wholesale figures
17    for items that you matched up with SKUs by your
18    own comparison?
19        MR. ARISOHN:  Object to form.
20        THE WITNESS:  Again, I think that
21    misstates what the work papers contain.
22        It's my understanding that the
23    wholesale data for every product contains a
24    Bell & Howell SKU, and that's reflected in

213

WEIR

1     my Table 1, where I have a SKU number for
2     every item in the table.
3         The retail data, some of those
4     products contain Bell & Howell matching SKUs
5     and others now contain Bell & Howell SKUs
6     that I have independently matched.
7         So, my work papers, whether in Stata
8     or Excel, will reflect, for some items, the
9     flag where I have matched a Bell & Howell
10    SKU to the retail data.
11        MR. WING:  So, we'll mark this as an
12    exhibit.
13        (Exhibit No. 7, Spreadsheet Document,
14    marked for identification as of this date.)
15        Q.   So, this is a document that was just
16    produced to me by Counsel during the break that
17    we were just sitting in.
18        To your understanding, was this
19    document previously produced to counsel?
20        A.   I don't know the answer to that
21    question.
22        Q.   Did you previously produce this
23    document to counsel?
24        A.   I don't know the answer to that

214

WEIR

1     question.  What I do know is that I just took a
2     moment at the break to identify this document
3     which we've been talking about and to reproduce
4     it so that it's available for discussion today.
5         Q.   And so, you reproduced it.  Do you
6     understand that you did produce it before?
7         A.   I don't know whether I reproduced it.
8     I just said that.
9         Q.   This document, where did you generate
10    this document?
11        MR. ARISOHN:  Object to form.
12        Q.   That's sitting in front of me.  I
13    mean, this document came from somewhere, where
14    did it come from?
15        A.   Where did it come from?  I mean, are
16    you asking what program?  Are you asking where,
17    like, physically did I work on this?
18        Q.   I'm asking that, you retrieved this
19    document from somewhere during the break that we
20    just took.  From where did you retrieve this
21    document?
22        A.   From my company's network.
23        Q.   So, this is a document that is stored
24    electronically on your company's network?

215

WEIR

1         A.   Correct.  It's an Excel spreadsheet.
2         Q.   And where in your company's network
3     was this document stored?
4         A.   I don't understand that question.
5         Q.   Did you maintain a separate electronic
6     file for Excel documents or other documents
7     relating to this case?
8         A.   I still don't understand that
9     question.  Are you asking did I segregate Excel
10    documents or are you asking whether I keep
11    documents for this case segregated from other
12    cases?
13        Q.   That is what I am asking.  I'm asking
14    you, do you have a folder that is "Bell & Howell
15    Case" from which you can pull these documents?
16        How did you identify which documents
17    are relating to the Bell & Howell case in your
18    system?
19        A.   I have a directory dedicated to the
20    Bell & Howell matter.
21        Q.   So, this is a document that was stored
22    in the Bell & Howell directory on your system,
23    correct?
24        A.   Correct.

216

WEIR

1       WEIR
2  Q. Have you produced all of the documents
3 that are within your Bell & Howell directory to
4 counsel in this case?
5  A. No.
6  Q. Which documents from your directory
7 have you not produced to counsel in this case?
8  A. I have not reproduced any documents
9 that were produced during the normal course of
10 the litigation to me and I have not produced
11 documents that were jointly deemed to be draft
12 work product by myself and counsel in this case.
13  Q. Did you do anything to confirm with
14 counsel which documents were generally disclosed
15 during discovery?
16   When you say there are two categories
17 of documents, right, one that were deemed to be
18 non-discoverable pursuant to
19 Rule 26 and then a subset of documents that you
20 said you weren't going to reproduce, correct?
21  A. I don't know if those are the only
22 categories, but, there are documents that should
23 have already been in Defendants' possession and I
24 did not reproduce those, and there are some
25 documents that were deemed to not be subject to

217

1       WEIR
2 Rule 26 disclosure.
3   I believe there are other documents
4 that Plaintiff just objected to the production
5 generally.
6  Q. With respect to documents that you
7 believe were previously disclosed in discovery,
8 did you do anything to confirm or identify which
9 documents those were?
10  A. Again, they're going to be
11 predominantly the Bates-numbered documents that
12 were produced from Defendant through counsel to
13 me.
14  Q. Other than the Bell & Howell
15 Bates-stamped documents, are there any other
16 documents that you did not produce from your
17 system on the basis that you believed they had
18 already been produced in litigation?
19  A. Not that I can recollect as I sit here
20 today.
21  Q. With respect to any additional
22 documents that either yourself and/or jointly
23 with counsel determined to not be responsive or
24 disclosable pursuant to Rule 26, do you have any
25 documentation identifying those documents?

218

1       WEIR
2  A. Well, I would have the ability to look
3 back at what I produced to counsel and identify
4 those documents that way.  Yes.
5  Q. To date do you have a written document
6 which identifies which documents have been
7 produced and which documents have not been
8 produced?
9  A. No.
10  Q. Has counsel requested that you produce
11 such a document?
12  A. No.
13  Q. Looking at, I believe, Exhibit 7, that
14 I just showed you, as I am just looking at it,
15 can you identify this document for me?
16  A. This is a comparison of the Harriet
17 Carter 25-state allocation to three government
18 indices as we have described before, looking at
19 share population, share of pest control service
20 sales and shares of retail trade sales.
21   And of interest to me was the bottom
22 line comparing the Harriet Carter 55 percent
23 allocation to the 25 states to 59 percent by
24 population, 52 percent by pest control and
25 59 percent by retail trade, indicating a

219

1       WEIR
2 convergence in that middle 55 percent range which
3 corresponds with the Harriet Carter those.
4  Q. The data that underlies those percent
5 figures set forth in this document, where is
6 that or --
7   MR. ARISOHN:  Object to form.
8  Q. -- is that underlying data on your
9 system?
10  A. I probably do have a reference
11 materials section that would include this data
12 that we maintain on a regular basis.
13  Q. So, looking at the --
14  A. Let me -- sorry to interrupt you, but,
15 I just want to clarify my last answer, which is
16 that these are all publicly available pieces of
17 information.  There's nothing proprietary or I
18 haven't done anything to the data, per se.
19  Q. The first first column states -- it is
20 "Harriet Carter Dollar Share Sales," appears to
21 be the column, correct?
22   MR. ARISOHN:  Object to from.
23  Q. The first column of percentages.
24  A. The third column on the sheet, the
25 first column of percentages, is the Harriet

220

WEIR

1    Carter market share by dollar sales percentages.
2    Yes.
3        Q.   And that is determined based on your
4    review of Harriet Carter sales records, correct?
5        A.   Correct.
6        Q.   And the determination of those
7    percentages, how was that accomplished?
8        A.   Of the Harriet Carter?
9        Q.   Yes.
10       A.   I believe we summed the sales for the
11   Harriet Carter data on a state-by-state basis and
12   for the nationwide and divided each state by the
13   nationwide amount to arrive at a percentage, and
14   then, for the 25-state class, summed up each
15   percentage factor for the 25 states to arrive at
16   the 55 percent figure.
17       Q.   Did you perform that analysis with
18   respect to each model of pest repellers that was
19   sold by Harriet Carter?
20       A.   I don't believe so.  No.
21       Q.   Do you know how many models of pest
22   repellers were sold by Harriet Carter?
23       A.   That data is knowable from the
24   underlying retail data, but I don't have a

221

WEIR

1    precise recollection as I sit here today.
2        Q.   Did you do anything to determine
3    whether the state-specific retail sales data
4    between products was consistent amongst all of
5    the states?
6        A.   It's my understanding that in the
7    aggregate we have accurate figures based on
8    Harriet Carter data and the government data that
9    I have here.  I was not looking at any one
10   specific product or any one specific state.
11       Q.   So, you believe that in totality these
12   numbers are accurate?
13       A.   That's correct.
14       Q.   Did you do any similar analysis or
15   comparison with respect to states that were not
16   included in this state-specific class?
17       A.   Well, this would, by default, turn out
18   the same result if we were to flip this on its
19   head.  Because, we would be looking at the net of
20   the 25 states, which would be 45 percent, and we
21   would be looking at the net of the 25 states for
22   the indices, which would show 41 to 48 percent.
23            So, again, I would say the answer is,
24   yes, we can understand the -- either the 25-state

222

WEIR

1    class or the non-25-state class information as
2    being validated through numerous sources and
3    cross-checks.
4        Q.   Did you perform any of those
5    cross-checks with respect to the states that were
6    not included in the state-specific class?
7        A.   Again, it's just an inversion of these
8    numbers, so, I would say, yes.
9            I didn't look on a state-by-state
10   basis, but, in the aggregate, the numbers are
11   reflective of both the 25-state multistate class
12   and the states that are not included in the
13   multistate class.
14       Q.   In the -- I believe it is the fourth
15   column on this sheet, where did you get the
16   underlying data for those figures?
17       A.   The original source would be the
18   U.S. Bureau of Census website, but I believe I
19   had already possessed that data at the time that
20   I conducted this cross-check.
21       Q.   Your report that you have disclosed in
22   this case does not state that you referenced any
23   Census data, correct?
24       A.   It does not overtly mention that, but,

223

WEIR

1    here are the work papers that shows that it's
2    been done.
3        Q.   This is a document that was produced
4    to me today, correct?
5        A.   It may very well have been produced to
6    you at some other time, but, I know it's been
7    produced to you today.
8        Q.   There's nothing in your report, your
9    report that states this:
10           "I have identified all of the
11   information on which I have reviewed and relied.
12   There is nothing in that report that states I had
13   reviewed and relied on the Census data with
14   respect to my analysis."
15           Correct?
16       A.   Again, I would refer you back to where
17   I refer to my educational background and 14 years
18   of expertise in analyzing this type of data,
19   where I bring to bear, as a sanity check, my
20   understanding of the availability and content of
21   Bureau of Economic Analysis data that I used as a
22   cross-check against the Harriet Carter --
23       Q.   And you understand the difference
24   between analysis and data, correct?

224

WEIR

2     MR. ARISOHN:  Object to form.
3     THE WITNESS:  I don't quite
4  understand.
5     **Q.  Your experience leads you to the**
6 **availability of this and the potential analysis,**
7 **correct?**
8     A.  And an analysis that I performed, as
9 reflected by this document.
10    **Q.  But, the underlying data to the**
11 **document does not come from your 14 years of**
12 **experience, correct?**
13     A.  It's been sitting in my network server
14 for years.
15    **Q.  But, it has a source and the source is**
16 **the Census Bureau, correct?**
17     A.  Well, I would describe it generally as
18 the Bureau of Economic Analysis.  The subdivision
19 for the Census data is the Census Bureau.
20     But, these are all data that I have
21 used and relied upon in many cases to sanity
22 check data such as the Harriet Carter sales data,
23 which is the foundation of my opinion about the
24 average retail pricing information that I use in
25 my Declaration.

225

WEIR

2    **Q.  So, this is data that you relied on as**
3 **the foundation of your opinions as it relates to**
4 **this specific class?**
5     A.  The Harriet Carter data is the sales
6 data that I relied upon as the foundation of my
7 opinion as to the average retail price points for
8 the various pest repellers in this case.
9    **Q.  And the additional data in this**
10 **document was the foundation for your opinion that**
11 **data was reliable and could be utilized in that**
12 **manner, correct?**
13     MR. ARISOHN:  Object to form.
14     THE WITNESS:  I have looked at the
15  population and expenditure data in order to
16  verify and sanity check the Harriet Carter
17  sales data.
18    **Q.  And one of your opinions in this case**
19 **is that the Harriet Carter sales data could be**
20 **extrapolated to the other non-Harriet Carter**
21 **retailers, correct?**
22     A.  Yes.  I believe it's usable in terms
23 of allocating things on a state-by-state basis.
24    **Q.  And included in the foundation of that**
25 **opinion is your review of the statistics set**

226

WEIR

2 forth in this document, correct?
3     A.  No.  I believe from my experience that
4 the Harriet Carter data could be used to
5 extrapolate to the states.  I just simply used
6 this other data to verify that that happened to
7 be correct and, lo and behold, that data bears it
8 out.
9    **Q.  Prior to this case, had you ever had a**
10 **case where you reviewed Harriet Carter sales**
11 **information?**
12     A.  It's very likely.  I review retailer
13 data on a weekly basis.
14    **Q.  Do you, as you sit here, ever recall**
15 **reviewing Harriet Carter sales information?**
16     A.  I don't know that I can cite to you a
17 specific example, but it's likely.
18    **Q.  Prior to this case had you ever used**
19 **state-specific Harriet Carter sales information**
20 **to extrapolate to other retailers?**
21     A.  I've certainly done similar exercises
22 where I used a single retailer data point to --
23     Well, first of all, we're not
24 extrapolating to other retailers, we're
25 extrapolating -- or, no.  Even "extrapolating" is

227

WEIR

2 the wrong word.
3     We're using the Harriet Carter data to
4 allocate state sales on a state-by-state basis.
5 That's what I've done.  And I've used similar
6 retail sales data and government sales data in
7 the past to make similar determinations and
8 allocations on a state-by-state basis.
9    **Q.  You stated earlier the foundation for**
10 **your opinion that the Harriet Carter sales data**
11 **was reliable to extrapolate to other states was**
12 **based on your experience and education?**
13     A.  That's correct.  I make these types of
14 apportionments in many cases on a regular basis.
15    **Q.  But, previous to this had you ever**
16 **reviewed Harriet Carter sales information or done**
17 **any analysis to show that it was representative**
18 **of brick and mortar sales, for example?**
19     A.  Again, I have analyzed many, many,
20 many retailer sales data and made many
21 apportionments on a state-by-state basis using
22 retailer data points, population data points,
23 share of expenditure data points.
24     Based upon my review of the Harriet
25 Carter data, I felt that was reasonable to do in

228



WEIR

1  this case.  I also felt like it was reasonable to
2  do a sanity check.  I did that.  That confirmed
3  my suspicions based on my expertise.  And here we
4  are, I've used the Harriet Carter data.
5      Q.   So, it's your testimony that you're
6  able to look at the Harriet Carter sales data and
7  say, "Based on that, I believe that it is
8  reliable that Colorado would have two percent of
9  the retail sales of these devices"?
10     A.   Based upon my review of Harriet Carter
11 sales data, based upon my past experience
12 reviewing dozens or hundreds of retailer sales
13 data, based upon on my understanding of
14 population and share of expenditure data, I
15 believe that, in the aggregate, across the
16 25-state class, that the estimate produced by
17 Harriet Carter of 55 percent is eminently
18 reasonable or conservative.
19         That's been confirmed prior to the
20 execution of this document by the government data
21 and it's been confirmed after the execution of
22 this document by the claims administration data
23 that shows, once again, that Harriet Carter data
24 was representative of the 25-state subclass.

229

WEIR

1      Q.   And your analysis of the class notice
2  data, that occurred after your disclosure in this
3  case, correct?
4      A.   Correct.  I think I just said that.
5      Q.   Did you do anything to determine
6  which, if any, of these retailers actually sold
7  devices in these states?
8      A.   Again, I'm not concerned with any one
9  retailer, I'm concerned with the determination of
10 retail sales in the aggregate to the class.
11         And so, I focus my analysis on the
12 nationwide sales, the California sales and the
13 apportionment of the nationwide sales to the
14 25-state subclass in the aggregate.
15     Q.   As part of your determination of the
16 class-wide -- the statewide class, would that not
17 include determining which, if any, devices were
18 sold in each of these individual states?
19     A.   Again, I've made that apportionment
20 based on the Harriet Carter data and I believe
21 that that data is accurate, but I don't need to
22 understand, as your previous question was trying
23 to elicit, information about what any one
24 retailer has done in any particular state,

230

WEIR

1  because I'm interested in the aggregate
2  information across the 25-state class.
3      Q.   And if you had information that any
4  retailers did not sell a specific device in a
5  specific state, that would not undermine your
6  opinion that Harriet Carter is representative of
7  all retailers in all states?
8      A.   Given all the information I have,
9  absolutely not.  I believe, again, that in the
10 aggregate we have a very good estimate of the
11 25-state subclass sales based upon the Harriet
12 Carter data, based upon the nationwide sales
13 data, based upon the California state-specific
14 information that we already have.
15         All of these data points align to
16 suggest that the information in the aggregate
17 contained in Table 3 is a reliable estimate of
18 the state retail sales for the 25-state
19 multistate class.
20     Q.   So, looking at this table, the one
21 state for which you had, other than Harriet
22 Carter state-specific information is California,
23 correct?
24     A.   Well, and we had a 50-state nationwide

231

WEIR

1  piece of information, which is informative, as
2  well.
3      Q.   As far as state-specific information,
4  the one state that you had been provided with
5  documentation from the retailers of
6  state-specific sales was California, correct?
7      A.   I have California sales data and I
8  have nationwide sales data, which is reflective
9  of all 50 states.
10     Q.   As an aggregate, not individually,
11 correct?
12     A.   Well, the aggregate is the sum of all
13 the individual components.  So, we have an
14 understanding of what the upper bound of the
15 state sales could be.  That's a useful data
16 point.
17     Q.   The fifth column in this report, the
18 underlying data for those numbers, where did you
19 get that data?
20     A.   Those are GDP PCE, personal
21 consumption and expenditure data.
22     Q.   And where is that data compiled?  By
23 whom is it compiled?
24     A.   Again, my understanding is that the

232



WEIR

overarching agency is the Bureau of Economic
Analysis.  That's data that has been in my
possession for years and is summarized here in
this table.

Q.   The data that you are referring to,
what does it encompass?  Here we have share of
exterminating and pest control service sales,
correct?

A.   Correct.

Q.   Is that a specific category within the
data that you are discussing?

A.   Yes.

Q.   And do you know what is encompassed
within that category?

A.   It's a category that involves
exterminating and pest control services.  So, for
example, you call up an exterminator and they
come to your house and exterminate pests.

Q.   The data to which you are referring,
is it maintained as a percentage in this way?

A.   I believe it's available as a
percentage and also a share of total expenditure
based on the category.

Q.   And did you do anything to verify that

233

WEIR

this category of information was relevant or
relevant to this matter?

A.   Yes.  I looked at the PCE information
about what that category is about and then
understood that this is about the sale of pest
repellers, and I find overlap in those categories
and believe that this category, along with other
pieces of information, provides a useful sanity
check.

Q.   And what is your basis for your
opinion that there was some overlap between the
issues in this case and that category of
information?

A.   One thing would be just literally the
name of the category and the type of products
that are at issue in this case.

Q.   Did you do anything to determine what,
if any, portion of that data involved ultrasonic
pest repellers or non-lethal pest repellers?

MR. ARISOHN:  Object to form.

THE WITNESS:  I did not.

Q.   This would include both hiring an
exterminator to come out to your house, to your
understanding, as well as anything else involving

234

WEIR

pest control services?

A.   Correct.  It's a category related to
pest control and extermination.

Q.   Does it specify that it involves sale
of pest control products?

A.   I believe it involves all expenditures
on pest control and extermination.

Q.   It specifies exterminating and pest
control services, correct?

A.   That's what the category name is.
Yes.

Q.   And is there some other document that
specifies that it includes the sale of pest
control products?

A.   I would have to go back and
double-check.  As I sit here today, I don't have
a precise recollection.

Q.   And to the extent there is such a
description, is it set forth in some
documentation?

A.   I mean, you're begging the question.
I don't have a recollection if something exists,
so I can't describe to you in how it would exist,
since I don't have a recollection of it as I sit

235

WEIR

here today.

Q.   It's your testimony that you reviewed
this information and relied upon it in some
manner in developing your opinions or analyzing
this data, correct?

A.   Absolutely.

Q.   You would agree that you have some
responsibility to verify that it is relevant or
that it applies to the issues involved in the
case, correct?

A.   Yeah.  And 12 months ago I made that
determination.

Q.   So, it's your testimony that you did
review that information and make that
determination?

A.   I reviewed all the information that I
felt was necessary at the time to determine that
that category, as intended by the federal
government, was useful in a sanity check against
the Harriet Carter data in this case.

Q.   And again, if we review your
disclosures in this case, nowhere does it
reference or refer to this category of
information or the underlying data, correct?

236

WEIR

2     A.   My disclosure is going to indicate
3  that I bring to bear my 14 years of experience.
4  And using this government information to
5  cross-check other pieces of information in a
6  litigation is something that I draw on my years
7  of experience in doing and understanding.
8     Q.   You could not do this analysis without
9  reviewing the data, correct?
10    A.   Again, I already possess the data,
11 because I use it on a regular basis.
12    Q.   You reviewed the data, correct?
13    A.   Again, I put it in the spreadsheet and
14 compared the results.
15    Q.   And comparing the results involves
16 reviewing the data to compare those results,
17 correct?
18    A.   I've reviewed the results which shows
19 Harriet Carter, 55 percent; population,
20 59 percent; pest control services, 52 percent;
21 retail trade sales, 59 percent.
22    Q.   The final column, what does that
23 column refer to?
24    A.   That is personal consumption
25 expenditure data on retail trade.  So, for

237

WEIR

2  example, buying consumer items, such as pest
3  repellers.
4     Q.   So, from where does that data come?
5     A.   Again, that's data that I've had in my
6  possession for some time, but the original source
7  of the data would be the Bureau of Economic
8  Analysis.
9     Q.   I notice that for the third column
10 population share you have an average over a span
11 of years, correct?
12    A.   Correct.
13    Q.   With respect to the other two columns
14 you do not provide any sort of date range,
15 correct?
16    A.   Not in this spreadsheet.
17    Q.   The numbers that are set forth in this
18 document that you have had in your possession for
19 some time, do you have any idea what the date
20 range for that data is?
21    A.   Not as I sit here today.  I would have
22 to go back and look that up for you.
23    Q.   So, you can't state whether this is
24 data that's ten years old or whether this is data
25 that is current?

