**EXHIBIT 1**

Page 1

1                  UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF NEW YORK

3

4    JOANNE HART and SANDRA          )

5    BUENO, on behalf of            )

6    themselves and all others      )

7    similarly situated,            )

8                      Plaintiffs,  )

9             vs.                    ) No.1:15-CV-04804-WHP

10   BHH, LLC d/b/a BELL +           )

11   HOWELL and VAN HAUSER, LLC,     )

12                      Defendants.  )

13

14

15            Videotaped Deposition of DR. PAUL W.

16   BORTH, called for examination, taken pursuant

17   to the Rules of the United States District Courts,

18   pertaining to the taking of depositions, taken before

19   Lynn A. McCauley, CSR No. 84-003268, RPR, a Certified

20   Shorthand Reporter of the State of Illinois, at

21   33 West Monroe Street, Suite 1100, Chicago, Illinois,

22   on January 16, 2018, at 9:44 a.m.

23

24

25   Pages 1- 313

1    any matters contained within those reports?            09:48

2           A.    No, they serve to reinforce it.            09:48

3           Q.    What was your assignment in this case?     09:48

4           A.    It would be best if I could read the       09:48

5    purpose --                                              09:48

6           Q.    Go ahead.                                  09:48

7           A.    -- of the reason I was retained.           09:48

8                 So this is included in my                  09:48

9    Defendants' Expert Disclosure.                          09:48

10                "This document was prepared to             09:48

11   evaluate the research reports that BHH, LLC and         09:48

12   Van Hauser, LLC used to support the entomological       09:48

13   claims made on and in the packaging and owner's         09:48

14   manual of various of its ultrasonic pest repeller       09:48

15   products."                                              09:49

16                That's the basis, the primary              09:49

17   purpose.                                                09:49

18          Q.    Okay.  Are you providing an opinion as to  09:49

19   the efficacy of the Bell + Howell ultrasonic pest       09:49

20   repellers in driving out and repelling insects?         09:49

21          A.    Yes.                                        09:49

22          Q.    Are -- and can we agree for today -- I      09:49

23   understand that this isn't completely scientifically    09:49

24   accurate -- but can we agree for today that if I say    09:49

25   the word insects, I am referring to ants, spiders,      09:49

Page 17

1    course of several years to write product labels, to        09:53
2    review product labels, and to approve product labels.      09:53
3                   Sometimes the essence of those were        09:53
4    written up in trade magazine articles and then            09:53
5    published in a trade magazine, which would -- the         09:53
6    circulation of that trade magazine would be going to      09:53
7    the customers of Dow AgroSciences, so I would             09:53
8    consider that marketing.                                  09:53
9         Q.   Who were the customers you're referring         09:53
10   to?                                                        09:53
11        A.   Professionals generally,                         09:53
12   agriculturalists, urban pest management                    09:53
13   professionals, owners of distributorships.                 09:53
14        Q.   Okay.  Did -- does Dow distribute               09:53
15   products directly to nonprofessional consumers?            09:53
16             MR. OSTOJIC:  Object to form.                     09:54
17                   But go ahead.                               09:54
18   BY THE WITNESS:                                             09:54
19        A.   I cannot recall any that they did during         09:54
20   my employment.                                             09:54
21   BY MR. KOPEL:                                              09:54
22        Q.   Have you ever worked on any matter              09:54
23   pertaining to the marketing of a product that was          09:54
24   distributed directly to nonprofessional consumers?         09:54
25        A.   I have to -- I have to clarify your --          09:54

