**EXHIBIT 26**

**EXPERT REPORT**

**DATED DECEMBER 22, 2017**

**By**

**STEFAN BOEDEKER,**

**Managing Director, Berkeley Research Group**

**In the Matter**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**CASE NO. 1:15-CV-04804-WHP**

JOANNE HART and SANDRA BUENO, on behalf of themselves and all others
similarly situated,
Plaintiffs,
v.
BHH, LLC d/b/a Bell + Howell and VAN HAUSER LLC
Defendants.

## Table of Contents

SECTION 1: QUALIFICATIONS ................................................................................ 1

SECTION 2: BACKGROUND .................................................................................. 2

SECTION 3: SUMMARY OF OPINIONS ....................................................................... 3

Opinion 1: The underlying theory of economic loss in the Weir Report is fundamentally flawed.... 3

Opinion 2: The Weir Report makes numerous assertions that are either proven wrong by the data or based on unsupported and unsupportable assumptions. .................................................. 3

Opinion 3a: The Weir Report purports to have performed statistical analyses which in fact, it did not. ................................................................................................................ 3

Opinion 3b: When conducting the analyses that the Weir Report incorrectly claimed to have performed, the results contradict the statements made in the Weir Report, and therefore, prove them wrong. ....................................................................................................... 3

SECTION 4: DETAILED SUPPORT FOR OPINIONS ..................................................... 4

Opinion 1: The underlying theory of economic loss in the Weir Report is fundamentally flawed.... 4

Opinion 2: The Weir Report makes numerous assertions that are either proven wrong by the data or based on unsupported and unsupportable assumptions. .................................................. 8

Opinion 3a: The Weir Report purports to have performed statistical analyses which in fact, it did not. ............................................................................................................... 16

Opinion 3b: When conducting the analyses that the Weir Report incorrectly claimed to have performed, the results contradict the statements made in the Weir Report, and therefore, prove them wrong. ...................................................................................................... 16

SECTION 5: SUMMARY AND CONCLUSIONS ......................................................... 24

## SECTION 1: QUALIFICATIONS

1. I am a statistician and an economist. I received a Bachelor of Science degree in Statistics and a Bachelors of Arts degree in Business Administration from the University of Dortmund/Germany in 1988. I received a Master's of Science degree in Statistics from the University of Dortmund/Germany in 1988, and I received a Masters of Arts degree in Economics from the University of California, San Diego in 1992. I also finished Ph.D. requirements (except dissertation) in Economics at the University of California, San Diego. Attached hereto as **_Exhibit A_** is a true and correct copy of my *curriculum vitae*.

2. I am currently employed as a Managing Director at the Berkeley Research Group ("BRG"). Prior to joining BRG, I was a Partner at Resolution Economics. I also held Managing Director positions at Alvarez & Marsal, Navigant Consulting, and LECG. I also held partner-level positions at Deloitte & Touche LLP, PricewaterhouseCoopers LLP, and Arthur Andersen LLP. At the three latter firms, I was responsible for the Economic and Statistical Consulting group on the West Coast. Before moving to the United States to attend graduate school, I worked as a statistician for the German Government for three years, from 1986 to 1989.

3. For over 25 years, my work has focused on the application of economic, statistical, and financial models to a variety of areas, such as providing solutions to business problems, supporting complex litigation in a consulting and expert witness role, and conducting economic impact studies in a large variety of industries including, but not limited to, healthcare, retail, technology, entertainment, manufacturing, automotive, energy and utilities, hospitality, and federal, state, and local government agencies.

4. I have extensive experience working on consumer class action cases where economic losses are alleged to have occurred. I have developed consumer demand and pricing models to assess if economic losses have occurred and if so, how to quantify these losses reliably. I have issued numerous expert reports and rebuttal reports dealing with these issues in the class certification stage and the liability and merits phases of consumer class actions. On numerous occasions I have been deposed and I have testified in court in class action proceedings.

5. All of the facts and circumstances set forth in this report are known to me personally and I am prepared to testify to them if called to do so. My curriculum vitae, which includes matters in which I have testified, is attached to this report as Attachment A. BRG is compensated for its work on this matter based on an agreed upon hourly billing rate schedule. My hourly billing rate for professional services related to this case is $650 and the billing rates of BRG staff supporting me on this engagement range from $150 to $495. BRG's payment in this matter is not contingent upon the outcome of this litigation.

## SECTION 2: BACKGROUND

6. It is my understanding that Plaintiffs in this case allege that individuals purchased Bell+Howell Ultrasonic Pest Repellers ("the Products") which were represented by the manufacturer as using ultrasonic sound waves to repel mice, rats, roaches, spiders, and ants ("the Claim"). It is further my understanding that Plaintiffs allege that this Claim is misleading to reasonable consumers because the Products do not repel pests at all. Based on this allegation, Plaintiffs conclude that the Products are ineffective and worthless.[1]

---

[1] First Amended Class Action Complaint, January 23, 2017 ("Complaint").

7.  I was asked by Counsel for the Defendants to review the Expert Report issued by Mr. Colin Weir ("Weir Report") and opine on the validity of the conclusions with respect to the determination of class-wide economic losses to the putative class offered in the Weir Report based on an analysis of the Defendants' own available business records and documents, third party retailer business records, and available market research data. A complete list of documents that I reviewed is attached to this report as ***Exhibit B***.

## SECTION 3: SUMMARY OF OPINIONS

8.  My review and detailed analysis of the Weir Report, the supporting data spreadsheets, and Stata programs, lead me to the conclusion that the damages methodology presented in the Weir Report is fundamentally flawed, irrelevant, and unreliable for a quantification of class-wide economic loss.

9.  More specifically, I have developed the following opinions:

> ***Opinion 1: The underlying theory of economic loss in the Weir Report is fundamentally flawed.***

> ***Opinion 2: The Weir Report makes numerous assertions that are either proven wrong by the data or based on unsupported and unsupportable assumptions.***

> ***Opinion 3a: The Weir Report purports to have performed statistical analyses which in fact, it did not.***

> ***Opinion 3b: When conducting the analyses that the Weir Report incorrectly claimed to have performed, the results contradict the statements made in the Weir Report, and therefore, prove them wrong.***

10. I may expand or modify these opinions and my conclusion as additional facts, documents or data become available.

## SECTION 4: DETAILED SUPPORT FOR OPINIONS

*Opinion 1: The underlying theory of economic loss in the Weir Report is fundamentally flawed.*

11. The analyses in the Weir Report are essentially no more than an exercise in simple arithmetic that attempts to identify total units sold and then multiplies this sales figure with an average price to arrive at an alleged class-wide economic loss to the members of the putative class assuming that none of the units would have been sold because the Products are allegedly ineffective and worthless.

12. In the context of alleged class-wide economic losses, it is important to define what "worthless" means. The Weir Report fails to give a precise definition of the concept of worthlessness. In Economics, there is no theoretical concept of worthlessness. Consumers pay a price for a product when they perceive to receive "utility" from the product. A product's utility is associated with the features and attributes of the product. The attributes of a product and the price consumers are willing to pay combined with their budget constraint determine the demand for the product. On the other hand, the price the manufacturer is willing to accept determines the supply of the product. The price at which the demand and the supply meet is the market equilibrium price for the product.

13. Each unit sold of the Products is thus the result of a particular consumer's demand match with the product supplied by the manufacturer. If product features change, consumers' preferences and choices may also change, which may shift the demand curve and potentially result in a different market equilibrium price.

14. Rather than assuming that the Products are "worthless" based on some unsubstantiated claim, an economic loss model would have to assess which features of the Products were allegedly ineffective and then test how the

consumers' demand curve would have changes. If a change in the demand curve would be observed, then further analysis into whether and how the change in consumer demand affected prices would be necessary. The Weir Report does not address the issue of consumer demand, choices, and preferences and changes thereof based on changing product features at all. Therefore, the analysis and calculations presented in the Weir Report only calculate total revenue but not economic loss which makes them irrelevant and unreliable.

15. The Weir Report asserts that "my analysis of this data indicates that there is no statistically significant price premium for additional features such as a night light. It is my professional opinion that the retail sales data presently available in this litigation indicate that such features have no additional value in the marketplace, and as such, no additional adjustments need to be made to my analysis presented above." Based on his incorrect professional opinion, when calculating the national retail price for the various products, Weir uses a simple average for determining the price for 26 of the 41 products.

16. In his calculation of damages, Weir assumes no price difference for these products. This overstates the quantification of damages and results in a fundamentally flawed analysis. Weir assumes that BHH's product differentiation strategy and its segmentation of its market is not applicable. BHH's sales data shows that consumers value the additional features of the products as indicated by simply being able to sell these products with additional features. These products garner a higher price point to the consumer and if consumers did not value or want these additional features, the sales for these products would be at or near zero.

17. This is simply contradicted by looking at the data that Weir himself generated: There are eight products priced higher than his calculated average price of the Products of $24.10. Six of the eight products have added features such as lights, additional outlet sockets, ionizers, and a "micro" design. Only two of the eight highest priced products have no additional features added but are sold in packages with more units. This observation is limited to only looking at data that Weir produced and the products that he provided sales prices for. If Weir had used nationwide retail prices for all the products instead of his flawed simple average product price, one can expect the same trend to follow – more variety of available price data can't possibly make the range of observed prices smaller. Products with additional features are priced higher than products absent of these features. The sales data shows that consumers place value on these additional features and are willing to pay more for them.

18. Weir purports to calculate damage numbers for three different classes: nationwide, California, and multistate. He uses simple arithmetic to calculate what the sales are, units multiplied by price, and then attributes that entire sales amount as damages that BHH owes to consumers. There are numerous flaws with this analysis.

19. California is included in each one of the classes. Weir does not remove California from the nationwide or multistate class. This results in an overstatement of damages. In order to generate his damages number, Weir lists the total unit and dollar sales of 16 of Bell & Howell's products. He appears to have a summed total of all units and dollar volume sold in California and in the United States, which incorporate more data than the 16 listed products. It is unclear where his summed total of units sold and dollar volume come from. He calculates 144,873 units sold in California for a total dollar volume of $3,530,975.78 and 1,836,902

units sold in the United States for a total dollar volume of $40,684,199.63. To calculate the average price per product sold, he subtracts out the units for product #50184 from the total units because he does not have any dollar sales for that product, and then divides the total dollar volume by total units sold. This results in an average price per of $24.80 in California and $24.10 for the United States. In this process he makes several mistakes.

20. The Weir Report does not utilize data at the same level of granularity for the 25 other products. Therefore, he is only able to calculate the actual average price for each of those products. For all other products in which he cannot calculate the actual average price, he uses the average price per product that he calculates (i.e., he utilizes a price that in essence is an average of averages and then concludes that the prices don't differ across products.

21. The numbers from which he calculates his average price for are unverifiable. Instead of using the average price per product from the 16 products for which he has data, he inflates the numbers by including data for which he does not have data for. A correct method of calculating the average price and extrapolating that number to the rest of the products that have missing prices would be to sum the total units and dollars for those 16 products and then divide the total dollar volume by total unit sales to generate an average price per unit sold.

22. This error leads to the following inflations of damages figures reported in the Weir Report:

    a. In California, he claims that the total units sold is 144,873 for a total dollar volume of $3,530,975.78. Summing the units sold and dollar volume of the 16 products in each respective column results in 91,641 units sold for a total dollar volume of $1,972,248. Subtracting out product #50184 from

the units to calculate the average price per product results in $22.12. Weir incorrectly assumes the average price per product in California to be $24.80. Weir overstates the average price per product by 12.12% or $2.68.

b. For the United States, Weir claims the total units sold to be 1,836,902 for a total dollar volume of $40,684,199.63. Summing the total units sold and dollar volume of the 16 products results in 1,280,682 units sold for a dollar volume of $24,466,220. The average price per product, subtracting out product #50184 results in an average price per product of $21.61. Weir purports the average price per product for the United States to be $24.10. This overstates the average price per product by 10.33% or $2.49.

c. Further, the Weir Report incorrectly claims that every unit that BHH sold to retailers should be included in the damages to consumers. He calculates the retail average price per product and then applies that average to the number of units that BHH sold to retailers, not the number of units that consumers had purchased. This grossly overstates damages because for that time period, BHH sold 2,583,986 units to retailers and Weir asserts that 1,981,775 units were sold to consumers. This is a difference of 602,211 units sold. Applying Weirs average price per product of $24.10 for the United States damages scenario, results in an overstatement of $14,513,277.05.

*Opinion 2: The Weir Report makes numerous assertions that are either proven wrong by the data or based on unsupported and unsupportable assumptions.*

## A. Experimental Testing Supporting Product Effectiveness

23. The Weir Report repeatedly asserts that the Product is ineffective[2] and worthless[3]. It even goes as far as offering a legal conclusion by stating that "this litigation calls for a calculation of Full Compensatory Damages."[4]

24. I am not a Biologist or other scientist of a discipline that designs and manufactures pest repelling devices. However, through my experience and work in the field of experimental design[5], I came to the opinion that the assertion in the Weir Report that BHH's products do not repel pests and are ineffective and worthless is indefensible when all the evidence available is considered.

