UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ :
JOANNE HART and SANDRA BUENO, *on* :
*behalf of themselves and all others similarly* :     15cv4804
*situated,* :
                                     :     <u>OPINION & ORDER</u>
             Plaintiffs, :
                                             :
                 -against- :
                                             :
BHH, LLC d/b/a BELL + HOWELL, *et al.,* :
                                           :
             Defendants. :
------------------------------------------------ :

WILLIAM H. PAULEY III, Senior United States District Judge:

            Joanne Hart and Sandra Bueno ("Plaintiffs") bring this class-action lawsuit for

fraud, breach of warranty, and violations of the California Legal Remedies Act. Plaintiffs move

to preclude expert testimony from Dr. Paul Borth and Dr. Philip Whitford, repeller-efficacy

experts for Defendants BHH, LLC and Van Hauser, LLC ("BHH") (ECF No. 130). By separate

motion, BHH moves to preclude expert testimony from Dr. Michael F. Potter, Plaintiffs'

repeller-efficacy expert (ECF No. 138). Finally, Plaintiffs also move to preclude testimony from

Stefan Boedeker, BHH's rebuttal expert on damages (ECF No. 132). For the following reasons,

Plaintiffs' motions are granted in part and denied in part, and BHH's motion is denied.

<u>BACKGROUND</u>

            This class-action lawsuit involves ultrasonic pest repellers manufactured and

sold by BHH and purchased by Plaintiffs (the "Products"). Plaintiffs claim the Products are

ineffective and that BHH committed fraud and breached warranties. As such, both parties seek

to introduce expert testimony regarding the Products' efficacy.

I. Repeller-Efficacy Experts

While this Court analyzes the arguments in more detail below, it notes that these Daubert motions read like ships passing in the night. Both parties' experts opine on whether the Products were effective for "their stated purpose." But the parties disagree over that "stated purpose." Accordingly, each expert tested "effectiveness" in relation to his own characterization of the Products' purpose and came to opposite conclusions.

Plaintiffs posit that the Products are either completely ineffective or, at best, merely drive pests into cabinets and behind furniture. Thus, they believe the Products failed to live up to BHH's warranties. BHH counters that the Products are "effective" because they change pests' behavior. But the parties dueling interpretations of efficacy tests go to the weight, not admissibility, of the evidence. A jury will determine the Products' "stated purpose," and that decision will inform how much weight each type of test is given.

A. Defendants' Repeller-Efficacy Experts

The heart of Plaintiffs' argument is that Borth and Whitford relied on a series of efficacy tests conducted by BHH in China (the "Tests"), which Plaintiffs claim are unreliable. BHH conducted seven Tests, all with a similar design: various pests were able to choose between two rooms, one with a Product turned "on" and one with a Product turned "off." (See Decl. of Yitzchak Kopel in Supp. of Pls.' Mots. to Preclude the Expert Test. of Dr. Paul Borth and Dr. Philip Whitford and the Rebuttal Expert Test. of Stefan Boedeker, ECF No. 135 ("Kopel Decl."), Exs. 4, 5, 6, 18, 20, 22, & 23.) Two of the Tests were conducted in empty dorm rooms in which the pests could roam free, and five of the Tests were conducted using two Plexiglas chambers connected by a tunnel. (See Kopel Decl., Exs. 4, 5, 6, 18, 20, 22, & 23.) Each Test

included a pre- and post-test period, during which the Products were turned "off." (Kopel Decl., Exs. 4, 5, 6, 18, 20, 22, & 23.)

Borth relied on five of the Tests, in addition to another efficacy test to which Plaintiffs do not object, to conduct a "chi-square statistical test" on the Products' efficacy. (See ECF No. 156, Ex. 3 ("Borth Report") at 26.[1]) In essence, Borth combined the results of various efficacy tests to render his opinion that the Products worked. Plaintiffs argue that because the Tests themselves are unreliable, Borth's chi-square tests must also be unreliable. Borth also relies on a 1984 study published by James B. Ballard ("Ballard Study"). (Borth Report at 7–8.) Finally, Borth includes opinions on topics ranging from consumer understanding of Product packaging to consumer diligence in following Product instructions. (See, e.g., Borth Report at 7, 11.) The Borth Report offers 20 opinions in total. Ultimately, Plaintiffs seek exclusion of (1) Borth's opinions on Product efficacy because of his reliance on the Tests and the Ballard Study; (2) his opinions regarding consumer understanding; and (3) specific Opinions 2, 6, 7, 9, and 12 of the Borth Report.