238

WEIR

2     A.   It is data that is relevant to the
3  class period.  It's not ten years old.  But, as
4  to the precise date, I don't have a memory of
5  that, as I sit here today.
6     Q.   And your determination of "relevant of
7  the class period," what did you do to determine
8  what information was relevant to the class
9  period?
10    A.   That the data was drawn from within
11 the class period.
12    Q.   So, "Retail Trade Sales," that
13 involves the sale of all retail products?
14    A.   I don't know if it's all retail
15 products, but it's a category of retail products.
16    Q.   What do you mean by "a category of
17 retail products"?
18    A.   It is not one single retail product,
19 it's a collection of retail products.
20    Q.   And with respect to these numbers,
21 what is the collection of retail products that
22 you are discussing?
23    A.   It is a category of products that
24 would include things like the Bell & Howell pest
25 repellers, but I don't know that I could

239

WEIR

2  enumerate everything that's included in the
3  category, as I sit here today.
4     Q.   This last column in this document
5  says, "Share Retail Trade Sales," correct?
6     A.   Correct.
7     Q.   And you stated that that involves a
8  category of retail sales, correct?
9     A.   It is itself its own index, so, the
10 column heading is referring to that index of
11 data.
12    Q.   And the index of data is titled
13 "Retail Trade Sales"?
14    A.   Correct.
15    Q.   And what does that category encompass?
16    A.   Products such as Bell & Howell pest
17 repellers, as well as other products, but, I
18 can't name every one of them for you as I sit
19 here today.
20    Q.   Categorically, what does it include?
21 I'm guessing that the information does not state
22 products such as the Bell & Howell pest
23 repellers.
24         How did you determine that the Bell &
25 Howell pest repeller fits within the category of

240



WEIR

1  data set forth in this column?
2  
3      A.   Based upon my general understanding of
4  the nature of that data.  And it may very well
5  fit within the description of that data, as well.
6           But, as to the precise description of
7  that, I don't recall it.  I haven't memorized it,
8  as I sit here today.
9      Q.   And where would the description of the
10 category, where would that information be found?
11     A.   I'm sure it's publicly available from
12 the Bureau of Economic Analysis.
13     Q.   Do you know that it's publicly known?
14     A.   Yes.  I just said I'm sure it's
15 available from the Bureau of Economic Analysis.
16     Q.   Did you review that product
17 description in determining that this number was
18 relevant to your analysis in this case?
19     A.   Some time ago, yes.
20     Q.   And again, there's nothing in your
21 report that discloses that you reviewed or relied
22 upon the data, this share of retail trade sales
23 data, correct?
24     A.   I disagree with that characterization.
25 Again, I identify my many years of experience and

241

WEIR

1  educational background, and this is information
2  that I bring both from my education and from my
3  experience as a useful cross-check against the
4  litigation-specific Harriet Carter data, upon
5  which I rely in my Declaration.
6      Q.   Your Declaration in this case does not
7  specifically identify these sources of
8  information as data and information that you
9  reviewed in forming your opinions, correct?
10         MR. ARISOHN:  Asked and answered.
11     Objection.
12         THE WITNESS:  I do stand by my last
13     fulsome answer to that question.
14     Q.   Did you do any statistical analysis
15 with respect to the various percentages set forth
16 in this document?
17     A.   That is the statistical analysis.
18     Q.   So, did you do any analysis as to
19 whether there was a statistical significance
20 between any of these individual --
21     A.   That's self-evident from the range of
22 the data.
23         So, we have data ranging from 52 to
24 59 percent from the cross-checks and the Harriet

242

WEIR

1  Carter falls squarely in the middle.
2  
3      Q.   For example, so, again, as we stated,
4  the one state for which you had been provided and
5  delineated or that you had been provided and
6  delineated sales data for was California,
7  correct?
8      A.   I had specific sales data for the
9  state of California and I had 50-state data in
10 the nationwide sales data.
11     Q.   So, if we look at the Harriet Carter
12 sales for California, according to this document,
13 those were seven percent, correct?
14     A.   I believe that's approximately
15 correct.
16     Q.   And if we look at the next column, the
17 population average is 12 percent, correct?
18     A.   That's correct.
19     Q.   And the share of exterminating pest
20 control services are 15 percent?
21     A.   Yes.  Correct.
22     Q.   And the share of retail trade sales
23 were 11 percent, correct?
24     A.   Correct.
25     Q.   So, for the one state for which you

243

WEIR

1  had specific information, these other data
2  sources that you looked at were at least
3  50 percent higher than the Harriet Carter
4  percentages, correct?
5      A.   Again, I'm not looking at any one
6  specific state, nor am I relying on these data
7  points for the state of California, for which I
8  have that data.
9         I'm relying on these data to
10 cross-check the aggregate impact of the Harriet
11 Carter data across the 25-state class, and that
12 shows between a three and four percentage point
13 difference between the cross-checks and the
14 Harriet Carter sales data, in the aggregate,
15 class-wide for the multistate class.
16     Q.   But, the fact that the one state for
17 which you had specific data was significantly
18 different than the data in the other data
19 sources, that didn't give you any pause as to
20 the reliability of the state breakdown of this data?
21     A.   No.  Because, I'm aggregating the data
22 across 25 states.  And you will see that some of
23 the states are plus, some of the states are
24 minus.

244

WEIR

But, in the aggregate, they reflect
the accurate distribution of sales as between the
25-state multi-class.  And that is what I was
interested in, was the aggregate damages to the
class as a whole.
    Q.   Did you do anything to determine,
other than this document here, to confirm that,
ultrasonic pest repellers specifically, that
there was no difference in consumer behavior
between states?
    A.   The analysis of the retail sales in
this case, the wholesale sales in this case, the
Harriet Carter data specifically and the
government indices data describes the work that I
did to verify the state-by-state breakdowns to
the multistate class; as it relates to my work
completed by October 31, 2017, new data has come
to light that verifies that work for the
multistate class.
    Q.   But, your opinion, as set forth in
your Declaration, obviously, was not based in any
way on data that you have subsequently been
provided, correct?
    A.   No.  My data was based, as I just

245

WEIR

said, upon my review of the wholesale data, the
retail data, the Harriet Carter data
specifically, the government index data.
    And lo and behold, when you get a new
piece of data that you can gain access to, it
confirms that I was correct in my assessment of
the Harriet Carter data at the time that I
executed my document on October 31, 2017.
    Q.   As of yet -- I believe I have asked
this -- you have not completed any documented
analysis of this subsequent information that
you've received, correct?
    A.   That is a work in progress.
    Q.   Other than the three sources of data
that are reflected in that spreadsheet that was
recently provided to me, is there any other
source of data or information that you reviewed
or utilized in this case that is not specifically
identified in your Declaration?
    THE WITNESS:  Would you read that
back, please.
    (Record read.)
    THE WITNESS:  Yes.  The Boedeker
Declaration and the class notice data that I

246

WEIR

have received.
    Q.   With respect to the opinions set forth
in your report that was submitted and filed in
October of 2017, did you rely on any sources of
data and information that are not specifically
identified in that document in compiling those
opinions?
    A.   Again, I think the things that we've
identified today are the things that come to
mind, as I sit here right now.
    Q.   So, you can't confirm or deny if there
were other sources of data information that you
reviewed in drafting your opinions that are not
disclosed in the report?
    A.   Other than the things that we've
discussed on the record today, nothing else is
coming to mind.  But, that's as I sit here today,
to the best of my recollection.
    Q.   Your testimony is that there may be
other sources of data or information that you
reviewed in drafting this report that were not
disclosed in the report?
    THE WITNESS:  Would you read back my
last substantive answer, please?

247

WEIR

    (Record read.)
    THE WITNESS:  That's my best answer to
your question.
    (Exhibit No. 8, Spreadsheet, Walmart
Sales Data, marked for identification as of
this date.)
    Q.   Do you recognize this document?
    A.   Yes.
    Q.   What is this document?
    A.   This is some raw Walmart sales data
and a statistical comparison of the difference
between a three-pack of pest repellers and a
three-pack of pest repellers with a light.
    And it demonstrates that there is no
statistically significant difference in price
between those two products.
    Q.   So, the first page of the document,
that is what you're referring to as the raw data,
correct?
    A.   I think the raw data may roll onto the
second page, as well, but the statistical
comparison takes place on the second page.
    Q.   Did you do a similar statistical
comparison with respect to any other items than

248

WEIR

1    the two that are set forth in this document?
2    
3        A.   I made similar comparisons, but did
4    not feel the need to conduct a t-statistic test,
5    as is shown here, due to the close nature of the
6    price comparison that I was able to see in the
7    raw data.
8        Q.   So, other this document that's in
9    front of us, you did not perform a similar t-test
10   with respect to any other devices?
11       A.   So, just so the record is clear, I
12   performed similar comparisons that identified
13   little or no difference in price, but it was not
14   necessary to conduct additional t-tests because
15   the pricing data was so close that one could tell
16   facially that there was no statistically
17   significantly different -- sorry -- no
18   statistically significantly difference in price.
19       Q.   Please listen to my question and
20   provide an answer.
21            You did not, with respect to any other
22   devices, perform a t-test to compare any other
23   devices than the two set forth in this report,
24   correct?
25       A.   I conducted a number of additional

249

WEIR

1    comparisons after making this examination and
2    made the determination that it was not necessary
3    to conduct any additional t-tests because the
4    data was self-evident in that there were no
5    statistically significant differences in price as
6    between products with and without any particular
7    ancillary attribute.
8        Q.   Did you perform any t-testing with
9    respect to other attributes than a night light?
10       A.   I conducted numerous additional
11   product comparisons, such as this, but, because
12   of the nature of the data, I did not need to
13   conduct a t-test to understand that there was no
14   statistically significant difference in price
15   across many of the different attributes, other
16   than a light.
17       Q.   Did you at any point quantify the
18   different attributes that you were comparing with
19   respect to pricing in this case?
20       A.   I looked across a number of different
21   attributes, such as lights, outlets, I believe
22   LEDs, size of device.
23            There may have been other factors, but
24   I made side-by-side comparisons of those using

250

WEIR

1    the raw data.
2        Q.   So, other than this document, any
3    other comparison was done simply by you reviewing
4    the raw data?
5        A.   Correct.
6        Q.   That's with respect to any devices,
7    other than SKU number 50105 and unit number
8    50161, correct?
9        A.   That's correct.  I examined many
10   devices other than those to make the
11   determination that the ancillary features had no
12   apparent statistically significant value in the
13   marketplace.
14       Q.   Is that analysis documented anywhere
15   other than in your report?
16       A.   The report is where I documented the
17   results of that work.
18       Q.   Did you perform statistical comparison
19   of retail pricing for devices with any retailers
20   other than Walmart?
21       A.   Yes.
22       Q.   Did you perform a statistical analysis
23   of those devices?
24       A.   Yes.  I looked at the average retail

251

WEIR

1    prices across comparable devices with and without
2    a particular attribute, such as a light, to
3    confirm that the market did not place any value,
4    as measured by price, on the ancillary feature of
5    those pest repellers.
6        Q.   So, when you say you performed a
7    statistical analysis, you're saying that you
8    looked at the devices and the prices looked
9    similar?
10       A.   I looked at average pricing data and
11   the pricing was either identical or not different
12   in a statistical sense.
13       Q.   When you say "not different in the
14   statistical sense," did you do any calculations
15   as you did with these two devices to determine
16   whether it was not different in a statistical
17   sense?
18       A.   It was not necessary to do so, because
19   a visual inspection of the data confirmed that
20   there was no statistically significant difference
21   in price due to the nature of the variation in
22   price and the closeness of the averages price
23   points fed into the analysis.
24            MR. WING:  If we can take a quick, we

252

```
 1              WEIR
 2  may be done.
 3       (Recess taken.)
 4       MR. WING:  Mr. Weir, I think I am done
 5  with questions I have today.
 6       I will say that it seems like there
 7  may be documents that we have not received
 8  that I know that you have stated -- we will
 9  figure that out.
10       And to the extent there's information
11  that you are now currently reviewing that
12  was produced subsequent to your disclosure
13  and that there are opinions or that you are
14  supplementing things, we would reserve the
15  right to re-call him.
16       Other than that, we are done today.
17       MR. ARISOHN:  All right.  I don't have
18  any questions.
19       THE WITNESS:  I'm sure Toni has done a
20  great job with the transcript, but I'll
21  reserve my right to read and sign.
22       (Time noted:  4:21 p.m.)
23
24
25
                                              253
```

```
 1         A C K N O W L E D G M E N T
 2
 3  STATE OF             )
 4                       :ss
 5  COUNTY OF            )
 6
 7       I, COLIN WEIR, hereby certify that I
 8  have read the transcript of my testimony taken
 9  under oath in my deposition of January 10, 2018;
10  that the transcript is a true, complete and
11  correct record of my testimony, and that the
12  answers on the record as given by me are true
13  and correct.
14
15
16       _____
17              COLIN WEIR
18
19
20  Signed and subscribed to before me,
21  this _____ day of _____, 2018.
22
23
24  _____
25  Notary Public, State of New York
                                              254
```

```
 1         C E R T I F I C A T E
 2
 3  STATE OF NEW YORK      )
 4                         : ss
 5  COUNTY OF NEW YORK     )
 6
 7       I, TONI FREEMAN GREENE, a Notary
 8  Public within and for the State of New York, do
 9  hereby certify:
10       That COLIN WEIR, the witness whose
11  deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
13  record of the testimony given by such witness.
14       I further certify that I am not
15  related to any of the parties to this action by
16  blood or marriage and that I am in no way
17  interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto
19  set my hand this 22nd day of January, 2018.
20
21
22
23
24  _____
25  TONI FREEMAN GREENE
                                              255
```



**Exhibits**

**Defendant's Exhibit 1**
3:13 44:16,19 47:5,
6,7,8 49:11 53:7
77:12

**Defendant's Exhibit 2**
3:14 49:10 50:3,8
64:8 66:24 72:17
89:22 91:6 148:2
185:6

**Defendant's Exhibit 3**
3:15 138:19,20
142:13 150:6
162:10,12 164:21
165:9 167:19 193:19

**Defendant's Exhibit 4**
3:18 141:10 142:12
148:16,18

**Defendant's Exhibit 5**
3:19 142:23 143:22
150:9,11,13

**Defendant's Exhibit 6**
3:20 145:23 146:20
147:2

**Defendant's Exhibit 7**
3:21 214:14 219:13

**Defendant's Exhibit 8**
3:22 248:5

**$**

**$24.10**
189:21,22 195:24
**$600**
34:17

**0**

**02108**
4:12

**1**

**1**
4:11 44:16,19 47:5,
6,7,8 49:11 53:7
77:12 119:16 164:20
168:17,18,19 189:20
193:6 195:20 212:18
214:2
**1.8**
111:11
**100**
8:8 16:19 119:5
121:22 127:16
**11**
14:21 108:14 243:23
**12**
15:15 24:7,9,16
108:25 236:12
243:17
**13**
73:12,14 90:12
110:13
**14**
6:14 8:21 40:15 50:5
67:11 126:2 130:7
224:18 225:11 237:3
**15**
4:11 63:9 191:18

243:20
**15th**
106:24,25 107:20
108:7,12
**16th**
107:23
**18**
158:13,16,17,24
173:2
**19**
86:2 166:13

**2**

**2**
47:9,14,15,19 49:10
50:3,8 64:8 66:24
72:17 89:22 91:6
104:25 148:2 185:6
**2.5**
111:14
**20**
104:12
**200,000**
112:25 115:5,6
**2004**
15:15
**2005**
15:16
**2007-ish**
13:9
**2010**
14:21
**2011**
63:7,8 104:12 108:6,
11
**2016**
30:15 104:21
105:13,20,24 106:3,
5,7,12,16,24,25
107:20 108:7,12
**2017**
30:15 44:21 45:4,17
52:5,20 54:18 71:16
85:4 98:4,14 104:16
107:23 133:15
134:7,13 245:18
246:9 247:5
**20th**
108:6,11
**25**
19:16,20 162:16
204:16 219:23
221:16 222:21,22
244:23
**25-state**
162:4,14,19,22
219:17 221:15
222:25 223:12
229:17,25 230:15
231:3,12,19 244:12
245:4
**26**
74:21 75:20,22 76:3,
12,21 170:3 217:19
218:2,24
**26(a)(2)**
4:20
**28th**
54:18

**3**

**3**
47:17,20 48:23
77:15 138:19,20
142:13 150:4,6
151:17 152:22
162:10,12 164:21
165:9 167:19 193:19
231:18

**31**
52:5,20 71:16 85:4
98:4 245:18 246:9
**31st**
44:21 45:4,17 98:14
100:21 104:16 134:7

**4**

**4**
141:10 142:12
148:16,18 151:17
152:22
**41**
222:23
**45**
222:21
**48**
222:23
**4:21**
253:22

**5**

**5**
56:7 142:23 143:22
150:9,11,13 151:17
152:22
**5-hour**
57:7,10
**50**
8:14 16:18 61:21
232:10 244:4
**50-state**
231:25 243:9
**50105**
251:8
**50161**
251:9
**52**
219:24 237:20
242:24
**55**
160:25 161:5 219:22
220:2 221:17 229:18
237:19
**55-odd**
160:24
**59**
219:23,25 237:20,21
242:25

**6**

**6**
49:22 50:17 66:20
145:23 146:20 147:2
151:18
**60**
8:14

**7**

**7**
88:11,20,25 101:12
214:14 219:13
**70**
110:20 111:15,21
115:24 118:25 125:2
126:21 127:13
**70-odd**
90:22

**8**

**8**
248:5

**9**

**9**
103:23 104:2,11
108:9

**A**

**ability**
20:17 29:9 219:2
**absent**
130:11
**absolutely**
198:13 231:10 236:7
**accept**
45:9 90:11 122:25
126:15 139:9 171:15
**acceptable**
117:8
**access**
181:9,11 246:6
**accomplish**
10:20 179:10,11,18,
19
**accomplished**
178:25 181:14 221:8
**accordance**
107:3
**account**
83:6 119:24 122:3
**accountant**
15:10
**accounted**
136:20
**accounting**
6:22 51:22
**accuracy**
63:3 154:23 163:15,
18,21
**accurate**
63:16 88:23 98:13
112:3 134:8 164:22
170:24 200:2 201:3
222:8,13 230:22
245:3
**accurately**
179:25 187:11
**acquire**
155:11
**act**
55:21 177:21
**acting**
179:5
**action**
5:4 17:16,22 18:7,21
19:25 20:22 21:6
28:4 29:5,6 30:8
32:5 53:13 57:16,24
58:2,14 59:3 80:18
**actions**
17:24
**active**
56:21 144:18
**actively**
145:15
**acts**
205:19
**actual**
70:20 103:4,22
143:9 181:13 198:17
**ad**
10:10
**add**
166:22
**addition**
46:4,9 50:4
**additional**
46:8,13 52:11,14,17
63:19,25 65:10

67:25 69:17 71:13
79:19 80:20 81:20
86:5,10,11 90:19,24
91:9,19 92:3,12
98:2,23 99:10
100:13 101:2,9
102:12 111:23,25
119:2 131:4 134:5
152:18,20 154:10
163:23 171:10 200:7
218:21 226:9
249:14,25 250:4,11
**address**
4:6,10
**adjustments**
86:11
**administration**
171:2 200:8 229:23
**adopted**
28:18
**advance**
30:16 172:4
**advanced**
5:12,13,14
**adversarial**
18:4
**advice**
70:6
**advise**
16:15 33:3 105:5
**advised**
74:16 77:16 105:12
**affirm**
97:25
**affirmative**
36:19
**affirmed**
72:11 161:8
**agencies**
159:9
**agency**
155:25 233:2
**aggregate**
97:14,25 98:5
120:16 132:2
136:10,16 145:13
196:19 197:2
198:12,13,14,17,22
222:8 223:15 229:16
230:11,15 231:2,11,
17 232:11,13
244:11,15 245:2,5
**aggregating**
244:22
**aggregation**
196:3
**agree**
112:14 126:14 179:4
236:8
**ahead**
41:24
**Aid**
92:7,15 93:2,11,16,
20 96:12
**airplane**
34:5
**airport**
27:14
**Alaska**
164:14,15 166:11,
14,17
**align**
231:16
**allegations**
26:3 36:13 54:15
77:23 80:25 108:20
**allege**
77:16
**alleged**
25:18,24 27:24