Page 19

1           So, again, there's a layer in                09:56

2     between Dow and the enduser.                        09:56

3           Q.   So did -- did Dow have any role in       09:56

4     creating the packaging or labeling of a product that 09:56

5     was ultimately viewed by a nonprofessional consumer? 09:56

6           MR. OSTOJIC:  Object to form.                 09:56

7     BY THE WITNESS:                                     09:56

8           A.   Yes.                                     09:56

9     BY MR. KOPEL:                                       09:56

10          Q.   And were you involved in that?           09:56

11          A.   Yes.                                     09:56

12          Q.   Can you give me an example?              09:56

13          A.   An example would be chlorpyrifos is the  09:56

14    active ingredient, c-h-l-o-r-p-y-r-i-f-o-s, that's   09:56

15    the active ingredient sold under the trade name at   09:56

16    one time of Dursban, D-u-r-s-b-a-n.  Dursban was sold 09:56

17    in big box stores like Lowe's Home and Garden, many, 09:56

18    many other places.                                  09:57

19              Now, Dow would have provided the          09:57

20    basic product information on the label and any claims 09:57

21    that were made on the product.                      09:57

22              Whether the distributor or that next      09:57

23    layer added things was beyond the scope of Dow.     09:57

24          Q.   Okay.  So do you know for certain whether 09:57

25    or not any claims that appeared on a packaging       09:57

Page 20

1   marketed to nonprofessionals were ever written or          09:57

2   reviewed by you personally?                                09:57

3        A.   I could not give you an example.                 09:57

4        Q.   So when it comes to claims written on the        09:57

5   labeling of Bell + Howell ultrasonic pest repellers,       09:57

6   would you consider yourself an expert in                   09:57

7   interpretation of those claims?                            09:58

8        A.   I would.                                         09:58

9        Q.   What's your basis for --                         09:58

10        A.   The basis -- sorry.                             09:58

11        Q.   What's your basis for that?                     09:58

12        A.   The basis is that I spent many years            09:58

13   writing, reviewing, approving pesticide labels to the     09:58

14   consumer -- or the customer of Dow AgroSciences.          09:58

15             I am very well aware of the                     09:58

16   technical language that appears on labels.  I've          09:58

17   written it, I've reviewed it, I've approved them, and     09:58

18   since the information on a product label is -- in my      09:58

19   opinion -- a binding document so to speak, it tells       09:58

20   the enduser how to use the product.                       09:58

21             How I wrote those labels for Dow                09:58

22   products would also apply for products that were          09:58

23   distributed or sold by Bell + Howell or Van Hauser.       09:58

24        Q.   Okay.  And you hold that opinion even           09:59

25   though you've -- you can't give me a single example       09:59

Page 24

1    opinion is legal or not.                                    10:02

2          Q.   Okay.                                           10:02

3          A.   You'd have to educate me.                       10:02

4          Q.   Sure.                                           10:02

5               And we just discussed an example.               10:02

6    Whether or not a consumer is required to read              10:02

7    instructions and use a product as directed.                10:02

8               Would you agree that that's                     10:02

9    something that would be at least potentially governed      10:02

10   by the applicable law?                                     10:02

11         MR. OSTOJIC:  Object to form, foundation.            10:02

12   BY THE WITNESS:                                            10:02

13         A.   I think -- yes, I would think so.               10:02

14   BY MR. KOPEL:                                              10:02

15         Q.   And you're not -- you're not qualified to       10:02

16   render an opinion on that; correct?                        10:02

17         A.   I cannot point to a legal statute that          10:02

18   would say so.  It makes common sense to me but...          10:02

19         Q.   Do these reports, Exhibits 1 and 2 in           10:02

20   front of you, do they list all facts or data that you      10:02

21   considered in forming your opinions?                       10:03

22         A.   At the time that I wrote them, yes.             10:03

23         Q.   Now, I -- I think that your report              10:03

24   referenced six tests that were conducted on the            10:03

25   Bell + Howell ultrasonic pest repeller; correct?          10:03

Page 46

1    BY MR. KOPEL:                                          10:33

2         Q.   If pests in a crack in a floor or          10:33

3    underneath a floor, then the ultrasonic sound waves   10:33

4    would not be able to reach them; correct?            10:33

5         A.   More than likely.                          10:33

6         Q.   Okay.  So is -- so is that area included   10:33

7    under your definition of drives pests out?           10:33

8         MR. OSTOJIC:  Object to form.                   10:33

9              But go ahead.                              10:33

10   BY THE WITNESS:                                       10:33

11        A.   If it was to drive -- if the ultrasonic    10:33

12   repeller drove pests out of a room, let's say, to    10:33

13   some area where they could not hear or be exposed to 10:33

14   the ultrasonic sound, then the answer is yes; and if 10:33

15   that's behind walls, yes; if that's in cracks, yes;  10:33

16   if it's -- if they can't -- if they're not exposed to 10:33

17   the sound, they can't be repelled.                   10:33

18   BY MR. KOPEL:                                         10:34

19        Q.   Do you think it was -- it is unreasonable  10:34

20   for a consumer to understand drives pests out to mean 10:34

21   drives pests out of the house?                       10:34

22        A.   I do not.                                  10:34

23        Q.   You think that is a reasonable            10:34

24   interpretation?                                       10:34

25        A.   I sure do.                                 10:34

Page 73

```
 1     that these devices do not repel pests."          11:35

 2               Do you see that?                        11:35

 3        A.   Yes.                                      11:35

 4        Q.   Okay.  And 4 to 8 are Chinese testing of  11:35

 5     the Bell + Howell ultrasonic devices; correct?    11:35

 6          MR. OSTOJIC:  Object to form.                11:35

 7     BY THE WITNESS:                                   11:35

 8        A.   Yes.                                      11:35

 9     BY MR. KOPEL:                                     11:35

10        Q.   And those -- those tests are contained    11:35

11     within Exhibits Borth 3, 4, 5, and the document which  11:36

12     I handed to you, which was previously marked as   11:36

13     Exhibit 13; correct?                              11:36

14        A.   Yes.                                      11:36

15        Q.   Okay.  And Reference 13 is referring to a 11:36

16     1984 study performed by Ballard, Gold and T. Decker;  11:36

17     correct?                                          11:36

18        A.   Correct.                                  11:36

19        Q.   And these are -- and one last thing.      11:36

20     Reference 10 is a chi-square test analysis that you  11:36

21     performed on References 4 through 8; correct?     11:36

22        A.   Correct.                                  11:36

23        Q.   And these -- these seven sources are what 11:36

24     you are basing your opinion on that these devices do  11:37

25     repel pests; correct?                             11:37
```