25. The Whitford Report illustrates that the Products do in fact work. BHH conducted 3 experiments that exposed mice and rats to sounds of Bell & Howell Ultrasonic Pest Repellers in 2011, 2014, and 2016. All tests used very similar apparatuses of two chambers of equal dimensions connected to each other with a tube that permitted mice or rats to freely move between the two chambers. The experimenters conducted pretests which introduced the rats and mice into the chambers absent of the ultrasonic pest repellers. This was to demonstrate that the mice and rats did not favor one chamber over the other and would distribute evenly between the two chambers.

26. Once the pretests were conducted, a Bell & Howell Pest Repeller was introduced and turned on in one chamber. The goal was to determine whether or not the Bell & Howell Pest Repeller worked as intended and did in fact repel mice and rats. The experiment ran for one week. In all tests in 2011 and 2014, experimenters

---

[2] Weir Report, Paragraphs 3 and 11.
[3] Ibid., Paragraphs 3, 8, and 11.
[4] Ibid., Paragraph 12.
[5] See.g., Dean, Angela and Daniel Voss, 2017 Design and Analysis of Experiments, 2nd Edition, Springer Texts in Statistics, for a detailed discussion of how to design experiments and how to properly perform statistical analysis of experimental data.

observed the mice and rats abandoning the chamber in which the pest repeller was turned on and moving to the unaffected chamber.

27. The tests conducted in 2011 and 2014 demonstrated that both rats and or mice would tolerate crowding to a level of one mouse or rat per 3.2 square feet. The pretests also demonstrated through equal disbursement throughout the chambers, that the animals preferred to have more space if available and not subjected to unpleasant sounds.

28. Further, I was provided the expert report by Dr. Paul Borth, a board certified entomologist who specializes in agricultural and urban pest management. Dr. Borth utilized a well-documented and well-established statistical methodology known as the Chi-Square Test of Independence. This methodology was developed to objectively test the hypothesis that the BHH pest repellers had no effect on the pest distribution, i.e., the pest distribution in the tests was independent from the repellers being used or not.

29. The Chi-Square test analyzes experimental results and objectively measures if the observed pest distribution when using the BHH ultrasonic pest repellers is the same as the expected distribution when the pest repellers are not used.

30. In general, in the framework of statistical hypothesis tests like the Chi-Square Test, a hypothesis will be formulated and then data are used to test if it is correct. The initial hypothesis is often referred to as the null hypothesis. In this case, the null hypothesis is that the pest distribution is independent of the use of the pest repeller. If the null hypothesis is rejected, then the conclusion is that the test distribution is not independent of the use of the test repeller which is statistical proof that the underlying experiment showed the efficacy of the product.

31. In statistical hypothesis testing, objective criteria are applied to assess if the null hypothesis can be rejected or not. These objective criteria are measured in terms of statistical significance. In practice, statisticians typically use significance levels of 10%, 5% and 1%. 5% significance level is the most commonly used significance level in practical applications and also the most widely accepted one in legal proceedings.

32. The smaller the significance level the more significant the test result is. Significance measures the likelihood that an observed effect is not due to chance. For example, if a statistical test indicates significance at the 5% level, then there is only a 5% chance that the observed effect is due to chance. The probability that an observed effect is due to chance is also referred to as the p-value of the test. Small p-values reject null in this statistical test.

33. Out of the six efficacy research reports in the Borth Report one was disqualified and not further analyzed. For the remaining five reports, a total of 136 Chi-Square Tests for independence were run where on the days the researchers had labeled as TESTING when the Pest BHH Repeller was ON in one of the testing arenas. When considering all TESTING days, across all experiments, all pests and all pest combinations a total of 136 chi-square tests were run to test the null hypothesis of independence, i.e., "no preference". For 124 out of those 136 Chi-Square Tests, the null hypothesis was rejected at the 5% or 10% level of significance which corresponds to 91% of the time.

34. Based on these statistical test results, I agree with Dr. Borth's conclusion that "Based upon the conditions in which the Pest Repellers were used in these five choice experiments and using the data reported in the associated research reports, the Pest Repellers can be classified as "efficacious" with a reasonable amount of

certainty, given that efficacy is defined as the affectation of pest behavior such that there is a disproportionate number of pests found in an adjoining arena where there is no Pest Repeller."

35. Further, applying the theory of statistical hypothesis testing to the results from five scientifically designed experiments yield strong statistical evidence to the contrary such that the hypothesis of the products' ineffectiveness must be rejected.

36. Finally, there is no evidence that the Products are worthless as the Weir Report claims without any evidence or proof of such a far reaching assertions besides Plaintiff's counsel telling Mr. Weir. Therefore, the conclusions in the Weir Report that the Products are worthless must be rejected because of their irrelevance and lack of reliability.

## B. Low Return Rates

37. I analyzed the same sales reports including summary data about product returns that Mr. Weir relied upon when he did his analysis. These reports give strong evidence that the Products have a very low return rate of 3.02%. In other words, the rate of products never returned is almost 97%. Because there are no barriers or penalties to returning the Product, this high percentage of non-returns is strong evidence of consumer satisfaction. In my opinion, the rate of approximately 97% non-returns are a conservative lower bound of the true consumer acceptance and satisfaction for two reasons:

a. The S/5 Repeller has an unusually high return rate of 34.19% which has an inflationary impact on the overall return rate.

    i. It is my understanding that the abnormally high return percentage for this Product is the result of the creation if an internal credit for 7,524 units of the product because of a double billing error.

    ii. When adjusting the return rate calculations by removing these 7,524 units from the analysis, the overall return rate drops to 2.75%.

  b. Products can be returned for other reasons than the ones at issue in this litigation.

38. Consumer reviews of the Products are widespread across many online media and retailers' websites. Based off of Amazon (3.5)[6], Bed Bath and Beyond (3)[7], HSN (3)[8], and WalMart (3)[9] consumer reviews, BHH products average 3 stars and

---

[6]Amazon product reviews
https://www.amazon.com/Bell-Howell-Ultrasonic-Pest-Repeller/dp/B008653COM/ref=sr_1_3?ie=UTF8&qid=1512344459&sr=8-3&keywords=bell+howell+pest+repeller
https://www.amazon.com/Bell-Howell-Ultrasonic-Pest-Repeller/dp/B008653COM/ref=sr_1_3?ie=UTF8&qid=1512344459&sr=8-3&keywords=bell+howell+pest+repeller
https://www.amazon.com/Bell-Howell-Electromagnetic-Ultrasonic-Repeller/dp/B016889558/ref=lp_11863717011_1_16?srs=11863717011&ie=UTF8&qid=1513916412&sr=8-16 Accessed 12/21/17

[7]Bed Bath and Beyond product review
https://www.bedbathandbeyond.com/store/product/bell-howell-4-pack-ultrasonic-pest-repellers/1043561858?skuId=43561858&mcid=PS_googlepla_nonbrand_googleplascatchall_online&product_id=43561858&adtype=pla&product_channel=online&adpos=1o1&creative=45758750869&device=c&matchtype=&network=g&mrkgadid=2974383472&mrkgcl=609&rkg_id=h-de3da19d5c771267957b091e30aa22cd_t-1513901343&gclid=CjwKCAiA1O3RBRBHEiwAq5fD_FcnIEFaCm5OWrc1RNqQT75Lohny_XBWjj078XlzzYwg529CclYo5RoCuzcQAvD_BwE
Accessed 12/21/17

[8]HSN product review
https://www.hsn.com/products/bell-howell-ultrasonic-pest-repeller-8-pack/8097992
Accessed 12/21/17

[9]WalMart product review
https://www.walmart.com/ip/Bell-Howell-3-Pack-Ultrasonic-Pest-Repellers-with-Extra-Outlet-and-Nightlight/33153927?action=product_interest&action_type=title&beacon_version=1.0.2&bucket_id=irsbucketdefault&client_guid=87bb17b6-6015-4327-3d3c-3a2c659bc7b8&config_id=106&customer_id_enc&findingMethod=p13n&guid=87bb17b6-6015-4327-3d3c-3a2c659bc7b8&item_id=33153927&parent_anchor_item_id=34685799&parent_item_id=34685799&placement_id=irs-106-t1&reporter=recommendations&source=new_site&strategy=PWVUB&visitor_id=aBEy-MD_atzlctXYVOE7nw
Accessed 12/21/17

above. In general, consumers' purchase decisions are heavily influenced by other consumers' reviews. Garnering ratings above 3 across many retailers' websites strongly indicates that the product works and consumers are generally satisfied with the Products rather than perceiving the Products to be worthless as the Weir Report asserts without any proof or evidence.

### C. Widely Varying Prices for Different Product Features

39. The Weir Report makes the assertion, "my analysis of this data indicates that there is no statistically significant price premium for additional features such as a night light. It is my professional opinion that the retail sales data presently available in this litigation indicate that such features have no additional value in the marketplace, and as such, no additional adjustments need to be made to my analysis presented above."

40. The only way how the Weir Report can create the appearance of no price differences, is by calculating the national retail price for the various products by using highly aggregated simple averages for 26 of the 41 products. In his calculation of damages. The similarity of these highly aggregated average prices is then used as support for the assumption that there are no price differences for these products. This circular approach results in a fundamentally flawed analysis and overstates the estimated damages figure.

41. Implicitly, the Weir Report assumes that BHH's products do not differ and that they do not seek to satisfy the demand of different consumer preferences. However, the data utilized in the Weir Report prove that consumers value the additional features of the products. The proof is simply given by the fact that products with additional features were sold at varying prices. These products typically sold at a higher price point to the consumer which is empirical evidence

that the assumption in the Weir Report is wrong. If consumers did not demand and value these additional features, the sales for these products would be at or near zero.

42. However, this is not the case. Looking at the data that Weir generated, there are eight products priced higher than the calculated average price of the Products of $24.10. Six of the eight products have added features such as lights, additional outlet sockets, ionizers, and a "micro" design. Only two of the eight highest priced products have no additional features added. This observation is limited to only looking at what Weir produced and the products that he provided sales prices for.

43. If actual transactional nationwide retail data for all the products were available instead of the highly aggregated, and thus misleading flawed simple average prices as constructed in the Weir Report, it is reasonable to assume the data would show even more variation simply based on the fact that an average is based on a range of data points with a low end and a high end, which are different from the average itself.

44. Products with additional features are priced higher than products absent of these features. The sales data shows that consumers place value on these additional features and are willing to pay more for them. I analyzed sales volume and average unit prices for 41 Products that had slightly different features. These 41 Products had 31 distinctively different price points ranging from $4.82 (Item# 50180, 5PK Ultrasonic Pest Repellers with Light) to $19.73 (Item# 50111, S / 9 Pest Repellers) with an overall weighted average price of $9.08 and an overall median price of $8.35 for products with widely varying features.

*Opinion 3a: The Weir Report purports to have performed statistical analyses which in fact, it did not.*

*Opinion 3b: When conducting the analyses that the Weir Report incorrectly claimed to have performed, the results contradict the statements made in the Weir Report, and therefore, prove them wrong.*

45. The Weir Report claims to have performed two statistical analyses – an analysis to assess if price differences are significant and an analysis if systematic correlations exist between retail prices and product features. My detailed analysis of all the data analyzed in the Weir Report as well as all the Stata programs documenting all the analyses from the Weir Report, I did not find any trace of these two analyses. Yet, the Weir Report utilizes the results from two not-performed analyses to draw conclusions about alleged class-wide economic losses.

## A.   First Statistical Analysis Stated in the Weir Report that Was Not Performed

46. The Weir Report states that "I have examined the sales data available in this litigation, including data from retailers such as Walmart. My analysis of this data indicates that there is no statistically significant price premium for additional features such as a night light."[10]

47. In order to assess if certain differences are statistically significant, the scientific theory of statistical hypothesis testing has to be applied.[11] In the following paragraphs, I will briefly discuss the fundamental concepts of this scientific method, which the Weir Report fails to apply. The following citations clearly

---

[10] Ibid., Paragraph 19.
[11] See also the discussion of the Chi-Square Test in Paragraphs 33-36 above,

demonstrate the need for statistical hypothesis testing if one wants to assess differences between samples:[12]

> Page 241:
>
> *Significance testing.* A "null hypothesis" is formulated—for example, that a parameter takes a particular value. Because of random error, an estimated value for the parameter is likely to differ from the value specified by the null—even if the null is right. ("Null hypothesis" is often shortened to "null.") How likely is it to get a difference as large as, or larger than, the one observed in the data? This chance is known as a $p$-value. Small $p$-values argue against the null hypothesis. Statistical significance is determined by reference to the p-value; significance testing (also called hypothesis testing) is the technique for computing $p$-values and determining statistical significance.
>
> Pages 251-252:
>
> *Is a difference statistically significant?*
>
> If an observed difference is in the middle of the distribution that would be expected under the null hypothesis, there is no surprise. The sample data are of the type that often would be seen when the null hypothesis is true. The difference is not significant, as statisticians say, and the null hypothesis cannot be rejected. On the other hand, if the sample difference is far from the expected value—according to the null hypothesis—then the sample is unusual. The difference is significant, and the null hypothesis is rejected. Statistical significance is determined by comparing $p$ to a preset value, called the significance level. The null hypothesis is rejected when $p$ falls below this level.