Whitford relies on two of the Tests, as well as various academic studies on ultrasonic repellers. (See ECF No. 151, Ex. 17 ("Whitford Report").) Plaintiffs object to his opinions to the extent they are based on the Tests and a study he conducted on mice at his farmhouse using a non-BHH repeller (the "Home Study"). (See ECF No. 151, Ex. 17 ("Whitford Report"), at 2–3, 18–19, 39–49.) In the Home Study, Whitford set his repeller device "on" from August to December 2009 and "off" from August to December 2010, then counted the mice he captured, as well as their droppings, for each year. (See Whitford Report at 39.) He

---

[1] Any page references to the Borth Report are to ECF pages.

also set the repeller device "on" from November 2012 to November 2013. (See Whitford Report at 39.)

B. Plaintiffs' Repeller-Efficacy Expert

Potter offers the inverse—namely, that the Products were ineffective. Potter served as the "National Technical Director" of Orkin, "the world's largest pest control company," where he handled testing, evaluation, and selection of pesticides, traps, and devices for controlling insects and rodents. (Kopel Decl., Ex. 9 ("Potter Report") ¶ 6.) After leaving Orkin, and for the past 26 years, his time "has been spent solving insect and rodent problems" while serving as a professor at the University of Kentucky, and he has "authored publications on cockroaches, ants, spiders, rodents, and other household pests." (Potter Report ¶ 7.) Further, throughout his "career as a practicing urban entomologist . . . [he has] evaluated numerous devices, including electronic pest repellers for their effectiveness against insects and rodents." (Potter Report ¶ 7.)

His opinions in this matter are based on (1) "a series of experiments [using the Products] designed by [him] in collaboration with two of the top research labs that evaluate pest controls," (the "Experiments") (Potter Report ¶¶ 27–28), and (2) literature studying ultrasonic devices similar to the Products, (Potter Report ¶ 52 & Part IX).

Potter designed two sets of Experiments—one set on cockroaches, ants, and spiders, the other on mice. (Potter Report ¶ 27.) In each insect Experiment, two chambers made of plywood and Plexiglas were connected by a cardboard tube. (Potter Report ¶ 30.) For each type of insect, two pairs of connected chambers were set up—one pair containing Products and one without to serve as a control. (Potter Report ¶ 30.) Testers introduced cockroaches and ants to the chambers using various forms of harborage (places in a home where pests may hide, such

as furniture) because those types of insects typically take shelter in harborage.  (Potter Report ¶¶ 30–32.)  Spiders were not placed in harborage because they typically do not seek it.  (Potter Report ¶ 33.)  Before the Products were turned on, "both sides of each enclosure were provisioned with food."  (Potter Report ¶ 30.)

In the rodent Experiments, six vacant apartments were divided into two groups of three apartments, with one set serving as a control and the other set, which contained Products, serving as the "treatment."  (Potter Report ¶ 40.)  The apartments contained "front rooms" where the mice began, and "back rooms" to which mice could escape from the front room.  (Potter Report ¶ 44.)  For each "treated" apartment, two Products were plugged into wall sockets.  (Potter Report ¶ 43.)  Mice were released into the apartments, which were "modified to minimize escape of introduced mice," and included harborage.  (Potter Report ¶ 42.)  Moreover, Potter relied on various studies conducted on non-BHH ultrasonic repellers to form his opinions, similar to Borth's reliance on the Ballard Study and Whitford's reliance on his Home Study.

BHH argues that the Experiments were unreliable because Potter (1) used harborage; (2) counted pests that stayed within harborage as "repelled"; (3) provided the pests with food; (4) provided no way for the pests to completely escape their enclosures; (5) is not an expert on rodents; and (6) did not rely on the Products' instructions.  They also argue that the studies Potter cited were unreliable because they were old, tested non-BHH repellers, and set forth insufficient data to demonstrate whether their repellers emitted sound at the same frequency and amplitude as the Products.  BHH further argues that Potter "parrots" the results of the Experiments and studies, serving as Plaintiffs' mouthpiece.