**allocate**
228:4
**allocating**
226:23
**allocation**
158:11 166:19
219:17,23
**allocations**
228:8
**allowed**
120:12 194:21
**alternate**
160:19
**amount**
93:21 94:5 118:22
221:14
**amounts**
112:20
**analyses**
11:10 12:3 16:6
86:12 122:18 128:19
135:19,20 187:12
**analysis**
5:12,14,18,20 6:3,6
10:20 12:13 14:3
18:5 26:2 39:15 40:8
42:20 68:15,18 69:3,
7 72:5,12,13 78:18
80:14,19,20 82:19
83:2,5,14 84:21
85:2,7,15,21 86:3,
16,18,20 87:15 88:3,
5,8,10 91:21,24
97:22,24 98:3
100:15,18,23
102:16,22 103:3,13,
21,25 104:5,19
105:3,19 106:4,16,
24 107:10,12,14
108:10 109:7,16
111:7,17,23,25
113:5,9,17 114:24
115:13 116:3,13,23
117:17,20 118:6,18
119:8,18,24 120:4,6,
21,23 121:18 122:3,
22 123:2 127:14,25
128:10,11,17,24
129:16,17,23 130:3,
17,19 131:15 132:10
133:14,20,24
134:16,22 135:8,13,
22 136:5,20 137:24
138:7,14 140:25
141:3 144:11,14,17,
24 145:14,16,22
149:20 155:16,17
156:21 158:18,19
159:9,24 160:3,8,9,
12 163:9,12 166:25
167:7,22 171:9
173:21,25 174:13,
20,23 175:15
176:13,24 177:4
178:3,20,22 180:3,5,
14,17 181:20 182:3,
6 183:5,10,13,15,18
184:13,20,24,25
191:5,6,15,16
192:10,11,16,21
193:2,4,7,11,12,13,
14,22 194:7,13,17,
21,22 195:2,7,11
196:24 198:25
199:22 200:3,10
201:16,19 202:3,6,
11 203:18 204:20
205:2,9 206:24
207:2 208:18 209:2,
20,24 210:9,24
211:2,5,7 212:4,12,
15,25 213:3 221:18



222:15 224:15,22,25
225:6,8,18 228:17
230:2,12 233:3
237:8 238:8 241:12,
15,18 242:15,18,19
245:12 246:12
251:15,23 252:8,24

**analyst**
10:14,15,23 11:5,7,
9,15 12:17,18,21,22
13:2,7

**analysts**
11:11

**analytical**
179:6 188:8

**analytics**
6:16 7:16 35:14,19

**analyze**
10:17 87:25 100:19
102:21 125:6 129:21
134:25 139:18,23
177:15,17,24

**analyzed**
105:17 106:15
116:16,18 135:11
191:10 199:4 207:6
228:19

**analyzes**
139:19

**analyzing**
51:6 85:21 106:20
112:21 134:3 191:21
224:19 236:5

**ancillary**
80:8 81:23 84:18
85:2,14,18,20,25
109:20 250:8 251:12
252:5

**and/or**
33:25 93:8 125:11
149:3 187:8 218:22

**Andrew**
15:9 35:12,19 160:6,
11 165:19 178:8

**animal**
143:24 144:4,9,13,
16,23 145:7

**answering**
203:16

**answers**
33:5

**anticipate**
46:7 59:9,13 68:9
101:8,10

**anticipated**
20:16

**anticipation**
35:7

**apologize**
45:14 47:16 53:24
141:7

**apparent**
251:13

**appearance**
48:16 63:23

**appeared**
48:2

**appears**
31:12 44:20 45:15
64:14 128:25 143:13
146:9 148:18 150:6
168:11 220:20

**appliances**
59:4

**application**
70:5,20

**applied**
70:16

**applies**
236:10

**apply**
70:15

**apportion**
156:13

**apportioned**
122:14 124:9

**apportioning**
166:13

**apportionment**
123:15 230:14,20

**apportionments**
35:23 228:14,21

**approximate**
31:19

**approximately**
13:9 15:15 16:12
17:14 31:24 35:3
243:14

**April**
104:12 108:6,11

**area**
9:8 119:17 122:8

**areas**
6:21

**arenas**
8:16

**ARISOHN**
39:17 41:15 47:18
52:25 67:22 68:7,19
70:12 72:7 74:18
75:2 91:15 98:16
102:18 119:10
120:24 124:2 125:12
146:21 165:25
169:22 175:20,25
178:13 185:18 197:9
202:14 206:12,15
207:23 209:5 212:9
213:20 215:12
220:7,22 225:2
226:13 234:21
242:11 253:17

**arithmetic**
111:16

**arrangement**
34:15,23

**arrive**
221:14,16

**articles**
51:3 64:15 65:17
71:8

**artificial**
198:20

**asks**
5:23

**aspects**
7:24 12:6 43:23

**assert**
108:15

**asserted**
110:5

**assessment**
246:7

**assigned**
211:24

**assignment**
36:6 40:25 78:5
79:10,18

**assignments**
59:11

**assist**
35:11 186:10

**assistance**
59:10

**assisted**
35:13,21 186:12

**assume**
25:21 109:16

**assumed**
104:12

**assuming**
84:5

**assumption**
16:25 25:14 78:15
80:4,25 81:4,13

**AT&T**
20:19 62:24 63:2

**attach**
26:10

**attached**
50:3

**attention**
23:3 83:25

**attorney**
170:5

**attorney's**
29:18,22

**attorneys**
169:25

**attribute**
87:24 250:8 252:3

**attributes**
250:10,16,19,22

**August**
54:18

**availability**
224:21 225:6

**average**
123:4,18 131:18,19,
25 132:5,9 133:19
137:19 138:4
188:18,21,23 189:22
190:25 193:5,16
195:14,17 196:7,10,
25 198:9,14,15
199:20 201:2,4,5
210:6 212:17 213:10
225:24 226:7 238:10
243:17 251:25
252:11

**averages**
136:18 198:23
252:23

**awarded**
69:21

**aware**
26:19 37:13 91:8
99:4 144:3 187:4
206:4

**awareness**
187:6

**awhile**
89:15

---

**B**

**B&h**
143:24

**baby**
53:23,24

**Bachelor's**
6:11

**back**
41:24 42:2 43:9
44:13 45:8 57:14
65:16 68:13 77:2,12
82:23 93:24 96:24
115:16 116:5 129:6
133:16 137:24
139:12 149:14,24
151:15 157:5 169:18
176:20 184:9
187:14,16 188:16
194:5 204:4 210:3,
21 219:3 224:17
235:16 238:22
246:22 247:24

**back-of-the-envelope**
111:14

**background**
29:23 36:9,22,23
37:9 38:16 39:14
40:5 41:2,9 42:24
43:2 50:5,10,20
67:10 86:25 102:5,
13 103:6,20 109:9
116:3 129:20 137:25
138:2 156:7,10
158:22 171:19
224:18 242:2

**base**
130:16

**based**
22:7 25:13 26:2
39:23,24 40:12
41:10 42:22 70:6
75:22 77:22 80:24,
25 81:12 83:9,19
87:9,10 98:9 104:19
108:21 109:20
110:4,18 112:24
131:2 132:10 133:25
136:5 153:18 155:6
163:9,12,14 170:25
171:7 180:8 189:19
190:6,21 192:19
198:22 200:20 210:6
212:6,8 221:4 222:8
228:12,24 229:4,8,
11,12,14 230:21
231:12,13,14 233:24
241:3 245:22,25

**basically**
60:15 104:22 190:2

**basis**
38:25 93:18,19
111:13 115:20
117:2,5,7,20 118:13
120:15,16 122:13,14
124:9 125:23 126:6
127:21 129:21 130:9
134:9 144:20 154:4,
15 179:13 197:7
200:17 204:25 207:9
218:17 220:12
221:12 223:11
226:23 227:13
228:4,8,14,21
234:11 237:11

**Bates-numbered**
218:11

**Bates-stamped**
218:15

**BEA**
155:20

**bear**
50:9,23 67:13 130:7
131:5 138:12 224:20
237:3

**bears**
138:15 227:7

**beat**
158:22

**began**
11:22 12:24 49:2

**begging**
235:22

**begin**
47:16

**beginning**
15:16

**begins**
47:20

**behalf**
4:17,24 10:18 12:3
16:6 21:5,23 22:6
28:6,8 48:2 57:16
58:2,13 60:4 63:9
140:13 149:4 172:9
177:7 180:5

**behavior**
25:25 245:10

**behold**
227:7 246:5

**beholder**
96:20

**believed**
218:17

**Bell**
5:6 32:3 33:9,14,19
37:12,25 38:12,13
51:24 65:5 66:4
92:21 93:7,13,17,22
94:5,9,13 96:16,23
97:22 111:19 112:11
113:7 126:22 127:4
132:13 141:22
144:3,21,22 166:3,5
188:25 189:5,7,15
190:21 191:20
194:14 195:8 196:8
209:11,13 211:23,24
213:25 214:5,6,10
216:15,18,21,23
217:3 218:14 239:24
240:16,22,24

**Benecol**
54:14

**benefit**
14:15 30:10 140:7

**BHH**
4:19 56:2

**billed**
35:4

**billing**
35:6 63:3

**bit**
27:6 190:15

**body**
49:22 50:8,16 67:9
77:7 89:21 147:25
156:4

**Boedeker**
52:7 79:6 99:11
246:24

**Boedeker's**
99:15 133:10 169:11

**bolstered**
173:4,8

**bonus**
14:9

**bonuses**
14:16 34:25

**bookkeeper**
15:10

**books**
200:22

**Boston**
4:11 10:10

**bottom**
55:17 58:24 65:19
162:2 166:21 219:21

**bound**
75:11 232:15

**breach**
23:16

**break**
41:18,20 48:5,7 49:9
52:23 53:6 98:16,18,
22 132:12 152:14,17
153:15 154:7 202:16
204:13,23 214:17
215:3,20

**breakdown**
18:15 152:7,11,12
153:8,25 154:19
155:3,5 168:2
244:21

**breakdowns**
245:16

**Brenner**
53:20 61:3

**brick**
228:18

**briefly**
151:16

**bring**
9:12 50:9,23 67:12
130:6 131:5 156:6,9,
11 171:20 224:20
237:3 242:3

**bringing**
14:21

**broad**
94:21

**broken**
154:4,9,14

**brought**
9:14 22:3 29:17
172:4

**Bueno**
4:19 34:2,8 56:2

**bureau**
155:15 157:8 159:8,
9 223:19 224:22
225:16,18,19 233:2
238:7 241:12,15

**Bureau's**
157:24

**Bursor**
19:10,23 20:8,21
21:3,9,14 22:11,22
28:8 36:4 47:13,24
48:2 53:9 62:10
63:6,9,16,20

**business**
7:21 200:20

**businesses**
7:21

**butter**
54:13

**buy**
112:25

**buying**
113:3 238:2

---

**C**

**C-O-L-I-N**
4:9

**CA**
167:13

**CA-U.S.**
168:24

**calculate**
173:13

**calculated**
38:25 40:10 69:19
70:3,16 108:5 123:7,
17 196:11

**calculates**
120:10

**calculating**
62:3 196:12

**calculation**
25:21 87:8 97:25
109:3 152:19 197:25

**calculations**
112:2 125:17 252:15

**calculator**
210:14

**California**
69:24 98:7 122:15
142:17 143:14
151:21 152:2,3
153:9,15,20 162:4
167:14,23 168:2,22
169:2 230:13



231:14,23 232:7,8
243:6,9,12 244:8
**call**
27:12 30:22 53:15
90:22 183:16,17
190:19 203:12
233:18
**called**
14:11 142:13 170:2
**calls**
70:22 91:16 109:2,7
**cans**
60:2
**capacity**
22:6
**caption**
31:13
**capture**
66:25 104:9
**captured**
147:2
**career**
27:7 200:19
**Carter**
90:9,13 154:16,21,
22 155:4,10,22,24
156:19,22 157:12
158:11,13,15,23
160:16 161:8,11
163:10,14,21,25
166:12 167:5 173:3,
14 174:2 204:10
219:17,22 220:3,20
221:2,5,9,12,20,23
222:9 224:23 225:22
226:5,16,19,20
227:4,10,15,19
228:3,10,16,25
229:5,7,11,18,24
230:21 231:7,13,23
236:21 237:19 242:5
243:2,11 244:4,12,
15 245:14 246:3,8
**case**
4:18,25 5:3,11 6:2,6
13:11 18:20 20:20
21:17,19,20,22,24
22:3,9,21,24 23:14,
15 24:3,4,15,19
25:10,11,12 26:9,20
28:3,4,8,11 29:2,5,
15 30:12,19,23,25
31:3,13 32:11 33:20,
24 34:11,14,21
35:11,17,20,25 36:8,
14 37:8 38:17 39:2,
4,12,22 41:13 42:10,
15 46:11 50:12,21
51:25 53:22 54:5,8,
11,19,22 55:2,13,19,
22,25 56:8,9,14,25
57:4,8,11,14,21,25
58:4,9,14,16,19
59:2,6,10,12,18,20,
25 60:5,7,9,17,20
61:4,8,17,19 62:6,
21,25 64:2 65:8,13
69:22 71:20 72:3
78:8 79:8 82:24
83:15 84:7,10 88:15
92:8 97:21 99:24
101:3,15 102:4
103:7,21 104:10
107:8 110:2 113:19
114:9 121:14 124:5
126:4,8,24 130:19
131:2,10 133:3,6,12,
17 135:3,4 139:25
140:17,21 151:11
153:12,14 157:4
158:6 161:24 166:13
169:25 170:10,12

171:20 172:3,5
178:4 179:15 182:9,
14 183:6,12 185:9,
13,23 186:2,6,25
210:11 216:8,12,16,
18 217:4,7,12
223:23 226:8,18
227:9,10,18 229:2
230:4 234:13,17
236:1,11,21,23 241:18
242:7 245:13 246:19
250:20
**cases**
16:13 17:5,15,20,23
18:10 19:24 20:3,21
21:5,18 22:14,19
23:20,24 24:14
27:21,23 28:20,23,
24 29:7 30:21 31:8,
16,23 32:4,7,12,13,
17,19,21,25 33:6
47:12 48:12,19
56:11 57:15 60:13,
25 61:6,10,13 63:19
130:8 178:6 216:13
225:21 228:14
**cash**
9:6,9
**catalog**
37:24
**catchall**
67:3 101:17
**categorically**
148:5 240:20
**categories**
9:5 73:12 141:20
190:2 204:17
217:16,22 234:7
**category**
102:2 197:4 233:11,
15,16,24 234:2,5,8,
13,16 235:3,11
236:19,24 239:15,
16,23 240:3,8,15,25
241:10
**caveat**
34:4 41:8 49:4
100:11 136:14
**cellphone**
21:17
**Census**
157:24 159:10
223:19,24 224:14
225:16,19
**central**
40:21
**cert**
59:7
**certainty**
31:4,14 61:9 147:19
149:25
**certification**
7:5 57:3
**certifications**
7:3
**cetera**
37:25 51:22 155:12
156:22 193:13
203:19
**chain**
92:4
**challenging**
40:22
**change**
10:4 13:6 104:10
111:12
**changing**
9:18
**characterization**
87:17 102:10 123:2
126:16 171:16 179:5

196:15 241:24
**characterized**
29:19
**characterizing**
41:5
**charged**
136:15
**check**
11:17 19:21 24:11
30:24 36:25 44:20
45:2,5,7,16 96:25
146:24 150:6 155:21
224:20 225:22
226:16 229:3 234:10
236:20
**checked**
37:18
**checkout**
9:10
**checks**
154:23,25
**chemicals**
54:4
**choice**
5:23 129:12
**cholesterol-
lowering**
54:13
**chose**
116:12
**chunk**
15:18
**circles**
81:12 209:23
**Circuit**
29:16
**circumstances**
120:3
**cite**
52:16 147:25 227:16
**cited**
50:7 64:15 67:3
89:21
**claim**
23:17 62:17 77:17
**claims**
23:22 80:18 126:22
171:2 200:8 229:23
**clarification**
47:18,19
**clarify**
220:15
**clarifying**
58:21
**class**
5:4 17:16,22,24
18:7,21 19:24 20:22
21:5,20,24 22:6
28:4,6 29:5,6 30:8
32:5 42:16 52:12
53:13 57:16,24 58:2,
14 59:7 60:5 94:14,
19 95:3,13,21 96:6
98:6,7 104:12 105:6,
9,13 106:21 107:11,
17,24 108:11 115:21
117:20 118:14
120:16 122:15,16
153:15 160:17 161:3
162:5,14,18,19,22
168:13,16 195:18
196:20,25 198:19,22
199:25 204:16
221:15 222:17
223:2,7,12,14 226:4
229:17 230:2,11,17
231:3,20 239:3,7,8,
11 244:12,16 245:6,
17,20 246:25
**class-wide**
36:17 38:25 88:15

96:18 97:25 98:5,10
131:24 134:9 136:12
230:17 244:16
**classes**
108:6 122:17
**classified**
183:13 207:13
**classify**
183:7
**clear**
26:6 41:4 203:8
249:11
**Clearing**
92:11,16 93:2 94:3
96:21
**clerical**
45:11
**clerk**
9:12
**client**
11:25 13:22
**clients**
7:15 12:3 16:5,7
**close**
16:19 112:20 249:5,
15
**closely**
104:9
**closeness**
252:23
**code**
136:2 180:13 187:8
205:15
**coding**
177:11
**Colgate**
57:20,22
**Colin**
4:8
**collaborated**
158:8 173:25
**collaboratively**
180:20
**collected**
73:21 186:21
**collecting**
140:14 186:13
**collection**
95:15 239:19,21
**College**
6:12
**Colorado**
229:9
**column**
142:12 163:5 164:4,
6,25 166:2 195:23
213:2 220:19,21,23,
24,25 223:16 232:18
237:22,23 238:9
240:4,10 241:2
243:16
**columns**
143:13 204:15
238:13
**combination**
61:20 87:13 184:16
**comfort**
121:11
**comfortable**
21:11 98:12 117:19
207:12 208:13
**comfortably**
35:5 63:24
**command**
180:25
**commands**
177:22,24,25 178:4,
5
**comment**
38:5

**Commission**
20:14
**common**
28:2 36:18,24
**communication**
75:3 91:16
**communications**
20:14 74:19 169:24
**companies**
60:14 62:16
**company**
15:8,23 21:21 59:24
95:2
**company's**
15:19 215:23,25
216:3
**comparable**
252:2
**comparative**
156:20 158:18,19
160:13 166:25
167:7,22 175:15
200:10 208:18 209:2
211:5
**compare**
204:15 237:16
249:22
**compared**
111:12 113:13
118:19 121:8 155:4
191:10 207:7
211:16,19 237:14
**compares**
120:11
**comparing**
219:22 237:15
250:19
**comparison**
85:9 113:18 124:15
126:19 128:21 131:2
135:9 160:15 163:22
167:10 183:21
190:6,10,21 201:23
202:7 204:10 205:10
208:9 211:10,13
213:19 219:16
226:12 248:12,23,25
249:6 251:4,19
**comparisons**
134:18 138:12
201:11 249:3,12
250:2,12,25
**compensated**
34:17,22
**compensation**
14:9 34:15 170:3
**compensatory**
23:16,21 24:5 25:13
28:21 41:11 42:8,15,
19 54:6,7 58:17
71:19 83:4,14 84:12
109:3,8,25
**competition**
38:12
**compiled**
160:10 186:24
232:23,24
**compiling**
247:7
**Complaint**
36:9 39:24 40:13
80:18 81:2 84:13
108:22 109:11
133:12
**complaints**
42:23 77:23
**complete**
17:8 45:6 52:4
75:15,18 161:24
177:3 179:6