Page 74

1       A.   In part, yes.                              11:37

2       Q.   What do you mean by in part?               11:37

3       A.   Well, I base my opinion on everything,     11:37

4   totality of everything I looked at, which would     11:37

5   include everything on this list.                    11:37

6       Q.   Okay.  What else on this list supports     11:37

7   that finding?                                       11:37

8       A.   Everything.  Referenced -- in total,       11:37

9   References 1 through 23.  Everything I read goes into 11:37

10  making an opinion.                                  11:37

11      Q.   I understand, but, you know, taken by      11:37

12  itself, did you find evidence in the First Amended  11:37

13  Class Action Complaint that these devices are       11:37

14  effective to repel pests?                           11:37

15      A.   First Amended Class Action -- okay.  I     11:37

16  have to ask to be repeated again.  Sorry.           11:37

17      Q.   Sure.                                       11:38

18           Taken by itself, did you find any           11:38

19  evidence within the First Amended Class Action       11:38

20  Complaint that the Bell + Howell devices are         11:38

21  effective to respell pests?                          11:38

22      A.   I don't know -- I'm sorry.  But I don't     11:38

23  know how you connect the Complaint.  Maybe it's      11:38

24  semantics, but I'm not understanding.                11:38

25      Q.   Well, the only reason I'm bringing up the   11:38

Page 126

1    people talk about replications.                           12:40

2         Q.   Given that you don't know the species of      12:40

3    tests used, would you be able to replicate this test    12:40

4    if you wanted to?                                        12:41

5         MR. OSTOJIC:  Object to form, foundation.           12:41

6              But go ahead.                                  12:41

7    BY THE WITNESS:                                          12:41

8         A.   It would be -- it would be coincidence I      12:41

9    guess.  It would be -- I certainly can test roaches,    12:41

10   I can test ants, and I can test spiders.                12:41

11             Whether they're exactly the same              12:41

12   species, we don't know since they -- since they         12:41

13   didn't say.                                             12:41

14   BY MR. KOPEL:                                            12:41

15        Q.   Well, in common practice and when we talk     12:41

16   about the scientific concept of replication, would be   12:41

17   to use the same species; correct?                       12:41

18        A.   You would want to have anything               12:41

19   identical, yes, replicates should be identical.         12:41

20        Q.   Given that we don't know the model of         12:41

21   pest repeller used here, would that also prevent you    12:41

22   from replicating this test if you wanted to do so?      12:41

23        A.   It depended on what level.                    12:41

24             If you -- if you wanted to test a             12:41

25   Bell + Howell ultrasonic repeller, and your question    12:41

Page 146

```
 1   BY THE WITNESS:                                     01:58
 2        A.   They may if they went to university and  01:58
 3   had statistic class.                                01:58
 4   BY MR. KOPEL:                                       01:58
 5        Q.   Given that there were uncertainties of   01:58
 6   large numbers of new pests added in the middle of the  01:58
 7   test and you don't know what chamber they're added  01:58
 8   to, are you really comfortable relying on this test?  01:58
 9        A.   Yes.                                      01:58
10        MR. OSTOJIC:  Asked and answered.             01:58