48. In practice, statistical analysts typically use levels of 10%, 5% and 1%. The 5% level is the most commonly used level in social science, and an analyst who

---

[12] Reference Manual on Scientific Evidence, at 241, 251-52 (Federal Judicial Center 3d ed.).

speaks of significant results without specifying the threshold probably is typically using this figure. An unexplained reference to highly significant results probably means that $p$ is less than 1%. These levels of 5% and 1% have become icons of science and the legal process. In truth, however, such levels are at best useful conventions.

> Page 252:
>
> Because the term "significant" is merely a label for a certain kind of $p$-value, significance is subject to the same limitations as the underlying $p$-value. Thus, significant differences may be evidence that something besides random error is at work. They are not evidence that this something is legally or practically important. Statisticians distinguish between statistical and practical significance to make the point. When practical significance is lacking—when the size of a disparity is negligible—there is no reason to worry about statistical significance.

49. In the statistical theory of hypothesis testing, objective decision criteria are developed and then applied to actual data to determine whether observed differences are due to chance. Typically, a Null Hypothesis is formulated and then compared to an Alternative Hypothesis. Actual data are used to then either reject or fail to reject the Null Hypothesis.

50. Rather than following the scientifically established method of statistical hypothesis testing, the Weir Report simply states that no significant price premiums exist. I reviewed all data and work papers to the Weir Report that I was provided, including the Stata programs but I did not find any reference to statistical testing that would have enabled the Weir Report to make any statement about significant differences. Therefore, the statement "My analysis of this data indicates that there is no statistically significant price premium for additional features such as a night light" is simply not true.

### B.   Second Statistical Analysis Stated in the Weir Report that Was Not Performed

51.   The Weir Report further states that "Hedonic regression could be used in this litigation to quantify and control for the value of additional Product features such as LED night lights if Bell + Howell retail market prices are systemically correlated with these attributes. However, after reviewing the myriad of retail pricing data available in this case, it is my professional opinion that it is not necessary to control for differences in Product features because such features do not appear to be systemically correlated with retail prices in a way that would indicate that consumers have paid an additional premium for such features."[13]

52.   "Revealed Preference" based approaches observe actual purchases by consumers or published prices and infer from that information the decomposition of the overall price of the composite product into its constituent components. This will most often be accomplished by using hedonic pricing models where the actual transaction prices of the composite product with varying attributes is regressed on the specifications of the composite product. The regression coefficients are then interpreted as the implicit market prices of each attribute.

53.   The proper use of hedonic pricing models requires the ability to observe all attributes of the composite good and the variation in each attribute. For example, if all vehicles are equipped with four-wheel drive, then hedonic pricing models cannot be used to estimate the implicit price of four-wheel drive. In the case of wet/dry vacuums, the hedonic approach is suited to estimate the potential economic loss to the consumer as there are products with different motor strength

---

[13] Weir Report, Paragraph 20.

sold in the market. This allows computing an implicit price of motor strength using hedonic pricing analysis.

54. The hedonic pricing approach builds on a theoretic foundation established by Andrew Court[7] in 1939 and expanded by Zvi Griliches,[14, 15] Sherwin Rosen,[16] Jack Triplett,[17] and many others.

55. Statistical correlation analysis is a tool to assess how two variables are related to each other (e.g., how do prices change when product features change). The Pearson correlation coefficient measures the linear association of two variables – if an increase in one variable is accompanied by an increase in another variable then there is positive correlation; if an increase in one variable is accompanied by a decrease in another variable then there is negative correlation. It ranges from -1 to +1 where -1 is perfect negative linear correlation, 0 is no linear correlation, and +1 is perfect positive linear correlation. In this case, statistical correlation analysis could have and should have been utilized to assess if additional product features change prices, e.g., does the addition of features increase the price of the Products.

56. Rather than following the scientifically established methods of hedonic regression analysis or [statistical] correlation analysis, the Weir Report simply states

---

[14] Griliches, Zvi (1961), "Hedonic Price Indexes for Automobiles: An Econometric Analysis of Quality Change", in: Price Statistics Review Committee, National Bureau of Economic Research, The Price Statistics of the Federal Government: Review, Appraisal, and Recommendations, General Series No. 73.  New York, NY: National Bureau of Economic Research, pp. 173-96, reprinted in Zvi Griliches, Technology, Education, and Productivity, Oxford: Basil Blackwell, 1988, pp. 76-104.

[15] Griliches, Zvi (1990), "Hedonic Price Indexes and the Measurement of Capital and Productivity: Some Historical References", in: Ernst R. Berndt and Jack E. Triplett (eds.), Fifty Years of Economic Measurement: The Jubilee of the Conference on Research in Income and Wealth, National Bureau of Economic Research Studies in Income and Wealth, Vol. 54. Chicago: University of Chicago Press, pp. 185- 202.

[16] Rosen, Sherwin (1974), "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition", Journal of Political Economy, 82(1) (January-February), pp. 34-55.

[17] Feenstra, Robert C. (1995), "Exact Hedonic Price Indexes", Review of Economics and Statistics, 77(4) (November), pp. 634-53.

that systematic correlations between prices and product features exist. I reviewed all data and work papers to the Weir Report that I was provided, including the Stata programs but I did not find any indication that hedonic regression analysis or statistical correlation analysis was performed. There was not a trace of documentation to any analysis that would have enabled the Weir Report to make any statement about systematic correlations. Therefore, the statement "after reviewing the myriad of retail pricing data available in this case, it is my professional opinion that it is not necessary to control for differences in Product features because such features do not appear to be systemically correlated with retail prices in a way that would indicate that consumers have paid an additional premium for such features" is simply not true.

57. I utilized the same price and volume data as the Weir Report. Based on product descriptions available in the data, I was able to identify the following features that the products are comprised of:

    a.  Ultrasonic Repeller

    b.  Electromagnetic Repeller

    c.  LED Indicator

    d.  Micro Size

    e.  Outlet Safety Cover

    f.  LED Nightlight

    g.  Nightlight Motion Sensor

    h.  Photocell Sensor Nightlight

    i.  Ionizer Purifier

    j.  UV Germicidal Protection

58. As described above, hedonic regression analysis is an econometric approach that expresses the price of a product as the weighted sum of the prices of its components. Besides identifying the additional features as input variables and utilizing volume sold as a weighting factor, I also extracted information about products that were sold as "combo-packages" in different combinations of units of individual products in a package. However, these data were not consistently available and I did not include them in my model.

59. The Weir Report completely ruled out the usefulness of hedonic regression analysis based on a non-empirical data free approach simply because of Weir's unfounded professional opinion. In contrast to this flawed approach, I used the existing data that are admittedly not perfect to specify a variety of hedonic regression analysis.

60. Across a variety of specifications ranging from linear to log-linear to double-log models, I found significant evidence in the data that prove wrong the assumption in the Weir Report that product features don't impact prices. For example, extra features like safety covers, night lights, and photo cells significantly changed the product prices in my hedonic regression analysis. The following Tables show the results of a linear and a log-linear multivariate regression model which indicate that product prices change in a statistically significant way when features vary:

**Table 1: Log-linear Multivariate Regression Model[18]**

| Variable | Estimate | Std. Error | t-Statistic | P-Value |
|---|---|---|---|---|
| Constant | 0.922 | 0.023 | 40.154 | 0.0% |
| Magnetic | (0.068) | 0.080 | (0.844) | 40.3% |
| MicroSize | 0.065 | 0.066 | 0.982 | 33.1% |
| Outlet | 0.002 | 0.042 | 0.059 | 95.3% |
| SafetyCover | (0.087) | 0.048 | (1.797) | 7.9% |
| LED | 0.033 | 0.022 | 1.509 | 13.8% |
| Photocell | 0.139 | 0.039 | 3.532 | 0.1% |

**Table 2: Linear Multivariate Regression Model[19]**

| Variable | Estimate | Std. Error | t-Statistic | P-Value |
|---|---|---|---|---|
| Constant | 8.748 | 0.504 | 17.346 | 0.0% |
| Magnetic | (1.418) | 1.757 | (0.807) | 42.4% |
| MicroSize | 1.474 | 1.455 | 1.013 | 31.6% |
| Outlet | (0.118) | 0.912 | (0.130) | 89.7% |
| SafetyCover | (1.849) | 1.062 | (1.742) | 8.8% |
| LED | 0.816 | 0.479 | 1.704 | 9.5% |
| Photocell | 3.177 | 0.864 | 3.677 | 0.1% |

[18] P-values 10% or smaller indicate statistical significance and are highlighted in yellow. In this model, the safety cover and the photo cell lead to significant price changes proving the Weir assertion wrong that product attributes don't affect product prices.

[19] P-values 10% or smaller indicate statistical significance and are highlighted in yellow. In this model, the additional features of safety covers, LED lights, and photo cells lead to significant price changes proving the Weir assertion wrong that product attributes don't affect product prices.

61. In summary, I actually performed a hedonic regression analysis with the data available to Weir rather than following his approach of simply visually inspecting the data and then without further analysis falsely concluding that product features do not impact product prices. My hedonic regression analysis proved the conclusion from the Weir Report wrong that product features do not impact product prices. Therefore, the conclusions about constant product prices regardless of product features render the Weir Report irrelevant and unreliable.

## SECTION 5: SUMMARY AND CONCLUSIONS

62. Based on a detailed and thorough review of the Weir Report and the work papers and support documents attached to it, I have formed the following opinions:

   *Opinion 1:* The underlying theory of economic loss in the Weir Report is fundamentally flawed.

   *Opinion 2:* The Weir Report makes numerous assertions that are either proven wrong by the data or based on unsupported and unsupportable assumptions.

   *Opinion 3a:* The Weir Report purports to have performed analyses which in fact, it did not.

   *Opinion 3b:* When conducting the analyses that the Weir Report incorrectly claimed to have performed, the results contradict the statements made in the Weir Report, and therefore, prove them wrong.

63. In summary, I conclude based on my review and detailed analysis of the Weir Report, the supporting data spreadsheets, and Stata programs, that the damages methodology presented in the Weir Report is fundamentally flawed, irrelevant, and entirely unreliable for a quantification of class-wide economic losses in this case.

Respectfully submitted – Los Angeles, CA on December 22, 2017.

_____
Stefan Boedeker

Appendix to Boedeker Rebuttal Report

**Hart v. BHH, LLC**

**California and United States**
*Average Product Price*

| Item | CA Sales | US Sales | CA/US Percentage | | Item | CA Dollar Sales | US Dollar Sales | CA Price | US Price |
|---|---|---|---|---|---|---|---|---|---|
| 50103 | 60 | 537 | 11.17% | | 50103 | $ 1,486.30 | $ 13,298.05 | $ 24.77 | $ 24.76 |
| 50105 | 16,017 | 181,412 | 8.83% | | 50105 | $ 337,681.18 | $ 3,712,931.94 | $ 21.08 | $ 20.47 |
| 50119 | 781 | 7,852 | 9.95% | | 50119 | $ 27,879.00 | $ 277,658.00 | $ 35.70 | $ 35.36 |
| 50123 | 5,147 | 58,010 | 8.87% | | 50123 | $ 154,277.00 | $ 1,728,008.00 | $ 29.97 | $ 29.79 |
| 50130 | 5,055 | 57,189 | 8.84% | | 50130 | $ 147,785.00 | $ 1,664,407.00 | $ 29.24 | $ 29.10 |
| 50131 | 5,877 | 63,625 | 9.24% | | 50131 | $ 173,358.00 | $ 1,882,315.00 | $ 29.50 | $ 29.58 |
| 50141 | 743 | 7,472 | 9.94% | | 50141 | $ 14,128.00 | $ 144,259.00 | $ 19.01 | $ 19.31 |
| 50143 | 5,298 | 58,199 | 9.10% | | 50143 | $ 139,805.00 | $ 1,548,095.00 | $ 26.39 | $ 26.60 |
| 50153 | 3,745 | 46,391 | 8.07% | | 50153 | $ 72,570.58 | $ 898,815.68 | $ 19.38 | $ 19.37 |
| 50161 | 5,366 | 67,738 | 7.92% | | 50161 | $ 87,061.55 | $ 1,116,224.85 | $ 16.22 | $ 16.48 |
| 50167 | 37,105 | 542,745 | 6.84% | | 50167 | $ 708,245.06 | $ 10,374,057.37 | $ 19.09 | $ 19.11 |
| 50181 | 52 | 593 | 8.77% | | 50181 | $ 1,517.06 | $ 17,417.82 | $ 29.17 | $ 29.37 |
| 50184 | 2,491 | 148,760 | 1.67% | | 50184 | N/A | N/A | N/A | N/A |
| 50186 | 3,321 | 33,242 | 9.99% | | 50186 | $ 97,325.00 | $ 977,990.00 | $ 29.31 | $ 29.42 |
| 50196 | 492 | 5,408 | 9.10% | | 50196 | $ 7,310.20 | $ 80,577.02 | $ 14.86 | $ 14.90 |
| 50199 | 91 | 1,509 | 6.03% | | 50199 | $ 1,819.09 | $ 30,164.91 | $ 19.99 | $ 19.99 |
| Average | 91,641 | 1,280,682 | 7.16% | | Average | 1,972,248 | 24,466,220 | $ 22.12 | $ 21.61 |