II.  Defendants' Rebuttal Expert on Damages

In rebuttal to Plaintiffs' damages expert, Defendants offer Boedeker.  Plaintiffs argue that Boedeker's testimony should be precluded because Boedeker's (1) testimony exceeds the scope of rebuttal in that he opines on the effectiveness of Defendants' products; (2) opinions regarding the market value of the Products' ancillary features are not reliable because he used wholesale prices rather than retail prices; and (3) criticisms of Weir's average price calculation are unreliable because they are not based on sufficient data.  (See Pls.' Mem. of Law in Supp. of Their Mot. to Preclude the Rebuttal Expert Test. of Stefan Boedeker, ECF No. 133 ("Boedeker Mot."), at 1.)  Defendants counter that Boedeker stays within the scope of Weir's opinions and bases his opinions on reliable principles and methods.

In addition, Defendants argue that Plaintiffs offer two untimely expert reports written by Weir, both of which should be ignored.  However, "Defendants did not file a notice of cross motion; instead they seek that relief on the cover of their memorandum of law filed in opposition to [Plaintiffs'] motion. . . . [T]h[is type of] cross motion is procedurally improper and is denied on that basis and without regard to its merits."  Sbarra v. Port Auth. of N.Y. & N.J., 2011 WL 4344078, at *8 (S.D.N.Y. Sept. 9, 2011).  See Fed. R. Civ. P. 7(b) ("A request for a court order must be made by motion.");  TransAtlantic Lines LLC v. Amergent Techs, LLC, 2017 WL 78511, at *6 (S.D.N.Y. Jan. 6, 2017) (affirming magistrate judge's ruling to strike a memorandum of law requesting sanctions where there was no pending cross motion for sanctions);  Corr. Officers Benevolent Ass'n of Rockland Cty. V. Kralik, 2011 WL 1236135, at *1 n.2 (S.D.N.Y. Mar. 30, 2011) (declining to consider a "cross-motion" where plaintiffs requested relief via an opposition motion, without filing a notice of motion).

DISCUSSION

I.    Standard

Federal Rule of Evidence 702 governs the admissibility of expert and other

scientific or technical testimony:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue,
> a witness qualified as an expert by knowledge, skill, experience,
> training, or education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based upon sufficient facts or
> data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

In determining whether expert testimony is admissible, a court must assume a

gatekeeper function to determine whether "the expert's testimony both rests on a reliable

foundation and is relevant to the task at hand."  Daubert v. Merrell Dow Pharms., Inc., 509 U.S.

579, 597 (1993); accord Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 184 (2d Cir.

2001).  Although the Daubert analysis was initially developed to examine scientific testimony, it

applies with equal force to other types of expert testimony, including testimony from economists.

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999).  The proponent of expert testimony

must establish admissibility by a preponderance of the evidence.  Bourjaily v. United States, 483

U.S. 171, 175–76 (1987).  And this Court has broad discretion in determining whether to admit

expert testimony, including rebuttal testimony.  Amorgianos v. Nat'l R.R. Passenger Corp., 303

F.3d 256, 265 (2d Cir. 2002); United States v. Tejada, 956 F.2d 1256 (2d Cir. 1992).

"The Supreme Court has identified a number of factors that may be considered in

assessing reliability," but there is "not a definitive checklist or test, as the gatekeeping inquiry

must be tied to the facts of a particular case, and will necessarily vary from case to case."  In re

LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430, 467 (S.D.N.Y. 2018)

7

(quotation marks and citations omitted).  As such, a reliability analysis is "flexible," and "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination."  Restivo v. Hessemann, 846 F.3d 547, 576 (2d Cir. 2017) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141–42 (1999)).  Relevance, on the other hand, "can be expressed as a question of 'fit'—'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"  In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting Daubert, 509 U.S. at 591).

Further, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible."  Amorgianos, 303 F.3d at 267.  "This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules . . . ."  Amorgianos, 303 F.3d at 267.  Thus, "[a]s long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination— rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  Emamian v. Rockefeller Univ., 2017 WL 6804074, at *1 (S.D.N.Y. Dec. 20, 2017) (quotation marks omitted).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596. "[O]nly serious flaws in reasoning or methodology will warrant exclusion."  In re Fosamax, 645 F. Supp. 2d at 173.