**completed**
98:25 100:23 176:25
178:23 207:2 245:18
246:11
**completely**
211:8
**compliance**
61:17
**complicated**
88:2
**comply**
73:18
**component**
83:2
**components**
122:23 123:8 232:14
**compound**
41:18
**comprise**
118:25 162:22
**comprised**
90:21 110:19
**comprises**
119:3
**Comprising**
115:24
**computations**
213:10
**compute**
160:18 180:25
**computer**
45:8 136:2 150:8
161:22
**computers**
10:3
**concentration**
6:19,20
**concept**
181:17
**concerned**
230:9,10
**conclusion**
41:10 42:21 72:9,11
175:21
**conclusions**
200:7
**conduct**
12:2 78:6 79:19 80:2
84:25 88:4 116:20
131:4 134:18 171:10
199:22 249:4,14
250:4,14
**conducted**
29:21 84:15,22 88:9,
10 100:15 105:4
111:23 117:17
122:18 223:21
249:25 250:11
**conducting**
16:5 35:22 119:24
**confidence**
138:3 158:10,23
173:3,7
**confirm**
106:10 107:5,10,19
113:5 130:3 144:15
145:11 217:13 218:8
245:8 247:12 252:4
**confirmed**
85:15 106:19 111:24
118:15 134:5 137:5
144:21 154:22
229:3,20,22 252:20
**confirming**
38:10
**confirms**
114:15 246:7
**conflict**
30:24
**conjoint**
5:12,14,18,20 6:3,6



conjunction
184:21
connection
49:19
conservative
98:13 112:4 134:9
138:5 199:21 200:2
201:4,15 229:19
consideration
42:6,11,12 69:13
83:8
considered
82:20
consist
85:8 87:19 211:7
consisted
111:9 127:12
consistent
139:14,16 140:12
222:5
constitutes
71:25
consult
33:4 35:6
consultant
11:21,22,24 12:18,
23 13:7,12,17,20
14:18 15:8 16:2
consulting
7:13 8:4 12:8
consumer
9:9 18:22 19:4 23:24
24:4 32:8,10 33:15,
17 53:14 55:20
158:3 238:2 245:10
consumers
25:5 77:18 198:18
consumption
155:7 232:22 237:24
contact
61:11
contacted
30:18 31:2
contained
54:3 129:24 134:6
135:12 153:5 173:5
231:18
content
224:21
contested
7:19 26:8
context
81:21 112:16
contingency
34:25
Continue
54:24 56:23 57:6,19
58:7 59:15 60:12
continued
12:2 13:22 14:2
continuing
59:13
continuum
13:21
contrary
130:11
contribution
14:12
contributions
14:14
control
158:4 219:19,24
233:8,17 235:2,4,6,
8,10,15 237:20
243:20
convergence
220:2
conversation
30:25

conversations
110:11
copy
44:21 45:3,16
Corporation
56:24
correct
4:21,25 5:5 10:7
14:17 16:11 17:13
20:9 22:8 25:10
27:20 28:7,16 34:13
39:16 41:12 47:16
49:15,16 50:16
57:17 58:3 60:6,22
61:14,15 64:7,16,21,
22 66:23 67:16 68:2,
3,17 69:8 72:2,10
73:10,13 74:4 75:12
76:7 77:6,8,9,20,24,
25 78:11,12,24
80:10,11 81:3 82:21,
22 87:15 88:7,19
89:10,24 90:4,9
95:3,13,21 97:4
99:16,17,19,20
100:25 102:3
103:18,25 104:13,14
108:18,23,24 109:4,
15,25 110:6,10,16,
22,24 111:5,25
112:7,12,15,18
115:23 117:5
122:19,24 123:10,
15,22 127:5,9 131:9,
17 132:6,7 134:13,
14 135:3,9,16
136:25 137:10 140:2
142:11,18,19,21
143:15,19,25 144:5
146:8,20 147:7
150:18,24 151:21,23
152:2,9 153:3,9,12,
16,21 154:2,7 156:5,
10,16 161:6,11
162:5,14,15,18,25
163:6,10,13 164:3,9,
15 165:22 167:15
168:3,9,14,23 169:9
171:14 172:8,15
173:16 174:21,23
175:2,3 177:2,11
178:2,9 180:24
183:20 186:17
188:19 189:3,9,10,
13 191:7 193:3
194:15,16,19
196:13,22 197:8,14,
21,22 198:2,12
199:8,10,11 202:22,
23 203:19,23 206:5,
6 209:3,22 210:9
211:18 216:2,24,25
217:20 220:21
221:5,6 222:14
223:24 224:5,16,25
225:7,12,16 226:12,
21 227:2,7 228:13
230:4,5 231:24
232:7,12 233:9,10
235:3,10 236:6,11,
15,23 237:9,12,17
238:11,12,15 240:5,
6,8,14 241:23
242:10 243:7,13,15,
17,18,21,23,24
244:5 245:24 246:7,
13 248:20 249:24
251:6,9,10
correctly
45:13 187:14
correspond
148:19 207:21

corresponded
191:12 194:22
corresponds
220:3
corroborate
168:25
corroborated
160:20 163:24
166:10 173:20
counsel
31:8 39:25 40:14
42:24 46:16,19,23
64:12,18 65:20,21,
24 66:8,13 69:16
70:7 71:7 73:22
74:4,14,15 75:3,7,23
76:18 77:24 91:8,12,
16 99:3,7 105:5
108:23 139:25 140:4
146:16 148:10 149:2
169:21 170:18
174:25 175:6,12,19
176:13 184:7 186:25
194:9 204:3,12
214:17,20,24 217:4,
7,12,14 218:12,23
219:3,10
counterclaim
22:4
countersued
21:25
counting
63:11
couple
26:21 29:14 204:5
court
26:16 105:2
created
165:8 182:22
creative
13:18
cross-check
223:21 224:23 237:5
242:4 244:11
cross-checking
187:16
cross-checks
223:4,6 242:25
244:11
crystal
26:6
current
238:25
cursory
102:7,11
Curtis
55:18
customer
63:17 82:2,9,22
112:18
customers
2:2 93:6 115:12

—— D ——

D-Z-I-E-L-A-K
58:25
daily
179:12
damage
70:24 197:25 198:10
damages
22:24 23:16,21 24:5
25:13,20 26:6,7
28:3,18,21 36:13,17,
20 38:24 39:15,21
40:2,9,11,12 41:12,
13 42:7,8,15,19
54:6,8 58:17 59:14
62:3,5 68:16,22
69:7,12,17,19,21,23

70:2,6,11,14,18
71:3,5,20 72:3,10
78:18 82:12,19,23
83:4,15 84:12 88:15
96:18 98:2,5,11
106:16 109:3,8,16,
25 110:2 121:13
123:7,16 136:12
153:15 198:5 245:5
data
6:16 7:16 10:18
16:17 35:14,18,22
39:7,8,11 42:13
46:10,11,13 49:24
51:6 52:11,14 63:4
82:15,17 83:11,13
86:3,8,21,22 87:10,
14,20,25 88:2,18
90:19,21,24 91:21
92:8,10,12,16,20
93:3,12,16,21 94:24
95:5,10,15,24 96:3,
8,11,13,22,25 97:3,
13,16,19 98:2,9
101:14,15 102:2,9,
12,16,20,22 103:8,
15,22 104:19
105:17,19,23 106:2,
7,11,15,18,20,23
107:13,20 108:10
109:19 110:15
111:11 112:2,11
113:14,15 114:11
115:2,19 116:16,18
117:9,11,13,18,19
118:16,18,19,23
119:2,5,6,15 121:8,9
122:7 124:4,7
125:16,20,22,23
126:6,7 127:11,21,
23,24 128:9,22
129:13,14,18,23
130:3,17,20 131:3
132:11,13,15 134:2,
5,25 135:11,16,18,
20 136:17 137:3,14,
17 138:21,25 139:6,
8,17,18,19,22,23,25
140:3,14,24 141:15,
20 142:4 143:3
145:5 147:18,23
148:21 149:2,5,7,12,
15,18,22 152:5,11,
13,16 153:5 154:10,
12,24 155:4,7,8,10,
11,13,16,18,19,22,
25 160:16,20,22,25
161:8,10 163:10,13,
14,21,22,25 165:10,
11,15 166:9,10,13,
17 167:5 168:17,18
170:4,25 171:2,5,24
172:10,13,15,17
173:3,15,21 177:20,
21,25 180:5 182:23
183:11,13 187:14
188:3,18,21,22,23,
24 190:7,22,25
191:7,9,11,13
192:24 193:5,15,20
194:23 196:4,9
199:20 200:8,13,21
201:2,8,9,12,15,20
203:6,13 204:10,11,
15,17,19 205:6,19
206:21,23 207:6,8
208:10,14,19,25
209:13,14 211:14,
19,20,25 213:12,24

214:4,11 220:3,4,8,
11,18 221:12,24,25
222:4,9 223:17,20,
24 224:14,19,22,25
225:10,19,20,22
226:2,5,6,9,11,15,
17,19 227:4,6,7,13,
22 228:3,6,10,20,22,
23,25 229:5,7,12,14,
15,21,23,24 230:3,
21,22 231:13,14,16
232:8,9,16,19,20,22
23 233:3,6,12,20
234:19 236:6,21,25
237:9,10,12,16,25
238:4,5,7,20,24
239:2,10 240:11,22
241:2,4,5,22,23
242:5,9,23,24 243:6,
8,9,10 244:2,7,9,10,
12,15,18,19,21,22
245:14,15,18,23,25
246:2,3,4,6,8,15,18,
25 247:6,13,21
248:6,11,19,21
249:7,15 250:5,13
251:2,5 252:11,20
date
17:9 30:16 34:7
44:18 52:21 72:18
85:5 104:17,20,23
105:6 106:3,5 107:3
112:5,9 134:15
135:6,8 137:7,8
138:22 141:12
142:25 145:25
171:4,6 200:9
214:15 219:5
238:14,19 239:4
248:7
dates
11:18 24:17 33:6
day
12:16 194:2
deal
9:13
dealing
81:22
Dean
57:20
death
29:2
deceased
29:4
deceptive
32:14
decide
178:18
decision
15:17
Declaration
38:8,19 44:21 45:3,
16 52:6,13 54:17
63:18 64:11 66:14,
20 67:8,24 71:17
98:15 107:24 108:4
111:6 133:15 134:7
136:21 162:10
164:21 165:9 167:20
183:16 193:21
212:19 225:25
242:6,7 245:22
246:20,25
dedicated
216:20
deemed
176:9 217:11,17,25
default
222:18
Defendant
76:25 89:20 218:12

defendant's
36:25 44:16 72:17
88:16 89:7 138:20
141:10 142:23
145:23
defendants
18:13 22:4 25:24
26:11 52:10 60:16
Defendants'
191:24 217:23
defense
21:14 22:6 169:20
define
9:5
definitive
33:5
definitively
32:10
degree
6:10,11
Dei
61:16
delineated
243:5,6
demonstrate
40:9
demonstrates
205:4 248:15
deny
247:12
department
9:6
depend
8:6 177:16
depending
5:25
depends
12:15 25:21 43:24
depo
147:2 150:6
deposed
12:19,20,21 13:2
23:10 32:24 48:21
deposition
8:10 22:21 30:17
35:7 46:5 47:7 48:25
49:5 56:18 91:6
112:6 133:2,11
depositions
74:20
derived
25:4
describe
7:12 23:21 35:17,24
80:6 86:19 100:18
101:20 177:19
205:12 225:17
235:24
describes
245:15
describing
95:22 96:10
description
125:19 142:10,11,
13,14,15 166:5,6
209:7 235:20 241:5,
6,9,17
descriptions
89:13,14,18 143:23
191:24,25 194:14
195:9 207:10,21
208:11 209:9,10
211:6,17,20,21
design
5:18
designated
81:17
designed
104:8
desk
180:18



detail
135:14
detailed
88:5,8,9 148:18
150:5
determination
36:10,15,19 39:23
42:8,14 44:24 69:23,
25 71:3 78:5,7 80:20
81:25 109:19 117:10
121:13 123:13
133:19 185:25 191:5
199:23 207:20
208:12 209:7,16,19,
21 221:7 230:10,16
236:13,16 239:6
250:3 251:12
determinations
205:21 207:11 228:7
determine
36:13,17 62:14
68:15 70:11 71:4
79:18,19 80:5 81:21
84:11,16,20 85:10
88:14 97:14 105:2
109:7,24 111:8,17
117:4,23 118:3
122:18 123:3 126:10
127:15 130:20
131:15 132:5,9
138:8 154:18 160:17
179:17 184:24
185:21 188:3 190:20
191:12 195:9,12,17
196:24 199:12
205:21 222:3 230:6
234:18 236:18 239:7
240:24 245:7 252:16
determined
42:18 68:21 70:23
85:22 87:9 109:21
123:4 175:17 176:4
178:24 206:25 207:3
208:20 218:23 221:4
determining
36:16 83:3 96:18
230:18 241:17
developer
5:17
developing
210:9 236:5
device
196:12 231:5 250:23
devices
78:3,10,14 81:2,9
82:3,6 83:21 127:14
196:16,19 229:10
230:8,18 249:10,22,
23 251:7,11,20,24
252:2,9,16
difference
85:12 136:6,10,17
224:24 244:14
245:10 248:12,16
249:13,18 250:15
252:21
differences
46:3 136:14,19
199:13 250:6
differentiate
182:21
difficult
11:10
diligent
186:19
direct
49:21 115:9 120:13
202:2,10
directed
211:3
direction
35:22 36:2 160:6

178:10,12 179:6
186:16 192:18,20
211:15
directly
40:3 140:19,20
174:5
directory
216:20,23 217:3,6
disagree
19:19 63:13 87:16
241:24
disclosable
218:24
disclose
64:3
disclosed
13:4 16:13 17:6,21,
22,23,25 18:9,21
19:3 21:13,23 22:5
31:9,17 158:6
217:14 218:7 223:22
247:15,23
discloses
241:21
disclosure
17:11 53:10 75:19,
22 76:3,21 176:10,
23 183:2,14 185:2
218:2 230:3 237:2
253:12
disclosures
157:4 236:23
discovered
204:8
discovery
217:15 218:7
discrete
5:23
discuss
89:23 126:2 128:4
129:15 135:15
discussed
12:5,7 35:13 40:24
43:5 53:5 56:12
57:15 60:17,25
62:12 65:17 71:15
101:22 110:14 123:9
127:2 139:14,15
151:20 157:8 159:2
167:2,8 247:17
discusses
125:21 135:10
discussing
74:8 98:23 99:19
145:9 151:17 233:12
239:22
discussion
42:23 50:25 68:13
80:9 215:5
discussions
39:24 40:14 75:23
77:23
dispensation
26:19
dispositive
82:10,12
disputes
18:2
distribution
191:21,22 245:3
divide
8:2 195:15
divided
12:10 196:5 221:13
do-file
205:18,19
do-files
205:14,16 210:4
document
43:8 45:19 47:20
48:8,14,18,22,23

49:13,18 50:15
63:15 66:2,17 72:21,
24 73:6,9,12,14,15,
19 88:21 89:2 91:4
100:21 129:4
138:21,23 139:2
140:5,12,15,18
141:3,11,13,16,19
142:2,9,10,24 143:2,
5,6,12,17 145:24
146:2,5,6 147:4
159:24 161:18,23
162:6,8,12 164:16,
17 165:5 166:24
167:21,24,25 168:4,
22 172:18,20,21
175:13,16 178:6,12
184:8 192:20,23
204:7,14 206:9,10,
19 214:14,16,20,24
215:3,10,11,14,20,
22,24 216:4,22
219:5,11,15 220:5
224:4 225:9,11
226:10 227:2
229:21,23 235:13
238:18 240:4 242:17
243:12 245:8 246:9
247:7 248:8,10,18
249:2,8 251:3
document's
176:2
documentary
126:4
documentation
119:20 161:25 194:6
218:25 232:6 235:21
documented
130:13 135:22,25
191:16 200:11
201:16 246:11
251:15,17
documents
29:10 38:3 44:14
49:14,18,24 50:13,
15,20 51:23 64:9,10,
11 65:16,19,23 66:3,
5,7,11,12,22 67:14,
20,25 68:5,10 71:6,
9,11,13,21 73:2,4,
13,21 74:3,17,23
75:5 76:2,10,15,16,
24 77:4,7 82:6 84:22
87:5,12,19 88:17
89:8,16,20 91:23
92:5,24 94:4,12
99:7,10,16,21,25
100:2,8,24 101:3,6
103:9 113:22 114:3
120:6 133:8 142:16
146:13 148:6,9
149:25 150:15
151:19,24 152:25
156:3,4 169:15
170:8 171:13,17
172:6 175:5,8
176:15 184:11
186:13,22,23 187:4
203:14 216:7,11,12,
16,17,19,22,6,8,11,
14,17,19,22,25
218:3,6,9,11,15,16,
22,25 219:4,6,7
253:7
dollar
90:9,12 93:21 134:6
142:20 146:25
147:6,16,20,21
150:23 151:4 162:21
163:5,8 164:3,7,11
166:18 195:14 196:4
220:20 221:2

dollars
198:18
domestic
158:2
DOT
181:15,25 182:8,13,
16,19,21,23 183:5
185:7,11,22 186:4,6
double-check
157:6 235:17
double-checked
204:4
downloaded
159:8
downsizing
15:20
dozens
35:5 51:3 229:13
draft
38:2 76:5 182:17
183:3,7,14,17
184:25 204:9 217:11
drafted
85:19 134:12,15
drafting
89:5 182:22 247:14,
22
drafts
76:6,8
draw
237:6
drawing
51:2
drawn
165:13,24 166:12
200:7 239:10
drink
57:10
due
29:3 249:5 252:22
duly
4:2
Dzielak
58:25

E

earlier
4:16 12:7 35:13
56:12 60:18 62:12
65:2 67:23 68:13
91:5 99:19 101:22
102:6,14 110:14
149:17 156:2 167:3
171:16 185:6,20
193:15 199:15 206:3
228:9
early
30:15
ease
146:11 161:21
easier
165:2
easily
174:18
easy
104:21
Ebin
32:12
econometrics
51:21
economic
10:14,15,17,23 11:4,
7,9,15 12:2,17,18,
20,22 13:6 14:3 16:6
41:12 42:9 44:8
68:24 70:2,24 71:2
72:2 155:15 157:8
158:18 159:8 161:15
224:22 225:18 233:2
238:7 241:12,15

economically
68:23
economics
6:11,15,22 7:5,8,16
34:16 44:4 51:17,19
education
5:8 6:9 51:13 228:12
242:3
educational
29:23 50:5,10 51:15
67:10 126:3 129:20
156:7,9 224:18
242:2
effectiveness
43:15,19 78:23 79:4,
15
efficaciousness
44:6
effort
207:15
efforts
175:7
electronic
19:4 146:12 216:6
electronically
215:25
elicit
230:24
eliminated
15:18
emblazoned
61:21
Emily
15:9
eminently
229:18
emotion
19:18
employed
7:7 8:19 10:6,8
employee
14:5
employees
15:2,6,12,15
employment
8:23 15:11
encompass
233:7 240:15
encompassed
123:20 202:25
233:14
end
15:15 53:19 104:20
105:6 119:18 201:13
endeavor
78:20
endeavored
199:17
ends
105:13
energy
57:2,9,10 58:11 59:4
61:17
engaged
8:14
engagement
20:5 23:2 32:2 55:3
81:7 83:11
engagements
48:17 63:6,22,25
entails
67:12
enter
178:5
entered
165:11 178:4,7,8
enterprise
7:22 16:3
entertained
64:4

entire
125:3
entirety
17:11 66:12 197:3
entities
90:16
entry
165:15
enumerate
240:2
equal
122:2
equipment
33:13
equivalent
164:20
error
45:11 104:4
establish
78:16 81:5,13 83:20,
21 84:5,6,9,10
established
25:23 78:8 79:21
82:11 83:9,19
109:17
establishing
79:9 82:13
establishment
79:12
estate
29:3
estimate
18:18,24 19:12 27:7
29:2 36:20 62:4 98:4
155:9 201:3,5
229:17 231:11,18
estimated
123:8,10
estimates
154:22
et al
56:2
ETI
7:10,12,13 8:17,20,
22 10:9,13 11:19
13:13 14:5,19,24
15:3,12 16:12,24
35:11
evaluate
20:18 43:18
evaluation
18:6 71:19 87:4,20
116:20 126:15
eve
27:16
evidence
26:5 36:18 109:14
126:4 130:11 183:2
evident
200:14 208:14
exact
121:7 131:6
examination
4:13 86:24 201:19
250:2
examined
4:3 86:21 251:10
Excel
128:15 136:3 156:25
157:3,14 165:8
180:7,10,11 183:23,
25 184:6,15 187:15,
18 188:11,14
192:11,23 193:18,
20,24,25 194:8,18,
25 203:3,6,22 204:2
210:14,16,25
212:13,21 213:4,12
214:9 216:2,7,10
excluded
144:24 145:15



exclusion
144:18
execute
205:15
executed
207:4 246:9
execution
17:9 51:5 229:21,22
exercise
62:14 84:16
exercises
35:24 227:21
exhibit
44:16,19 47:5,6,7,8
49:10,11 50:3,8 53:7
64:8 66:23,24 67:5,9
72:17 77:12 89:22
91:6 138:19,20
141:10 142:12,13,23
143:21,22 145:23
146:20 147:2 148:2,
16,18 150:3,6,9,11,
13 162:10,12 164:21
165:9 167:19 185:6
193:19 214:13,14
219:13 248:5
exhibits
52:8 67:20 99:11
150:19,21 151:17
152:22
exist
13:21 161:16 185:16
206:10 235:24
existed
118:11
existence
40:22 99:5
exists
195:4 206:20 235:23
expand
164:23
expect
182:18
expectation
38:10 111:4 112:19,
24 151:10 176:18
182:14
expenditure
155:8 226:15 228:23
229:15 232:22
233:23 237:25
expenditures
158:4 235:7
experience
6:15 29:23 30:21
33:21 39:6 40:15
50:6,10,24 51:14
67:11 112:25 126:2
129:19,20 130:7
156:7,9,12 171:19,
23 201:6 225:5,12
227:3 228:12 229:12
237:3,7 241:25
242:4
expert
4:20,24 12:24 13:5
16:5,14 17:6,12,16,
21 19:3,10 21:13,23
23:10,15 31:10,17
32:22 44:24 48:13
49:3 53:10 74:20
79:7 85:16 97:20
210:24
expertise
131:6 224:19 229:4
experts
62:4 79:11
explicitly
87:12
export
182:3

exported
188:4
exposing
169:24
express
94:16 95:5,10 96:9
201:18
expressly
158:10
extends
106:23
extent
34:21 37:3 38:18,23
48:15,19 76:6 77:3
91:2,15 110:25
121:15 135:21 144:8
148:8,25 151:8
161:16 165:6 169:23
175:21 176:24 177:5
178:7 184:5,12,23
186:4 194:7 195:3,4
201:14 207:23
213:3,13 235:19
253:10
exterminate
233:19
exterminating
233:8,17 235:9
243:19
extermination
235:4,8
exterminator
233:18 234:24
extrapolate
227:5,20 228:11
extrapolated
226:20
extrapolating
227:24,25
eye
96:19 114:13
eyeball
87:18
eyeballing
160:14
eyes
26:16 209:9
EZ
61:18