11             But go ahead.                            01:58
12   BY THE WITNESS:                                     01:58
13        A.   Yes again.                               01:58
14   BY MR. KOPEL:                                       01:58
15        Q.   Do you think that this would pass muster 01:58
16   in peer review?                                     01:58
17        MR. OSTOJIC:  Object to form.                 01:58
18             But go ahead.                            01:58
19   BY THE WITNESS:                                     01:58
20        A.   It depends on the peers, it depends on   01:58
21   the publication.                                    01:58
22   BY MR. KOPEL:                                       01:58
23        Q.   Would you have relied on a test like this  01:58
24   in the course of your work at Dow?                  01:58
25        A.   No.                                       01:58
```

Page 147

| | | |
|---|---|---|
| 1 | Q.   Why not? | 01:58 |
| 2 | A.   Too many unanswered questions. | 01:58 |
| 3 | Q.   So why are you more comfortable in the | 01:58 |
| 4 | course of your work here relying on it? | 01:58 |
| 5 | A.   Because the -- I -- because I've worked | 01:59 |
| 6 | with Dow Chemical, I know the rigor with which they | 01:59 |
| 7 | require their data to be obtained and used and | 01:59 |
| 8 | analyzed. | 01:59 |
| 9 | I don't know the rigor from | 01:59 |
| 10 | Bell + Howell case -- or the Bell + Howell culture. | 01:59 |
| 11 | Q.   Was there a reason -- | 01:59 |
| 12 | A.   They're different companies. | 01:59 |
| 13 | Q.   Was there a reason that Dow Chemical had | 01:59 |
| 14 | a heightened -- a very rigorous standard? | 01:59 |
| 15 | MR. OSTOJIC:  Object to form. | 01:59 |
| 16 | Go ahead. | 01:59 |
| 17 | BY THE WITNESS: | 01:59 |
| 18 | A.   Well, I didn't set the standard.  I only | 01:59 |
| 19 | complied with it.  They wanted to reduce variability | 01:59 |
| 20 | and be able to write labels and literature that was | 01:59 |
| 21 | unquestionable. | 01:59 |
| 22 | BY MR. KOPEL: | 01:59 |
| 23 | Q.   Do you agree that had the -- these new | 01:59 |
| 24 | pests been added to Chamber B, that would skew the | 02:00 |
| 25 | test results? | 02:00 |

```
 1          Q.   And it's possible they're in the chamber   02:34
 2    together at the same time that they were -- the --    02:34
 3    the spiders, roaches, and ants were affecting each    02:34
 4    other's movements within the chambers; correct?       02:34
 5          MR. OSTOJIC:  Object to form, foundation.        02:34
 6    BY THE WITNESS:                                        02:34
 7          A.   It's possible, yes.  We have no way of      02:34
 8    knowing.                                               02:34
 9    BY MR. KOPEL:                                          02:34
10          Q.   Well, spiders eat roaches; right?           02:34
11          A.   Yes.                                        02:34
12          Q.   So wouldn't you say it's pretty likely in   02:34
13    that case that the spiders were affecting the         02:34
14    movement of the roaches?                              02:34
15          A.   No, I didn't say that --                    02:34
16          MR. OSTOJIC:  Objection to form and             02:34
17    foundation.                                           02:34
18    BY THE WITNESS:                                        02:34
19          A.   -- I said it's possible.                    02:34
20                                                           
21    BY MR. KOPEL:                                          02:34
22          Q.   But you don't know one way or the other;    02:34
23    right?                                                 02:34
24          A.   I can't prove it one way or the other.      02:34
25          Q.   Do you know one way or the other?           02:34
```