**Hart v. BHH, LLC**

**United States**
*Total Retail Nationwide Sales*

| Price ID | Item | Wholesale Item Description | Wholesale Total Units Sold Nationwide | Nationwide Retail Price | Nationwide Retail Dollar Sales |
|---|---|---|---|---|---|
| Average | 50101 | Micro Pest Repeller | 34,558 | $ 21.61 | $ 746,962.79 |
| Average | 50102 | S/6 Pest Repellers | 13,058 | $ 21.61 | $ 282,245.50 |
| 50103 | 50103 | Electro Ultra Repeller | 879 | $ 24.76 | $ 21,767.20 |
| 50105 | 50105 | S/3 Pest Repellers | 206,115 | $ 20.47 | $ 4,218,524.50 |
| Average | 50108 | S/9 Micro Pest Repeller - White | 2,080 | $ 21.61 | $ 44,958.70 |
| Average | 50109 | S/9 Micro Pest Repeller - Black | 837 | $ 21.61 | $ 18,091.55 |
| 50119 | 50119 | S/8 Micro Pest Repellers | 7,866 | $ 35.36 | $ 278,153.06 |
| Average | 50120 | S/5 Pest Repeller with Light | 3,201 | $ 21.61 | $ 69,188.84 |
| 50123 | 50123 | S/5 Pest Repeller | 58,376 | $ 29.79 | $ 1,738,910.45 |
| Average | 50127 | S/5 Clear Micro Pest Repeller | 2,160 | $ 21.61 | $ 46,687.88 |
| Average | 50129 | S/9 Micro Pest Repellers - Black | 792 | $ 21.61 | $ 17,118.89 |
| 50130 | 50130 | S/6 Pest Repellers - Combo | 27,093 | $ 29.10 | $ 788,504.41 |
| 50131 | 50131 | S/6 Pest Repellers | 59,779 | $ 29.58 | $ 1,768,532.94 |
| Average | 50138 | S/5 Pest Repellers | 13,111 | $ 21.61 | $ 283,391.09 |
| 50141 | 50141 | S/2 Motion Sensor Pest Repellers | 7,665 | $ 19.31 | $ 147,985.18 |
| Average | 50142 | S/3 Micro Pest Repellers | 3,090 | $ 21.61 | $ 66,789.60 |
| 50143 | 50143 | S/6 Micro Pest Repellers | 46,061 | $ 26.60 | $ 1,225,223.87 |
| Average | 50144 | S/5 Mini Pest Repellers - Blue | 1,490 | $ 21.61 | $ 32,205.99 |
| Average | 50145 | S/5 Mini Pest Repellers - Green | 1,480 | $ 21.61 | $ 31,989.84 |
| Average | 50146 | 3 Basic Pest Repellers | 27,826 | $ 21.61 | $ 601,452.24 |
| Average | 50150 | S/6 Pest Repellers | 41,099 | $ 21.61 | $ 888,344.92 |
| Average | 50151 | Pest Repeller with night light | 24,841 | $ 21.61 | $ 536,932.19 |
| 50153 | 50153 | Electro Magnetic Repeller | 120,535 | $ 19.37 | $ 2,335,339.79 |
| Average | 50157 | S/6 Black Pest Repellers | 14,674 | $ 21.61 | $ 317,174.95 |
| Average | 50159 | S/5 Repeller | 18,692 | $ 21.61 | $ 404,023.05 |
| 50161 | 50161 | Pest repeller | 411,674 | $ 16.48 | $ 6,783,795.64 |
| Average | 50165 | S/4 Pest repellers | 162,358 | $ 21.61 | $ 3,509,328.81 |
| 50167 | 50167 | Ultrasonic Pest Repeller | 702,814 | $ 19.11 | $ 13,433,624.92 |
| Average | 50177 | Electro/Ultra Repeller | 13,968 | $ 21.61 | $ 301,914.93 |
| 50181 | 50181 | Ionic Pest Repeller | 12,137 | $ 29.37 | $ 356,492.55 |
| Average | 50184 | S/3 Pest Repellers | 265,260 | $ 21.61 | $ 5,733,530.60 |
| 50186 | 50186 | S/6 Pest Repeller - Basic | 41,867 | $ 29.42 | $ 1,231,740.19 |
| Average | 50191 | S/5 Ultra sonic Pest Repellers | 20,712 | $ 21.61 | $ 447,684.86 |
| Average | 50192 | Pest Repeller - 2 LED | 44,298 | $ 21.61 | $ 957,490.53 |
| 50196 | 50196 | S/3 Micro Pest Repellers | 37,026 | $ 14.90 | $ 551,672.47 |
| Average | 50197 | S/4 Pest repellers | 24,452 | $ 21.61 | $ 528,524.05 |
| 50199 | 50199 | S/3 Pest Repellers | 14,676 | $ 19.99 | $ 293,373.24 |
| Average | 50111 | S/9 Pest Repellers | 28,038 | $ 21.61 | $ 606,034.57 |
| Average | 50180 | 5pk Ultrasonic Pest Repellers with light | 58,511 | $ 21.61 | $ 1,264,701.08 |
| Average | 50152 | S/6 round micro Pest Repellers | 5,312 | $ 21.61 | $ 114,817.59 |
| Average | 50155 | S/8 Classic Pest Repellers | 3,525 | $ 21.61 | $ 76,192.02 |
| | | TOTAL | 2,583,986 | | $ 53,101,417.48 |

Hart v. BHH, LLC

**California**
*Total Retail Statewide Sales*

| Percentage ID | Price ID | Item | Wholesale Item Description | Wholesale Total Units Sold Nationwide | CA/US Retail Sales Percentage | CA Retail Price | CA Retail Dollar Sales |
|---|---|---|---|---|---|---|---|
| Average | Average | 50101 | Micro Pest Repeller | 34,558 | 7.16% | $ 22.12 | $ 54,706.29 |
| Average | Average | 50102 | S/6 Pest Repellers | 13,058 | 7.16% | $ 22.12 | $ 20,671.18 |
| 50103 | 50103 | 50103 | Electro Ultra Repeller | 879 | 11.17% | $ 24.77 | $ 2,432.88 |
| 50105 | 50105 | 50105 | S/3 Pest Repellers | 206,115 | 8.83% | $ 21.08 | $ 383,663.46 |
| Average | Average | 50108 | S/9 Micro Pest Repeller - White | 2,080 | 7.16% | $ 22.12 | $ 3,292.70 |
| Average | Average | 50109 | S/9 Micro Pest Repeller - Black | 837 | 7.16% | $ 22.12 | $ 1,324.99 |
| 50119 | 50119 | 50119 | S/8 Micro Pest Repellers | 7,866 | 9.95% | $ 35.70 | $ 27,928.71 |
| Average | Average | 50120 | S/5 Pest Repeller with Light | 3,201 | 7.16% | $ 22.12 | $ 5,067.27 |
| 50123 | 50123 | 50123 | S/5 Pest Repeller | 58,376 | 8.87% | $ 29.97 | $ 155,250.37 |
| Average | Average | 50127 | S/5 Clear Micro Pest Repeller | 2,160 | 7.16% | $ 22.12 | $ 3,419.34 |
| Average | Average | 50129 | S/9 Micro Pest Repellers - Black | 792 | 7.16% | $ 22.12 | $ 1,253.76 |
| 50130 | 50130 | 50130 | S/6 Pest Repellers - Combo | 27,093 | 8.84% | $ 29.24 | $ 70,012.40 |
| 50131 | 50131 | 50131 | S/6 Pest Repellers | 59,779 | 9.24% | $ 29.50 | $ 162,878.87 |
| Average | Average | 50138 | S/5 Pest Repellers | 13,111 | 7.16% | $ 22.12 | $ 20,755.08 |
| 50141 | 50141 | 50141 | S/2 Motion Sensor Pest Repellers | 7,665 | 9.94% | $ 19.01 | $ 14,492.92 |
| Average | Average | 50142 | S/3 Micro Pest Repellers | 3,090 | 7.16% | $ 22.12 | $ 4,891.56 |
| 50143 | 50143 | 50143 | S/6 Micro Pest Repellers | 46,061 | 9.10% | $ 26.39 | $ 110,647.23 |
| Average | Average | 50144 | S/5 Mini Pest Repellers - Blue | 1,490 | 7.16% | $ 22.12 | $ 2,358.71 |
| Average | Average | 50145 | S/5 Mini Pest Repellers - Green | 1,480 | 7.16% | $ 22.12 | $ 2,342.88 |
| Average | Average | 50146 | 3 Basic Pest Repellers | 27,826 | 7.16% | $ 22.12 | $ 44,049.35 |
| Average | Average | 50150 | S/6 Pest Repellers | 41,099 | 7.16% | $ 22.12 | $ 65,060.88 |
| Average | Average | 50151 | Pest Repeller with night light | 24,841 | 7.16% | $ 22.12 | $ 39,324.01 |
| 50153 | 50153 | 50153 | Electro Magnetic Repeller | 120,535 | 8.07% | $ 19.38 | $ 188,555.86 |
| Average | Average | 50157 | S/6 Black Pest Repellers | 14,674 | 7.16% | $ 22.12 | $ 23,229.36 |
| Average | Average | 50159 | S/5 Repeller | 18,692 | 7.16% | $ 22.12 | $ 29,589.97 |
| 50161 | 50161 | 50161 | Pest repeller | 411,674 | 7.92% | $ 16.22 | $ 529,111.82 |
| Average | Average | 50165 | S/4 Pest repellers | 162,358 | 7.16% | $ 22.12 | $ 257,017.32 |
| 50167 | 50167 | 50167 | Ultrasonic Pest Repeller | 702,814 | 6.84% | $ 19.09 | $ 917,124.14 |
| Average | Average | 50177 | Electro/Ultra Repeller | 13,968 | 7.16% | $ 22.12 | $ 22,111.74 |
| 50181 | 50181 | 50181 | Ionic Pest Repeller | 12,137 | 8.77% | $ 29.17 | $ 31,049.84 |
| Average | Average | 50184 | S/3 Pest Repellers | 265,260 | 1.67% | $ 22.12 | $ 98,265.15 |
| 50186 | 50186 | 50186 | S/6 Pest Repeller - Basic | 41,867 | 9.99% | $ 29.31 | $ 122,577.03 |
| Average | Average | 50191 | S/5 Ultra sonic Pest Repellers | 20,712 | 7.16% | $ 22.12 | $ 32,787.68 |
| Average | Average | 50192 | Pest Repeller - 2 LED | 44,298 | 7.16% | $ 22.12 | $ 70,124.99 |
| 50196 | 50196 | 50196 | S/3 Micro Pest Repellers | 37,026 | 9.10% | $ 14.86 | $ 50,049.46 |
| Average | Average | 50197 | S/4 Pest repellers | 24,452 | 7.16% | $ 22.12 | $ 38,708.21 |
| 50199 | 50199 | 50199 | S/3 Pest Repellers | 14,676 | 6.03% | $ 19.99 | $ 17,691.83 |
| Average | Average | 50111 | S/9 Pest Repellers | 28,038 | 7.16% | $ 22.12 | $ 44,384.95 |
| Average | Average | 50180 | 5pk Ultrasonic Pest Repellers with light | 58,511 | 7.16% | $ 22.12 | $ 92,624.57 |
| Average | Average | 50152 | S/6 round micro Pest Repellers | 5,312 | 7.16% | $ 22.12 | $ 8,409.05 |
| Average | Average | 50155 | S/8 Classic Pest Repellers | 3,525 | 7.16% | $ 22.12 | $ 5,580.17 |
| | | TOTAL | | **2,583,986** | | | **$ 3,774,818.00** |

**Hart v. BHH, LLC**

**25 State Class**
*Total Retail Sales by State*

| State | State/US Retail Dollar Sales Percentage | | State Retail Dollar Sales |
|---|---|---|---|
| Alaska | 0.19% | $ | 100,270.88 |
| California | 7.11% | $ | 3,774,818.00 |
| Colorado | 2.11% | $ | 1,120,104.84 |
| Delaware | 0.45% | $ | 237,298.02 |
| Iowa | 1.21% | $ | 641,345.64 |
| Kansas | 0.99% | $ | 523,882.65 |
| Maine | 0.55% | $ | 293,550.48 |
| Minnesota | 1.20% | $ | 636,980.18 |
| Missouri | 2.26% | $ | 1,199,837.68 |
| Nebraska | 0.60% | $ | 318,972.78 |
| New Hampshire | 0.45% | $ | 239,220.82 |
| New Jersey | 3.19% | $ | 1,692,990.01 |
| New York | 7.58% | $ | 4,026,206.82 |
| North Carolina | 2.85% | $ | 1,515,384.36 |
| Ohio | 4.37% | $ | 2,318,040.43 |
| Oklahoma | 1.52% | $ | 807,835.58 |
| Oregon | 1.22% | $ | 648,423.53 |
| Pennsylvania | 5.27% | $ | 2,797,957.23 |
| Texas | 5.86% | $ | 3,111,170.10 |
| Utah | 0.55% | $ | 293,870.68 |
| Vermont | 0.29% | $ | 152,027.77 |
| Virginia | 2.64% | $ | 1,402,873.07 |
| Washington | 1.59% | $ | 843,072.09 |
| West Virginia | 0.94% | $ | 496,573.13 |
| Wyoming | 0.29% | $ | 153,405.22 |
| | | | |
| **TOTAL** | **55.26%** | **$** | **29,346,111.99** |
| | | | |
| | | $ | 435,350.90 |



# STEFAN BOEDEKER

**Managing Director**
**Berkeley Research Group**

550 South Hope Street
Suite #2150
Los Angeles, CA 90071
Tel: (310) 499-4924
Cell: (213) 705-1324
Email: sboedeker@thinkbrg.com

## Education

- BS in Statistics,
  University of Dortmund, Germany
- BA in Business Administration
  University of Dortmund, Germany
- MS in Statistics
  University of Dortmund, Germany
- MA in Economics
  University of California, San Diego
- Met Ph.D. requirements except
  dissertation in Economics,
  University of California, San Diego

## Professional Associations

- Member of the American Economic
  Association (AEA)
- Member of the American Statistical
  Association (ASA)
- Member of the Econometric Society
- Member of the Mathematical
  Association of America (MAA)
- Member of the American Association
  for Public Opinion Research
  (AAPOR)
- Member of the Market Research
  Association (MRA)
- In 2001 Stefan was a member of an
  AICPA task force dealing with
  Corporate Integrity Agreements
  (CIA). Stefan was responsible for
  issues related to statistical
  methodology utilized in CIA's.