II.   <u>Dr. Borth and Dr. Whitford</u>

A.  <u>The Tests</u>

The bulk of Plaintiffs' moving papers is dedicated to the Tests relied on by Borth and Whitford. Specifically, Plaintiffs argue that their opinions are inadmissible because they are founded on unreliable Tests. Plaintiffs raise a host of arguments concerning unreliability: (1) the Tests lacked experimental controls; (2) for the Tests using tunnels, pests found in the tunnels, rather than in chambers, were counted as repelled; (3) harborage was not used during the Tests; (4) multiple pests were kept in the same enclosures during the Tests; (5) the Tests failed to memorialize the species of pests used; (6) dead pests were replaced mid-test; and (7) the Tests were not replicated.[2] These arguments fail.

It is true that the "[f]ailure to test for alternative causes or to use control experiments may provide a basis for exclusion." <u>Astra Aktiebolag v. Andrx Pharm., Inc.</u>, 222 F. Supp. 2d 423, 488 (S.D.N.Y. 2002), <u>aff'd sub nom.</u> <u>In re Omeprazole Patent Litig.</u>, 84 F. App'x 76 (Fed. Cir. 2003). But the Tests had experimental controls. "[I]t is axiomatic that, when designing an experiment to test whether an observed result was caused by [a] given variable, the control or benchmark group must lack that variable." <u>Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.</u>, 2015 WL 539489, at *5 (S.D.N.Y. Feb. 10, 2015). The Tests did exactly that. During the pre- and post-tests, pests were left to roam for multiple days while the Products were turned off. (<u>See</u> Kopel Decl., Exs. 4–6, 18, 20, 22, 23.) "It is not required . . . that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible." <u>Astra Aktiebolag</u>, 222 F. Supp. 2d at 488. Whether the controls used in the Tests were as worthy as those used in the Experiments is for the jury to

---

[2] Plaintiffs concede that not every purported deficiency applies to each Test.

decide, but on a motion to exclude an expert this Court "should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." Amorgianos, 303 F.3d at 267 (internal citations and quotation marks omitted).

Plaintiffs' arguments regarding the method of counting pests and the use of harborage go to weight, not admissibility. See Amorgianos, 303 F.3d at 267. These were merely choices regarding the Tests' design and do not affect reliability. BHH's experts cannot testify that the Products were effective even if harborage were used, given that the Tests were run without harborage, but that is not what they seek to do. Rather, Borth and Whitford seek to testify that the Test results demonstrate the repellers affected the pests. On cross-examination, Plaintiffs are free to inquire about whether counting non-chambered pests inflated the Test results, or whether an empty room is a realistic test. But that does not mean the tests were unreliable—instead, they were "slight modification[s] of an otherwise reliable method." Amorgianos, 303 F.3d at 267.

Plaintiffs' arguments concerning cross-contamination of pests, memorialization of species, and the replacement of dead pests are not persuasive. See In re Fosamax, 645 F. Supp. 2d at 173. These alleged flaws are better addressed through the adversary process than by exclusion. See Amorgianos, 303 F.3d at 267.

Finally, Plaintiffs argue that the tests were not replicated by the testing companies or by BHH's experts. This argument also lacks merit. Replication falls under the first Daubert factor, which addresses whether a scientific methodology can be or has been tested. See Daubert, 509 U.S. at 593–94; Jarvis v. Ford Motor Co., 1999 WL 461813, at *4–5 (S.D.N.Y. July 6, 1999). Therefore, for Daubert purposes, replication means that experiments are capable of repetition, not that experts must repeat the same experiment again and again to demonstrate

reliability.  See LeFevre v. Sec'y, Dep't of Veterans Affairs, 66 F.3d 1191, 1194 (Fed. Cir. 1995)

("In evaluating any study for the purpose of making such [positive association] determinations,

the [tester] shall take into consideration whether the results are statistically significant, are

capable of replication, and withstand peer review."); Beyer v. Anchor Insulation Co., 238 F.