F

facially
249:16
fact
25:9,14 29:25 67:4
78:10 81:10 107:18
128:3 129:18 145:19
244:17
factor
70:22 221:16
factored
38:23
factors
125:8 204:16 250:24
facts
120:3 170:4
fair
7:11 10:21,22 33:8
45:18 64:6 150:10,
12 178:25 179:2
fairly
29:19 165:7
falls
243:2
familiar
33:9,14,25 51:13
143:3 146:3 181:16,
17

family
60:14 90:9,12
146:25 147:6,16,20
150:22 151:4
Famular
56:24 59:4
fashion
193:3
fats
54:16
FCC
62:11
feature
252:5
features
80:7 81:23 84:18
85:2,14,18,20,25
86:5,9 109:21
251:12
fed
252:24
federal
4:20 20:14 75:20,22
76:3,12 183:2
236:19
fee
21:18
feel
21:11 98:12 117:19
171:9 209:22 249:4
fees
29:18,22 34:25
felt
38:24 204:9 208:12
228:25 229:2 236:18
fewer
198:6
field
7:3,5 51:17,19
fields
6:17 7:15,17 51:20
figure
142:17 146:8 164:3
197:23 198:10,12
221:17 253:9
figured
196:2
figures
90:3 91:10 111:8
119:23 130:4,20
142:20 143:9,18
144:22 145:11
147:16,21 150:17,23
151:4,20,21 153:8
155:18 158:7 163:19
169:2 189:8,17
194:15 195:10,12,13
197:6,14,16 207:19
213:14,15,17 220:5
222:8 223:17
file
9:16 75:15,18 76:15,
21 77:5 84:23 87:6
133:5 139:12 142:6
175:8 181:15,25
182:6 200:11 201:17
205:9 206:21 213:12
216:7
filed
52:10 63:18 67:24
97:21 99:6 108:4
247:4
files
107:13 114:6
135:19,21,24 182:8,
13,16,20,22,23
183:5 185:7,11,22
186:5,6 203:4,6,9,
10,24 205:7 207:16
208:15 210:20
211:12 212:4 213:4

final
182:17,23 183:3,11,
16,17 193:19,23
237:22
finance
6:16,22 51:21
find
26:17 101:17 130:15
234:7
finding
26:15 30:3 121:17
findings
45:4
finds
81:16
finish
41:23
finished
41:22
firm
7:13 29:22 34:20
155:14
fish
60:3
Fisher
19:10,24 20:8,21
21:4,9,14 22:11,22
28:9 36:5 47:13,24
48:2 53:9 62:10
63:6,9,16,20
fit
241:5
fits
240:25
fixed
14:7
flag
209:14 214:10
flagging
209:15 212:16
flags
210:19
flip
222:19
Floor
4:11
focus
6:21 230:12
focused
45:15
FOIA
20:6,7,11,20 21:4
62:11
folder
216:15
follow
114:21 125:7 151:15
177:12 197:10
206:11
footnote
104:25
forget
160:23
form
39:17 67:22 68:7,19
70:12 72:7,10 76:8
102:18 103:20
119:11 120:23 124:2
165:25 175:20
178:13 183:4 185:18
197:9 203:13
206:12,15,20 209:5
212:9 213:20 215:12
220:7 225:2 226:13
234:21
format
97:15 139:3 140:19
141:15,18 143:20
146:12 148:25
forming
49:25 50:11 242:10

formulating
99:22
forward
59:12 103:21
found
38:6,7 39:5 212:25
241:10
foundation
225:23 226:3,6,10,
24 228:9
fourth
223:15
fraction
119:3 134:2
fractional
42:3
frame
39:10
framework
36:12 40:8 68:22
100:20 106:24
109:25
frameworks
62:2
front
27:10,11 29:11 30:7
88:22 92:5,25 96:14
140:8 143:12 174:9,
16,17 192:5,7
215:13 249:9
full
4:6 23:15,21 24:5
25:10,13 28:20
41:11 42:8,14,19
54:6,7 58:16 71:19
83:3,14 84:12 109:3,
8,24 120:22
fully
70:8
fulsome
131:11 242:14
function
10:16
functions
16:9 170:6

G

gain
246:6
Gamble
53:21 54:22
garnered
80:7
gathered
71:10
gave
22:20 28:3 42:11,12
56:17 69:13 83:8
109:10 125:8 131:11
GDP
155:8 171:24 232:21
general
16:23 18:14 50:19
51:17 65:3 79:15
102:2 138:10 177:18
241:3
generally
15:13 21:10,12
217:14 218:5 225:17
generate
71:21 107:14
162:10,11 190:24
192:20 193:5,20
201:22 215:10
generated
71:12 91:23 140:13
141:4 155:9 164:6
167:19 169:7 180:8,
23 182:7,23 185:8,
22 186:5 187:22,24

189:5 193:17 210:6
generates
189:2
generating
159:11 180:4
generation
10:11
give
5:19 34:3 47:3,4
54:5 104:25 121:11
177:18 179:22
244:20
giving
25:4 46:7
Globe
10:11
goal
196:24
good
4:15 27:2 98:4
137:23 196:14
231:11
government
155:6,25 163:22
167:2,8 171:8
204:11 219:17 222:9
228:6 229:21 236:20
237:4 245:15 246:4
governmental
170:22 171:12,23
175:16
grade
38:5
granted
59:8
grass
61:20,23
great
109:10 130:22
253:20
greater
13:23,24 197:25
greatly
197:8
grocery
9:11,22
gross
104:22 158:2
grows
61:21,22
growth
28:15
guess
18:3 38:22 61:7 72:8
75:14 79:11 81:11
100:18 106:13
114:21 117:6 122:17
179:4 188:6
guessing
240:21
guide
66:25 206:2
guidelines
179:21
Gulkis
56:7

H

hails
155:15
hair
27:24 28:15
half
6:14 8:21 11:17
61:22,23
hall
180:18
hand
159:14



handy
66:24
happened
12:15 13:3 22:22
227:6
happy
48:4
Harbor
14:11
harm
42:9 68:24
Harriet
90:9,13 154:15,21,
22 155:4,10,22,23
156:19,22 157:12
158:11,13,15,23
160:16 161:7,10
163:10,14,21,25
166:12 167:5 173:3,
14 174:2 204:10
219:16,22 220:3,20,
25 221:5,9,12,20,23
222:9 224:23 225:22
226:5,16,19 227:4,
10,15,19 228:3,10,
16,24 229:5,7,11,18,
24 230:21 231:7,12,
22 236:21 237:19
242:5,25 243:11
244:4,11,15 245:14
246:3,8
Hart
4:18 33:25 34:8 56:2
Hauser
4:19
he'll
52:25
head
9:7,17 18:16 19:2,14
22:15 23:13 27:3
156:23 160:24 167:9
172:15 189:19
194:11 222:20
heading
240:10
heard
22:23 56:18,20
62:21
hedonic
50:24
held
25:24
helping
7:21
helps
9:9 39:10
Hendricks
59:23 62:24
hereto
50:3
hesitant
97:16
Hey
30:23 182:6
high
64:25 72:15 198:8
high-level
69:18
higher
137:22 198:5,9,11
244:4
highest
5:7
highly
137:20
hiring
234:23
historically
137:16
history
38:5

hogwash
25:7
hold
5:9 6:10 7:2 45:8
home
8:11 56:5 90:8,13
148:22
homeopathic
24:21 26:20 56:10
homeopathy
44:22
honest
30:5
honestly
46:25
hour
34:17 202:15
hours
35:3 46:8
house
92:11,16 93:3 94:4
96:22 233:19 234:24
houses
177:20
Howell
5:6 32:3 33:10,15,19
37:12,25 38:12,13
51:24 65:5 66:4
92:21 93:7,13,17,22
94:5,9,13 96:16,23
97:22 111:19 112:11
113:7 126:22 127:4
132:13 141:22
144:3,22,23 166:3
188:25 189:5,7
190:21 191:20
194:14 195:8 196:8
209:11,13 211:23,24
213:25 214:5,6,10
216:15,18,21,23
217:3 218:14 239:24
240:16,22,25
Howell's
166:5 189:15
HSN
148:19 150:17
hundred
24:24 127:18 130:16
hundreds
51:3 176:14 197:20
229:13
hypothetical
120:2

I

idea
238:19
identical
87:24 252:12
identification
44:17 72:18 93:6
138:22 141:12
142:25 145:25
204:23 205:5 211:25
212:2 214:15 248:6
identified
50:2 113:15 145:19,
21 170:4 171:12
208:7 224:11 246:20
247:7,10 249:12
identifies
205:3 213:14 219:6
identify
89:4 142:6 170:5
172:19 174:12,18
175:8 192:6,8
206:22 210:18
211:12,22 212:14
215:3 216:17 218:8
219:3,15 241:25

242:8
identifying
176:21 218:25
II
15:17
ill-suited
108:3
imagining
104:4
immediately
76:4 161:17
impact
197:23,25 244:11
implicitly
171:21,23
implied
174:5,8
importing
188:9
inadvertent
17:7 52:5 67:17
incident
26:18
include
82:18 142:16 143:17
151:20 152:7,10
167:25 220:11
230:18 234:23
239:24 240:20
included
6:22 45:24 86:24
92:13 107:23
144:14,16 145:13,22
146:14 150:17
157:20 162:17 169:6
174:13 189:7 213:11
222:17 223:7,13
226:24 240:2
includes
45:19 95:19 142:10
143:13 146:6 152:3,
4,11,13,16 163:4
167:4 175:14 235:14
including
51:20 86:22 210:14,
15
inclusion
85:13
inconsistent
121:16,19
incorporated
7:9 121:17
incorrect
17:3 111:4 147:12
increase
13:22 98:10
increased
16:10
independent
78:6 79:22 81:8
109:6 131:5 207:20
independently
70:10 71:9 78:2
101:18 214:7
indeterminate
207:14
index
157:9 160:16 240:9,
10,12 246:4
indexes
175:16
indicating
219:25
indicator
104:24
indices
155:6 157:11,22,23
158:8,19 159:2
160:19 161:9,15
163:15,17,23 167:2,
8 171:8,12 172:19

204:11 219:18
222:23 245:15
indicia
139:10
individual
9:24 113:14 120:21
149:13 152:8,12,14,
17 153:6,7 162:20,
23 165:8 171:25
205:22 230:19
232:14 242:21
individually
232:11
ineffective
25:15,18 26:12
77:19 78:3,11,14
81:3 83:22 108:17
infer
189:19
inflate
198:10
inflation
198:20
information
23:8 37:11 51:24
52:15,19 62:15,17
65:4 67:25 83:10
87:22,23 91:3 92:3,
24,25 93:7 94:8,18,
20 95:7,18 96:17
102:3,24 103:13,17
105:15 111:2
114:14,15,22 115:15
116:15 118:15
120:22 121:18 122:5
127:8 136:23,24
137:9,10 141:22
144:8,10 147:6
151:9,25 152:9,18,
21,24,25 153:2,19,
25 154:3,5,6,7,8,13,
17,20 156:3 159:3,
19 165:23 170:9,22
171:13 172:24 174:3
187:25 188:10
189:6,23,25 190:9,
11,13,19,24 191:14
196:17 199:5,19,24
204:24 205:17,20
209:12,25 210:7
213:16 220:17 223:2
222:12 225:24
227:11,15,19 228:16
230:24 231:3,4,9,15,
17,23 232:2,4 234:2,
4,9,14 236:4,15,17,
25 237:4,5 239:8
240:21 241:10
242:2,9 244:2
246:12,18 247:6,13,
21 253:10
informative
232:2
informed
74:13
inherently
134:9
initial
4:9 10:13 68:18
71:18 209:18
initially
30:18
innovation
6:23
input
149:3,6 177:23
178:18 188:2
208:17,19,25 210:2
212:7,8
inputs
125:16

inquiry
128:21 204:6
ins
23:5
inspection
201:12 252:20
instances
29:11 191:11
instructed
76:17 91:12
instructions
69:16
intended
95:11 236:19
intention
17:10 107:7 110:23
144:12
intentionally
84:2
interactions
12:2 13:23
interest
219:21
interested
231:2 245:5
interfacing
16:4
intermediary
205:2 206:17
intermediate
205:24
internal
189:15
interpretation
51:4
interrupt
220:14
inversion
223:8
investigate
37:3
investigation
130:18 131:10
involve
23:20 28:20 30:8
32:7,10,13 53:13,22
54:11 55:2,19 56:8,
25 57:8,21 58:9,16
59:2,25 61:19 62:25
89:12 123:8
involved
7:18,20,21,23 8:9,15
11:9 12:5 18:2,8
19:24 20:4,22 21:20
22:10,17 23:20
24:20 27:23 43:4
51:25 53:25 54:12
55:5,6,12 62:13
79:12 87:7 88:6 93:8
122:22 123:2 187:9
208:9 210:8 234:19
236:10
involvement
61:8 62:20
involves
56:9 177:11 233:16
235:5,7 237:15
239:13 240:7
involving
5:4 18:21 20:20
22:22 23:15,24 24:4
28:14 45:12 53:14
61:17 234:25
issue
36:14 37:7 39:21
54:2,8 62:19 66:4
126:24 141:23 198:7
234:17
issued
96:9 112:8

issues
9:9 53:25 124:17
234:13 236:10
item
101:12 116:23
142:10,11,13 143:23
166:3,4 188:25
195:25 196:22,23
197:12 198:12,24
199:7,8 214:3
items
89:3,4 117:24
119:21 120:7 121:25
122:2,23 127:3,17
131:14,16 133:18
177:11 188:17 189:3
195:21 197:7,8,14,
18,20,24 199:2,6,9,
13 209:19 211:17,18
213:16,18 214:9
238:2 245:18

J

Jacqueline
57:20
Joanne
4:18 33:25 34:8
job
10:12 253:20
Johnson
54:10
jointly
217:11 218:22
journal
64:15 65:17 71:8
journals
64:15
judge
22:25 27:12 29:14,
16 69:20,25 70:23
judges
30:7
Judging
169:10
jumping
65:15 100:10
jumps
76:4
June
104:21 105:13,20,24
106:3,5,7,11,16,24,
25 107:3,20 108:7,
12
junior
11:11 13:25 16:4
jury
27:10 28:18 29:12
69:20,25 70:23

K

K-E-A-R-N-S
15:9
Kangadis
32:12 60:14
Kearns
15:9 35:12 160:6
165:19 178:10,11,
16,23 179:5,19,22,
25 184:22 186:12,
18,24 192:18,19
202:2,10 207:4
208:8 211:14
Kearns'
186:15 187:10
Kennelly
29:16
kind
35:19,23 36:22 37:8
38:9 51:5 55:7 209:6



**knowable**
23:11 35:8 221:24
**knowledge**
20:16 34:3,10 35:15
51:2 54:19,21 55:13,
22 56:4,14 58:5,19
59:5,20 60:7 61:13
62:18 74:2 105:23
169:20 170:11
171:18,22 172:4
176:6 184:23
**Kopel**
31:5,6,8,16 32:16
60:21 61:2,3,6,13

**L**

**labeled**
54:3 162:14 166:2
168:19
**labeling**
54:15
**labels**
43:7 89:14,18
**Labs**
58:8
**lack**
51:17
**landmark**
15:16
**language**
101:16 108:2
**large**
197:24
**largely**
7:15
**larger**
119:3
**late**
30:15
**law**
69:17
**lawsuit**
5:4
**lawyer**
4:22 23:19 69:15
73:5
**lead**
209:12
**leading**
5:17
**leads**
225:5
**Learning**
58:10
**leaving**
100:10
**led**
182:25 207:17
208:15
**LEDS**
250:23
**Lee**
15:7
**left**
17:8 67:18 178:17
**legal**
23:22 70:17 175:21
176:3
**legitimate**
42:9 74:13
**lengthy**
41:18
**Leonard's**
90:8,12 117:22,25
118:5,7 150:11,14,
22 151:5
**level**
5:7 65:2 72:15
207:11

**levels**
18:3
**levied**
20:13
**liability**
25:23 26:10,14,16
40:4 41:11 69:2
78:7,17 79:2,9,12,
18,20 80:5,23 81:6,
14 82:10,14 83:8,17,
20 84:5,6,10 109:12,
17 110:3,6
**liable**
25:24
**liberty**
64:3
**license**
7:4
**licenses**
7:2
**lies**
114:14
**life**
194:2
**light**
86:6 245:19 248:14
250:10,17 252:3
**lights**
250:22
**limited**
11:13 55:4 107:10
**Lincoln**
130:23
**linear**
41:6
**lined**
196:23
**lines**
68:21 204:5 205:15
**list**
47:21 48:3,24 49:7,
14 53:19 54:9,25
64:9,20 65:16,20
66:17,22 67:19 68:4,
10 73:22 75:14 77:7
103:9 156:4
**listed**
48:17 51:9 64:10
65:18,19 66:11 67:7,
15 162:24 199:9
**listen**
249:19
**listening**
88:24
**listing**
55:25
**lists**
73:12
**literally**
9:8 27:14 190:3,17
234:15
**literature**
51:16
**litigation**
7:19 8:3,9,15 12:7
17:17 18:8,21 19:25
20:16,23 22:7,12
26:18 27:17 30:8
32:5 37:7 39:9
40:16,18,21 43:7
53:14 58:8 60:15
61:18,25 66:5 67:15
69:2 71:10 74:24
75:16,18 76:16,18,
23 86:9,22 88:6
92:22 103:16 104:18
109:2,7 144:5 197:5
217:10 218:18 237:6
**litigation-specific**
242:5

**litigations**
17:24 130:8
**LLC**
4:19
**lo**
227:7 246:5
**location**
10:6
**locations**
154
**log**
129:7 181:15,25
182:6,8,13,16,19,21,
23 183:5 185:7,11,
22 186:4,6
**long**
8:19 10:23 11:14
13:12 14:18 41:21
62:22 136:13
**looked**
29:22 37:10 43:11
79:3 84:14 89:16
102:24 109:18
111:10 121:2,4
125:9 133:10 140:23
185:6,20 192:23
204:18 207:9 209:8
210:18 226:14 234:4
244:3 250:21 251:25
252:9,11
**lost**
29:3
**lot**
14:14 16:8 23:5
123:12
**low**
198:12
**low-priced**
137:16
**lower**
137:6 138:8 201:13
**lowest**
200:24
**lunch**
151:16

**M**

**machines**
57:3
**made**
14:13 20:7,10 24:23
36:15 39:22 42:7
55:9 81:24 86:11
99:4 109:19 117:10
170:8 175:7 188:11,
12 191:4,5 199:23
200:19 205:5,22
207:11,20 209:9,10,
16,17,21 211:11,13
228:20 230:20
236:12 249:3 250:3,
25
**maintain**
38:2 181:25 182:8
216:6 220:12
**maintained**
233:21
**maintenance**
9:17,18
**major**
15:20 37:13
**majority**
88:5
**make**
10:2 36:10,18 42:14
45:5 66:24 67:4,5
78:5,7 80:20 94:15
98:8 106:15 109:14
133:19 158:11,21
167:19 174:4 185:24

**208:12,23 209:2,6**
228:7,13 236:15
251:11
**making**
69:25 123:12 144:19
250:2
**Mall**
4:11
**management**
8:16 11:25 13:24,25
**managerial**
16:2,10
**manages**
9:7,8
**managing**
16:4
**manner**
189:12 226:12 236:5
**manual**
26:4 109:13
**March**
107:23 133:15
**mark**
138:18 214:12
**marked**
44:17 72:18 138:22
141:11 142:24
143:20 145:24
195:24 214:15 248:6
**market**
38:11 81:8,12,23
84:15 88:18 101:13,
14,23,25 102:9,12,
15,20,21 109:20
115:25 133:22 221:2
252:4
**market-based**
29:20 30:2
**market-wide**
137:19 188:23
189:21 196:7
**marketing**
6:23 51:22 57:7
**marketplace**
80:8 81:19 84:20
86:10 118:21,22
120:19 125:3 138:5,
6,9 251:14
**marshalling**
11:10
**Martinelli**
54:9
**Massachusetts**
4:12 9:20
**match**
105:4 190:6 191:6
209:12
**match-ups**
190:4
**matched**
191:6,20 209:20
211:23 213:18
214:7,10
**matches**
119:5
**matching**
122:7 127:23 191:23
208:13 214:5
**materials**
49:25 51:16 146:15
220:11
**math**
111:14
**mathematical**
82:21
**mathematics**
62:14
**matter**
26:3 30:4 32:3 33:9
36:6 44:22,25 45:20
46:16 49:20 56:6