Page 179

```
 1  not clear.                                          02:52
 2              Earlier we discussed, you know, that     02:52
 3  Dow had rigorous standards when evaluating efficacy  02:52
 4  of insecticides, that companies differ in terms of   02:52
 5  the standards required.                               02:52
 6              Do you recall that?                       02:53
 7      A.   Yes, words to that effect.  I don't know    02:53
 8  that I used the word standards, but, yes, I recall    02:53
 9  the conversation.                                     02:53
10      Q.   Okay.  In the course of your work at Dow,   02:53
11  would you have relied upon the five -- solely upon    02:53
12  the five studies we just examined, that is the five   02:53
13  Chinese studies of the Bell + Howell repellers in     02:53
14  determining that a product was effective?             02:53
15              You know what.  Let me restate the        02:53
16  question, okay?                                       02:53
17              In the course of your work at Dow,        02:53
18  would you have relied on the five Chinese studies     02:53
19  that we just discussed in making a determination that 02:53
20  the product would be effective inside people's        02:53
21  residences?                                           02:53
22      MR. OSTOJIC:  Object to form, foundation.         02:53
23              To the extent you can answer, go          02:54
24  ahead.                                                02:54
25                                                        
```

```
 1    BY THE WITNESS:                                     02:54
 2         A.   I would not have relied on those studies  02:54
 3    solely to fulfill my obligation to Dow.             02:54
 4    BY MR. KOPEL:                                        02:54
 5         Q.   Why not?                                   02:54
 6         A.   Because they are -- well, for the reasons  02:54
 7    we pointed out.  They weren't -- they could have been 02:54
 8    done better.  They could have been -- or else you    02:54
 9    have to have other tests that are done, replicated,  02:54
10    there's a control, the species.                      02:54
11              I mean for Dow's purposes, this -- I       02:54
12    would not use these data to make a commercialization 02:54
13    decision on, but I wouldn't discount them either.    02:54
14              I've said that, and I want to make         02:55
15    sure you understand that.  I don't throw data out.   02:55
16              So sole -- the -- solely, no.  In          02:55
17    combination with other things, as many other things  02:55
18    that I can find, they're part of the package.        02:55
19         Q.   Would the totality of the data you've      02:55
20    seen on the effectiveness of the Bell + Howell       02:55
21    repellers, would the totality of that data have been 02:55
22    sufficient for you to commercialize this product for 02:55
23    use in residences with Dow?                          02:55
24         MR. OSTOJIC:  Object to form, foundation, and   02:55
25    irrelevant.                                          02:55
```

Page 181

```
 1              But go ahead.                        02:55
 2    BY THE WITNESS:                                02:55
 3        A.   Well, it's difficult to say because   02:55
 4    different -- as I said before, business people are 02:55
 5    involved in the decisionmaking at Dow.         02:55
 6              If the business leaders saw the data 02:55
 7    and agreed that it was sufficient to back up the 02:56
 8    claims on the labels, they might have.         02:56
 9        Q.   Was it -- and, as I understood it, it was 02:56
10    your job to make -- to make these determinations; was 02:56
11    it not?                                        02:56
12        A.   That was one of many.                 02:56
13        Q.   Okay.                                 02:56
14        A.   But my -- my opinion carried a lot of 02:56
15    weight.                                        02:56
16        Q.   Okay.  As to your own purposes, would you 02:56
17    have relied on the totality of the data you've seen 02:56
18    on Bell + Howell repellers to go forward with the 02:56
19    commercialization of the product at Dow?       02:56
20        MR. OSTOJIC:  Object.  Same objections as  02:56
21    before.                                        02:56
22        THE WITNESS:  As a Dow -- all right.  I have 02:56
23    to ask you to read it back because I think you said 02:56
24    at the end as a Dow employee, so that's --     02:56
25        MR. KOPEL:  I believe that's what I --     02:56
```