## Background

Stefan is a Managing Director at Berkeley Research Group where he focuses on the application of economic, statistical, and financial models to a variety of areas such as solutions to business issues, complex litigation cases, and economic impact studies. He has extensive experience applying economic and statistical theories and methodologies to a wide variety of cases where But-for-scenarios have to be developed based on probabilistic methods and where statistical predictive modeling has to be applied to assess liability and damages.

Stefan has applied these techniques in business disputes, single-plaintiff cases, multi-plaintiff cases, and class action proceedings in the areas of class certification, liability assessment, developing damages scenarios, and post settlement or judgment distributions.

## Professional and Business Experience

### Representative Engagements

### Litigation

» In a class action alleging misleading advertising practices, Stefan performed statistical analyses in the class certification stage.

» For a major healthcare provider involved in a dispute with a potential class of more than 3,000 other providers over allegedly excessive outlier payments Stefan performed economic and statistical analyses. Ultimately, class certification was denied in that case.

» In a class action alleging discriminatory allocation of public funds by a large metropolitan transportation authority, Stefan performed statistical analyses of transportation data.

» In a multi-plaintiff case against a state authority on improper funding of special education programs, Stefan performed statistical analyses of funding related ledger data.

» In a class action alleging improper practices of charges for gym memberships, Stefan performed statistical analyses in the class certification analysis. Based on the analysis, the ultimately certified class was significant smaller than initially defined. In this case, Stefan also developed statistical models to assess damages.



» In a class action alleging losses to consumers due to faulty window regulators in automobiles, Stefan utilized statistical models to assess economic damages.

» In a class action against a large financial institution alleging fee overcharges for personal trust accounts, Stefan utilized statistical analyses to segment the account holders and ultimately reduce the size of the class.

» In a class action case where a provider of a used car evaluation model was ordered by the court to test if their model did not significantly undervalued cars, Stefan performed statistical analyses.

» In a class action case over fee overcharges in the payment process of car insurance, Stefan developed a distribution model of repayments to class members after a settlement had been reached.

» In a class action of home owners over alleged diminution of property values due to proximity to a plume of contaminated soil, Stefan performed statistical analysis to assist counsel in a motion against class certification.

» In a natural resource damage class action case, Stefan provided econometric analysis of property value loss due to proximity to a solid waste site utilizing hedonic regression models.

» For a class action case involving potential damage from a landfill in a state park, Stefan analyzed data about travel, tourism and park attendance. Stefan specified and estimated linear regression models and time series models to predict park attendance.

» In a class action case involving alleged diminution of property values due to ground-water contamination, Stefan specified and estimated hedonic regression models to show that other factors than the contamination contributed significantly to the loss in property value.

» In a class action against a large financial institution alleging non-payment of coupon payments for bearer bonds Stefan designed and administered large-scale databases to reconstruct accounting records of a large financial institution's Corporate Trust Department. He developed statistical models to analyze bondholders' presentment behavior of Bearer bonds.

» In a class action dispute between the Department of Interior and individual Native Americans over mismanagement of individual trust accounts, Stefan performed a statistical analysis of an electronic database with approximately 60 million records in order to draw a statistically valid sample of accounts for further analysis.

» In a trademark infringement case of video equipment, Stefan calculated damages based on the defendant's unjust enrichment utilizing statistical time trend models.

» For a shareholder derivative action against a leading publicly-traded health care provider, employed an econometric approach to quantify potential damages per share due to alleged section 10b-5 violations and other claims. For the same matter, developed a multi-trader model to estimate the number of shares potentially damaged.

» In a dispute between a major health care provider and private payor groups, Stefan developed statistical stratified sampling models to assess exposure across different contract types.



» For a large financial institution's personal trust department involved in a consumer class action, Stefan designed a random sample to estimate the potential exposure due to fee overcharges.

» For a computer equipment leasing company involved in an employee class action, Stefan utilized statistical models to estimate exposure due to alleged forfeiture of unpaid vacation time in a class action of former and current employees.

» For a limousine company involved in a wage and hour class action, Stefan developed a statistical sampling based exposure model to quantify the impact of alleged unpaid overtime and missed meal breaks.

» In several cases involving 12 hour shift workers at hospitals Stefan performed rebuttal analyses of plaintiff's damages computations.

» For a large electronic retail chain Stefan calculated exposure based on the failure of paying overtime for store managers.

» For a major department store Stefan performed a statistical analysis of manager surveys where he found significant differences in the managers' allocation of time across department and stores.  Ultimately, due to these differences a class was not certified.

» For a large sporting goods retail chain Stefan assisted in defining the size of the potential class and in estimating the potential exposure which led to a favorable, early settlement of the case.

» For a women's shoes retail chain Stefan designed and statistically analyzed an observational study to quantify the amount of time spent on exempt versus non-exempt tasks.

» For a video rental store chain Stefan developed sampling algorithms based on in-store security cameras to analyze time spent by assistant managers on exempt versus non-exempt activities.

» For a large fast food chain Stefan directed a team collecting employee work information from restaurant locations in order to monitor and gain compliance in response to litigation

» For a large mass merchandiser Stefan developed a document and data reconciliation tool and he developed a statistical sampling mechanism to proof compliance with a court ordered document retention procedures in the course of a wage and hour litigation.

» Stefan worked with a Fortune 500 bank in a class action suit to review the claims of managers that were misclassified and should have been paid overtime.  To compute damages, Stefan reviewed the overtime records of employees in this position prior to a job classification change and, in the absence of overtime data after the job classification change, Stefan reviewed sign in and sign out times of the office building.

» For a long-term care provider Stefan used data from timesheets, payroll, and other scheduling records to create comprehensive reports showing potential exposure for each of the claimed areas:  timely wage payment, overtime wage payment, adequate daily meal and rest break periods, and travel time compensation.



» For a maternity clothing store chain Stefan performed analyses related to exempt/non-exempt status issues for managers and assistant managers. Stefan also conducted a break time analysis for all employees.

» For a commercial flooring contractor Stefan assessed the job duties and responsibilities of a group of supervisors. During the engagement, the scope of work expanded to include an analysis of misclassification and back-pay exposure for additional groups of employees.

» For a software developer Stefan analyzed how department and project specific characteristics impacted the work flow and the correlation of that impact to certain exemptions.

» For a large meatpacker Stefan conducted a time and motion study to properly assess the duration of certain separately compensated activities to rebut allegations of violation of minimum wage laws.

» For a public university housing department Stefan conducted an extensive time and motion study to identify the tasks (and associated time range to perform each task) related to processing a contract cancellation.

» For a large drugstore chain Stefan used in-store cameras for the smaller stores and actual in-store observations for the larger stores to conduct a time motion study and quantify the time spent by assistant managers on certain pre-defined tasks.

» For a large public storage company Stefan conducted a detailed time and motion study to determine the cost of collection and administration of late payments. Using both self-logging and independent review techniques, Stefan defined each step in the late payment process, calculated the cost to the company for such activities, and compared this cost to the late fees under dispute.

» For a large retail store chain Stefan performed statistical analyses of regularly conducted employee activity surveys.

» For a mass merchandiser, Stefan conducted an observational study of activities of all individuals classified as managers to show significant differences in daily activities.

» For a department store, Stefan conducted an in-store observational study of managers and assistance managers to assess the percentage of time spent on managerial tasks.

» For a state ferry system in the Pacific Northwest, Stefan conducted an observational study of engine room personnel during shift changes to quantify potentially unpaid time worked.

» For a large retail chain Stefan conducted an extensive analysis of the company's compliance with break time rules and regulations and also the employees' usage and potential abuse of break time.

» For a large mass merchandise retailer Stefan compiled a comprehensive database of punch clock data, payroll data, point of sales data, hardcopy information about manual edits of time entries, store security system data, etc. to analyze allegations of inserting breaks, deleting time and forcing employees to work after they clocked out.



» For a large electronic retail chain Stefan analyzed time card data, point of sales data and other store specific attributes to quantify potentially missed meal and rest breaks.

» In a gender discrimination case involving a client in the food processing industry, Stefan analyzed the impact of the implementation of an Affirmative Action Plan on the allegedly discriminatory employment practices.

» In a class action case alleging age discrimination for a vegetable seed company, Stefan performed rebuttal work of the plaintiff's expert's liability and damages analysis.

» In a class action case alleging age discrimination for a major aerospace company, Stefan performed statistical analyses to rebut allegations of age discrimination.

» In a class action race discrimination suit against the Alabama Department of Transportation, Stefan developed statistical regression models and tests to analyze the alleged discrimination.

» In a class action gender discrimination case against a large real estate brokerage firm, Stefan provided deposition testimony to class certification issues.

» In a gender discrimination case against a temporary employment agency, Stefan performed econometric analyses to disprove salary discrimination against two former female employees.  Stefan addressed plaintiffs' expert's damages calculations and developed alternative scenarios.

» For a large meat processing plant, Stefan performed statistical analyses of employment data to address allegations of discriminatory hiring practices.

» For a leading publicly-traded developer of enterprise management software, Stefan employed a statistical approach to demonstrate the diversity of investment styles among proposed lead plaintiffs for a securities class action lawsuit alleging section 10b-5 violations and other claims. For the same matter, Stefan employed an econometric approach to estimate potential damages for each lead plaintiff.

» For a leading publicly-traded developer of enterprise management software, Stefan employed an econometric time-series model to analyze allegations of insider trading and the timing of certain stock transactions relative to information available to officers in the company.

» For a shareholder derivative action against a leading publicly-traded health care provider, employed an econometric approach to quantify potential damages per share due to alleged section 10b-5 violations and other claims. For the same matter, developed a multi-trader model to estimate the number of shares potentially damaged.

» For a publicly-traded manufacturer of office supplies, developed a Black-Scholes application and utilized a binomial distribution probability methodology to evaluate the appropriateness of the size of a loan loss reserve related to a loan collateralized by the assets of an employee stock purchase plan.

» For a large software developer, Stefan performed statistical modeling to assist in a securities class action litigation involving allegations of improper revenue recognition, reserve allocations, financial statement disclosures and other accounting irregularities



» For a failed computer hardware company in defense of a 10b-5 securities litigation action, Stefan performed statistical analyses of accounting transactions, inventory and receivable reserves and the auditor's work papers in its evaluation of the allegations.

» In several Rule 10b(5) class actions, Stefan used the event study approach to calculate the value line of a security.  In these cases Stefan applied complex and advanced one, two, and multi-trader models.

## **Non-Litigation**

» For large grocery store chains, Stefan analyzed the effectiveness of a frequent shopper card program utilizing data mining techniques.  He also analyzed customer data to facilitate the introduction of one-to-one marketing tools.

» For a grocery store chain, Stefan utilized econometric elasticity models to recommend pricing strategies for in-store promotions.

» For a grocery store chain, Stefan developed customer segmentation models to design segment specific marketing campaigns.

» For the American Film Marketing Association, Stefan performed an economic impact study of the influence of the independent film producers and distributors on the U.S. economy in general, and the California economy in particular.

» For a large entertainment client, Stefan developed statistical models to predict the return of video cassettes and DVDs.

» For several clients in the retail industry, Stefan developed statistical models to estimate the liability of unredeemed gift certificates.

» For a client in the restaurant business, Stefan developed statistical models to quantify the dollar amount of outstanding unredeemed gift certificates.

» For a major hotel chain, Stefan developed statistical models to forecast the redemption of frequent traveler program points for tax purposes.

» For a high profile e-commerce company, Stefan's team produced an interactive business decision tool to forecast company growth and profitability. The interactive model allows the client, through the choice of a few fundamental inputs, to measure the simultaneous impact on all cost and revenue dimensions of the company, including real estate and equity participation.

» For the Nevada Resort Association, Stefan quantified the economic impact of the gaming industry with special emphasis on the accelerated population growth in greater Las Vegas.