Supp. 3d 270, 281 (D. Conn. 2017) ("[A] study's results must be capable of replication.");

United States v. Norwood, 939 F. Supp. 1132, 1136 (D.N.J. 1996) (finding an expert reliable

where study was, among other things, "capable of replication and objective measurement").

Here, other than duplicating the precise species of pest used, the Tests are capable of replication.

In fact, BHH replicated the two types of Tests multiple times.  (See Kopel Decl. Exs. 4–6, 18,

20, 22, 23.)

      B.  Borth's Other Opinions

         1.  Ballard Study

      Plaintiffs contend the Ballard Study does not conclude that the Products are

effective, so Borth cannot use it to support such a conclusion.  However, the Ballard Study states

that cockroach "activity was increased by the active ultrasound-emitting device."  (See Kopel

Decl., Ex. 7 ("Ballard Study") at 1).)  And, as Plaintiffs concede, "Borth states that Ballard

(1984) found that cockroach 'activity was increased by the active ultrasound-emitting device.'"

(Mem. of Law in Supp. of Pls.' Mot. to Preclude the Expert Test. of Dr. Paul Borth and Dr.

Philip Whitford, ECF No. 131 ("Borth & Whitford Mot."), at 16 (citing Borth Report at 6–7).)

This is a proper use of the Ballard Study.  Further, Plaintiffs' argument that Borth ignores the

Ballard Study's statement that the importance of its observations is difficult to interpret is of no

moment.  That statement does not undermine the Ballard Study's reliability—it limits its

applicability.  (Borth & Whitford Mot. at 16.)  Plaintiffs are free to cross-examine Borth on

whether the results of the Ballard Study are as strong as he suggests. In other words, this, again, should be tested through the adversary process. See Emamian, 2017 WL 6804074, at *1.

2. Specific Opinions

Plaintiffs challenge five specific opinions in Borth's report—namely, Opinions 2, 6, 7, 9, and 12, as well as Borth's opinions regarding consumer understanding. Plaintiffs contend that these opinions are inadmissible factual interpretations or legal conclusions. This Court agrees.

"[E]xperts are not percipient witnesses. They are witnesses who, by virtue of specialized expertise, are able to provide opinions or information beyond the ken of the layperson. It is therefore inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's story." Scentsational Techs., LLC v. Pepsi, Inc., 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018) (quotation marks omitted). Though "[i]t is certainly the case that an expert may and often must rely on facts[,] . . . if the statements go beyond recitation of how a document is supportive of an opinion and are instead a characterization of the document for the purposes of having the fact finder accept that interpretation as fact, the expert goes too far." Scentsational Techs., 2018 WL 1889763, at *4; see United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) (quoting United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991)) ("Generally, the use of expert testimony is not permitted if it will 'usurp . . . the role of the jury in applying th[e] law to the facts before it.'").

The same holds true for legal conclusions—"the use of expert testimony is not permitted if it will usurp . . . the role of the trial judge in instructing the jury as to the applicable law." Duncan, 42 F.3d at 101 (quotation marks omitted). "When an expert undertakes to tell the

jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's. When this occurs, the expert acts outside of his limited role . . . . [As such,] this Court requires the exclusion of testimony which states a legal conclusion." Duncan, 42 F.3d at 101.

Borth's opinions regarding consumer understanding, as well as Opinions 2 (concerning whether the Products contained the same set of instructions), 6 (concerning whether BHH had the discretion to change its packaging), and Opinions 7, 9, and 12 (each of which concerns the operation of Hart and Bueno's minds) of the Borth Report are all excluded. See Scentsational Techs., 2018 WL 1889763, at *4; In re M/V MSC Flaminia, 2017 WL 3208598, at *18 (S.D.N.Y. July 28, 2017) ("An expert report may provide insight about specialized practices in an industry, but it must not substitute for the factfinder[']s owns findings, nor may it present opinions in the form of legal conclusions regarding the reasonableness or prudence of a defendant's actions, or the scope of a [party]'s knowledge."); Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 182 (S.D.N.Y. 2008) (excluding expert testimony where expert opined on a defendant's belief that the value of a security was "deeply discounted" because "[o]pining about a party's state of mind, as [the expert] does here, is impermissible"); In re Rezulin Prod. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."); Fed. R. Civ. P. 702 (allowing experts to impart only "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.").