**59:4 62:11 88:13**
100:3 136:11 165:15
188:7,8 212:23
216:21 234:3
**matters**
47:21 48:16
**MBA**
5:9 6:18
**Mcmillion**
55:17
**means**
46:17 137:11 178:15
**meant**
132:4 164:12
**measure**
41:12 42:20 68:15,
24 71:20 72:2
**measured**
80:8 81:24 84:19
252:5
**measurement**
52:24 70:24 199:25
**mechanics**
129:23
**mechanism**
129:15 178:24
**Melgar**
59:16
**members**
34:20
**memorable**
61:7
**memorize**
24:17 172:16
**memorized**
11:18 16:18 17:19
18:17 19:8 30:16
97:11 241:7
**memory**
30:20 33:6 100:9
110:19 192:7 210:17
239:4
**mention**
105:14 223:25
**mentioned**
21:5 29:13 92:19
191:17 203:22
**merger**
18:6 20:19
**met**
4:16 70:17 154:23
**method**
128:4 206:25 207:3
**methods**
208:7
**Microsoft**
128:15 136:3
183:23,25 184:6,15
187:15,18 188:10
193:18,20 194:8,25
**middle**
4:9 191:18 220:2
243:2
**million**
24:24 111:11,14
**mind**
6:24 21:2 29:15
41:20 42:2 56:5
65:15 76:5 92:14
100:10 170:14
172:17 247:11,18
**mine**
180:19
**Minoxidil**
28:2
**minus**
111:15 161:2 244:25
**minutes**
48:6

**mischaracterization**
69:9 174:14 190:16
**mischaracterize**
84:2
**mischaracterizes**
207:24 211:9
**mischaracterizing**
83:24 103:19
**misleading**
77:17
**missed**
169:12
**missing**
45:12
**misspeaking**
92:6
**misstates**
39:18 213:22
**mistaken**
24:18
**misunderstanding**
117:16
**Mobility**
62:24
**Mobility's**
63:2
**model**
42:9 221:19
**models**
221:22
**moment**
215:3
**moments**
48:3
**monetary**
96:23 132:15,19,21
143:9,18 146:7
147:16 150:16,23
151:4
**money**
14:13 82:23
**monitor**
10:2 192:25
**months**
24:7,9,16 56:18
116:5 129:7 236:12
**morning**
4:15
**mortar**
228:18
**motion**
52:9
**move**
59:12 181:21
**movie**
33:13,16
**moving**
99:12 103:21
**multi-class**
245:4
**multiplication**
70:4,22 166:18
**multiplied**
164:10 198:9
**multiplier**
69:23 70:2 71:4
**multiply**
164:7
**multistate**
98:6 122:15 160:17
161:2 162:18,22
204:16 223:12,14
231:20 244:16
245:17,20
**myriad**
5:24 7:14 196:19



**N**

nation
160:18
nationwide
93:18 98:6 111:13
122:13,16 124:9
131:13 142:18
143:14 151:20 152:4
160:25 166:8,15,20
168:13,16,19,21
189:20 195:22
197:18 198:21
212:25 221:13,14
230:13,14 231:13,25
232:9 243:10
natively
203:15
natural
27:24 28:15 54:3
nature
23:22 26:13 36:8
37:6,19,21 38:10
40:4,11,12,25 42:7,
25 43:2,3 64:2 65:3
84:14 95:24 98:13
118:20,21 124:18
125:5,6 241:4 249:5
250:13 252:22
NDTY
54:25
necessarily
23:7 27:19 181:8
182:2,19 189:7
needed
10:21 117:14
needing
88:2
Nest
58:8,10
net
112:21,22 115:10,20
118:12 120:14,16
121:11 122:11 126:6
130:9 222:20,22
network
90:8,13 148:22
159:17 215:23,25
216:3 225:13
news
23:3
newspaper
10:12
night
86:5 250:10
non-25-state
223:2
non-discoverable
217:18
non-harriet
226:20
non-jury
30:7
non-lethal
234:20
normal
217:9
Northeastern
5:9 6:8
Notary
4:3
note
38:4 53:13
noted
78:17 253:22
notes
38:2
notice
52:12 133:11 230:2
238:9 246:25

nuanced
114:12
number
16:20 17:18 23:13
27:18 47:12,25 62:2
90:5 93:12,17 94:8,
12,18,25 95:12,20
96:5 111:10 114:16,
17 115:10 117:9
119:21 120:17
121:25 122:2,23
123:3,17 125:8
127:3 142:17 143:23
146:7 148:2 160:23
161:4 166:3,4
188:25 189:14
195:19 197:24
198:2,8 202:21
203:3 204:18 214:2
241:17 249:25
250:21 251:8
numbers
98:13 116:13 123:9,
25 128:4 140:6
142:21 187:13 196:2
197:13,17 199:2,7,8
210:25 212:17
222:13 223:9,11
232:19 238:17
239:20
numerous
54:3 131:7 223:3
250:11

**O**

object
39:17 67:22 68:7,19
70:12 72:7 102:10,
18 119:11 124:2
165:25 175:20,22
178:13 185:18 197:9
206:12,15 209:5
212:9 213:20 215:12
220:7,22 225:2
226:13 234:21
objected
218:4
objection
74:14 91:15 119:10
120:24 125:12
207:23 242:12
objections
73:25 74:5 175:11
176:23
objective
5:25 126:17
obligations
91:14
obtained
106:2
occasion
21:15,16
occasionally
14:10
occasions
131:7 156:14
occurred
230:3
occurs
104:18
October
44:21 45:4,17 52:5,
20 71:16 85:4 98:4,
14 100:21 104:16
134:7,12 245:18
246:9 247:5
offer
46:6,12
offered
29:24 78:20

offering
26:14 70:25 78:9,12,
25 84:3
office
141:15 159:15 177:8
186:10
Ohio
6:12
oil
32:15 60:18,19
olive
32:15 60:19
omission
17:7 52:5 67:17
omitted
144:10 189:11
on-the-job
6:15 129:20
one's
150:10
ongoing
100:19,22 104:18
105:9 107:17,25
124:17,18 125:5
200:6
online
37:11,24 43:5
operate
200:20
opined
24:5
opinion
26:14 54:5 64:6
70:19,25 71:22 72:5
78:9,13,20 79:2 84:4
86:7,14 88:14
101:15 158:6,20
225:23 226:7,10,25
228:10 231:7 234:12
245:21
opinions
45:20,22 46:6,8,12,
15,18,22 47:2 48:20
50:2,12 72:2 78:15
82:16 135:3,4 226:3,
18 236:5 242:10
247:3,8,14 253:13
opposed
8:4 182:22 199:14
Optic
57:22
optical
33:12
oral
48:25 49:6
order
5:24 39:9 42:13
44:14 70:17 83:20
148:4 226:15
original
139:12 149:14,18,22
223:18 238:6
originally
155:15
outlets
250:22
output
107:2 128:23,25
129:4,8,9 180:13,22
181:13 187:14,17,25
188:14 205:8,13
212:6,7,11
outs
23:5
outset
36:7 39:4
overarching
233:2
overlap
41:7 234:7,12

overly
38:16 45:14
oversaw
210:10
oversimplification
208:4
overtly
223:25

**P**

p.m.
253:22
pages
47:15 148:17 165:9
176:15 184:11
paid
34:24 132:2 195:17
pairing
114:10,25 115:3
panned
171:9
paper
135:15 139:18 162:9
167:18 174:12,16
205:25 213:9
papers
71:12 86:25 99:12
113:12,17 123:22
124:11 125:11,15
126:5 127:20 128:6,
8 129:25 133:17
134:25 135:14
138:16 139:13,15,22
158:25 159:4,22
173:5,23 174:6,7,13,
20,25 192:3,4,7,8
200:4 202:21,24
203:7,12,18,20,21
204:20 213:5,8,22
214:8 224:2
paperwork
52:10
paragraph
49:22 50:17 66:20
77:15 86:2 88:11,20,
25 90:12 101:12
103:23 104:2,11
107:22 108:9,14,25
110:13 158:13,16,
17,24 173:2,9,11,12,
18,19,22 191:18,19
parallel
59:3
parcel
80:22
part
22:18 24:24 52:12
80:22 87:6 107:6
137:2 139:24 144:4
148:23 153:12
157:15,17,21
161:17,23 182:12
187:22 201:2 204:19
212:20,21 213:5
230:16
participated
210:10
parties
27:16
party
21:19 101:19
party's
170:4
pass
73:23
passed
74:7 140:4 169:3
past
23:9 24:3,6,7,9,16
26:24 37:16 39:6

228:7 229:12
Patrick
59:23
pause
244:20
pay
83:25
paying
23:3
PCE
232:21 234:4
PDF
96:2 149:6 203:13,
14
pending
26:23 32:18 54:19,
22 55:14,23 56:4,15
57:4,12 58:4,20
59:6,21 60:8 62:7
penny
28:19
people
5:23 10:3 11:11
14:13
percent
8:8,14 61:21 90:22
110:20 111:15,21
115:24 118:25 119:5
121:22 124:24 125:2
130:17,24,25 161:5
160:17,24,25 161:5
166:14 167:14
219:22,23,24,25
220:2,4 221:17
222:21,23 229:9,18
237:19,20,21 242:25
243:13,17,20,23
244:4
percentage
17:15 111:8 117:24
120:7,11 162:3
163:5,9 164:7
166:12,19 204:15
221:14,16 233:21,23
244:13
percentages
170:23 220:23,25
221:2,8 242:16
244:5
perfect
100:9
perform
6:3 14:3 72:4 100:23
102:15,20 105:19
111:7,17 114:23
115:13 116:13
128:18 131:9,15
145:14 156:20
180:13,16 184:19
192:15 193:13
194:4,13 202:6,10
210:13 221:18 223:5
249:9,22 250:9
251:19,23
performance
14:16 34:25 210:9
performed
35:18 39:13 44:10
69:6 91:21 97:21
100:17 103:3 104:5
116:3 118:18 128:2,
20 140:25 141:3
149:21 159:25
160:4,8,13 178:3
183:6,10,20,23,24
184:5,12,21,24
186:19 192:2,11
193:7,14 194:8,18
195:7 211:3,4 212:4
213:4 225:8 249:12
252:7

performing
6:5 16:8
period
8:6 12:12,14 13:9
94:14,19 95:3,13,21
96:6 104:12 105:6,9,
13,16 106:21
107:11,17,24 108:3,
11 115:21 195:18
196:20 198:19
239:3,7,9,11
permissible
175:10 176:9,22
permits
152:11
permitted
211:25
person
9:7 35:16
personal
155:7 169:19 170:11
176:5,11 232:21
237:24
personally
33:23 61:12 160:4
165:20 175:17 177:6
178:5 179:10,18
184:19 187:9 192:15
211:3
perspective
116:19 122:11
pest
5:5,6 33:18,21 37:12
43:13,18,23 44:4,5
51:25 78:24 79:4,16,
23 81:17 85:10
92:21 93:13,17,22
94:5,9,13 96:16,23
97:22 111:19 141:22
145:6,16 158:4
196:8 219:19,24
221:19,22 226:8
233:8,17 234:6,20
235:2,4,6,8,9,14
237:20 238:2 239:24
240:16,22,25 243:19
245:9 248:13,14
252:6
pests
77:18 81:3,15,18
84:17 108:16 233:19
pharmacy
92:4
phone
30:22
photocopy
45:13
phrase
25:22
physically
180:16 215:18
piece
232:2 246:6
pieces
172:23 220:16 234:9
237:5
pill
25:4
place
149:9 248:23 252:4
plaintiff
42:17 57:25 58:14
91:8 218:4
plaintiff's
21:10,12
plaintiffs
4:18,25 18:10,12
21:6,21 25:17,22
57:17 58:2 60:5
68:25 73:23 74:14
77:16 78:16 81:5,13



82:13 84:4,9 108:15
109:17 169:25
**Plaintiffs'**
40:4 41:10 42:23
80:4,18 83:17,19
108:19 109:11
110:2,5 170:18
175:11 176:23
**play**
22:19
**plays**
103:2
**plenty**
169:11
**pocket**
210:14
**point**
12:19 15:21 16:17
51:11 61:11 64:5
95:15 107:24 110:14
159:7 172:22,25
190:13 194:13
195:17 196:8 208:25
227:22 232:17
244:13 250:18
**points**
137:21 155:25
160:22 193:6,17
195:23 201:4,5
226:7 228:22,23
231:16 244:8 252:24
**policy**
7:20 8:4 12:7
**pomace**
32:15 60:18
**populate**
165:16 168:12
172:7,11
**populated**
172:10,13
**populating**
165:21
**population**
155:7,18 156:8,12,
21 157:25 171:24
219:19,24 226:15
228:22 229:15
237:19 238:10
243:17
**populations**
155:12
**Porter**
54:25
**portion**
140:10 234:19
**positive**
63:22
**possess**
7:6 237:10
**possessed**
159:13 223:20
**possession**
77:10 91:9 101:24
102:8,12 147:18
148:12 217:23 233:4
238:6,18
**possibility**
65:15
**possibly**
121:3
**postdate**
106:11
**postdates**
105:20,24 106:7
**postgraduate**
5:16
**potential**
69:7 70:11 225:6
**potentially**
29:3 46:8 99:12

**practical**
188:7
**practice**
24:22 25:7 36:24
130:12,13 181:25
**preceding**
86:20
**precertification**
103:24
**precise**
16:16,20 23:22
30:20 51:18 52:21
64:2 75:8 85:5 87:7
90:5 94:11 97:15
121:7 132:23 139:2
141:16 176:16 184:3
210:17 222:2 235:18
239:4 241:6
**precisely**
30:11 94:2 96:8
99:13 188:13 206:7
**predominantly**
218:11
**preliminary**
43:11
**premium**
62:4 86:5
**preparation**
51:8
**prepared**
212:13
**preparing**
133:2
**prepped**
27:18
**present**
52:21 87:8 104:13,
15,23 105:19 107:16
180:16
**presentation**
200:8
**presented**
86:12
**presently**
15:4,8 86:8
**president**
8:18 14:22 15:7,23
**presidents**
14:23
**press**
22:23
**presume**
73:23 77:10
**previous**
18:20 228:15 230:23
**previously**
16:9 19:9 31:6,9,15
60:21 211:23
214:20,23 218:7
**price**
9:16,23,25 62:4 80:8
81:24 84:19 85:12
86:4 93:8 97:9,15,22
109:20 122:24
123:10,18 131:14,
16,18,20,22,25
132:2,6,9 133:20
136:10 137:19,21
138:12 162:3
166:15,20 167:15
189:21 190:25
193:6,13,17 195:10,
17,22,23 196:2,8,10,
21 198:10,11 200:24
201:4,5 210:6 213:2
226:7 248:16 249:6,
13,18 250:6,15
252:5,22,23
**prices**
10:4 85:9 123:4,14
133:21,22 135:8

**producers**
33:12
**product**
9:24 27:24 32:14
37:2,6 40:20 43:6
54:14,16 61:20 76:5
80:7 81:22 84:14
87:22,23 89:12,14,
18 132:5,6 158:2
159:12 182:17
183:3,4,17 191:24,
25 192:11 194:14
195:8 197:4 198:8
204:9 206:9,17
207:9,21 208:11
209:7,9,10 211:6,16,
20,21,22 213:24
217:12 222:11
238:18 241:16
250:12
**product-by-**
192:10
**product-by-
product**
190:19,23
**product-specific**
208:11
**production**
43:8 72:25 73:4
91:13 149:9 157:17,
21 161:18,23 169:17
175:10 218:4
**products**
9:12,14,22 18:22
19:4 23:25 24:4
25:14,18 26:12
27:25 28:15 32:8,10
33:15,17,19 36:10,
22 37:25 42:25 43:3
53:14 65:5 66:4
77:18 81:14,17
84:15,19 88:6,9,10
108:16 126:23
132:3,7,8 136:15
166:7 190:3,18
191:19,23 196:6
198:4,6,15,16
200:23 207:12 214:5
222:5 234:16 235:6,
15 239:13,15,17,19,
21,23 240:16,17,22
248:17 250:7
**profess**
23:7,18
**professed**
40:21
**professional**
86:7,13 194:2
**professor**
38:5
**program**
6:22 128:14 176:25
177:20,24 178:17
185:21 187:11 194:4
215:17
**programs**
179:8 210:25
**progress**
246:14
**project**
11:25 12:15
**projectors**
33:13,16
**projects**
10:19 13:24 14:2
**promise**
97:16
**promised**
58:11
**promoted**
11:4,20 13:17 14:22

**promotion**
12:22
**proper**
42:19 68:15 71:20
**propose**
7:9
**proposed**
18:6 42:17 161:2
**proprietary**
20:18 220:17
**Protection**
55:21
**protective**
39:8
**protein**
55:6,12
**provide**
7:13 39:7,8 46:15,
19,22 69:17 74:16
81:23 143:10 152:23
153:24 154:3 158:6
168:17 182:13 183:2
238:14 249:20
**provided**
16:22 29:2 35:16
48:20 57:9 62:2
64:5,12,18 65:20,21
69:18 73:22 82:6
87:5,11 89:9 91:10
95:11,18 96:11,13
105:22 106:6 119:8
123:21 138:17
143:8,9 144:8
145:12 146:15
147:5,11,15,20
148:9,11,25 149:7
150:22 151:10
153:2,5,7,20 154:6,8
157:15,16 169:14
170:5 171:3 174:25
188:19 189:6,8
190:9,12,17,18
191:4,8,9 195:4
205:14 213:17 232:5
243:4,5 245:24
246:17
**providing**
59:10 82:16 186:24
**proxy**
115:20 117:9,14
118:13 120:18
122:12 124:8 126:7
129:13 130:4,10,21
**public**
4:3 7:20 8:4 12:7
48:16 63:23 116:25
117:25 118:5 120:9
**publications**
47:20
**publicly**
220:16 241:11,13
**Publishers**
92:11,15 93:2 94:3
96:21
**pull**
216:16
**purchased**
93:6 121:24
**purely**
129:17 160:13
161:10
**purports**
139:6
**purpose**
155:14
**purposes**
41:19 103:24 106:15
183:14 184:25
185:16 188:9 209:20
**pursuant**
66:19 68:25 76:2,11

91:13 110:2 177:21
217:18 218:24
**pursued**
60:16
**purveyor**
33:15
**put**
40:8 67:3 104:7
113:2 136:2 157:17
237:13
**putting**
25:3 66:21

---

**Q**

**Qualifications**
13:11 16:16,21 17:2,
5 20:25 23:12 24:12
27:5 30:10 33:5
44:17 47:7
**quantification**
26:5 71:2 85:24
95:11
**quantified**
43:21
**quantifier**
26:7 59:14
**quantify**
85:20,22 114:19
250:18
**quantity**
57:9 93:8 115:18
119:6 121:8
**query**
66:6
**question**
8:5 21:7 27:2 35:8
41:18 42:2 43:21,25
44:15 47:3 70:9 75:4
83:21 91:17 95:16
96:4,7 106:14
117:21 122:20 125:7
127:18 130:24
149:15 169:23
170:7,17 176:3
177:12,14,16 183:8
189:24 197:11
199:16 208:22
209:18 214:22 215:2
216:5,10 230:23
235:22 242:14 248:4
249:19
**questioning**
74:22 202:20
**questions**
5:24 44:8 46:6,24
63:12 203:17 253:5,
18
**quick**
202:15 252:25
**quiz**
33:6
**quote/unquote**
54:13