Page 182

```
 1          THE WITNESS:  -- different.  Not a          02:56
 2     Bell + Howell employee, a Dow employee.          02:56
 3          MR. KOPEL:  I believe that's what I said, but  02:56
 4     let's --                                         02:56
 5          THE WITNESS:  Okay.                         02:56
 6          MR. KOPEL:  Let's let the court reporter read  02:56
 7     it back, please.                                 02:56
 8                        (WHEREUPON, the record was    02:57
 9                         read by the reporter.)       02:57
10          MR. OSTOJIC:  Same objections.              02:57
11     BY THE WITNESS:                                  02:57
12          A.   All right.  For my own purposes, what do  02:57
13     you mean by that?                                02:57
14     BY MR. KOPEL:                                    02:57
15          Q.   Sure.  I mean in the course of your    02:57
16     professional obligations at Dow.                 02:57
17          A.   Okay.                                  02:57
18                No.                                   02:57
19          Q.   Can you please turn to your initial    02:57
20     report at Page 8?                                02:57
21          A.   Okay.                                  02:57
22          Q.   I'm looking at Opinion 5 and the first  02:58
23     sentence.                                        02:58
24          A.   Oh, sorry.  I'm on the wrong one again.  02:58
25     I pulled the rebuttal.                           02:58
```

Page 309

```
 1    BY MR. KOPEL:                                          06:49
 2        Q.   Have you seen any evidence that the           06:49
 3    ultrasonic waves emitted by the Bell + Howell          06:49
 4    repellers are capable of reaching pest in a room that  06:49
 5    contains furniture?                                    06:49
 6        MR. OSTOJIC:  Objection.  Asked and answered       06:49
 7    and may call -- and foundation.                        06:49
 8             Also incomplete hypothetical to type          06:49
 9    of furniture, where it's located.                      06:49
10             Go ahead.                                     06:49
11        MR. KOPEL:  That's called witness coaching.        06:49
12    Please stop that.                                      06:50
13    BY THE WITNESS:                                        06:50
14        A.   I've not seen Bell + Howell --                06:50
15    Bell + Howell devices tested in rooms that have        06:50
16    furniture or carpeting.  Though it still doesn't       06:50
17    change my opinion.                                     06:50
18    BY MR. KOPEL:                                          06:50
19        Q.   Do you believe that if submitted for          06:50
20    publication in a peer-reviewed journal, the Chinese    06:50
21    studies conducted on the Bell + Howell repellers       06:50
22    would be potentially selected for publication?         06:50
23        MR. OSTOJIC:  Objection.  Asked and answered       06:50
24    like two to three hours ago.                           06:50
25             Common, we got to move on to other            06:50
```

Page 310

| | | |
|---|---|---|
| 1 | things.  We're just repeating the same questions. | 06:50 |
| 2 | But go ahead and answer it again. | 06:50 |
| 3 | BY THE WITNESS: | 06:50 |
| 4 | A.   No, that wasn't the purpose of their | 06:50 |
| 5 | studies.  Feuerstein said that.  It did not want to | 06:50 |
| 6 | publish. | 06:50 |
| 7 | MR. KOPEL:  All right.  I have no further | 06:50 |
| 8 | questions. | 06:50 |
| 9 | MR. OSTOJIC:  We're going to reserve | 06:50 |
| 10 | signature. | 06:50 |
| 11 | THE VIDEOGRAPHER:  The time it now 6:53 p.m. | 06:51 |
| 12 | This is the end of Media No. 5.  This concludes this | 06:51 |
| 13 | deposition. | 06:51 |
| 14 | We're off the record. | 06:51 |
| 15 | MS. REPORTER:  Are you ordering the | 06:51 |
| 16 | transcript at this time? | 06:51 |
| 17 | MR. KOPEL:  Not at this time. | 06:51 |
| 18 | Do you know pricing?  Can I look at | 06:51 |
| 19 | pricing?  I'm going to have my office contact | 06:51 |
| 20 | Veritext in regards to ordering. | 06:51 |
| 21 | MS. REPORTER:  Would you like a copy if it's | 06:51 |
| 22 | ordered? | 06:51 |
| 23 | MR. OSTOJIC:  I will not need one now; but | 06:51 |
| 24 | obviously if the plaintiff orders one, please contact | 06:51 |
| | me, I will probably get a copy. | 06:51 |
| 25 | (Whereupon, at 6:53 p.m. the deposition was concluded.) | |