» For the Los Angeles Unified School District, Stefan performed an economic study about the impact of different recycling programs.



» For the Los Angeles County Department of Health Services, Stefan conducted a time and motion study to determine the time required to complete specific Medi-Cal eligibility and provider forms.

» For the Arizona Tax Research Association, Stefan developed economic models to quantify the revenue impact of a proposed change of taxation in the construction sector in Arizona.

» For a hotel property management company, Stefan analyzed customer data, and used data mining methods to develop predictive models for customer acquisition, retention, and attrition.

» For a project analyzing the extent of competition in the market segments of a pipeline company, Stefan estimated regression and Tobit-models to determine optimal bidding behavior for gas storage demand. He prepared testimony given in filings before the Federal Energy Regulatory Commission (FERC).

» For a hotel property management company, Stefan developed a demand driven yield management system.

» For a company providing self-storage space, Stefan developed a demand driven price-setting strategy utilizing own- and cross-price elasticity regression models.

» For a high-tech start-up with a unique service offering of new products, Stefan recommended product-pricing scenarios.

» For a large international conglomerate, Stefan developed customized data mining techniques for the implementation within a customer knowledge management system.

» For a large law firm, Stefan performed a comprehensive statistical analysis of Los Angeles Superior Court jury verdicts over the last decade. The project tested the hypothesis of systematic bias in particular courthouses with respect to plaintiff-win probability, length of trial, length of deliberation, and dollar amounts awarded.

## Depositions & Testimony

### Depositions

1. MRO Communications, Inc vs. American Telephone and Telegraph Company, United States District Court District of Nevada, Case. No. -5-95-903-PMP, Deposition Testimony, September 26, 1996

2. Yolanda Aiello Harris, individually and on behalf of all others similarly situated; Jennifer Hopkins, individually and on behalf of others similarly situated; Shannon L. Bradley, individually and on behalf of others similarly situated, Plaintiffs, vs. CB Richard Ellis, Inc., a California corporation; CB Commercial INC., a California corporation; Defendants, Superior Court of California, County of San Diego, Case No. GIC 745044, Deposition Testimony, January 5, 2001.



3.  State of Tennessee, ex rel., Douglas Sizemore, Petitioner vs. Xantus Healthplan of Tennessee, Inc., Chancery Court of Davidson County, Tennessee at Nashville, Case No 99-917-II, Deposition Testimony, October 11, 2001.

4.  Howard Wright, Inc., a California corporation doing business as AppleOne Employment Services, Plaintiffs, vs. Olsen Staffing Services, Inc., a Delaware Corporation, Dagney Smith, an individual, Vicky Riechers, an individual, and Linda Shiftman, an individual, Defendants, Superior Court of the State of California for the County of Los Angeles, Case No. BC 200657, Deposition Testimony, December 7, 2001.

5.  Sacred Heart Medical Center, et al., Plaintiffs, -vs- Department of Social and Health Services, and Dennis Braddock, the Secretary of the Department of Social and Health Services, Defendants, Superior Court of the State of Washington in and for the County of Thurston, No. 00-2-01898-1, Deposition Testimony, January 23, 2003.

6.  Patrick Bjorkquist individually and on behalf of all others similarly situated, Plaintiff, vs. Farmers Insurance Company of Washington, Defendant, in the Superior Court of the State of Washington for King County, Case No.: 02-2-11684-1 SEA, Deposition Testimony, November 3, 2003.

7.  Diversified Property, a general partnership, Dora Saikhon Family Trust, and Nancy Saikhon Borrelli, an individual, Plaintiffs vs. Manufacturers Life Insurance (U.S.A.), a Michigan corporation, erroneously sued as Manufacturers Life Insurance Company, Inc., Defendants in the Superior Court of California, County of San Diego, Case No.: GIC 815128, Deposition Testimony on July 21, 2004.

8.  Alan Powers, Plaintiff, vs. Laramar Group et al., Defendants in the United States District Court, Northern District of California, No. C-02-3755 SBA, Deposition Testimony on August 27, 2004.

9.  Group Anesthesia Services, A Medical Group, Inc., Claimant, vs. American Medical Partners of North Carolina, Inc., etc., et al., Respondents, JAMS Arbitration, Reference No. 1100040919, Deposition Testimony on February 9, 2005.

10. Group Anesthesia Services, A Medical Group, Inc., Claimant, vs. American Medical Partners of North Carolina, Inc., etc., et al., Respondents, JAMS Arbitration, Reference No. 1100040919, Deposition Testimony on March 11, 2005.

11. Fujitsu v. Cirrus Logic et al., United States District Court, Northern District of California, San Jose Division, Case No. 02CV01627.  Deposition Testimony on April 21 and 22, 2005.

12. Goldman et al. v. RadioShack Corporation, United States District Court, Eastern District of Pennsylvania, Case No. 03 CV 0032, Deposition Testimony on May 18, 2005.

13. Perez et al. v. RadioShack Corporation, United States District Court, Northern District of Illinois, Eastern Division, Case No. 02-CV-7884, Deposition Testimony on December 13, 2005.

14. United States of America ex rel. A. Scott Pogue v. American Healthcorp Inc., Diabetes Treatment Centers of America Inc., et al., United States District Court, Middle District of Tennessee at Nashville, Civil No. 3-94-0515, Deposition Testimony on May 12, 2006.

15. School Districts' Alliance v. State of Washington, United States District Court, Eastern District of Thurston, Case No. 04-2-02000-7, Deposition Testimony on July 20, 2006.



16. Boca Raton Community Hospital, Inc., a Florida not-for-profit corporation d/b/a Boca Raton Community Hospital, on behalf of itself and on behalf of Class of all others similarly situated v. Tenet Healthcare Corp., a Nevada Corporation, United States District Court,  Southern District of Florida, Miami Division, Case No. 05-80183-CIV-SEITZ/MCALILEY, Deposition Testimony on July 25, 2006.

17. Boca Raton Community Hospital, Inc., a Florida not-for-profit corporation d/b/a Boca Raton Community Hospital, on behalf of itself and on behalf of Class of all others similarly situated v. Tenet Healthcare Corp., a Nevada Corporation, United States District Court,  Southern District of Florida, Miami Division, Case No. 05-80183-CIV-SEITZ/MCALILEY, Deposition Testimony on October 13, 2006.

18. Louise Ogborn v. McDonald's Corporation et al., Commonwealth of Kentucky 55th Judicial District, Bullitt County Circuit Court, Case No. 04-CI-00769, Deposition Testimony on October 19, 2006.

19. Elise Davis v. Kohl's Department Stores, Inc. consolidated with Rosie Grindstaff v. Kohl's Department Stores, Inc., Superior Court of the State of California for County of Los Angeles Central District, Case No. BC 327426 (lead case) consolidated with Case No. BC 341954, Deposition Testimony on April 25, 2007.

20. Norman Utley, et al., v. MCI, Inc., MCI Worldcom Communications, Inc., and MCI Network Services, Inc., formerly known as MCI Worldcom Network Services, Inc., United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:05 - CV- 0046 - K, Deposition Testimony on May 30, 2007.

21. Ramon Moreno and Ernesto Morailo, on behalf of themselves and all others similarly situated v. Guerrero Mexican Food Products Inc., a division of Gruma Corporation; and Gruma Corporation, a Nevada Corporation, United States District Court, Central District of California, Case No. CV05-773RSWL(PLAx), Deposition Testimony on August 10, 2007.

22. Darensburg et al. v. Metropolitan Transportation Commission, U.S. District Court, Northern District of California, Case No. C-05-1597-EDL, Deposition Testimony on March 18, 2008.

23. In Re: King Pharmaceuticals, INC, Derivative Litigation, Lead Case No: BOO19077(M), The Chancery Court, Sullivan County at Bristol, Tennessee, Deposition Testimony on April 4, 2008.

24. P. Ansley et al. v. Lewis Homes of California, a California General Partnership, et al., Superior Court of the State of California, For the County of Solano,  Case No. FCS02445, Deposition Testimony on April 10, 2008.

25. Personnel Plus v. Ashish Wahi et al., Superior Court of the State of California, County of Orange, Case No. 07CC08363, Deposition Testimony on August 13, 2008.

26. First Capitol Consulting Inc. v. LVX, Inc. et al., Superior Court of the State of California for the County of Los Angeles, Case No. BC378202, Deposition Testimony on October 27, 2008.

27. R. Molina et al. v. Lexmark International, Inc., Superior Court of the State of California for the County of Los Angeles, Case No. BC339177, Deposition Testimony on November 19, 2008.



28. In re National Century Financial Enterprises, Inc. Investment Litigation, No. 2:03-MD-1565-JLG-MRA (S.D.Ohio), Deposition Testimony on January 22, 2009.

29. New York City Employees' Retirement System, et al. v. Bank One, N.A., et al., Case No. 03-cv-09973 (LAK) (S.D.N.Y.), Deposition Testimony on January 22, 2009.

30. Dole Fresh Fruit International, Ltd, Hyundai Precision America, Inc., JAMS Arbitration, ADRS Case #05-1138-RTA, Deposition Testimony on December 21, 2009.

31. D. Berry, L. Hedges et al. v. Volkswagen of America, Inc. In The Circuit Court of Jackson County, Missouri, at Independence, No. 0516-CV01171 Division 2, Deposition Testimony on February 18, 2010.

32. D. Aberle et al. v. Davidson Builders, Inc., et al., Superior Court of the State of California, County of Orange, Case No.: 37-2008-00083718-CU-CD-CTL, Deposition Testimony on March 24, 2010.

33. Urga, et al. v. Redlands Community Hospital, Superior Court of the State of California, County of San Bernardino, Case No. SCVSS 123769, Deposition Testimony on May 17, 2010.

34. Oberschlake, et al v. St. Joseph Hospital of Orange, et al, Superior Court of the State of California, County of Orange, Case No. 05CC00301, Deposition Testimony on August 12, 2010.

35. J. Morrison v. The Vons Companies, Inc., Superior Court of State of California, County of San Diego, Case No. 37-2009-00081026-CU-BT-CTL, Deposition Testimony on December 7, 2010

36. R. Pate, et al. v. Children's Hospital of Orange County, Superior Court of California, County of Orange, Case No. 05CC00303, Deposition Testimony on April 13, 2011.

37. M. St. Croix, et al. v. Cedar Fair, L.P., et al., Superior Court of California, County of Orange,     Case No. 30-2008-0214500, Deposition Testimony on August 22, 2011.

38. Steven Domalewski, a minor v. Hillerich and Bradsby Co., et al., Superior Court of New Jersey, Passaic County, Docket No.: PAS-L-2119-08, Deposition Testimony on January 5, 2012.

39. Cathleen McDonough, et al., v. Horizon Blue Cross/Blue Shield of New Jersey, United States District Court, District of New Jersey, Civil Action No. 09-cv-00571-(SRC) (PC), Deposition Testimony on January 10, 2012.

40. Daniel Ordonez, et al., v. Radio Shack, United States District Court, Central District of California, Case No. CV 10-07060 CAS (JCGx), Deposition Testimony on October 24, 2012.

41. Ameritox, Ltd., v. Millennium Laboratories, Inc., United States District Court, Middle District of Florida, Case No. 8:11-cv-00775-SCB-TBM, Deposition Testimony on December 20, 2013.

42. United States of America, ex rel. Glenda Martin v. Life Care Centers of America, Inc., United States District Court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:08-CV-251, Deposition Testimony on January 15, 2014.



43. United States of America, ex rel. Tammie Taylor v. Life Care Centers of America, Inc., United States District Court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:12-CV-64, Deposition Testimony on January 15, 2014.

44. Darren Smith, et al., v. Panera Bread Company, Superior Court of California, County of San Diego, Case No. 37-201-00084077 CU-BT-CTL, Deposition Testimony on April 30, 2014.

45. Joseph Hummel et al., v. Castle Principles, LLC et al., Superior Court of California, County of Santa Clara, Case No. 112CV223170, Deposition Testimony on June 19, 2014.

46. Sherman Way Oil, Inc. (Bijan Pouldar), American Pacific Enterprises Group (Sherwin Louie), Bahman Kohanteb, Hamid Kalhor , Claimants, Vs. Circle K Stores, Inc., Respondent, Alternative Dispute Resolution Case No's 13-7103-DSC through 13-7106-DSC, Deposition Testimony on September 25, 2014.

47. In re: ExxonMobil Oil Corporation, et al., Southern California Bulk Sale Litigation, Case No. CV12-04689-PA (VBKx), Deposition Testimony on September 25, 2014.

48. Oracle Wage and Hour Cases, Raghunandam Matam et al., v. Oracle Corporation, Superior Court of California, County of Alameda, No. RG-09480164, Deposition Testimony, October 21, 2014.

49. G. Taylor et al. v. Shippers Transport Express, Inc., et al., United States District Court, Central District of California, Case No.: CV13-02092-BRO (PLAx), Deposition Testimony on October 24, 2014.

50. Denise Mays et al. v. Children's Hospital of Los Angeles, Superior Court of California, County of Los Angeles, Case No. BC477830, Deposition Testimony on March 17, 2015.

51. Direct General Insurance Company v. Indian Harbor Insurance Company et al., United States District Court, Southern District of Florida, Miami Division, Case No. 14-20050-CIV-Cooke/Torres, Deposition Testimony on March 27, 2015.