C.  Whitford's Home Study

Plaintiffs argue that Whitford should be precluded from relying on his Home Study because it used different repellers than those at issue in this litigation and it lacked

adequate experimental controls.  (Borth & Whitford Mot. at 17–19.)  These arguments are unpersuasive.

First, experts may rely on analyses of similar technologies to the technology at issue in rendering their opinions.  See Zuchowicz v. United States, 140 F.3d 381, 385–86 (2d Cir. 1998) (affirming district court's admission of a medical expert who, in part, based his opinion regarding whether a drug caused plaintiff's disease on its similarities to those "of accepted cases of drug-induced" disease and on "cases involving classes of drugs that are known to cause other," similar diseases).  And any differences between repellers can be tested on cross-examination.  See Amorgianos, 303 F.3d at 267.  Ultimately, Whitford's analysis of a similar ultrasonic repeller "fit[s] . . . [with] the facts of the case."  In re Fosamax, 645 F. Supp. 2d at 173 (quotation marks omitted).

Second, the Home Study used experimental controls—Whitford turned the devices on during 2009 and off during 2010.  As discussed, "[i]t is not required . . . that an expert categorically exclude each and every possible alternative cause in order to render the proffered testimony admissible."  Astra Aktiebolag, 222 F. Supp. 2d at 488; see also In re Fosamax, 645 F. Supp. 2d at 173; Emamian, 2017 WL 6804074, at *1.

III.   Dr. Potter

BHH advances a smattering of purported deficiencies in Potter's testimony.  They fit into four categories: (1) the studies Potter relies on are unreliable; (2) Potter "parrots" the studies rather than offering his own opinions; (3) the Experiments are unreliable; and (4) Potter "parrots" the results of the Experiments.  None are persuasive.

A. The Studies

BHH dwells on Potter's reliance on articles discussing tests of ultrasonic devices similar to, but not manufactured by, BHH. (See Defs.' Mem. of Law in Supp. of Their Mot. to Preclude the Expert Test. of Pls.' Proffered Expert Witness, Michael F. Potter, ECF No. 142 ("Potter Mot."), at 5–10.) Such a challenge is puzzling considering both of BHH's efficacy experts rely on studies and tests of non-BHH repellers, and Borth relies on the Ballard Study. (See Borth Report at 6; Whitford Report at 2–3.) BHH cannot "have [its] cake and eat it too." (Defs.' Reply Mem. of Law in Supp. of Their Mot. to Preclude the Expert Test. of Pls.' Proffered Expert Witness, Michael F. Potter, ECF No. 158, at 10.)

It is proper for Potter to buttress his Experiments with studies demonstrating that repellers employing similar technology are also ineffective. See Zuchowicz, 140 F.3d at 385–86. BHH said it best: "Dr. [Potter] is simply using [these studies] as an example of ultrasound's effect on" pests. (Defs.' Resp. in Opp. to Pls.' Mot. to Preclude the Expert Test. of Dr. Paul Borth and Dr. Philip Whitford, ECF No. 145, at 12.) Ultimately, this issue goes to weight, not admissibility. See Amorgianos, 303 F.3d at 267.

B. The Experiments

BHH argues that the Experiments were unreliable because Potter (1) used harborage; (2) counted pests that stayed within harborage as "repelled"; (3) provided the pests with food; (4) provided the pests with no way to completely escape their enclosures; (5) is not an expert on rodents; and (6) did not rely on the Products' instructions. These arguments are meritless.

BHH's arguments regarding use of harborage, methods for counting pests as "repelled," use of food, and whether the pests could escape the enclosures fail because they go to

weight, not admissibility.  See Amorgianos, 303 F.3d at 267.  None of these alleged deficiencies undermine the science behind the Experiments.  Thus, they serve as points on which BHH is free to cross-examine Potter.

BHH's argument about Potter's qualifications on rodents is also unavailing. Potter served as National Technical Director of the world's largest pest control company, where he handled testing, evaluation, and selection of pesticides, traps, and devices for controlling rodents.  (Kopel Decl., Ex. 9 ("Potter Report") ¶ 6.)  He has since spent the last 26 years "solving insect and rodent problems" as a professor at the University of Kentucky, and he has authored publications on rodents.  (Potter Report ¶ 7.)  Further, he has spent his career "evaluat[ing] numerous devices, including electronic pest repellers for their effectiveness against insects and rodents."  (Potter Report ¶ 7.)