---

**R**

**raised**
44:9 213:8
**range**
104:17 220:2
238:14,20 242:22
**ranging**
242:24
**rank**
11:20
**Rash**
55:17
**rate**
34:17



rates
29:20,25 34:22 82:5,
8
ratings
82:3
ratio
117:15
raw
139:17,21,25 140:3,
14,24 203:13 204:19
206:21 211:14
248:11,19,21 249:7
251:2,5
re-call
253:15
re-ran
187:12
re-reviewed
50:22
re-verified
170:25
read
42:4 88:20,23
133:15 246:21,23
247:24 248:2 253:21
reader
33:3 66:16
reading
42:2 108:22 200:22
ready
103:6
reality
61:22
reason
147:10 149:10
188:14
reasonable
77:17 118:13 120:18
122:12 124:8 126:7
130:4 228:25 229:2,
19
reasonableness
129:22 155:9
reasons
22:23 189:14
rebuttal
79:5
recall
24:13 29:11 30:3
31:2 44:15 64:23
65:12 76:11 93:25
97:3,7 99:13 100:8
106:8,22 116:9,21
120:20 129:7 141:17
149:8 151:3 160:7,9,
11,12 184:14 188:12
189:16,18 192:13,22
193:10,16,23 201:25
202:5 227:14 241:7
receipt
97:19
receive
14:10 30:22 52:18
66:8 90:15 99:11,15
101:7 128:23
132:15,19,20 151:8
161:23
received
52:11 67:21,25 71:7
90:18,23 91:2,20
92:2,10,17,19 93:4,
12,16,21 94:4,8,11,
24 95:16 96:22 97:8
98:3,24 99:21 100:2,
7,15 101:4 106:11
110:15 111:2
115:15,22 116:14
117:4,13 127:2,7,10
134:2,5 136:23
139:25 140:3,14
147:23 148:7,8,21

receiving
9:12 97:3 101:8
recently
56:22 246:17
recess
53:3 98:20 151:13
202:18 253:3
recitation
108:19
recognize
72:20 138:23 141:13
143:2 146:2 162:8
167:17 248:8
recollect
52:22 65:11 76:13
94:17 97:5,15 116:7
139:2 218:19
recollection
17:14 27:4 29:10
30:15 31:22 32:6,8,
23 33:11 47:11,22
48:9 53:8 55:7 57:11
58:18,22 60:24 61:5
62:6 66:9,10 73:20
75:8 79:3 85:6 90:7
93:10,15,25 94:7
99:23 100:6 110:17
121:7 127:6 132:17,
24 139:7 140:8,11,
24 141:6,14 142:3,7
143:4,7,10 146:4
147:15 151:7 153:4
157:10,19 160:2
161:12 176:8,11,16
182:10 184:3,10,18
185:3,10,12,25
186:8 194:3 202:9,
12 210:21 212:22
222:2 235:18,23,25
247:19
record
4:7 19:22 41:4,21
42:4,5 89:8 102:14
151:15 173:6 246:23
247:17 248:2 249:11
records
35:6 88:16,17 89:9,
17,19,24 90:16
91:20 98:23 99:2,3,
18 100:14,16,17,19
101:9 103:4 116:23
117:23 127:2 145:16
186:19 189:13 204:5
221:5
recover
82:23
recreate
181:12
refer
7:10 66:16 172:20,
23 173:2 202:24
203:21 224:17,18
236:24 237:23
reference
26:4 68:25 109:13
129:19 143:18
157:22 158:21
171:21 174:4 220:10
236:24
referenced
50:16 159:18,21
173:6 205:11 223:23
references
158:17 171:23
referencing
161:5
referred
159:19 172:8 173:20
202:21 203:17

referring
40:19 139:22 147:23
155:2 175:14 203:7
233:6,20 240:10
248:19
reflect
42:6 104:8,22
113:17 114:7 120:6
140:5 148:21 149:11
150:20,23 151:24
174:20,22 214:9
245:2
reflected
13:10 48:13,22 49:6
50:14 52:2,13 69:3
72:14 77:6 84:22
87:5,12 101:13
102:16,22 103:9,13
104:20 110:9 113:9,
11,12 117:18 124:10
125:10,14,15,24,25
127:20 128:2,6
129:9,11,12 134:22,
24 145:2,18 150:16
155:19 156:4,15
158:3,24 160:18
195:20 200:3 213:25
225:9 246:16
reflecting
38:19 93:12 94:4
96:22 127:8 161:14
176:12
reflective
127:23 131:25
140:15 149:22,23
150:7 196:18 198:17
223:12 232:9
reflects
17:2,11 41:21 46:14
49:18 52:15 73:7
119:6,9,20 135:2,4
136:17 137:4 140:9
143:24 147:5 150:11
162:12 166:25
167:7,21 195:2
196:7 205:9
refresh
27:4 29:19 47:11,22
48:8 93:25 143:6
147:14 210:21
refreshes
53:8
refund
25:10
regard
6:2 51:16 54:6 79:25
123:19 124:14 125:9
126:9 131:10 206:25
register
9:8 19:17
regression
50:24 180:25 181:2
regrowth
27:25
regular
220:12 228:14
237:11
regularly
155:13 159:11 184:4
regulatory
15:17 17:25 18:2
relate
51:3 60:14 66:3 93:5
96:15 142:4 170:3
related
6:16 7:16 10:18 12:3
16:6 20:5,17 29:24
40:5 54:15 55:11
60:18 63:2,3 75:16,
18 157:24 158:2
204:5 235:3

relates
26:5 44:4 46:12 57:2
69:22 71:2 92:20
93:16 94:8,18,20
99:24 102:4 226:3
245:17
relating
7:15 44:3 65:4 93:7
145:6 153:19 216:8,
18
relationship
37:20,22 113:6
114:8,16,19 115:8
118:11 119:14
120:14 121:21
relative
50:20
relevant
5:11,21 95:3,12,21
105:6 175:5 234:2,3
236:9 239:2,6,8
241:18
reliability
155:22 244:21
reliable
226:11 228:11 229:9
231:18
relied
49:25 50:4,11,14
71:14 77:5 94:24
103:15 156:3 170:6
171:14 224:12,14
225:21 226:2,6
234:4 241:21
relies
155:23
rely
156:17 171:17 242:6
247:5
relying
69:16 101:24 103:4
244:7,10
remainder
8:15 104:11
remaining
65:19
remarkable
22:2
remedies
24:21 42:12 56:10
69:14
remedy
24:23,25 25:10
26:20
remember
20:5 30:11 43:10
52:9 53:18 55:3 90:5
118:9 210:4
remnant
104:5,7
rendered
28:11,12 45:20
rendering
45:23
repeatedly
210:12
repel
77:18 81:15,18
108:16
repellant
43:13
repeller
33:18 112:17 143:25
144:13,16 240:25
repeller's
43:18
repellers
5:5,6 33:22 37:12
43:23 44:4,5 51:25
78:24 79:4,16,23
80:15,21 81:18

relates
26:5 44:4 46:12 57:2

85:10 92:21 93:13,
17,23 94:6,10,13
95:2 96:5,17,23
97:23 111:19 113:7
127:9 137:19 141:23
144:4,9,23 145:6,7,
17 164:8 196:8
221:19,23 226:8
234:7,20 238:3
239:25 240:17,23
245:9 248:13,14
252:6
repelling
84:17
rephrase
75:4
reply
41:22
report
32:22 44:24 45:24
46:2,14,20 49:22
50:2,8,16 52:3,4,7,8
64:8 66:11,22 67:4,
16 69:4 71:24,25
72:14,16 76:7 77:6,
13 79:5 80:10 85:19,
25 86:16,18 87:2,6
88:11 89:5,22 90:2,
10 92:3 94:23 95:9
97:20 98:4,24 99:6,
11,14,15,22 100:4
102:17,23 103:14,23
104:7 106:23 107:2
108:10,14 110:10,
18,22 112:3,7,9,10
113:10,12 119:8
123:6,23 125:10,17,
18,24,25 128:3,5,7
129:10,11,16 133:3,
4,9,11,14 134:12,16,
23 135:2,5,6 136:3
137:7,8 145:3,18
147:25 153:19
155:17,19,23 156:5,
16 157:15,18 158:5
159:19,22 161:6
165:3 168:13 169:11
171:4,6,11 173:24
174:5 182:22,24
183:11 195:20 200:9
223:22 224:9,10,13
232:18 241:21
247:4,15,22,23
249:23 251:16,17
REPORTER
4:5
reports
99:7
represent
139:4 194:24 206:22
representation
45:10 90:11 139:9
representations
108:22 134:8 138:6
170:8
representative
5:22 16:23 111:18,
22 133:22 138:5
201:8,14 228:17
229:25 231:7
represented
126:21 165:7
representing
22:4
reproduce
215:4 217:20,24
reproduced
215:6,8 217:8
reputation
29:22
request
20:6,7,11,13,21 21:4

62:11 65:22 74:4,10
75:15 91:5 161:16
182:20 195:5
requested
29:25 46:15,19 47:4
65:24 66:2,8,12 71:7
73:13 99:3,5,7,9
101:2 182:13
186:14,22 219:10
requests
73:14,19,22,25 74:6,
12,13 75:6
require
81:6 114:12 154:9
requirements
9:21
research
5:25 36:9,22,23
37:6,9 38:3,20 39:14
40:5 41:2,9 42:24
43:3,5 78:3,6 79:14,
19,22,25 80:2,5,15
81:9,12,16,20 88:18
101:13,14,23 102:2,
6,9,11,12,15,20,21
103:6 109:10 122:9
126:5 128:14,15
130:2 131:5 138:2
researched
37:15 172:3
reserve
253:14,21
resolve
56:6
resolved
32:20 54:23 60:10
62:19
resource
51:11,12
respect
6:18 12:4 18:7 19:4,
23 20:15 21:3 30:6,
12,19 31:3,16 34:11,
14 38:3 43:13,22
44:8 50:19 53:10
55:9 62:19 65:7,13
69:11 71:18,21 72:5
76:16 78:23 79:15,
23 80:3,15 81:3,9
82:3 83:2,18 88:5
89:5 90:2 91:19,24
93:2,11,20,21 94:3,
22 95:8,17 96:21
97:9 99:2 100:13,16,
17,24 101:3,15
111:19 113:7 22
115:14 116:13
117:3,12,21 118:7,
17 122:16 123:24
126:25 127:3 128:24
131:13 133:5,14,18
139:13 140:2 144:9
149:12 151:22
155:12 170:11
171:24 174:2 178:3
179:14 185:8,19,23
186:5 187:10 188:16
192:21 195:25
198:25 208:18
209:25 210:24 211:5
218:6,21 221:19
222:16 223:6 224:15
238:13 239:20
242:16 247:3 248:25
249:10,21 250:10,20
251:7
respond
75:11
responded
10:10
responding
185:5,15,16,19



**response**
186:7,11,15
46:7 47:3 91:4 139:5
147:5,11 148:10
151:10 169:15,21
194:9
**responsibilities**
15:24 16:3
**responsibility**
11:25 13:23,25
187:23 236:9
**responsible**
9:17
**responsive**
66:6 73:21 74:3,10,
12 75:6 175:9,18
176:2,5,9,21 182:20
186:20 187:4 218:23
**result**
48:16 49:5 51:13
69:24 98:9 161:7
182:5 201:3 204:20
222:19
**resulted**
63:23 212:17
**resulting**
85:13
**results**
51:4 119:18 129:17
155:5 157:10 181:2,
3,6,10,11,21 193:19,
23 207:15 208:14
211:12 212:24
237:14,15,16,18
251:18
**retail**
37:19,22 38:11 39:7,
8 84:14 86:8 90:18,
21,23,24 91:3,9
92:20,23 93:22
103:4,15,22 110:15,
20 112:2,15 113:6,
13,18 114:8,11,18,
20 115:2,6,7,15,21,
22 117:10,17 118:2,
13,16,19 119:2,5,23
120:12,15,18 121:8,
21,25 122:13,18,24
123:10,14,25 124:4,
8,16,18,21,24
125:10,20,22 126:7,
19,20 127:8,24
128:22 129:13
130:5,10,21 131:3,
13,16,18,20,21,22,
25 132:2,6,9,11,13
133:20 134:16
136:5,7,9,23,24
137:3,5 139:21
140:9,24 143:18
145:10,11 147:20
148:21 153:25 154:3
162:21 163:5,8,13
164:2,7,11 166:10,
11,15,16,17,20
173:14 183:19,21
184:13 188:17,20
189:8,20 190:7,22,
25 191:12,19,23,24
193:5 194:15,23
195:22 196:2,4,13,
25 200:13 201:20
202:4,7 207:7,10
208:10,13 211:20,
21,22 212:25 214:4,
11 219:20,25 221:25
222:4 225:24 226:7
228:6 229:10 230:11
231:19 237:21,25
239:12,13,14,15,17,
18,19,21 240:5,8,13
241:22 243:22

245:12 246:3
251:20,25
**retail-specific**
134:25
**retailer**
37:23 38:14 39:6
65:3 88:17 89:23
90:16 92:12 98:23
100:14 101:6,9,21
102:5,25 112:18
115:17 118:9 119:22
120:8 121:20,24
137:16,20 139:11
142:3 153:7 154:14,
15,18,21 190:23
191:22 199:3,14
200:18 201:12
204:25 209:13,14
227:12,22 228:20,22
229:13 230:10,25
**retailer-by-**
204:24
**retailer-specific**
138:12 206:23
**retailers**
37:2,14,17 38:12
52:16,17 64:21
86:23 90:3,6,19
92:2,19 94:22 95:8
97:2,8 99:18 110:15
111:3,18 113:14
114:18 115:11,12,
14,23 116:4,7,9,14,
17,24 117:4,13
118:10,24 120:21
121:3,16 124:19
126:25 127:5,10,15,
16 132:12,16,19,22
133:21 134:17,19
135:9,11 136:6,8,11,
16,22 137:4,9,12,13,
25 140:2,3,17,20
143:7 145:12 149:13
153:3,6,20,23 189:9,
16,24 190:8,12,18,
25 191:8,10 199:7,9,
18,19 200:11,14,16
201:9,21,24 203:15
205:23 209:10
213:17 226:21
227:20,24 230:7
231:5,8 232:6
251:20
**retained**
4:24 19:9 30:13 36:4
41:9 47:13,23 48:12
53:9 60:4 63:8,20
68:14
**retention**
22:11 33:8,20,24
41:2 43:18 49:4,19
65:8 100:3
**retirement**
14:11,14
**retrieve**
215:21
**retrieved**
215:19
**return**
82:5,17
**returns**
82:19 83:4 112:22
115:11 130:9
**reverse-engineer**
62:16
**review**
36:8 39:23 40:13
42:22 43:6,12,22
44:7,19 47:10 49:8
65:7,10 72:19 82:2,
5,8 84:8,11 87:9,14,
19,25 89:19 101:14,

20 102:4,7 110:18
115:16 126:3 133:3,
4,5,8,13,16 138:24
142:2 146:21 148:18
180:2,6,11,21 185:7,
14,21 186:23 192:20
200:14,21 221:5
226:25 227:12
228:24 229:11
236:15,22 241:16
246:2
**reviewed**
44:10,14 49:14,19
50:11,13,21 51:7
52:2,6 64:23 65:13
66:19,23 67:2,6
68:10 73:15 77:4
78:22 79:6,7 84:13
89:4,22 91:5 103:8,
10 109:13 111:2
133:11,12 171:13
172:6,11 175:17
185:24 207:19
224:12,14,17 228:10
228:16 236:3,17
237:12,18 241:21
242:10 246:18
247:14,22
**reviewing**
20:24 187:8 227:15
229:13 237:9,16
251:4 253:11
**reviews**
82:2,9
**revision**
98:8
**Rider**
73:9
**ridiculously**
44:23
**Rite**
92:7,15 93:2,11,16,
20 96:12
**role**
9:2 10:24 11:6,8,12,
23 12:17 13:19
59:13 61:24
**roles**
9:4 12:4 14:4 15:5,
24 16:10
**roll**
248:21
**Roman**
15:18
**room**
52:24
**Rossi**
61:16
**roughly**
12:13
**routinely**
159:16 171:17
**row**
211:10
**RQ**
161:13
**Rule**
74:21 75:20,22 76:3,
12,21 170:3 217:19
218:2,24
**Rules**
4:20 75:19 76:3
183:2
**run**
30:24 181:20
**rung**
11:11

20 102:4,7 110:18
115:16 126:3 133:3,
4,5,8,13,16 138:24
142:2 146:21 148:18
180:2,6,11,21 185:7,
14,21 186:23 192:20
200:14,21 221:5
226:25 227:12
228:24 229:11
236:15,22 241:16
246:2

**S**

**Safe**
14:11
**salaried**
14:4
**salary**
14:7
**sale**
24:20 27:23 32:14
37:25 53:23,24
54:12 57:22 58:10
60:2,18 174:3
190:25 234:6 235:5,
14 239:13
**sales**
35:22 39:7,8 52:15
55:5 66:3 86:8,21
87:10,14,21,22 90:3,
23,24 91:3,9 92:20,
23 93:22 96:16,23
97:14 98:2 103:4,15,
22 104:19,22
105:23,25 108:5
109:18 110:15,20
111:8,9,12,19 112:2,
14,15,22 113:6,18
114:9,20 115:6,15,
21,22 118:2,5,12,14,
19,23,25 119:23
120:11,12,14,15,17,
18 121:22,25 122:7,
8,11 124:8,16,17,18,
19,21,24 125:6
126:20,21,22,23
127:9 128:9,22
129:13 130:5,9,10
131:3 132:11,13,15,
19,21 134:3,6,8
135:11 136:9,17,23
137:3,14 138:21
139:6,8,21 140:9
142:20 143:8,9,18
144:22 145:10,11,13
146:7,10 147:16,18,
20,23 150:16,23
151:4,20,21,25
152:8 153:8 154:13
156:13 158:7 162:3,
4,21 163:5,8,13,19
164:3,7,11,14,15
166:11,14,18 167:23
168:2,9,10,13,16,20,
21,23,24 169:2
170:23 173:14
183:19,22 184:13
188:17,20 189:8,17
191:13,21,23 194:15
195:14,16 196:4,5,
19,25 197:6,13,16
198:9,10,11,12,21,
23 199:25 200:25
201:2 207:7,8,19
210:6,7 213:16
219:20 220:20
221:2,5,11 222:4
225:22 226:5,17,19
227:10,15,19 228:4,
6,10,16,18,20 229:7,
10,12 230:11,13,
14,17,18,19 231:5,8
232:7,8,9,16 233:8
237:21 239:12
240:5,8,13 241:22
243:6,8,10,12,22
244:15 245:3,12,13
248:6,11
**salient**
38:7,21 96:17
**sample**
111:20 116:8 124:23
134:3

**Sandra**
4:19 33:25 34:8
**sanity**
154:23,25 155:21
169:3 224:20 225:21
226:16 229:3 234:9
236:20
**satisfied**
63:17 119:13 122:10
122:12 126:12
**satisfy**
26:15 115:19 118:11
120:13 126:5 129:24
130:25 181:20
**satisfying**
124:6
**save**
181:22
**saved**
181:6,14
**savings**
58:11
**Sawtooth**
5:17
**scenario**
40:17,19
**scenarios**
42:16
**scientific**
26:4 43:12,22 44:3,7
109:14
**scientist**
25:6
**scope**
43:17 46:14 74:19
75:21 78:4 79:10,17
81:7 83:10 170:10
**Scott**
4:16
**Scott's**
61:18
**screen**
129:2,3 162:7 168:7
181:2,5,21
**search**
186:19
**seat**
170:15
**section**
220:11
**seed**
61:18,20
**seek**
68:23
**segregate**
216:10
**segregated**
216:12
**self-evident**
200:12,13 205:6
207:16 209:15 212:3
242:22 250:5
**sell**
37:23 113:2,4
197:24 198:2,4
199:7,9 200:23
231:5
**sells**
196:13
**Selwyn**
15:7
**semantics**
45:15
**semi-responsive**
66:6
**senior**
10:18,20 11:4,6,14
12:18,22 13:2,6,17,
19 14:18 15:25

**sense**
5:19 11:13 16:23
18:14 19:6 31:19
55:15 137:23 208:23
252:13,15,18
**sensitive**
62:17
**sentence**
86:20
**separate**
216:6
**serve**
206:21
**served**
9:6,11 10:24
**server**
225:13
**service**
219:19 233:8
**services**
7:14 63:4 233:17
235:2,10 237:20
243:20
**set**
36:19 86:16,18
94:22 95:9 98:14
108:10 111:11
114:22 136:20
169:14 179:21
183:11,15 194:15
220:5 226:25 235:20
238:17 241:2 242:16
245:21 247:3 249:2,
23
**sets**
157:7
**settled**
26:22 27:16 60:10
**settlement**
29:19 60:9
**seventh**
29:16 38:4
**shape**
206:20
**share**
219:19 220:20 221:2
228:23 229:15
233:7,23 238:10
240:5 241:22
243:19,22
**shares**
173:14 219:20
**sheet**
165:8 220:24 223:16
**shelf**
9:22
**Shelf-keeping**
189:4
**Shop**
8:25 9:3 10:6
**Shopping**
90:8,13 148:22
**short**
7:9 150:10
**shoulder**
170:16
**show**
84:10 146:9,11
161:20 162:21
222:23 228:17
**showed**
219:14
**shown**
119:19 249:5
**shows**
112:2 117:17 224:2
229:24 237:18
244:13
**side**
8:3 18:4 21:10,12,14
45:8



**side-by-side**
201:10,23 202:3,7
250:25
**sign**
253:21
**significance**
86:15 242:20
**significant**
85:12 86:4 248:16
250:6,15 251:13
**significantly**
197:13 244:18
249:17,18
**signing**
90:25 142:14
**similar**
11:8 15:25 46:3
59:17 73:16 92:18
96:12 100:16,20
141:18,24 158:2
187:18 199:16
222:15 227:21
228:5,7 248:24
249:3,9,12 252:10
**similarly**
12:10 57:24
**simple**
87:25
**simply**
84:5 145:19 173:12
227:5 251:4
**single**
154:18,21 227:22
239:18
**single-page**
204:14
**sir**
5:2
**sit**
6:24 23:8 35:9 44:15
52:22 76:13 85:6
92:14 93:10 94:2
97:6 116:6,9,21
121:6 132:17,25
146:5 149:16,25
151:6 160:11 184:2,
10,18 185:3 186:3,9
187:3 188:13 192:14
193:10 202:13
212:14,22 218:19
222:2 227:14
235:17,25 238:21
239:5 240:3,18
241:8 247:11,18
**sitting**
30:13 34:5 46:4
214:18 215:13
225:13
**situation**
15:22 26:17
**size**
250:23
**SKU**
164:15 166:4,20
168:20,21 189:2,15
190:21 191:12,22
194:22 195:15,16,18
207:13,14 208:11,13
209:12,14 210:7
211:17,18,24
212:16,17 213:14,
16,25 214:2,11
251:8
**SKU-BY-SKU**
190:4,9,13,24 205:6,
10,21 206:23 207:9
208:10
**SKU-SPECIFIC**
188:20,21,22,24
189:17,23,25 191:14
196:16 204:24