52. Dennis Dickman v. Gerdau Reinforcing Steel, et al., Superior Court of California, County of San Bernardino, Case No. CIV-DS-1406231, Deposition Testimony on July 7, 2015.

53. Fred Devries, et al. v. Morgan Stanley & Co. LLC, et al., United States District Court, Southern District of Florida, Case No. 9:12-cv-81223-KAM, Deposition Testimony on July 31, 2015.

54. Dennis Dickman v. Gerdau Reinforcing Steel, et al., Superior Court of California, County of San Bernardino, Case No. CIV-DS-1406231, Deposition Testimony on September 11, 2015

55. Leah Davis, and Amy Krajec, et al. v. St. Jude Hospital, Superior Court of California, County of Orange, Case No. 30-2012-00602596-CU-OE-CXC, Deposition Testimony on January 19, 2016.

56. In re MyFord Touch Consumer Litigation, Whalen, et al. vs. Ford Motor Company, United States District Court Northern District of California San Francisco Division, Case No. 13-cv-3072-EMC, Deposition Testimony on February 23, 2016.



57. United States of America, ex rel. Glenda Martin v. Life Care Centers of America, Inc., United States District court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:08-CV-251 & United States of America, ex rel. Tammie Taylor v. Life Care Centers of America, Inc., United States District court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:12-CV-64, Deposition Testimony on March 4, 2016.

58. The United States of America and the State of Florida ex rel. Angela Ruckh v. CMC II LLC, United States District court for the Middle District of Florida Tampa Division, Civil Action No. 8:11 CV 1303 SDM-TBM, Deposition Testimony on March 16, 2016.

59. Bertha Sanchez, et al. v. St. Mary Medical Center, et al., Superior Court of the State of California for the County of San Bernardino, Case No. CIVDS 1304898, Deposition Testimony on July 13, 2016.

60. Christian Juarez, et al v. Dignity Health, a California corporation, et al., Superior Court of the State of California, County of Los Angeles, Central Civil West District, Case No. BC550950, Deposition Testimony on August 15, 2016.

61. In Re Dial Complete Marketing and Sales Practices Litigation, United States District Court, District of New Hampshire, Case No. 11-md-2263-SM (MDL Docket No. 2263), Deposition Testimony on August 30, 2016.

62. In Re: Myford Touch Consumer Litigation, United States District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC, Deposition Testimony on September 16, 2016.

63. United Healthcare Insurance Company v. Lincare Inc., Case Improvement Plus of Texas Insurance Company: Care Improvement Plus South Central Insurance Company: Care Improvement Plus of Maryland, Inc. v. Lincare Inc., In An Arbitration Before the American Arbitration Association, Case No. 01-15-0003-4095, Deposition Testimony on December 21, 2016.

64. The Moses H. Cone Memorial Hospital Operating Corporation d/b/a Cone Health v. Springfield Service Corporation d/b/a SPI Healthcare, United States District Court for the Middle District of North Carolina, Civil Action No. 1:13-cv-651, Deposition Testimony on January 17, 2017.

65. The People of the State of California, acting by and through Orange County District Attorney Tony Rackauckas v. General Motors LLC, Superior Court of the State of California in and for the County of Orange Complex Litigation Division, Case No. 30-2014-00731038-CU-BT-CX, Deposition Testimony on April 20 and 21, 2017.

66. In Re: Emerson Electric Co. Wet/Dry Vac Marketing And Sales Litigation, United States District Court for the Eastern District of Missouri, MDL No. 2382, Civil Action No. 4:12-md-2382-HEA, Deposition Testimony on May 17, 2017.

67. The People of the State of California, acting by and through Orange County District Attorney Tony Rackauckas v. General Motors LLC, Superior Court of the State of California in and for the County of Orange Complex Litigation Division, Case No. 30-2014-00731038-CU-BT-CX, Rebuttal Deposition Testimony on June 13, 2017.



68. Clayton Dezan, et al. v. Dignity Health, a California Corporation; Community Hospital of San Bernardino, et al, Superior Court of The State of California for the County of San Bernardino, Case No. CIVDS1516658, Deposition Testimony on August 22, 2017.

69. Millennium Health, LLC v. Blue Shield of California, Counterclaim, Blue Shields of California v. Millennium Health, LLC, American Arbitration Association, Case No. 01-15-0005-5926, Deposition Testimony on August 24, 2017.

70. Matthew Townsend, et al. v. Monster Beverage Corporation and Monster Energy Company, United States District Court Central District of California, Case No. 5:12-cv-02188 VAP (KKx), Deposition Testimony on September 20, 2017.

71. Welltower Inc., v. Scott M. Brinker, In the Court of Common Pleas Lucas County, Ohio, Case No. CI-17-2692, Deposition Testimony on October 4th, 2017.

72. In Re Seagate Technology LLC Litigation, United States District Court, Northern District of California San Jose Division, Case No. 5:16-cv00523-RMW, Deposition Testimony on December 12th, 2017.


## **Testimony**

1. State of Tennessee, ex rel., Douglas Sizemore, Petitioner vs. Xantus Healthplan of Tennessee, Inc., Chancery Court of Davidson County, Tennessee at Nashville, Case No 99-917-II, Trial Testimony, October 16, 2001.

2. State of Tennessee, ex rel., Douglas Sizemore, Petitioner vs. Xantus Healthplan of Tennessee, Inc., Chancery Court of Davidson County, Tennessee at Nashville, Case No 99-917-II, Rebuttal Testimony, October 26, 2001.

3. Howard Wright, Inc., a California corporation doing business as AppleOne Employment Services, Plaintiffs, vs. Olsen Staffing Services, Inc., a Delaware Corporation, Dagney Smith, an individual, Vicky Riechers, an individual, and Linda Shiftman, an individual, Defendants, Superior Court of the State of California for the County of Los Angeles, Case No. BC 200657, Trial Testimony, March 4, 2002.

4. Columbia/HCA Healthcare Corporation - Billing Practices Litigation, United States District Court, Middle District of Tennessee, Nashville Division, Case No. 3-98-MDL-1227 on June 28, 2002.

5. Sacred Heart Medical Center, et al., Plaintiffs v. Department of Social and Health Services, and Dennis Braddock, the Secretary of the Department of Social and Health Services, Defendants, Superior Court of the State of Washington in and for the County of Thurston, No. 00-2-01898-1, Testimony in Liability Trial, April 14, 2003.



6.   Diversified Property, a general partnership, Dora Saikhon Family Trust, and Nancy Saikhon Borrelli, an individual, Plaintiffs v. Manufacturers Life Insurance (U.S.A.), a Michigan corporation, erroneously sued as Manufacturers Life Insurance Company, Inc., Defendants in the Superior Court of California, County of San Diego, Case No.: GIC 815128, Trial Testimony on October 25, 2004.

7.   Bridgestone/Firestone North American Tire v. Sompo Japan Ins. Co. of America, United States District Court for the Middle District of Tennessee Nashville Division Civil Action NO. 3-02-1117, March 7, 2005

8.   Group Anesthesia Services, A Medical Group, Inc., Claimant, vs. American Medical Partners of North Carolina, Inc., etc., et al., Respondents, JAMS Arbitration, Reference No. 1100040919, Arbitration Testimony on March 23, 2005.

9.   Goldman et al. v. RadioShack Corporation, United States District Court, Eastern District of Pennsylvania, Case No. 03 CV 0032, Testimony in Liability Trial, on June 28 and 29, 2005.

10.  Goldman et al. v. RadioShack Corporation, United States District Court, Eastern District of Pennsylvania, Case No. 03 CV 0032, Rebuttal Testimony in Liability Trial, on July 5, 2005.

11.   Mauna Loa Vacation Ownership LLP v. Accelerated Assets, LLP. United States District Court, District of Arizona, Case No. CIV 03-0846 PCT DGC.  Trial Testimony, on February 22, 2006.

12.  School Districts' Alliance v. State of Washington, United States District Court, Eastern District of Thurston, Case No. 04-2-02000-7, Trial Testimony on November 13, 2006.

13.  In the Matter of Premier Medical Group, PC, Appellant – Department of Health and Human Services, Office of Medicare Hearings and Appeals, Southern Field Office, ALJ Appeal No. 1-221579701, Medicare Appeal No. 1-18761858, Provider No. 3706654, AR No. 9406352171039, Judge Zaring Robertson, US Administrative Law Judge, Testimony on April 1, 2008.

14.  Darensburg et al. v. Metropolitan Transportation Commission, U.S. District Court, Northern District of California, Case No. C-05-1597-EDL, Trial Testimony on October 9, 2008.

15.  R. Molina et al. v. Lexmark International, Inc., Superior Court of the State of California for the County of Los Angeles, Case No. BC339177, Trial Testimony on October 22 and 26, 2009.

16.  Dole Fresh Fruit International, Ltd, Hyundai Precision America, Inc., ADRS Case #05-1138-RTA, Trial Testimony on February 19, 2010.

17.  In the matter of University of Tennessee Cancer Institute, ALJ Appeal No. 1-446 575 318, Office of Medicare Hearings & Appeals, Judge Z. Robertson, US Administrative Law Judge, Testimony on April 20, 2010.

18.  Urga, et al. v. Redlands Community Hospital, Superior Court of the State of California, County of San Bernardino, Case No. SCVSS 123769, Trial Testimony on July 20, 2010.

19.  Marine Engineers' Beneficial Association v. Department of Transportation, Ferries Division Federal Mediation & Conciliation Service Cause No. 110105-52404-6 AGO Matter No. 10499471, July 19, 2011.



20. Richard Robinson v. County of Los Angeles, et. al., United States District Court of California, Central District, Case No. CV06-2409 GAF (VBKx), Trial Testimony on December 1, 2011.

21. In the matter of American Home Patient, ALJ Hearing, Appeal No. 1-982137828, Office of Medicare Hearings & Appeals,  Miami Office Southern Field Division, Testimony on October 29, 2012.

22. In the matter of American Home Patient, ALJ Hearing, Appeal No. 1-924297238, Office of Medicare Hearings & Appeals,  Irvine Office Western Field Division, Hearing Testimony on February 28, 2013.

23. TaylorMade Golf Company Challenge to Callaway Golf Company's Final Response, National Advertising Division, New York, Testimony on March 13, 2013.

24. United States of America, ex rel. Tammie Taylor v. Life Care Centers of America, Inc., United States District Court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:12-CV-64, Testimony on May 13, 2014.

25. United States of America v. Houshang Pavehzadeh, United States District Court for the Central District of California, No. CR 13-0320-R, Testimony on May 19, 2014.

26. Sherman Way Oil, Inc. (Bijan Pouldar), American Pacific Enterprises Group (Sherwin Louie), Bahman Kohanteb, Hamid Kalhor , Claimants, Vs. Circle K Stores, Inc., Respondent, Alternative Dispute Resolution Case No's 13-7103-DSC through 13-7106-DSC, Arbitration Testimony on October 10, 2014.

27. Heidi's Children Dental Center (DC14-0813-204-LM) vs. Denti-Cal, Testimony at Administrative Law Judge Hearing, Judge Lewis Munoz, in Los Angeles on November 5, 2014.

28. AdvanceMed Audit of Altercare of Wadsworth, Medicare Appeal, Medicare Appeal No. 1-912446681, Bertha Sanchez, et al. v. St. Mary Medical Center, et al., Superior Court of the State of California for the County of San Bernardino, Case No. CIVDS 1304898, Certification Hearing Testimony on October 21, 2016.

29. Michael Bozsik v. Livingston International Inc., Ontario Superior Court of Justice, Court File No. 5270/14, Cross Examination Testimony on May 12, 2016.

30. Bertha Sanchez, et al. v. St. Mary Medical Center, et al., Superior Court of the State of California for the County of San Bernardino, Case No. CIVDS 1304898, Certification Hearing Testimony on October 21, 2016.

31. In Re Dial complete Marketing and Sales Practice Litigation, United States District Court, District of New Hampshire, Case No. 11-md-2263-SM (MDL Docket No. 2263), Hearing Testimony on November 16, 2016.

32. United Healthcare Insurance Company v. Lincare Inc., Case Improvement Plus of Texas Insurance Company: Care Improvement Plus South Central Insurance Company: Care Improvement Plus of Maryland, Inc. v. Lincare Inc., In An Arbitration Before the American Arbitration Association, Case No. 01-15-0003-4095, Arbitration Testimony on February 6, 2017.



33. The United States of America and The State of Florida ex rel. Angela Ruckh v. CMC II, LLC, United States District Court for the Middle District of Florida Tampa Division, Civil Action No. 8:11 CV 1303 SDM-TBM, Trial Testimony on February 8, 2017.

34. Federal Government of Germany v. A Consortium of Publicly Traded Companies in an arbitration under the laws of Germany, Arbitration Testimony on March 21 and 22, 2017.

35. In Re Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III), United States Copyright Royalty Judges The Library of Congress Washington, D.C., Docket No. 16-CRB-0001-SR/PSSR (2018-2022), Trial Testimony on May 9, 2017.

36. ZPIC Audit Appeal of Providence Health System Southern California, Office of Medicare Hearings and Appeals, OMHA Appeal Number 1-1823418684, Hearing Testimony on October 16, 2017.