Finally, BHH contends that Plaintiffs failed to follow BHH's instructions when conducting the Experiments.  But this ignores the fact that the subject of this litigation is what a reasonable consumer would have understood those instructions to mean.  This Court will not exclude expert testimony because Plaintiffs did not conduct tests using BHH's interpretation of the instructions, rather than their own.  These interpretations will be tested by the adversary process.  See Emamian, 2017 WL 6804074, at *1.

C.  Parroting

BHH's final argument is that Potter "parrots" the results of the Experiments and studies he relies on.  Although BHH is correct that testifying experts may not parrot studies or act as conduits for consulting experts, it misapplies the principle.  Courts apply this doctrine when an expert is not qualified to interpret the "parroted" results.  "If an expert simply presents the findings and experts opinions of others, that expert must be independently qualified in the

subject. . . . [A]n expert may certainly present the findings and conclusions of those whose work he or she supervised and that he or she could personally replicate if necessary. But a proffered expert may not simply pass off as their own, or serve as a vehicle for presenting, the opinions of others in subjects on which the proffered expert is not personally qualified." In re M/V MSC Flaminia, 2017 WL 3208598, at *22. For instance, in Malletier v. Dooney & Bourke, Inc., the court excluded an expert's testimony where he relied solely on a consulting expert for statistical analysis, because he was "not qualified to conduct or interpret statistical analyses," and thus served as a "mouthpiece" for that consultant. Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 664–66.

Here, Potter designed the Experiments himself and applied those results to information gleaned from studies, consulting experts, and his prior experience to form his overall opinion. (Potter Report ¶¶ 27–28.) In other words, Potter based his opinions on his expertise, the Experiments, outside studies, and consulting experts. And even if he had not designed the Experiments, he is more than qualified to interpret their results. See Tomita Techs. USA, LLC v. Nintendo Co., 2013 WL 4101251, at *2 (S.D.N.Y. Aug. 14, 2013), aff'd, 594 F. App'x 657 (Fed. Cir. 2014) (holding that plaintiff's expert had not "parroted" a consulting expert, because the challenged expert "reviewed documentation . . . in addition to his own testing . . . and applied to that information his extensive experience"); Medisim Ltd. v. BestMed LLC, 861 F. Supp. 2d 158, 169 (S.D.N.Y. 2012) ("Where a testifying expert has expertise in the field covered by a consulting expert and independently verifies the latter's conclusions, there is no danger that the former is acting as a mere 'mouthpiece or conduit' of the latter."); see also In re M/V MSC Flaminia, 2017 WL 3208598, at *22 ("Therefore, to the extent that [the expert's] report simply repeats the findings of other experts and proffers them as his own despite his lack of

<u>qualifications in the relevant field</u>, the Court agrees those portions must be excluded." (emphasis added)).

IV.    <u>Boedeker</u>

      A.    <u>Scope of Rebuttal Testimony</u>

           Plaintiffs contend that Boedeker's testimony exceeds the scope of Weir's opinions by commenting on the effectiveness of Defendants' Products. They argue such testimony is improper because (1) Weir does not opine on the effectiveness of the Products, but rather assumes for his damages calculations that the Products were worthless; and (2) such testimony is outside of Boedeker's expertise. (<u>See</u> Boedeker Mot. at 2–7.) Defendants counter that Boedeker is not offering testimony on effectiveness. Rather, he seeks to rebut Weir by demonstrating that Weir's starting assumption of the Products' total worthlessness is incorrect. In essence, Defendants argue that Plaintiffs may not be able to prove complete worthlessness, and if they cannot, their damages model is incorrect. (<u>See</u> Defs.' Resp. in Opp. to Pls.' Mot. to Preclude, ECF No. 146 at 5–9.)