**SKUS**
132:14 189:4 190:5,
17 191:6,20 193:12
194:14 195:8 207:22
208:19 209:13 211:6
212:2 213:18 214:5,
6
**slight**
98:10
**small**
24:24 65:14
**smaller**
12:14 198:2
**software**
5:17,18 128:13
194:3
**solar**
143:24 144:4,9,13,
16,22,23
**sold**
32:15 33:17,19
93:14,18 94:5,9,13,
19 95:2,12,20 96:5
112:17,18 114:17
115:5,6,11,12
116:25 117:10,25
118:5 120:8 122:12,
24 123:3 127:16
142:17 143:14
151:22 166:8
197:18,19,20 199:2,
14 221:20,23 230:7,
19
**solution**
25:3,4
**somebody's**
140:9
**sort**
13:21 41:17 52:9
101:16 102:5 140:14
238:14
**sought**
29:18
**sounds**
95:23 176:2
**source**
71:13 149:24 223:18
225:15 238:6 246:18
**sources**
154:10 223:3 242:8
244:3,20 246:15
247:5,13,21
**span**
238:10
**speak**
23:23 50:17 88:21
89:2 91:11 92:9
113:25 171:18
172:21
**speaking**
118:4 145:9
**speaks**
125:18
**specific**
6:19 10:5 46:22
50:21 51:24 65:12
66:17 67:14 71:10
95:19,23 100:3
114:18 117:5 118:6,
9 121:20 124:13
126:10,25 127:4,14
130:19 131:9,16,21,
22 132:3,4,6,13
138:7,14 141:19
142:7 143:5 146:4,
18 152:8 153:8,19
159:24 174:7 178:12
179:20 184:8,17
185:12 186:2 189:3
190:24 191:7,20
194:4 196:21,22
199:9 205:22 207:13

**Starkist**
59:23
**started**
15:14
**Starting**
48:23
**Stata**
114:6 128:10,11,13,
16,18,20,25 135:19,
21,23,24 176:25
177:3,5,6,10,13,15,
19 178:5,25 179:7,
11,12 180:3,9,12,13,
23 181:7 182:2
183:20,23,25 184:15
185:8,21 187:11,22,
24 188:2,5,12,15
192:25 193:8,14,17,
24,25 194:19 202:6
203:4,9,10,24 205:6,
7 207:16 208:15,17
209:6,16,17,24
210:4,15,16,19,25
211:4,11,12 212:4,5,
6,7,12,21 214:8
**state**
4:5,6 22:7,19 25:16
31:4,13 86:2 94:12
101:25 104:10
107:16 108:4,25
112:10 114:22
124:10 127:25
135:25 147:19,22
148:4 149:25 156:13
157:25 158:3,4,9,18
162:20,21 163:4,8
164:2,7 168:2
173:20,22,24 198:21
221:13 222:11
223:23 228:4 230:25
231:6,19,22 232:5,
16 238:23 240:21
243:4,9,25 244:7,8,
17,21
**state-by-state**
35:23 93:19 122:14
154:14,19 155:3,5
157:9 158:7 221:12
223:10 226:23
228:4,8,21 245:16
**state-specific**
151:25 152:4 153:25
154:4 173:13 174:2
187:20 222:4,17
223:7 227:19
231:14,23 232:4,7
**stated**
39:14 41:11 68:14
69:6 83:17 90:10
108:8 110:3 121:20
145:8 147:3 171:16
173:7 206:13,18
211:4 228:9 240:7
243:3 253:8
**statement**
13:10 16:16,21,25
17:4 20:24 23:12
24:11 27:4 30:10
33:4 44:16 47:6
63:14 77:22 94:16,
21 95:5,19,23 96:9
211:8
**statements**
55:9 144:19,20
**states**
9:21 54:17 77:15
86:13 94:25 103:23
110:25 123:15,24
135:7 144:2 152:6,8,
12,15,17 157:25
162:16,17,24 167:14

169:4 170:24 171:25
173:12,18 219:23
220:19 221:16
222:6,16,21,22
223:6,13 224:10,13
227:5 228:11 230:8,
19 231:8 232:10
244:23,24 245:11
**statewide**
230:17
**stating**
141:2
**statistic**
18:17 19:8,18
**statistical**
51:6 72:4,12,13
84:16,21 85:2,7,21
86:14,16,17,19 87:4,
15,19 117:2,7,14,20
121:10,17 122:11
127:21 128:13
183:12 242:15,18,20
248:12,22,24
251:19,23 252:8,13,
15,17
**statistically**
85:11 86:4 111:20
118:4 119:15 121:12
248:16 249:16,18
250:6,15 251:13
252:21
**statistics**
6:16 7:16 51:21
116:19 166:22
226:25
**statute**
70:20,22
**statutory**
42:11 69:7,12,13,20
70:5,11,14,18 71:5
**Stein**
15:9
**stem**
40:3 78:15
**step**
25:20 26:7 40:6
78:18 109:15
**steps**
107:10 165:16
**stick**
92:13
**stop**
8:24 9:2 10:6 41:14
**stopped**
63:11
**store**
9:8,13,15,19 37:24
**stored**
215:24 216:4,22
**strong**
112:23 114:16
**struck**
22:2
**studies**
43:12,20,22 44:7,11
78:22 79:3 130:16
**study**
44:3,12 51:5
**studying**
200:19
**stylized**
49:15
**subclass**
42:16 198:21 229:25
230:15 231:12
**subdivision**
225:18
**subject**
11:17 39:8 41:8
44:20 45:2,16 73:24
74:5,14,24 75:19

76:21 92:22 105:2
128:20 146:23
148:17 150:5 175:10
176:23 197:4 217:25
**subjective**
126:12,14
**submitted**
13:11 32:22 44:22
45:3,17,25 54:18
99:14,22 100:4
247:4
**subpoena**
72:17,25 73:3,9
74:25 75:10,13
91:14 113:23 139:6
147:5,12 148:10
151:11 169:16,21
175:9,18 176:10,22
182:12 185:5,15,17,
20 186:7,11,16,20
187:5 194:10
**subsequent**
90:24 91:3 92:3
97:20 118:16,17
134:4,11 193:11
200:5 246:12 253:12
**subsequently**
71:15 90:18 111:24
191:4 245:23
**subset**
217:19
**subsidiary**
80:7 159:9
**substantially**
96:12
**substantive**
35:17 247:25
**substantively**
96:19
**substitute**
54:14
**subtracted**
82:18
**subtracting**
83:4
**succeed**
7:22
**successful**
78:19 82:13
**successfully**
21:24
**sued**
21:25
**suffered**
68:24
**suffering**
25:2
**sufficient**
115:18 116:18
121:10 122:4 205:20
**sufficiently**
118:10
**sugar**
25:3
**suggest**
231:17
**suggested**
160:20,23
**suggesting**
25:9 208:23 212:10
**suite**
27:25
**sum**
34:22 152:5 232:13
**summarize**
56:3
**summarized**
233:4
**summarizing**
35:21



summary
69:18 145:5 162:19,
25 163:3 166:22
summed
221:11,15
summing
55:5
supermarket
9:3 10:4
Supermarkets
8:25
supervisory
11:12
supplement
55:6 91:13 112:9
supplemented
67:19 68:4 71:16
91:4 112:6
supplementing
68:9 253:14
supplements
55:10
support
173:23
suppose
65:9 132:4
supposed
106:25
surprise
19:15
surrounding
51:20
survey
5:22 29:21
suspicions
229:4
sworn
4:3
symptoms
25:2
synthetic
54:4
system
63:3 135:23 178:17,
19 181:7 208:17
209:2 216:19,23
218:17 220:9

**T**

T-MOBILE
20:19
t-statistic
249:4
t-test
249:9,22 250:14
t-testing
250:9
t-tests
249:14 250:4
tab
146:25 147:3,8,11
148:14,19 150:3,7,
11,14 162:3,4,5,13,
19,24 164:5,13,15,
17,19 167:4,13,15
168:5,8,10,23
table
119:16 161:6
168:17,18,19 170:15
172:4 182:4 189:20
193:6 195:20 196:23
199:10 212:18
214:2,3 231:18,21
233:5
tables
188:11,12 193:21
213:10
tabs
162:2,20 165:4

tag
9:22
tailor
106:4
taker
38:4
takes
248:23
taking
14:13 24:23 48:5
70:2
talk
30:23 46:11
talked
64:25 100:5 102:6
109:10 199:15
203:20 212:16
talking
24:7 34:4 40:20
81:11 83:7 122:6,7
124:23 131:24
168:16 197:15
204:23 215:4
tallied
63:10
tally
47:25 63:12 187:25
tangential
51:20
tangentially
50:9
target
111:21
task
194:5
tasks
179:6,9,11,17,21
210:13
tax
14:15
team
62:4 169:13
technique
5:22 51:4
technology
7:8 34:16
telephone
55:20 62:16
telling
119:12
temporal
104:10
temporally
122:6
ten
238:24 239:3
tend
137:5
term
51:18 202:25
terminate
106:25
terminated
22:24
termination
21:18
terms
23:6 83:3 136:11
141:24 198:4 226:22
test
169:3 249:4
testified
4:4 23:14 26:21,24
27:8,19,22 28:6,24,
25 29:7 48:21 60:20
67:23 149:17 153:2
156:2 176:25 183:19
193:15 206:3,8
210:8

testify
12:24 27:15 29:17
45:23 132:24 134:10
testifying
16:5 26:13 29:11
49:2 57:16 58:2,13
70:14,15 174:11
210:23
testimony
17:9 19:22 25:8,12
27:9,11 28:3,18
29:24 30:6 38:21
39:18 48:25 49:6
51:8 71:19 83:24
84:3 174:15,19
207:25 211:9 229:6
236:3,14 247:20
theater
130:23
then-proposed
20:18
theory
35:23 40:4 41:11
68:25 78:17 80:5,22
81:5,14 82:14 83:17,
19 109:11,17 110:3,
5
therefrom
25:5
thereto
89:22 148:2
thermostats
58:10,12
thicker
61:21
thing
7:4 51:5 76:4 131:7,
23 234:15
things
5:24 41:5 50:9,11
51:21 89:11,15
100:5 101:17 114:12
153:14 156:6 166:23
167:24 169:11
173:17 179:22
204:18 205:13,16
210:15 226:23
239:24 247:9,10,16
253:14
thinking
39:20
third-party
88:17 89:23 90:15
100:14
thought
109:11 191:3
thousand
197:19
thousands
176:14 184:11
197:20
three-pack
248:13,14
threshold
88:13
time
8:3,6,14 12:10,14,
19,23 13:8 16:12,24
21:8 34:18,24 45:11
53:2,19 62:22 66:14
68:8,11 90:20 99:25
105:16 108:3 111:5
131:23 140:22 141:7
159:7 187:2 200:21
203:17 204:9 223:20
224:7 236:18 238:6,
19 241:19 246:8
253:22
timeframe
14:22 105:3,4

timeline
41:6
times
18:25 19:6,13,20
23:9 27:7,10,13,15,
19 29:14 37:15
47:23,25 53:8 63:9
83:23 127:19 166:19
173:6 180:15 202:21
211:10
title
8:17 10:13 11:3,19
13:16 164:16
titled
4:18 73:9 168:9,23
240:12
titles
13:18
today
6:25 8:8 23:8 30:13
35:9,13 44:15 46:5,
24 52:22 56:6 62:12
63:8 65:2 76:14 85:6
92:14 93:10 94:2
97:6 101:22 102:6,
14 110:12 116:6,10,
21 121:6 132:17,25
146:5 149:16 150:2
151:6 160:11 169:8
184:2,10,18 185:4
186:3,9 187:3
188:13 192:14
193:10 199:15
202:13,20 210:23
212:14,22 215:5
218:20 222:2 224:5,
8 235:17 236:2
238:21 239:5 240:3,
19 241:8 247:10,17,
18 253:5,16
told
27:15 92:7 199:16
210:12
Toni
253:19
tool
156:18 212:24
tools
179:7 184:3 210:13
toothpaste
57:23
top
18:16 19:2,14 22:15
23:13 27:3 160:24
167:9 172:14 177:19
189:18 194:11
topic
96:15
total
9:25 15:2 34:23 55:5
98:10 108:5 111:10
115:21 118:21,22
120:18 122:12
124:8,16,20,25
127:13 134:3,8
164:8,10 166:8
195:14,15 196:25
197:18 198:18
199:25 210:7 233:23
totality
66:19 90:22 126:23
130:10 133:25 142:5
145:10 149:11,24
222:12
trade
22:23 219:20,25
237:21,25 239:12
240:5,13 241:22
243:22
training
5:12,13,15

trans
54:16
transaction
18:6 190:10
transactions
9:13 93:9
transcript
33:4 66:16 253:20
transition
13:5
translation
115:9
transmitted
170:19
tremendous
131:6
trial
26:25 27:8,12,15,18,
22 28:24,25 29:8
59:12
trials
28:13,14
triggers
70:17
true
172:16 179:3 208:3
truthfully
46:25
tuna
60:2
turn
47:5 49:10 73:8
77:12 205:3 222:18
turned
27:25
Turning
64:8
type
36:13 39:11,21 40:2,
16,18 42:7,13 55:11
81:22 92:16 93:3
128:17 130:23 131:7
139:23 143:3 180:24
188:14 224:19
234:16
types
7:14 17:20,23 20:3
27:21 39:15 228:13
typical
30:21 123:4,18
typically
38:9 201:3

**U**

U-S-T-A
15:17
U.S.
162:3,4 163:5,22
166:11 167:13,23
168:9,10,23 223:19
ultimate
30:3
ultimately
117:25 123:7,11,16
193:2
ultrasonic
5:4 33:21 51:25
78:23 79:16 145:16
234:19 245:9
ultrasound
43:13,23
unable
116:12
unaware
33:18
underfilled
60:2
underlies
220:4

underlying
161:25 205:19 220:8
221:25 223:17
225:10 232:19
236:25
undermine
231:6
underpin
159:22
underpinned
103:5
understand
5:24 36:8 37:6,19
70:8 75:10,13,17
80:21 94:17 95:6
106:13 108:15
114:13 115:9 117:6,
8 120:2,3 122:5
129:22 136:9,13
138:3 153:13 161:24
165:6 194:22
199:17,18 201:13
204:13 206:9 215:7
216:5,9 222:25
224:24 225:4 230:23
250:14
understandable
199:5
understanding
5:3 22:18 23:6 26:10
36:5 38:24 39:3,11
40:12,16,24 44:23
45:19 48:11 49:17
54:20 56:16 57:5,13
59:22 60:11 62:8,22
70:21 73:6 74:15
75:21,25 76:19
80:17 83:18 84:9,24
87:3 94:23 95:10,14,
18,24 105:8,11
107:15,17 108:9,13
110:5,21 112:24
113:16,21 116:22
120:5 122:8 124:17,
20 125:4 126:20
127:8,21 136:12
137:3,25 138:10
144:6,7 148:20
153:10,11 157:13
159:15,23 162:17
165:10 167:22
171:19 174:24
175:13 177:10
194:12 200:4,15,18
201:20 203:25
208:22 213:13,15,23
214:19 222:7 224:21
229:14 232:15,25
234:25 237:7 241:3
understate
137:18
understood
118:20 234:6
undertake
109:16
undertaken
165:18
unit
9:23,24 96:16 123:5,
18 143:8 146:7,9
189:4 195:16 196:5
198:23 251:8
United
157:25 167:14
units
93:8,12,17 94:5,9,
13,19 95:12,20 97:9
111:10 112:25 113:3
114:16,17 115:5,6,
10,20 117:9 120:17
121:12 122:12
123:3,13,17,20



134:17 142:17
143:13,14 151:22
166:8,19 197:18,19,
21,24 198:2,5,7,15
**universe**
111:21 124:21
147:17,22
**University**
5:10
**unnecessary**
116:20
**unrelated**
22:24
**updated**
97:3
**upper**
232:15
**usable**
226:22
**user**
177:23
**USTA**
15:17
**utilization**
193:14
**utilize**
103:12 179:10
**utilized**
82:15 103:18 112:11
126:10 159:20 193:2
195:9 226:11 246:19
**utilizing**
107:20 177:25

---

**V**

**vague**
33:11 119:25
**validate**
156:19 163:18,20
**validated**
155:24 163:15 167:5
199:24 223:3
**validation**
163:24 171:10 200:5
**valueless**
25:19
**values**
160:19
**Van**
4:19
**variation**
252:22
**vary**
197:8
**vendors**
9:14
**venues**
60:17
**verdict**
28:11,12,17
**verification**
171:7
**verifies**
245:19
**verify**
106:17 154:23
155:8,21 157:11
170:18,23 171:5
175:4 179:24 181:20
185:15 186:18
187:10,13 201:7
226:16 227:6 233:25
236:9 245:16
**verifying**
181:24
**versus**
125:9 139:11
183:19,23 184:13

**vice**
8:18 14:22,23 15:23
**view**
33:16
**Violations**
55:20
**visual**
201:12 252:20
**voluminous**
97:11 133:16 135:14

---

**W**

**W-E-I-R**
4:10
**W-O-O-S-T-E-R**
6:13
**wages**
29:3
**Walgreen's**
92:7
**Walmart**
37:15 39:5,7 86:23
90:8,14 95:17,19,20
96:4,8,9,13 112:25
113:3 115:5,6
137:15,17,22
138:11,21 139:6,10,
20 150:7,18 190:4,9,
17 191:2 200:21,22,
25 201:7,13 248:5,
11 251:21
**Walmart's**
138:8
**wanted**
178:23
**warehouse**
113:2
**warranty**
23:16
**washing**
57:3
**Washington**
4:11
**watch**
180:13,16
**water**
25:3 61:22,23
**ways**
62:13
**website**
36:25 223:19
**websites**
37:18 64:20,24 65:6,
7,12,18 71:8 101:21
102:5,8,25 103:9,18
**week**
12:16 24:8 59:8
**weekly**
227:13
**weeks**
22:21
**Weir**
4:9,15 5:1,7 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1,5 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1,20 73:1

74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1,22 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1,
20 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1,4
**Whirlpool**
56:24 58:25 61:16
**White**
57:22
**wholesale**
89:9,17 111:12
112:11,14,21 113:3,
6,13,15 114:8,10,17,
20 115:2,10,19
116:24 117:9,18,19,
24 118:4,12,19,25
119:6,9,14,21
120:14,17 121:9,12,
21,25 122:11 123:9,
13,20,25 124:4,7,16,
19,25 125:9,16,20,
22,23 126:6,20,22
127:23 128:4,21
129:13,18,23 130:4,
9,17,20 131:3 140:5
166:4,6,9 183:22
190:7,10,22 191:10,
21 197:7 207:8,10
208:10,13,19

211:19,20 213:14,
17,24 245:13 246:2
**wholesaled**
120:7 127:4,17
**wholesales**
113:18 120:11
127:13 164:8 183:19
184:13
**Wing**
4:14,16 52:23 53:4
74:22 98:18,21
138:18 151:14
161:13 170:7 175:23
176:4 194:24
202:17,19 214:12
252:25 253:4
**wipes**
53:23,24 54:2
**withheld**
76:2
**Witness's**
207:24
**Wooster**
6:12
**word**
88:24,25 188:10
228:2
**words**
173:10 190:15
**work**
5:16 7:8,18,20,21
8:8 12:8 18:12 19:23
21:3,9 34:21 35:11,
17,19,25 44:2 56:21
61:10 62:13 71:12
76:5 86:25 100:19
101:3 102:13 103:6
107:6 109:23 110:7,
9 113:12,17 121:5
123:12,19,22
124:10,11 125:11,15
126:5 127:20 128:6,
8 129:25 133:14,16
134:24 135:13,15
138:16 139:13,15,
17,22,24 153:12
158:22,24 159:4,11,
21 162:9 163:20,23
165:18,20 167:18
173:4,5,23 174:6,7,
12,16,20,22,25
178:11 179:25
180:3,9,19 182:9,13,
17 183:3,17 186:15
187:10 192:2,3,4,7,
8,17 200:4 202:21,
24 203:7,12,18,20,
21 204:9,20 205:24
206:9,17,22 208:8,9
210:11 212:3 213:5,
8,9,22 214:8 215:18
217:12 224:2
245:15,17,19 246:14
251:18
**worked**
8:24 31:15 32:16
60:21 61:2,3,12 62:3
**working**
14:2 180:10,12
**worthless**
77:19 79:24 80:3,16,
21 81:10 108:17
**written**
48:24 49:5 64:6
219:5
**wrong**
58:23 228:2
**wrongful**
28:25

---

**Y**

**year**
8:13 12:13 23:9
24:3,6 26:24 43:9
116:6 121:5
**years**
6:15 8:13,21,24
10:25 11:2,17 13:15
14:21 16:22 17:2
29:23 32:2 40:15
50:5,23 67:11 126:2
130:7 224:18
225:11,14 233:4
237:3,6 238:11,24
239:3 241:25
**Yitz**
31:5,6,8,15 32:16
60:21 61:2,12

---

**Z**

**Zicam**
56:7 59:16,17