## Publications

Boedeker, Stefan and Goetz Trenkler (2001) - "A Comparison of the Ridge and Iteration Estimator" - in: Econometric Studies: A Festschrift in Honour of Joachim Frohn (ed. by Ralph Friedmann, Lothar Knueppel, and Helmut Luetkepohl), New Brunswick


## Professional and Business History

» Berkeley Research Group, 2010 - Present, Managing Director

» Resolution Economics, 2008 - 2010, Partner

» Alvarez & Marsal, 2007 - 2008, Managing Director

» LECG LLC, 2005 - 2007, Director

» Navigant Consulting Inc., 2004 -2005, Managing Director in Litigation and Investigation Practice

» Deloitte & Touche LLP, 2003 - 2004, Leader of the Economic and Statistical Consulting Practice in the West Region

» PricewaterhouseCoopers LLP, 2002 - 2003, Leader of the Litigation Consulting Group in Los Angeles, Leader of the Economic and Statistical Consulting Practice in the West Region

» Andersen LLP, 1992 - 2002, Partner (since 2000), last position held: Director of Economic and Statistical Consulting practice in the Pacific Region

» University of California, San Diego, 1989 - 1991, Teaching Assistant, Department of Economics

» German Government, 1986 - 1989, Economic Research Assistant

Exhibit B: Documents Reviewed and Relied Upon

- Weir Report
- Whitford Report
- Borth's Expert Report
- Borth-Chi-Square Test Report
- Bell & Howell - Master Sales – CONFIDENTIAL.xlsx
- CONFIDENTIAL - Bell & Howell - Price Premium Analysis.xlsx
- Exhibit 3 – CONFIDENTIAL.xlsx
- Bell & Howell.do
- Bell_&_Howell_Data_Dr. Leonard's.dta
- Bell_&_Howell_Data_Dr. Leonard's_Total.dta
- Bell_&_Howell_Data_Family Dollar.dta
- Bell_&_Howell_Data_Family Dollar_Total.dta
- Bell_&_Howell_Data_Harriet Carter.dta
- Bell_&_Howell_Data_Harriet Carter_CA.DTA
- Bell_&_Howell_Data_Harriet Carter_Total.dta
- Bell_&_Howell_Data_Harriet Carter_US.DTA
- Bell_&_Howell_Data_HSN.DTA
- Bell_&_Howell_Data_HSN_Total.dta
- Bell_&_Howell_Data_Walmart.dta
- Bell_&_Howell_Data_Walmart_Total.dta
- Pest Repeller Skus 06162017 REV
- BHH1
- BHH2
- BHH3
- BHH4
- BHH5
- BHH6
- BHH7
- Pest Repeller Reports  50111 – 50180
- Pest Repeller Reports - Summary Pages Revised 6-29-16 (2)
- Pest Repeller Reports - Summary Pages Revised 6-29-16
- Pest Repeller Reports - Summary Pages
- Pest Repeller Sales Summary - June 20, 2011 through June 15, 2016
- 50101 - EM Returns - 1-1-15 through 6-15-16
- 50102 - EM Returns - 1-1-15 through 6-15-16
- 50105 - EM Returns - 1-1-15 through 6-15-16
- 50105 - VA  Returns - 1-1-15 through 6-15-16
- 50108 - EM Returns - 1-1-15 through 6-15-16
- 50119 - EM Returns - 1-1-15 through 6-15-16
- 50123 - EM Returns - 1-1-15 through 6-15-16
- 50127 - EM Returns - 1-1-15 through 6-15-16

- 50129 - EM Returns - 1-1-15 through 6-15-16
- 50130 - EM Returns - 1-1-15 through 6-15-16
- 50131 - EM Returns - 1-1-15 through 6-15-16
- 50138 - EM Returns - 1-1-15 through 6-15-16
- 50141 - EM Returns - 1-1-15 through 6-15-16
- 50143 - EM Returns - 1-1-15 through 6-15-16
- 50145 - EM Returns - 1-1-15 through 6-15-16
- 50146 - EM Returns - 1-1-15 through 6-15-16
- 50150 - EM Returns - 1-1-15 through 6-15-16
- 50151 - EM Returns - 1-1-15 through 6-15-16
- 50153 - VA Returns - 1-1-15 through 6-15-16
- 50157 - EM Returns - 1-1-15 through 6-15-16
- 50159 - EM Returns - 1-1-15 through 6-15-16
- 50161 - EM Returns - 1-1-15 through 6-15-16
- 50161 - VA Returns - 1-1-15 through 6-15-16
- 50165 - EM Returns - 1-1-15 through 6-15-16 (2)
- 50167 - EM Returns - 1-1-15 through 6-15-16
- 50167 - VA Returns - 1-1-15 through 6-15-16
- 50181 - EM Returns - 1-1-15 through 6-15-16
- 50181 - VA Returns - 1-1-15 through 6-15-16
- 50184 - EM Returns - 1-1-15 through 6-15-16
- 50186 - EM Returns - 1-1-15 through 6-15-16
- 50191 - EM Returns - 1-1-15 through 6-15-16
- 50192 - EM Returns - 1-1-15 through 6-15-16
- 50196 - EM Returns - 1-1-15 through 6-15-16
- 50196 - VA Returns - 1-1-15 through 6-15-16
- 50197 - EM Returns - 1-1-15 through 6-15-16
- 50103 - VA Returns - 6-20-2011 through 12-31-11
- 50105 - VA Returns - 6-20-2011 through 12-31-11
- 50153 - EM Returns - 6-20-2011 through 12-31-11
- 50153 - VA Returns - 6-20-2011 through 12-31-11
- 50161 - EM Returns - 6-20-2011 through 12-31-11
- 50165 - EM Returns - 6-20-2011 through 12-31-11
- 50165 - VA Returns - 6-20-2011 through 12-31-11
- 50101 - EM Returns 2012 through 2014
- 50103 - EM Returns 2012 through 2014
- 50105 - EM Returns 2012 through 2014
- 50105 - VA Returns 2012 through 2014
- 50131 - EM Returns 2012 through 2014
- 50138 - EM Returns 2012 through 2014
- 50150 - EM Returns 2012 through 2014
- 50153 - EM Returns 2012 through 2014
- 50159 - EM Returns 2012 through 2014

- 50161 - EM Returns 2012 through 2014
- 50161 - VA Returns 2012 through 2014
- 50167 - EM Returns 2012 through 2014
- 50167 - VA Returns 2012 through 2014
- 50184 - EM Returns 2012 through 2014
- 50184 - VA Returns 2012 through 2014
- 50186 - EM Returns 2012 through 2014
- 50191 - EM Returns 2012 through 2014
- 50197 - EM Returns 2012 through 2014
- 50101 - EM Sales 1-1-15 through 6-15-16
- 50102 - EM Sales 1-1-15 through 6-15-16
- 50102 - VA Sales 1-1-15 through 6-15-16
- 50103 - EM Sales 1-1-15 through 6-15-16
- 50103 - VA Sales 1-1-15 through 6-15-16
- 50105 - EM Sales 1-1-15 through 6-15-16
- 50105 - VA Sales 1-1-15 through 6-15-16
- 50119 - EM Sales 1-1-15 through 6-15-16
- 50120 - EM Sales 1-1-15 through 6-15-16
- 50120 - VA Sales 1-1-15 through 6-15-16
- 50130 - EM Sales 1-1-15 through 6-15-16
- 50131 - EM Sales 1-1-15 through 6-15-16
- 50141 - EM Sales 1-1-15 through 6-15-16
- 50142 - EM Sales 1-1-15 through 6-15-16
- 50142 - VA Sales 1-1-15 through 6-15-16
- 50143 - EM Sales 1-1-15 through 6-15-16
- 50146 - EM Sales 1-1-15 through 6-15-16
- 50150 - EM Sales 1-1-15 through 6-15-16
- 50151 - EM Sales 1-1-15 through 6-15-16
- 50153 - EM Sales 1-1-15 through 6-15-16
- 50153 - VA Sales 1-1-15 through 6-15-16
- 50157 - EM Sales 1-1-15 through 6-15-16
- 50159 - EM Sales 1-1-15 through 6-15-16
- 50161 - EM Sales 1-1-15 through 6-15-16
- 50161 - VA Sales 1-1-15 through 6-15-16
- 50167 - EM Sales 1-1-15 through 6-15-16
- 50167 - VA Sales 1-1-15 through 6-15-16
- 50177 - EM Sales 1-1-15 through 6-15-16
- 50177 - VA Sales 1-1-15 through 6-15-16
- 50181 - EM Sales 1-1-15 through 6-15-16
- 50181 - VA Sales 1-1-15 through 6-15-16
- 50184 - EM Sales 1-1-15 through 6-15-16
- 50184 - VA Sales 1-1-15 through 6-15-16
- 50186 - EM Sales 1-1-15 through 6-15-16

- 50186 - VA Sales 1-1-15 through 6-15-16
- 50191 - EM Sales 1-1-15 through 6-15-16
- 50192 - EM Sales 1-1-15 through 6-15-16
- 50196 - EM Sales 1-1-15 through 6-15-16
- 50196 - VA Sales 1-1-15 through 6-15-16
- 50197 - EM Sales 1-1-15 through 6-15-16
- 50199 - EM Sales 1-1-15 through 6-15-16
- 50199 - VA Sales 1-1-15 through 6-15-16
- 50101 - EM Sales - 2012 through 2014
- 50102 - EM Sales - 2012 through 2014
- 50102 - VA Sales - 2012 through 2014
- 50103 - EM Sales - 2012 through 2014
- 50103 - VA Sales - 2012 through 2014
- 50105 - EM Sales - 2012 through 2014
- 50105 - VA Sales - 2012 through 2014
- 50108 - EM Sales - 2012 through 2014
- 50109 - EM Sales - 2012 through 2014
- 50120 - EM Sales - 2012 through 2014
- 50120 - VA Sales - 2012 through 2014
- 50123 - EM Sales - 2012 through 2014
- 50127 - EM Sales - 2012 through 2014
- 50129 - EM Sales - 2012 through 2014
- 50130 - EM Sales - 2012 through 2014
- 50131 - EM Sales - 2012 through 2014
- 50138 - EM Sales - 2012 through 2014
- 50141 - EM Sales - 2012 through 2014
- 50143 - EM Sales - 2012 through 2014
- 50144 - EM Sales - 2012 through 2014
- 50145 - EM Sales - 2012 through 2014
- 50146 - EM Sales - 2012 through 2014
- 50150 - EM Sales - 2012 through 2014
- 50151 - EM Sales - 2012 through 2014
- 50153 - EM Sales - 2012 through 2014
- 50153 - VA Sales - 2012 through 2014
- 50157 - EM Sales - 2012 through 2014
- 50159 - EM Sales - 2012 through 2014
- 50159 - VA Sales - 2012 through 2014
- 50161 - EM Sales - 2012 through 2014
- 50161 - VA Sales - 2012 through 2014
- 50165 - EM Sales - 2012 through 2014
- 50165 - VA Sales - 2012 through 2014
- 50167 - EM Sales - 2012 through 2014
- 50167 - VA Sales - 2012 through 2014

- 50177 - EM Sales - 2012 through 2014
- 50177 - VA Sales - 2012 through 2014
- 50181 - EM Sales - 2012 through 2014
- 50181 - VA Sales - 2012 through 2014
- 50184 - EM Sales - 2012 through 2014
- 50184 - VA Sales - 2012 through 2014
- 50186 - EM Sales - 2012 through 2014
- 50186 - VA Sales - 2012 through 2014
- 50191 - EM Sales - 2012 through 2014
- 50192 - EM Sales - 2012 through 2014
- 50196 - EM Sales - 2012 through 2014
- 50196 - VA Sales - 2012 through 2014
- 50197 - EM Sales - 2012 through 2014
- 50199 - EM Sales - 2012 through 2014
- 50199 - VA Sales - 2012 through 2014
- 50103 - VA 6-20-11 through 12-31-11
- 50105 - EM 6-20-11 through 12-31-11
- 50105 - VA 6-20-11 through 12-31-11
- 50153 - VA 6-20-11 through 12-31-11
- 50159 - EM 6-20-11 through 12-31-11
- 50159 - VA 6-20-11 through 12-31-11
- 50161 - EM 6-20-11 through 12-31-11
- 50161 - VA 6-20-11 through 12-31-11
- 50165 - EM 6-20-11 through 12-31-11
- 50165 - VA 6-20-11 through 12-31-11
- 50167 - EM 6-20-11 through 12-31-11
- 50167 - VA 6-20-11 through 12-31-11
- 50111 Returns
- 50111
- 50152 and 50155 (2)
- 50152 and 50155
- 50152 Sales - Jan through June 2016
- 50155 Sales - Jan through June 15 2016 (2)
- 50155 Sales - Jan through June 15 2016
- 50180 EM - 2012 – 2014
- 50180 EM - 2015-2016
- 50180 VA - 2012 – 2014
- 50180 VA - 2015-2016
- 50180 VA returns 2014
- 50192 - EM Returns 2012 through 2014 (2)
- 50192 - EM Returns 2012 through 2014
- Amended Complaint