           Federal Rule of Civil Procedure 26 governs rebuttal experts and allows expert testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). "Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party." <u>Scott v. Chipotle Mexican Grill, Inc.</u>, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (quotation marks omitted). Thus, "[t]he scope of a rebuttal is limited to the same subject matter encompassed in the opposing party's expert report," and a "rebuttal expert report is not the proper place for presenting new legal arguments, unless presenting those arguments is substantially justified and causes no prejudice." <u>Scott</u>, 315 F.R.D. at 44. However, rebuttal experts may rely on new

methodologies "for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness." Park W. Radiology v. CareCore Nat'l LLC, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009). They also "may rely on facts or other data in evidence when constructing an expert report." Scott, 315 F.R.D. at 45. And, scope aside, rebuttal experts still must meet Daubert standards. Scott, 315 F.R.D. at 44.

Boedeker admits he is not an expert on the efficacy of ultrasonic repellers. (See Kopel Decl., Ex. 21, Boedeker Tr. 25:5–11.) Yet he still offers such opinions. (See, e.g., Kopel Decl., Ex. 26 ("Boedeker Report"), ¶¶ 23–38.) This is obviously improper—he cannot give expert testimony about a subject in which he lacks expertise. Plaintiffs need not argue scope to preclude these opinions. However, Boedeker also opines that, had Weir considered that a jury could find the Products were not completely worthless, his damages calculation would have been different. This is proper rebuttal because it offers a new methodology—one in which complete worthlessness is not assumed. See Park West, 675 F. Supp. 2d at 326. Such testimony thus falls within the scope of Weir's opinions. As such, Boedeker may rely on or invoke other experts' opinions regarding whether a product is effective, so long as he uses them to challenge Weir's damages methodology and not to show whether the Products were effective. Scott, 315 F.R.D. at 45 ("[A]n expert may rely on facts or other data in evidence when constructing an expert report.").

B. Sufficient Facts or Data

Plaintiffs' other grounds for preclusion stem from their belief that Boedeker's opinions are based on insufficient facts or data. First, Plaintiffs argue that Boedeker's opinions and hedonic regression analysis regarding the market value of the Products' ancillary features are not reliable because he used wholesale prices rather than retail prices. But Defendants explain

that Boedeker offers his hedonic regression analysis to demonstrate how the effectiveness of ancillary Product features could impact price—something he claims Weir failed to take into account. For instance, Boedeker posits, if a Product served as a nightlight and a repeller, it may still retain some value if the repeller feature failed but the nightlight feature did not. Simply put, Boedeker did not conduct the hedonic regression to prove that his version was correct. Rather, he conducted it to show that Weir should have made such a calculation. (Boedeker Report ¶ 60.) This is permissible because "the defendant has no burden to produce models or methods of their own; they need only attack those of the plaintiffs' experts." Scott, 315 F.R.D. at 44 (quotation marks omitted).

Second, Plaintiffs argue that Boedeker's criticisms of Weir's average price calculation are unreliable because Boedeker's calculations are not based on sufficient data. This is unpersuasive. Boedeker only included Products that contained sales pricing information in his calculations, rather than substituting an average price for Products without requisite inventory data. (Boedeker Report ¶¶ 21–22.) In other words, he offers a new methodology for the average price calculation, which is permissible. See Park W., 675 F. Supp. 2d at 326. Plaintiffs' disagreement with that decision does not give rise to the preclusion of Boedeker's testimony. Boedeker's "slight modification of an otherwise reliable method . . . will not render [his] opinion per se inadmissible." Amorgianos, 303 F.3d at 267. "[I]t should be tested by the adversary process," not precluded. Emamian, 2017 WL 6804074, at *1.

CONCLUSION

For the foregoing reasons, Plaintiffs' motion seeking to exclude Borth and Whitford's expert testimony (ECF No. 130) is granted in part and denied in part. Opinions 2, 6, 7, 9, and 12 of the Borth Report, as well as Borth's opinions regarding consumer understanding,

are excluded at trial.  Plaintiffs' motion seeking to exclude Boedeker's expert testimony (ECF No. 132) is granted in part and denied in part.  Boedeker's opinions regarding whether the Products were effective is excluded at trial.  Boedeker may, however, discuss Product effectiveness consistent with this Opinion & Order.  BHH's motion seeking to exclude Potter's expert testimony (ECF No. 138) is denied.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 130, 132, and 138.

Dated: July 19, 2018
     New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.